# EXHIBIT E



WEBSTER L. GOLDEN
WINTON A. WINTER, JR.
SHERRI E. LOVELAND
MOLLY M. WOOD
CHRISTOPHER F. BURGER*
WESLEY F. SMITH
BRADLEY R. FINKELDEI
MATTHEW H. HOY*
LESLIE M. MILLER
EMILY A. DONALDSON, CELA◦
REBECCA J. WEMPE
PATRICIA E. HAMILTON*
JEFFREY L. HEIMAN
KANA R. ROLLER*
SCOTT E. TADDIKEN, PA
DENISE L. McNABB*

\* Admitted in Kansas and Missouri
◦ Admitted in Kansas and Virginia
▫ Certified elder law attorney
⁺ Of Counsel

**STEVENS & BRAND**
Attorneys at Law

US Bank Tower
900 Massachusetts, Suite 500
Post Office Box 189
Lawrence, Kansas 66044-0189
Phone: (785) 843-0811 / Fax: (785) 843-0341

June 17, 2024

J. ERIC WESLANDER*
AMY L. DURKIN
RICHARD S. SCHOENFELD*
KATE MARPLES SIMPSON*
WHITNEY L. CASEMENT
ANN J. PREMER◦
JEAN B. MÉNAGER*
PEYTON N. WEATHERBIE
MACK W. CURRY, III
THOMAS D. HANEY⁺
STANTON A. HAZLETT⁺
C. DAVID NEWBERY⁺
BERNARD J. (B.J.) HICKERT⁺
JAMES (JAY) NEWBERY⁺
PETER K. CURRAN, Retired

Richard B. Stevens (1899-1991)
John W. Brand (1907-1971)
John W. Brand, Jr. (1932-2015)
Evan H. Ice (1963-2016)

Mark P. Johnson
Dentons US LLP
4520 Main Street, Suite 1100
Kansas City, MO 64111-7700

**Re: Response to Demand to Cease and Desist Operation of Gaggle**

Dear Mark,

On May 31, you wrote on behalf of four clients who were members of the Unified School District No. 497 ("District") student press during the 2023-24 academic year. However, your letter did not acknowledge that in early April, your clients, along with 160 other high school journalism students at Lawrence High School and Lawrence Free State High School, were exempted from Gaggle's monitoring services on their District-issued devices. The District took this action after it met with students, heard their concerns, and sought a compromise that balanced the District's unparalleled duty to protect student safety with the distinct needs of student journalists. At this time, the District intends to continue using Gaggle's services (while maintaining its pre-existing exemption of student journalists) to ensure the District does everything in its power to protect students from harm—whether from themselves or someone else.

Moreover, the District is statutorily required under both state and federal law to monitor students' District-issued devices to ensure they are not used to access or produce harmful content. Under the Children's Internet Protection Act, districts must prevent students from using district-owned technology to access obscene and harmful content and must enforce those restrictions any time minors use their devices. 20 U.S.C. §7131. The Kansas Internet Protection Act imposes a similar responsibility. *See* K.S.A. 75-2589. Likewise, pursuant to K.S.A. 72-6147, Kansas boards of education are required to implement policies to prevent bullying, including cyberbullying, "on *or while utilizing* school property." (emphasis added).

Although, for the reasons set forth below, the District believes Gaggle's services are constitutional as they are presently used, the District remains willing to sit down with you, and/or concerned students, listen to their ideas, and seek solutions that prioritize student wellbeing and safety.

## 1. First Amendment

Under the First Amendment to the United States Constitution, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend I. In the Supreme Court's landmark *Tinker* decision, the Court made clear that students retain their First Amendment rights whenever they are at school, but those rights are affected by state and school officials' authority "to prescribe and control conduct in the schools." *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 506-07 (1969). Schools may regulate otherwise-protected speech when it would (1) intrude on others' rights or (2) "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *Id.* at 513.

The District is confident that its use of Gaggle would satisfy a *Tinker* test because Gaggle, itself, does not impose consequences; those are administered by the District on a case-by-case basis. The District uses Gaggle to identify student speech indicating that a student might need help; often, that does not call for a punitive response at all. Where the District must take adverse action, it is because the speech *does* intrude on others' rights and/or substantially interfere with school operations. Therefore, its restrictions accord with *Tinker*. Put another way, Gaggle is just a tool for observing speech that would necessitate a school's response if it happened in-person, in front of a teacher; the restrictions on speech monitored by Gaggle are no less predictable than any other restrictions the District imposes on students for the sake of safety and order in schools.

A "prior restraint" occurs when a restriction "chills" speech before it happens. *Brammer-Hoelter v. Twin Peaks Charter Academy*, 602 F.3d 1175, 1182 (10th Cir. Ct. App. 2010). However, this requires more than a "mere allegation" that speech was subjectively chilled; to be legally cognizable, a plaintiff must establish their restraint was based on an "objectively justified fear of real consequences." *Id.* at 1182, quoting *Initiative & Referendum Institute v. Walker*, 450 F.3d 1082, 1088 (10th Cir. 2006).

According to the demand letter, "[t]he District is chilling constitutionally protected expression because students are unclear as to Gaggle's guidelines regarding what content will be searched, seized, and subject to investigation." This assertion is not particularized enough to evince what sort of speech the District has allegedly chilled or to substantiate an "objectively justified fear of real consequences" as contemplated by *Brammer-Hoelter*. See 602 F.3d at 1182. Again, using Gaggle to *monitor* speech is not, itself, a regulation. This would be a significant hurdle for standing. Other standing-related problems stem from the fact student journalists' devices have not been monitored by Gaggle since April and the fact that each of the students

named in the demand letter have graduated, thus, they are no longer subject to the regulations for which they allege constitutional violations.

That being said, the District is investigating providing additional information to the student population to reduce any confusion about Gaggle and its use in the District. Currently the District uses https://www.usd497.org/Page/16711 to provide information, but is open to your and your clients' suggestions on how to provide more clear information. Furthermore, the District will look to update its Acceptable Use Policy to more clearly identify the use of Gaggle. Finally, the District is investigating the use of "pop-up" windows that will let students know that Gaggle is in use and where to obtain additional information if they have questions. We invite you and your clients feedback on these possibilities and any additional suggestions they may have.

## 2. Fourth Amendment

The Fourth Amendment to the U.S. Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment's protections against unreasonable searches and seizures apply to searches of students by public school officials. *New Jersey v. T.L.O.*, 469 U.S. 325, 333 (1985). In the public school setting, determining whether a search or seizure is "reasonable" requires considering (1) the "scope of the legitimate expectation of privacy at issue," (2) the "character of the intrusion," and (3) the "nature and immediacy of the government concern at issue" along with the "efficacy of the means" to address it. *Vernonia School Dist. 47J v. Acton*, 515 U.S. 658-660 (1995). A student's "legitimate expectation of privacy" whenever they are at school is lower than whatever the same student might expect at home or, certainly, what a non-student adult could reasonably expect. *Id.* at 656-67.

The Fourth Amendment does not require individualized suspicion to justify a search. *Id.* at 653-54. Safety is such a compelling government interest that it "needs little verification by this point," and could even justify "qualitatively severe" suspicionless intrusions. *Interest of L.E.*, 589 S.W.3d 593, 602-03 (Mo. Ct. App. 2019) (finding mandatory hand-searches of students' bags when entering school constitutional); see also *Boim v. Fulton Cnty. Sch. Dist.*, 494 F.3d 978, 984 (11th Cir. Ct. App. 2007) ("Thus, in this climate of increasing school violence and government oversight, and in light of schools' undisputably compelling interest in acting quickly to prevent violence on school property . . . it is imperative that school officials have the discretion and authority to deal with incidents like the one they faced . . ."), and *Milligan v. City of Slidell*, 226 F.3d 652, 655 (5th Cir. Ct. App. 2000) ("In this case, the school sought to protect its students, to foster self-discipline and to deter possibly violent misconduct. These are compelling governmental interests"). Likewise, compliance with the Children's Internet Protection Act and the Kansas Internet Protection Act also manifests a compelling governmental interests.

Without violating anyone's constitutional rights, students are frequently subject to other types of "searches." For instance, all students may be required to enter school through a metal detector to determine whether a more intrusive search of their person is necessary. Schools often use drug-sniffing dogs to identify lockers or bags that are likely to contain illegal drugs. *Zamora v. Pomeroy*, 639 F.2d 662, 670-71 (10th Cir. Ct. App. 1981). In *Zamora*, which is cited in the

demand letter, the Tenth Circuit found there "is no merit in the contention that a school locker is the property of the student who occupies it pro tem;" therefore, it is subject to a school's duty to ensure it is not used to break the law. *Id.* at 670-71. For the purposes of the Fourth Amendment, using drug-sniffing dogs to sniff the exterior of students' lockers does not even constitute a "search." Restatement - Children and the Law § 10.20(g).

As such, the District's use of Gaggle's services is likely not even a "search." It is like a situation in which a drug-sniffing dog smells a student's locker to determine whether it contains drugs, and, if it alerts, it forms individualized suspicion as to that particular locker. Similarly, Gaggle uses machine learning technology to scan for self-destructive or violent terms and, when it flags them, refers the data to a human who takes a closer look.[1] However, even if Gaggle's automated flagging service does constitute a search, it is justified. A district-issued device, like a district-assigned locker, is not the student's property just because the student "occupies it pro tem." See *Zamora*, 639 F.2d at 670-71. A student's reasonable expectation of privacy on a district-issued device is lower than their expectation of privacy on a personal device, and district-issued devices are subject to an Acceptable Use Policy (AUP) that students are expected to sign.[2] That policy informs students that District devices use "filtering services" and that students should "[e]xpect any device to be regularly inspected for inappropriate material."[3]

Given these facts, the District is confident its practices would be upheld under a *Vernonia* test because (1) students do not have a reasonable expectation of privacy on school issues devices and programs; (2) the character of the intrusion is unintrusive as to student data for which there is not reasonable concern forming the basis for closer investigation, and (3) the nature of the concern at issue—student safety—is paramount. Finally, Gaggle's efficacy is clear; since October 2023, the system has detected hundreds of files containing questionable or potentially dangerous content, including several dozen in which student-created data indicated an imminent threat of suicide or violence to another person.[4] Incidents stemming from Gaggle-detected content resulted in at least four dozen contacts to parents or guardians, law enforcement, or outside agencies.[5] It is the District's data-driven belief that Gaggle has saved students' lives in Lawrence Public Schools; the District is prepared to share its Safety Audit data with you to substantiate this claim.

Claims as to Gaggle's legality under the Kansas Student Publications Act or Kansas shield laws are inapplicable in light of the District exempting student journalists from monitoring. The demand letter's passing reference to possible Fourteenth Amendment violations is underdeveloped, but surely inapplicable given the nature of the monitoring at hand—Gaggle does not impose consequences and disciplinary procedures remain in the District's hands as they would for any other case of school-related discipline. If that is not the issue the demand letter alludes to, clarification of this matter would certainly be appreciated.

---

[1] Gaggle, *Gaggle Safety Management* (June 14, 2024, 4:08 PM), https://www.gaggle.net/safety-management.
[2] District Student Acceptable Use Policy (AUP).
[3] *Id.*
[4] Gaggle Safety Audit (June 13, 2024).
[5] *Id.*

In conclusion, the District would like to reiterate its willingness to continue conversations around students' rights and safety in Lawrence Public schools. In doing so, the District will remain unconditionally focused on students' safety and wellbeing, as well as its clear obligations under both federal and state law—obligations underlying its decision to use Gaggle's services in the first place. We look forward to your response.

Very truly yours,
STEVENS & BRAND, LLP

Bradley R. Finkeldei
bfinkeldei@stevensbrand.com

cc: Dr. Anthony Lewis

Lawrence
900 Massachusetts, Suite 500

WWW.STEVENSBRAND.COM

Topeka
4848 S.W. 21st Street, Suite 201