# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

JACK TELL; NATASHA TORKZABAN; )
MORGAN SALISBURY; OPAL MORRIS; )
HENRY FARTHING; SUZANA )
KENNEDY; NAOMI SUI PANG; A.T., a )
minor, by and through her parents DAVE )
TELL and HANNAH TELL; and P.M., a )
minor, by and through her parents )
MARGARET WEISBROD MORRIS and ) Case No.: 2:25-cv-02428-KHV-GEB
JONATHAN MORRIS, )
) Hon. Kathryn H. Vratil
*Plaintiffs*, )
)
v. )
)
LAWRENCE BOARD OF EDUCATION, a )
political subdivision of the State of Kansas; )
LAWRENCE USD 497, a political )
subdivision of the State of Kansas; and )
GREG FARLEY, in his individual capacity, )
)
*Defendants*. )
)

## DECLARATION OF A.T. IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

I, A.T., pursuant to 28 U.S.C. § 1746 hereby declare as follows:

1. I am a minor and the editor-in-chief of *The Budget*, the student newspaper at Lawrence High School ("LHS"). I am of sound mind, and otherwise competent to make this Declaration. The evidence set out in the foregoing Declaration is based on my personal knowledge.

2. On the morning of August 14, 2025, my journalism adviser, Abbi Epperson-Ladd, told me that prior to the start of the 2025-2026 academic year, LHS Principal Quentin Rials issued a directive that neither *The Budget* nor its student reporters may report on this lawsuit or Gaggle-related issues, and that Principal Rials directed her to consult the District's lawyer. After Principal Rials issued that directive, a person Ms. Epperson-Ladd understood to be a District administrator

reiterated to her by telephone that neither *The Budget* nor its student reporters may report on this lawsuit or Gaggle-related issues.

3. When I told Ms. Epperson-Ladd that *The Budget* intended to report on the lawsuit and related issues with Gaggle, she directed me not to report because "the District told me 'no,' and I don't want to go against that."

4. That same morning, I asked to meet with Principal Rials to verify the prior restraint and to request the name of the District's attorney. His secretary directed me to Assistant Principal Mike Gillman.

5. Assistant Principal Gillman told me that he could not discuss anything related to the lawsuit or Gaggle reporting and doubted that Principal Rials would do so either.

6. I then overheard Principal Rials's secretary inform him of the nature of my meeting request. Principal Rials declined to meet with me.

7. That evening, August 14, 2025, I drafted an initial story about the lawsuit and Gaggle that I intended to publish the next day.

8. On August 15, 2025, when I arrived for journalism class, Ms. Epperson-Ladd told me that she had unilaterally set a meeting for me with a teachers' union representative. She said the purpose of the meeting was "to suggest other options besides publishing" and to "offer some other courses of action, like reaching out to other reporters," and that she wanted me to "hear out the representative" before publishing.

9. Ms. Epperson-Ladd appeared visibly worried. She said she was "very concerned," that she had already been called for a meeting with administration, and that she wanted to be careful. I understood this to mean that administrators were pressuring her to stop my story or she could face adverse consequences. As a result, my speech and reporting were, and remain, chilled.

10. After speaking with Ms. Epperson-Ladd, I met with teacher Jeff Plinsky, who identified himself as representing the teachers' union. Mr. Plinsky told me that I have "constitutional rights to do what you want to do," but urged me to "keep in mind that a young teacher with no due process protections, what that means is that they could fire her tomorrow for no reason," explaining that "for the first three years of a teacher's contract, they do not have to give a reason to fire a teacher."

11. I asked whether Ms. Epperson-Ladd is protected by K.S.A. 72-7209 *et seq*. Mr. Plinsky responded that while she is protected by statute, "that just means they can't say that they are firing her for these press problems…they can just say we're firing her because we don't like her."

12. I understood from this interaction that the District is threatening to terminate Ms. Epperson-Ladd's employment because of my reporting, using a pretext to justify any adverse action.

13. Mr. Plinsky further stated, in substance, that Ms. Epperson-Ladd "is in a really tough place," that he feared the District could "fire her, not replace her, and let *The Budget* die," and that "her being able to find a job after that is pretty tough."

14. Mr. Plinsky suggested that I send my materials to a reporter at the *Lawrence Times* so that Ms. Epperson-Ladd could tell administration, "I have done what the admin has asked me to do."

15. Mr. Plinsky acknowledged that the administration had rescinded the directive against publication the day before but said he remained concerned for Ms. Epperson-Ladd's continued employment.

3

16. Mr. Plinsky warned that administrators might say to Ms. Epperson-Ladd, "if you can't control your editors, we want you out of the building," and told me to "understand there are consequences to other people's lives" if I exercised my rights.

17. I left the interaction upset and felt that my right to publish was chilled.

18. Although it appears Principal Rials's directive was rescinded, its practical effect persists. I am being pressured that, if the story runs, I will be responsible for Ms. Epperson-Ladd's termination.

19. No administrator has identified to me any libel, obscenity, incitement, promotion of criminal or suspension/expulsion-level conduct, or any content-linked reasonable forecast of a material and substantial disruption tied to my proposed reporting.

20. As a direct and proximate result of the District's original no-reporting directive and the subsequent pressure described above, my reporting and publication about the lawsuit were halted and remain chilled.

21. I face an untenable choice: remain silent to protect my adviser's employment or exercise my right to publish and risk being blamed for her termination.

22. The prior restraint and related pressure have chilled my editorial judgment and *The Budget* staff's newsgathering and publishing decisions on a matter of public concern.

23. Despite the District's assurances, absent court relief I and similarly situated student journalists do and feel restrained from publishing further coverage of the lawsuit. Because of these pressures, I have not published, and do not intend to publish, the story I have written about the lawsuit.

*(Signature on following page)*

I declare under penalty of perjury that the foregoing is true and correct.

Further Declarant Sayeth Naught.

Executed on August 15, 2025, at Lawrence, Kansas.

                                                                _____
                                                                                              A.T.