# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JACK TELL, NATASHA TORKZABAN,　　　 )
MORGAN SALISBURY, OPAL MORRIS,　　 )
HENRY FARTHING, SUZANA KENNEDY,　 )
NAOMI SUI PANG, ASHLYN TELL, and　 )
P.M., a minor, by and through　　　　 )
her parents MARGARET WEISBROD　　 )
MORRIS and JOHNATHAN MORRIS,　　 )
　　　　　　　　　　　　　　　　　 )
　　　　　　　　　Plaintiffs,　　　　 )　　　CIVIL ACTION
　　　　　　　　　　　　　　　　　 )
v.　　　　　　　　　　　　　　　　 )　　　No. 25-2428-KHV
　　　　　　　　　　　　　　　　　 )
LAWRENCE BOARD OF EDUCATION, a　 )
political subdivision of the State of Kansas,　 )
LAWRENCE USD 497, a political subdivision　 )
of the State of Kansas, GREG FARLEY, in his　 )
individual capacity, and QUENTIN RIALS, in　 )
his individual capacity,　　　　　　　 )
　　　　　　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　 )
　　　　　　　　　Defendants.　　　 )
　　　　　　　　　　　　　　　　　 )

## MEMORANDUM AND ORDER

On November 17, 2025, Jack Tell, Natasha Torkzaban, Morgan Salisbury, Opal Morris, Henry Farthing, Suzana Kennedy, Naomi Sui Pang, Ashlyn Tell and P.M by and through her parents Margaret Weisbrod Morris and Johnathan Morris filed their first amended complaint against Greg Farley, Lawrence Board of Education, Lawrence Unified School District 497 and Quentin Rials. Plaintiffs allege violation of the First Amendment, Fourth Amendment and Fourteenth Amendment, First Amendment retaliation and violation of the Kansas Open Records Act ("KORA"), K.S.A. § 45-215 et seq. This matter is before the Court on Defendants' Motion To Partially Dismiss Plaintiffs' First Amended Complaint (Doc. #34) filed December 19, 2025 and Plaintiffs Ashlyn Tell And P.M.'s Motion For Partial Judgment On The Pleadings On KORA

Violations And For Declaratory And Compliance Order (Doc. #41) filed January 20, 2026.[1]  For

reasons stated below, the Court sustains defendants' motion in part and plaintiffs' motion in full.

## Legal Standards

Defendants seek to partially dismiss plaintiff's complaint under Rules 12(b)(1) and

12(b)(6) of the Federal Rules of Civil Procedure.

Plaintiffs seek partial judgment on the pleadings under Rule 12(c) of the Federal Rules of

Civil Procedure.  The Court reviews a Rule 12(c) motion under the same standard that governs a

Rule 12(b)(6) motion.  Ward v. Utah, 321 F.3d 1263, 1266 (10th Cir. 2003).

## I.    Rule 12(b)(1)—Subject Matter Jurisdiction

Federal courts are courts of limited jurisdiction.  Marcus v. Kan. Dep't of Revenue, 170

F.3d 1305, 1309 (10th Cir. 1999).  Therefore, the law imposes a presumption against jurisdiction.

Basso v. Utah Power & Light Co., 495 F.2d 906, 909 (10th Cir. 1974).  The Court may exercise

jurisdiction only when specifically authorized to do so, see Castaneda v. INS, 23 F.3d 1576, 1580

(10th Cir. 1994), and must dismiss a claim if it becomes apparent at any stage of the proceedings

that it lacks jurisdiction.  Basso, 495 F.2d at 909; Fed. R. Civ. P. 12(h)(3).  Plaintiffs bear the

burden of showing that jurisdiction is proper and must demonstrate that the case should not be

dismissed.  See Basso, 495 F.2d at 909.  Conclusory allegations of jurisdiction are not enough.

United States v. Spectrum Emergency Care, Inc., 190 F.3d 1156, 1160 (10th Cir. 1999).

Rule 12(b)(1) motions generally take the form of facial attacks on the complaint or factual

attacks on the accuracy of its allegations.  Laufer v. Looper, 22 F.4th 871, 875 (10th Cir. 2022).

---

[1]    Plaintiffs request that the Court set these motions for oral argument.  See Plaintiffs' Request For In-Person Oral Argument On Defendants' Motion To Partially Dismiss And Plaintiffs' Motion For Partial Judgment On The Pleadings (Doc. #45) filed February 25, 2026. Because oral argument would not materially assist the Court, it declines to do so.

A facial attack assumes that the allegations in the complaint are true and argues that they fail to establish jurisdiction.  Baker v. USD 229 Blue Valley, 979 F.3d 866, 872 (10th Cir. 2020).  A factual attack goes beyond the allegations in the complaint and adduces evidence to contest jurisdiction.  Id.  On a factual attack to subject matter jurisdiction, the Court may refer to evidence outside the pleadings.  Fed. R. Civ. P. 12(b)(1).

**II.    Rule 12(b)(6)—Failure To State A Claim; Rule 12(c)—Judgment On The Pleadings**

As mentioned above, a motion for judgment on the pleadings under Rule 12(c) is governed by the same standards as a motion to dismiss under Rule 12(b)(6).  See Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1160 (10th Cir. 2000).  In ruling on a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court assumes as true all well-pleaded factual allegations and determines whether they plausibly give rise to an entitlement to relief.  Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim which is plausible—and not merely conceivable—on its face.  Id. at 679–80; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  In determining whether a complaint states a plausible claim for relief, the Court draws on its judicial experience and common sense.  Iqbal, 556 U.S. at 679.

The Court need not accept as true those allegations which state only legal conclusions.  See id.; United States v. Herring, 935 F.3d 1102, 1110 (10th Cir. 2019).  Plaintiffs bear the burden of framing their claims with enough factual matter to suggest that they are entitled to relief; it is not enough to make threadbare recitals of a cause of action accompanied by conclusory statements.  See Twombly, 550 U.S. at 556.  Plaintiffs make a facially plausible claim by pleading factual content from which the Court can reasonably infer that defendants are liable for the alleged misconduct.  Iqbal, 556 U.S. at 678.  Plaintiffs must show more than a sheer possibility that

defendants have acted unlawfully—it is not enough to plead facts that are "merely consistent" with defendants' liability.  Id. (quoting Twombly, 550 U.S. at 557).  A pleading which offers labels and conclusions, a formulaic recitation of the elements of a cause of action or naked assertions devoid of further factual enhancement will not stand.  Id.  Similarly, where the well-pleaded facts do not permit the Court to infer more than mere possibility of misconduct, the pleading has alleged—but has not "shown"—that the pleaders are entitled to relief.  Id. at 679.  The degree of specificity necessary to establish plausibility and fair notice depends on context, because what constitutes fair notice under Rule 8(a)(2), Fed. R. Civ. P., depends on the type of case.  Robbins v. Okla., 519 F.3d 1242, 1248 (10th Cir. 2008).

### Factual Background

Plaintiffs' first amended complaint is summarized as follows:

On August 1, 2023, the Lawrence Unified School District and Gaggle.Net, Inc. executed a Contract for Services.  The Contract has a three-year term, from August 1, 2023 to July 31, 2026, and provides that "Gaggle shall monitor email, message communications, documents, and other file types subject to certain file size limitations within third-party services."  The Board publishes meeting agendas and materials on its public BoardDocs site.  On August 28, 2023, the Board published an agenda item titled "Purchase of Gaggle Software."  The agenda describes Gaggle as "a digital surveillance tool that helps school districts manage student safety on school-provided devices and platforms by monitoring student accounts to identify and flag those who may be struggling and need help.  Gaggle Safety Management uses trained safety experts and an algorithm to provide real-time analysis and review of students' use of collaboration platforms for email and schoolwork.  Safety experts evaluate flagged content and notify school officials about references to self-harm, depression, drug use, and violent threats."

In November of 2023, the District began using Gaggle to monitor student activities. Around the same time, the District published a webpage titled "Gaggle Frequently Asked Questions" (the "Gaggle FAQs").  In relevant part, the Gaggle FAQs state, "Gaggle cannot and does not monitor personal devices or any personal accounts, including but not limited to internet usage and web browsing, calls, texts, emails, and social media posts on personal devices or accounts.  Gaggle also does not monitor teacher and staff accounts."  Contrary to these assurances, students reported that Gaggle flagged email communications accessed though personal devices, including messages sent from personal phones through school-issued Gmail accounts.  Students also reported that Gaggle flagged content stored in Google Drive folders not intended for school assignments, such as personal writings and draft editorials.  Students also experienced Gaggle monitoring teachers' emails and communications.  Gaggle would scan, seize and remove emails between teachers and students based on their content.  Gaggle did so for journalism advisor Barbara Tholen and others.

On May 31, 2024, counsel for plaintiffs sent a demand letter to the District, detailing constitutional concerns and demanding that it stop using Gaggle.  On June 17, 2024, counsel for the District responded, asserting that the District's use of Gaggle was lawful and that the District would not alter its use of Gaggle.  Despite this notice and opportunity to cure, on July 8, 2024 the Board voted to renew its Gaggle contract for the 2024–25 school year.

In late summer or early fall of 2025, the District purportedly canceled the Gaggle contract and adopted ManagedMethods, a substantially similar AI-driven surveillance product that continues to scan student content.  Defendants' practice is to present technology procurements and renewals for public Board approval on the consent agenda, supported by staff memoranda and quotes, followed by public votes.  In July of 2025 alone, the Board approved multiple technology

renewals and subscriptions by motion and vote. No agenda from July of 2025 to the present has publicly presented any ManagedMethods procurement or configuration item, and no minutes reflect a Board vote authorizing a vendor substitution for AI-student monitoring surveillance. No public Board agenda disclosed the vendor switch, and no public Board vote authorized the ManagedMethods procurement. The District omitted the replacement platform from contemporaneous court filings seeking partial dismissal and failed to disclose a material continuation of the challenged monitoring under a different vendor.

ManagedMethods maintains a website that includes a "how it works" page and "frequently asked questions." The District was fully aware of the information contained in the ManagedMethods FAQs when it adopted the use of ManagedMethods. In relevant part, the ManagedMethods FAQs provide, that ManagedMethods (1) scans data and detects risks within the District's Google Workspace and/or Microsoft 365 environment to report on and remediate data security, student safety and compliance risks within the District's cloud environment; (2) scans content based on specific parameters that are set up using keywords, regex text, numerical strings and AI; (3) within seconds, detects and removes, revokes access or quarantines risks (based on policy configurations), often before any human realizes that the email or file share has come across; (4) works in the same way no matter the device and/or network from which a student, teacher or staff member is accessing the District's domain; (5) scans files shared outside the District's domain; (6) removes and quarantines files from the owner's Drive and moves quarantined emails to the user's trash or spam folder; (7) flags false positives; and (8) focuses on monitoring and providing total control over the District's Google Workspace and/or Microsoft 365 environment.

The District configured ManagedMethods' Cloud Monitor to scan student content, apply automated "risk" detections using keywords and AI and take automated remediation actions—

including quarantine, deletion, breaking shares and revoking access—without individualized suspicion, notice to students or a meaningful opportunity to contest.  The District did not publish any narrowing standards, due process protections or opt-out mechanisms accompanying the switch to ManagedMethods, and it did not revise Board policies or the Student Handbook to disclose Cloud Monitor's automated quarantine and seizure functions.

The ManagedMethods substitution does not cure the constitutional infirmities of the District's surveillance regime.  The core practice continues: suspicionless scanning, automated flagging and seizure of students' digital speech and effects in the District's Google Workspace. Plaintiffs continue to suffer ongoing harm and face a real and immediate threat of future injury because ManagedMethods operates on the same student accounts and content, applies automated "student safety" policies using AI and removes, quarantines and interferes with student communications and files—often before any human review and without student notice or process. Plaintiffs argue that the District's vendor substitution does not moot their claims and, instead, underscores the need for injunctive relief.

ManagedMethods' Cloud Monitor—by its own terms—scans the District's Google Workspace domain regardless of device or network.  These platforms are tied to each student's unique District-managed account and are subject to continuous monitoring and scanning.  Content created or stored within these accounts—regardless of the device used—is monitored in real time by AI-surveillance monitoring and remains accessible to the District through its administrative control over the Google Workspace for Education environment.

While students of the District, Jack Tell, Torkzaban, Salisbury, Morris, Farthing, Kennedy and Sui Pang were required—and Ashlyn Tell and P.M. are currently required—to use District-managed accounts, platforms and servers.  Each is governed by the District's no-privacy policies

in order to obtain educational services from the District, including required assignments, teacher feedback, class participation and peer collaboration.  An enrolled student who declines a District-issued device must still access District-managed platforms such as Google Docs, Google Classroom and District email to complete required assignments, receive teacher feedback, participate in class and collaborate with peers.  Thus, enrolled students using personal devices are still subject to AI surveillance monitoring because they must access District-managed platforms. Plaintiffs cannot/could not refuse or decline the privacy terms imposed by the District without forfeiting access to the basic tools of their public education, including access to the District-managed platforms.  Plaintiffs cannot/could not withhold consent to the District's surveillance practices without jeopardizing their education.

The Handbook includes a section titled "Intellectual Property," which links to the "Complete Board Policy JT."  It states that "[p]ublications, articles, materials, models, and other items produced by students will be owned by the student unless the work is produced at the district's request for its use."  Because Complete Board Policy JT recognizes student ownership of publications and other work product, the District's automated quarantine, deletion and share-breaking of student files meaningfully interferes with students' possessory interests in their own work and deprives them of access to their intellectual property.

The Handbook includes a section titled "Investigation and Interrogation (Student Rights to have parents present)," which provides, in relevant part:

> Administrators, other school staff, and school resource officers (SROs) may at times need to interview students to gather facts about something that occurred, such as a policy violation. An interview is an informal procedure to obtain information. Interrogation is when a law enforcement officer is formally questioning a suspect alleged to have been involved in a crime, such as to garner a confession. If an SRO is speaking with a student about involvement in a suspected or alleged crime, a parent/guardian will be notified to be present.

The Investigation and Interrogation section links to the "Complete Board Policy JCAC." The Complete Board Policy JCAC provides, in relevant part:

> Principals (or a designee) or others designated by the superintendent, may conduct investigations and question students about infractions of school rules or the student conduct code . . .

At Lawrence High School and Lawrence Free State High School, student journalists are (and at all relevant times were) required to house their research, writing and other journalistic materials on school-issued accounts, thereby subjecting them to AI surveillance monitoring searches and seizures. Shortly after the District implemented Gaggle, plaintiff-student journalists working for Lawrence High School's student publication, *The Budget*, noticed that Gaggle was seizing various materials, such that materials disappeared from their school-issued accounts and were unavailable. Gaggle's seizure of plaintiffs' journalistic materials extended to materials that were not inappropriate or otherwise in violation of any District policy.

The repeated seizures of journalistic materials interfered with student journalist work for *The Budget*. Student journalists were obstructed to the point that the journalism teacher and adviser of *The Budget*, Barbara Tholen, interceded with District officials on their behalf. Tholen devoted significant time and effort to bringing Gaggle's repeated flagging and seizure of student materials to the attention of District officials, advising District officials that such seizures were impermissible and were adversely impacting *The Budget*. She pleaded with District officials to limit or discontinue the use of Gaggle with respect to student journalism.

To continue *The Budget*'s work, Tell and Torkzaban, as editors-in-chief of *The Budget*, moved all journalistic materials and endeavors to Tholen's school-issued account to eliminate interference from Gaggle. The student journalists at *The Budget* could continue drafting and publishing newspapers only by having Tholen provide access to her personal account to all student

journalists and conducting all work only on that account. Notwithstanding these efforts, Tell, Torkzaban, Salisbury and Kennedy were unable to publish at least four editions of *The Budget* due to Gaggle's interference. Because Tholen's time and attention were diverted by Gaggle-related disruptions and her efforts to advocate for her students' rights, she was unable to timely review several articles submitted for publication. As a result, *The Budget* was unable to publish work that otherwise would have run, directly impairing plaintiff-student journalists' ability to report and share news.

In early 2024, District administrators summoned art, journalism and photography students to the front office at Lawrence High School for questioning. Opal Morris and Henry Farthing were among those summoned. Farthing was attending an Advanced Placement United States history course at Lawrence High School when two security officers approached and instructed him to accompany them to the front office. The security guards refused to provide an explanation for Farthing's removal from class. Morris was attending a videography class when two security officers entered the classroom and instructed her to accompany them to the front office. The security guards refused to provide an explanation for Morris's removal from class. Upon independently arriving at the front office, Morris and Farthing observed several classmates from their photography course already present and waiting, in addition to student journalists and art students. Notably, one student in the front office was not an art, journalism or photography student. Morris and Farthing later determined that the student was the model for an art student's painting which Gaggle had flagged and seized. Neither Morris nor Farthing felt free to leave during the encounter.

Assistant Principal Farley asked, "Who wants to go first?" Morris volunteered, and she was ordered into a private meeting room with Farley and other administrators. Once her private

meeting with Farley and other administrators commenced, Morris asked why they pulled her out of class and summoned her to the front office. Farley informed Morris that it was due to "some images on your device." Farley then accused Morris of having photos or documents on her computer that constituted indecent exposure or child pornography. The production of or possession of child pornography is a crime under K.S.A. § 22-5510. When Morris responded that she did not have any such materials, Farley asked whether she had uploaded anything to her device that day. Morris responded that she had uploaded a photography assignment that included a picture of one of her friends who was fully clothed and wearing a spaghetti-strap tank top. Spaghetti-strap tank tops are permitted under the District's dress code.

Morris then asked if she could pull up the images to prove that she had not uploaded any documents that constituted indecent exposure or child pornography. Farley told Morris that she could not do so but proceeded to interrogate Morris regarding the photographs. Farley required Morris to recall and explain from memory minute details regarding the photographs she had taken, but he did not allow her to view or display those photos. Morris is not aware of any effort by District officials to contact her parents regarding her detention and interrogation. No District official or faculty attempted to notify or involve Morris's parents before or during the investigative meeting in which she was accused of uploading inappropriate images.

Meanwhile, in the room where the remaining students were still waiting, administrators told the group that Gaggle had flagged their images for indecent exposure and child pornography. As with Morris, administrators did not show students the flagged content or explain what rule, if any, had been violated. No one contacted the students' parents, and no parents were present at the meetings. Administrators, including Farley, admitted they had not seen the content at issue, but rather, that Gaggle had informed them that the content had been flagged. As with Morris,

administrators asked Farthing and other students whether they had uploaded anything to their District Google Drives that might have triggered an alert.  Administrators did not give students notice of discipline or tell them what specific file(s) had been flagged.   Administrators called Farthing and the other students individually into meetings and questioned them further regarding their conduct.  The administrators eventually sent the students back to class.

By investigating Morris and Farthing for protected speech and accusing them of possessing child pornography, Farley demonstrated reckless and callous indifference to plaintiffs' constitutional rights, which a reasonable official would have known.  Farley's actions would chill a person of ordinary firmness from engaging or continuing to engage in activity protected by the U.S. Constitution.  Farley's actions were substantially motivated by plaintiffs engaging in activity protected by the U.S. Constitution.  As a direct and proximate result of Farley's unlawful actions, Morris and Farthing were deprived of their First Amendment rights.

After the incident, Morris and Farthing discovered that multiple digital photographs had been removed from their school accounts.  Morris determined that the flagged content consisted of original artistic photographs taken and uploaded for class assignments.  The photographs had been stored on District-managed platforms and were no longer accessible through their school-issued accounts.  Morris, Farthing and other students later confirmed the seizures by comparing their school accounts to independent backup drives.  At no point did anyone notify students that their files had been removed or offer an opportunity to contest the action.

District staff later required Morris to meet with them and explain each image in her photography portfolio.  This compelled review of her work made Morris concerned that future assignments involving protected expression would trigger additional scrutiny, interrogations, deletions and/or discipline.  Only after months of student advocacy did the District restore the

removed images.

No individualized suspicion existed that Morris or Farthing had violated the law or school rules, and the District refused to review the images at issue even as it compelled the students to describe them from memory. Such conduct contravenes clearly established standards governing student searches in the school context.

In the weeks following the summoning of students to the front office, and in light of the District's and Gaggle's ongoing obstruction of student journalism, Tell, Torkzaban and Salisbury requested a meeting with District Director of Technology David Vignery. Vignery refused to meet with the students until March of 2024, citing personal scheduling conflicts. On or about March 6, Tell, Torkzaban and Salisbury met with Vignery, Superintendent Anthony Lewis and other senior District administrators to voice their concerns about Gaggle surveillance. David Cunningham, an attorney with the Kansas Association of School Boards, was present at the meeting. Cunningham introduced himself at the outset of the meeting by stating: "I'm David Cunningham, I'm an attorney with the Kansas Association of School Boards and provide legal services to the District." Tell, Torkzaban and Salisbury did not expect the presence of the District's legal counsel at the meeting. Had defendants informed plaintiffs that defendants' counsel would be present, plaintiffs would have brought legal representation of their own.

At the meeting on March 6, District Mental Health Coordinator Kiley Luckett told Tell, Torkzaban and Salisbury that plaintiffs were "valuing their constitutional rights above the mental health of their peers." At the meeting, Tell, Torkzaban and Salisbury asked for a resolution to the ongoing surveillance. District spokesperson Julie Boyle told Tell, Torkzaban and Salisbury at the meeting that she had only recently learned of the issue, but internal correspondence produced under KORA revealed that Boyle had been informed about the matter months earlier.

On or about March 29, 2024, Tell, Torkzaban and Salisbury again met with District officials. Prior to the meeting, plaintiffs informed the District that they were arranging to bring their own counsel, to which District spokesperson Julie Boyle responded, "there will be no need." Plaintiffs understood Boyle's comment to mean that the District would not bring its counsel to the meeting. David Cunningham, the District's attorney, was present at the meeting alongside senior District administrators.

The District brought an experienced school attorney to the meetings on March 6 and March 29 to advance its institutional interests and protect itself from legal exposure, including in response to plaintiffs' ongoing constitutional injuries. The District failed to provide advance notice of Cunningham's attendance at either meeting, depriving plaintiffs of a meaningful opportunity to secure counsel or otherwise prepare for what became an adversarial dialogue concerning plaintiffs' ongoing constitutional injuries. By positioning legal counsel against unrepresented student journalists in closed-door meetings about protected speech, the District created a fundamental imbalance that chilled plaintiffs' expression and discouraged further advocacy concerning plaintiffs' ongoing constitutional injuries.

The District's decision to involve legal counsel in these meetings—without warning and in the presence of unrepresented students—was undertaken in retaliation for plaintiffs' constitutionally protected activity and intended to deter plaintiffs' opposition to the Gaggle surveillance regime.

One week after the meeting on March 29, the District informed the student journalists that their files would be exempted from Gaggle scanning. In April of 2024, the District purported to remove Gaggle scanning from approximately 160 accounts used by journalism students at Lawrence High School. The District did not actually remove Gaggle surveillance from those

devices.

The District did not reinstate or honor any journalism "exemption" when it deployed ManagedMethods. The District configured or made available ManagedMethods' Content Filter in conjunction with Cloud Monitor, further extending monitoring to students' browsing behavior when using District-managed accounts and devices. ManagedMethods' Cloud Monitor operates on student Google Workspace accounts regardless of device or network, and its automated quarantine and deletion features apply to student emails and files—the very locations where student journalists' work is drafted, stored, exchanged and published. ManagedMethods' own documentation acknowledges that false positives are "part of the territory" and provides no guarantee regarding the false positive rate. The combination of keyword/regex matching and AI in ManagedMethods' "risk" detections, together with automated remediation, creates a substantial risk that constitutionally protected journalism and art will be flagged, quarantined, unshared or deleted without individualized suspicion, context sensitive review, notice or a meaningful opportunity to contest.

The District did not publish any narrowing standards, notice procedures, appeal processes or opt out mechanisms contemporaneous with the switch to ManagedMethods. Despite having previously promised to remove scanning from journalism accounts, the District did not revise any policy or Student Handbook to disclose Cloud Monitor's automated quarantine and seizure functions.

On April 19, 2024, Tell, Torkzaban and Salisbury met with District Board President Jones and Board members serving on the District's policy committee. At the meeting, plaintiffs discussed their concerns related to Gaggle's effect on First Amendment speech and press protections and Fourth Amendment protections against unreasonable searches and seizures.

Plaintiffs who are existing District students remain subject to 24-hour AI-surveillance monitoring of their District-managed accounts with no opportunity to opt out or limit the surveillance's scope.

On August 1, 2025, plaintiffs filed their Verified Complaint For Civil Rights Violations (Doc. #1) commencing this litigation.  On the morning of August 14, 2025, *The Budget*'s journalism adviser, Abbi Epperson-Ladd, told Tell that several weeks earlier, Lawrence High School Principal Quentin Rials issued a directive that neither *The Budget* nor its student reporters may report on this lawsuit and directed her to consult the District's lawyer.  Epperson-Ladd further told Tell that after Principal Rials issued the directive, a person Epperson-Ladd understood to be a District administrator reiterated to her by telephone that neither *The Budget* nor its student reporters may report on this lawsuit.  When Tell stated that *The Budget* intended to report on the lawsuit and related Gaggle coverage, Epperson-Ladd directed Tell not to report because "the District told me 'no,' and I don't want to go against that."  That same morning, Tell asked to meet with Principal Rials to verify the prohibition and to request the name of the District's attorney. Rials' secretary directed Tell to Assistant Principal Mike Gillman.  Assistant Principal Gillman told Tell that he could not discuss anything related to the lawsuit or Gaggle reporting and doubted that Principal Rials would do so either.  Tell overheard Principal Rials' secretary informing Rials of the nature of Tell's meeting request; Principal Rials declined to meet with Tell.

On the afternoon of August 14, 2025, attorney Bradley R. Finkeldei, communicating on the District's behalf, confirmed by telephone to plaintiffs' attorney Harrison M. Rosenthal that (1) Principal Rials issued a directive prohibiting *The Budget* and its student reporters from reporting on this lawsuit; (2) Epperson-Ladd enforced that directive in a face-to-face discussion with Tell; and (3) the restriction was later lifted such that *The Budget* and Tell are free to report on Gaggle and this lawsuit without restriction.  By issuing the directive that neither *The Budget* nor

its student reporters could report on this lawsuit, Principal Rials demonstrated reckless and callous indifference to Tell's constitutional rights, which a reasonable official would have known. Principal Rials's actions would chill a person of ordinary firmness from engaging or continuing to engage in activity protected by the U.S. Constitution. Principal Rials's actions were substantially motivated by Tell engaging in activity protected by the U.S. Constitution. As a direct and proximate result of Principal Rials's unlawful actions as alleged herein, Tell was deprived of her First Amendment rights.

On the evening of August 14, 2025, Tell drafted an initial story on the lawsuit and Gaggle surveillance that she intended to publish the next day. The next morning, not even three hours after Mr. Finkeldei confirmed in writing that neither the District nor any District official "will prohibit, delay, condition, or otherwise restrain any student journalist or journalism adviser from reporting on" this lawsuit, a District teacher, Jeff Plinsky, met with Tell and pressured her not to publish an article regarding the lawsuit, citing potential adverse consequences to her adviser. Specifically, on the morning of August 15, 2025, when Tell arrived for journalism class, Epperson-Ladd told Tell that Epperson-Ladd had unilaterally set a meeting for Tell with a teachers-union representative. Epperson-Ladd stated that the purpose of the meeting was "to suggest other options besides publishing" and to "offer some other courses of action, like reaching out to other reporters," and that she wanted Tell to "hear out the representative" before publishing. Tell observed that Epperson-Ladd was visibly worried. Epperson-Ladd stated that she was "very concerned," had already been called for a meeting with administration and wanted to be careful. Tell understood this to mean that administration was pressuring Epperson-Ladd to quash the story or face adverse consequences. As a direct and proximate result, Tell's speech and reporting were chilled.

After speaking with Epperson-Ladd, Tell met with teacher Jeff Plinsky, who identified himself as representing the teachers' union. Plinsky told Tell that she has "constitutional rights to do what you want to do," but urged Tell to "keep in mind that a young teacher with no due process protections . . . could [be] fire[d] . . . tomorrow for no reason," explaining that "for the first three years of a teacher's contract, they do not have to give a reason to fire a teacher." When Tell asked whether Epperson-Ladd is protected by K.S.A. § 72-7209 et seq., Plinsky responded that while she is protected by statute, "that just means they can't say that they are firing her for these press problems . . . they can just say we're firing her because we don't like her." Tell understood this interaction to mean the District is substantially likely to terminate Epperson-Ladd's employment because of Tell's reporting, using a pretext to justify adverse action. Plinsky further stated that Epperson-Ladd is "in a really tough place," expressed fear that the District could "fire her, not replace her, and let *The Budget* die," and that "her being able to find a job after that is pretty tough." Plinsky suggested that Tell send materials to a reporter at *The Lawrence Times* so that Epperson-Ladd could tell administration, "I have done what the admin has asked me to do."

Plinsky acknowledged that the administration had rescinded the prior restraint the day before, but he remained concerned for Epperson-Ladd's continued employment. Plinsky warned Tell that administrators might say to Epperson-Ladd, "if you can't control your editors, we want you out of the building," and told Tell to "understand there are consequences to other people's lives" if she exercised her constitutional rights. Plinsky acted at the direction of the District, the Board and/or Principal Rials when he met with Tell. By pressuring Tell not to exercise her constitutionally protected rights, Plinsky demonstrated reckless and callous indifference to Tell's constitutional rights, which a reasonable school official would have known.

Plinsky's actions would chill a person of ordinary firmness from engaging or continuing to

engage in activity protected by the U.S. Constitution.  Plinsky's actions were substantially motivated by Tell engaging in activity protected by the U.S. Constitution.  As a direct and proximate result of Plinsky's unlawful actions, Tell was deprived of her First Amendment rights. Tell left the interaction with Plinsky upset and felt her right to publish was chilled.

Consequently, the same day, plaintiffs filed Plaintiffs' Emergency Motion for Temporary Restraining Order and Preliminary Injunction, bringing the foregoing facts to the Court's attention and seeking an order enjoining the District from (i) enforcing or reimposing the prior restraint forbidding *The Budget* and Tell from reporting on this lawsuit or related District conduct; and (ii) taking or threatening adverse employment action against *The Budget*'s faculty adviser, Epperson-Ladd, because of such reporting.  Further, on that same day, the District issued a Clarification Memorandum to Epperson-Ladd stating that the District would not restrict lawful reporting.  Notwithstanding the issuance of the Clarification Memo, Tell's right to publish remained chilled, given that synonymous representations by the District in the Finkeldei-Rosenthal emails had already proven insufficient to protect lawful reporting within three hours after such representations were made.

On August 19, 2025, the Court entered its Memorandum and Order.  The Order deferred consideration of plaintiffs' request for a preliminary injunction, but, among other things, affirmed that "K.S.A. § 72-7211 protects Epperson-Ladd by stating that '[n]o [student publication] advisor or employee shall be terminated from employment, transferred, or relieved from duties imposed under this subsection for refusal to abridge or infringe upon the right to freedom of expression conferred by this act.'"  Based on the foregoing assurances from the Court that Epperson-Ladd would not be terminated or otherwise relieved from her duties for assisting with lawful reporting on this lawsuit, on August 19, 2025, Tell published an article regarding the instant lawsuit.

Nevertheless, Tell's right to publish was chilled for no less than five days in the interim.

Since filing the initial complaint, absent any solicitation, counsel for plaintiffs have received significant supportive correspondence and additional information volunteered by parents, faculty and other interested parties affected by Gaggle. In relevant part, plaintiffs were contacted by the parent of a student at Lawrence Free State High School who undertook significant, but ultimately futile, efforts to opt his son out of Gaggle surveillance. The parent's experience demonstrates that it is not possible for parents or students to opt out of the challenged surveillance.

October 30, 2025, P.M., acting in her capacity as News Managing Editor of Lawrence Free State High School's student publication, the *Free Press*, submitted five requests to the District under KORA. These requests sought records concerning the District's substitution of ManagedMethods for Gaggle and associated procurement, configuration and data-disposition activities. Specifically, P.M. requested the fully executed ManagedMethods contract(s) and attachments; all ManagedMethods invoices, payments, purchase orders and cost analyses; procurement RFP/RFQ materials, proposals, evaluation and scoring records, award memoranda and related protests or resolutions; District communications with ManagedMethods and internal communications concerning selection, implementation, configuration, scope, efficacy and public messaging; and Gaggle wind-down/off-boarding and data-disposition records, including notices of termination or non-renewal, off-boarding checklists, certifications of data deletion or return and correspondence regarding student and staff data disposition. Each of P.M.'s requests specified production in the electronic formats in which the records are maintained, including text-searchable PDFs for executed agreements, native CSV/XLSX for spreadsheets and MSG/EML with headers and attachments preserved for emails and messages, and required that any withholdings identify specific subsections of K.S.A. § 45-221, with production of all reasonably segregable non-exempt

material.  Each of P.M.'s requests asked for an itemized estimate limited to actual costs under K.S.A. § 45-219, requested the use of the lowest-cost staff reasonably necessary to fulfill the request, invoked K.S.A. § 45-218(d)'s three-business-day action requirement and invited rolling production and forwarding to any other custodian holding responsive records.

Also on October 30, 2025, Ashlyn Tell, acting in her capacity as Online Editor-in-Chief of *The Budget*, submitted five substantively identical KORA requests seeking the same categories of records and specifying the same production formats, exemption-identification requirements, itemized cost estimates limited to actual costs, use of lowest-cost staff and K.S.A. § 45-218(d)'s three-business-day mandate.  Plaintiffs sent their requests to the District's records custodian and copied Superintendent Dr. Jeanice Kerr Swift, Deputy Superintendent Dr. Larry Englebrick, Board President GR Gordon-Ross and Board Vice President Bob Byers, thereby ensuring agencywide notice to senior officials most likely to maintain or direct access to responsive records.  On October 31, the District acknowledged receipt of each request by email, stating only that the requests were "under review to determine the availability of the records and the time and resources required to compile and produce them," that the "district will provide you with an estimated cost . . . along with an estimated timeframe for completion" and that "no work to gather or produce records will begin until the estimated charges, if any, are communicated and approved."

The acknowledgments did not identify any custodian holding responsive records, describe any search methodology or repositories to be searched, forward the requests to other offices or personnel despite plaintiffs' invitation to do so, provide any records or furnish a compliant delay notice stating the earliest date and time the records would be available for inspection and the place of inspection.  The acknowledgments did not issue any written denial identifying specific statutory bases under K.S.A. § 45-221 for withholding records, produce reasonably segregable non-exempt

material or provide an itemized estimate limited to actual costs under K.S.A. § 45-219.

As of November 4—the third business day following receipt—defendants had not provided any responsive records, had not provided a compliant delay notice stating the earliest availability date and place of inspection and had not issued a written denial identifying specific statutory exemptions. Despite senior officials being copied and the existence of readily identifiable responsive records, including the District's October of 2025 check register presented at the October Board meeting reflecting a payment to "MANAGED METHODS INC," defendants did not produce records responsive to plaintiffs' requests. Defendants did not provide any itemized fee estimate limited to actual costs, identify staff roles or hourly rates to be used or cite any specific subsection of K.S.A. § 45-221 for any withholding. Defendants did not produce any reasonably segregable non-exempt material.

As of the date of this filing, defendants have not produced records responsive to plaintiffs' KORA requests of October 30, 2025, have not provided a lawful production schedule or earliest availability date, have not identified specific exemptions under K.S.A. § 45-221 and have not furnished an itemized actual-cost estimate using the lowest-cost staff reasonably necessary. Defendants intentionally withheld disclosure of the District's switch to ManagedMethods and delayed the production of public records concerning that switch to impede public oversight and frustrate plaintiffs' reporting and preparation of the first amended complaint. The timing and pattern of noncompliance—generic "under review" acknowledgments on October 31, 2025; no records or compliant delay notices by November 4, 2025; no itemized actual-cost estimates; no identification of specific exemptions; and continued non-production through the filing deadline— evidence bad faith and an intent to delay or frustrate inspection.

Defendants' refusal to timely produce records and failure to conduct a reasonable search

across known repositories and custodians impeded plaintiffs' ability to report to the public about the vendor substitution, procurement process, configuration, data-disposition and costs associated with ManagedMethods and Gaggle, causing harm to plaintiffs and undermining KORA's policy of openness.

Defendants' implementation and use of the District's surveillance regime subjected plaintiffs to searches and seizures without individualized suspicion or reasonable grounds to believe any plaintiff had violated the law or school rules. Defendants' implementation and use of Gaggle and the District's adoption of ManagedMethods chilled their expression. District policy and practice suppress student speech, and ManagedMethods' automated "risk" policies and quarantine/deletion features operate without notice or process. Defendants failed to articulate clear standards regarding what content would be flagged, reviewed, seized, or otherwise declared impermissible, and plaintiffs refrained from engaging in protected expression, including journalism and creative work, to avoid investigation or discipline.

Ashlyn Tell and P.M. are current students in the District. Defendants continue to conduct suspicionless searches and seizures of their digital effects through round the clock surveillance by Gaggle and ManagedMethods' Cloud Monitor and Content Filter of their District managed accounts, including emails, documents and cloud stored files. ManagedMethods operates regardless of device or network when students access District managed accounts. As a direct and proximate result of the surveillance regime, these plaintiffs have self-censored by refraining from creating and saving lawful, non-disruptive expressive content—such as original photography, creative writing, academic writing and journalistic drafts—to their District issued devices and accounts, resulting in missed publication cycles, delayed stories and changes to coursework and portfolios.

Ashlyn Tell and P.M. know from experience that their protected expression has triggered investigations, deletions and ostensible justifications. ManagedMethods' own documentation acknowledges false positives and describes automated remediation "within seconds" before any human review, which compounds deterrence. The lack of clear standards and notice further heightens the deterrent effect, as plaintiffs cannot reasonably predict what speech will result in review, removal or discipline. But for defendants' implementation and maintenance of the surveillance regime, Tell and P.M. would continue to engage in protected speech on District managed platforms without fear of investigation or loss of their work product. The District's surveillance exposes Tell and P.M. to a credible and imminent threat of future investigation, discipline and deletion of their work. It also inflicts present harm by forcing students to choose between self-censorship and risking loss of access to education. Defendants' policy subjects current students and their private communications, expressive works and academic materials, to real time review, removal and scrutiny by unknown third-party contractors and District personnel—all without judicial oversight or procedural safeguards.

Principal Rials retaliated against Tell by pressuring her not to publish, chilling her speech for at least five days and altering her editorial decisions. Tell and P.M. remain subject to ManagedMethods' automated scanning, flagging and quarantine of content, without individualized suspicion, advance notice or a meaningful opportunity to contest.

### Claims

Plaintiffs bring 12 claims for relief:

Count One seeks declaratory relief and alleges that all defendants violated all plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizure by (1) approving, renewing and implementing Gaggle and ManagedMethods, (2) using Gaggle and

ManagedMethods to scan contents of Student Google Drive and Googleworkspace, (3) using AI-surveillance monitoring to scan and seize the contents of the Student Google Drive and Google Workspace including drafts, communications, pending publications and artistic photographs, (4) quarantining and deleting student files and emails and (5) searching the belongings of and interrogating Morris and Farthing.

Count Two seeks injunctive relief and alleges that the Board and District violated and continues to violate the Fourth Amendment right of Ashlyn Tell and P.M to be free from unreasonable search and seizure by (1) conducting surveillance and AI-surveillance including Gaggle and ManagedMethods and (2) impermissibly monitoring, scanning and seizing their files, communications and digital content housed on the Student Google Drive and Google Workspace. Plaintiffs seek an order enjoining the District and Board from operating suspicionless surveillance that scans, flags and quarantines or deletes student content in Gmail, Drive, Shared Drive, Docs, Sheets, Slides, Chat, Meet and Classroom absent individualized suspicion, notice and constitutionally adequate process; and from imposing prior restraints or retaliating against student journalists.

Count Three seeks damages and alleges that all defendants violated all plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures. As a result of defendants' surveillance regime, plaintiffs have suffered and will continue to suffer injury, including suspicionless scanning, automated flagging and quarantine or deletion of their files and communications through Gaggle and ManagedMethods, damage to their reputations, mental anguish, emotional distress, humiliation and public embarrassment. Plaintiffs seek actual, nominal and compensatory damages in addition to attorney fees and costs.

Count Four seeks declaratory relief and alleges that all defendants violated all plaintiffs'

First Amendment rights to freedom of speech and freedom of press by using the District's surveillance regime to flag and remove plaintiffs' protected content including photography, artistic expression and journalism materials without any forecast or determination that the speech would disrupt classwork, involve substantial disorder or invade the rights of others.

Count Five seeks injunctive relief and alleges that the District and the Board violated Ashlyn Tell and P.M.'s First Amendment rights to freedom of speech and freedom of press because plaintiffs have suffered and will continue to suffer irreparable injury from defendants' AI-surveillance monitoring to limit protected First Amendment expression, which continues to restrict and chill their speech so long as suspicionless monitoring, automated flagging and quarantine/deletion continue.  Plaintiffs seek an order enjoining the District and Board from operating suspicionless surveillance that scans, flags and quarantines or deletes student content in Gmail, Drive, Shared Drive, Docs, Sheets, Slides, Chat, Meet and Classroom absent individualized suspicion, notice and constitutionally adequate process; and from imposing prior restraints or retaliating against student journalists.

Count Six seeks damages and alleges that all defendants violated all plaintiffs' First Amendment rights of freedom of speech and freedom of press by implementing the surveillance regime to limit protected First Amendment expression, which continues to restrict and chill their speech so long as suspicionless monitoring, automated flagging and quarantine/deletion continue. Plaintiffs suffered injury including damage to their reputations, mental anguish, emotional distress, humiliation and public embarrassment.  Plaintiffs seek actual, nominal and compensatory damages in addition to attorney fees and costs in an amount to be determined at trial.

Count Seven seeks declaratory relief and alleges that the District and Board violated plaintiffs' First, Fourth and Fourteenth Amendment rights because the policies and practices—

-26-

implemented through Gaggle and ManagedMethods—are vague because they fail to provide parents and students with sufficient information to know what is restricted or required so that they may act accordingly.

Count Eight seeks declaratory relief and alleges that the District and Board violated plaintiffs' First, Fourth and Fourteenth Amendment rights because the surveillance regime— implemented through Gaggle and ManagedMethods—is substantially overbroad because it reaches and regulates a significant amount of protected First Amendment speech and expressive conduct, including non-harmful, non-disruptive and non-invasive speech that is of no legitimate concern.

Count Nine seeks damages, declaratory relief and injunctive relief and alleges that Rials, the District and the Board violated Ashlyn Tell's right to be free from retaliation for exercising her First Amendment rights to freedom of speech and freedom of press by chilling her protected activity and causing her to refrain from reporting on this lawsuit for no less than five days.

Count Ten seeks injunctive and declaratory relief and alleges that the District and the Board violated the rights of Ashlyn Tell and P.M. under KORA by failing to conduct adequate search for responsive records.

Count Eleven seeks injunctive and declaratory relief and alleges that the District and Board violated the rights of Ashlyn Tell and P.M. under KORA by failing to disclose responsive records.

Count Twelve seeks injunctive and declaratory relief and alleges that the District and Board violated the rights of Ashlyn Tell and P.M. under KORA by failing to respond within the required time.

**<u>Analysis</u>**

Defendants argue that the Court should partially dismiss plaintiffs' first amended complaint

because it largely fails to establish subject matter jurisdiction and state a claim on which relief can be granted. Specifically, defendants argue that the Court lacks subject matter jurisdiction over some claims because (1) several plaintiffs have already graduated, (2) the District has decided to stop using Gaggle to monitor students and (3) plaintiffs acknowledge that the alleged restrictions and retaliations based on student publication about this lawsuit have ended. Defendants argue that some of plaintiffs' claims also fail because (1) Farley and Rials are entitled to qualified immunity, (2) plaintiffs' claims against the Board duplicate claims against the District, (3) plaintiffs' requests for declaratory relief and injunctive relief are not separate claims, (4) plaintiffs' KORA claims are improper and (5) plaintiffs have not alleged facts necessary to support a First Amendment retaliation claim.

Ashlyn Tell and P.M. argue that the Court should (1) grant them partial judgment on the pleadings against the District and Board on their KORA claims and (2) enter a declaratory and compliance order under K.S.A. § 45-222.

## I.    Subject Matter Jurisdiction

Defendants argue that the Court lacks subject matter jurisdiction over some of plaintiffs' claims because they are moot. Specifically, defendants argue that (1) plaintiffs who have already graduated (Jack Tell, Torkzaban, Salisbury, Morris, Kenney and Sui Pang) cannot being claims for injunctive and declaratory relief, (2) the District has decided to stop using Gaggle to monitor students and (3) plaintiffs acknowledge that the alleged restrictions and retaliations based on student publication about this lawsuit have ended.

### A.    Graduated Plaintiffs

Defendants argue that the Court should dismiss the claims of plaintiffs who have graduated, because graduation moots their claims for injunctive and declaratory relief. Plaintiffs do not

contest defendants' argument that graduation moots claims for *prospective relief*. Accordingly, the Court dismisses the claims for injunctive and declaratory relief by those students. See Lane v. Simon, 495 F.3d 1182, 1186–87 (10th Cir. 2007) (plaintiffs' claims for declaratory and injunctive relief moot because of graduation). Their claims for damages for completed injuries (detentions and accusatory questioning premised on algorithmic flags, refusal to permit a student to retrieve and display alleged content and seizure or quarantine of student materials) remain.

     B.     Gaggle

Defendants argue that because the District has decided to stop using Gaggle to monitor students, the Court should dismiss for mootness and lack of standing all plaintiffs' claims for injunctive relief and declaratory relief based on Gaggle usage. Plaintiffs respond that a live controversy exists because the District transitioned from Gaggle to ManagedMethods, which continues to monitor students.

An exception to the doctrine of mootness arises when defendant voluntarily ceases the challenged practice or action. This exception "traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." Greater Yellowstone Coal. v. Tidwell, 572 F.3d 1115, 1121 (10th Cir. 2009) (quoting City News & Novelty, Inc. v. City of Waukesha, 531 U.S. 278, 284 n. 1 (2001)). If defendant voluntarily ceases a challenged act, a claim will be moot only if it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Adarand Constructors, Inc. v. Slater, 528 U.S. 216, 222 (2000) (quoting United States v. Concentrated Phosphate Export Assn., Inc., 393 U.S. 199, 203 (1968)). The party asserting mootness bears a "heavy burden" of persuading the Court that the challenged conduct cannot reasonably be expected to start up again. Adarand Constructors, 528 U.S. at 222 (quoting Friends of Earth, Inc. v. Laidlaw Env. Servs., Inc.,

528 U.S. 167, 189 (2000)).

Here, the first amended complaint alleges that the District continues to employ a program which scans and monitors student content on District-provided Google accounts using keywords and machine-learning models and generates alerts to designated personnel who review and decide whether and how to intervene.   In other words, other than switching from Gaggle to ManagedMethods, defendants have not ceased or altered their challenged behavior.   Defendants also have not shown that they will not switch back to Gaggle in the future.

Accordingly, plaintiffs' claims based on Gaggle usage are not moot.

C.    Student Publication

Defendants argue that the Court lacks subject matter jurisdiction over Count Nine, which seeks damages, declaratory relief and injunctive relief from alleged restrictions and retaliations based on student publication about this lawsuit because defendant has ceased such activity. Specifically, defendants argue that the claim is moot because (1) the District's attorney rescinded any prohibition on publication, (2) the District issued a clarification memo which stated that it would not restrict lawful reporting and (3) on August 29, 2025, Ashlyn Tell published an article about the instant lawsuit and suffered no retaliatory response.   Plaintiffs respond that ad hoc communications that do not bind the District do not meet defendants' burden of demonstrating that the challenged conduct cannot reasonably be expected to recur.

When a party challenges allegations supporting subject-matter jurisdiction, the Court can consider affidavits outside the complaint without converting the motion to dismiss to a motion for summary judgment.  Davis ex rel. Davis v. United States, 343 F.3d 1282, 1296 (10th Cir. 2003). To carry its burden to defeat the voluntary cessation exception to mootness, defendant must undertake "changes that are permanent in nature" and "foreclose a reasonable chance of recurrence

of the challenged conduct." <u>Prison Legal News v. Fed. Bureau of Prisons</u>, 944 F.3d 868, 881 (10th Cir. 2019) (quoting <u>Tandy v. City of Wichita</u>, 380 F.3d 1277, 1291 (10th Cir. 2004)).   Such changes could include withdrawing or altering administrative policies through a formal process or making a declaration under penalty of perjury.  <u>Prison Legal News</u>, 944 F.3d at 881.  The Court may afford more solicitude to a government official's claims (than to the claims of other defendants) that their voluntary conduct moots a case.  <u>Id.</u>  Most cases that deny mootness following a government official's voluntary cessation rely on clear showings of reluctant submission and a desire to return to the old ways.  <u>Brown v. Buhman</u>, 822 F.3d 1151, 1167 (10th Cir. 2016).  Absent evidence that the voluntary cessation is a sham, the mere possibility that a successor official may return to the old ways does not necessarily keep a case alive.  <u>Prison Legal News</u>, 944 F.3d at 881.

Here, the District sent a formal memorandum and email stating that no further restrictions on publication would occur, and defendants have filed two declarations under penalty of perjury stating that no such restrictions on publication about this lawsuit will recur.  In the six months since Ashlyn Tell published her article, defendants have not taken any adverse action against her. The record contains no evidence that defendants' voluntary cessation was a sham or that defendants have any desire to reinstate the restrictions on student publication about this lawsuit. Thus, defendants have shown that their allegedly wrongful behavior cannot be reasonably expected to recur.

Accordingly, the portion of Count Nine which seeks declaratory and injunctive relief based on restrictions on student publication is moot, and the Court dismisses it for lack of subject matter jurisdiction.   The portion of Count Nine which seeks damages for Tell's deprivation of constitutional rights, emotional distress and lost or delayed publication opportunities is not moot.

## II.     Qualified Immunity

Defendants argue that the Court should dismiss plaintiffs' claims against Farley and Rials because they are entitled to qualified immunity.  Plaintiffs disagree, arguing that the first amended complaint alleges violations of the First and Fourth Amendments such as detentions, accusatory questioning premised on automated flags, refusal to allow a student to retrieve content and seizure or quarantine of student expressive work.[2]

Qualified immunity shields government officials from liability for performing discretionary functions if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Defendants who assert qualified immunity—including in a motion to dismiss—are presumptively immune from suit.  Cuervo v. Sorenson, 112 F.4th 1307, 1314 (10th Cir. 2024).  On a motion to dismiss, plaintiffs can overcome the presumption if they establish that the complaint alleges factual content from which the Court can reasonably infer that (1) defendant's conduct violated a constitutional right and (2) that right was clearly established at the time of the alleged violation.  Id.; see Iqbal, 556 U.S. at 678.

Whether a right is "clearly established" is an objective test.  A right is clearly established "when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains."  Thomas v. Kaven, 765 F.3d 1183, 1194 (10th Cir. 2014) (quoting PJ ex rel. Jensen v. Wagner, 603 F.3d 1182, 1196–97 (10th Cir. 2010)).  A constitutional right is clearly established when it is "sufficiently

---

[2]     Plaintiffs also argue that if the Court contemplates addressing qualified immunity now, it should allow targeted discovery limited to personal participation and the circumstances of the detentions, accusations and quarantines to resolve any factual disputes.  Defendants' qualified immunity arguments, however, rely on the first amended complaint, not contested facts.  Therefore, targeted discovery on these issues is unnecessary.

clear that every reasonable official would have understood that what he is doing violates that right."
Heard v. Dulayev, 29 F.4th 1195, 1203 (10th Cir. 2022) (citations omitted).  Under this demanding
standard, the alleged violation "must have a sufficiently clear foundation in then-existing
precedent" either with "controlling authority or a robust consensus of cases of persuasive
authority."  Id. (citations omitted).

The Supreme Court has warned against defining a clearly established right "at a high level
of generality" and emphasized that the law must be "particularized to the facts of the case," but
this does not mean that a right is only clearly established if a case exists that is factually identical.
Est. of Ceballos v. Husk, 919 F.3d 1204, 1215 (10th Cir. 2019) (citations omitted).  This makes
good sense: if a right is clearly established only when a prior case presents identical facts, qualified
immunity would apply under every different fact pattern.  Under this standard, officials would
always be entitled to qualified immunity so long as their actions—no matter how outrageous or
harmful—were sufficiently novel.  While the case need not be directly on point, the "existing
precedent must place the lawfulness of the defendant's conduct beyond debate."  Heard, 29 F.4th
at 1203 (citations and brackets omitted).

    A.    Greg Farley

The first amended complaint alleges that Farley violated plaintiffs' First and Fourth
Amendment rights.

        i.    First Amendment

The First Amended complaint alleges that Farley (1) questioned Morris and
Farthing after Gaggle flagged their photography assignments, (2) accused Morris and Farthing of
uploading images containing indecent exposure or child pornography to their school accounts,
(3) refused to permit Morris to pull up the images at issue but questioned her about the details of

the photos, (4) did not contact Morris's parents about her questioning and (5) had not seen the offending images, but based his accusations on Gaggle's flagging. It further alleges that, due to the Farley's accusations and questioning, students have "self-censored" by refraining from creating and saving lawful, non-disruptive expressive content such as photography, creative writing, academic writing and journalistic drafts, as to not trigger further investigation, thereby chilling the exercise of First Amendment rights.

Defendants argue that Farley did not violate plaintiffs' First Amendment rights because (1) under the First Amendment, child pornography is not "speech," and (2) Farley did not restrict plaintiffs' speech because he did not delete or command anyone to delete any images—he merely questioned plaintiffs. Defendants also argue that even if the images were speech, the First Amendment allows schools to ban vulgar, lewd, indecent and sexually explicit material, and Farley could restrict the speech under the Supreme Court standard in Hazelwood School District v. Kuhlmeier, 484 U.S. 260 (1988). Defendants argue that no law clearly establishes that a school official who questions students about images that have been flagged as child pornography violates their First Amendment right to free speech.

Defendants' arguments that plaintiffs' material was not "speech" because it was child pornography (or vulgar, lewd, indecent or sexually explicit material) are unpersuasive. The first amended complaint alleges that the images did not violate the law or school policy. Defendants' argument that Farley did not restrict plaintiffs' speech is similarly unpersuasive because the first amended complaint alleges that students "self-censored" and thus their speech was restricted due to Farley's actions. The law does not clearly establish, however, that Farley could not restrict such speech.

Hazelwood governs school-sponsored speech, such as student newspapers. Hazelwood,

484 U.S. 260. School-sponsored speech includes "school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school," including "activities [which] may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." Id. at 271. Under Hazelwood, educators may restrict the content of school-sponsored speech so long as their actions are reasonably related to legitimate pedagogical concerns. Id. at 273.

Here, plaintiffs allege that Farley restricted their First Amendment right to free speech by questioning them about flagged photography assignments and accusing them of creating indecent exposure or child pornography in the assignments. The student photography assignments qualify as school-sponsored speech, and preventing indecent exposure and child pornography are legitimate pedagogical concerns. Thus, the first amended complaint does not plausibly allege that Farley violated plaintiffs' First Amendment right to free speech by questioning them about photography assignments which Gaggle had flagged as pornographic.

Accordingly, Farley is entitled to qualified immunity on plaintiffs' First Amendment claims against him.

### ii.    Fourth Amendment

The first amended complaint alleges that Gaggle searched, flagged and seized student materials, and Farley questioned students about photography assignments which Gaggle had flagged as indecent exposure or child pornography. Defendants argue that the first amended complaint does not allege that Farley engaged in a search or seizure of student materials (he never asked plaintiffs to show him materials, inspected their devices or platforms or seized any of their

work).  Defendants also argue that by questioning them, Farley did not impermissibly seize the students themselves, because Gaggle flagging justified his "seizure" for questioning, and he did not prevent plaintiffs from contacting parents or attorneys, threaten them or detain them for an unreasonable period of time or under unreasonable conditions.

Indeed, courts have found that questioning students in difficult circumstances does not violate clearly established Fourth Amendment rights.  See Wyatt v. Fletcher, 718 F.3d 496, 503–04 (5th Cir. 2013) (school coach entitled to qualified immunity on Fourth Amendment seizure claim based on coach's questioning of student athlete inside locked locker room even though coach allegedly shouted and used "intimidating gestures"); Foley v. Carlsbad Mun. Sch., No. 1:09-CV-01147-RB-GBW, 2011 WL 13286401, at *7 (D.N.M. Jan. 24, 2011) (school officials' threatening and coercive questioning of minor student about possible marijuana distribution, detaining her for more than two hours and not allowing her to contact her parents did not violate clearly established Fourth Amendment rights).

A search or seizure in a public school is appropriate if it is "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place." Couture v. Bd. of Educ. of Albuquerque Pub. Sch., 535 F.3d 1243, 1250 (10th Cir. 2008). "Justified at its inception" means that "there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." A.M. v. Holmes, 830 F.3d 1123, 1158 (10th Cir. 2016).  A search is permissible in scope if it is "reasonably related to the objectives of the search and not excessively intrusive."  Id. at 1160 (quoting New Jersey v. T.L.O., 469 U.S. 325, 342 (1985)).

The first amended complaint alleges that Gaggle, not Farley, searched student material and seized content.  The first amended complaint alleges that Farley seized the students by calling them

to the front office and questioning them individually without contacting their parents.[3]  The question is whether Gaggle's flagging the material as indecent exposure or child pornography justified Farley's "seizing" the students for questioning.  Plaintiffs have not cited (and the Court has not found) any law that when AI surveillance flags student material as potentially criminal, a school official cannot reasonably rely on that information to call in a student for questioning.  Thus, existing precedent has not placed "beyond debate" the statutory or constitutional question whether Farley lacked justification for questioning the students.  Shaw v. Schulte, 36 F.4th 1006, 1013 (10th Cir. 2022) (quoting White v. Pauly, 580 U.S. 73, 79 (2017)).  Also, Farley's reliance on Gaggle flagging does not constitute that "rare obvious case" where the unlawfulness of his conduct would have been sufficiently clear even though existing precedent did not address similar circumstances.  Id. (quoting Est. of Ceballos, 919 F.3d at 1218).  The first amended complaint does not factually allege that Farley's questioning was unreasonable or excessively intrusive given the objective of the search.  Therefore, the law did not clearly establish that Farley's questioning violated plaintiffs' Fourth Amendment rights, and he is entitled to dismissal of that claim based on qualified immunity.

    B.    Quentin Rials

    The first amended complaint alleges that Rials issued a directive forbidding *The Budget* and its student reporters from reporting on this lawsuit and caused a District teacher to meet with and pressure Ashlyn Tell not to report on this lawsuit.  Defendants argue that the first amended complaint fails to allege that Rials violated plaintiffs' First Amendment rights by restricting

---

        [3]    As to the allegations that Farley did not view the content or allow plaintiffs to pull up the content, the first amended complaint alleges that Gaggle seized and quarantined flagged material, so it is not clear that Farley (or anyone else) could have accessed the material once Gaggle flagged it.

student reporting on the lawsuit because (1) educators may make viewpoint-based decisions on school-sponsored speech, (2) courts give substantial deference to educators' stated pedagogical concerns such as the need to impart values like discipline, courtesy and respect for authority or the desire to avoid controversy within school environment and (3) it does not allege that Rials was behind any third-party threat not to publish.

Plaintiffs' response does not address these arguments about Rials. Under District of Kansas Rule 7.1, if a party does not timely respond to a motion to dismiss, the Court ordinarily will grant the motion as uncontested without further notice. See D. Kan. R. 7.1(c). Likewise, under District of Kansas Rule 7.1 and basic litigation principles, when a party files a response to a motion but does not address all arguments which the motion raises, the party has effectively conceded the arguments which it does not address and abandoned any claims which depend on response to such arguments. C1.G ex rel. C.G. v. Siegfried, 38 F.4th 1270, 1282 (10th Cir. 2022) (district court correctly dismissed plaintiff's facial challenge because he abandoned it by not addressing it in response to defendants' motion to dismiss); see Brown v. Nationwide Ins. Co., No. 21-4122, 2023 WL 4174064, at *8–9 (10th Cir. June 26, 2023) (district court properly concluded that plaintiff abandoned bad faith claim because she responded to motion to dismiss but ignored arguments on that claim); Lancaster v. Sprint/United Mgmt. Co., 670 F. App'x 984, 984–85 (10th Cir. 2016) (plaintiff waived retaliation claim because she did not respond to defendant's argument on claim).

Accordingly, Rials is entitled to qualified immunity, and the Court dismisses plaintiffs' claims against him.

### III.   Claims Against School Board

The first amended complaint alleges that the Board (1) violated plaintiffs' Fourth

Amendment rights to be free from unreasonable search and seizure, (2) violated plaintiffs' First Amendment rights to freedom of speech and freedom of press and (3) retaliated against Ashlyn Tell for exercising her First Amendment rights.  Defendants argue that the Court should dismiss plaintiffs' claims against the Board, because they duplicate plaintiffs' claims against the District. Plaintiffs respond that Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978), requires plaintiffs to plausibly allege that an official policy or custom was the moving force behind a constitutional violation, and the Board adopts and clarifies the rules and the District implements and enforces them.  Plaintiffs argue that they included both the District and the Board to capture the policy adoption and operational implementation, and that at this stage, pruning parties risks confusion about where the authority for the challenged practices lies.

Plaintiffs do not challenge or distinguish defendants' arguments and this Court's findings in Rubio v. Turner Unified Sch. Dist. No. 202, 453 F. Supp. 2d 1295, 1300 (D. Kan. 2006), that "the board of education is merely the governing body of the school district and is not a separate legal entity, any judgment against the board necessarily is against the school district" and "a claim against a sub-unit of a school district is the equivalent of a suit against the school district itself," so "[a]suit against both entities is duplicative."  453 F. Supp. 2d at 1300.

Accordingly, the Court dismisses plaintiffs' claims against the Board.

## IV.     Requests For Declaratory And Injunctive Relief

Defendants argue that the Court should dismiss Counts One, Two, Four and Five of the first amended complaint, because they merely seek injunctive and declaratory relief for claims which plaintiffs plead separately.  Defendants argue that declaratory and injunctive relief are remedies, not separate causes of action.  Plaintiff responds that "[t]he Court can, as a matter of pleading hygiene, construe any standalone counts for injunctive or declaratory relief as prayers for

relief attached to Plaintiffs' constitutional claims without dismissing anything on the merits." Plaintiffs' Opposition To Defendants' Motion To Partially Dismiss (Doc. #40) filed January 20, 2026 at 1.

The Court construes Counts One, Two, Four and Five as prayers for relief as opposed to standalone claims, and declines to dismiss them.

## V. Kansas Open Records Act

On October 27, 2025, defendants filed a motion to partially dismiss plaintiffs' original complaint. The motion included a qualified immunity argument. On October 29, Magistrate Judge Gwynne E. Birzer explained to the parties by letter that unless they agreed to proceed with scheduling, she would postpone scheduling under Rules 16(b) and 26(f) until the Court's decision regarding defendants' motion to dismiss the original complaint.

On October 30, Ashlyn Tell and P.M., acting in their journalistic capacities, submitted KORA requests to defendants seeking contracts, invoices, procurement, configuration and policy records for Gaggle and ManagedMethods. Their requests invoked the three-business-day action requirement of K.S.A. § 45-218(d), requested itemized estimates limited to actual costs and asked that non-exempt material be segregated and produced. On October 31, defendants acknowledged the requests and stated that their attorneys were reviewing it. As of November 4, defendants had not (1) identified any custodian holding responsive records, (2) described any search methodology or repositories to be searched, (3) forwarded the request to any other offices or personnel, (4) provided any records, (5) provided a list of costs or (6) provided the earlies date and place of inspection.

On November 13, the Court entered an order deferring scheduling until the Court's ruling on defendants' motion to dismiss the original complaint. On November 17, plaintiffs filed their

first amended complaint alleging violations of KORA. Defendants seek to dismiss plaintiffs' KORA claims, and plaintiffs seek judgment on the pleadings that defendants violated KORA.

A.    Defendants' Motion To Dismiss Plaintiffs' KORA Claims

Defendants argue that plaintiffs' KORA claims (Counts Ten, Eleven and Twelve) are improper because the KORA requests sought information related to this case despite a court order which effectively stayed discovery. They argue that (1) plaintiffs cannot use KORA requests to evade discovery restrictions and (2) qualified immunity protects defendants from the burdens of discovery until the Court resolves that defense.

Plaintiffs respond that defendants admit noncompliance with baseline KORA requirements of timeliness and adequacy. Plaintiffs further respond that no stay was in place on October 30 when plaintiffs filed their KORA requests—only Judge Birzer's letter expressing intent to postpone scheduling absent party input, which did not impose a stay on discovery.

Defendants' argument is that Judge Birzer's letter imposed a stay on discovery. It did not, and defendants filed no motion to stay discovery. No local rule prohibited discovery before a scheduling conference and order. Even if a general discovery stay had been in place, defendants could have sought a protective order or issued a timely KORA denial which cited their legal basis for withholding. Furthermore, the qualified immunity of individual defendants would not protect the District (or its appointed record custodian) from a duty to comply with KORA. Plaintiffs' KORA claims do not seek relief from the individual defendants, so qualified immunity has no bearing on this issue.

Accordingly, plaintiffs have stated a claim for a violation of KORA by the District, and the Court overrules defendants' motion to dismiss Counts Ten, Eleven and Twelve.

B.      Plaintiffs' Motion For Judgment On The Pleadings

Plaintiffs request that the Court (1) grant judgment on the pleadings against the District on Counts Ten, Eleven and Twelve, declaring that defendant violated K.S.A. § 45-218(d) with respect to the requests of October 30, 2025; (2) enter a compliance order under K.S.A. § 45-222 directing defendant within 14 days to issue a KORA-compliant response to each request that (a) describes the searches conducted and repositories consulted; (b) specifies the earliest date and place for inspection or production; (c) for any record withheld in whole or in part, cites the specific K.S.A. § 45-221(a) subsection; and (d) produces all reasonably segregable non-exempt material as required by K.S.A. § 45-221(d); (3) reserve plaintiffs' right to seek attorney's fees and costs under K.S.A. § 45-222 upon the requisite showing on a fuller record, with any fee determination deferred until after compliance; and (4) award any further relief the Court deems just and proper.

Defendants respond that (1) plaintiffs' requests violated a discovery stay; (2) even if no discovery stay was in place, its absence was a mere technicality, and the Court later issued a stay of discovery; (3) a compliance order is not yet appropriate because the parties are still negotiating the scope of plaintiffs' KORA requests and (4) plaintiffs are not entitled to any remedies because defendants acted in good faith and had a reasonable basis in fact and law in believing that a discovery stay was in place.

Section 45-218(d) imposes mandatory, time-defined obligations. The agency must act "as soon as possible, but not later than the end of the third business day" after receipt of requests. K.S.A. § 45-218(d). If the agency does not immediately grant access, "the custodian shall give a detailed explanation of the cause for further delay and the place and earliest time and date that the record will be available for inspection." Id. If the agency denies access, "the custodian shall provide, upon request, a written statement of the grounds for denial," which "shall cite the specific

provision of law" and be furnished within three business days of the request.  Id.  The agency must produce reasonably segregable non-exempt material.  K.S.A. § 45-221(d).

As established above, no discovery stay existed on October 30, 2025 when plaintiffs submitted KORA requests, and defendants admit violations of Section 45-218(d).  By November 4—the third business day—defendants had not denied the requests, produced any records or provided the earliest available date and place of inspection.  The Court therefore declares that defendants violated Section 45-218(d) with respect to the KORA requests of Ashlyn Tell and P.M. dated October 30, 2025.

Defendants argue that a compliance order is not yet appropriate because the parties are still negotiating the scope of plaintiffs' requests.  To comply with KORA, defendants do not necessarily need to produce all of plaintiffs' requests—they must, however, (1) give a detailed explanation of the cause for further delay and the place and earliest time and date that the record will be available for inspection, (2) if the request for access is denied, provide, upon request, a written statement of the grounds for denial which cites the specific provision of law under which access is denied and (3) produce reasonably segregable, non-exempt material.  The Court therefore orders that, within five days, no later than 5:00 P.M. on April 13, 2026, defendants issue a KORA-compliant response for each request which (a) describes the searches conducted and repositories consulted; (b) specifies the earliest date and place for inspection or production; and (c) for any record withheld in whole or in part, cites the specific K.S.A. § 45-221(a) subsection and (d) produces all reasonably segregable non-exempt material as required by K.S.A. § 45-221(d).

Under Section 45-222, if the Court finds that the agency's denial of access to the public record was not in good faith and without a reasonable basis in fact or law, it shall award costs and attorney fees for services rendered in such action.  K.S.A. § 45-222.  On this record, the Court

cannot determine whether defendants acted in good faith.  No discovery stay absolves them of culpability for failure to comply.  The individual defendants are not parties to Counts Ten, Eleven and Twelve, so their claim of qualified immunity is irrelevant to the question of KORA compliance.  Plaintiffs may seek attorney fees and costs under Section 45-222 upon the requisite showing on a fuller record. The Court schedules a hearing on those issues for 3:00 P.M. on Thursday, April 23, 2026.

## VI.     First Amendment Retaliation Claim

Plaintiffs allege that in retaliation for Ashlyn Tell's exercise of her First Amendment rights to free speech and press by seeking to report on this lawsuit, the District chilled her activity for no less than five days.  Defendants argue that plaintiff fails to allege facts to support her First Amendment retaliation claim because (1) vicarious liability under respondeat superior does not exist in Section 1983 cases, (2) to prevail against an institution, plaintiff must establish official policy or custom, causation and state of mind and (3) plaintiff must make clear who has allegedly done what and may not merely assert that defendants violated her rights.  Defendants argue that plaintiff failed to (1) adequately plead that the District's actions gave rise to her claim for First Amendment retaliation, (2) plead facts identifying a particular District policy, custom or other action that caused her alleged constitutional injuries and (3) plead facts that support her conclusions that defendants caused her injuries, acted with a retaliatory motive or acted with deliberate indifference.  Plaintiff does not address defendants' assertion that the first amended complaint does not satisfy the pleading standards applicable to a First Amendment retaliation claim against the District.

Accordingly, the Court dismisses the First Amendment retaliation claim of Ashlyn Tell. See Siegfried, 38 F.4th at 1282 (district court correctly dismissed plaintiff's facial challenge

because he abandoned it by not addressing it in response to defendants' motion to dismiss); see Brown, 2023 WL 4174064, at *8–9 (district court properly concluded that plaintiff abandoned bad faith claim because she responded to motion to dismiss but ignored arguments on that claim); Lancaster, 670 F. App'x at 984–85 (plaintiff waived retaliation claim because she did not respond to defendant's argument on claim).

**IT IS THEREFORE ORDERED** that Defendants' Motion To Partially Dismiss Plaintiffs' First Amended Complaint (Doc. #34) filed December 19, 2025 is **SUSTAINED in part. The Court dismisses the First Amendment retaliation claim of Ashlyn Tell, the claims for injunctive and declaratory relief of the graduated students, the claims against the School Board and, based on qualified immunity, all claims against Greg Farley and Quentin Rials.**

**IT IS FURTHER ORDERED** that Plaintiffs Ashlyn Tell And P.M.'s Motion For Partial Judgment On The Pleadings On KORA Violations And For Declaratory And Compliance Order (Doc. #41) filed January 20, 2026, is **SUSTAINED.  On the issue of attorney costs and fees, the Court sets a hearing for 3:00 P.M. on April 23, 2026 to determine whether defendants acted in good faith.  IT IS FURTHER ORDERED that, no later than 5:00 P.M. on April 13, 2026, defendants issue a KORA-compliant response for each request which (a) describes the searches conducted and repositories consulted; (b) specifies the earliest date and place for inspection or production; and (c) for any record withheld in whole or in part, cites the specific K.S.A. § 45-221(a) subsection and (d) produces all reasonably segregable non-exempt material as required by K.S.A. § 45-221(d).**

Dated this 8th day of April, 2026 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge