# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

JACK TELL; NATASHA TORKZABAN;
MORGAN SALISBURY; OPAL MORRIS;
HENRY FARTHING; SUZANA KENNEDY;
NAOMI SUI PANG; ASHLYN TELL;
PHOEBE MORRIS; E.B., a minor, by and
through his parent and next friend
CATHERINE P. BATZA, Ph.D.; and H.C.,
a minor, by and through his parents and
next friends DANIELLE BRUNIN and
ERIK CHANEY,

)
)
)
)
)
)
)
)
)
)
)
)
)

*Plaintiffs,*

v.

LAWRENCE USD 497, a political subdivision
of the State of Kansas,

*Defendant.*

)
)
)
)
)
)
)
)
)
)
)
)

Case No.:  2:25-cv-02428-KHV-GEB


**SECOND AMENDED COMPLAINT
FOR
CIVIL RIGHTS VIOLATIONS**


**JURY TRIAL DEMANDED**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

JACK TELL; NATASHA TORKZABAN; )
MORGAN SALISBURY; OPAL MORRIS; )
HENRY FARTHING; SUZANA KENNEDY; )
NAOMI SUI PANG; ASHLYN TELL; and )
P.M., a minor, by and through her parents )
MARGARET WEISBROD MORRIS and )
JONATHAN MORRIS, )

        Πλαιντιφφσ,

        v.

LAWRENCE BOARD OF EDUCATION, a )
political subdivision of the State of Kansas; )
LAWRENCE USD 497, a political subdivision )
of the State of Kansas; GREG FARLEY, in his )
individual capacity; and QUENTIN RIALS, in )
his individual capacity,

        Δεφενδαντσ.

Case No.: 2:25-cv-02428-KHV-GEB

**FIRST AMENDED COMPLAINT FOR CIVIL RIGHTS VIOLATIONS**

**JURY TRIAL DEMANDED**

---

Mark P. Johnson (Kan. No. 22289)
Harrison M. Rosenthal (Kan. No. 28894)
Jacob S. Margolies (Kan. No. 29470)

DENTONS US LLP

4520 Main St., Ste. 1100
Kansas City, MO 64111
Phone: (816) 460-2400
Fax: (816) 531-7545
mark.johnson@dentons.com
harrison.rosenthal@dentons.com
jacob.margolies@dentons.com

Χουνσελ φορ Πλαιντιφφσ
Mark P. Johnson (Kan. No. 22289)
Harrison M. Rosenthal (Kan. No. 28894)
Jacob S. Margolies (Kan. No. 29470)
Rebecca Hughes Parker (pro hac vice)

DENTONS US LLP

4520 Main St., Ste. 1100
Kansas City, MO 64111
Phone: (816) 460-2400
Fax: (816) 531-7545
mark.johnson@dentons.com
harrison.rosenthal@dentons.com
jacob.margolies@dentons.com
rebeccahughes.parker@dentons.com

*Counsel for Plaintiffs*

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 2 of 86
**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................................... 1

PARTIES ................................................................................................................................. 8

    I.     Plaintiffs ..................................................................................................... 8

    II.    ~~Defendants~~Defendant ..................................................................... ~~10~~11

JURISDICTION AND VENUE ............................................................................... ~~12~~11

FACTUAL ALLEGATIONS ..................................................................................... ~~13~~12

    I.    ~~Defendants~~Defendant Authorized Sweeping, Suspicionless Monitoring Programs. ................................................................................. ~~13~~12

    II.    The District's Technology and Standards. ....................................... ~~24~~22

    III.    The Lawrence Public Schools' Acceptable Use Policy. ................... ~~29~~28

    IV.    AI-Surveillance Monitoring Obstructs Student Journalism~~.~~ ............. ~~31~~29

    V.    The District Searched and Seized Morris's and Farthing's Personal Effects. ..................................................................................................... 31

~~32~~

    VI.    The Students Met With District Representatives Who Falsely Promised That Journalism Students Would No Longer Be Subject to AI-Surveillance Monitoring Search and Seizure~~.~~ ................................. ~~37~~36

    VII.    Gaggle Obstructed Suzana Kennedy's Investigation Into Its Methodology and Implementation. ..................................................... ~~43~~42

    VIII.    Kennedy's Investigation Uncovered That Gaggle Deters Students from Reporting Mental Health Concerns, Thereby Creating and Exacerbating the Very Problems the District Claimed it Would Remedy~~.~~ ............................................................................................... ~~45~~44

    IX.    Principal Rials Issued a Facially Unconstitutional Directive Prohibiting Student Reporting on This Lawsuit, Which He Continued to Enforce Within Hours of the District's Purported Rescission of Same. ............................ ~~48~~47

    X.    Concerned Families May Not Opt Out of AI-Surveillance Monitoring. .......... ~~53~~52

    XI.    Current Students E.B. and H.C. Have Been Subjected to and Remain Subject to AI-Surveillance Monitoring. ............................................................. 54

XIXII. DefendantsDefendant Failed to Act Upon Plaintiffs' Kansas Open Records Act Requests. .................................................................................................... 57

Requests. ............................................................................................................ 55
INJURIES TO PLAINTIFFS.............................................................................. 5961

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 3 of 86

CAUSES OF ACTION ............................................................................................ 6163

FIRST CLAIM
    Violation of Fourth Amendment (Declaratory Relief) Unreasonable Search,
     Unreasonable Seizure 42 U.S.C. § 1983 (All Plaintiffs E.B. and H.C.
     against allDefendant)............................................................................. 63

    Defendants) .......................................................................................... 61
SECOND CLAIM
    Violation of Fourth Amendment (Injunctive Relief) Unreasonable Search,
     and Unreasonable Seizure 42 U.S.C. § 1983 (Injunctive Relief) (Plaintiffs
     Ashlyn TellE.B. and PH.M.C. against Defendant)................................. 67

    against Defendants Board and District) ............................................... 64
THIRD CLAIM
    Violation of Fourth Amendment (Damages) Unreasonable Search,
     Unreasonable Seizure 42 U.S.C. § 1983 (All Plaintiffs against
     allDefendant) ....................................................................................... 68

    Defendants) .......................................................................................... 66
FOURTH CLAIM
    Violation of First Amendment (Declaratory Relief) Freedom of Speech,
     Freedom of Press 42 U.S.C. § 1983 (All Plaintiffs E.B. and H.C. against all
     DefendantsDefendant) ....................................................................... 6770

FIFTH CLAIM
    Violation of First Amendment (Injunctive Relief) Freedom of Speech,
     Freedom of Press 42 U.S.C. § 1983 (Ashlyn TellInjunctive Relief)
     (Plaintiffs E.B. and PH.MC. against Defendant).................................. 72

    Defendants District and Board)............................................................. 69
SIXTH CLAIM
    Violation of First Amendment (Damages) Freedom of Speech, Freedom of
     Press 42 U.S.C. § 1983 (All Plaintiffs against all DefendantsDefendant)....... 7173

SEVENTH CLAIM
    Violation of First, Fourth, and Fourteenth Amendments (Declaratory
     Relief) Vagueness 42 U.S.C. § 1983 (All Plaintiffs against the District
     andDefendant) ..................................................................................... 74

    Board)................................................................................................... 72
EIGHTH CLAIM
    Violation of First, Fourth, and Fourteenth Amendments (Declaratory
     Relief) Overbreadth 42 U.S.C. § 1983 (All Plaintiffs against the District
     and) ...................................................................................................... 75

    Board)................................................................................................... 73
NINTH CLAIM
    First Amendment Retaliation and Prior Restraint Freedom of Speech, Freedom of
     Press 42

U.S.C. § 1983 (Plaintiff Ashlyn Tell against ~~Defendants Rials, District,~~ ~~and~~Defendant) ................................................................................................... 77

~~Board)~~ ................................................................................................................... ~~75~~

TENTH CLAIM
Violation of Kansas Open Records Act Failure to Conduct Adequate Search
for Responsive Records (Injunctive and Declaratory Relief) K.S.A. 45-215

ii

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 4 of 86

et seq.; 28 U.S.C. § 1367 (Plaintiffs Ashlyn Tell and ~~P.M.~~Phoebe Morris against Defendant) ........................................................................ 79

~~Defendants District and Board)~~ ...................................................................~~77~~

ELEVENTH CLAIM

Violation of Kansas Open Records Act Failure to Disclose Responsive Records (Injunctive and Declaratory Relief) K.S.A. 45-215 et seq.; 28 U.S.C. § 1367 (Plaintiffs Ashlyn Tell and ~~P.M.~~Phoebe Morris against ~~Defendants District~~Defendant) ................................................... 79

~~and Board)~~ ....................................................................................~~78~~

TWELFTH CLAIM

Violation of Kansas Open Records Act Failure to Respond Within Time Required (Injunctive and Declaratory Relief) K.S.A. 45-215 et seq.; 28 U.S.C. § 1367 (~~Plaintiff~~Plaintiffs Ashlyn Tell and ~~P.M.~~Phoebe Morris against ~~Defendants District~~Defendant) ................................................. 80

~~and Board)~~ ....................................................................................~~78~~

PRAYER FOR RELIEF ....................................................................... ~~79~~80

DEMAND FOR JURY TRIAL ................................................................ ~~80~~81

~~iii~~

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 5 of 86

**INTRODUCTION**

1.       This case challenges the Lawrence, Kansas, School District's ("the District" or "USD 497") decision and policy to subject all students to round-the-clock digital surveillance—scanning their files, flagging their speech, and removing their creative work from access, often without any notice, suspicion of wrongdoing, or meaningful recourse. Through its use of Gaggle beginning in November 2023, and now through a substantially similar replacement platform, ManagedMethods, the District has conducted suspicionless searches and seizures of student expression on a scale and scope that no court has ever upheld—and that the Constitution does not permit. The District's self-purported late-summer 2025 change in vendor does not cure the constitutional infirmities; it merely continues them under another name.

2.       The District did not disclose the vendor substitution in contemporaneous court filings, public Board agendas, or minutes during the summer and fall of 2025, did not present any consent agenda item or motion seeking Board approval for ManagedMethods, and nevertheless presented a check register reflecting payment to "MANAGED METHODS INC" in October 2025 at the October 27, 2025 Board meeting, thereby continuing the challenged practices under a different name without transparent Board action.

3.       The ~~Defendants'~~ District's adoption and application of Gaggle—and the District's subsequent substitution of ManagedMethods—constitute facial violations of the First Amendment and, as applied to Plaintiffs, violations of their First Amendment rights. The District's surveillance regime has also violated Plaintiffs' Fourth Amendment rights by causing searches of their protected content without reasonable suspicion and the seizure and censorship of protected materials. In addition, Plaintiffs assert state law claims under the Kansas Open Records Act, K.S.A. 45-215 *et seq.*, based on the District's failure to timely and lawfully respond to records

1

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 6 of 86

requests regarding ManagedMethods and the vendor transition. The Court has supplemental jurisdiction over those claims under 28 U.S.C. § 1367.

4.      In November 2023, USD 497 and its Board of Education implemented Gaggle, a third-party software that scans all student emails, documents, and other files on school issued accounts and devices, which students must use to obtain the education the District is obligated to provide. Gaggle operates without individualized suspicion or case-specific review. Once flagged, student content is initially reviewed by Gaggle contractors whose training and qualifications are unknown to the District; they are not District employees nor subject to District oversight. Only if a contractor's review identifies the content as "suspect" do District officials review the content and, in some cases, remove it entirely from student accounts—all without students' knowledge, notice, or opportunity to contest.

5.      Soon after the District launched Gaggle, the creative contents of numerous art, journalism, and photography students were flagged, many of those students were interrogated, and their original images were removed. Although the flagged artwork did not contain nudity or violate school policy in any way, student work was seized without warning. Students discovered their files were missing only after comparing school accounts to personal backups. One student was compelled to describe every image in her art portfolio to school administrators. Some students recovered seized work only after months of advocacy.

6.      Gaggle surveillance also disrupted the work of student journalists at *The Budget* and the *Free Press*, the award-winning student publications at Lawrence High School and Lawrence Free State High School, respectively. Through Gaggle, student journalists' work product was subject to prior review, and, as shown through the students' investigative reporting, prior restraint.

2

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 7 of 86

7. The District and its use of Artificial Intelligence ("AI") student-monitoring programs—operating at the District's behest—do not merely infringe students' Fourth and First Amendment rights; they do so in a way that actively undermines the very safety concerns the District claims to address. Acting with the District's knowledge, Gaggle and ManagedMethods automatically and unilaterally seize student materials containing an undisclosed list of "trigger words" or phrases, without regard to context. This sweeping censorship extends to all student documents and content within the Google Workspace/Suite on District platforms. As a result, when students use their school-issued accounts to seek help or report concerns—particularly about mental health—AI student-monitoring programs frequently intercept and seize those communications before they can reach their intended recipients, including teachers, counselors, and even parents. Such censorship denies some students the help they may need, contrary to ~~Defendants'~~ the District's articulated purpose for using AI student monitoring.

8. Student journalism editors raised concerns with District administrators that Gaggle surveillance was impeding their ability to report on matters of public concern—activity protected by the First Amendment. After months of advocacy, the District purportedly granted a limited exemption from file scanning within the journalism Google Drive. But in practice, the District has continued to monitor, seize, and remove student journalists' emails, where most of their work was drafted, stored, and exchanged.

9. When *The Budget*'s then-editor-in-chief investigated via requests under the Kansas Open Records Act why Gaggle continued to operate in violation of the purported exemption for student journalism, the findings responsive to her requests were, ironically, suppressed by Gaggle itself, apparently unbeknownst to the District officials tasked with responding to the requests. Like the fox guarding the henhouse, Gaggle prevents parties from learning about how and when it

3

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 8 of 86

operates. The District was made aware of Gaggle's actions with respect to student journalists, but took no action to eliminate the problem.

10. The Supreme Court established more than 50 years ago that America's students do not "shed their constitutional rights . . . at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). This includes their First Amendment rights to speech and expression, *id.*, and their Fourth Amendment rights against unreasonable search and unreasonable seizure. *New Jersey v. T.L.O.*, 469 U.S. 325, 333 (1985). And the Court has been clear: unless a school search is "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place," the search is unconstitutional. *Id.* at 341–42 (internal quotation marks and citation omitted). School officials must have "reasonable suspicion" that their search will "raise a moderate chance of finding evidence of wrongdoing." *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364 (2009).

11. ~~Defendants are~~The District is engaged in drag-net searches and seizures of all students' protected expression without any suspicion that students are violating the law or school rules or engaging in any sort of wrongdoing whatsoever. ~~Defendants'~~The District's policy and use of AI student-monitoring programs are not only unconstitutional under *Tinker*, *T.L.O.*, and their progeny, but also cut against ~~Defendants'~~the District's stated purpose of helping students struggling with mental health by blocking emails to teachers, other faculty, and even parents regarding the same. The District's vendor substitution to ManagedMethods does not alter these constitutional defects where the core practice—suspicionless scanning, flagging, and seizure of student speech and effects—continues.

12. Plaintiffs include two groups of students. Jack Tell, Natasha Torkzaban, Morgan Salisbury, Opal Morris, Henry Farthing, Suzana Kennedy, and Naomi Sui Pang were students at Lawrence High School when Gaggle was first deployed in 2023. They experienced direct

4

interference with their journalistic, artistic, and/or creative works and suffered harm to their ability to engage in protected expression. Plaintiffs Ashlyn Tell and P.MPhoebe Morris were current student journalists when the First Amended Complaint was filed and suffered similar harms, including KORA-related injuries. Plaintiffs E.B. and H.C. are current students at Lawrence High School and Lawrence Free State High School, respectively, who suffer similar harms on an ongoing basis and whose school-issued accountswho remain enrolled in the District, remain subject to continuous, unjustified, and illegal surveillanceAI-surveillance, and face ongoing injury from the challenged practices.

13.     Gaggle operates through artificial intelligence that flags items for review. Gaggle moderators conduct a brief contextual review to determine the propriety of the content at issue and quarantine the item unless the flag is deemed a false positive. In its first six months of operation, Gaggle flagged 285,863 items for review and labeled 1,096 as "actionable incidents." The District has never informed students of the standards governing these flags, what content may be removed, or what triggers a review.

14.     The District's new platform, ManagedMethods, likewise scans student Google Workspace content, and, according to the District's own description, can also track browser activity. The District has not disclosed any narrowing standards or due process protections accompanying its vendor switch. Such opacity forces students to weigh the risk of discipline and file deletion each time they write, store, or share work on District platforms. Their protected speech and expression is chilled by the constant surveillance of the District and its use of AI surveillance monitoring.

15.     Students are required to use District-managed servers and IT infrastructure for, among other things, journalism, photography, academic writing, personal expression, course readings and assignments, and all other aspects of their education. There is no meaningful way for

x

students to opt out of the District's surveillance regime without forfeiting access to a full and equal public education. With the District's knowledge and approval, AI monitoring is sweeping,

5

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 10 of 86
invasive, and continuous—it tracks students' access to District servers and monitors activity off-campus, outside school hours, and without even a modicum of individualized suspicion. District policies mandate use of these platforms for course participation but provide no means for students to avoid surveillance while still receiving the education to which they are entitled.

16.     In the first weeks of the 2025–2026 school year, Lawrence High School Principal Quentin Rials issued a directive forbidding *The Budget* and its student reporters from reporting on this lawsuit. Even after District counsel represented that the prohibition had been lifted, District agents met with and pressured Editor-in-Chief Ashlyn Tell not to publish, including by invoking potential adverse employment consequences for the faculty adviser. These actions constitute unlawful First Amendment retaliation and prior restraint, chilling a person of ordinary firmness from engaging in protected newsgathering and reporting on matters of public concern.

17.     In late summer and/or fall 2025, the District purportedly canceled its Gaggle contract and adopted ManagedMethods, citing claimed cost savings. No public Board agenda disclosed the switch; no public Board vote authorized this surveillance procurement; and contemporaneous filings in this lawsuit omitted the change. The Superintendent's apparent unilateral decision to terminate and/or materially alter a Board-authorized student-monitoring contract—and to adopt a replacement surveillance product—on information and belief departed from established District governance practice and exceeded her authority, particularly where materially similar technology renewals and procurements are routinely presented for Board approval, including FMX, Microsoft, Mosyle, ParentSquare, OpenEye, Cisco FLEX, and Webex.

18.    On October 30, 2025, Plaintiff-journalists submitted Kansas Open Records Act ("KORA") requests for the ManagedMethods contract and attachments; invoices, payments, and cost analyses; procurement RFP/RFQ materials, bids, scoring, and award memoranda; and District

6

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 11 of 86

communications concerning the selection, configuration, and public messaging of the vendor transition, as well as Gaggle wind down and data disposition records. KORA requires that within three business days the District must either provide the requested records, explain the reason for any delay and state the earliest date the records will be available, or provide a written denial citing the specific statutory basis. While the District and Board "acknowledge[d] receipt" of the KORA requests, they failed to act within three business days. As of the date of this filing, Defendants have failed to give a detailed explanation of the cause for further delay and the place and earliest time and date that the record will be available for inspection, thereby violating KORA. The Court has since held, as a matter of law, that the District thereby violated KORA, and has found that Plaintiffs are entitled to their costs and attorney fees, with the amount to be determined. (ECF Nos. 56, 79.)

19.    Plaintiffs seek damages, as well as injunctive and declaratory relief, both for the harms already suffered and to prevent further injury. The District's surveillance regime violates well-established constitutional protections applicable in the school setting, including the Fourth Amendment's limits on suspicionless searches and seizures and the First Amendment's prohibitions on policies and practices that chill protected student speech.

20.    Defendants' The District's use of AI surveillance is excessive, unconstitutional, and antithetical to the values the Bill of Rights was designed to protect. By subjecting students to hundreds of thousands of searches and untold numbers of secret seizures each school year, the District has transformed its schools into a miniature surveillance state in the heart of Kansas. Rather than teaching civic responsibility, the District has conditioned students to fear speech, suppress thought, and self-censor their creative and journalistic work. As employed by Defendants' the District, student-monitoring AI surveillance deletes protected content without notice, polices student expression, and reinforces a single message: Big Brother is watching. Unsurprisingly, this regime

has chilled student speech—particularly journalism and visual art—by deterring lawful expression

out of fear

of <s>7</s>

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 12 of 86

of being flagged, interrogated, or erased. This lawsuit asks the Court to do what the District would not: draw the constitutional line that should never have been crossed.

## PARTIES

### I.    Plaintiffs

16.    Plaintiff Jack Tell is 18 years or older, a citizen of the United States, and a domiciliary of Douglas County, Kansas. At all times relevant to this Complaint, Tell was a student enrolled in Lawrence USD 497 and served as co-editor-in-chief of *The Budget*, the Lawrence High School student newspaper.

17.    Plaintiff Natasha Torkzaban is 18 years or older, a citizen of the United States, and currently a domiciliary of Johnson County, Kansas. During the events alleged herein, Torkzaban was domiciled in Douglas County, Kansas, was a student enrolled in Lawrence USD 497, and served as co-editor-in-chief of *The Budget*.

18.    Plaintiff Morgan Salisbury is 18 years or older, a citizen of the United States, and a domiciliary of Douglas County, Kansas. At all times relevant to this Complaint, Salisbury was a student enrolled in Lawrence USD 497 and served as an editor of *The Budget*.

19.    Plaintiff Opal Morris is 18 years or older, a citizen of the United States, and a domiciliary of Douglas County, Kansas. At all times relevant to this Complaint, Morris was a student enrolled in Lawrence USD 497 and actively involved in the District's visual arts programs. Morris currently studies art and design at the Kansas City Art Institute.

20.    Plaintiff Henry Farthing is 18 years or older, a citizen of the United States, and a domiciliary of Douglas County, Kansas. At all times relevant to this Complaint, Farthing was a student enrolled in Lawrence USD 497 and actively involved in the District's visual arts programs. Farthing earned regional recognition in the 2025 Scholastic Art and Writing Awards, receiving a Gold Key, a Silver Key, and an Honorable Mention in photography—placing among the top 5%

of 8

of submissions. Farthing was also selected as a winner in the national YoungArts competition, making Farthing the only public school student in the country to receive the honor in photography that year.

21.     Plaintiff Suzana Kennedy is 18 years or older, a citizen of the United States, and a domiciliary of Douglas County, Kansas. At all times relevant to this Complaint, Kennedy was a student enrolled in Lawrence USD 497 and served as co-editor-in-chief of *The Budget*. Kennedy was named class valedictorian and Kansas Student Journalist of the Year in 2025—reporting on issues including student privacy.

22.     Plaintiff Naomi Sui Pang is 18 years or older, a citizen of the United States, and a domiciliary of Douglas County, Kansas. At all times relevant to this Complaint, Sui Pang was a student enrolled in Lawrence USD 497 and served as connections manager between *The Budget* and *The Lion's Roar*, the Lawrence High School video production team. Sui Pang received the Kansas Association of Broadcasters' award for best sports feature, placed sixth in the state in the Kansas Scholastic Press Association's Sports Hype Video category, and earned top-five placements in two video categories at the eMagine Media Festival.

23.     Plaintiffs Jack Tell, Torkzaban, Salisbury, Morris, Farthing, Kennedy, and Sui Pang are suing because Defendants have Defendant has violated their Fourth Amendment rights against unreasonable search and seizure and their First Amendment rights by censoring protected expression.

24.     Plaintiff Ashlyn Tell is an eighteen-year-old student at Lawrence High School, where she serves as the second-year editor-in-chief of *The Budget*. At all 18 years or older, a citizen of the United States, and a domiciliary of Douglas County, Kansas. At times relevant to this Complaint, Ms. Tell was a student enrolled inat Lawrence USD 497 High School, where she served

xvi

as the second-year editor-in-chief of *The Budget*. Ms. Tell is a 4.0 student, ranked first in her class,

a varsity lettered athlete, and the sitting Board President of the Honor Moon

9

xvii

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 14 of 86

nonprofit organization. Ms. Tell is also a recipient of the AP Scholar with Distinction Award. Ms. Tell lives with her parents in Douglas County, Kansas.

25.     Plaintiff ~~P.M. is a seventeen-year-old student at~~ Phoebe Morris is 18 years or older, a citizen of the United States, and a domiciliary of Douglas County, Kansas. At times relevant to this Complaint, Morris was a student enrolled in Lawrence Free State High School, where she served as co-news-editor-in-chief and ~~now as~~then co-news manager of the Free Press, Lawrence Free State High School's award-winning student newspaper. ~~At all~~ times relevant to this Complaint, ~~P.M. was a student enrolled in Lawrence USD 497. P.M. lives with her parents Margaret Weisbrod Morris and Jonathan Morris in Douglas County, Kansas. Margaret Weisbrod Morris and Jonathan Morris bring this action on behalf of their minor daughter, P.M.~~

26.     Plaintiff E.B. is a minor who resides in Lawrence, Kansas. E.B. is a student enrolled at Lawrence High School in Lawrence USD 497, where he serves as a staff writer for The Budget, the Lawrence High School student newspaper. He will be a junior in the 2026-2027 school year. E.B. was born in 2010 and will not graduate from high school until at least 2028. E.B. brings this action by and through his parent and next friend Catherine P. Batza, Ph.D., pursuant to Fed. R. Civ. P. 17(c).

27.     Plaintiff H.C. is a minor who resides in Lawrence, Kansas. H.C. is currently a student enrolled in Lawrence USD 497. He attended West Middle School and will attend Free State High School beginning in the 2026-2027 school year. H.C. was born in 2011 and will not graduate from high school until at least 2030. H.C. brings this action by and through his parents and next friends Danielle Brunin and Erik Chaney pursuant to Fed. R. Civ. P. 17(c).

~~26~~28.     Plaintiffs ~~Ashlyn Tell and P.M.~~ are suing because ~~Defendants are~~Defendant has violated or is violating their Fourth Amendment rights against unreasonable search and seizure and their First Amendment rights by censoring and chilling protected expression. Plaintiffs ~~Ashlyn Tell and P.M. oppose~~E.B. and H.C. are current students who remain subject to the District's AI-

surveillance monitoring and seek to use ~~the District's Student Google Drive and Google Workspace~~District-managed accounts, platforms, and devices without unreasonable search, seizure, and/or censorship of their protected expression.

**II.    ~~Defendants~~Defendant**

~~27~~29.   Defendant Lawrence USD 497 (the "District") is a political subdivision of the State of Kansas located in Douglas County, with its headquarters located at 110 McDonald Drive, Lawrence, Kansas, 66044. The District operates two public high schools and one virtual K-12 school—Lawrence High School, Lawrence Free State High School, and Lawrence Virtual School—and is responsible for implementing Board policy, including policies governing student technology use, digital surveillance, and privacy. At all times relevant to this Complaint, the District implemented, oversaw, and enforced the challenged surveillance programs.

~~28.    Defendant Lawrence Board of Education (the "Board") is a political subdivision of the State of Kansas and the governing body of the District. The Board conducts its regular and periodic meetings at the District's Educational Support Center located at 110 McDonald Drive,~~

30.    The District acts through its Board, Superintendent, administrators, employees, and agents. The challenged policies and practices were established, approved, or ratified by officials with final policymaking authority for the District—including the Board of Education's approval and renewal of the Gaggle procurement and the Superintendent's termination of Gaggle and adoption of ManagedMethods—and were implemented and enforced by District administrators.

~~10~~**JURISDICTION AND VENUE**

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 15 of 86

Lawrence, Kansas 66044. The Board possesses final policymaking authority for the District and is responsible for approving contracts, allocating funds, and adopting policies, including those related to student surveillance software. The Board approved the contract with Gaggle.Net, Inc., and authorized its implementation across District-managed platforms.

29.    Defendant Greg Farley is employed by the District as an Assistant Principal at Lawrence High School and, in that role, implements District policy with the District's knowledge and authorization. At all times relevant to this Complaint, Farley exercised authority to interrogate students based on Gaggle-flagged content, participated in the seizure of student expressive work, and compelled students to justify their protected expression.

30.    At all times relevant to this Complaint, Farley acted under color of state law. Plaintiffs sue Farley in his individual capacity for conduct not authorized by, and inconsistent with, his official duties as Assistant Principal of Lawrence High School. Farley's actions, as alleged herein, violated clearly established constitutional rights of which a reasonable school official would have known.

31.    Acting under the authority of his position, Farley personally interrogated Plaintiffs Opal Morris and Henry Farthing after Gaggle flagged their photography assignments. During these interrogations—conducted in the presence of other District employees—Farley accused Morris and Farthing of uploading images containing indecent exposure and child pornography. Both students denied the accusations and offered to open and review the flagged images with Farley. Farley refused to examine the images himself, instead compelling Plaintiffs' to recall and describe minute visual details of their work from memory—an exercise calculated to intimidate and chill their lawful, protected artistic expression.

xx

11

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 16 of 86

32.    Defendant Quentin Rials is employed by the District as the Principal at Lawrence High School, and, in that role, implements District policy with the District's knowledge and authorization. An attorney, Rials graduated from Washburn University School of Law and became licensed to practice law in the State of Kansas in 2007. At times relevant to this Complaint, Rials issued a directive forbidding *The Budget* and its student reporters from reporting on this lawsuit and, upon information and belief, caused a District teacher to meet with and pressure Ashlyn Tell not to report on this lawsuit in furtherance of the foregoing directive, subsequent to and notwithstanding the District's purported rescission of such directive.

33.    At all times relevant to this Complaint, Rials acted under color of state law. Plaintiffs sue Rials in his individual capacity for conduct not authorized by, an inconsistent with, his official duties as Principal of Lawrence High School. Rials' actions, as alleged herein, violated clearly established constitutional rights of which a reasonable school official would have known.

34.    Acting under the authority of his position, Rials issued a facially illegal and unconstitutional directive forbidding *The Budget* and its student reporters from reporting on this lawsuit. Not three hours after counsel for the District confirmed in writing that the District had lifted Rials' restriction on reporting related to the lawsuit—and on the same day Rials issued a Clarification Memo (defined below) containing synonymous representations—on information and belief, Rials caused a District teacher to meet with and pressure Plaintiff Ashlyn Tell not to report on this lawsuit, including threatening the employment and livelihood of the student journalism advisor. As with Farley, the foregoing exercises were calculated to intimidate and chill Plaintiffs' protected artistic expression.

## JURISDICTION AND VENUE

xxii

35~~31~~.    This Court has federal question jurisdiction under 28 U.S.C. § 1331 and jurisdiction

for civil rights violations under 28 U.S.C. § 1343 because Plaintiffs' claims arise under the First,

~~12~~

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 17 of 86

Fourth, and Fourteenth Amendments to the United States Constitution; the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and 1988; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

3632.    This Court has supplemental jurisdiction over Plaintiffs' state-law claims, including those arising under the Kansas Open Records Act ("KORA"), K.S.A. 45-215 *et seq.*, pursuant to 28 U.S.C. § 1367(a), because those claims form part of the same case or controversy under Article III and derive from a common nucleus of operative fact. Plaintiffs' KORA claims concern the same policies, practices, and events as the federal claims, including the procurement, configuration, and operation of the District's student-surveillance platforms and the District's handling of Plaintiffs' related records requests. Plaintiffs' KORA claims do not raise novel or complex issues of state law, do not predominate over Plaintiffs' federal claims, and no circumstance listed in 28 U.S.C. § 1367(c) warrants declination.

3733.    The Court has personal jurisdiction over all DefendantsDefendant because they reside in, areit is organized under the laws of, and/or conductconducts official activities within, the State of Kansas, and the acts and omissions giving rise to Plaintiffs' claims occurred in this District.

3834.    Venue is proper in the U.S. District Court for the District of Kansas under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Lawrence, Kansas, which is located in this federal district.

**FACTUAL ALLEGATIONS**

**I.    DefendantsDefendant Authorized Sweeping, Suspicionless Monitoring Programs.**

3935.    On or about August 1, 2023, the District and Gaggle.Net, Inc., executed a Contract for Services (the "Contract"). A true and correct copy of the Contract is attached heretowas

previously filed as Exhibit A. to the First Amended Complaint and is incorporated herein by reference.[1]

---

[1] Exhibits referenced in this Second Amended Complaint were previously filed with the First Amended Complaint and are incorporated by reference using the same exhibit lettering. Because the exhibit lettering has not changed, Plaintiffs do not reattach the exhibits to this proposed Second Amended Complaint.

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 18 of 86

4036. The Contract provides, in part, "Gaggle shall monitor email, message communications, documents, and other file types subject to certain file size limitations within third-party services . . ." (Ex. A at 10.)

4137. The Contract has a three-year term, from August 1ˢᵗ, 2023, to July 31ˢᵗ, 2026.

4238. Under the Contract, the District agreed to pay Gaggle three annual payments of $59,961.25 for Year 1, $51,162.25 for Year 2, and $51,162.25 for Year 3. (Ex. A at 3.)

4339. The Board publishes meeting agendas and materials on its public BoardDocs site at https://go.boarddocs.com/ks/usd497/Board.nsf/Public.

4440. On or about August 28, 2023, the Board published an agenda item titled "Purchase of Gaggle Software," which is publicly available at https://go.boarddocs.com/ks/usd497/Board.nsf/goto?open&id=CUWR6N6A4EBE, (the "August 28 Agenda"). A true and correct copy of the August 28 Agenda is attached heretowas previously filed as Exhibit B.

4541. The August 28 Agenda describes Gaggle as "a digital surveillance tool that helps school districts manage student safety on school-provided devices and platforms by monitoring student accounts to identify and flag those who may be struggling and need help. Gaggle Safety Management uses trained safety experts and an algorithm to provide real-time analysis and review of students' use of collaboration platforms for email and schoolwork. Safety experts evaluate flagged content and notify school officials about references to self-harm, depression, drug use, and violent threats." (Ex. B at 2.)

46~~42~~.   The District began using Gaggle to monitor student activities in November 2023.

47~~43~~.   At about the same time, the District published a webpage titled "Gaggle Frequently

Asked Questions" (the "Gaggle FAQs"), which is publicly available at

~~14~~

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 19 of 86
https://www.usd497.org/parents-and-students/resources/safety-information-and-

resources/gaggle. A true and correct copy of the Gaggle FAQs ~~is attached hereto~~was previously

filed as Exhibit C.

48<u>44</u>.    The Gaggle FAQs state, in relevant part, "Gaggle cannot and does not monitor

personal devices or any personal accounts, including but not limited to internet usage and web

browsing, calls, texts, emails, and social media posts on personal devices or accounts. Gaggle also

does not monitor teacher and staff accounts." (Ex. C.)

49<u>45</u>.    Contrary to these assurances, students reported that Gaggle flagged email

communications accessed via personal devices, including messages sent from personal phones

through school-issued Gmail accounts. Students also reported that Gaggle flagged content stored

in Google Drive folders not intended for school assignments, such as personal writings and draft

editorials.

50<u>46</u>.    Students further experienced that Gaggle was being used to monitor teachers'

emails and communications, contrary to the District's public representations. Emails between

teachers and students, such as those of the journalism advisor Barbara Tholen, would be scanned

and subsequently seized and removed based on the content of such emails.

51<u>47</u>.    On May 31, 2024, counsel for Plaintiffs sent a demand letter to the District,

detailing constitutional concerns and demanding that the District cease its use of Gaggle. A true

and correct copy of the May 31 letter ~~is attached hereto~~was previously filed as Exhibit D.

52<u>48</u>.    On June 17, 2024, counsel for the District responded, asserting that the District's

use of Gaggle was lawful and that the District would not alter its use of Gaggle. A true and correct

copy of the District's June 17 response ~~is attached hereto~~was previously filed as Exhibit E.

xxviii

~~53~~49.    Despite this notice and opportunity to cure, the Board voted on July 8, 2024, to renew its Gaggle contract for the 2024–2025 school year at a cost of $53,000. The Board voted ~~6~~

6–1 ~~15~~

xxix

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 20 of 86

in favor of renewal. A true and correct copy of the July 8, 2024 meeting agenda is attached hereto was previously filed as Exhibit F, and a true and correct copy of the minutes memorializing the vote after private discussion are attached hereto were previously filed as Exhibit G.

54 50.    In late summer or early fall 2025, the District purportedly canceled its Gaggle contract and adopted ManagedMethods, a substantially similar AI-driven AI-driven surveillance product that continues to scan students' Google Workspace content. A true and correct copy of the District's check register reflecting a payment to "MANAGED METHODS INC" in October 2025 is attached hereto was previously filed as Exhibit H.

55.    Defendants' 51.    Defendant's practice is to present technology procurements and renewals for public Board approval on the consent agenda, supported by staff memoranda and quotes—including FMX, Microsoft licensing, Mosyle Manager, ParentSquare, OpenEye, Cisco FLEX, and Webex— followed by public votes.

56 52.    In July 2025 alone, the Board approved multiple technology renewals and subscriptions by motion and vote. No agenda from July 2025 to present publicly presented any ManagedMethods procurement or configuration item, and no minutes reflect a Board vote authorizing a vendor substitution for AI-student monitoring surveillance.

57 53.    ManagedMethods maintains a website that includes a "how it works" page and "frequently asked questions" ("ManagedMethods FAQs"). A true and correct copy of these materials is attached hereto was previously filed as Exhibit I.

58 54.    On information and belief, the District was fully aware of the information contained in the ManagedMethods FAQs when it adopted the use of ManagedMethods.

xxx

5955.   The ManagedMethods FAQs include a section titled "Is ManagedMethods

FERPA,

COPPA, and CSPC compliant," which provides, in relevant part:

16

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 21 of 86

> Both of ManagedMethods' products, Cloud Monitor and Content Filter, use deep, 1-to-1 API integrations to provide visibility and control of your districts [sic] cloud computing and Internet browsing behavior. Cloud Monitor scans data and detects risks within your Google Workspace and/or Microsoft 365 environment. The platform works as a nearly native tool to report on and remediate data security, student safety, and compliance risks within your cloud environment.

(Ex. I. at 1.)

6056.   The ManagedMethods FAQs include a section titled "Is Cloud Monitor a content filter," which provides, in relevant part:

> Cloud Monitor scans your district's Google Workspace and/or Microsoft 365 domain to detect content based on specific parameters (we call "risks") that are set up using contextual keywords, regex text, and numerical strings, and artificial intelligence. Cloud Monitor is capable of scanning for different types of content within your domain for both data security and student safety use cases.

> For example, it can detect when a file containing personally identifiable information is being shared outside your domain and/or globally and automatically break the share. The platform can also detect when explicit images are being uploaded and/or shared from your district's shared drives, email, and chat apps.

> Cloud Monitor specifically works to detect risks inside Google Workspace for Education apps currently including Gmail, Drive, Shared Drive, Docs, Slides, Sheets, Chat, Meet, and Classroom. In Microsoft 365, the platform works to detect risks inside Microsoft's cloud-specific environment (not on-prem software), including Outlook, Word, PowerPoint, Excel, SharePoint, and OneDrive.

(Ex. I. at 2.)

6157.   The ManagedMethods FAQs include a section titled "Is Cloud Monitor a firewall / next-gen firewall," which provides, in relevant part:

> Cloud Monitor uses deep, 1-to-1 API integrations with Google Workspace and Microsoft 365 to provide a layer of monitoring and control security within your district's cloud applications. *In most cases, the platform will detect and remove, revoke access, or quarantine risks (based on your policy configurations) within*

*seconds, oftentimes before any human realizes that the email or file share has come across.*

(Ex. I at 3, emphasis added.)

<s>62</s>58.   The ManagedMethods FAQs include a section titled "What is cloud security and how is it different from my current network security setup," which provides, in relevant

part:

<s>17</s>

xxxii

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 22 of 86

If your district is using cloud-based applications such as those provided in Google Workspace and/or Microsoft 365 (including Gmail, Google Docs, Google Drive, Exchange Online, SharePoint, OneDrive, etc.) you need a cloud security layer to protect access to data and accounts beyond where firewall technology can reach.

We sometimes liken the differences to going to a bar. On a busy Saturday night, most bars will have a bouncer (or two) at each door to check IDs, aggressive behavior, etc. to limit access to the inside only to those who should be authorized to be let inside. But once someone gets inside, the bouncer at the door is no longer helpful. Someone could get in with a fake ID and start causing trouble once inside. That's why bars will also have security inside the bar, to make sure those that have been granted access are behaving appropriately.

(Ex. I at 4.)

63 59.  The ManagedMethods FAQs include a section titled "Does ManagedMethods retain any data," which provides, in relevant part:

Both ManagedMethods products, Cloud Monitor and Content Filter, use deep, 1-to-1 API integrations to scan data and detect risks. Cloud Monitor works within your district's Google Workspace and/or Microsoft 365 environment. The platform works as a nearly native tool to report on and remediate data security, student safety, and compliance risks within your cloud environment. Meanwhile, Content Filter works on the browser level to ensure CIPA compliance on the internet.

(Ex. I at 5.)

64 60.  The ManagedMethods FAQs include a section titled "How is Cloud Monitor different from Google's native security" which provides, in relevant part:

Because Cloud Monitor integrates with Google Workspace through APIs, the platform is reporting on information that exists within your Google Workspace environment. The main difference is that we're organizing the data in ways that are far easier to find and analyze. We're also doing all the "heavy lifting" on the back end to automate alerts and actions so you don't need to expend your limited resources on creating scripts and coding.

* * *

Cloud Monitor allows admins to make deeper investigations and analysis of data security issues without the need for scripting. It also allows admins to remediate policy violations without the need to upgrade to Google Workspace for Education Plus (though some of our customers choose to in order to take advantage of other Plus benefits for students and teachers).

18

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 23 of 86

> ManagedMethods takes student safety monitoring very seriously. We've worked closely with our customers to develop out-of-the-box safety monitoring policies and artificial intelligence trained specifically for the K-12 environment. While admins could, in theory, set up Google DLP policies in Admin console to scan for keywords in similar ways that Cloud Monitor does, it doesn't provide quite the same level of functionality and customization. Admin console also doesn't provide any kind of student safety monitoring templates in their policy library or AI in their safety monitoring technology.

(Ex. I at 6.)

6561.    The ManagedMethods FAQs include a section titled "How does Cloud Monitor work" which provides, in relevant part:

> Cloud Monitor uses deep, 1-to-1 API integrations to scan data and detect risks within your Google Workspace and/or Microsoft 365 environment. The platform works as a nearly native tool to report on and remediate data security, student safety, and compliance risks within your cloud environment.

> Cloud Monitor comes with out-of-the-box risk and policy templates that can get your district on the path to better cloud security and student safety monitoring right away. The platform also allows you to edit the out-of-the-box templates and/or create your own to make the platform work best for your specific needs and context. We currently provide extensive customer success and solutions support at no additional cost to our customers.

> Because Cloud Monitor uses APIs, instead of appliances, in most cases the initial setup and activation takes mere minutes. While it may take a bit of time to get the platform configured to your liking, many of our customers find that they are accessing the product settings less and less over time, as automated policies take over much of the repetitive remediation work.

> Further, due to the API-based architecture of the platform, Cloud Monitor will work in the same way to monitor, audit, and control data security, student safety, and compliance risks in your district's Google Workspace and/or Microsoft 365 environment no matter what device and/or network a student, teacher, or staff member is accessing your domain from.

(Ex. I at 10.)

6662.    The ManagedMethods FAQs include a section titled "How does Cloud Monitor help me manage files/data being improperly shared outside my domain" which provides,

in relevant part:

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 24 of 86

Cloud Monitor makes it easy to see what files are being shared inside and outside your domain, via link, and via global permissions. *Admins can also see the number of users the file is shared with, and further dive into specifically which users/email accounts the file is shared with—categorizing internal and external domain shares*.

Cloud Monitor will help you manage files/data being improperly shared outside your domain in a couple of ways. Admins can begin by unsharing files/data that are improperly shared outside your domain on either a one-off or bulk files unshare basis.

\* \* \*

*Cloud Monitor will scan both text and image files to determine if a shared file triggers any configured risk and/or violates a policy*.

(Ex. I at 12, emphasis added.)

6763.   The ManagedMethods FAQs include a section titled "Where do quarantined files go" which provides, in relevant part:

When you quarantine a file in Cloud Monitor, it is *removed from the file owner's Drive/OneDrive and all shares to the file are broken*. The file is *moved to a folder in the Cloud Monitor admin's Drive/OneDrive named "CAM_Quarantine" on the administrator's cloud drive for further investigation*. Administrators can get to the quarantined file by navigating to their Drive/OneDrive account and opening the CAM_Quarantine folder.

(Ex. I at 14, emphasis added.)

6864.   The ManagedMethods FAQs include a section titled "Where do quarantined emails go" which provides, in relevant part:

When you quarantine an email, it is moved to the user's trash folder. Alternatively upon request quarantined emails can be sent to spam.

Cloud Monitor also makes it easy to "un-SPAM" emails in just a few simple clicks. This need became particularly important for school districts using Google Classroom and other LMS tools. Some wily students think it's funny to mark email notifications from their teachers as SPAM. Using Cloud Monitor, admins can easily find and "un-SPAM" any emails they need to.

Admins can automate un-SPAMing emails by setting up SPAM email exclusions for regularly mis-mark messages. The process includes defining email subject lines that you would like to be automatically moved back into the user's inbox from their SPAM folder.

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 25 of 86
(Ex. I at 15.)

6965.   The ManagedMethods FAQs include a section titled "Will I get a lot of false positives" which provides, in relevant part:

*False positives are, unfortunately, part of the territory when it comes to this type of technology.* We have heard anecdotally from our customers that they get way less false positives from Cloud Monitor than other, similar solutions. That being said, we do not guarantee a specific level of false positives (or lack thereof).

We do work hard to make adjustments to risk configurations and machine learning model training based on our customers' false positives feedback. Customers can report false positives by either sending an email to our support team or directly in the platform using a "Report False Positive" button.

(Ex. I at 16, emphasis added.)

7066.   The ManagedMethods FAQs include a section titled "What's the difference between risk and policy" which provides, in relevant part:

A risk is set up to tell the Cloud Monitor platform what you want it to look for as it scans your Google Workspace and/or Microsoft 365 domain. You may find a wide variety of risk types in your domain. *Common risk types include (but are not limited to) image risks, profanity, PII, and PCI.* Risk types can be customized in Cloud Monitor to ensure you only see the risks that are relevant to you. *Risks can be set up using comma-delimited keyword lists, and regex strings.* They can also be further refined based on the risk match count, context, and context check length.

Policies are used to automate the actions you would like the platform to take when a risk is detected in your environment. In Cloud Monitor, policies are divided into three categories for Google Workspace domains: content policies, user policies, and app policies. They are divided into two categories for Microsoft 365 domains: content policies and user policies.

Depending on the policy category, you can customize automated remediation based on the risk, the source of the risk (such as email, shared file, etc.), the sharing behavior by domain, OU, and/or a specific user. *Depending on the type of risk and policy, you can remediate the risk in a number of different ways, including (but not limited to): unshare, quarantine, delete, remove from your domain, revoke access to your domain, sanction, unsanction, and warn the user.*

(Ex. I at 19, emphasis added.)

7167.   The ManagedMethods FAQs include a section titled "What is the end user experience when a policy violation occurs in Cloud Monitor" which provides, in relevant

part:

21

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 26 of 86

In most cases, admins will choose to send an automated email notification to the end-user who violates a policy, explaining the reason for the policy violation and what (if any) additional actions they need to take. These emails are easily customized in the Cloud Monitor platform.

In the case of student safety policies, such as monitoring for self-harm signals, most districts choose not to automate user notifications in Cloud Monitor. Instead, they may send a notification to a school counselor or principal who is trained in taking the next steps to follow up with the student in distress.

(Ex. I at 22.)

72668.    The ManagedMethods FAQs include a section titled "How does Cloud Monitor help me manage my devices" which provides, in relevant part:

Cloud Monitor is not meant as a device management platform. It currently does not do anything to help you manage your devices in any way. Our *focus is on monitoring and providing total control* over your Google Workspace and/or Microsoft 365 environment.

(Ex. I at 27, emphasis added)

73669.    The ManagedMethods FAQs include a section titled "Can Cloud Monitor help my team identify Google Docs, Slides, etc. that are being used as chat rooms" which provides,

in relevant part:

Cloud Monitor can be configured to use its risks and policies engines to monitor for and alert admins on improper text and images being shared in Google Workspace for Education apps including Gmail, Google Docs, Google Slides, and Chat. The platform works the same way in Microsoft 365 apps including Outlook, Word, and PowerPoint.

(Ex. I at 29.)

747070.    No public Board agenda disclosed the vendor switch, and no public Board vote authorized the ManagedMethods procurement.

757171.    The District omitted the replacement platform from contemporaneous court filings seeking partial dismissal, failing to disclose a material continuation of the challenged

monitoring under a different vendor.

22

xxxviii

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 27 of 86

7672.   Upon information and belief, the District configured ManagedMethods' Cloud Monitor to scan student Google Workspace content, apply automated "risk" detections using keywords and AI, and take automated remediation actions—including quarantine, deletion, breaking shares, and revoking access—without individualized suspicion, notice to students, or a meaningful opportunity to contest.

7773.   Upon information and belief, the District did not publish any narrowing standards, due process protections, or opt-out mechanisms accompanying the switch to ManagedMethods, and did not revise Board policies or the Student Handbook to disclose Cloud Monitor's automated quarantine and seizure functions.

7874.   The Board routinely votes to approve materially similar technology procurements and renewals—including FMX, Microsoft licensing, Mosyle Manager, and Webex—by consent motion supported by staff memoranda and quotes.

7975.   The Superintendent's apparent unilateral termination of Gaggle and adoption of ManagedMethods departed from this governance practice and, upon information and belief, exceeded her authority absent Board approval.

8076.   The ManagedMethods substitution does not cure the constitutional infirmities of the District's surveillance regime. The core practice continues: suspicionless scanning, automated flagging, and seizure of students' digital speech and effects in the District's Google Workspace.

xxxix

81 77. Plaintiffs continue to suffer ongoing harm and face a real and immediate threat of future injury because ManagedMethods operates on the same student accounts and content, applies automated "student safety" policies using AI, and removes, quarantines, and interferes with student communications and files—often before any human review and without student notice or process.

23

xl

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 28 of 86

The District's vendor substitution therefore does not moot Plaintiffs' claims and, instead, underscores the need for injunctive relief.

## II.    The District's Technology and Standards.

82 78.    At all times relevant to this Complaint, the District has provided students with iPads or MacBooks for use in completing coursework, accessing educational materials, and communicating with teachers and staff.

83 79.    Students using iPads are instructed to use Manager, a District-approved version of the Apple App Store, to download applications, including Google Suite products. Students may also access Google applications through a web browser, bypassing Manager entirely. Students using MacBooks—primarily those involved in journalism activities—typically access Google Suite tools such as Google Classroom and Google Drive via a browser, most commonly Google Chrome. All student access to Google services is linked to accounts within the District-managed Google Workspace domain.

84 80.    ManagedMethods' Cloud Monitor—by its own terms—scans the District's Google Workspace domain regardless of device or network.

85 81.    These platforms are tied to each student's unique District-managed account and are subject to continuous monitoring and scanning. Content created or stored within these accounts— regardless of the device used—is monitored in real time by AI-surveillance monitoring and remains accessible to the District through its administrative control over the Google Workspace for Education environment.

86 82.    The District publishes and makes available the Student Handbook on the District's website at https://www.usd497.org/parents-and-students/resources/calendars-2024-2025-clone. A true and correct copy of the 2024–2025 Student Handbook is attached hereto was previously filed as Exhibit J.

24

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 29 of 86

8783.   The Handbook contains a section titled "Computer Use," which links to the "Complete Board Policy IIBG." (Ex. J at 10.) A true and correct copy of the Complete

Board Policy IIBG is attached heretowas previously filed as Exhibit K.

8884.   The Complete Board Policy IIBG provides, in relevant part:

Use of District Computers
Computer systems are for educational and professional use. All information created or accessed by staff and students may be subject to monitoring without notice by district administrators and/or school staff when appropriate. Students and staff shall be informed annually of the district's acceptable use policy. The district retains the right to impose disciplinary measures on any student. These measures may include expulsion of students and termination of staff for a violation of this policy.

* * *

Privacy Rights
Employees and/or students shall have no expectation of privacy when using district email, other official communication systems, or computer applications. Any email, computer application, or information in district computers or computer systems may be subject to monitoring without notice by the administration and/or school staff when appropriate. The district retains the right to duplicate any information created by employees or students in a computer system or on any hard drive.

* * *

Email - Students
Email messages shall be used only for approved educational purposes, and appropriate language must be used in all messages. Students are expected to use the system following guidelines approved by teachers and/or the administration.

* * *

Responsibilities
The superintendent shall oversee the district system.

Principals shall approve building-level activities, ensure proper training in the requirements of this policy, and establish a system to ensure adequate supervision of students and maintain executed user agreements.

District staff may develop regulations including a student disciplinary code. Those regulations and agreements are to be published annually in each student and staff handbook.

(Ex. K.)

25

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 30 of 86

8985.   The Complete Board Policy IIBG does not state that Gaggle or ManagedMethods ManagedMethods-employed employed personnel will access the students' content. (*Id*.)

9086.   Further, under "Computer Use," the Handbook includes a section titled "Use Of Personal Technology Devices," which links to the "Complete Board Policy IIBGD." (Ex. J at 10.) A true and correct copy of the Complete Board Policy IIBGD is attached here towas previously filed as Exhibit L.

9187.   The Complete Board Policy IIBGD provides, in relevant part: "Students and staff bringing and using personal, non-district-issued technology devices to district buildings shall follow the guidelines as stated in the District Acceptable Use Policy." (Ex. L.)

9288.   The Handbook includes a section titled "Fees (Student)," which provides, in relevant part:

The school board approved the 2024-2025 fee schedule on July 8, 2024. It includes Instructional Fees for books, materials, and digital resources of $100 for K-5, $150 for 6-12, and $115 for Lawrence Virtual School (LVS). Device Fees for iPads and MacBooks are $15 for K-8, and $25 for 9-12.

(Ex. J at 14.)

93.    While students of the District, Plaintiffs Jack Tell, Torkzaban, Salisbury, Morris, Farthing, Kennedy, and Sui Pang were required, and Plaintiffs Ashlyn Tell and P.M. are currently

89.    While students of the District, Plaintiffs have been required to use District-managed accounts, platforms, and servers—each governed by the District's no-privacy policies—in order to obtain the educational services provided by the District, including required assignments, teacher feedback, class participation, and peer collaboration. Plaintiffs E.B. and H.C. are currently required to use those District-managed tools and remain subject to the challenged surveillance regime.

9490.   An enrolled student who declines a District-issued device must still access the

District-managed platforms such as Google Docs, Google Classroom, and District email in order to complete required assignments, receive teacher feedback, participate in class, and collaborate with peers.

26

xlvi

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 31 of 86

9591.    Thus, enrolled students using personal devices are still subject to AI surveillance monitoring because they must access these District-managed platforms.

9692.    Plaintiffs cannot/could not refuse or decline the privacy terms imposed by the District without forfeiting access to the basic tools of their public education, including access to the District-managed platforms.

9793.    Plaintiffs cannot/could not withhold consent to the District's surveillance practices without jeopardizing their education.

9894.    The Handbook includes a section titled "Intellectual Property," which links to the "Complete Board Policy JT." (Ex. J at 19.) A true and correct copy of the Complete Board Policy JT is attached here towas previously filed as Exhibit M.

9995.    The Complete Board Policy JT provides, in relevant part:

> The board recognizes the importance of creating an environment that encourages student innovation in creating and developing high-quality materials as part of their educational experience. *Publications, articles, materials, models, and other items produced by students will be owned by the student* unless the work is produced at the district's request for its use.
>
> If the work is being produced on behalf of the district, the superintendent will apply for copyrights and patents when deemed appropriate. Students will be expected to cooperate in the district's efforts.
>
> The board and the student may agree to share ownership of such intellectual property. When ownership is shared, neither the board nor the student will attempt to copyright or patent such items without the knowledge and consent of the other party.

(Ex. M, emphasis added.)

100. 96.    Because Complete Board Policy JT recognizes student ownership of their publications and other work product, the District's automated quarantine, deletion, and share-breaking of student files meaningfully interferes with students' possessory interests in their own work and deprives them of access to their intellectual property.

xlvii

27

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 32 of 86

101. 97.        The Handbook includes a section titled "Investigation and Interrogation (Student

 Rights to have parents present)," which provides, in relevant part:

Administrators, other school staff, and school resource officers (SROs) may at times need to interview students to gather facts about something that occurred, such as a policy violation. An interview is an informal procedure to obtain information. Interrogation is when a law enforcement officer is formally questioning a suspect alleged to have been involved in a crime, such as to garner a confession. If an SRO is speaking with a student about involvement in a suspected or alleged crime, a parent/guardian will be notified to be present.

(Ex. J at 19.)

102. 98.        The Investigation and Interrogation section links to the "Complete Board Policy

 JCAC." (Ex. J at 19.) A true and correct copy of the Complete Board Policy JCAC is

attachedwas previously filedhereto as Exhibit N.

103. 99.        The Complete Board Policy JCAC provides, in relevant part:

Principals (or a designee) or others designated by the superintendent, may conduct investigations and question students about infractions of school rules or the student conduct code . . .

Taking Students Into Custody
Students shall not be voluntarily released by school officials to law enforcement authorities unless the student has been placed under arrest or taken into custody by law enforcement or the Kansas Department for Children and Families (DCF) pursuant to a lawfully issued warrant. If a student is taken into custody by a school resource officer, or any other law enforcement persons, for any reason other than being the alleged victim of abuse or neglect, school administrators shall contact the parent or guardian. Notification efforts shall be documented.

(Ex. N.)

104. 100.       The Handbook includes a section titled "Personal Belongings," which provides, in

 relevant part:

Students should not bring money to school other than for lunches or other school related activities. *Students are discouraged from bringing toys, electronic*

*equipment, and other personal property to school unless it is for a special school activity.* The school will not assume responsibility for lost personal property.

(Ex. J at 20, emphasis added.)

28

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 33 of 86

105. 101.    The Handbook includes a section titled "Safe Schools Information, Searches:
 Property," which links to the "Complete Board Policy JCAB." (Ex. J at 22.) A true and correct copy of the Complete Board Policy JCAB is attached here towas previously filed as Exhibit O.

106. 102.    The Complete Board Policy JCAB provides, in relevant part:

Principals are authorized to search property if there is reasonable suspicion that district policies, rules, or directives are being violated. All searches shall be carried out in the presence of another adult witness. Any person other than the principal conducting a search of a student's locker or property shall do so only with the consent of and in the presence of the principal, unless circumstances require immediate action in order to preserve the security and safety of staff and students.

District property, including lockers, is under the supervision of the principal. Students shall have no expectation of privacy when utilizing district property, including lockers. Lockers shall be subject to random searches without prior notice or reasonable suspicion.

The combinations and/or keys to all locker locks shall be in the possession of the principal and stored in a place designed to guard against unauthorized access or use. The principal may search any locker at any time without notice. Students shall not place locks, other than those approved by the school, on any locker.

* * *

Searches of Property by Law Enforcement
If a law enforcement officer desiring to search a student's locker or property has a search warrant, the principal shall permit the search which shall be made in the presence of the principal.

Prohibited items found during the search shall remain in the custody of either the principal or the law enforcement officer. If any items are turned over to law enforcement officials, the principal shall receive and retain a receipt for the items.

(Ex. O.)

## III.    The Lawrence Public Schools' Acceptable Use Policy.

107. 103.    The District provides a Student Acceptable Use Policy ("AUP") for student use of

1

computer technology. The AUP was provided to and signed by students at the end of the eighth grade while registering for high school classes. A true and correct copy of the AUP ~~is attached~~<ins>was previously filed</ins>~~hereto~~ as Exhibit P.

~~29~~

<ins>li</ins>

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 34 of 86

108. 104.    The District required Plaintiffs to sign the AUP while Plaintiffs were under 18 years old.

109. 105.    Under the heading "Expectations for All Students," the AUP provides that students will "[u]se technology for educational purposes, and students will *not* "[h]ave any expectation of privacy when using any district owned device (computer, tablet, iPad, etc.) at school or a school related function or with respect to email, files or directories." (Ex. P.)

110. 106.    Under the heading "Additional Expectations for Students with Personally Assigned Computing Devices," the AUP provides that students will "[r]egularly save any information stored on a district device to assigned cloud storage directory," "[e]xpect any district device to be regularly inspected for inappropriate material," and expect "e-mail transmissions and receptions to be subject to review." Such section further provides that "[a]ll such information and/or files shall be and remain the property of the school district and no user shall have any expectation of privacy regarding the use of the device(s), district network, or the district's Internet." (Ex. P.)

111. 107.    Under the heading "Student Use of Personal Mobile Devices at School or School-Related Activities," the AUP provides that "[s]tudents may use personal mobile devices in the manner directed by building staff and administration" and "[s]tudents may, but are not required or expected to, bring a personal mobile device to school or school-related activities." (Ex. P.)

112. 108.    The AUP provides "Consequences for AUP Violations" including suspension from use of district technology, suspension or expulsion from school, and any other consequence outlined in the Student Handbook. (Ex. P.)

113. 109.    Under District policy, students are prohibited from using school internet services or transmitting documents without signing the AUP.

30

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 35 of 86

114. 110.    In practice, student access to District-managed platforms is often provisioned automatically upon enrollment.

115 111.     As a result, students may gain access to District-managed platforms prior to signing the AUP, but such use would nonetheless constitute a violation of District policy.

116. 112.    Plaintiffs, by refusing to sign the AUP, would forfeit access to a full and equal public education.

## IV.    AI-Surveillance Monitoring Obstructs Student Journalism.

117. 113.    At Lawrence High School and Lawrence Free State High School, student journalists are, and at all times relevant to this Complaint, were, required to house their research, writing, and other journalistic materials on school-issued accounts, thereby subjecting them to AI-surveillance monitoring searches and seizures.

118 114.    Shortly after the District's implementation of Gaggle, Plaintiff-student journalists working for *The Budget* noticed that various materials were being seized by Gaggle, such that the materials at issue disappeared from their school-issued accounts and were unavailable to them.

119 115.    Gaggle's seizure of Plaintiffs' journalistic materials extended to materials that were not inappropriate or otherwise in violation of any District policies.

120 116.    The repeated seizures of Plaintiffs' journalistic materials interfered with Plaintiff-student journalists' work for *The Budget*.

121. 117.    Plaintiff-student journalists were obstructed to the point that the journalism teacher and adviser of *The Budget*, Barbara Tholen, interceded with District officials on their behalf.

122. 118.    Tholen devoted significant time and effort to bringing Gaggle's repeated flagging and seizure of student materials to the attention of District officials, advising District officials that such seizures were impermissible and were adversely impacting *The Budget*. She

pleaded with District officials to limit and/or discontinue the use of Gaggle with respect to student

journalism.

31

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 36 of 86

123. 119.    To continue *The Budget*'s work, Plaintiffs Jack Tell and Torkzaban, as editors-in-chief of *The Budget*, moved all journalistic materials and endeavors to Tholen's school-issued account in an effort to eliminate interference from Gaggle.

124. 120.    The student journalists at *The Budget* could continue drafting and publishing newspapers only by having Tholen provide access to her personal account to all student journalists and conducting all work only in that account.

125. 121.    Notwithstanding the students' and Tholen's efforts, Plaintiffs Jack Tell, Torkzaban, Salisbury, and Kennedy were unable to publish at least four editions of *The Budget* due to Gaggle's interference.

126. 122.    Because Tholen's time and attention were diverted by Gaggle-related disruptions and her efforts to advocate for her students' rights, she was unable to timely review several articles submitted for publication. As a result, *The Budget* was unable to publish work that otherwise would have run, directly impairing Plaintiff-student journalists' ability to report and share news.

## V.    The District Searched and Seized Morris's and Farthing's Personal Effects.

123.    Acting under the authority of his position, Farley personally interrogated Plaintiffs Opal Morris and Henry Farthing after Gaggle flagged their photography assignments. During these interrogations—conducted in the presence of other District employees—Farley accused Morris and Farthing of uploading images containing indecent exposure and child pornography. Both students denied the accusations and offered to open and review the flagged images with Farley. Farley refused to examine the images himself, instead compelling Plaintiffs' to recall and describe minute visual details of their work from memory—an exercise calculated to intimidate and chill their lawful, protected artistic expression.

127. 124.    In early 2024, District administrators summoned art, journalism, and photography students to the front office at Lawrence High School for questioning.

128. 125.    Among those summoned were Plaintiffs Opal Morris and Henry Farthing.

129. 126.    Farthing was attending an Advanced Placement United States history course at Lawrence High School when two security officers approached and instructed Farthing to accompany them to the front office. The security guards refused to provide an explanation for Farthing's removal from class.

130. 127.    Opal Morris was attending a videography class when two security officers entered the classroom and instructed her to accompany them to the front office. The security guards refused to provide an explanation for Morris's removal from class.

32

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 37 of 86

131. 128.    Upon independently arriving at the front office, Morris and Farthing observed several classmates from their photography course already present and waiting, in addition to student journalists and art students.

132. 129.    Notably, one student in the front office was not an art, journalism, or photography student. Morris and Farthing later determined that student was the model for an art student's painting which had been flagged and seized by Gaggle.

133. 130.    Neither Morris nor Farthing felt free to leave during the encounter.

134. 131.    Then-Lawrence High School Assistant Principal Greg Farley ("Farley") then asked, "Who wants to go first?"

135. 132.    Morris volunteered to "go first," and she was ordered into a private meeting room with Farley and other administrators.

136. 133.    Once her private meeting with Farley and other administrators commenced, Morris inquired why she was pulled out of class and why she was summoned to the front office.

137. 134.    Farley informed Morris that it was due to "some images on your device."

138. 135.    Farley then accused Morris of having photos or documents on her computer that constituted indecent exposure or child pornography.

139. 136.    The production of or possession of child pornography is a crime under K.S.A. 22-22-55105510.

140. 137.    When Morris responded that she did not have any such materials, Farley asked whether she had uploaded anything to her device that day.

141. 138.    Morris responded that she had uploaded a photography assignment that included a

 picture of one of her friends who was fully clothed and wearing a spaghetti-strap tank top.

142 139.    Spaghetti-strap tank tops are permitted under the District's dress code.

33

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 38 of 86

143. 140.    Morris then asked if she could pull up the images she had uploaded that day to prove that she had not uploaded any documents that constituted indecent exposure or child pornography.

144. 141.    Farley told Morris that she could not do so, but then proceeded to interrogate Morris regarding the very photographs he refused to examine or allow Morris to access.

145. 142.    Farley required Morris to recall and explain from memory minute details regarding the photographs she had taken, but she was not allowed to view or display those photos.

146. 143.    Morris is not aware of any effort by District officials to contact her parents regarding her detention and interrogation by Assistant Principal Farley. On information and belief, no District official, including faculty, attempted to notify or involve Morris's parents before or during the investigative meeting in which she was accused of uploading inappropriate images. Neither of Morris's parents were present for the meeting.

147. 144.    Meanwhile, in the room where the remaining students were still waiting, administrators told the group that their images had been flagged by Gaggle for indecent exposure and child pornography.

148. 145.    Notwithstanding their accusation, as with Morris, administrators did not show students the flagged content or explain what rule, if any, had been violated, nor were the students' parents contacted or present in the meeting.

149. 146.    Administrators, including Farley, admitted they had not seen the content at issue, but rather, that they were informed second-hand by Gaggle that the content had been flagged.

150. 147.    As with Morris, Farthing and other students were asked whether they had uploaded anything to their District Google Drives that might have triggered an alert.

34

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 39 of 86

151. 148.    No student was given notice of discipline, nor were they told what specific file(s) had been flagged.

152. 149.    Farthing and the other students were then individually called into meetings with administrators where they were each questioned further regarding their conduct. None of the parents of those students was present during these meetings and, on information and belief, none of the parents were contacted before these meetings, nor was any attempt made to contact the parents.

153. 150.    The students were eventually sent back to class.

154. 151.    By investigating Opal Morris and Henry Farthing for protected speech and accusing them of possessing child pornography, Defendant Farley demonstrated reckless and callous indifference to Plaintiffs' constitutional rights, which a reasonable official would have known.

155. Defendant 152.    Farley's actions would chill a person of ordinary firmness from engaging or continuing to engage in activity protected by the U.S. Constitution.

156. Defendant 153.    Farley's actions were substantially motivated by Plaintiffs engaging in activity protected by the U.S. Constitution.

157. 154.    As a direct and proximate result of Defendant Farley's unlawful actions as alleged herein, Plaintiffs Opal Morris and Henry Farthing were deprived of their First Amendment rights.

158. 155.    After the incident, Morris and Farthing discovered that multiple digital photographs had been removed from their school accounts.

159. 156.    Morris determined that the flagged content consisted of original artistic photographs taken and uploaded for class assignments.

160 157.    Specifically, the flagged content included the following images, which                                    are                                    partially obscured below to protect student privacy:



Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 40 of 86





161. 158.        The photographs had been stored on District-managed platforms and were no longer accessible through Morris's and Farthing's school-issued accounts.

162. 159.        Morris, Farthing, and other students later confirmed the seizures by comparing their school accounts to independent backup drives.

36

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 41 of 86

163. 160.         At no point were students notified that their files had been removed or offered an opportunity to contest the action.

164. 161.         Morris was subsequently required to meet with District staff and explain each image in her photography portfolio.

165. 162.         This compelled review of her work made Morris concerned that future assignments involving protected expression would trigger additional scrutiny, interrogations, deletions, and/or discipline.

166. 163.         Only after months of student advocacy did the District restore the removed images.

167. 164.         The above-described searches and interrogations were neither justified at their inception nor reasonable in scope.

168. 165.         No individualized suspicion existed that Morris or Farthing had violated the law or school rules, and the District refused to review the images at issue even as it compelled the students to describe them from memory.

169. 166.         Such conduct contravenes clearly established standards governing student searches in the school context.

## VI.    The Students Met With District Representatives Who Falsely Promised That Journalism Students Would No Longer Be Subject to AI-Surveillance Monitoring Search and Seizure.

170. 167.         In the weeks following the summoning of students to the front office in 2024, and

lxvi

in light of the District's and Gaggle's ongoing obstruction of student journalism, Plaintiffs Jack Tell, Torkzaban, and Salisbury requested a meeting with District Director of Technology David Vignery.

171. 168.        Vignery refused to meet with the students until March 2024, citing personal scheduling conflicts.

37

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 42 of 86

172. 169.        On or about March 6, 2024, Plaintiffs Jack Tell, Torkzaban, and Salisbury met with Vignery, Superintendent Anthony Lewis, and other senior District administrators to voice their concerns about Gaggle surveillance.

173. 170.        Present at the March 6 meeting was David Cunningham, an attorney with the Kansas Association of School Boards, who introduced himself at the outset of the meeting by stating: "I'm David Cunningham, I'm an attorney with the Kansas Association of School Boards and provide legal services to the District."

174. 171.        Plaintiffs Jack Tell, Torkzaban, and Salisbury did not expect the presence of the District's legal counsel at the March 6 meeting. Had Defendants Defendant informed Plaintiffs that Defendants' its counsel would be present, Plaintiffs would have brought legal representation of their own.

175. 172.        At the March 6 meeting, District Mental Health Coordinator Kiley Luckett told Plaintiffs Jack Tell, Torkzaban, and Salisbury that Plaintiffs were "valuing their constitutional rights above the mental health of their peers."

176. 173.        At the meeting, Plaintiffs Jack Tell, Torkzaban, and Salisbury asked for a resolution to the ongoing surveillance.

177. 174.        District spokesperson Julie Boyle told Plaintiffs Jack Tell, Torkzaban, and Salisbury at the meeting that she had only recently learned of the issue.

178. 175.        District internal correspondence produced in response to request under the Kansas Open Records Act revealed that Boyle had been informed about the matter months earlier.

179176.        In light of Gaggle's arbitrary seizure of journalistic materials, Plaintiff                                                                                          Torkzaban, as part of her reporting for *The Budget*, investigated what types of communications would trigger flagging and seizure by the District's Gaggle surveillance.

38

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 43 of 86

180. 177.        On March 29, 2024, as part of her reporting for *The Budget*, Plaintiff Torkzaban sent an email to journalism advisor Barbara Tholen, simulating a student with a mental health issue.

181. 178.        In her email, Torkzaban stated as follows, "Hey Barb, The meeting today had me stressed, really worried about my mental health. Was too busy to talk to you in class, but sometimes you have to test the waters."

182. 179.        Tholen never received Torkzaban's email because, on information and belief, it was flagged and seized by Gaggle and the District pursuant to the surveillance program.

183. 180.        On or about March 29, 2024, Plaintiffs Jack Tell, Torkzaban, and Salisbury again met with District officials.

184. 181.        Prior to the March 29 meeting, Plaintiffs Jack Tell, Torkzaban, and Salisbury, caught off guard by the presence of the District's counsel at the March 6 meeting, informed the District that Plaintiffs were arranging to bring their own counsel, to which District spokesperson Julie Boyle responded, "there will be no need."

185. 182.        Plaintiffs Jack Tell, Torkzaban, and Salisbury understood Boyle's comment to mean that the District would not bring its counsel to the March 29 meeting.

186. 183.        David Cunningham, the District's attorney, was present at the March 29 meeting alongside senior District administrators.

184. ~~187.~~ Attorney Cunningham, advocating on behalf of ~~Defendants~~Defendant, made the following
 exchange:

**Plaintiff Torkzaban:** And in the Shawnee Mission case, [student journalists] were actually able to ultimately publish their work, but that is not the reason why they were damaged. They were damaged because their reporting process was compromised.

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 44 of 86

**Attorney Cunningham:** *I'm* saying there's no evidence to suggest that your reporting efforts are being compromised in any way.

**Plaintiff Jack Tell:** But the student press . . . .

**Attorney Cunningham:** I'm not here to debate this! We're not in court . . . *Tinker v. Des Moines* is a perfect example of that. You know, the court's going to balance the interests. If you *read* the case and you *understand* balancing, the court's balancing the interests of First Amendment rights versus the administration's right to control the environment . . . . I understand you disagree with that, and I'm okay. That's why we have courts.

188. 185.    On information and belief, the District brought an experienced school attorney to the March 6 and March 29 meetings to advance its institutional interests and protect itself from legal exposure, including in response to Plaintiffs' ongoing constitutional injuries.

189. 186.    The District failed to provide advance notice of Attorney Cunningham's attendance at either meeting, depriving Plaintiffs of a meaningful opportunity to secure counsel or otherwise prepare for what became an adversarial dialogue concerning Plaintiffs' ongoing constitutional injuries.

190. 187.    By positioning legal counsel against unrepresented student journalists in closed- closed-door door meetings about protected speech, the District created a fundamental imbalance that chilled Plaintiffs' expression and discouraged further advocacy concerning Plaintiffs' ongoing constitutional injuries.

191188. On information and belief, the District's decision to involve legal counsel in these meetings—without warning and in the presence of unrepresented students—was undertaken in retaliation for Plaintiffs' constitutionally protected activity and intended to deter Plaintiffs' opposition to the Gaggle surveillance regime.

192. 189.    One week after the March 29 meeting, the District informed the student journalists that their files would be exempted from Gaggle scanning.

lxxi

40

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 45 of 86

193. 190.    In April 2024, the District purported to remove Gaggle scanning from approximately 160 accounts used by journalism students at Lawrence High School.

194. 191.    On information and belief, the District did not actually remove Gaggle surveillance from those devices.

195 192.    The District has never disclosed to the students and staff subject to                                                                                              surveillance what content is subject to review, removal, or flagging under the Gaggle program. The District reiterated the purpose of the program was to flag and catch threats to student safety.

196. 193.    Upon information and belief, the review process for student content includes individuals contracted and/or employed by Gaggle whose training, qualifications, and experience are not disclosed to the students.

197. 194.    On information and belief, the District has itself never known the identity, training, or qualification of any of those Gaggle contractors or employees. They are anonymous to the District, and on information and belief, the District has never asked Gaggle to identify those persons.

198. 195.    On or about April 19, 2024, Plaintiffs Jack Tell, Torkzaban, and Salisbury met with District Board President Jones and Board members serving on the District's policy committee.

199. 196.    At the meeting, Plaintiffs discussed their concerns related to Gaggle's effect on First Amendment speech and press protections and Fourth Amendment protections against unreasonable searches and seizures.

200. 197.    Plaintiffs who are existing District students remain subject to 24-hour AI-surveillance monitoring of their District-managed accounts with no opportunity to opt out or limit the surveillance's scope.

41

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 46 of 86

201. 198.    Upon information and belief, the District did not reinstate or honor any journalism "exemption" when it deployed ManagedMethods.

202. 199.    Upon information and belief, the District configured or made available ManagedMethods' Content Filter in conjunction with Cloud Monitor, further extending monitoring to students' browsing behavior when using District-managed accounts and devices.

203. 200.    ManagedMethods' Cloud Monitor operates on student Google Workspace accounts regardless of device or network, and its automated quarantine and deletion features apply to student emails and files—the very locations where student journalists' work is drafted, stored, exchanged, and published.

204. 201.    ManagedMethods' own documentation acknowledges that false positives are "part of the territory" and provides no guarantee regarding the false positive rate. (Ex. I at 16.)

205. 202.    The combination of keyword/regex matching and artificial intelligence in ManagedMethods' "risk" detections, together with automated remediation, creates a substantial risk that constitutionally protected journalism and art will be flagged, quarantined, unshared, or deleted without individualized suspicion, context sensitive review, notice, or a meaningful opportunity to contest.

206. 203.    Upon information and belief, the District did not publish any narrowing standards, notice procedures, appeal processes, or opt out mechanisms contemporaneous with the ManagedMethods switch,

207. 204.    Upon information and belief, the District did not revise any policy or the Student Handbook to disclose Cloud Monitor's automated quarantine and seizure functions, despite having previously promised to remove scanning from journalism accounts.

42

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 47 of 86

208205.    The District's vendor substitution does not cure the constitutional infirmities.

Plaintiffs who are existing District students continue to suffer ongoing harm and face a real and immediate threat of repeated injury, and the District's actions do not moot their claims but instead underscore the need for declaratory and injunctive relief.

## VII.    Gaggle Obstructed Suzana Kennedy's Investigation Into Its Methodology and Implementation.

209. 206.    In light of the arbitrary seizure of journalistic materials, and in her second year as co-editor-in-chief of *The Budget*, Plaintiff Suzana Kennedy, in the fall of 2024, began investigating Gaggle. Kennedy was at the time a senior at Lawrence High School.

210. 207.    On October 4, 2024, Kennedy emailed Janice Dunn, Board Clerk; Julie Boyle, Executive Director of Communications for the District; and Cynde Frick, Executive Director of Finance for the District, requesting information about Gaggle under the Kansas Open Records Act § 45-215 *et seq*.

211208.    Specifically, Kennedy requested the following public records:

- Possible Student Situations (PSS) by date and type;

- Any Gaggle Safety Audit data performed by Gaggle for the School District;

- Any internal documents collected by the District to verify if PSS incidents flagged by Gaggle were verified as critical incidents or false alarms;

- Documents concerning Gaggle flagged incidents referred to law enforcement and whether those incidents were false alarms; and

- Any District documents about disciplinary actions prompted by Gaggle alerts.

212. 209.    In her email, Kennedy noted that "[t]he Kansas Open Records Act requires a

response time within three business days. If access to the records we are requesting will take longer

43

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 48 of 86

than that time period, please contact us with information about when we might expect copies or the ability to inspect the requested records."

213. 210.          Boyle responded to Kennedy, informing Kennedy that the District would provide the requested materials by the end of the following week (*i.e.*, October 11, 2024).

214. 211.     On October 10, 2024, Boyle emailed Kennedy, notifying her that the District would require additional time to respond to her request, and that she "anticipate[d] a new timeline of October 16."

215. 212.     On October 17, 2024, having received no materials responsive to her request, Kennedy emailed Boyle once again to request an update.

216. 213.     Boyle responded that the Board was "still working on it toward our goal of getting you information tomorrow."

217. 214.     On October 21, 2024, still having received no materials responsive to her request, Kennedy emailed Boyle once again to request an update.

218. 215.     On November 13, 2024, still having received no response to her prior email, Kennedy emailed Boyle again to request an update.

219. 216.     On November 19, 2024, still having received no response to her prior email, Kennedy emailed Boyle yet again to request an update.

220. 217.     On November 22, 2024, Boyle emailed Kennedy, providing the requested materials and informing her that the Board had sent the materials to Kennedy on October 18, 2024, in addition to re-sending such materials to Kennedy in response to her follow-up request on October 21, 2024.

221. 218.     Specifically, Boyle wrote that she was "curious whether Gaggle is preventing you from receiving my emails because of the nature of the words in the data you requested. This will

44

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 49 of 86

be the third time I have sent it to you. I'm going to try placing the Excel spreadsheet in a

Google folder to see if that makes a difference in you being able to access it. I am also copying

Mrs. Tholen; she should be able to receive it."

222. 219.    Boyle's suspicion proved accurate. Unbeknownst to Kennedy or Boyle at the time,
 Gaggle had flagged and seized Boyle's emails, such that they were never received by

Kennedy until Tholen was copied.

223. 220.    Student investigations of Gaggle and discussions of its methodology were flagged
 and censored by Gaggle, apparently without the District's knowledge, pursuant to the

duties the District expected Gaggle to perform.

224. 221.    On information and belief, the District did not ask Gaggle why it had flagged and
 seized Boyle's emails.

225. 222.    Gaggle's seizure of Boyle's emails to Kennedy demonstrates that student student-journalistsjournalists' purported exemption from Gaggle, as committed to by the

Board in April 2024, had not actually been implemented.

226. 223.    Indeed, in Tholen's response to Boyle's November 22 email, Tholen stated:

I am still working under the assumption that USD 497 intends for journalism
students NOT to be surveilled by Gaggle. I've never been convinced that the
solution was actually working. But since district administrators have celebrated that
solution publicly more than once, I can only assume that everyone is on board with
ensuring this fix actually works…..… Gaggle is also supposed to *not* flag the
journalism and video students at both high schools…..… Certainly, if a Kansas Open
Records Request about a district vendor was prevented from being delivered by that
same vendor, I'd have a lot of questions.

**VIII.    Kennedy's Investigation Uncovered That Gaggle Deters Students from Reporting
Mental Health Concerns, Thereby Creating and Exacerbating the Very Problems the
District Claimed it Would Remedy.**

227. 224.    The documents requested by Plaintiff Kennedy pursuant to her open records request
 demonstrate that Gaggle's methodology was and is fundamentally flawed.

lxxx

45

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 50 of 86

228. 225.    The documents provided to Kennedy by the Board include a spreadsheet of incidents (the "Gaggle Seizures Spreadsheet") in which Gaggle seized materials from school-issued accounts. A true and correct copy of that Gaggle Seizures Spreadsheet is attached heretowas previously filed as Exhibit Q.

229. 226.    With respect to each incident of seizure reflected in the Gaggle Seizures Spreadsheet, the spreadsheet lists the key words and phrases that triggered the seizures.

230. 227.    Key words and phrases that trigger Gaggle seizure include: (1) "called me a"; (2) "called her a"; (3) "very uncomfortable"; (4) "my mental health"; (5) "care about myself"; (6) "I'm not good enough"; (7) "get suspended"; (8) "been struggling"; (9) "call me fat"; (10) "tell her to stop"; (11) "zaza"; (12) "are you safe"; (13) "mental breakdowns"; (14) "anxiety attack"; (15) "do this anymore"; (16) "you need to stop"; (17) "bra"; (18) "roll up"; (19) "want to be happy"; (20) "hurt so bad"; and (21) "just leave me alone[.]" *See* Gaggle Seizures Spreadsheet, "Keywords" Column, Rows 36, 99, 106, 121, 122, 134, 142, 186, 233, 320, 332, 476, 541, 625, 798, 967, 975, 976, 989, 1011, 1021.

231. 228.    Many of the key words and phrases that trigger Gaggle seizure are protected speech under the First Amendment.

232. 229.    On information and belief, any documents or emails containing any of the foregoing words or phrases (or one of numerous additional words or phrases yet to be identified) were and will be seized by Gaggle and disappear from school-issued accounts, effectively censoring students and imposing a moratorium on the use of any of the foregoing words and phrases, among others, regardless of the context.

233. 230.    On information and belief, ManagedMethods and Gaggle operate in a substantially similar manner.

46

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 51 of 86

234. 231.    However, even more egregious than Gaggle's gratuitous and overbroad censorship of the foregoing words and phrases at the District's behest is the fact that Gaggle is effectively self-defeating, assuming the articulated purpose of Gaggle is accurate, *i.e.*, to identify possible student mental health issues.

235. 232.    As demonstrated by the seizure of Torkzaban's March 29, 2024 email to Tholen, and by Boyle's repeated emails to Kennedy, Gaggle flags and seizes emails (and any other files) that contain one of any number of terms unrelated to mental health, indicating that the effect of Gaggle is to stifle protected student speech. Gaggle took, and is taking, such action at the District's behest and under the District's authority.

236. 233.    Consequently, any student who reaches out to faculty—or indeed, to anyone—via their school-issued accounts to seek help or to report issues with their own or anyone else's mental health will be thwarted by Gaggle, which will flag and seize any such communications before they are received by the intended recipient(s).

237 234.    Such a methodology belies the District's assertion that Gaggle is "a digital surveillance tool that helps school districts manage student safety on school-provided devices and platforms by monitoring student accounts to identify and flag those who may be struggling and need help." (Ex. B.)

238. 235.    This is neither a past nor a theoretical problem. Upon information and belief, as recently as April 2025, a student's email to his parents was seized by Gaggle.

239. 236.    Neither the District nor the Board have articulated any government interest that would ever be served by seizing and blocking communications between students and their parents.

47

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 52 of 86

240. 237.     At all times relevant to this Complaint, Defendants wereDefendant was or should have been aware
 that theirits actions were unconstitutional and violated clearly established constitutional

rights of which a reasonable official would have known.


**IX.     Principal Rials Issued a Facially Unconstitutional Directive Prohibiting Student Reporting on This Lawsuit, Which He Continued to Enforce Within Hours of the District's Purported Rescission of Same.**

238.     Plaintiffs include the following allegations as factual background and to preserve

the record concerning issues addressed in prior filings and orders. Plaintiffs do not, by including

these allegations, reassert the standalone First Amendment retaliation claim dismissed in the

Court's April 8, 2026 Memorandum and Order.


241. 239.     On August 1, 2025, Plaintiffs filed their *Verified Complaint for Civil Rights*
 *Violations* (ECF No. 1) (the "Initial Complaint"), commencing this litigation.

240.     Quentin Rials is employed by the District as the Principal at Lawrence High School,

and, in that role, implements District policy with the District's knowledge and authorization. An

attorney, Rials graduated from Washburn University School of Law and became licensed to

practice law in the State of Kansas in 2007. At times relevant to this Complaint, Rials issued a

directive forbidding *The Budget* and its student reporters from reporting on this lawsuit and, upon

information and belief, caused a District teacher to meet with and pressure Ashlyn Tell not to report

on this lawsuit in furtherance of the foregoing directive, subsequent to and notwithstanding the

District's purported rescission of such directive.

241.     Acting under the authority of his position, Rials issued a facially illegal and

unconstitutional directive forbidding *The Budget* and its student reporters from reporting on this

lawsuit. Not three hours after counsel for the District confirmed in writing that the District had lifted Rials' restriction on reporting related to the lawsuit—and on the same day Rials issued a Clarification Memo (defined below) containing synonymous representations—on information and belief, Rials caused a District teacher to meet with and pressure Plaintiff Ashlyn Tell not to report on this lawsuit, including threatening the employment and livelihood of the student journalism advisor. As with Farley, the foregoing exercises were calculated to intimidate and chill Plaintiffs' protected artistic expression.

242.   Plaintiff Ashlyn Tell is the editor-in-chief of *The Budget* for the 2025–2026 school year. Having attained the age of majority after the Initial Complaint and before this ~~First~~Second Amended Complaint, she now proceeds in her own name as the real party in interest.

243.   On the morning of August 14, 2025, *The Budget*'s journalism adviser, Abbi Epperson-Ladd, told Ms. Tell that, ~~several weeks earlier~~soon after the lawsuit was filed, Lawrence High School Principal Quentin Rials issued a directive that neither *The Budget* nor its student reporters may report on this lawsuit, and that Principal Rials directed her to consult the District's lawyer.

244.   Epperson-Ladd further told Ms. Tell that, after Principal Rials issued the directive, a person Epperson-Ladd understood to be a District administrator reiterated to her by telephone that neither *The Budget* nor its student reporters may report on this lawsuit.

245.   When Ms. Tell stated that *The Budget* intended to report on the lawsuit and related Gaggle coverage, Epperson-Ladd directed Ms. Tell not to report because "the District told me 'no,' and I don't want to go against that."

246.   That same morning, Ms. Tell asked to meet with Principal Rials to verify the prohibition and to request the name of the District's attorney. Rials' secretary directed Ms. Tell to Assistant Principal Mike Gillman.

48

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 53 of 86

247.    Assistant Principal Gillman told Ms. Tell he could not discuss anything related to the lawsuit or Gaggle reporting and doubted that Principal Rials would do so either.

248.    Ms. Tell overheard Principal Rials' secretary informing Rials of the nature of Tell's meeting request; Principal Rials declined to meet with Tell.

249.    On the afternoon of August 14, 2025, attorney Bradley R. Finkeldei, communicating on the District's behalf, confirmed by telephone to the undersigned Harrison M. Rosenthal that (1) Principal Rials issued a directive prohibiting *The Budget* and its student reporters from reporting on this lawsuit; (2) Epperson-Ladd enforced that directive in a face-to-face discussion with Ms. Tell; and (3) the restriction was later lifted such that *The Budget* and Ms. Tell are free to report on Gaggle and this lawsuit without restriction. A true and correct copy of subsequent email correspondence memorializing the foregoing conversation between Mr. Finkeldei and Mr. Rosenthal (the "Finkeldei–Rosenthal Emails") ~~is attached hereto~~was previously filed as Exhibit R.

250.    By issuing the directive that neither *The Budget* nor its student reporters may report on this lawsuit, Principal Rials demonstrated reckless and callous indifference to Plaintiff Ashlyn Tell's constitutional rights, which a reasonable official would have known.

251.    Principal Rials's actions would chill a person of ordinary firmness from engaging or continuing to engage in activity protected by the U.S. Constitution.

252.    Principal Rials's actions were substantially motivated by Plaintiff Ashlyn Tell engaging in activity protected by the U.S. Constitution.

253.    As a direct and proximate result of Principal Rials's unlawful actions as alleged herein, Plaintiff Ashlyn Tell was deprived of her First Amendment rights.

254.    On the evening of August 14, 2025, Ms. Tell drafted an initial story on the lawsuit and Gaggle surveillance that Ms. Tell intended to publish the next day.

49

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 54 of 86

255.    The next morning, not even three hours after Mr. Finkeldei confirmed in writing that neither the District nor any District official "will prohibit, delay, condition, or otherwise restrain any student journalist or journalism adviser from reporting on" this lawsuit (*see* ~~Finkeldei Rosenthal~~Finkeldei–Rosenthal Emails, Email dated Aug. 15, 2025, 8:04 a.m. CT), a District teacher, Jeff Plinsky, met with Ms. Tell and pressured her not to publish an article regarding the lawsuit, citing potential adverse consequences to her adviser.

256.    Specifically, on the morning of August 15, 2025, when Ms. Tell arrived for journalism class, Epperson-Ladd told Tell that Epperson-Ladd had unilaterally set a meeting for Tell with a teachers-union representative. Epperson-Ladd stated the purpose of the meeting was "to suggest other options besides publishing" and to "offer some other courses of action, like reaching out to other reporters," and that she wanted Ms. Tell to "hear out the representative" before publishing.

257.    Ms. Tell observed that Epperson-Ladd was visibly worried. Epperson-Ladd stated she was "very concerned," had already been called for a meeting with administration, and wanted to be careful. Tell understood this to mean that administration was pressuring Epperson-Ladd to quash the story or face adverse consequences. As a direct and proximate result, Ms. Tell's speech and reporting were chilled.

258.    After speaking with Epperson-Ladd, Ms. Tell met with teacher Jeff Plinsky, who identified himself as representing the teachers' union. Plinsky told Ms. Tell that she has "constitutional rights to do what you want to do," but urged Ms. Tell to "keep in mind that a young teacher with no due process protections . . . could [be] fire[d] . . . tomorrow for no reason," explaining that "for the first three years of a teacher's contract, they do not have to give a reason to fire a teacher."

50

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 55 of 86

259.    When Ms. Tell asked whether Epperson-Ladd is protected by K.S.A. 72-7209 *et seq.*, Plinsky responded that while she is protected by statute, "that just means they can't say that they are firing her for these press problems . . . they can just say we're firing her because we don't like her."

260.    Ms. Tell understood this interaction to mean the District is substantially likely to terminate Epperson-Ladd's employment because of Ms. Tell's reportage, using a pretext to justify adverse action.

261.    Plinsky further stated that Epperson-Ladd is "in a really tough place," expressed fear that the District could "fire her, not replace her, and let *The Budget* die," and that "her being able to find a job after that is pretty tough."

262.    Plinsky suggested that Ms. Tell send materials to a reporter at *The Lawrence Times* so that Epperson-Ladd could tell administration, "I have done what the admin has asked me to do."

263.    Plinsky acknowledged that the administration had rescinded the prior restraint the day before, but he remained concerned for Epperson-Ladd's continued employment.

264.    Plinsky warned Ms. Tell that administrators might say to Epperson-Ladd, "if you can't control your editors, we want you out of the building," and told Ms. Tell to "understand there are consequences to other people's lives" if she exercised her constitutional rights.

265.    On information and belief, Plinsky acted at the direction of the District, the Board, and/or Principal Rials when Plinsky met with Ms. Tell.

266.    By pressuring Ms. Tell not to exercise her constitutionally protected rights, Plinsky demonstrated reckless and callous indifference to Ms. Tell's constitutional rights, which a reasonable school official would have known.

51

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 56 of 86

267.    Plinsky's actions would chill a person of ordinary firmness from engaging or continuing to engage in activity protected by the U.S. Constitution.

268.    Plinsky's actions were substantially motivated by Ms. Tell engaging in activity protected by the U.S. Constitution.

269.    As a direct and proximate result of Plinsky's unlawful actions as alleged herein, Plaintiff Ashlyn Tell was deprived of her First Amendment rights.

270.    Ms. Tell left the interaction with Plinsky upset and felt her right to publish was chilled.

271.    Consequently, the same day, Plaintiffs filed *Plaintiffs' Emergency Motion for Temporary Restraining Order and Preliminary Injunction* (ECF No. 4) (the "Motion"), fully incorporated by reference herein, bringing the foregoing facts to the Court's attention and seeking an order enjoining the District from (i) enforcing or reimposing the prior restraint forbidding *The Budget* and Ashlyn Tell from reporting on this lawsuit or related District conduct; and (ii) taking or threatening adverse employment action against The Budget's faculty adviser, Abbi Epperson-Ladd, because of such reporting.

272.    Further, on that same day, the District issued a memorandum (ECF No. 13-1 at 4) (the "Clarification Memo") to Epperson-Ladd stating that the District would not restrict lawful reporting. Notwithstanding the issuance of the Clarification Memo, Ms. Tell's right to publish remained chilled, given that synonymous representations by the District in the Finkeldei-Rosenthal Emails had already proven insufficient to protect lawful reporting within three hours after such representations were made.

273.    On August 19, 2025, the Court entered its *Memorandum and Order* (ECF No. 5) (the "Order"). The Order deferred consideration of Plaintiffs' request for a preliminary injunction,

52

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 57 of 86

but, *inter alia*, affirmed that "K.S.A. § 72-7211 protects Epperson-Ladd by stating that '[n]o [student publication] advisor or employee shall be terminated from employment, transferred, or relieved from duties imposed under this subsection for refusal to abridge or infringe upon the right to freedom of expression conferred by this act.'" Order at 2.

274.    Based on the foregoing assurances from the Court that Epperson-Ladd would not be terminated or otherwise relieved from her duties for assisting with lawful reporting on this lawsuit, on August 19, 2025, Ms. Tell published an article regarding the instant lawsuit. Nevertheless, Ms. Tell's right to publish was chilled for no less than five days in the interim.

**X.    Concerned Families May Not Opt Out of AI-Surveillance Monitoring.**

275.    Since filing the Initial Complaint, absent any solicitation, counsel for Plaintiffs have received significant supportive correspondence and additional information volunteered by parents, faculty, and other interested parties affected by Gaggle.

276.    In relevant part, Plaintiffs were contacted by the parent ("Parent Doe") of a student at Lawrence Free State High School who undertook significant, but ultimately futile, efforts to opt his son out of Gaggle surveillance. A true and correct copy of Parent Doe's email correspondence with Amy McAnarney (the "McAnarney Emails"), Principal of Lawrence Free State High School, is attached heretowas previously filed as Exhibit S.

277.    Specifically, on August 5, 2024, Parent Doe wrote, "I would like to opt my child out of gaggle [sic]. That is my request. It is spyware. It also uses AI…… Gaggle is constantly learning how to better detect what it considers, or is told to consider, to be problematic speech. But setting that aside, the whole thing creeps me out…… I strongly disapprove of AI spyware monitoring, and would like to opt out of participation in this project." McAnarney Emails at 1.

~~53~~

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 58 of 86

278.    Principal McAnarney responded that, "I do not have the power to do that since Gaggle monitors district owned/issued devices. You would have to contact the district to make this request." McAnarney Emails at 1.

279.    Per McAnarney's instruction, on that same day, Parent Doe emailed and wrote a letter to the District. A true and correct copy of Parent Doe's email to the District (the "Doe Email") was previously filed is attached hereto as Exhibit T.

280.    In relevant part, Parent Doe wrote:

I would like to opt my child out of the "Gaggle" project. Gaggle is spyware. I also understand that it uses Artificial Intelligence (AI) to read and evaluate all of my child's written communication, what he writes, and perhaps what he reads as well... I am not interested in having my child train AI based spyware programs to better conduct surveillance. But setting the AI issues aside, frankly the whole thing creeps me out... I strongly disapprove of AI spyware monitoring, and request to immediately opt out of participation in this project, however well-intentioned it may be. [I also have a question... Is the district paying for use of the Gaggle program, is it being provided for free, or is the district getting paid for its use? Because as I see it my child is the product here and I don't wish to sell his services to Gaggle.]

Doe Email at 1-2.

281.    Having received no response, on August 20, 2024, Parent Doe wrote, "I have received no reply to the email below which I originally sent on August 5, 2024. As a parent and voter I thought perhaps I might receive some sort of reply?" Doe Email at 1.

282.    On August 21, 2024, District Superintendent Larry Englebrick responded to Parent Doe (the "Englebrick Email"). A true and correct copy of the Englebrick Email is attached hereto was previously filed as Exhibit U.

283.    In relevant part, Englebrick wrote that, "because Gaggle is the monitoring program selected by the district to fulfill its federal and state requirements, the District may not allow your student to 'opt out' of using Gaggle on district issued devices." Englebrick Email at 1.

54

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 59 of 86

284.    Similarly, on August 21, 2024, District Board President Kelly Jones responded to Parent Doe (the "Jones Email"). A true and correct copy of the Jones Email is attached heretowas previously filed as Exhibit V.

285.    In relevant part, Jones wrote that, "[t]here is currently not a process for parents and caregivers to opt their children out of district communication devices, which utilize the safety/surveillance software, Gaggle. Students' personal devices and private accounts are not monitored by Gaggle." Jones Email at 1.

286.    As detailed above, it is untrue that personal devices and personal accounts are not monitored by Gaggle.

287.    Notwithstanding Doe's repeated attempts to opt his son out of Gaggle, the District ultimately refused to allow him to do so. Doe's persistent, but ultimately futile, efforts to opt out of Gaggle demonstrate that, notwithstanding any official policies advising otherwise, it is impossible to opt out of Gaggle in practice.

288.    Upon information and belief, Defendants doDefendant does not allow concerned families to opt out of ManagedMethods AI-surveillance monitoring.

289.    The District's actions were directly contrary to representations made to students and parents that opt-outs would be allowed upon request.

**XI.    Current Students E.B. and H.C. Have Been Subjected to and Remain Subject to AI-Surveillance Monitoring.**

290.    E.B. is a current Lawrence High School student and staff writer for The Budget. During the 2023-2024 or 2024-2025 school year, E.B. prepared a class presentation about NATO that briefly mentioned nuclear and chemical warfare. Because of that presentation, Gaggle flagged and quarantined E.B.'s document, and E.B. could not access the document for a period of time.

291.    A vice principal approached E.B. and asked about the context of the document. E.B. explained that it was for a class presentation, and the document was returned to him shortly

thereafter. At no point did anyone explain to E.B. that his communications or documents were being monitored by AI surveillance software.

292.    E.B. also had several essays deleted by Gaggle during this period. As a direct and proximate result of these experiences, E.B. began self-censoring his communications—a chilling effect that persists to this day.

293.    As a staff writer for The Budget, E.B. has kept portions of his journalistic research—including interview transcripts—off of the District's Google Drive specifically because he feared the content would be flagged, quarantined, or deleted. For example, while working on a story about a student suicide hotline in Lawrence, E.B. stored his interviews and research on his personal devices rather than risk having them quarantined or deleted by the District's surveillance system.

294.    E.B. currently uses District-managed platforms for coursework and is required to use Google Classroom and other District tools to complete assignments. Like all students in the District, E.B. cannot refuse or decline the privacy terms imposed by the District without forfeiting access to the basic tools of his public education.

295.    In late 2024 or early 2025, while enrolled at West Middle School, H.C. sent a joking email reply to a friend that included the phrase "stop bullying me." Because of that email, Gaggle flagged H.C.'s communication. School counselor Tiffany Fike pulled H.C. out of class without explanation and escorted him to student services. Ms. Fike then displayed the email on her screen and asked whether the bullying was "an actual issue" and whether the school "needed to do anything about it." H.C. explained that the email was a joke and not serious. The meeting lasted approximately 10 minutes. At no point did anyone notify H.C.'s parents that he had been removed from class and questioned by school officials. As a direct and proximate result of this experience, H.C. began self-censoring his communications—a chilling effect that persists to this day. H.C. remains subject to the District's ongoing surveillance regime through ManagedMethods.

ci

296.    H.C. cannot locate the email at issue and believes it was seized by Gaggle and/or the District. He cannot access other emails from that time period either. The District did not inform H.C. or his parents that it was using Gaggle or any other AI surveillance software to monitor student communications. H.C. was not told how Ms. Fike obtained the flagged message, though she may have said "our system flagged it." The District did not announce its use of Gaggle or, later, ManagedMethods to students.

297.    As a direct and proximate result of this experience, H.C. stopped sending joke emails and changed the way he communicates online. He began avoiding, and continues to avoid using, any words he thought could be flagged by the surveillance system. H.C. alleges that the email was joking, non-disruptive, and not an actual bullying report, and that the District's surveillance response caused him to self-censor his communications—a chilling effect that persists to this day.

298.    H.C. currently uses a District-issued iPad for schoolwork and is required to use Google Classroom to complete assignments. Like all students in the District, H.C. cannot refuse or decline the privacy terms imposed by the District without forfeiting access to the basic tools of his public education.

299.    E.B. and H.C. remain subject to ongoing surveillance by ManagedMethods. Upon information and belief, the District configured ManagedMethods' Cloud Monitor to scan student Google Workspace content, apply automated "risk" detections using keywords and AI, and take automated remediation actions, including quarantine, deletion, breaking shares, and revoking access, without individualized suspicion, notice to students, or a meaningful opportunity to contest.

300.    The District has not announced any intention to discontinue its surveillance program. E.B. and H.C. face a credible and imminent threat of future investigation, discipline, and deletion of their communications, and a present harm from being forced to choose between self-censorship and risking loss of access to education.

cii

**XI.    Defendants XII. Defendant Failed to Act Upon Plaintiffs' Kansas Open Records Act Requests.**

301.    Plaintiffs retain the KORA allegations and claims in this Second Amended Complaint for completeness and possible appellate purposes because an amended complaint supersedes the prior operative pleading. Plaintiffs do not seek through this amendment to disturb the Court's prior KORA rulings or the ongoing KORA compliance and fee proceedings.

290. 302.    On October 30, 2025, Plaintiff P.M. Phoebe Morris, acting in her capacity as News Managing Editor of the *Free Press*, submitted five Kansas Open Records Act ("KORA"), K.S.A. 45-215 *et seq*., requests to the District seeking records concerning the District's substitution of ManagedMethods for Gaggle and associated procurement, configuration, and data-disposition activities.

55

ciii

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 60 of 86

291. 303.    Specifically, P.M. Phoebe Morris requested the fully executed ManagedMethods contract(s) and attachments; all ManagedMethods invoices, payments, purchase orders, and cost analyses; procurement RFP/RFQ materials, proposals, evaluation and scoring records, award memoranda, and related protests or resolutions; District communications with ManagedMethods and internal communications concerning selection, implementation, configuration, scope, efficacy, and public messaging; and Gaggle wind-down/off-boarding and data-disposition records, including notices of termination or non-renewal, off-boarding checklists, certifications of data deletion or return, and correspondence regarding student and staff data disposition.

292. 304.    Each of P.M.'s Phoebe Morris's requests specified production in the electronic formats in which the records are maintained, including text-searchable PDFs for executed agreements, native CSV/XLSX for spreadsheets, and MSG/EML with headers and attachments preserved for emails and messages, and required that any withholdings identify specific subsections of K.S.A. 45-221, with production of all reasonably segregable non-exempt material.

293. 305.    Each of P.M.'s Phoebe Morris's requests asked for an itemized estimate limited to actual costs under K.S.A. 45-219, requested the use of the lowest-cost staff reasonably necessary to fulfill the request, invoked K.S.A. 45-218(d)'s three-business-day action requirement, and invited rolling production and forwarding to any other custodian holding responsive records.

294. 306.    Plaintiff Ashlyn Tell, acting in her capacity as Online Editor-in-Chief of *The Budget*, submitted five substantively identical KORA requests on October 30, 2025 seeking the same categories of records and specifying the same production formats, exemption-identification requirements, itemized cost estimates limited to actual costs, use of lowest-cost staff, and K.S.A. 45-218(d)'s three-business-day mandate.

56

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 61 of 86

295307.    Plaintiffs sent their requests to the District's records custodian and copied the Superintendent Dr. Jeanice Kerr Swift, the Deputy Superintendent Dr. Larry Englebrick, the Board President GR Gordon-Ross, and the Board Vice President Bob Byers, thereby ensuring agency-wide notice to senior officials most likely to maintain or direct access to responsive records.

296. 308.    On October 31, 2025, the District acknowledged receipt of each request by email, stating only that the requests were "under review to determine the availability of the records and the time and resources required to compile and produce them," that the "district will provide you with an estimated cost . . . along with an estimated timeframe for completion," and that "no work to gather or produce records will begin until the estimated charges, if any, are communicated and approved." True and correct copies of Plaintiff P.M.'sPhoebe Morris's KORA requests with receipt acknowledgement are attached heretowere previously filed as Exhibit W, and true and correct copies of Ms. Tell's KORA requests with receipt acknowledgements are attached heretowere previously filed as Exhibit X.

297. 309.    The October 31 acknowledgments did not identify any custodian holding responsive records, did not describe any search methodology or repositories to be searched, did not forward the requests to other offices or personnel despite Plaintiffs' invitation to do so, did not provide any records, and did not furnish a compliant delay notice stating the earliest date and time the records would be available for inspection and the place of inspection.

298. 310.    The October 31 acknowledgments did not issue any written denial identifying specific statutory bases under K.S.A. 45-221 for withholding records, did not produce reasonably segregable non-exempt material, and did not provide an itemized estimate limited to actual costs under K.S.A. 45-219.

299. 311.    As of November 4, 2025—the third business day following receipt—Defendants Defendant had not provided any responsive records, had not provided a compliant delay notice stating the

57

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 62 of 86

earliest availability date and place of inspection, and had not issued a written denial identifying specific statutory exemptions.

300. 312.    Despite senior officials being copied and the existence of readily identifiable responsive records, including the District's October 2025 check register presented at the October 27, 2025 Board meeting reflecting a payment to "MANAGED METHODS INC," Defendants Defendant did not produce records responsive to Plaintiffs' requests.

301. Defendants 313.    Defendant did not provide any itemized fee estimate limited to actual costs, did not identify staff roles or hourly rates to be used, and did not cite any specific subsection of K.S.A. 45-221 for any withholding; nor did they produce any reasonably segregable non-exempt material.

302. As of the date of this filing, Defendants have not produced records responsive to Plaintiffs' October 30, 2025 KORA requests, have not provided a lawful production schedule or earliest availability date, have not identified specific exemptions under K.S.A. 45-221, and have not furnished an itemized actual-cost estimate using the lowest-cost staff reasonably necessary.

314.    On April 8, 2026, the Court granted Plaintiffs Ashlyn Tell and Phoebe Morris partial judgment on the pleadings, holding as a matter of law that the District violated KORA by failing to adequately respond to their October 30, 2025 requests, and ordered the District to issue KORA-compliant responses. (ECF No. 56.) On June 1, 2026, the Court found that the District's denial of access was not in good faith, found that Plaintiffs are entitled to their costs and attorney fees under K.S.A. 45-222 (with the amount to be determined under D. Kan. Rule 54.2), and—after the District began producing records on a rolling basis—ordered the District to provide weekly status reports and to remove the "confidential" watermark it had unilaterally applied to non-exempt records. (ECF No. 79.)

303. 315.    Upon information and belief, Defendants Defendant intentionally withheld disclosure of the District's switch to ManagedMethods and delayed the production of public

cviii

records concerning that switch to impede public oversight and frustrate Plaintiffs' reporting and preparation of this ~~First~~Second Amended Complaint.

~~304.~~ 316.    The timing and pattern of noncompliance—generic "under review" acknowledgments on October 31, 2025; no records or compliant delay notices by November 4, 2025; no itemized actual-cost estimates; no identification of specific exemptions; and continued non-production through the filing deadline—evidence bad faith and an intent to delay or frustrate inspection.

~~58~~

cix

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 63 of 86

305. Defendants'317. Defendant's refusal to timely produce records and failure to conduct a reasonable search across known repositories and custodians impeded Plaintiffs' ability to report to the public about the vendor substitution, procurement process, configuration, data-disposition, and costs associated with ManagedMethods and Gaggle, causing harm to Plaintiffs and undermining KORA's policy of openness.

**INJURIES TO PLAINTIFFS**

306. Defendants'318. Defendant's implementation and use of the District's surveillance regime—including Gaggle and, beginning in late summer/fall 2025, ManagedMethods—violated Plaintiffs' Fourth Amendment rights by subjecting them to unreasonable searches and seizures without any individualized suspicion or reasonable grounds to believe any Plaintiff had violated the law or school rules.

307. Defendants'319. Defendant's implementation and use of Gaggle and the District's adoption of ManagedMethods violated Plaintiffs' First Amendment rights by chilling protected expression. District policy and practice are vague and overbroad insofar as they suppress a substantial amount of lawful and protected student speech without justification, and ManagedMethods' automated "risk" policies and quarantine/deletion features operate without notice or process.

308.320. Because DefendantsDefendant failed to articulate clear standards regarding what content would be flagged, reviewed, seized, or otherwise declared impermissible, Plaintiffs refrained from engaging in protected expression, including journalism and creative work, in order to avoid investigation or discipline.

309.321. Plaintiffs Ashlyn TellE.B. and PH.MC. are current students in the District and remain subject to ongoing Fourth Amendment injuries because Defendants continueDefendant continues to conduct suspicionless searches and seizures of their digital effects through round the

~~clock~~round-the-clock surveillance via Gaggle and ManagedMethods' Cloud Monitor and Content

Filter of their ~~District managed~~

District-managed ~~59~~

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 64 of 86
accounts, including emails, documents, and ~~cloud stored~~cloud-stored files. ManagedMethods operates regardless of device or network when students access ~~District managed~~District-managed accounts.

~~310. Plaintiffs Ashlyn Tell and P.M. likewise suffer ongoing First Amendment injuries. As a direct and proximate result of the surveillance regime, these Plaintiffs have self-censored by refraining from creating and saving lawful, non-disruptive expressive content—such as original photography, creative writing, academic writing, and journalistic drafts—to their District-issued devices and accounts, resulting in missed publication cycles, delayed stories, and changes to coursework and portfolios.~~

322.    Plaintiffs E.B. and H.C. likewise suffer ongoing First Amendment injuries. E.B., a student journalist, has kept portions of his journalistic research off the District's systems and has curtailed the academic and journalistic work he is willing to create and save on his District-issued accounts, for fear it will be flagged, quarantined, or deleted. H.C. has changed the way he communicates—refraining from messages, including ordinary jokes, that he fears the surveillance system will flag.

~~311~~323.    This chilling effect is neither abstract nor speculative; Plaintiffs ~~Ashlyn Tell~~E.B. and ~~P.M~~H.C. know from experience that their protected expression has triggered investigations, deletions, and ostensible justifications. ManagedMethods' own documentation acknowledges false positives and describes automated remediation "within seconds" before any human review, which compounds deterrence. The lack of clear standards and notice further heightens the deterrent effect, as Plaintiffs cannot reasonably predict what speech will result in review, removal, or discipline.

~~312.~~ 324.    But for ~~Defendants'~~Defendant's implementation and maintenance of the surveillance regime, Plaintiffs ~~Ashlyn Tell~~E.B. and ~~P~~H.~~M~~C. would continue to engage in protected

speech on ~~District managed~~District-managed platforms without fear of investigation or loss of their work product.

~~313.~~325.    The District's surveillance exposes Plaintiffs ~~Ashlyn Tell~~E.B. and ~~PH~~.MC. to a credible and imminent threat of future investigation, discipline, and deletion of their work. It also inflicts a present harm by forcing students to choose between ~~self censorship~~self-censorship and risking loss of access to education.

~~314. Defendants'~~326. Defendant's policy places all current students, including Plaintiffs ~~Ashlyn Tell~~E.B. and ~~PH~~.MC., in continuing danger of direct constitutional injury by subjecting their private

~~60~~

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 65 of 86
communications, expressive works, and academic materials to ~~real time~~real-time review,

removal, and scrutiny by unknown ~~third party~~third-party contractors and District personnel—all

without judicial oversight or procedural safeguards.

315. 327.      Plaintiff Ashlyn Tell also suffered a discrete First Amendment ~~retaliation~~ injury
when Principal Rials imposed a prior restraint and District agents pressured her not to

publish, chilling her speech for at least five days and altering her editorial decisions. Plaintiffs also

allege that Defendant's treatment of student-journalist KORA requests, including delay, excessive

fees, and purported restrictions on sharing nonexempt public records, chilled and burdened

protected newsgathering and reporting activity.

316. 328.      Plaintiffs ~~Ashlyn Tell~~E.B. and ~~PH.~~MC. remain subject to ManagedMethods' automated
scanning, flagging, and quarantine of Gmail, Drive, Shared Drive, Docs, Sheets, Slides,

Chat, Meet, and Classroom content, without individualized suspicion, advance notice, or a

meaningful opportunity to contest.

## CAUSES OF ACTION

**FIRST CLAIM**
**Violation of Fourth Amendment (Declaratory Relief)**
**Unreasonable Search, Unreasonable Seizure**
**42 U.S.C. § 1983**
**(~~All~~ Plaintiffs E.B. and H.C. against ~~all Defendants~~Defendant)**

317. 329.      Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set
forth herein.

318. 330.      The Fourth Amendment provides that "the right of the people to be secure in their
persons, houses, papers, and effects, against unreasonable searches and seizures, shall not

be violated." U.S. Const. amend. IV.

319. 331.      It is clearly established that the Fourth Amendment's prohibition against

unreasonable searches and seizures applies to actions taken by public schools and persons acting on behalf of public schools. *New Jersey v. T.L.O.*, 469 U.S. 325, 333 (1985).

61

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 66 of 86

320. 332.    It is clearly established that students have legitimate expectations of privacy, which must be balanced against the school's need to maintain an environment in which learning can take place. *Id.* at 326.

321333.    It is clearly established that in a school setting, a search of joint student-school

property such as a locker and the interference with the property inside of that joint property without reasonable suspicion constitutes an unlawful search and seizure under the Fourth Amendment. *Zamora v. Pomeroy*, 639 F.2d 662, 670–71 (10th Cir. 1981).

322. 334.    Plaintiffs' "publications, articles, materials, models and other items" uploaded to and stored on the Student Google Drive and Google Workspace are recognized as their intellectual property under official District policy.

323. 335.    The Board's July 8, 2024 approval and renewal of the Gaggle contract, and the Superintendent's vendor substitution to ManagedMethods in late summer or fall 2025 without a public Board vote, are official policies and decisions attributable to the District and the Board. These policies were the moving force behind the unreasonable searches and seizures alleged herein.

324336.    The District's and Board's policy and practice of using the District's surveillance

regime—including Gaggle and ManagedMethods' Cloud Monitor and Content Filter—to scan the contents of the Student Google Drive and Google Workspace constitutes an unlawful search under

cxv

the Fourth Amendment. ManagedMethods operates regardless of device or network when students access District-managed accounts.

325. 337.     The District's and Board's policy and practice of using AI-surveillance monitoring to scan the contents of the Student Google Drive and Google Workspace constitutes an unlawful search under the Fourth Amendment.

62

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 67 of 86

326. 338.    The District's and Board's policy and practice of using AI-surveillance monitoring to unilaterally seize the contents of the Student Google Drive and Google Workspace constitutes an unlawful seizure under the Fourth Amendment.

327. 339.    The District's act of quarantining and deleting student files and emails constitutes a seizure because it meaningfully interferes with Plaintiffs' possessory interests in their digital effects by removing access to their own work and communications and by breaking shares. Moving files to an administrator's "CAM_Quarantine" folder and revoking access prevents Plaintiffs from possessing, using, or controlling their property.

328. 340.    The District's and Board's use of AI-surveillance monitoring to scan and unilaterally seize the contents of Plaintiffs' Student Google Drive and Google Workspace was not justified at its inception, as the searches and seizures were not based on any suspicion of any individual student wrongdoing. Rather, Plaintiffs' files were scanned and seized prior to any suspicion of an infraction.

329. 341.    The District's and Board's use of AI-surveillance monitoring to scan and unilaterally seize Plaintiffs' drafts, communications, and pending publications were and are unlawful searches and seizures under the Fourth Amendment.

330. 342.    The District's and Board's use of AI-surveillance monitoring to scan and unilaterally seize Plaintiffs' drafts, communications, and pending publications was not justified at its inception as the searches and seizures were not based on any suspicion of any individual student.

331. 343.    The District's and Board's use of AI-surveillance monitoring to scan and unilaterally seize Plaintiffs Morris's and Farthing's artistic photographs and E.B.'s academic work constituted an unlawful search and seizure under the Fourth Amendment. The District's flagging, review, and rendering inaccessible of H.C.'s email communication likewise meaningfully interfered with his possessory interest in his own communications.

63

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 68 of 86

332. The District's and Board's use of AI-surveillance monitoring to scan and 344. The District's use of AI-surveillance monitoring to scan and unilaterally seize Morris's and Farthing's artistic photographs, E.B.'s academic work, and H.C.'s email communication was not justified at its inception as the searches and seizures were not based on any reasonable suspicion of any individual student.

333. Defendant 345. Farley's search of the belongings and his interrogation of Opal Morris and Henry Farthing were not based on reasonable suspicion at their inception, as the search was not based on any suspicion of any individual student.

334. Defendants' 346. Defendant's policy and practice of using Gaggle and ManagedMethods constitutes an unreasonable search and seizure of Plaintiffs' property, files and communications. Accordingly, Plaintiffs E.B. and H.C., who as current students remain subject to that policy and practice, are entitled to a declaratory judgment that the District's policy and practice violates the Fourth Amendment rights of the students subject to it, including E.B. and H.C.

all Plaintiffs are entitled to declaratory judgment recognizing that Defendants abridged Plaintiffs' Fourth Amendment Rights.

335. 347. Plaintiffs E.B. and H.C. are entitled to declaratory judgment that the District's use of Gaggle and ManagedMethods violates the Fourth Amendment.

**SECOND CLAIM**
**Violation of Fourth Amendment (Injunctive Relief)**
**Unreasonable Search, Unreasonable Seizure**
**42 U.S.C. § 1983**
**(Plaintiffs Ashlyn Tell E.B. and PH.MC. against Defendants Board and District Defendant)**

336. 348. Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

cxix

337. 349.    The District's and Board's policy and practice of conducting the District's surveillance regime—including Gaggle and ManagedMethods' Cloud Monitor and Content Filter—constitutes an unlawful abridgment of the Fourth Amendment right to be free from unreasonable searches and unreasonable seizures.

338. 350.    The District's and Board's policy and practice of conducting AI-surveillance monitoring constitutes an ongoing abridgment of Plaintiffs Ashlyn Tell's, E.B.'s and PH.MC.'s Fourth Amendment rights to be free from unreasonable searches and unreasonable seizures.

64

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 69 of 86

339. 351.    As described above, Plaintiffs Ashlyn TellE.B. and PH.MC. are likely to succeed on their claim for declaratory judgment that Defendants'Defendant's policy and practice of conducting AI-surveillance monitoring constitutes unlawful suppression of their Fourth Amendment rights to be free from unreasonable searches and seizures.

340. Defendants'352. Defendant's vendor substitution does not moot Plaintiffs' claims. ManagedMethods continues to scan, flag, and quarantine content on the same student accounts and platforms, thereby perpetuating the challenged conduct.

341. 353.    As a direct and proximate result of the District's and Board's policies and actions, Plaintiffs Ashlyn TellE.B. and PH.MC. have suffered and continue to suffer irreparable injuries, including being deprived of their constitutional right to be free from unreasonable searches and seizures.

342. 354.    The denial of constitutional rights is an irreparable injury *per se*. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

343. 355.    Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to their Fourth Amendment rights.

344. 356.    Without injunctive relief, the District and Board will continue to violate Plaintiffs' Fourth Amendment rights by impermissibly monitoring, scanning, and seizing their files, communications, and digital content housed on the Student Google Drive and Google Workspace.

345. 357.    The ongoing damage to Plaintiffs' Fourth Amendment rights outweighs the injury that the District and Board will suffer if injunctive relief is granted.

346. 358.    The District and Board would not suffer any harm if injunctive relief were granted, as AI-surveillance monitoring only creates and exacerbates the problems it purports to remedy, as described above.

65

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 70 of 86

347359.        Granting injunctive relief to Plaintiffs will advance the public interest, as the public interest favors the protection of constitutional rights.

348. 360.        Plaintiffs are entitled to an order enjoining the District and Board from operating suspicionless surveillance that scans, flags, and quarantines or deletes student content in Gmail, Drive, Shared Drive, Docs, Sheets, Slides, Chat, Meet, and Classroom absent individualized suspicion, notice, and constitutionally adequate process; and from imposing prior restraints or retaliating against student journalists.

**THIRD CLAIM**
**Violation of Fourth Amendment (Damages)**
**Unreasonable Search, Unreasonable Seizure**
**42 U.S.C. § 1983**
**(All Plaintiffs against all DefendantsDefendant)**

349. 361.        Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

350. Defendants'362.    Defendant's policy and practice of conducting the District's surveillance regime— including Gaggle and, beginning in late summer/fall 2025, ManagedMethods' Cloud Monitor and Content Filter—constituted an unlawful abridgment of Plaintiffs' Fourth Amendment rights to be free from unreasonable searches and seizures as explained in Claim I.

351. 363.        As a direct and proximate result of Defendants'Defendant's policies and actions, Plaintiffs have suffered and will continue to suffer injury, including suspicionless scanning, automated flagging, and quarantine or deletion of their files and communications through Gaggle and ManagedMethods. Plaintiffs are entitled to actual, nominal, and compensatory damages against

Defendant ~~Defendants~~ in an amount to be proven at trial, together with attorneys' fees and costs under 42 U.S.C. § 1988.

352. 364.        As a direct and proximate result of ~~Defendants'~~ Defendant's actions, Plaintiffs were deprived of

their constitutional rights to be free from unreasonable searches and seizures and of access to

66

cxxiv

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 71 of 86

journalistic materials that directly affected their work for their publications. Plaintiffs are entitled to actual, nominal, and compensatory damages against ~~Defendants~~Defendant in an amount to be proven at trial, together with attorneys' fees and costs under 42 U.S.C. § 1988.

~~353.~~ 365.    As a direct and proximate result of ~~Defendants'~~Defendant's actions, Plaintiffs Morris ~~and~~ , Farthing, E.B., and H.C. were deprived of their constitutional rights to be free from unreasonable searches and seizures and suffered damage to their reputations, mental anguish, emotional distress, humiliation, and public embarrassment. Plaintiffs were deprived of their constitutionally protected property rights in their artistic expression and access to their work product. Plaintiffs are entitled to actual, nominal, and compensatory damages against ~~Defendants~~Defendant in an amount to be proven at trial, together with attorneys' fees and costs under 42 U.S.C. § 1988.

~~354. The individual Defendants acted with reckless and callous disregard and were indifferent to Plaintiffs' clearly established Fourth Amendment rights. Accordingly, punitive damages are appropriate against the individual Defendants to punish the abridgment of Plaintiffs' constitutional rights and to deter similar violations in the future.~~

~~355.~~ 366.    Plaintiffs are entitled to damages in an amount to be determined at trial.

**FOURTH CLAIM**
**Violation of First Amendment (Declaratory Relief)**
**Freedom of Speech, Freedom of Press**
**42 U.S.C. § 1983**
**(~~All~~ Plaintiffs E.B. and H.C. against ~~all Defendants~~Defendant)**

~~356.~~ 367.    Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

~~357.~~ 368.    The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

67

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 72 of 86

358369.It is clearly established that students do not shed their constitutional rights to freedom of speech or expression at the schoolhouse gates. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).

359. 370.    It is clearly established that the First Amendment's protections extend beyond the spoken word to include symbolism and artistic expression. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995).

360. 371.    All Plaintiffs' speech and expression uploaded to and stored in the District-managed platforms are protected by the First Amendment.

361. 372.    Plaintiffs Jack Tell, Torkzaban, Ashlyn Tell, Kennedy, Sui Pang, Salisbury, Phoebe Morris, and PE.MB.'s student journalism materials, including drafts, communications, and pending publications are protected by the First Amendment and are recognized by official Board policy as belonging to them.

362373.    Plaintiffs Morris's and Farthing's artistic expression in their photography                                                      is protected by the First Amendment and is recognized by official Board policy as belonging to them.

363. 374.    The District's and Board's use of the District's surveillance regime—including Gaggle and ManagedMethods—to flag and remove Plaintiffs' protected content constitutes a content-based restriction and prior restraint, implemented without any forecast or determination that the regulated speech would disrupt classwork, involve substantial disorder, or invade the rights of others.

364375.    The District's and Board's use of the District's surveillance regime to                                    monitor,                                    flag,

and remove Plaintiffs' protected expression is not justified by any legitimate pedagogical interest

or sufficient governmental concern.

68

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 73 of 86

365. 376.    The District's and Board's use of the District's surveillance regime to flag and remove Plaintiffs Jack Tell, Torkzaban, Ashlyn Tell, Kennedy, Sui Pang, and Salisbury'sSalisbury, Phoebe Morris, protected journalism materials functioned as prior restraint without any forecast or determination that the regulated speech would disrupt classwork, involve substantial disorder, or invade the rights of others.

366. 377.    The District's and Board's use of the District's surveillance regime to flag and remove Plaintiffs Morris's and Farthing's photography and artistic expression functioned as prior restraint without any forecast or determination that the regulated expression would disrupt classwork, involve substantial disorder, or invade the rights of others.

367. 378.    Plaintiffs' First Amendment rights were violated by Defendants'Defendant's use of the District's surveillance regime to flag and remove protected expression. Accordingly, Plaintiffs E.B. and H.C., who as current students remain subject to that policy and practice, are entitled to a declaratory judgment recognizing that Defendants abridged Plaintiffs'that the District's policy and practice violate the First Amendment rights of the students subject to it, including E.B. and H.C.

rights.

368. 379.    Plaintiffs E.B. and H.C. are entitled to declaratory judgment that the District's use of Gaggle and ManagedMethods violates the First Amendment.

**FIFTH CLAIM**
**Violation of First Amendment (Injunctive Relief)**
**Freedom of Speech, Freedom of Press**
**42 U.S.C. § 1983**
**(~~Ashlyn Tell~~Plaintiffs E.B. and ~~PH~~.~~M~~C. against ~~Defendants District and Board~~Defendant)**

~~369.~~ 380.    Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set
 forth herein.

~~370. Defendants'~~381.Defendant's actions violated Plaintiffs' First Amendment rights for the reasons
 stated in Claim IV.

~~371~~382.    As a direct and proximate result of the District's policies and actions, Plaintiffs

 E.B. ~~Ashlyn Tell~~ and ~~PH~~.~~M~~C. have suffered and continue to suffer irreparable injury, including ~~Defendants'~~Defendant's use

of ~~69~~

cxxx

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 74 of 86

of AI-surveillance monitoring to limit protected First Amendment expression, which continues to restrict and chill their speech so long as suspicionless monitoring, automated flagging, and quarantine/deletion continue.

372. 383.    Plaintiffs Ashlyn Tell E.B. and PH. MC. have suffered irreparable injury, including being deprived of their constitutional rights to freedom of expression by censorship of journalistic materials and the chilling effect such censorship has produced on publication. These injuries are ongoing because the District has substituted ManagedMethods for Gaggle and continues the challenged conduct on the same student accounts and platforms.

373. 384.    Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to their First Amendment rights.

374. 385.    Without injunctive relief against Defendants and their, Defendant's use of Gaggle, Defendants' suppression of ManagedMethods, or substantially similar surveillance tools will continue to suppress Plaintiffs' First Amendment rights will continue.

375. 386.    The threatened continuing violation of Plaintiffs' First Amendment rights outweighs the injury if any, that the Defendants Defendant will suffer if injunctive relief is granted. Any administrative burden associated with ceasing suspicionless monitoring and automated quarantine is outweighed by the protection of constitutional rights.

376. 387.    Indeed, Defendants Defendant would not suffer any harm if injunctive relief were granted, as AI-surveillance monitoring only creates and exacerbates the problems Defendants purport Defendant purports to remedy by using same through such monitoring, as described above.

377 388.    Granting injunctive relief to Plaintiffs will advance the public interest, as the public

interest favors the protection of constitutional rights.

378. 389.     Plaintiffs are entitled to an order enjoining the District and Board from operating suspicionless surveillance that scans, flags, and quarantines or deletes student content in Gmail,

70

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 75 of 86
Drive, Shared Drive, Docs, Sheets, Slides, Chat, Meet, and Classroom absent individualized suspicion, notice, and constitutionally adequate process; and from imposing prior restraints or retaliating against student journalists.

**SIXTH CLAIM**
**Violation of First Amendment (Damages)**
**Freedom of Speech, Freedom of Press**
**42 U.S.C. § 1983**
**(All Plaintiffs against all DefendantsDefendant)**

379. 390.    Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

380.    Defendants'391.    Defendant's actions violated Plaintiffs' constitutional rights for the reasons set forth herein.

381. 392.    As a direct and proximate result of Defendants'Defendant's policies and actions, Plaintiffs have suffered and continue to suffer injury, including use of the District's surveillance regime to limit protected First Amendment expression, which continues to restrict and chill their speech so long as suspicionless monitoring, automated flagging, and quarantine/deletion continue.

382. 393.    As a direct and proximate result of Defendants'Defendant's actions, Plaintiffs Jack Tell, Torkzaban, Ashlyn Tell, Kennedy, Sui Pang, Salisbury, Phoebe Morris, and PE.MB. have suffered injury, including deprivation of their constitutional rights to freedom of expression through censorship of journalistic materials and the chilling effect produced on their student publications.

383. 394.    As a direct and proximate result of Defendants'Defendant's actions, Plaintiffs Morris and , Farthing, E.B., and H.C. were deprived of their rights guaranteed by the First Amendment and suffered damage to their reputations, mental anguish, emotional distress, humiliation, and public embarrassment. Plaintiffs were deprived of access to their constitutionally protected artistic expression.

71

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 76 of 86

384. 395.    Plaintiffs are entitled to actual, nominal, and compensatory damages against Defendant ~~Defendants~~ in an amount to be proven at trial, together with attorneys' fees and costs under 42 U.S.C. § 1988.

~~385. The individual Defendants acted with reckless and callous disregard and were indifferent to Plaintiffs' clearly established First Amendment rights. Accordingly, punitive damages are appropriate against the individual Defendants to punish the abridgment of Plaintiffs' constitutional rights and to deter similar violations in the future.~~

**SEVENTH CLAIM**
**Violation of First, Fourth, and Fourteenth Amendments**
~~**(Declaratory Relief)**~~
~~**Vagueness**~~
~~**42**~~ **(Declaratory Relief)**
**Vagueness** ~~42~~ **U.S.C. § 1983**
~~**(All Plaintiffs against the District and Board)**~~
**(Plaintiffs E.B. and H.C. against Defendant)**

386. 396.    Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

387. 397.    The First and Fourteenth Amendments to the Constitution prohibit government restrictions on speech that fail to provide members of the public fair notice of what constitutes prohibited conduct.

388. 398.    A government policy is unconstitutionally vague if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.

389. 399.    The District's ~~and Board's~~ surveillance policies and practices—implemented

cxxxv

through Gaggle and ManagedMethods—are vague because they fail to provide parents and students with sufficient information to know what is restricted or required so that they may act accordingly.

390. 400.    The District's and Board's surveillance policies and practices are vague because

prohibitions framed as "references to self-harm, depression, drug use, and violent threats" lack

72

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 77 of 86

precision and guidance and are implemented through undisclosed keyword lists, AI-driven

"risk" scoring, and automated remediation, without notice, narrowing standards, or appeal

processes.

391. 401.    The District's and Board's surveillance policies and practices do not provide precision and guidance to those enforcing the policy, enabling arbitrary or discriminatory

enforcement.

392402. The District's and Board's surveillance policies and practices chill Plaintiffs and other students from engaging in protected First Amendment speech because students must

self self-censorcensor to avoid triggering suspicionless searches and seizures of their property and

expression.

393403. Plaintiffs are entitled to a declaration under 28 U.S.C. § 2201 that the District's and Board's surveillance policies and practices are unconstitutionally vague and therefore

violate the First, Fourth, and Fourteenth Amendments.

**EIGHTH CLAIM**
**Violation of First, Fourth, and Fourteenth Amendments**
**(Declaratory Relief)**
**Overbreadth**
**42 U.S.C. § 1983**
**(All Plaintiffs against the District and Board)**
**(Plaintiffs E.B. and H.C. against Defendant)**

394. 404.    Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

395. 405.    The First Amendment to the Constitution prohibits government action that regulates substantially more speech than the Constitution allows to be regulated.

396. 406.    "[A] law may be invalidated as overbroad if 'a substantial number of its

applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (internal quotation marks omitted and citation omitted).

73

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 78 of 86

397. 407.    The District's use of the surveillance regime—including Gaggle and ManagedMethods—is substantially overbroad because it reaches and regulates a significant amount of protected First Amendment speech and expressive conduct, including non-harmful, non-disruptive, and non-invasive speech that is of no legitimate concern. As alleged herein, the District has seized student content and property protected by both the First and Fourth Amendments, demonstrating the overbreadth of its seizures and related actions.

398. 408.    The District's and Board's use of AI-surveillance monitoring reaches and regulates a greater volume of protected First Amendment expression in proportion to any legitimate purpose.

399. 409.    The District's and Board's use of AI-surveillance monitoring reaches and regulates a greater volume of permissible expression in proportion to any legitimate purpose by censoring messages containing innocuous phrases such as "called me a," "called her a," "very uncomfortable," and "my mental health."

400. 410.    The District's and Board's use of AI-surveillance monitoring reached a substantial amount of protected expression by censoring and seizing Plaintiffs Jack Tell, Torkzaban, Salisbury, Ashlyn Tell, Kennedy, and Sui Pang, and Salisbury'sPang's drafts and journalistic works, and thereby limiting the production of The Budget's publications.

401. 411.    The District's and Board's use of AI-surveillance monitoring reached and regulated a substantial amount of protected expression by flagging and seizing photos created by Plaintiff Morris, depicting outfits complying with official school dress code policy.

402. 412.    To the extent the District's surveillance regime has any constitutionally permissible application in terms of protecting students from harm, its application is so broad that it chills a substantial amount of constitutionally protected speech.

74

cxl

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 79 of 86

403. 413.    The District's use of AI-surveillance monitoring chills Plaintiffs and other students

from engaging in the full array of their protected First Amendment expression.

404414.Plaintiffs are entitled to a declaration under 28 U.S.C. § 2201 that the District's use

of Gaggle and ManagedMethods is substantially and unlawfully overbroad and therefore

violates the First and Fourth Amendments.

## TENTH CLAIM

**NINTH CLAIM**
**First Amendment Retaliation**
**Freedom of Speech, Freedom of Press**
**42 U.S.C. § 1983**
**(Plaintiff Ashlyn Tell against Defendants Rials, District, and Board)**

405. Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set

forth herein.

406. It is clearly established that "the First Amendment prohibits government officials

from subjecting an individual to retaliatory actions" for engaging in protected speech. *Hartman v.*

*Moore*, 547 U.S. 250, 256 (2006).

407.    It is clearly established that filing a lawsuit is protected conduct under the First

Amendment. *Van Deelen v. Johnson*, 497 F.3d 1151, 1156 (10th Cir. 2007).

408. Plaintiff Ashlyn Tell engaged in protected First Amendment activity when she filed

this lawsuit.

409. Plaintiff Ashlyn Tell engaged in protected First Amendment activity when she

sought to report on this lawsuit, the District's surveillance practices, and related matters of public

concern in her capacity as *The Budget*'s editor-in-chief.

410. Defendant Rials issued a directive forbidding *The Budget* and its student reporters

from reporting on this lawsuit, and, even after purporting to rescind that directive, pressured Ms.

75

cxlii

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 80 of 86

Tell—through a District teacher and threats to her adviser's employment—not to publish an article about this lawsuit.

411. Principal Rials issued the directive in his official capacity.

412. District counsel confirmed and communicated the directive on the District's behalf.

413. The District issued a Clarification Memo while failing to prevent or repudiate the subsequent pressure campaign.

414. The directive and pressure campaign were undertaken pursuant to official policy, custom, or a decision by officials with final policymaking authority for student publications and communications.

415. These policies and decisions were the moving force behind the violation of Ms. Tell's First Amendment rights.

416. The District's failure to train and supervise officials regarding prior restraints and student press rights constituted deliberate indifference that caused the constitutional injury.

417. Accordingly, Defendants District and Board are liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

418. Defendants' actions would deter a person of ordinary firmness from continuing to engage in protected petitioning and speech/press activity.

419. Defendants acted with a retaliatory motive: their directive and subsequent pressure were substantially motivated by, and were a but-for cause of, Ms. Tell's protected activity—namely, filing this lawsuit and intending to report on it.

420. As a result of Defendants' actions, Ms. Tell's protected activity was chilled: she refrained from reporting on the lawsuit for no less than five days, until the Court confirmed that her adviser would not be terminated or relieved of duties for assisting with lawful reporting. The

76

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 81 of 86

rescission of the prior restraint did not cure the already-inflicted injury or the continued pressure campaign.

421. By issuing a prior restraint and by pressuring Ms. Tell not to publish—including through threats affecting her adviser's employment—Defendants violated Ms. Tell's rights under the First Amendment. These threats also contravened K.S.A. 72-7211, which protects student publication advisers from adverse employment action for refusing to abridge student expression.

422. Defendants' retaliatory actions were the direct and proximate cause of Ms. Tell's injuries, including deprivation of constitutional rights, emotional distress, and lost or delayed publication opportunities. Ms. Tell is entitled to actual, nominal, and compensatory damages against the Board, the District, and Principal Rials in an amount to be proven at trial, together with attorneys' fees and costs under 42 U.S.C. § 1988.

423. Principal Rials acted with reckless and callous disregard and deliberate indifference to Ms. Tell's constitutional rights. Accordingly, punitive damages are appropriate against Principal Rials to punish and deter similar violations in the future.

424. Ms. Tell also seeks declaratory and injunctive relief prohibiting Defendants from imposing prior restraints or retaliating against student journalists, and requiring training and supervision sufficient to prevent recurrence of the unconstitutional conduct.

**TENTH CLAIM**
**Violation of Kansas Open Records Act**
**Failure to Conduct Adequate Search for Responsive Records**
**(Injunctive and Declaratory Relief)**
**K.S.A. 45-215 et seq.; 28 U.S.C. § 1367**
**(Plaintiffs Ashlyn Tell and P.M.Phoebe Morris against Defendants District and BoardDefendant)**

425. 415.    Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 82 of 86

426. Defendants are416.    Defendant is obligated under K.S.A. 45-215 et seq. to conduct a reasonable
search for records responsive to Plaintiffs' KORA requests.

427. 417.    Plaintiffs have a legal right to obtain such records, and no legal basis exists for
Defendant's Defendants' failure to conduct a search for them.

428. Defendants'418.    Defendant's failure to conduct a reasonable search for records responsive to
Plaintiffs' requests violates K.S.A. 45-215 et seq. and the regulations promulgated

thereunder.

## ELEVENTH CLAIM
**Violation of Kansas Open Records Act**
**Failure to Disclose Responsive Records**
**(Injunctive and Declaratory Relief)**
**K.S.A. 45-215 et seq.; 28 U.S.C. § 1367**
**(Plaintiffs Ashlyn Tell and P.M.Phoebe Morris against Defendants District and BoardDefendant)**

429. 419.    Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set
forth herein.

430. Defendants are420.    Defendant is obligated under K.S.A. 45-218 to produce or make available for
inspection all records responsive to Plaintiffs' KORA requests as soon as possible.

431. 421.    Plaintiffs have a legal right to obtain such records within the statutory time frame,
and no legal basis exists for Defendants'Defendant's failure to produce or make the

requested records available.

432. Defendants'422. Defendant's failure to produce or make any responsive records available violates,
at a minimum, K.S.A. 45-218, as well as the regulations promulgated thereunder.

cxlvi

**TWELFTH CLAIM**
**Violation of Kansas Open Records Act**
**Failure to Respond Within Time Required**
**(Injunctive and Declaratory Relief)**
**K.S.A. 45-215 et seq.; 28 U.S.C. § 1367**
**(~~Plaintiff~~Plaintiffs Ashlyn Tell and ~~P.M.~~Phoebe Morris against ~~Defendants District and Board~~Defendant)**

~~433.~~ 423.    Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

~~78~~

~~Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 83 of 86~~

~~434. Defendants are~~424.    Defendant is obligated under K.S.A. 45-218(d) to produce or make available for inspection all records responsive to Plaintiffs' KORA requests by the deadline set forth in the statute. Plaintiffs have a legal right to the timely production of such records, and no legal basis exists for ~~Defendants'~~Defendant's failure to produce any records or make any records available for inspection within the statutory time period.

~~435. Defendants'~~425. Defendant's failure to respond within the statutory time frame, and in particular to either identify the applicable statutory exemptions and to disclose all responsive, non-exempt records within the statutory time frame violates, at a minimum, under K.S.A. 45-218(d), as well as the regulations promulgated thereunder.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray for judgment against ~~Defendants~~Defendant as follows:

A.    Declare that ~~Defendants'~~Defendant's operation of AI-surveillance monitoring—including Gaggle and ManagedMethods—violates the First, Fourth, and Fourteenth Amendments, and that ~~Defendants'~~Defendant's policies and practices are unconstitutionally vague and overbroad;

B.    ~~Declare that Defendants' imposition of a prior restraint against Plaintiff Ashlyn Tell violated the First Amendment;~~

cxlvii

~~C~~B.    Enter a permanent injunction enjoining ~~Defendants~~Defendant from operating AI-surveillance monitoring programs that scan, flag, and quarantine or delete student content in Gmail, Drive, Shared Drive, Docs, Sheets, Slides, Chat, Meet, and Classroom absent individualized suspicion, contemporaneous notice, and constitutionally adequate process;

C.    Preserve and enforce the Court's prior rulings that Defendant violated the Kansas Open Records Act, including the declaratory, compliance, fee, and cost relief ordered in ECF Nos. 56 and 79;

~~D.    Declare that Defendants violated the Kansas Open Records Act by failing to timely act, failing to conduct an adequate search and provide custodian assistance, failing to disclose responsive records and all reasonably segregable non-exempt material, and failing to identify specific statutory exemptions for any withholdings;~~

~~79~~

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 84 of 86

ED.    Order Defendants to expeditiously conduct an adequate search for all records responsive to Plaintiffs' KORA requestssuch further KORA compliance relief as may be necessary to enforce the Court's prior orders;

F.    Order Defendants to immediately process and disclose all responsive, nonexempt records, and enjoin Defendants from improperly delaying or withholding responsive records;

E.    Award Plaintiffs their reasonable attorneys' fees and costs under K.S.A. 45-222, in the amount to be determined by the Court;

GF.    Award Plaintiffs compensatory and nominal damages against all Defendants, and punitive damages against the individual DefendantsDefendant;

HG.    Award Plaintiffs their reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and K.S.A. 45-222, and any other applicable law;

IH.    Award Plaintiffs their costs, and pre- and post-judgment interest as permitted by law;

JI.    Grant Plaintiffs such other and further relief as the Court deems just, equitable, and appropriate.

## DEMAND FOR JURY TRIAL

In compliance with Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury on all issues so triable.

80

Dated:  June 26, 2026

Respectfully submitted,

**DENTONS US LLP**

*/s/ Harrison M. Rosenthal*
Mark P. Johnson (Kan. No. 22289)
Harrison M. Rosenthal (Kan. No. 28894)
Jacob S. Margolies (Kan. No. 29470)
Rebecca Hughes Parker (pro hac vice)

4520 Main Street, Suite 1100
Kansas City, Missouri 64111-7700
Telephone:  (816) 460-2400
Facsimile:  (816) 531-7545
mark.johnson@dentons.com
harrison.rosenthal@dentons.com
jacob.margolies@dentons.com
rebeccahughes.parker@dentons.com

*Counsel for Plaintiffs*

cl

Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 85 of 86

**Dated:** November 17, 2025

Respectfully submitted,

_____

**DENTONS US LLP**

*/s/ Harrison M. Rosenthal*
Mark P. Johnson (Kan. No. 22289)
Harrison M. Rosenthal (Kan. No. 28894)
Jacob S. Margolies (Kan. No. 29470)

4520 Main Street, Suite 1100
Kansas City, Missouri 64111-7700
Telephone: (816) 460-2400
Facsimile: (816) 531-7545
mark.johnson@dentons.com
harrison.rosenthal@dentons.com
jacob.margolies@dentons.com

*Counsel for Plaintiffs*

cli

81

~~Case 2:25-cv-02428-KHV-GEB Document 23 Filed 11/17/25 Page 86 of 86~~

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on ~~November 17~~June 26, ~~2025~~2026, a true and correct copy of the above and foregoing was e-filed with the Court's CM/ECF electronic filing system, which provided notice to all parties who have entered an appearance in this action.

Plaintiffs will serve or file this Second Amended Complaint as required by the Federal Rules of Civil Procedure, the District of Kansas local rules, and any order granting leave to amend.

~~Because the First Amended Complaint adds Defendant Quentin Rials, Plaintiffs will serve a summons and a copy of the First Amended Complaint on Defendant Rials in accordance with Fed. R. Civ. P. 4 and will file proof of service upon completion.~~

/s/ *Harrison M. Rosenthal*
*Counsel for Plaintiffs*

| Summary report: Litera Compare for Word 11.4.0.111 Document comparison done on 6/26/2026 10:34:52 AM | |
|---|---|
| **Style name:** Underline Strikethrough | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** C:\Users\hrosenthal\OneDrive - Dentons\Desktop\23.pdf | |
| **Modified filename:** C:\Users\hrosenthal\OneDrive - Dentons\Desktop\SAC.docx | |
| **Changes:** | |
| Add | 661 |
| Delete | 1219 |
| Move From | 14 |
| Move To | 14 |
| Table Insert | 3 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 3 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 1914 |