**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| JACK TELL; NATASHA TORKZABAN; MORGAN SALISBURY; OPAL MORRIS; HENRY FARTHING; SUZANA KENNEDY; NAOMI SUI PANG; ASHLYN TELL; PHOEBE MORRIS; E.B., a minor, by and through his parent and next friend CATHERINE P. BATZA, Ph.D.; and H.C., a minor, by and through his parents and next friends DANIELLE BRUNIN and ERIK CHANEY,<br><br>*Plaintiffs*<br><br>v.<br><br>LAWRENCE USD 497, a political subdivision of the State of Kansas,<br><br>*Defendant* | Case No. 2:25-cv-02428-KHV-GEB |

**DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT**

Cameron E. Grant
Melika Harris
Andrew Gnefkow
LEWIS BRISBOIS BISGAARD & SMITH LLP
4600 Madison Ave., Suite 700
Kansas City, MO 64112
(816) 299-4255
Cameron.Grant@lewisbrisbois.com
Melika.Harris@lewisbrisbois.com
Andrew.Gnefkow@lewisbrisbois.com

*Counsel for Defendant*

Kansas City, Missouri
November 2, 2026

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .... iv

INDEX OF EXHIBITS .... vi

MEMORANDUM .... 1

INTRODUCTION .... 1

STATEMENT OF MATERIAL FACTS .... 3

PROCEDURAL HISTORY .... 14

SUMMARY JUDGMENT STANDARD .... 16

ARGUMENT .... 17

I. E.B. LACKS STANDING BECAUSE HE IS EXEMPT FROM MANAGEDMETHODS .... 19

II. H.C. LACKS STANDING TO MAINTAIN CLAIMS FOR DECLARATORY OR INJUNCTIVE RELIEF UNDER THE FIRST AMENDMENT BECAUSE H.C. FAILS TO IDENTIFY ANY RESTRICTION ON HIS SPEECH, AND THEREFORE FAILS TO IDENTIFY CONCRETE, PARTICULARIZED, AND IMMINENT HARM .... 19

- A. H.C. is Not Enrolled in Journalism or Art Classes .... 19
- B. H.C.'s Claims Regarding the "Joking Email" Relate to Gaggle .... 19
- C. H.C. Lacks Standing to Pursue First Amendment Claims Because He Identifies No Speech that ManagedMethods Has Restricted .... 19

III. H.C.'S CLAIMS FOR DECLARATORY AND INJUNCTIVE RELIEF BASED ON FOURTH AMENDMENT SEIZURE MUST BE DISMISSED BECAUSE MANAGEDMETHODS DOES NOT SEIZE CONTENT .... 21

IV. H.C.'S CLAIMS FOR DECLARATORY RELIEF AND AN INJUNCTION BASED ON FOURTH AMENDMENT SEARCH SHOULD BE DISMISSED BECAUSE HE HAS NO REASONABLE EXPECTATION OF PRIVACY IN HIS SCHOOL-ISSUED DEVICES OR ACCOUNTS. ALTERNATIVELY, THE DISTRICT'S MONITORING IS JUSTIFIED AS A SPECIAL NEEDS SEARCH .... 21

- A. H.C. and his parents signed the District's Acceptable Use Policy, which placed H.C. on notice that his school devices and accounts were subject to monitoring .... 22
- B. H.C. is subject to additional Board policies regarding privacy contained in the District's Student Handbook .... 23

C. Based on the Acceptable Use Policy and the Board policies disclaiming any expectation of privacy in District technology, H.C. lacked any expectation of privacy, and his claims for declaratory and injunctive relief under the Fourth Amendment must be dismissed. .......... 23

1. District-Issued Accounts and Devices Are Analogous to Lockers, which School Officials Retain the Right to Search ..... 24

2. District-Issued Accounts and Devices Are Also Analogous to Government Employer-Issued Devices and Accounts, as to which Government Employees have no expectation of privacy..... 26

D. Alternatively, the District's use of ManagedMethods is justified as a Special Needs Search .......... 27

1. The constitutionality of the District's use of ManagedMethods is established by cases upholding the constitutionality of metal detectors, drug-sniffing dogs, and random drug testing in schools .......... 28

2. The District's use of ManagedMethods is justified as a special needs search under the 10th Circuit's decision in *Dubbs* .......... 32

3. Federal law mandates monitoring for content ManagedMethods is designed to detect .......... 34

V. THE CURRENT STUDENTS' CLAIMS FOR UNCONSTITUTIONAL OVERBREADTH AND VAGUENESS MUST BE DISMISSED FOR LACK OF STANDING .......... 35

A. E.B. lacks standing .......... 35

B. H.C. lacks standing to maintain his claim that ManagedMethods is void for vagueness because ManagedMethods does not restrict speech and H.C.'s alleged chilling effect injury is not traceable to any ambiguity regarding the District's use of ManagedMethods .......... 35

1. Neither ManagedMethods nor the District restricts speech, so ManagedMethods cannot be unconstitutionally vague .......... 36

2. H.C.'s claim based on alleged self-censorship is speculative and not objectively justified .......... 37

C. H.C. similarly lacks standing to pursue his claim that ManagedMethods is unconstitutionally overbroad .......... 39

1. ManagedMethods does not regulate or censor H.C.'s communications in any way, so it cannot be overbroad in violation of the First Amendment .......... 39

2. ManagedMethods does not perform an action that could be considered an overbroad seizure or search in violation of the Fourth Amendment ..... 40

CONCLUSION ..... 40

## TABLE OF AUTHORITIES

**Cases**


*A.M. v. Holmes*, 830 F.3d 1123 (10th Cir. 2016) ........ 42

*Bd. of Educ. of Ind. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*, 536 U.S. 822 (2002) ........ 2, 30, 31, 34, 37

*Bingham v. Baycare Health Sys.*, 2016 WL 3917513 (M.D. Fla. July 20, 2016) ........ 29

*Black Emergency Response Team v. Drummond*, 2026 WL 2654160 (10th Cir. Sept. 9, 2026) ........ 38

*Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175(10th Cir. 2010) ........ 40

*Burlison v. Springfield Pub. Schs.*, 708 F.3d 1034 (8th Cir. 2013) ........ 30, 32, 33, 36

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ........ 18, 40

*Doe ex rel. Doe v. Little Rock Sch. Dist.*, 380 F.3d 349 (8th Cir. 2004) ........ 33

*Doe 1 v. George Wash. Univ.*, 480 F. Supp. 3d 224 (D.D.C. 2020) ........ 29

*Dubbs v. Head Start, Inc.*, 336 F.3d 1194 (10th Cir. 2003) ........ 35

*Georgelas v. Desert Hill Ventures, Inc.*, 45 F.4th 1193 (10th Cir. 2022) ........ 18

*Herrera v. Santa Fe Pub. Schs.*, 792 F. Supp. 2d 1174 (D.N.M. 2011) ........ 35

*Illinois v. Lidster,* 540 U.S. 419 (2004) ........ 32

*In re Isiah B.*, 500 N.W.2d 637 (Wis. 1993) ........ 26

*In re Patrick Y.*, 746 A.2d 405 (Ct. App. Md. 2000) ........ 26

*Laird v. Tatum*, 408 U.S. 1 (1972) ........ 40

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........ 19

*Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy,* 594 U.S. 180 (2021) ........ 34, 37

*Nat'l Council for Improved Health v. Shalala*, 122 F.3d 878 (10th Cir. 1997) ........ 39

*New Jersey v. T.L.O.,* 469 U.S. 325 (1985) ........ 25, 27

*O'Connor v. Ortega*, 480 U.S. 709 (1987) ........ 28

*Phelps v. Hamilton*, 122 F.3d 1309 (10th Cir. 1997) ........ 19

*Shoemaker v. State*, 971 S.W.2d 178 (Ct. App. Tex. 1998) ........ 26

*State v. J.A.*, 679 So. 2d 316 (Fla. Dist. Ct. App. 1996) ........ 30, 34

*State v. Jakeway*, 558 P.2d 113 (Kan. 1976) ........ 26

*State v. Stein*, 456 P.2d 1 (Kan. 1969) ........ 26, 27

*Thom v. Bristol-Myers Squibb Co.,* 353 F.3d 848 (10th Cir. 2003) ........ 17

*U.S. v. Hartwell*, 436 F.3d 174 (3d Cir. 2006) ........ 31, 35

*United States v. Hamilton*, 701 F.3d 404 (4th Cir. 2012) ........ 28

*United States v. Jacobsen*, 466 U.S. 109 (1984) ........ 22, 42

*Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646 (1995) ........ 25

*Winsness v. Yocom*, 433 F.3d 727 (10th Cir. 2006) ........ 19, 22, 37, 38

*Wyo. Gun Owners v. Gray*, 83 F.4th 1224 (10th Cir. 2023) ........ 38

*Zamora v. Pomeroy*, 639 F.2d 662 (10th Cir. 1981) ........ 26

*Zorn v. City of Marion*, 774 F. Supp. 3d 1279 (D. Kan. 2025) ........ 28

**<u>Statutes</u>**

47 U.S.C. § 25(h)(5)(B) ........ 36

47 U.S.C. § 25(h)(5)(A) ........ 36

**<u>Regulations</u>**

47 C.F.R § 54.520(c)(1) ........ 37

**<u>Other Authorities</u>**

Fed. R. Civ. P. 56(c)(1) ........ 3

D. Kan. Rule 56.1(a) ........ 3

# INDEX OF EXHIBITS

Exhibit 1 – Plaintiffs' Second Amended Complaint.
Exhibit 2 – Declaration of James Polk in Support of Defendant's Motion.
Exhibit 3 – James Polk FRCP 30(b)(6) deposition transcript excerpts.
Exhibit 4 – Jeanice Swift deposition transcript excerpts.
Exhibit 5 – Kiley Luckett FRCP 30(b)(6) deposition transcript excepts.
Exhibit 6 – ManagedMethods Policies (SAC Ex. I).
Exhibit 7 – Greg Farley deposition transcript excerpts.
Exhibit 8 – Jeanice Swift October 29, 2025 email correspondence with Attachment.
Exhibit 9 – Kiley Luckett deposition transcript excerpts.
Exhibit 10 – David Vignery deposition transcript excerpts.
Exhibit 11 – Anthony Lewis deposition transcript excerpts.
Exhibit 12 – E.B. deposition transcript excerpts.
Exhibit 13 – H.C. deposition transcript excerpts.
Exhibit 14 –H.C.'s Answers to Defendant's First Interrogatories.
Exhibit 15 – Policy IIBG (SAC Ex. K).
Exhibit 16 – Policy JCAB (SAC Ex. O).
Exhibit 17 – Acceptable Use Policy (SAC Ex. P).

N.B.: Exhibits 6, 15, 16, and 17 were exhibits to Plaintiffs' Second Amended Complaint. The previous exhibit cover pages and the ECF headers have been removed, to make the documents easier to read when they are attached to this filing.

Defendant Lawrence USD 497 ("Defendant" or the "District") respectfully moves for summary judgment pursuant to Fed. R. Civ. P. 56, dismissing E.B. and H.C.'s claims for declaratory relief, injunctive relief, vagueness and overbreadth.

## INTRODUCTION

Plaintiffs commenced this action August 1, 2025, alleging that the District's use of Gaggle violated their constitutional rights. Shortly after Plaintiffs filed their Complaint, the District replaced Gaggle with ManagedMethods, which performs a similar function, but on a reduced scale.

Only two of the Plaintiffs, H.C. and E.B., are current students within the District (the "Current Students"), and they are the only Plaintiffs who assert claims for declaratory relief, injunctive relief, vagueness and overbreadth (claims I, II, IV, V, VII and VIII). Defendant moves for summary judgment dismissing those claims.

E.B. lacks standing to seek declaratory or injunctive relief for one simple reason: Because he is enrolled in the journalism class Media Design & Production, he is exempt from ManagedMethods.

H.C. is not exempt from ManagedMethods, but he lacks standing to seek declaratory and injunctive relief based on alleged First Amendment violations, for a slightly different reason. H.C. alleges only that *Gaggle* flagged a "joking email" he sent while in middle school, but the District no longer uses Gaggle. H.C. does not allege *ManagedMethods* restricted his speech in any way, and therefore, he cannot demonstrate any concrete, particularized and imminent harm sufficient to confer standing.

H.C. theoretically has standing to allege Fourth Amendment violations because his content is monitored by ManagedMethods, but the District is entitled to summary judgment dismissing those claims as well. First, ManagedMethods does not "seize" any content. Whereas Gaggle quarantined some content, ManagedMethods does not operate in the same

way; ManagedMethods does not quarantine or block any content. Because ManagedMethods does not seize any content, H.C. cannot maintain any claim based on seizure.

Second, H.C. has no reasonable expectation of privacy while using District technology. H.C. admits he and his parents signed the District's Acceptable Use Policy, and H.C.'s use of District technology is subject to Board policies contained in the Student Handbook, all of which inform H.C. that his devices and content may be monitored.

Alternatively, the District's use of ManagedMethods to monitor H.C.'s content is justified as a special needs search. The Supreme Court has recognized that in some circumstances, even where an expectation of privacy exists, the Government's "need to discover such latent or hidden conditions, or to prevent their development, is sufficiently compelling to justify the intrusion on privacy entailed by conducting such searches without any measure of individualized suspicion." *Bd. of Educ. of Ind. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*, 536 U.S. 822, 829–30 (2002). Examples of constitutional special needs searches include metal detectors in airports and schools, and random school drug tests. Just as those suspicionless, "dragnet" searches do not violate the Fourth Amendment, the District's use of ManagedMethods is justified to detect latent threats of violence, self-harm or child pornography. Whereas metal detectors and drug testing infringe upon a person's bodily privacy, ManagedMethods searches only electronic content on H.C.'s District-owned devices as to which he has no expectation of privacy, so the District's use of ManagedMethods is constitutional as a matter of law.

For similar reasons, the Current Students lack standing to maintain claims based on alleged overbreadth and vagueness. E.B. lacks standing altogether, and H.C.'s allegation that *Gaggle* flagged his joking email does not create an objectively certain, immediate risk of harm based on the District's use of ManagedMethods. And ManagedMethods is neither vague nor overbroad, as explained below.

The Second Amended Complaint alleges various free speech and privacy interests that Plaintiffs claim the District violated. Many of the alleged violations relate specifically to journalism, but H.C. is not enrolled in journalism and E.B. is exempt from ManagedMethods. Plaintiffs' allegations relate primarily to Gaggle, but the District no longer uses Gaggle. Most of the allegations in the Second Amended Complaint relate to Plaintiffs who have graduated. Defendant does not ask the Court to resolve, at the summary judgment stage, the former students' claims for nominal damages based on the District's prior use of Gaggle. But the Court can, and should, determine that E.B. lacks standing and that H.C. either lacks standing to pursue, or cannot as a matter of law establish, his claims for declaratory and injunctive relief related to the District's use of ManagedMethods. The Court should accordingly grant summary judgment dismissing the Current Students' claims: I, II, IV, V, VII and VIII.

## STATEMENT OF MATERIAL FACTS

Pursuant to Fed. R. Civ. P. 56(c)(1) and D. Kan. Rule 56.1(a), the District submits the following statement of material facts as to which it contends no genuine issue exists. Citations to "SAC ¶" refer to the Second Amended Complaint (ECF No. 101).[1]

### A. The Parties

1. Defendant Lawrence USD 497 is a political subdivision of the State of Kansas that operates Lawrence High School ("LHS"), Lawrence Free State High School ("Free State"), Lawrence Virtual School, and the District's elementary and middle schools. (**Exhibit 1,** SAC ¶ 29.)

[1] The parties have stipulated, as will be reflected in the Pretrial Order to be entered by the Court, to a presumption of the authenticity of documents Bates stamped by the District, for purposes of summary judgment and trial. Defendant relies in part on this stipulation for the admissibility of discovery documents attached hereto.

2. Plaintiffs Jack Tell, Natasha Torkzaban, Morgan Salisbury, Opal Morris, Henry Farthing, Suzana Kennedy, Naomi Sui Pang, Ashlyn Tell, and Phoebe Morris are 18 or older and are no longer enrolled in the District. (**Exhibit 2**, Declaration of James Polk, ¶ 5; Ex. 1, SAC ¶¶ 16–25; *see* ECFs 71, 73 (Plaintiffs' motions to add H.C. and E.B. as plaintiffs on the grounds that other Plaintiffs would soon graduate from the District).)

3. Only two Plaintiffs are current District students: E.B., who attends LHS, and H.C., who began attending Free State in the 2026–2027 school year. (Ex. 1, SAC ¶¶ 12, 26–28.)

**B. The Transition from Gaggle to ManagedMethods**

4. The District began using Gaggle in late 2023. (Ex. 1, SAC ¶ 42; **Exhibit 3**, FRCP 30(b)(6) Deposition of James Polk conducted October 27, 2026, pp. 7:12–15, 14:3–12.)

5. In summer 2025, the District reviewed its technology contracts to streamline services and find savings. As part of that review, the District's technology staff recommended replacing Gaggle. The District's executive leadership adopted that recommendation. (Ex. 3, Polk Depo. pp. 17:25–18:5, 19:8–24:3.)

6. The recommendation to replace Gaggle with ManagedMethods was based on three pillars: it was a balance of the District's desire to reduce cost; maintain compliance with federal E-Rate and other requirements to monitor for student safety; but not be more invasive than necessary. (**Exhibit 4**, Deposition of Jeanice Swift conducted on October 15, 2026, p. 140:16-23; Ex. 3, Polk Depo. pp. 24:4–25:18, 39:6–22.)

7. In terms of invasiveness and how that played into the District's decision to switch from Gaggle to ManagedMethods, the District had experienced a high level of "white noise" with Gaggle, with administrators receiving hundreds of alerts, and the District desired to adopt a tool that was "tighter and cleaner," while maintaining its federal monitoring

requirements, in addition to its obligation to address issues such as suicidal ideations. (Ex. 4, Swift Depo, pp. 143:2 – 145:6.)

8. During the fall 2025 semester, ManagedMethods ran in a pilot, while Gaggle remained in use. District staff forwarded alerts to buildings when school staff needed to act. Gaggle remained operational until approximately November or December 2025. (**Exhibit 5**, FRCP 30(b)(6) Deposition of Kiley Luckett conducted October 27, 2026 pp. 22:2–24:25; Ex 3, Polk Depo. p. 45:2–17.)

9. During the pilot, the District calibrated ManagedMethods to reduce low-priority alerts. It released the platform to building administrators beginning in January 2026 and completed districtwide rollout in spring 2026. (Ex. 3, Polk Depo. pp. 43:10–44:24; Ex. 5, Luckett 30(b)(6) Depo. p. 22:9–17.)

10. Since the rollout, ManagedMethods has been the only student-monitoring platform the District uses. The District renewed its ManagedMethods subscription for an additional year. (Ex. 3, Polk Depo. pp. 20:11–15, 40:8–21; Ex. 2, Polk Decl. ¶ 8.)

**C. How ManagedMethods Operates**

11. ManagedMethods monitors content in students' District Google Workspace accounts. Monitoring attaches to the District account, not to a device, so it occurs whenever a student is logged into a District account. (**Exhibit 6**, SAC Ex. I at 1–2, 10; Ex. 3, Polk Depo. pp. 41:12–14, 49:9–23; Ex. 1, SAC ¶¶ 55–56, 61, 80.)

12. ManagedMethods does not monitor students' personal email accounts, personal cloud storage, personal social media, or content stored only on personal devices, and it does not manage or access student devices. (Ex. 1, SAC ¶¶ 68, 80; Ex. 6, SAC Ex. I at 27; Ex. 2, Polk Decl. ¶ 10.)

13. ManagedMethods uses pre-written monitoring policies. During onboarding, the District removed terms that generated alerts not rising to a safety concern, such as "lit,"

which can refer to intoxication or to English literature. (Ex. 3, Polk Depo. pp. 26:9–30:13; Ex. 5, Luckett Depo. pp. 15:12–16:18.)

14. The District configured ManagedMethods to alert on student-safety concerns: suicide and self-harm, threats of violence, and sexually explicit images. Unlike Gaggle, ManagedMethods is not configured to alert on substance abuse or cyberbullying. (Ex. 3, Polk Depo. pp. 28:7–19, 35:10–25, 45:18–46:10; **Exhibit 7**, Deposition of Greg Farley conducted August 10, 2026, pp. 66:3–70:11; **Exhibit 8**, LBOE_00003118-LBOE_00003120.)

15. ManagedMethods generates alerts through an entirely automated process. No vendor employee or contractor reviews student content before an alert is sent to the District. (Ex. 5, Luckett Depo. pp. 37:11–15, 53:8–12.)

16. At a high school, alerts are routed to the principal and assistant principals, who divide responsibility by students' last names. (**Exhibit 9**, Deposition of Kiley Luckett conducted September 2, 2026, p. 109:16–21; Ex. 5, Luckett Depo. pp. 41:19–44:11.)

17. ManagedMethods does not block, hold, or delay any email. All student-to-student and student-to-staff emails are delivered. (Ex. 5, Luckett Depo. pp. 68:23–69:5; Ex. 3, Polk Depo. p. 35:10–25.)

18. ManagedMethods does not quarantine, remove, or hide student documents or messages concerning self-harm, suicide, or violence. That content remains in the student's account, and the student's use of the account is unaffected. The only content ManagedMethods can quarantine is sexually explicit imagery. (Ex. 3, Polk Depo. pp. 35:10–36:17; Ex. 5, Luckett Depo. pp. 54:9–13, 61:15–62:8.)

19. The District does not invariably notify a student that content has been flagged. The administrator who receives an alert decides, based on its content, whether and how to speak with the student. (Ex. 5, Luckett Depo. pp. 45:3–46:25, 49:7–10, 53:13–21.)

20. Administrators are trained to speak with the student privately, to tell the student that the student is not in trouble, and to connect the student with a counselor or social worker when the concern involves self-harm or abuse. Law enforcement and a threat assessment are involved only for threats such as weapons. (Ex. 5, Luckett Depo. pp. 47:1–48:22, 45:12–46:13.)

21. The District uses its monitoring program as a support and safety tool, not a disciplinary tool. It is not aware of any student disciplined for uploading content containing nudity flagged by ManagedMethods. The District is not aware of any student disciplined for any content flagged by ManagedMethods. (Ex. 5, Luckett Depo. pp. 60:13–61:14; Ex. 2, Polk Decl. ¶ 11.)

**D. The Journalism Exemption**

22. In spring 2024, after student journalists raised concerns about monitoring, the District decided to exempt journalism students from Gaggle monitoring. (Ex. 1, SAC ¶¶ 169, 189–190; Ex. 5, Luckett Depo. pp. 72:7–73:24; **Exhibit 10**, Deposition of David Vignery conducted September 10, 2026, pp. 138:17–139:24; **Exhibit 11**, Deposition of Anthony Lewis conducted September 9, 2026, pp. 99:4–100:1.)

23. The District's attempt to exempt students from Gaggle initially encountered some technical difficulties, and the effort "took some work," to move certain students into a separate organizational unit within the District's Google Workspace. (Ex. 3, Polk Depo, pp. 63:17 -65:3; 38:7–23, 59:11–16, 60:24–62:5.)

24. Since the District implemented ManagedMethods, it has exempted any student who is enrolled in the following course from ManagedMethods altogether: Media Design & Production, a/k/a Digital Media Technology, Journalism Media Communications, Advanced media Deign & Production, and Yearbook. (Ex. 2, Polk Decl., ¶ 13.)

25. The District is not aware that any student subject to the above exemptions from ManagedMethods has been flagged. (Ex. 3, Polk Depo, p. 63: 11-14; Ex. 2, Polk Decl., ¶¶ 11, 13.)

**E. The Current Students**

26. E.B. is the managing editor of the online edition of *The Budget* and also writes stories as a staff member. He has taken a jewelry-making art class but no photography classes. (**Exhibit 12**, Deposition of E.B. conducted October 1, 2026, pp. 9:7–13, 11:21–12:7, 49:19–50:9.)

27. E.B. is currently enrolled in Media Design & Production at LHS, and he is therefore exempt from ManagedMethods. (Ex. 2, Polk Decl, ¶ 12.)

28. H.C. is not enrolled in an exempt course, so his use of District technology is monitored by ManagedMethods. (**Exhibit 13**, Deposition of H.C. conducted September 8, 2026, p. 36:5–8; Ex. 2, Polk Decl. ¶14.)

29. The Second Amended Complaint alleges a NATO presentation E.B. prepared in eighth grade was flagged by Gaggle and made unavailable to him for about a day. An administrator briefly asked him about it in a hallway, and the document was back in his Drive the next day. (Ex. 1, SAC ¶¶ 290–291; Ex. 12, E.B. Depo. pp. 51:10–52:4, 98:14–99:15, 109:11–110:17.)

30. The Second Amended Complaint also alleges Gaggle deleted several of E.B.'s essays (SAC ¶ 292), but E.B. clarified during his deposition this did not occur, and this allegation was contained in the SAC and E.B.'s interrogatory responses due to a "miscommunication." (Ex 12, E.B. Depo. pp. 99:21 – 100:3.)

31. E.B. knows of no other content of his that was identified as concerning, and no other District official has spoken with him about content he created. (Ex. 12, E.B. Depo. pp. 99:19–100:1, 102:1–25.)

32. E.B. is not aware of any email or Google Drive content he created being flagged by ManagedMethods, during either the 2025–2026 or the 2026–2027 school year. (Ex. 12, E.B. Depo. pp. 43:25–44:14, 50:17–20.)

33. E.B. has never been disciplined by the District. (Ex. 12, E.B. Depo. p. 74:6–9.)

34. The only H.C. content he alleges was flagged is a "joking email" email he sent from his District account, which he dates to late 2023 or early 2024; the SAC dates it to late 2024 or early 2025. Either way, it was flagged by Gaggle while H.C. attended West Middle School. (Ex. 1, SAC ¶ 295; Ex. 13, H.C. Depo. pp. 29:13–15, 41:9–21, 56:22–57:22.)

35. H.C. testified a friend had called him a "silly name," and H.C. responded with: "Stop bullying me." (Ex. 13, H.C. Depo, pp. 41:22-25.)

36. A counselor met with H.C. alone for about ten minutes to ask whether he was being bullied. H.C. explained the email was a joke and returned to class. He was not disciplined, no restrictions were placed on his email, and the meeting did not change how he completed schoolwork or communicated with teachers. (Ex. 13, H.C. Depo. pp. 50:2–13, 53:8–54:4, 55:7–13; **Exhibit 14,** Plaintiff H.C.'s Answers to Defendant's First Interrogatories, Nos. 1, 2, and 6.)

37. H.C. is not aware of any of his communications, writings, photographs, or other content being flagged by ManagedMethods. He has not observed students being called into offices under ManagedMethods. (Ex. 13, H.C. Depo. pp. 26:10–21, 40:6–9, 50:25–51:9.)

38. H.C. alleges he changed his online communication following the joke email incident in that he "stopped sending joke emails," and limited his communication to "casual talk, like small talk or educational emails." (Ex.13, H.C. Depo, pp. 54:10-17.)

39. H.C. has never been suspended, disciplined, or expelled for violating the AUP. (Ex. 13, H.C. Depo. p. 46:20–23.)

**F. No Reasonable Expectation of Privacy when Using District Technology**

40. The District creates each student's Google account within the District-managed Google Workspace domain. Content in those accounts remains accessible to the District through its administrative control of that domain. (Ex. 1, SAC ¶¶ 79, 81, 110; Ex. 10, Vignery Depo. pp. 74:5–7, 137:5–12, 138:7–13, 161:22–25.)

41. Board Policy IIBG provides that students "shall have no expectation of privacy when using district email, other official communication systems, or computer applications," and that information in District computer systems "may be subject to monitoring without notice." (Ex. 1, SAC ¶ 84; **Exhibit 15**, SAC Ex. K; Ex. 11, Lewis Depo. pp. 47:12–48:21.)

42. Board Policy JCAB provides that students "shall have no expectation of privacy when utilizing district property." (Ex. 1, SAC ¶ 102; **Exhibit 16**, SAC Ex. O.)

43. The Student Acceptable Use Policy provides that students will use technology for educational purposes and will not have any expectation of privacy when using District-owned devices or with respect to email, files, or directories. It also provides that email transmissions are subject to review without prior notice, and that information and files remain the property of the District. (Ex. 1, SAC ¶¶ 105–106; **Exhibit 17**, SAC Ex. P.)

44. Parents acknowledge the AUP electronically, through a form in the District's enrollment platform, when they enroll or re-enroll a student. By doing so, they acknowledge that the student will be issued a District account and devices. The District runs reports, most often before each school year, to identify students without an acknowledgment on file and follows up with those families. (Ex. 3, Polk Depo. pp. 51:18–25, 54:5–55:5, 56:3–57:20; Ex. 10, Vignery Depo. pp. 55:11–13, 56:8–57:24, 153:13–154:12.)

45. A family that declines to acknowledge the AUP may still enroll the student. Such a student may use building devices at school but traditionally does not take them home.

The number of students without an AUP on file is small. (Ex. 3, Polk Depo. pp. 50:11–22, 52:5–53:25, 55:9–56:24.)

46. H.C. and his parents signed the AUP each year he was issued a District iPad, including the 2026–2027 school year. (Ex. 13, H.C. Depo. pp. 12:7–14:13.)

47. E.B. has no reason to doubt that the AUP was signed by him or on his behalf as a condition of enrollment. (Ex. 12, E.B. Depo. pp. 92:9–93:2, 105:13–19.)

48. Both Current Students acknowledged the AUP's terms at deposition. H.C. understood that his District iPad was for educational purposes, that District devices would be inspected, and that District email could be reviewed without prior notice. E.B. agreed that he has no expectation of privacy in District email, in schoolwork stored on District Google Drive, or in District devices, and that his files are District property. (Ex. 13, H.C. Depo. pp. 14:14–17:8; Ex. 12, E.B. Depo. pp. 90:5–91:12, 106:5–108:13.)

**G. Personal alternatives**

49. H.C. has a personal Gmail account and a personal computer. He kept non-school memes and images on his District iPad to show friends, and he agreed he could have kept them on his personal computer or phone instead. None of that material was seized. (Ex. 13, H.C. Depo. pp. 20:7–11, 26:22–27:4, 36:14–39:2.)

50. E.B. uses his personal laptop, iPhone, and personal accounts for journalism work, including recording interviews, because he knows those are not monitored. (Ex. 12, E.B. Depo. pp. 53:13–56:18, 74:20–75:2.)

**H. Special Needs**

51. Before adopting monitoring, District leadership faced significant post-COVID student mental-health challenges and found two firearms at Lawrence High School within one month. Each student who brought a gun said they did so out of fear for their safety, and

neither had told any adult at school or at home. (Ex. 11, Lewis Depo. pp. 50:13–52:8, 58:15–59:1.)

52. High-risk student mental-health situations, in which a student has a plan and intent to self-harm or cannot be kept safe, are common in the District. (Ex. 9, Luckett Depo. p. 45:9–22.)

53. The District can support students during the school day, but crises also arise in the evenings, on weekends, and during breaks, when no staff member is present to notice them. (Ex. 11, Lewis Depo. p. 65:6–16.)

54. The District monitors student accounts to intervene early: to reach students before they harm themselves, to learn of threats of violence, and to get struggling students support. The District also understands that the Children's Internet Protection Act and the District's receipt of E-Rate funds require it to monitor student activity on District-issued devices and accounts. (Ex. 11, Lewis Depo. pp. 48:22–49:13, 50:13–52:8, 107:6–108:12, 116:13–117:5; Ex. 3, Polk Depo. pp. 62:15–63:20.)

55. In selecting and configuring ManagedMethods, the District focused on keeping students safe from suicide and self-harm and from threats of violence. It calibrated the platform so that administrators receive alerts warranting follow-up, and buildings that piloted it gave positive feedback. (Ex. 3, Polk Depo. pp. 28:7–19, 43:15–44:24, 46:16–25.)

56. Counselors assess students flagged for possible self-harm using a tiered risk framework. At low risk, they contact guardians and provide support. At moderate risk, they contact guardians and may create a safety plan. At high risk, they recommend evaluation at a hospital or community mental health center, typically without involving police. (Ex. 9, Luckett Depo. pp. 43:8–20, 45:5–46:12.)

57. District training for administrators who respond to alerts instructs them to maintain student privacy and dignity whenever possible. (Ex. 5, Luckett Depo. pp. 85:24–86:6.)

58. A monitoring flag is not visible in the District's student information system and does not become part of a student's cumulative record. (Ex. 5, Luckett Depo. pp. 47:9–48:18.)

59. Under ManagedMethods, no vendor employee reads student content. Alerts go only to designated District administrators, who follow up privately and without discipline, as described in Facts 16–23. (Ex. 5, Luckett Depo. pp. 37:11–15, 41:19–44:11, 47:1–48:22.)

60. Information gathered through monitoring has allowed the District to save students' lives. (Ex. 5, Luckett Depo. pp. 79:6–14, 81:9–84:2.)

61. The District's intervention made possible by monitoring includes the following examples: (1) intervening after a student wrote a suicide note on the District account during the summer, which was flagged; the District reached the student's family, and the student was hospitalized the same day, before the student could act on the plan; (2) a student emailed a friend overnight about an overdose attempt; the email was flagged, police were called and the student was taken to the hospital; (3) during a holiday break, an alert revealed that a student was being physically abused by a parent, and the District contacted the Department for Children and Families; (4) a student wrote about repeated heavy drinking and not wanting to live that way; the content was flagged and staff helped the student enter substance-use treatment; and (5) a student disclosed sexual exploitation at a residential treatment facility, the content was flagged and staff helped the student make reports and obtain intensive therapy. (Ex. 5, Luckett Depo. pp. 81:9–83:6, 85:6–12.)

## PROCEDURAL HISTORY

Defendant files this motion in an unusual procedural posture: the Pretrial Order, which will supersede the Second Amended Complaint, will not be entered until after Defendant has filed this motion. Defendant directs its motion to the Second Amended Complaint, with the understanding that Plaintiffs will assert substantially similar claims in the Pretrial Order.[2]

Plaintiffs filed their Complaint on August 1, 2025. (ECF 1.) E.B. and H.C. were not among the initial plaintiffs. (*See* ECF 1.) The Complaint alleged that the District implemented Gaggle in November 2023. (ECF 1, ¶ 3.) The Complaint centered around Gaggle's alleged interference with "the creative contents of numerous art, journalism, and photography students …" (*Id.*, ¶ 4.) Plaintiffs' initial Complaint made no reference to ManagedMethods. (*See id.*)

On October 27, 2025, Defendant filed a partial motion to dismiss, attaching a Declaration from District Superintendent Dr. Jeanice Swift stating the District had stopped using Gaggle to monitor students for the 2025-2026 school year. (ECF 18-1, ¶ 10.)

On November 17, 2025, Plaintiffs filed their First Amended Complaint. (ECF 23.) E.B. and H.C. were not among the plaintiffs at that time. (*See id.*) The First Amended Complaint alleged that in the late summer and/or fall of 2025, the District replaced Gaggle with ManagedMethods. (ECF 23, ¶ 17.) The First Amended Complaint characterized ManagedMethods as a "substantially similar AI driven surveillance product." (ECF 23, ¶ 54.)

---

[2] By moving for summary judgment against the Second Amended Complaint, as Defendant must (because the Pretrial Order has not yet been entered), Defendant preserves any argument that Plaintiffs have waived any allegations or claims in the Second Amended Complaint not set forth in the final Pretrial Order, and does not waive any objection to claims or contentions Plaintiffs may be allowed to assert in the final Pretrial Order, including without limitation Defendant's continuing objection to any improper request for monetary or other relief that was not disclosed in accordance with the Scheduling Order and federal and local rules.

The First Amended Complaint alleged some specifics about ManagedMethods, but Plaintiffs' claims in the First Amended Complaint largely parroted their claims in the initial Complaint, which only referenced Gaggle.

On May 18, 2026, Plaintiffs moved under Rule 21 to add H.C. as a plaintiff. (ECF 71.) In support of their motion, Plaintiffs explained: "Plaintiffs file this Motion now to avoid a foreseeable mootness issue: Ashlyn Tell and Phoebe Morris are the only remaining Plaintiffs eligible to pursue prospective relief, and both are scheduled to graduate from Lawrence USD 497 on May 20, 2026." (ECF 71 at 1.) On May 20, 2026, Plaintiffs filed a similar motion to add E.B. as a plaintiff. (ECF 73.)

On June 1, 2026, the Court overruled Plaintiffs' motions to add E.B. and H.C. as Plaintiffs, stating: "The Court is not convinced that the proposed claims of H.C. and E.B. easily map on those of the existing plaintiffs." (ECF 78.) The Court ruled that any motion to add H.C. and E.B. as Plaintiffs should be one for leave to amend, complying with District of Kansas Rule 15.1(a). (*Id.*)

On June 26, 2026, Plaintiffs filed an unopposed motion for leave to file a Second Amended Complaint. (ECF 94.) The Court granted Plaintiffs' motion on July 8, 2026 (ECF 100), and Plaintiffs filed the Second Amended Complaint on July 10, 2026 (ECF 101).

As reflected in the blackline attached to Plaintiffs' motion for leave (ECF 94-2), there is substantial overlap between the First Amended Complaint and Plaintiffs' then-proposed Second Amended Complaint, but the Second Amended Complaint adds allegations specific to E.B. and H.C. (ECF 94-2, ¶¶ 290-300; ECF 101, ¶¶ 290-300.)

In the Second Amended Complaint, E.B. alleges that during either the 2024 or 2025 school years, he prepared a presentation about NATO that was quarantined. (Ex. 1, ¶ 290.) He alleges that he also "had several essays deleted by Gaggle during this period" (*Id.*, ¶ 291), but he clarified during his deposition these allegations are inaccurate and were included in

the Second Amended Complaint due to a "miscommunication" (SOF 30). E.B. further alleges that he kept journalism work product off the District's drive to circumvent the District's monitoring. (Ex. 1, ¶ 293.)

H.C. alleges that in late 2024 or early 2025, he sent a "joking email reply" that Gaggle flagged. (*Id.*, ¶ 295.) H.C. alleges that as a result of his incident, he "stopped sending joke emails …" (*Id.*, ¶ 297.)

E.B. and H.C. allege they "remain subject to ongoing surveillance by ManagedMethods." (*Id.*, ¶ 299.) The Second Amended Complaint does not allege, however, that ManagedMethods flagged any of E.B.'s or H.C.'s content from the time of its implementation in the fall of 2025. (*See id.*)

The Court held the Pretrial Conference on October 30, 2026. (ECF 190.) The Court ordered the parties to continue to confer and submit a revised, proposed Pretrial Order by close of business on November 6, 2026. (*Id.*) The process continues as of this filing, so Defendant addresses its motion to the Second Amended Complaint.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is proper if there is no genuine issue of fact and the movant is entitled to judgment as a matter of law. *Thom v. Bristol-Myers Squibb Co.,* 353 F.3d 848, 851 (10th Cir. 2003) (citing FRCP 56(c)). The court should draw all reasonable inferences from the factual record in the light most favorable to the nonmovant. *Id.* "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Id.*

Where a defendant moves for summary judgment on an issue as to which it will not bear the burden of persuasion at trial, the defendant demonstrates its *prima facie*

entitlement to summary judgment "simply by pointing out to the court a lack of evidence for the [plaintiff] on an essential element of the [plaintiff's] claim." *Id.* If the defendant carries this burden, the burden shifts to the plaintiff to "'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the [plaintiff]." *Id., citing* FRCP 56(e). Conversely, once a party establishes its *prima facie* entitlement to judgment on a matter of law on an issue as to which it bears a burden, the burden shifts to the non-movant to establish a genuine issue of fact. *Georgelas v. Desert Hill Ventures, Inc.*, 45 F.4th 1193, 1198 (10th Cir. 2022).

As to standing: "The party invoking federal jurisdiction bears the burden of establishing standing," and to survive summary judgment, that party cannot rely on the allegations in its complaint and must instead set out specific facts, supported by evidence or affidavit, that establish standing. *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 411-12 (2013).

## ARGUMENT

### I. E.B. LACKS STANDING BECAUSE HE IS EXEMPT FROM MANAGEDMETHODS.

The Current Students' First and Second claims seek declaratory relief and an injunction based on allegations that ManagedMethods violates the Fourth Amendment. (Ex. 1, ¶¶ 329-360.) Their Fourth and Fifth claims seek declaratory and injunctive relief based on allegations that ManagedMethods violates the First Amendment. (Ex. 1, ¶¶ 367-389.)

E.B. is currently enrolled in "Media Design & Production," at LHS. (SOF 24, 27.) Media Design & Production is a journalism class, and any student enrolled in that class is exempt from ManagedMethods. (SOF 22, 24.) E.B. is exempt from ManagedMethods. (SOF 24, 25.)

"The case or controversy requirement of Article III limits federal jurisdiction to cases in which the plaintiff can demonstrate that (1) he or she has suffered an injury in fact; (2)

there is a causal connection between the injury and the conduct complained of; and (3) it is likely that the injury will be redressed by a favorable decision." *Winsness v. Yocom*, 433 F.3d 727, 731 (10th Cir. 2006) (quotation omitted). "The plaintiff's injury, moreover, must be 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 732 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Thus, the mere presence of an allegedly unlawful government practice or regulation is insufficient to confer standing onto a plaintiff; the plaintiff must also allege that the regulation imminently threatens to invade their rights. *Id.*

In *Winsness*, one of the plaintiffs, Larsen, sought a declaration that a statute criminalizing the abuse of an American flag violated the First Amendment and requested an injunction. *Id.* at 729. Larsen alleged that the statute chilled him from engaging in protected speech because he feared that he would be arrested. *Id.* at 732. However, the officials charged with enforcing the statute renounced any intent to enforce the statute. *Id.* at 732–733. As a result, the lack of any objectively reasonable threat of the statute's enforcement led the Tenth Circuit to conclude that Larsen lacked standing to seek a declaratory judgment or an injunction, even though Larsen alleged that he was subjectively chilled. *Id.* at 733–734. The Tenth Circuit also rejected Larsen's claim that the statute was unconstitutionally overbroad, reasoning that individual standing is a prerequisite to making a facial overbreadth challenge, *id.* at 734, and upheld the district court's dismissal of Larsen's claims based on lack of standing.

E.B. is in an identical position to Larsen: E.B. is not currently monitored by ManagedMethods because he is enrolled in Media Design & Production at LHS, and any student enrolled in that class is exempt from ManagedMethods. (SOF 27.) Because E.B. is not subject to monitoring by ManagedMethods, he faces no imminent intrusion on his First or Fourth Amendment rights, and therefore, like Larsen, he lacks standing.

## II. H.C. LACKS STANDING TO MAINTAIN CLAIMS FOR DECLARATORY OR INJUNCTIVE RELIEF UNDER THE FIRST AMENDMENT BECAUSE H.C. FAILS TO IDENTIFY ANY RESTRICTION ON HIS SPEECH, AND THEREFORE FAILS TO IDENTIFY CONCRETE, PARTICULARIZED, AND IMMINENT HARM.

Unlike E.B., H.C. is not exempt from ManagedMethods. This at least gets H.C. in the door for Article III standing. But H.C. lacks standing for the separate reason that he has failed to identify any concrete, particularized and imminent harm related to his speech, primarily, because the only intrusion on his speech is alleged to have occurred through Gaggle, use of which the District has discontinued.

### A. H.C. is Not Enrolled in Journalism or Art Classes.

H.C. is not enrolled in a journalism or art class within the District, so he is not exempt from ManagedMethods. Although H.C. is not exempt from ManagedMethods, many of the claims in the Second Amended Complaint relate to alleged interference with students' speech related to journalism or art, but H.C. is not enrolled in related classes, so Plaintiffs' allegations about those types of speech in the Second Amended Complaint do not pertain to H.C.

### B. H.C.'s Claims Regarding the "Joking Email" Relate to Gaggle.

H.C. alleges a single concrete interference with his speech: Gaggle flagged a joking email he sent in late 2024 or early 2025. (Ex. 1, ¶ 295.) The joking email consisted of the phrase: "Stop bullying me." (SOF 35.) The timeframe confirms H.C.'s allegation that the email would have been flagged by Gaggle, not ManagedMethods. (SOF 8-10.) The District no longer uses Gaggle. (SOF 4.)

### C. H.C. Lacks Standing to Pursue First Amendment Claims Because He Identifies No Speech that ManagedMethods Has Restricted.

When asked by the District's interrogatories to identify any document that H.C. contended was searched, seized, deleted, quarantined, censored or otherwise interfered with

by Defendant, H.C. identified only the joking email. (SOF 34, 36, Ex. 14.) When asked during his deposition whether any communications were seized by ManagedMethods, he responded: No. (SOF 37, Ex. 13, 40:9.) When asked whether any of his communications were flagged by ManagedMethods, H.C. stated: "Not that I know of." (SOF 37, Ex. 13, 50:25 – 51:3.) H.C. is not aware that any of his writings, photographs, memes, or anything else that he stored on his Google Workspace was flagged by ManagedMethods. (Ex. 13, 51:4-9.) H.C. did not send the joking email for any educational purpose. (Ex. 13, 43:20.) After H.C. spoke with the school counselor about the joking email, he testified that he stopped sending joking emails and would only send emails related to "casual talk, like small talk or educational emails." (Ex. 13, 54:10-17.) The joking email incident did not change the way in which H.C. communicated with teachers or completed schoolwork assignments. (Ex. 13, 55:7-13.)

ManagedMethods has a narrower scope than Gaggle, and monitors H.C.'s school-issued device and his school account only related to suicide and self-harm, threats of violence, and sexually explicit images. (SOF 11, 14.) ManagedMethods does not monitor for bullying (SOF 14), which was the subject of H.C.'s joking email (SOF 35).

H.C. has not identified a single one of his communications that has been flagged by ManagedMethods. H.C. alleges *Gaggle* affected the content of his communications insofar as, based on Gaggle, he only used his school device and school account to send "educational emails" in addition to small talk or casual talk. H.C. does not allege and, during his deposition could not identify, any way in which *ManagedMethods* impacts his speech.

Having failed to allege that ManagedMethods impacts his speech in any way, H.C. has failed to identify any concrete, particularized and imminent harm, and he therefore lacks standing to seek declaratory or injunctive relief based on alleged First Amendment violations. *See Winsness,* 433 F.3d at 731.

## III. H.C.'S CLAIMS FOR DECLARATORY AND INJUNCTIVE RELIEF BASED ON FOURTH AMENDMENT SEIZURE MUST BE DISMISSED BECAUSE MANAGEDMETHODS DOES NOT SEIZE CONTENT.

Under the Fourth Amendment, "[a] 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

ManagedMethods does not seize property: ManagedMethods does not block, hold, or delay any email. (SOF 17.) All emails are delivered. (SOF 17.) ManagedMethods does not quarantine, remove, or hide documents or messages; that content remains in the student's account, and the student's use is unaffected. (SOF 18.)

The Second Amended Complaint contains allegations regarding "quarantining," but even if quarantining constitutes a seizure – a position the District denies – ManagedMethods, as opposed to Gaggle, does not quarantine any content, other than sexually explicit imagery. (SOF 18.) H.C. cannot therefore obtain injunctive or declaratory relief based on any Fourth Amendment seizure. *See Jacobsen*, 466 U.S. at 113.

## IV. H.C.'S CLAIMS FOR DECLARATORY RELIEF AND AN INJUNCTION BASED ON FOURTH AMENDMENT SEARCH SHOULD BE DISMISSED BECAUSE HE HAS NO REASONABLE EXPECTATION OF PRIVACY IN HIS SCHOOL-ISSUED DEVICES OR ACCOUNTS. ALTERNATIVELY, THE DISTRICT'S MONITORING IS JUSTIFIED AS A SPECIAL NEEDS SEARCH.

As discussed below, courts have affirmed the constitutionality of metal detectors in airports, metal detectors in schools, school locker searches, the use of drug-sniffing dogs in schools, government-employer monitoring of government-employee emails, and drug tests in schools. ManagedMethods is similar to, but less invasive than, those constitutional searches.

Just as "individualized suspicion" is not required by the government before it requires passengers to pass through a metal detector in an airport or before entering a school, the District does not need individualized suspicion before using ManagedMethods to detect threats of suicide and self-harm, threats of violence or pornography, especially not where

students generally, and H.C. in particular, signed the District's Acceptable Use Policy and is on notice of Board policies stating that he has no expectation of privacy in his use of District technology. The District is accordingly entitled to summary judgment dismissing H.C.'s claims for declaratory and injunctive relief arising under the Fourth Amendment.

### A. H.C. and his parents signed the District's Acceptable Use Policy, which placed H.C. on notice that his school devices and accounts were subject to monitoring.

The District provides students access to "computer technology" subject to its Student Acceptable Use Policy ("AUP"). (SOF 43, Ex. 17.) The AUP states that in order for students to receive access to the District's technology resources, students must agree that they will comply with the AUP's guidelines and Board Policies IIBG and IIBGA. (Ex. 17.)

The AUP provides Expectations for All Students. (Ex. 17.) Students will: "Expect any district device to be regularly inspected for inappropriate material, which might include unlicensed software or inappropriate content and software." (Ex. 17.) Students will also:

> Expect, without prior notice, any and all usage of the district network and internet access, including but not by way of limitation, e-mail transmissions and receptions to be subject to review. Any information gathered during monitoring may be copied and or stored. All such information and/or files shall be and remain the property of the school district and ***no user shall have any expectation of privacy*** regarding the use of the devices(s), district network, or the district's internet.

(Ex. 17 (emphasis added).)

H.C. acknowledges that both he and his parents he signed the AUP. (SOF 46.) When asked whether he understood based on the AUP that his school-issued device would be regularly inspected for inappropriate material, H.C. responded: Yes. (Ex. 13, 15:22-16:2.) When asked whether he understood, based on the AUP, that students should expect their network and internet access, including email transmissions, to be monitored without prior notice, H.C. responded: Yes. (Ex. 13, 16:18-17:8.)

**B. H.C. is subject to additional Board policies regarding privacy contained in the District's Student Handbook.**

The District maintains policy IIBG, which is part of the Student Handbook. (SOF 41, Ex. 15.) District Policy IIBG, regarding Computer Use, provides: "Computer systems are for educational and professional use. All information created or accessed by staff and students ***may be subject to monitoring without notice*** by district administrators and/or school staff when appropriate." (Ex. 15 (emphasis added).)

Policy IIBG provides the following under Privacy Rights:

> Employees and/or students shall have ***no expectation of privacy*** when using district email, other official communication systems, or computer applications. Any email, computer application, or information in district computers or computer systems ***may be subject to monitoring without notice*** by administration and/or school staff when appropriate.

(Ex. 15 (emphasis added).)

The District maintains policy JCAB, entitled Searches of Property, stating: "Students will have no expectation of privacy when utilizing district property, including lockers." (SOF 42, Ex. 16.)

**C. Based on the AUP and the Board policies disclaiming any expectation of privacy in District technology, H.C. lacked any expectation of privacy, and his claims for declaratory and injunctive relief under the Fourth Amendment must be dismissed.**

"The Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'" *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 654 (1995). A student may have a reasonable expectation of privacy in a personal item he or she brings to school such as a purse, but students do not have a reasonable expectation of privacy in a school-issued locker, and government employees do not have a reasonable expectation of privacy in their use of government computers, especially not where, as here, written policies and agreements provide notice those items are subject to search. As a matter of law, H.C. lacks any reasonable expectation of privacy when using District technology.

**1. District-Issued Accounts and Devices Are Analogous to Lockers, which School Officials Retain the Right to Search.**

In *New Jersey v. T.L.O.*, the Supreme Court held that a student has a reasonable expectation of privacy in personal items brought into school. 469 U.S. 325, 333 (1985). In its reasoning, the Supreme Court took care to explain that the item searched, the student's purse, was a personal item brought into the school by the student that was comparable to "personal luggage," *id.* at 337-38. In contrast to this recognition of students' reasonable expectation of privacy in their own belongings, the Supreme Court explicitly refused to address "whether a schoolchild has a legitimate expectation of privacy in lockers, desks, or other school property provided for the storage of school supplies" or whether *any* standards at all govern "searches of such areas by school officials." *Id.* at. 337 n.5.

Several courts have found that students lack any expectation of privacy in school lockers, particularly where school policy allows the locker to be searched over the students' objection. *See State v. Stein*, 456 P.2d 1, 3 (Kan. 1969) (a student and a school official exercise joint control over a school-provided locker when the school maintains the means to access the locker and that joint control allows for a school official to inspect the locker over the student's objection), *cited with approval in State v. Jakeway*, 558 P.2d 113, 117 (Kan. 1976); *In re Isiah B.*, 500 N.W.2d 637, 649-50 (Wis. 1993) ("School administrations may adopt a locker policy retaining ownership and possessory control of school lockers and give notice of that policy to students. Because Isiah B. had no reasonable expectation privacy in his locker, there was no Fourth Amendment violation[.]"); *In re Patrick Y.*, 746 A.2d 405, 411 (Ct. App. Md. 2000) (when state law treats a locker as school property subject to routine search by school officials, a student has no expectation privacy in its contents and no defense against a suspicionless search); *Shoemaker v. State*, 971 S.W.2d 178, 182-83 (Ct. App. Tex. 1998) (when every student signs a policy indicating lockers may be inspected, a school official has the authority to

conduct a random locker search without violating a student's Fourth Amendment rights); *Zamora v. Pomeroy*, 639 F.2d 662, 670 (10th Cir. 1981) ("Inasmuch as the school had assumed joint control of the locker it cannot be successfully maintained that the school did not have a right to inspect it.").

As stated by the Supreme Court of Kansas:

> Although a student may have control of his school locker as against fellow students, his possession is not exclusive against the school and its officials. A school does not supply its students with lockers for illicit use in harboring pilfered property or harmful substances. We deem it a proper function of school authorities to inspect the lockers under their control and to prevent their use in illicit ways or for illegal purposes. We believe this right of inspection is inherent in the authority vested in school administrators and that the same must be retained and exercised in the management of our schools if their educational functions are to be maintained and the welfare of the student bodies preserved.

*Stein,* 456 P.2d at 3.

Here, like the lockers discussed above, District technology is owned by the District and provided to students for educational purposes. The AUP, like the locker policies above, demonstrates H.C. was aware that: (1) the District considered the devices and content its property, not H.C.'s property; (2) the technology is provided and intended for "educational purposes," not personal use; and (3) the District retained the right to monitor the contents of devices and its servers at any time. (SOF 43, Ex. 17.)

H.C. has an even lower expectation of privacy in his use of District technology than he would have in a locker. The Supreme Court has recognized that students are likely to store "highly personal items as photographs, letters and diaries" in their personal effects brought with them to school. *T.L.O.*, 469 U.S. at 339. But for a student abiding by the AUP, the District's laptops should contain only school-related material, and to the extent H.C. has a need to create, store or transmit personal content, he is able to do to so using personal technology devices he owns, that are not issued by the District. (SOF 49.) In contrast to a

personal physical item he may carry to school, H.C. has no reasonable expectation of privacy with respect to any use of his District-issued devices and accounts, and cannot suffer any Fourth Amendment injury resulting from the District monitoring in accordance with policies H.C. agreed and assented to when he signed the AUP and through his use of District technology pursuant to its policies.

**2. District-Issued Accounts and Devices Are Also Analogous to Government Employer-Issued Devices and Accounts, as to which Government Employees have no expectation of privacy.**

The District's use of ManagedMethods is similarly authorized by case law upholding the constitutionality of government monitoring of employee computers and emails. Federal courts, including the District of Kansas, have held that a person has no reasonable expectation of privacy in email communications submitted using work-issued devices or on work-issued email accounts that are subject to an authorized use policy that prohibits personal use and authorizes employer monitoring. *See Zorn v. City of Marion*, 774 F. Supp. 3d 1279, 1316 (D. Kan. 2025) (collecting cases to demonstrate circumstances where courts have held that an employee has no reasonable expectation of privacy in a workplace computer or emails); *United States v. Hamilton*, 701 F.3d 404, 408-09 (4th Cir. 2012) ("In similar circumstances, we have held that a defendant did not have an 'objectively reasonable' belief in the privacy of files on an office computer after his employer's policy put him 'on notice' that 'it would be overseeing his Internet use.'"); *cf. O'Connor v. Ortega*, 480 U.S. 709, 717 (1987) (plurality opinion) ("The operational realities of the workplace, however, may make *some* employees' expectations of privacy unreasonable *when an intrusion is by a supervisor rather than a law enforcement official*. Public employees' expectations of privacy in their offices, desks, and file cabinets, like similar expectations of employees in the private sector, *may be reduced by virtue of actual office practices and procedures, or by legitimate regulation*." (second and third emphasis added)).

If an employee has no reasonable expectation of privacy in a workplace computer, the employee cannot maintain a claim under section 1983 for Fourth Amendment violations related to the search and seizure of that computer. *See Zorn*, 774 F. Supp. 3d at 1316. Federal courts have also rejected claims of attorney-client privilege with respect to emails submitted on work accounts by analogizing the inquiry to the Fourth Amendment and concluding that the sender had no reasonable expectation of privacy when the sender is aware of an employer policy of monitoring email accounts. *See Bingham v. Baycare Health Sys.*, 2016 WL 3917513, at *2-*3 (M.D. Fla. July 20, 2016) (unpublished), *cited in Zorn*, 774 F. Supp. 3d at 1316. At least one U.S. district court has extended this reasoning to the context of a university and held that a student employee had no reasonable expectation of privacy in a school-provided email account when the student accepted terms of use indicating that the university reserved the right to monitor all emails sent to or from a school-issued email account. *See Doe 1 v. George Wash. Univ.*, 480 F. Supp. 3d. 224, 227, 230 (D.D.C. Aug. 17, 2020). Accordingly, that court denied the student's claim of attorney-client privilege. *Id.* at 230.

As discussed above, H.C. was aware based on the AUP and written Board policies that (1) the District treated H.C.'s laptop and school account as its own property; (2) use of the District's technology is only authorized for school use; and (3) the District would monitor H.C.'s devices and accounts without notice. H.C. was subject to an acceptable use policy similar to workplace policies that deprive workers of any reasonable expectation of privacy with respect to their employer, so his and his Fourth Amendment claims should be dismissed

### D. Alternatively, the District's use of ManagedMethods is justified as a Special Needs Search.

Courts have approved "dragnet," suspicionless searches in several circumstances analogous to the District's use of ManagedMethods. Courts have approved the constitutionality of the use of metal detectors in airports and at schools, the use of drug-

sniffing dogs in schools, and indiscriminate drug testing in schools. As a matter of law, the District's use of ManagedMethods can be justified as a special needs search based on these cases, even if H.C. has a reasonable expectation of privacy (which he doesn't).

**1. The constitutionality of the District's use of ManagedMethods is established by cases upholding the constitutionality of metal detectors, drug-sniffing dogs, and random drug testing in schools.**

"[I]n certain limited circumstances, the Government's need to discover such latent or hidden conditions, or to prevent their development, is sufficiently compelling to justify the intrusion on privacy entailed by conducting such searches without any measure of individualized suspicion." *Earls*, 536 U.S. at 829 (alteration in original). Because public schools present special government needs to provide for the discipline, health, and safety of its students, suspicionless searches of students can be constitutionally permissible in some circumstances. *Id.* at 830. Under this doctrine, courts have upheld suspicionless drug testing of all students who voluntary participate in extracurricular activities, *id.*, suspicionless searches of students' backpacks for drugs using drug-sniffing dogs, *Burlison v. Springfield Pub. Schs.*, 708 F.3d 1034, 1039-41 (8th Cir. 2013), and suspicionless searches of students for weapons using metal detectors, *State v. J.A.*, 679 So. 2d 316, 318-19 (Fla. Dist. Ct. App. 1996) (collecting cases from other jurisdictions upholding use of metal detectors in schools).

When considering whether a suspicionless "special needs" search at a public school was reasonable in *Earls*, the Supreme Court balanced "the nature of the privacy interest allegedly compromised," *id.* at 830-32, and "the character of the intrusion," including the efforts to maintain student privacy, the confidentiality of the results of the search, whether the search turned over to law enforcement or used to impose discipline or academic consequences, *id.* at 832-34, against "the nature and immediacy of the government's concerns and the efficacy of the [search] in meeting them," *id.* at 834-38. Applying this balancing test to the present facts, the District's monitoring is justified as a "special needs" search.

The nature of the privacy interest here is minimal. Both H.C. here and the students in *Earls* had a reduced privacy interest due to the nature of the school environment. *Id.* 830-31. In fact, H.C. has a lesser privacy interest than the interest implicated in *Earls*. In *Earls*, the school performed a search of the students' bodies by subjecting them to a urine test. *Id.* at 832. Here, the District makes technology available to H.C., but does not search H.C.'s body or personal belongings.

As demonstrated in Section IV.C, *supra*, courts have held that a student's expectation of privacy is reduced when the search focuses on school-provided property, like lockers, rather than a student's body or possessions. Other courts have upheld suspicionless searches extending to a random sample of the entire student body. *See Burlison*, 708 F.3d at 1036-37.

The character of the intrusion here is minor. In *Earls*, the Supreme Court acknowledged that the extraction of urine is highly intrusive, *id.* at 832, but was nonetheless satisfied by the school's precautions to make it minimally intrusive by: (1) providing privacy during the test, (2) limiting access to the results on a "need to know" basis, and (3) only using the results to prohibit students from participating in extracurricular activities without imposing academic or criminal consequences, *id.* at 832-34. Any search of H.C. is limited to school property issued to him for school purposes, not his body or personal effects, so any privacy invasion is minimal. Additionally, the District does not review *all* H.C.'s student activity; administrators would only review H.C.'s content flagged by ManagedMethods for content indicative of suicide and self-harm, violence, and sexually explicit images.

The Third Circuit's analysis in *U.S. v. Hartwell* is particularly instructive. 436 F.3d 174 (3d Cir. 2006). "Suspicionless checkpoint searches are permissible under the Fourth amendment where a court finds a favorable balance between 'the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest,

and the severity of the interference with individual liberty.'" *Id.* at 178-79 (quoting *Illinois v. Lidster,* 540 U.S. 419, 427 (2004)). In upholding airport screening, the Third Circuit reasoned:

> Third, the procedures involved in Hartwell's search were minimally intrusive. They were well-tailored to protect personal privacy, escalating in invasiveness only after a lower level of screening disclosed a reason to conduct a more probing search. The search began when Hartwell simply passed through a magnetometer and had his bag x-rayed, two screenings that involved no physical touching. *See United States v. Slocum,* 464 F.2d 1180, 1182 (3d Cir.1972) (an airport magnetometer screen *"per se* is justified"). Only after Hartwell set off the metal detector was he screened with a wand—yet another less intrusive substitute for a physical pat-down. And only after the wand detected something solid on his person, and after repeated requests that he produce the item, did the TSA agents (according to Hartwell) reach into his pocket.

*Id.* at 180 (footnote omitted)

ManagedMethods operates similarly to airport screening, but with key differences rendering ManagedMethods less intrusive. A magnetometer searches a *person,* whereas ManagedMethods only searches *devices* and *content*. The use of a wand is similar to the District's review of content only after a ManagedMethods flag prompts review, again with a key difference that only *content,* not a *person* is subject to further review. And whereas the last step involved airport screening may involve a TSA agent reaching into a person's pocket (*see id.*), the final step in ManagedMethods is possible discipline, counseling, or referral to law enforcement, never involving a physical search by the District of a student – and all of which are purely hypothetical as to H.C. individually, who alleges only that a teachers spoke with him about the "joking email" that was flagged under Gaggle, not ManagedMethods.

ManagedMethods also compares favorably to a school's use of drug sniffing dogs upheld as constitutional in *Burlison v. Springfield Public Schools*. The plaintiff in that case, a high school freshman, was directed, along with other students and teachers, to leave his personal belongings behind while drug dogs searched the class. *Burlison*, 708 F.3d at 1036. The drug dog visit was in accordance with the district's standard operating procedure, which

permitted searches "to protect the safety and health of the [d]istrict's faculty, staff and students." *Id.* at 1037 (alteration in original). The Eighth Circuit noted: "Students do retain Fourth Amendment rights at school, but those rights are different in public schools than elsewhere. That is because schools have a legitimate need to maintain an environment in which learning can take place." *Id.* at 1039 (citations omitted) (quotation marks omitted). The Eighth Circuit affirmed summary judgment dismissing Burlison's Fourth Amendment claims, in part, because "such a drug dog survey is minimally intrusive, and provides an effective means for adducing the requisite degree of individualized suspicion to conduct further, more intrusive searches." *Id.* at 1040 (citation modified). ManagedMethods is similar to an indiscriminate drug search, again, with a key difference being that ManagedMethods does not monitor H.C.'s personal effects, but rather content he creates on a school-issued device.

Finally, the District minimizes the intrusiveness of its search by only manually reviewing material initially flagged as concerning. *Compare Doe ex rel. Doe v. Little Rock Sch. Dist.*, 380 F.3d 349, 355-56 (8th Cir. 2004) (rejecting suspicionless searches of student backpack contents for drugs, in part, because the drugs would be turned over to police and used for criminal prosecution, but suggesting a less invasive search method—like a drug-sniffing dog—would be constitutional), *with Burlison*, 708 F.3d at 1039-41 (upholding use of drug-sniffing dogs to perform suspicionless searches of student backpacks without commentary on the ultimate consequences of finding drugs).

The District has several legitimate interests in monitoring student communications on school-provided devices and accounts. As a general matter, the District "has the obligation to protect pupils from mistreatment by other children, and also to protect teachers themselves from violence by the few students whose conduct in recent years has prompted national concern." *Earls*, 536 U.S. at 831 (quoting *T.L.O.*, 469 U.S. at 350 (Powell, J.,

concurring)). Preventing student violence has justified the use of metal detectors in schools. *See J.A.*, 679 So. 2d at 320 (citing *T.L.O.*, 469 U.S. at 339).

The District's monitoring is justified based on its interest in maintaining student safety and preventing school violence. As articulated by the Supreme Court:

> [W]e do not believe the special characteristics that give schools additional license to regulate student speech always disappear when a school regulates speech that takes place off campus. The school's regulatory interests remain significant in some off-campus circumstances. The parties' briefs, and those of *amici*, list several types of off-campus behavior that may call for school regulation. These include serious or severe bullying or harassment targeting particular individuals; threats aimed at teachers or other students; the failure to follow rules concerning lessons, the writing of papers, the use of computers, or participation in other online school activities; and breaches of school security devices, including material maintained within school computers.

*Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 188 (2021).

The legitimacy and immediacy of the District's interests is more than sufficient to justify ManagedMethods as a special needs search, even if H.C. had a reasonable expectation of privacy, which he does not. *See Earls*, 536 U.S. at 834-35; *Burlison*, 708 F.3d at 1037 (considering the student-plaintiff's admission that many of his classmates used drugs, as evidence supporting the defendant school's claim that it had a special need to combat a "drug problem" in the school). And the District is not obligated to pick the least intrusive method to achieve its goals. *See Earls*, 536 U.S. at 837 ("[R]easonableness under the Fourth Amendment does not require employing the least intrusive means[.]"). ManagedMethods passes constitutional muster based on these principles.

**2. The District's use of ManagedMethods is justified as a special needs search under the 10th Circuit's decision in *Dubbs*.**

In *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1213-14 (10th Cir. 2003), the Tenth Circuit articulated several factors distinguishing reasonable "special needs" searches from unreasonable ones:

> The Supreme Court has not told us what, precisely, this set of cases has in common, but the cases seem to share at least these features: (1) an exercise of governmental authority distinct from that of mere law enforcement—such as the authority as employer, the *in loco parentis* authority of school officials, or the post-incarceration authority of probation officers; (2) lack of individualized suspicion of wrongdoing, and concomitant lack of individualized stigma based on such suspicion; and (3) an interest in preventing future harm, generally involving the health or safety of the person being searched or of other persons directly touched by that person's conduct, rather than of deterrence or punishment for past wrongdoing. It also appears significant that each of these cases involved extraction of consent through a threatened withholding of a benefit, rather than lack of consent.

The District's use of ManagedMethods bears the hallmarks of valid "special needs" searches identified in *Dubbs.* First, the District does not use the monitoring primarily for law enforcement purposes or to dispense academic discipline; instead ManagedMethods primarily identifies instances involving safety concerns or child pornography.

Second, ManagedMethods affects all students equally and allows for administration to address the flagged communications in private meetings with students that do not create individualized stigma beyond a student being called discreetly out of class.

Third, the primary purpose of the monitoring is to protect the health and safety of students suffering from severe mental health episodes. Even if some students face a minor form of "discipline," – which no Plaintiff alleges has occurred *under ManagedMethods* – such a downstream consequence of the monitoring does not render the "special needs" search unconstitutional. *See, e.g., Hartwell*, 436 F.3d at 180-81 (upholding an airport's suspicionless use of metal detectors as minimally intrusive even though the search lead the airport to calling police and, ultimately, to the prosecution of the defendant), *cited in Herrera v. Santa Fe Pub. Schs.*, 792 F. Supp. 2d 1174, 1191-92 (D.N.M. 2011); *Burlison*, 708 F.3d at 1039-41 (upholding use of drug-sniffing dogs to perform suspicionless searches of student backpacks without commentary on the ultimate consequences of finding drugs).

Fourth, the District does not use its custodial powers to subject H.C. to monitoring without any consent. Instead, H.C. consented to monitoring through the AUP and Board policies contained in the Student Handbook.

The legitimacy of the District's interest in protecting the health and safety of its students is compelling, and the District's *in loco parentis* authority justifies some level of searching (through monitoring) that the government writ large would not have as to an ordinary citizen. The District is entitled to summary judgment because ManagedMethods' passive monitoring of District-owned accounts and devices is less intrusive than other types of special needs searches that have been found constitutional.

**3. Federal law mandates monitoring for content ManagedMethods is designed to detect.**

To participate in federal funding or discount programs, the District must certify that it "is enforcing a policy of Internet safety for minors that includes the online activities of minors and the operation of a technology protection measure … that protects against access through such computers to visual depictions that are (1) obscene; (2) child pornography; or (3) harmful to minors. 47 U.S.C. § 254(h)(5)(B). The District must "ensure[] the use of such computers in accordance with" the above certifications. 47 U.S.C. § 254(h)(5)(A).

Federal regulations promulgated pursuant to the Children's Internet Protection Act ("CIPA") require a school to certify an Internet safety policy addressing the following issues:

> (A) Access by minors to inappropriate matter on the Internet and World Wide Web,
> (B) The safety and security of minors when using electronic mail, chat rooms, and other forms of direct electronic communications,
> (C) Unauthorized access, including so-called "hacking," and other unlawful activities by minors online;
> (D) Unauthorized disclosure, use, and dissemination of personal information regarding minors; and
> (E) Measures designed to restrict minors' access to materials harmful to minors.

47 C.F.R. § 54.520(c)(1). The policy "must also include monitoring the online activities of minors." *Id.*

As discussed in Section IV.D.1 above, in some cases, a government interest "is sufficiently compelling to justify the intrusion on privacy entailed by conducting such searches without any measure of individualized suspicion." *Earls*, 536 U.S. at 829. "The doctrine of *in loco parentis* treats school administrators as standing in the place of students' parents under circumstances where the children's actual parents cannot protect, guide, and discipline them." *Mahanoy Area Sch. Dist. v. B. L. ex. Rel. Levy*, 594 U.S. 180, 189 (2021).

In addition to the District's general legal and moral obligations, authority, CIPA and its regulations impose specific obligations upon the District to address the safety and security of minors in their use of the Internet, and the District must protect against access to obscenity or child pornography. The District's legal obligation to comply with these requirements is further justification for its use of ManagedMethods as a special needs search.

## V. THE CURRENT STUDENTS' CLAIMS FOR UNCONSTITUTIONAL OVERBREADTH AND VAGUENESS MUST BE DISMISSED FOR LACK OF STANDING.

### A. E.B. lacks standing.

As set forth in Section I above, E.B. lacks standing to maintain claims for declaratory or injunctive relief because he is exempt from ManagedMethods. For the same reason, he lacks standing to assert claims for unconstitutional vagueness or overbreadth. *See Winsness*, 433 F.3d at 731 (affirming dismissal of the plaintiff's claims based on constitutional overbreadth for lack of standing).

### B. H.C. lacks standing to maintain his claim that ManagedMethods is void for vagueness because ManagedMethods does not restrict speech and H.C.'s alleged chilling effect injury is not traceable to any ambiguity regarding the District's use of ManagedMethods.

Claim Seven alleges the District's "surveillance policies and practices" are vague because they "fail to provide parents and students with sufficient information to know what is restricted or required …" (ECF 101, ¶ 399.) As a result, H.C. claims he must "self-censor to avoid triggering suspicionless searches and seizures of [his] property and expression[,]" 101 ECF, ¶ 402. H.C. further alleges that the vagueness of the District's monitoring policy allows for it to be arbitrarily enforced. 101 ECF, ¶ 401.

**1. Neither ManagedMethods nor the District restricts speech, so ManagedMethods cannot be unconstitutionally vague.**

"A law can be unconstitutionally vague 'for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement.'" *Black Emergency Response Team v. Drummond*, 2026 WL 2654160, at *7 (10th Cir., September 9, 2026) (quoting *Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1233 (10th Cir. 2023)). As with any challenge brought in federal court, however, H.C. must first demonstrate that he has standing by alleging an actual or imminent injury that is traceable to ManagedMethods' monitoring. *See Winsness*, 433 F.3d at 731.

As an initial matter, ManagedMethods does not restrict any speech. Unlike Gaggle, ManagedMethods does not prevent or block access to any documents or communications,[3] even when it identifies content for administrator review. (SOF 19–21). H.C. does not present any evidence to the contrary; in fact, H.C. has not lost access to any document or email since the District began using ManagedMethods. (SOF 38–39).

---

[3] As a single exception to this rule, ManagedMethods will quarantine access to photographs containing sexually explicit content. (SOF 20.) H.C. does not allege that he intends to send sexually explicit photos to other students using District devices, email, or file storage or that ManagedMethods has chilled his desire to do so. Therefore, H.C. has not alleged that this action by ManagedMethods interferes or threatens to interfere with his First or Fourth Amendment rights. Accordingly, the analysis proceeds without reference to this unimplicated exception.

ManagedMethods does not itself prohibit any conduct or restrict any speech, and it is not a "policy" that can be vague or definite. District *policy* prohibits certain conduct. (Exs. 12, 15.) ManagedMethods is a *tool* that may alert the District to certain conduct or speech, but alleging that ManagedMethods itself is unconstitutionally vague is akin to arguing that a magnetometer or a police baton is unconstitutionally vague. A tool cannot be vague. A *policy* could theoretically be vague, but H.C. does not identify which District policy is unconstitutionally vague, and the District does not – through ManagedMethods or otherwise – restrict speech.

**2. H.C.'s claim based on alleged self-censorship is speculative and not objectively justified.**

To the extent H.C.'s vagueness claim is predicated on an allegation that he self-censors his speech, H.C. also lacks standing. "An allegation of inhibition of speech, without more, will not support standing." *Nat'l Council for Improved Health v. Shalala*, 122 F.3d 878, 884 n.9 (10th Cir. 1997). "All of the Supreme Court cases employing the concept of 'chilling effect' involve situations in which the plaintiff had suffered actual or imminent concrete harm (past or immediately threatened) separate from the 'chill' itself." *Id.* To succeed on a claim, a plaintiff must demonstrate (1) that a government action actually chilled their desire to speak and (2) "such chilling effect was caused by an objectively justified fear of real consequences." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1183 (10th Cir. 2010).

H.C. does not allege ManagedMethods ever flagged, much less interfere with any of his speech. H.C.'s alleged decision to self-censor is entirely self-imposed and was based on the District's use of Gaggle, which the District has discontinued. Because H.C.'s self-censorship is not traceable to any ambiguity or vagueness in ManagedMethods' surveillance, his self-censorship injury cannot establish the standing necessary to seek declaratory relief. *See Clapper v. Amnesty Int'l*, 568 U.S. 398, 416 (2013) ("[R]espondents cannot manufacture

standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."). To the extent that H.C. alleges that he must self-censor out of concern that the ManagedMethods monitoring will eventually result in punishment for protected speech by the District due the vagueness of the District's disciplinary policies, his alleged injury is too speculative to establish an injury-in-fact. *See Laird v. Tatum*, 408 U.S. 1, 11, 13–14 (1972) (reasoning that a plaintiff's belief the a government might use information gathered during lawful monitoring to harm the plaintiff in the future was too speculative to supply standing via a chilling effect claim).

Furthermore, the District's use of ManagedMethods is not vague. ManagedMethods scans all of H.C.'s files and communications, regardless of their content, (SOF 12-13, 18), and H.C. consented to this monitoring when he agreed to the District's Acceptable Use Policy, (SOF 43, 46, 48). H.C. is aware that the monitoring occurs, and that it encompasses all work performed on his Google Classroom. No aspect of the monitoring performed by ManagedMethods is vague.

H.C. does not allege the District has ever disciplined him (SOF 38), or any other student, through its use of ManagedMethods. And for unconstitutional discipline to occur in the future, ManagedMethods would first have to alert the District as to H.C.'s content, and administrator reviewing the content would then have to improperly decide that H.C. is subject to discipline for constitutionally protected speech – none of which has ever happened.

ManagedMethods has never interfered with H.C.'s ability to communicate freely, it has never restricted his communications, and it has never led to discipline or censorship as to H.C. Therefore, H.C. faces only speculative, non-imminent harm, and he lacks standing to challenge ManagedMethods' constitutionality on vagueness grounds.

### C. H.C. similarly lacks standing to pursue his claim that ManagedMethods is unconstitutionally overbroad.

H.C.'s Eighth Claim alleges that monitoring by ManagedMethods violates both his First and Fourth Amendment rights because it is overbroad. ECF 101, ¶ 411. With respect to the First Amendment, H.C. alleges that ManagedMethods regulates or prohibits substantially more protected speech and expression than it legitimately regulates. ECF 101, ¶¶ 407–09, 412–13. With respect to the Fourth Amendment, H.C. alleges that ManagedMethods threatens to search and seize more of his communications and files than is justified. ECF 101, ¶ 407.

#### 1. ManagedMethods does not regulate or censor H.C.'s communications in any way, so it cannot be overbroad in violation of the First Amendment.

H.C. alleges that ManagedMethods regulates student content by censoring and seizing it. ECF 101, ¶¶ 407, 409. However, the undisputed facts demonstrate that H.C. faces no imminent threat that ManagedMethods will restrict his speech by censoring or his seizing his files or communications. Specifically, ManagedMethods, unlike Gaggle, does not block or interfere with student files or communications. (SOF 19–21). H.C. does not present any evidence to contradict this policy, and H.C. admits that he has no knowledge of the District interfering with his files or communications since switching from Gaggle to ManagedMethods. (SOF 38–39). Because H.C. lacks an objectively justified fear that Gaggle will interfere with his First Amendment rights at all—by censoring or seizing his files of communications—he lacks the standing necessary to pursue his overbreadth claim. *See* Section II, *supra*.

### 2. ManagedMethods does not perform an action that could be considered an overbroad seizure or search in violation of the Fourth Amendment.

As explained in Section III, ManagedMethods does not block or quarantine content, so it does not "seize" any property under the Fourth Amendment. *Jacobsen*, 466 U.S. at 113. Although ManagedMethods monitors H.C.'s content, this monitoring is not impermissibly overbroad. A search violates the Fourth Amendment as impermissibly overbroad when it exceeds the scope of its justification. *United States v. Leary*, 846 F.2d 592, 605 ("The fourth amendment requires not only that the warrant sufficiently specify the evidence to be seized, but also that the scope of the warrant be limited to the specific areas and things for which there is probable cause to search"); *see also A.M. v. Holmes*, 830 F.3d 1123, 1158 (10th Cir. 2016) (explaining that a search of a student in a school must be "justified at its inception" to satisfy the Fourth Amendment). However, as addressed in Section III, *supra*, the Fourth Amendment only provides protection from searches that invade a person's reasonable expectation of privacy, and H.C. has no reasonable expectation of privacy in the areas searched by the ManagedMethods given his agreement to Acceptable Use Policy. Therefore, the monitoring performed by ManagedMethods on H.C. cannot possibly violate the Fourth Amendment as overbroad.

Because the undisputed facts demonstrate that ManagedMethods does not threaten to seize any of H.C.'s files or communications at all or threaten to invade H.C.'s reasonable expectation of privacy, the District is entitled to summary judgment on H.C.'s Fourth Amendment overbreadth claim.

## CONCLUSION

Defendant requests that the Court grant Defendant's motion for summary judgment and dismiss Claims I, II, IV, V, VII and VIII.

Respectfully submitted,

LEWIS BRISBOIS BISGAARD & SMITH, LLP

By: /s/ *Cameron E. Grant*
Cameron E. Grant, KS No. 28388
Melika Harris, KS No. 30908
Andre Gnefkow, KS. No. 79266
4600 Madison Ave., Suite 700
Kansas City, MO 64112
Telephone: (816)299-4255
Facsimile: (816)299-4245
Cameron.Grant@lewisbrisbois.com
Melika.Harris@lewisbrisbois.com
Andrew.Gnefkow@lewisbrisbois.com

*Counsel for Defendant*