IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| JACK TELL; NATASHA TORKZABAN; MORGAN SALISBURY; OPAL MORRIS; HENRY FARTHING; SUZANA KENNEDY; NAOMI SUI PANG; ASHLYN TELL; PHOEBE MORRIS; E.B., a minor, by and through his parent and next friend, CATHERINE P. BATZA, Ph.D.; and H.C., a minor, by and through his parents and next friends, DANIELLE BRUNIN and ERIK CHANEY, | ) | |
| Plaintiffs, | ) | |
| vs. | ) | Case No: 2:25-cv-02428-KHV-GEB |
| LAWRENCE USD 497, a political subdivision of the State of Kansas, | ) | |
| Defendant. | ) | |

FOR READ AND SIGN PURPOSES ONLY

RULE 30(b)(6) DEPOSITION OF DEFENDANT LAWRENCE USD 497, by its designated representative, JAMES POLK, taken on October 27, 2026, at 12:30 p.m., taken remotely via Zoom Videoconference, before Stacy L. Decker, a Certified Court Reporter, taken on behalf of the Plaintiffs.



EXHIBIT 3

A. I was principal of Quail Run Elementary.

Q. Did you continue as sort of a district administrator for a while?

A. I was a building principal for four years, and then I took the job of director of data and assessment in the summer of, I believe, 2024.

Q. While you were a building administrator, did you do any teaching?

A. I substitute taught from time to time, but no.

FOR READ AND SIGN PURPOSES ONLY

Q. Did you succeed David Vignery as the director of sort of technology for the District?

A. It's not as cut and dry as it sounds. David left the District and there was around a 16-month gap between him leaving and me taking over the department of technology.

Q. Was there anybody else -- did anybody else hold that job in the interim?

A. Not in that time, no.

Q. And so about -- well, three months ago or so, congratulations --

A. Thanks.

your promotion to your present position?

A. There were several things that changed. The main one is that I now supervise around 12 additional employees than I was supervising before. In addition to that, I now -- the employees that I manage are technology employees. So our Tier 1 technology support, which is our building technicians, and then our network team, which is in charge of our network infrastructure in allowing WiFi, cybersecurity, and all of those components.

FOR READ AND SIGN PURPOSES ONLY

Q. Do you have any involvement with the District's participation in the E-Rate program?

A. Yes. In that process I'm being on-boarded slowly into knowing that. We have another employee that's been in charge of that since David Vignery.

Q. Who is that?

A. Paula Murrish.

Q. Paul?

A. Paula Murrish.

Q. Oh, I'm sorry. Does the E-Rate program provide subsidies to the school

Ms. Luckett being involved in that training?

A. Likely that she was involved. I don't recall.

Q. Was there somebody from Gaggle involved in that training?

MR. GRANT: I'm sorry. Mark, can you clarify. Are these kind of background questions about what James knows personally, or are you now in the 30(b)(6)?

MR. JOHNSON: These can be background. It kind of informs his knowledge for testifying on behalf of the District.

FOR READ AND SIGN PURPOSES ONLY

MR. GRANT: So, James, you're clear about the distinction? So far we're not into the District testimony part; this remains background about your personal knowledge.

THE DEPONENT: Okay.

MR. JOHNSON: What did I ask, Stacy?

(The pending question was read by the Court Reporter as follows: Was there somebody from Gaggle involved in that training?)

A. I don't recall.

Q. (By Mr. Johnson) Was the training remote?

A. I believe the training was onsite

at District office.
Q. Which District office?
A. The one on McDonald Drive.
Q. I'm going to hand you a document that's previously been marked in the case. It's the Gaggle contract.
MR. GRANT: James I believe has a copy in his binder.
Q. (By Mr. Johnson) And now we're getting into you testifying on behalf of the District.
A. Okay.

FOR READ AND SIGN PURPOSES ONLY

Q. Okay. So you have the District's contract with Gaggle in front of you; is that correct?
A. Yeah.
Q. Now, one of the subjects that you've been designated to testify on behalf of the District is contained in Item 1 of the letter from Mr. Grant, Exhibit 201. And it indicates you're going to testify for the District concerning decisions made concerning the selection, adoption, implementation, continued use, and so forth, of the programs including contracts? Yes?

A. Okay.
Q. And I believe you have in front of you the contract that the District had with Gaggle; is that correct?
A. That's correct.
Q. Was that contract in place when you were promoted to the position of director of data and assessment?
A. Yes.
Q. Were you given a copy of the contract?
A. No.

FOR READ AND SIGN PURPOSES ONLY

Q. Did you at any time before your promotion this past July have in your possession a copy of Exhibit 3, the contract?
A. I don't believe so.
MR. GRANT: Again, Mark, so that question was him personally, not did the District have a copy --
MR. JOHNSON: Okay.
Q. (By Mr. Johnson) To your knowledge, as testifying on behalf of the District, did the District provide you a copy of the contract with Gaggle?
A. No.

Q. Did you make recommendations to the executive leadership team for each of the products that your team reviewed and evaluated?

A. Not for each product. We made recommendations based on the products that we identified where we could find savings. If we reviewed a product and deemed that we needed to continue with that product, we weren't making recommendations to continue.

Our focus at that time was finding savings and streamlining. And so the recommendations that we would be making to the executive leadership team involved changes that we would be making.

FOR READ AND SIGN PURPOSES ONLY

Q. Do you remember how many products that your team recommended should be cancelled?

A. The products that we reviewed and wanted to make changes to totalled eight from a -- what was the term you used, cancelled?

Q. I said cancelled.

A. I don't recall off the cuff, but it was less than eight.

Q. So the recommendation sort of in a

global sense was keep these products, delete these products. So you made a recommendation about each one of the products that your team reviewed?

A. That's correct.

Q. And with respect to the products which your team recommended be cancelled, did the executive leadership team adopt each of your recommendations?

A. I don't believe so. I believe there were a few that we -- that we did keep in place.

FOR READ AND SIGN PURPOSES ONLY

Q. No. I understand there were a few kept in place. But you made recommendations you said concerning you think eight products?

A. Yeah.

Q. Some pro, some con. Did the executive leadership team reject any of the recommendations your team made?

A. I believe they did, and I don't recall perfectly what it might have been. But I think there was a product that -- Learning A-Z is the product I'm thinking of -- or no, not Learning A-Z. Raz Kids was one of the products that we had reviewed and made a

recommendation on.
And I believe we delayed our renewal of that product. Once teachers came back for the school year, we realized that that product was essential to their work. And so that would be an example of one that they did not take my proposal on.
Q. With the exception of that recommendation, did the executive leadership team adopt the other recommendations that your team made?
A. I believe so.

FOR READ AND SIGN PURPOSES ONLY

Q. And is it fair to say that one of the recommendations your team made was to replace Gaggle?
A. That's correct.
Q. Is it fair to say that the recommendation you made concerning Gaggle was financial, in other words, find something cheaper?
A. No. The directive was never about Gaggle. The directive was much broader than that. It's let's evaluate what we are paying for and let's see if we can find savings in there. And the word we use in our district is

"streamline." Gaggle is a product that came out of that work. It was never targeted work at Gaggle.

Q. I get that. But is it fair to say that the recommendation you made, your team made, concerning Gaggle was financial?

A. Primarily, yes.

Q. What other factors played into the recommendation that your team made?

A. Yeah. Some of the feedback that I had heard in the use of Gaggle, and I think it's pretty well documented, was the amount of white noise that Gaggle created, the amount of alerts that it was causing.

And so as we reviewed and went through that process to explore other alternatives, finding something that we could really dial in and reduce the amount of white noise in our system so that we were providing our administrators with alerts that were appropriate and needed and pressing and not more than that. That was a factor that went into it as well.

We thought this might be an opportunity for us to find a product that

FOR READ AND SIGN PURPOSES ONLY

worked better and was more targeted for what we were after.

Q. Beyond the white noise factor and the financial factor, can you remember any other criterion playing into the recommendation that you made to the executive leadership team?

A. I don't believe so.

Q. Thank you. Now, the white noise factor, I mean, could we also say that's false positives?

A. That's one way of putting it. In my experience, ManagedMethods is the product that we pivoted to, and I did a lot of the on-boarding for that product. In my experience with those types of products, it's not necessarily a false positive. There might be something that flags in the system for very specific reasons, but it doesn't raise to the level of intervention or investigation. And so when we talk about white noise, it's more -- it's more that than necessarily like a false positive.

Q. When you use the term "white noise," does that include alerts sent by

FOR READ AND SIGN PURPOSES ONLY

Gaggle that were found by the District administrators not to include language that was actually of concern?

A. Yeah. So an example that we ran into with ManagedMethods when we rolled it out is the word "lit" as an example. So when you hear the word "lit," it could be used in reference to getting drunk or high. But in a school system, we have AP lit courses.

So when you isolate things down and you look at the white noise that I'm referring to or rising to the level of severity, it really is dialing it in to make sure that we're monitoring what needs to be monitored and not more.

FOR READ AND SIGN PURPOSES ONLY

Q. Would it be fair to say that some of the white noise generated by Gaggle was because of the particular words they were searching for?

A. That could be a factor.

Q. To your knowledge did the District ever provide a list of words to Gaggle that the District wanted Gaggle to search for?

A. To my knowledge, I do not believe that that was the case.

Q. Do you know if that was done with respect to ManagedMethods? In other words, did the District provide a list of words that they believed ManagedMethods should search for?

A. No, we did not. The way that that worked with ManagedMethods is we rolled out that product and -- ManagedMethods has they call them policies. But they have policies that are essentially prewritten that monitor for a stock amount of things.

So if you're looking at the toxicity policy inside of ManagedMethods, it's going to look for words like bomb, knife, gun. Those are all predetermined words that ManagedMethods has inside of their platform.

So some of the work that we did in the on-boarding process of that product is we reviewed what they had and then we made changes to that, if necessary. We never submitted a list to them. We worked off the list that they had.

Q. How did the District make those changes?

A. We really -- you know, our charge

FOR READ AND SIGN PURPOSES ONLY

we would talk about the direction that we were going when we get briefed in certain things and we get told to move forward with certain products and not with others.

Q. So it wasn't you, it wasn't somebody on your team. Were you given to understand it was somebody in the executive leadership team who was having that communication with Gaggle?

A. That would be my understanding.

Q. Did you ever see an email from a Gaggle representative during that period of time that indicated the school district was changing priorities?

FOR READ AND SIGN PURPOSES ONLY

A. Personally I'm not aware of an email.

Q. Were you made aware that Gaggle was concerned that the District was changing priorities?

A. I personally was not made aware of that. I did not have communication with Gaggle.

Q. During the summer of 2025, did you become aware of communications with Gaggle by the District indicating that their service was

too expensive?
A. Say that again.
Q. Did you become aware during the summer of 2025 that there was communication between the District and Gaggle in which the District expressed concern about the cost of the Gaggle product?
A. That's an interesting question. The work I was doing would make me think that that communication had happened. I'm not aware of the District communications that occurred between the parties. But, I mean, that was directly related to the work that I was doing. So in the conversation that was had with Gaggle, I would -- I would make an assumption that that was what was communicated.
Q. Were you aware that Gaggle made an effort to save the business?
A. No.
Q. So as far as you know, and you're testifying here on behalf of the District, the decision to cancel Gaggle was made by the District, and Gaggle made no attempt to come back and try to save the business?

FOR READ AND SIGN PURPOSES ONLY

adjustment. I've heard it characterized as changing a feature from the Gaggle service. In your mind is that the same thing?

A. Yeah. Yeah. And I think that's -- I think that's one of the things that when -- when we looked at ManagedMethods, one of the ways that ManagedMethods really works in our system now is that, other than inappropriate images that were required to monitor for, information is flowing all the time. So there's no quarantine or blocking that's happening inside of ManagedMethods.

FOR READ AND SIGN PURPOSES ONLY

And so we're still alerted and flagged to issues that are happening. But the student experience is unaffected, because that information is still flowing. So that was something that we put in place as we looked at ManagedMethods for sure. So that makes sense to me.

Q. Are you aware if the District ever asked ManagedMethods to change any other features in the service they provided to the District?

A. We asked them to, I mean, work with us on implementing, and that

implementation process is a negotiation of how can we get this the best -- I mean, if our, you know, focus on student safety, not only -- that played out in many ways. It plays out in the types of policies that we enacted and are monitoring on. It played out in how we are, as Gaggle calls it, blocking or quarantining. I mean, that is the on-boarding process is working with the company to take their product and make it suit the best needs of our organization.

Q. When was the on-boarding process with Gaggle conducted?

FOR READ AND SIGN PURPOSES ONLY

A. With Gaggle?

Q. Yeah.

A. That would have been in the winter of 2023 I would think.

Q. And we see the change in the blocking of student email that Gaggle agreed to.

Are you aware of any other feature of the service provided by Gaggle to the District that was changed between implementation and your study of the products in the summer of 2025, in other words, over a

A. The way that that was set up, I think it's important to clarify how it functions. Students are exempt from monitoring, and the way that that was set up, based on their enrollment in certain courses.

Q. Right. By the way, I apologize for being a little short about that.

A. That's okay. And so as students, and through the process that they took to identify these courses, it is digital media technology and journalism media communications. Students that are enrolled in those courses are exempt from monitoring status. Now, when students are not enrolled in those courses, students are being monitored. I think that's an important thing to note.

Q. And I appreciate that. Thank you for that distinction.

And as far as you know, that has been the program since the exemptions were first implemented in 2024?

A. As far as I know.

Q. And that continues to today?

A. That continues to today.

FOR READ AND SIGN PURPOSES ONLY

A. Not to my understanding.

Q. Why not?

A. Yeah, so ManagedMethods, the adoption of that product was a single year under $20,000, and it was simply sent as an invoice to us. There's no contract that we signed in order to initiate those services.

Q. But it's now been extended beyond a single year; is that fair to say?

A. We have renewed that contract for one more year.

Q. Again, you used the word contract. Is there now what many people would consider a contract between the District and ManagedMethods?

FOR READ AND SIGN PURPOSES ONLY

A. No. We renewed with that product for one more year.

Q. Why is there no contract?

A. That's not dissimilar to how we engage with most of our services. Being invoiced for products is common practice.

Q. So it's fair to say that the District is conducting stem to stern, 24 hours a day, seven days a week, monitoring of student content based on an invoice?

A. That's a loaded question.
Q. Of course it is.
MR. GRANT: For the record, they've all been loaded questions. Just so we're clear.
THE DEPONENT: That's true.
A. We are monitoring student content inside the G Suite under student accounts 24 hours a day, seven days a week, yes.
Q. (By Mr. Johnson) From your experience versus director of data and assessment, and now --
FOR READ AND SIGN PURPOSES ONLY
A. Data assessment and information technology. Just add another comma.
Q. -- is it common to conduct such functions without a contract that specifies how the service is to be provided?
A. It varies greatly with the different products that we engage with. There are products that we engage with, typically multiyear agreements, where we do sign a contract. In that case, we are making a commitment to that company that we will be partners with them for multiple years.
Because we're a school district,

we aren't offered the opportunity to pay a lot of contracts up front, so we have to pay them annually based on the budget that's allocated to us. And there's always variability in those contracts, because when you enter in a multiyear contract, your budget could change drastically based on lots of external factors as well as there could be a reason that the board might not approve that contract to extend for other years.

So in the case of engaging with companies for multiple years, you do see contracts. In annual services that you engage with a company in, oftentimes those are continued engagements. Even if they're initial, a single-year usage, invoices are still common practice.

FOR READ AND SIGN PURPOSES ONLY

Q. So you have it -- sort of an annual invoice from ManagedMethods. Does that -- I mean, from the District's point of view, does that invoice incorporate the terms set by ManagedMethods in its website?

A. Yes.

Q. Do you know if ManagedMethods has changed the description of its terms in its

website since the District entered into this invoice relationship with them?

A. I'm not aware.

Q. It could have happened but you don't know?

A. Correct.

Q. Have the services provided by ManagedMethods changed in any way since the District adopted ManagedMethods in 2025?

A. Yes.

Q. In what way have they changed?

A. Yeah. I think I have described the process that -- the deliberate intentional process that we took with them to on-board their product so that it functioned in the desired way focusing on student safety.

And, you know, one of the things we did with them was work with them to raise the floor on the level of alerts that we were getting.

Q. Okay. So you -- when you say raise the floor -- go ahead.

When you say raise the floor, do you mean that the District was looking for more alerts from ManagedMethods?

FOR READ AND SIGN PURPOSES ONLY

talking about the exact type of things that it's looking for. And there are distinctions.

In Gaggle they were looking for things like substance abuse. They were looking for things like cyberbullying. Those are not policies in which we've enacted inside of ManagedMethods as we've really dialed in what we're looking for.

So there are changes, yes. I don't know if we're changing what we're monitoring, but what we're being alerted on is changing.

FOR READ AND SIGN PURPOSES ONLY

Q. Did the District conduct a town hall or a forum at which parents could learn about the changes from Gaggle to ManagedMethods?

A. Not to my knowledge.

Q. Did the District solicit comments from parents or other interested individuals concerning the change in the service between Gaggle and ManagedMethods?

A. We did some pretty extensive work with some of our buildings to -- before we rolled out ManagedMethods to the District to get feedback on what they were seeing, the

types of alerts that they were getting, how the product was working for them and received a lot of positive feedback on the --
Q. Did any of the feedback solicited come from parents?
A. Not that I'm aware of.
Q. Did any of the feedback solicited come from people, this would be students and staff, from people outside the buildings, members of the community?
A. So not staff?
Q. Not staff. I'm distinguishing -- this may be a bad way of putting it, inside the buildings and outside the buildings.
A. Not to my knowledge.
Q. And with the changes that you've mentioned in the service provided by ManagedMethods, have any town halls or solicitations from community information been sought?
A. I'm very sorry. Say that one more time.
Q. You've testified how the services provided by ManagedMethods have been changed. You called it sort of upping --

FOR READ AND SIGN PURPOSES ONLY

A. Raising the floor.

Q. Raising the floor. Thank you. And that would be a change in the service being provided by ManagedMethods; is that fair to say?

A. You could say that.

Q. Thank you. With that, were any town halls conducted or solicitations for information from the community?

A. Not to my knowledge. And when we make changes to products, we don't -- we don't often -- well, not often. We don't always open it up to community feedback. We recently changed assessment platforms. That's not something that we open up for feedback. We were conducting business as usual, making what we thought were appropriate and good changes focused on student safety, and we conducted business the way that we thought best and went through a really extensive process to on-board that I think is really solid.

FOR READ AND SIGN PURPOSES ONLY

Q. Got it. Thank you. To your knowledge has the District generated any statistics concerning what it considers to be successful outcomes with the use of student

monitoring?

MR. GRANT: Objection. That's out of this topic.

MR. JOHNSON: Just wanted to make sure. You don't want to hear him testifying to it. Sorry about that.

THE DEPONENT: That's okay.

Q. (By Mr. Johnson) Item Number 3, just want to make sure we're clear on something. The District monitors student content uploaded to the Google Suite even if the student is off campus?

FOR READ AND SIGN PURPOSES ONLY

A. So the monitoring for these products is done through student accounts. So the accounts are not tied to devices. So if a student is in their account, logged in on personal device off campus, if they're logged into our account, it is being monitored.

Q. Okay. Just wanted to make sure.

And that includes if the student is using a personal device?

A. Yes.

Q. Is it your understanding that, to receive the education that the state has specified they are to receive, students at

Lawrence School District have to have a student account?

A. We are a public school, so all students are welcome. In our current infrastructure, all of our students have a district account.

Q. I understand all of them do. But do they have to have a student account in order to receive their education?

A. We absolutely work with families to address concerns when they're presented to us to understand what are the hesitations to engage in the use of technology or the use of student accounts. We often in those get opportunities to explain to them why student accounts are important, especially in our secondary schools and the type of learning that transpires. Some of those things are really important. Does a student have to have an account in order to attend our school system, no.

Q. They don't. Can you quantify the number of students at the school district who do not have student accounts?

A. I couldn't speak for it perfectly,

FOR READ AND SIGN PURPOSES ONLY

no.

Q. Do you know if there is a total count, a running total, of the number of students enrolled with the District who do not have student accounts?

A. I'm not aware of a total kept.

Q. So as far as you know, the District doesn't track that number?

A. I mean, I believe that we could audit that number if we needed to.

Q. Why don't you?

A. I've never been asked that before.

FOR READ AND SIGN PURPOSES ONLY

Q. Well, you're being asked now.

A. Why don't we look to see how many students don't have District accounts?

Q. Yes.

A. So it would be uncommon for a student to not have a student account. As students enroll into our District and re-enroll into our District, part of that process is signing our Acceptable Use Policy. And so by signing our Acceptable Use Policy, those parents are acknowledging that students are going to have accounts, they are going to be issued devices, among many other things.

Q. Is it District policy not to issue District devices to students who do not sign the Acceptable Use Policy?

A. Yeah, it's not that cut and dry. When we have students that don't sign our Acceptable Use Policy, there are courses in which we teach that students need technology for. And just because a student doesn't sign an AUP or a family doesn't sign an AUP, we still want students to have really rich educational experiences. So there are situations where we have devices on hand at buildings that students can engage with. But traditionally students don't take those devices home.

FOR READ AND SIGN PURPOSES ONLY

Q. So is what you're telling me that students don't have to sign the Acceptable Use Policy to use District devices?

A. I'm saying that we prioritize the student experience in our District. And, while students signing an AUP is imperative, we have been known to work with families to make it so that students can engage in curriculum when necessary.

Q. How often does that occur?

A. It depends. It happened -- I mean, it happens from time to time.
Q. Does the District track the number of students who fit that description?
A. Tracking is not the word I would use for it. Are we aware that there are students that don't sign the AUP, yes.
Q. Okay. For students who don't sign the AUP and have to have access to District devices in order to do their work, do the students have to sign something that indicates they're using a District device?
A. We go through a pretty extensive process to try to engage with families so that we don't run into those situations. In the past we have printed paper copies of the AUP. We've done home visits to engage with families to get them to sign documents to ensure that their students can engage in the curriculum.
If they do not get the AUP signed, I don't believe there's an additional document we would have a student sign as we need someone, a parent, guardian, or a student that's 18, to sign the AUP.
Q. So you don't track that number

FOR READ AND SIGN PURPOSES ONLY

because you're telling me you can't; you don't have them sign an additional document about use of the District devices?

A. We're able to run reports in order to identify students that do not have an AUP on file.

Q. How often do you run those reports?

A. We run them most frequently at the beginning of school years.

Q. Is it correct that, today, a student does not have to sign an AUP in order to enroll; that, in fact, the enrollment process contains, in essence, a requirement that parents agree to the AUP before the student can be enrolled?

A. Can you reword that for me.

Q. Sure. Is it correct that, today, in order for a parent to enroll his or her child with the District, there is a notice contained in the electronic enrollment software that requires the parent to acknowledge the AUP?

A. There is a form inside the enrollment platform that is requiring parents

FOR READ AND SIGN PURPOSES ONLY

to acknowledge the AUP.

Q. And it's an electronic form; it's not a paper form?

A. That's correct.

Q. So there's no longer anything that the student or parents, I guess we would say, use as a wet signature?

A. No.

Q. If the parent chooses not to acknowledge the AUP, will the District still enroll the student?

A. Yes. Yes. We -- and I've referenced this. But we have families that contact us concerned around a number of things when enrolling students. If the AUP is one of those things, we engage with those families to understand what the hesitations are. We work to inform them as to why we would like the AUP acknowledged and signed and help them through that process.

If families are adamantly against signing that AUP, we typically do work with those families. Because, like I said, we are a public school. We're going to welcome all students in our District.

FOR READ AND SIGN PURPOSES ONLY

Q. Does the District track how many students are enrolled through the process you just described?

A. Well, they would fall under the category of a student not having an AUP, so we would be able to run a report on that.

Q. I think you said the District routinely runs that report at the start of the school year?

A. Uh-huh.

Q. Have you seen that report for the '26-'27 school year?

FOR READ AND SIGN PURPOSES ONLY

A. Of course.

Q. Do you remember how many students are numbered on that -- included in that report?

A. It's -- I don't recall the exact number, but it is a small number.

Q. A handful?

A. Yeah.

Q. Less than 10?

A. I don't know.

Q. Less than 100? That would be a pretty big number, wouldn't it?

A. We run that report leading up to

the school year several times. And so that number, as the school year approaches, shrinks and shrinks. So I don't recall what the last time we ran that was.

Q. Who is responsible for following up with parents who have not acknowledged the AUP?

A. That varies. That varies. Sometimes that will fall on the enrollment center. They're our first line of contact with the families. So if families have concerns, that's normally a place. Sometimes the enrollment center will kick back to the buildings. So building principals or office staff might engage with those families.

And then, occasionally, those will get kicked up the chain to the District level. And so if it's specifically a technology concern, it might come my way. If it's a teaching and learning concern, it might go to the associate superintendent of teaching and learning.

Q. So you have been with the District since 2020. At what point did the AUP process stop being a paper process, if you know?

FOR READ AND SIGN PURPOSES ONLY

asking you, Mr. Polk, about Acceptable Use Policies and the like. The last item in Number 6 is opt-outs. So is it correct that, for as long as you have been in technology issues with the District, so going back to the middle of 2024, the District has not allowed opt-outs from student monitoring?

A. That's correct.

Q. Are you aware of any exceptions to that? In other words, are you aware of any situations where students have been allowed to opt out of student monitoring?

FOR READ AND SIGN PURPOSES ONLY

A. Yes. Students --

Q. Please tell me about that.

A. Students that are enrolled in digital media technology and journalism media communications, those students are the exception.

Q. With those exceptions, any other examples of opt-outs of which you are aware?

A. No.

Q. Do you have any information as to how many students have sought opt-outs other than, again, the journalism students?

A. No, I'm not aware of students who

have sought opt-outs.

Q. Number 7, with respect to journalism and art exemptions, do you have any sense as to whether those exemptions have been effective?

A. And by effective, you mean they haven't been flagged?

Q. Yes.

A. Yes, I believe they have been effective.

Q. Are you aware of any of the students who were supposed to be exempted who have been flagged?

FOR READ AND SIGN PURPOSES ONLY

A. I'm not aware, no.

Q. And that would be by either Gaggle or ManagedMethods?

A. Personally, I'm unaware. I believe that, as the exceptions were being put in place, that there were definitely -- I mean, the configuration of excluding those students was pretty -- it was a very large task, and so my understanding is that it took some work. And so I'm not exactly sure on when the -- when the configuration was at the point it is now that allowed them to not be

Q. Does that assuage any concern you have about exempting the journalism students from monitoring?

A. I think it's the obligation of any staff member, teacher, paraprofessional, anyone employed by the District, to be active supervisors when interacting with children, whether that be in an electronic platform or on a playground. It's our responsibility as a staff member to do our best to keep students safe.

And so while we all -- while staff are always going to make their best effort to do that, it would be very difficult for a teacher to monitor a student's inbox.

Q. Now, in the time that you have been involved in District technology matters, in other words, since the summer of 2024, have you heard -- to your knowledge has any district administrator provided instructions for student journalists not to write stories about Gaggle?

A. The only thing I'm familiar with are the -- in regards to that are the exhibits that are in here.

FOR READ AND SIGN PURPOSES ONLY