IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | |
|---|---|
| JACK TELL; NATASHA TORKZABAN; MORGAN SALISBURY; OPAL MORIS; HENRY FARTHING; SUZANA KENNEDY; NAOMI SUIPANG; ASHLYN TELL, PHOEBE MORRIS, E.B. a minor, by and through his parent and next friend CATHERINE P. BATA, PH.D.; and H.C., a minor, by and through his parents and next friends DANIELLE BRUNN and ERIK CHANEY, | No. 2:25-cv-02428-KHV-GFB |
| Plaintiffs, | |
| v. | |
| LAWRENCE USD 497, a political subdivision of the State of Kansas, | |
| Defendant. | |

DEPOSITION OF KILEY LUCKETT, a Witness, taken on behalf of the Plaintiffs before Jane A. Blackerby, CSR #1369, CCR #877, pursuant to Notice on the 2nd day of September, 2026, at the offices of Dentons US LLP, 4520 Main Street, Suite 1100, Kansas City, Missouri



EXHIBIT 9

on one mentoring and counseling, lunch supervision, student support meetings.
Q. Anything else?
A. No.
Q. Understood. Once again, for my own edification, do you after receiving your master's degree receive a professional license or anything of that nature?
A. Yes.
Q. Can you tell me about that.
A. I have a licensed master's social work degree, or I have a licensed master social worker. I'm a licensed master social worker in the state of Kansas.
Q. Understood. And that is state by state?
A. Yes.
Q. And what's required to obtain the licensure?
A. You have to have a degree from an accredited university. You have to apply to take the test. You have to take and pass the test. You have to pay for your licensure.
Q. Understood. Is there continuing education that's required to maintain the

credential, the license?
A. Yes.
Q. Tell me about that.
A. There are required continuing education units that are required every two years in order to update your license.
Q. Is it similar, and you might not know, to continuing legal education where there is a seminar that is offered for a number of hours. You sit in on a topic. You report the hours to an agency and then they, the agency, reviews compliance and says, Ms. Luckett, you've satisfied the requirements. We'll see you again in two years?
A. Yes.
Q. Okay. Are you up to date?
A. Yes.
Q. When was the last reporting period?
A. I'm not sure I understand what you're asking.
Q. When was -- for example, attorneys have to submit all of their hours yearly in July. Do you have a similar cutoff or deadline?
A. My license renews every other January.
Q. I see. And aside from Kansas, do you

Q. What about the student support services when were you a member of that?
A. I have been a member of that since '24.
Q. The beginning of academic year 2024?
A. Yes.
Q. Okay. Any other teams within that realm that you're part of that I'm missing?
A. The team IEB which is -- oh, goodness. What does that stand for. I'm on the team and I can't remember. Engagement and belonging. What is the i.
Q. Inclusion, maybe?
A. Inclusion, engagement and belonging, thank you. Yes. That was the three.
Q. Okay. So team IEB, student support services, any others that come to mind?
A. As far as teams, no.
Q. Okay. How often does each group meet, roughly?
A. What do you mean each group?
Q. So the team IEB, did the team have meetings?
A. Weekly.
Q. Weekly meetings. Where were those?
A. At the District office.

changed.

Q. Understood. Can you recall a circumstance where you needed to make a change for a given reason?

A. Yes.

Q. Tell me about that.

A. Staff turnover.

Q. Understood.

A. A new staff person needed to be added.

Q. Okay. I'm asking these questions only because I'm trying to get a better understanding of the architecture of how Gaggle functions and/or Managed Methods. Can you create categories of a letter?

A. I cannot.

Q. Who would?

A. Gaggle or Managed Methods.

Q. But no one within the District?

A. No.

Q. What about a quarantine action?

A. What about it?

Q. Can you change the criteria for what would trigger a quarantine action?

A. I don't believe so.

Q. Okay. What about notification rules?

Can you change notification rules? Did you testify earlier -- I don't want to cut you off. Did you testify earlier that you could change who receives what notification?

A. Yes, and like the timing of it, but not whether -- like not the seriousness of it.

Q. That's --

A. Or the content of it.

Q. Understood. The seriousness or the content is set by Gaggle or Managed Methods. Is that your understanding?

A. Yes.

Q. Can we go or five or ten more minutes before we take a break?

A. We can.

Q. Are there location or school based mental health teams?

A. There are.

Q. Can you tell me about those.

A. Yes. All buildings and our virtual school, public schools have school based mental health teams that are comprised of building administrators, school nurses, psychologists, social workers, counselors, other staff depending, and they meet on a regular schedule

to address student and building needs.
Q. Understood. Would this be a weekly meeting?
A. Depending on the school.
Q. Okay. Did you have any role in forming or coordinating those teams?
A. No.
Q. Walk me through, if you would, the process when a building team member, a building counselor identified a potential student safety concern.
A. So I can say for me when I was in a building a teacher would report to me that a student made comments that were concerning, whether it was -- I don't want to be here. I should just kill myself, etcetera. I would then pull that student into my office, discuss with them what was going on, potentially perform an assessment, if necessary, contact guardians, safety plan.
Q. Understood. Once again, for my own edification, this is very clearly outside of my wheelhouse and area of expertise. Is there a written crisis response of some sort?
A. Yes.

Q. Just very briefly, what would that entail?

A. It depends what you were referring to when you say crisis response because crisis response can be an active shooter. It can be a flood. It can be a tornado. It could be a student with a weapon. Crisis response could be the death of a student. It very much is dependent on the situation.

Q. Understood, and realizing that I'm thinking specifically of a student who's undergoing a mental health crisis, and there could be several crisis response plans, I suppose, that fall within that, including someone brings a weapon to campus, someone is suicidal.

A. Uh-huh.

Q. Are there other specific plans that you can recall where there's a procedure or process?

A. Those would be the main ones.

Q. Okay. I believe you also mentioned potentially performing risk assessments.

A. Uh-huh.

Q. What is a risk assessment?

A. It is an assessment to gauge somebody's

risks. Are they at -- are they low risk, moderate risk, high risk, and depending on the identified risk level dictates what the next steps would be.

Q. Can you give me just a brief, I don't want to spend too much time on this example of each one, what would -- what would be a low risk and what would be the response?

A. Low risk could be I don't actually have a plan or intent to end my life, and maybe I am frustrated and I don't have the words to verbalize that, so it would be contacting parents or guardians and letting them know and providing support to that student as needed. If it was moderate risk, it would be contacting guardians, potentially creating a safety plan, and if it was high risk it would be recommending being seen by an outside professional for a screen and hospitalization potentially.

Q. Understood. That's helpful. I assume high risk, I hope high risk situations are rare?

A. They are not.

Q. Are there examples that would require the District calling in outside personnel to assist, specifically, some uniformed officer?

A. Yes.
Q. Can you give me an example of that?
A. If an opportunity has a plan and intent to harm themselves or they are not in a place mentally where they can be kept safe, we would recommend they be seen at either the hospital or the community mental health center.
Q. Understood.
A. We would not call an officer for that, typically, unless there was some sort of transportation need for a patient was unable to get their child support.
Q. Understood. I've heard the name PowerSchool before. Does that mean anything to you?
A. It does.
Q. What is PowerSchool?
A. PowerSchool is our school information system.
Q. Does that have an effect on your current role? How do you use PowerSchool?
A. I use PowerSchool for data, contact information and documentation.
Q. Is it specific to the field of mental health or is it broad?

A. It's specific to education.
Q. Okay. What sorts of data are on PowerSchool? Once again, for my own edification.
A. Attendance, data and information, behavior entries, special education documents, demographic documents as far as for introduce race, yeah.
Q. Is there any sort of interplay between student monitoring broadly defined as Gaggle and managed methods and PowerSchool?
A. Can you ask that one more time. I'm sorry.
Q. The question was whether there was or is interplay between student monitoring systems and PowerSchool?
A. Can you define by what you mean by interplay?
Q. If, for example, there was a flag on Gaggle or Managed Methods, does that -- is that visible through PowerSchool?
A. It is not.
Q. They are two totally separate entities?
A. That is correct.
Q. Okay. If someone receives a flag on

Gaggle or Managed Methods, is that -- is that flag part of any permanent record, for lack of a better phrase?
A. That is not.
Q. Is there a permanent record?
A. We call it a cumulative record, but yes.
Q. Okay. And once again, forgive my ignorance here. What goes on a cumulative record?
A. So it is like your transcripts, your grades, courses that you have taken. It also depends on your level, a high school transcript is going to look different than like a elementary grade card. It will often have attendance. If you have ever had behavior, it's expulsion, suspension, information like that. I have an IEP or 504, that documentation.
Q. Does the school maintain counseling records broadly defined?
A. No.
Q. If you respond to, as part of the risk assessment, a low risk, moderate risk, high risk incident, does that -- are those records kept in the ordinary course?

A. What do you mean in ordinary course?
Q. Is there some database or system of recordkeeping for those assessments?
A. Yes.
Q. Is that separate from the student record, that cumulative record?
A. Yes.
Q. So if somebody has an incident that you analyze or investigate, that is kept separate from their cumulative record?
A. Yes.
Q. Understood. If a student has a low -- if a student risk assessment is performed, who ultimately is responsible for determining whether intervention is necessary?
A. That would be the person performing the assessment.
Q. And who generally performs the assessment?
A. Either a counselor or social worker.
Q. Okay. And that person would also be responsible for determining whether additional intervention is necessary. Is that right?
A. They would make the recommendation on, in their professional opinion, what is the best

A. Uh-huh.
Q. Did that require a handoff of your Gaggle or Managed Methods duties?
A. Yes.
Q. Can you tell me about that?
A. We were having conversations and looking at what is needed and they were kind of making a plan for implementation, and my supervisor at the time was kind of taking over some of those.
Q. Understood. And --
A. Kevin Harrell.
Q. Kevin Harrell, and he was overtaking some of those duties?
A. Uh-huh.
Q. Okay. Anyone else aside from Kevin Harrell?
A. Tina Mitchell.
Q. Anyone else?
A. Not that I'm aware of.
Q. Okay. Should we take a break?
A. I'm good if you're good.
MR. ROSENTHAL: I would like a break. We'll go off the record at 10:46.
(Recess.)

Q. (By Mr. Rosenthal) We are back on the record at 10:52. And, Ms. Luckett, did you seek with anyone about your deposition during the break?

A. No.

Q. Okay. I generally ask. I'm going to hand you and your attorney two exhibits. One has been previously marked as Exhibit 3. I'm also handing a copy to the court reporter and the other has been previously marked as Exhibit 30 with a copy to the court reporter. Ms. Luckett, do you recognize Exhibit 3?

A. I do not.

Q. And do you recognize Exhibit 30?

A. I do.

Q. Tell me how you recognize Exhibit 30. It appears to be information from Gaggle, our emergency contact list. And at the top do you see 2023 to 2024 in the left-hand column?

A. I do, uh-huh.

Q. I assume that means 2023 to 2024, the safety management emergency contact. Would you agree?

A. I would agree.

Q. And the column to the right that is

earlier we talked about meeting minutes notes, agenda items, things of that sort, from some of the teams that you were on. If you still have access to those, would you be willing to provide your counsel with copies of those?
A. Yes.
Q. Okay. Talk to me about the early stages of Gaggle.
A. Okay.
Q. Did you review any contract with Gaggle?
A. No.
Q. What about a company proposal?
A. No.
Q. Was there a company demonstration?
A. Yes.
Q. Can you tell me about that.
A. An online meeting kind of going over where they walk us through what the platform looks like, what it does.
Q. This was maybe like a Zoom meeting between District personnel and Gaggle employees?
A. That's correct.
Q. We talked about the implementation plan that you helped create. Is that right?

A. That is correct.
Q. Did you review any sort of board report regarding Gaggle?
A. No.
Q. Were you one of the original folks to receive all of the Gaggle communications at the beginning?
A. Can you specify Gaggle community? Like what does that mean?
Q. Were you one of the emergency contacts?
A. Yes.
Q. And that's a contractually required emergency contact. Is that your understanding? I'll represent to you that's my understanding.
A. Yes.
Q. Do you know who selected you to be that contact, that person?
A. Dr. Cynthia Johnson.
Q. Okay. And about when did your first notifications through Gaggle begin?
A. Whenever Gaggle went live.
Q. And I believe earlier you mentioned receiving a one hour training on Gaggle before it went live?
A. Uh-huh.

A. That is correct.
Q. Did you review any sort of board report regarding Gaggle?
A. No.
Q. Were you one of the original folks to receive all of the Gaggle communications at the beginning?
A. Can you specify Gaggle community? Like what does that mean?
Q. Were you one of the emergency contacts?
A. Yes.
Q. And that's a contractually required emergency contact. Is that your understanding? I'll represent to you that's my understanding.
A. Yes.
Q. Do you know who selected you to be that contact, that person?
A. Dr. Cynthia Johnson.
Q. Okay. And about when did your first notifications through Gaggle begin?
A. Whenever Gaggle went live.
Q. And I believe earlier you mentioned receiving a one hour training on Gaggle before it went live?
A. Uh-huh.

Q. Was there any other training that you recall?
A. Yes.
Q. Can you tell me about the other training?
A. There were like tutorials and webinars that I went through.
Q. Were those required or were they on your own volition, wanting to learn more about Gaggle?
A. They were on my own.
Q. And they were not mandatory?
A. That is correct.
Q. Was the first one mandatory?
A. It was.
Q. Do you recall who conducted that training?
A. I do not.
Q. And I think you said you don't recall when it happened aside from before the implementation. Is that correct?
A. Before coinciding with it, yes. Yeah.
Q. Did anyone provide any written materials regarding Gaggle, such as procedures, manuals, charts, anything like that?

depend on the level of severity of the alert?
A. It does.
Q. Can you tell me a little bit about that?
A. There's either kind of two severities. If there's questionable content and then there's a possible student situation, and if there is a possible student situation there is more alerts.
Q. And that's because the possible student situation is more serious?
A. That is correct.
Q. And the alerts would be more in real time? How would you describe the difference of the alerts?
A. If it's a QCON there's just the e-mail and that is sent. If it is a possible student situation, there is an e-mail and a text message. If the text message is not acknowledged, then they start a calling trace until somebody acknowledges the alert.
Q. Understood. Did you at one point receive all alerts for every school, every grade, etcetera?
A. Yes.
Q. Tell me about that process.

A. What would you like to know about that process?

Q. How did you feel about it? Was it overwhelming?

A. Depending on the day it could be overwhelming.

Q. On average how many alerts would you get when you were on that full distribution list?

A. It's impossible to say an average. I would say daily there was typically something but I can't, like -- it's really too hit or miss to say. Like I can't say that there was an average of five a day or five a week, you know.

Q. It depended?

A. It depended. As with other things, it seems they all -- the serious ones happened close together and then you'll have nothing for a week and then there will be more, you know. It was very dependent.

Q. Would you ever have several hundred in a given day?

A. No. No.

Q. What would be the max that you would have ever received in a given day?

A. I would say 10 to 20.
Q. What would be a very high number?
A. Yeah. I think 20 would be a high number. Yeah.
Q. And were there days you didn't receive any?
A. I would assume, yes.
Q. But generally, it was probably at least one a day?
A. I think that's, yeah, pretty safe to say.
Q. Okay. Maybe at least five a day?
A. I -- those aren't words, I apologize. It's difficult to say.
Q. So we talked about questionable student content or I believe you used the acronym QCON. Is that correct?
A. That's correct.
Q. And then we talked about possible student situation or PSS?
A. That is correct.
Q. Do you recall, or is there a category imminent threat or equivalent escalation, does that ring a bell?
A. It does not.

Q. Any song lyrics that come to mind?
A. Not off the top of my head.
Q. I Shot the Sheriff by Eric Clapton, could that potentially issue a flag?
A. Potentially.
Q. Some of those examples, it seems you would agree with me, are purely legitimate academic work. Yeah?
A. That is correct.
Q. Okay. And the Gaggle did, in fact, flag as non-issues speech that was legitimate academic speech?
A. At times.
Q. Okay. If I use the term protected speech or protected expression, realizing you're not a lawyer, or I should ask you. Do you have any legal background?
A. I don't.
Q. Okay. Is there a legal -- go ahead.
A. No. There is a dual master's in social work law program that I really wish I would have done. That is neither either nor there. I was just afraid of the LSAT so I didn't do it.
Q. Fair enough. If I use the term --
A. Protected.

Q. Yes, but as part of your -- as part of your training, broadly defined, either for your master's, your professional licensure or others, did you have -- I think you said you had some understanding of the legal landscape. Is that correct?
A. Some.
Q. Okay. If I used the term protected expression, what I mean by that is in the school context, expression that is not reasonably forecast to cause a substantial disruption on campus. In broad terms do those words make sense to you?
A. In broad terms they make sense to me.
Q. Okay. You would agree that advocating drugs, elicit drugs would not be based on your understanding and knowledge as your training would not be protected expression within the school context. Correct?
MR. GNEFKOW: Objection, but you can answer.
A. Okay. Sorry, would you say that again?
MR. ROSENTHAL: Would you read the question back for me, please.
(The requested portion of the

Q. Who would fill in the recommended action?
A. The staff person who was addressing the situation.
Q. And that person was always a District employee. Is that right?
A. That is correct.
Q. Okay. Gaggle wouldn't fill that in?
A. No.
Q. Or Managed Methods?
A. No.
Q. Were you or the person who reviewed the flag able to review the entire document?
A. No.
Q. Only the snippet?
A. That is correct.
Q. And I think you mentioned, and please correct me if I'm wrong, key words or screen shot. Is that right?
A. There would be both.
Q. Okay. Anything else?
A. There could be, but I don't specifically recall.
Q. If it was an image, for example, what would the reviewer see?

screen shot or snippet?
A. That is correct. There could be -- it could be all that is there, but there could be more.
Q. Beyond the snippet or screen shot?
A. Correct.
Q. Is there any way for you or for the reviewer to know whether there is more than just what's on the screen shot?
A. Not from Gaggle.
Q. How would you come by that knowledge?
A. Going to our IT who has the ability to do, as far as looking into computer stuff.
Q. Did a student ever come to you or anyone ever come to you and say this was either a nonissue or a false positive broadly defined and request that you un-quarantine and restore access?
A. Yes.
Q. What was that process like?
A. So we had to learn kind of the work around for it, because what we didn't want to have happen is it just get quarantined again, like if they're still working on it or whatever, so I believe the kind of process was to figure

out a way to like download it onto like something that would not be a school issued account so the student could have whatever it was.

Q. I see. So the reviewer, the USD 497 person would download it onto, did you say a school account?

A. No. Something that would not be -- I believe what they would do is -- so it would not be in a school account. So maybe they put it on like a flash drive or they e-mail it to a personal account or whatever it is.

Q. I see. So that future iterations of that document or thing would not be re-subject to quarantine?

A. That is correct.

Q. Okay. Can you think of specific examples? Did this affect journalism or art or history or science?

A. It did.

Q. Okay. Any one of those specifically that you can elucidate?

A. Art, science I think were the main ones, some debate.

Q. And debate you mentioned references to

bombs or World War III or history. Are there other examples with respect to art and science?

A. Science, anatomy, body, like the body parts, the body system.

Q. Genitalia?

A. Genitalia, things like that. And art, student artwork.

Q. I think the human anatomy is clear to me, unless there are specific examples that you can think of that you want to share.

A. No.

Q. What about student artwork?

A. You know, work that could potentially display students in inappropriate context or with inappropriate items.

Q. And what would -- I can speculate, but what would some of those be that you have seen?

A. I mean, self harm, if appropriate dressed, lingerie, weapons, that sort of thing.

Q. Things that would otherwise violate school policy. Is that fair?

A. That is correct.

Q. Okay. Are you good to keep going?

A. Uh-huh.

Q. So I believe earlier you said that at a

certain time you received literally every single alert?
A. That is correct.
Q. Was there a point in time, a point in time at which that changed?
A. When we moved from Gaggle to Managed Methods.
Q. And can you tell me about that change and what happened?
A. The District leadership made the decision to change how we utilized this sort of platform.
Q. And that included how many alerts you received?
A. Correct.
Q. And what was -- you said District leadership?
A. That is correct.
Q. What was the genesis of that concern? You receiving too many communications?
A. I wouldn't say that. It was -- I wasn't a part of the conversations to know exactly what was going on with them, but it was as we were looking at, I know, as they were looking at like the expense and then, you know,

what -- is there something that is more cost effective that still will provide the same services or what services do we really need to focus on for this.

Q. Understood. And I think I was asking originally about just the frequency of communications. Do you receive less frequent communications with Managed Methods?

A. Yes.

Q. Do you know why you received less communications with Managed Methods?

A. Based on how the notifications are set up.

Q. And can you tell me a little bit about that?

A. I don't receive notifications.

Q. Oh, you don't receive notifications for Managed Methods?

A. That is correct.

Q. Okay. Why not?

A. Because that is how it is set up.

Q. Who receives the notifications?

A. The building principals.

Q. But no longer you. Correct?

A. I do not receive the notifications, no.

Q. Is there anyone else who had once received notifications that no longer received notifications?

A. No, not -- yes.

Q. Who would that be?

A. So Kevin Harrell also received notifications, but then when he moved to Managed Methods that changed.

Q. Two questions. Are you familiar with any sort of bundling of communications at any point based upon how many communications District personnel were receiving?

A. Yes.

Q. Can you tell me about that?

A. We went to a -- I'm trying to think of what the word is. Give me a moment. I can't remember, but instead of the alerts coming in one by one you would get like a collection of -- outside of the school day you would get a digest, that's what they called it, a digest that would send in the morning for those that happened outside, the nonurgent alerts that happened outside of the school day.

Q. And what was the reason for changing that to make it a digest?

A. Less interference into administrators in boxes.
Q. So you would receive all of the non -- what was your --
A. The QCONs.
Q. All of the QCONs at once instead of sporadically throughout the day?
A. For the ones that would happen outside of the school day.
Q. For the ones that would happen outside of the school day, between what's the school day?
A. I think they probably did 5:00 p.m. to 7:00 a.m. and then that digest comes in at a.m.
Q. And if there was a PSS that came through in those off hours between 5:00 and the start of the next school day, you would still receive that communication?
A. PSS always alert instantly.
Q. And would go through the tree, the tree that you mentioned of texts, call, etcetera?
A. That is correct.
Q. Were you ever woken up in the middle of the night?

A. Yes.
Q. How frequently did that happen?
A. Again, it's hard to recall. I remember a time where there was like, it went like three or four nights in a row there were ones that I was woken up for and then, you know, it would go weeks without. It all really kind of depended.
Q. For those three or four did you act on any of those?
A. Yes.
Q. What did that entail?
A. It entailed -- because the way the pain calling tree words is by the time it got to me other people hadn't responded, so I would respond. Look at the alert. See what needed to be done, and if something, if it was like a time sensitive, it was urgent I would, you know, notify guardians or attempt to contact guardians and nonemergency police if we thought that there was like imminent danger. Sometimes it was just, you know, notifying sending an e-mail to a school staff person to check in with a student first thing in the morning, etcetera.
Q. And your response, the phone calls and the like could have happened at midnight?

A. I was on call 24/7.
Q. Did they happen like literally at a.m.?
A. Yes.
Q. Okay. With respect to the switch, I believe earlier did I hear you say you were part of the -- you were consulted before the District implemented Gaggle. Is that right?
A. I wouldn't say I was consulted, no. As they decided to implemented Gaggle I was on the team of how do we implement, but adopting Gaggle, no.
Q. Thank you. I'm so sorry. I don't want to misstate your testimony. You were not part of whether you should bring Gaggle to the District but how to operationalize it?
A. That is correct.
Q. Were you also part of that? Were you also part of that same process for Managed Methods?
A. I was not.
Q. Okay. Do you know who was?
A. Kevin Harrell, Tina Mitchell, James Polk.
Q. Anyone else?

emergency contact, incident, QCON, PSS, Quarantine and Block, could you review that?

A. I can.

Q. Thank you.

A. Okay.

Q. Is what you just read an accurate representation of how you understood Gaggle to function?

A. It is.

Q. Okay. On the next page, with the Bates stamp Defendants 142, do you see under the detection method the sentence Gaggle uses machine learning, ML or AI to detect potentially harmful content?

A. I do.

Q. And under the category options, customers such as our District are not able to request certain trigger words, in quotations. Only the categories and who the alerts are sent to?

A. Yes.

Q. Is that an accurate representation of how you understood the new Gaggle to operate at the time?

A. Yes.