IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| JACK TELL; NATASHA TORKZABAN; MORGAN SALISBURY; OPAL MORRIS; HENRY FARTHING; SUZANA KENNEDY; NAOMI SUI PANG; ASHLYN TELL; PHOEBE MORRIS; E.B., a minor, by and through his parent and next friend, CATHERINE P. BATZA, Ph.D.; and H.C., a minor, by and through his parents and next friends, DANIELLE BRUNIN and ERIK CHANEY, | ) | |
| Plaintiffs, | ) | |
| vs. | ) | Case No: 2:25-cv-02428-KHV-GEB |
| LAWRENCE USD 497, a political subdivision of the State of Kansas, | ) | |
| Defendant. | ) | |

DEPOSITION OF DR. ANTHONY S. LEWIS, taken on September 9, 2026, at 12:00 p.m., remotely via Zoom Videoconference, before Stacy L. Decker, a Certified Court Reporter, taken on behalf of the Plaintiffs.



EXHIBIT 11

Use Policy. The district retains the right to impose disciplinary measures on any student. These measures may include expulsion of students and termination of staff for a violation of this policy."

Do you see that paragraph?

A. Yes, I do.

Q. And is that your understanding of how the policy operated when you were superintendent?

A. Yes.

Q. Further down on the page, under Privacy Rights, do you see the paragraph -- for the record, this is the paragraph that reads, "Employees and/or students shall have no expectation of privacy when using district email other, official communication systems, or computer applications. Any email computer application or information on district computers or computer systems may be subject to monitoring without notice by the administration and/or school staff when appropriate."

Do you see that paragraph?

A. Yes, I see it.

Q. And the same question, was that your understanding of the policy and how it operated when you were superintendent?

A. Yes.

Q. Thank you. And on the subsequent page, under Responsibilities, it says, "The superintendent shall oversee the district system."

Do you see that?

A. Yes, I see it.

Q. Okay. And that policy was operative and congruent with your understanding during your tenure as superintendent; is that correct?

A. Yes.

Q. Okay. With the caveat that we'll get into this a little bit further on, can you tell me a little bit about what that oversight required you to do concerning Gaggle. What was your Gaggle oversight process at a high level?

A. As with any policy, the board adopts -- crafts, adopts, approves policies. It's the superintendent's duty to operationalize the policy. And so what that

meant as it relates to this particular policy is that -- ensuring that this policy was operational by ensuring that there was a way for us to monitor students' activities on the devices with the understanding that they are using district-owned devices.

And then as it relates to safety, ensuring that there was a way for administrators to intervene, preferably early on before an incident may happen. And then also use this as a way to teach students the appropriate uses of internet, computers, laptops, iPads, et cetera.

Q. Understood. Do you recall delegating oversight responsibility as related to Gaggle to specific people or to specific departments?

A. Yes.

Q. Can you tell me about that, the delegation.

A. That was the technology department under David Vignery's leadership. Our -- I'm trying to think of the name of the department, but it was the Student Support Services department that included student mental health

and safety. I think Ron may have been in that role at that time.

Q. Did you require those folks to provide information or reports to you as superintendent?

A. Yes. Before -- you know, before taking a proposal or recommendation to the board, we had some conversations about Gaggle in some of our -- well, call them Executive Leadership Team meetings there.

Q. Can you tell me about some of those initial conversations.

A. What I can remember was, when I first learned of Gaggle and its use, was centered around our ability to come into compliance with the Childhood Internet Protective Act, CIPA, a way for us to monitor students' devices for safety reasons, for their personal safety reasons, and for, you know, other safety reasons.

For an example, one February, I can't remember the year, we found two guns in Lawrence High School. I went over and talked to the students and asked both of them two separate occasions, you know, what would make

you bring a gun to school. And both of them feared for their safety. One feared for their safety on the way to school. One feared for their safety while at school.

And I asked those students did you tell an adult in the building, and they both said no. And I said did you tell any family member, anyone at home, and they both said no.

And so that was a problem for me, because, at minimum, students come in contact with at least seven adults in the high school, there for seven periods, and the fact that they couldn't tell one adult was a problem for me.

And so what we know is that students at that time, and probably still do, live on devices, they express themselves through text messages, through, you know, the devices that they use, that they find a way to get around what we think is a safe network, they find a way to get around it and express themselves on their devices.

So when they shared with me the performance over what Gaggle can do, it was a no-brainer for me in terms of keeping students

safe or getting them the support they need, intervening mainly. And when I say intervening, intervening before a student decides to harm themselves, intervening when we're able to flag that, hey, someone's thinking about bringing a weapon to the building. So it was more about prevention and keeping students safe.

Q. Understood. Just as a brief follow-up question, Lawrence Public Schools doesn't use metal detectors, correct?

A. Correct.

Q. Okay. Have you ever been in a school district that uses metal detectors?

A. Yes.

Q. Can you tell me a little bit about that.

A. Yeah. That was during my time in Kansas City, Missouri, School District. All of our secondary schools, middle and high schools, used metal detector. And I had one elementary school that used metal detectors during my time there.

Q. Okay. Anything -- this is very foreign to me, so I appreciate you elucidating

Academic year is fine.

A. It had to be maybe '23-'24. There may have been some conversations before that, but we didn't have the funding for it. Because I was always intrigued by it. But, yeah, '23-'24.

Q. Okay. My next question was going to be who brought the proposal to you, but that might have also by the way of those initial conversations that you had.

Can you tell me a little bit about those, how you first became aware of it, the folks within the strict that brought it to your attention.

A. Yeah, it was David Vignery who brought it to my attention. And we had been having conversations about students post-COVID, you know, students' significant mental health challenges coupled with the two guns we found in one month in one of our high schools.

The safety forms that we were doing, the feedback we were getting from community members around keeping students safe, so all that; and then Gaggle, we have to

move forward with this.
Q. And just so I'm clear, the two guns that you discussed earlier that were two independent incidents, that happened before the adoption of Gaggle; is that right?
A. Yes.
Q. And it sounds like, in combination with those other things, those were a factor in your decision to move forward with Gaggle; is that right?
A. Yes. That factor among others, yes.
Q. Before Gaggle was adopted, was there any existing filtering, security, reporting, or student support systems that were in place?
A. If I recall correctly, there was like an antiquated system that depended heavily upon one IT person in our district to go in and frequently monitor. That wasn't effective.
Q. Okay. And that one person had access to what sorts of things, like alerts?
A. I don't know if you would call them alerts. Had access to -- I'm not a tech

would go in and examine it.

Q. Understood. So to your understanding, there was always a human involved in the Gaggle review process; is that correct?

A. That's correct. And that came -- that was really beneficial, because there were some conversations we were having as a community, as the Lawrence community, when it comes to safety is that, you know, we do -- the district does a pretty good job of supporting students 8:00 to 3:00 during the school day, but it's when they leave us in the evenings and on weekends, you know, things happen. And so Gaggle would monitor all of our devices.

Q. And just to ask you a few follow-up questions about that, was it your understanding that the human review aspect of Gaggle, those were Gaggle employees or contractors?

A. Yes.

Q. They were not district folks; is that right?

A. That's correct.

child's administrator if they want to opt out. I don't know exactly when that came about or when that option was available to families.

Q. Okay. So was it your recollection that a student or a parent could decline to participate in Gaggle monitoring?

A. They could -- they could voice a concern about it. I do remember some of our principals having conversations with parents and letting them know that it was our obligation to monitor student devices because -- well, one, they're district-owned devices that students are using, and we have an obligation to monitor and keep those students safe. So I don't know if there's -- the only opt-out that I recall was with our journalism students. I don't recall -- I do recall some families talked to their principals about they were wanting to opt out, but I don't think we allowed them to opt out. I don't recall.

Q. Okay. So it was -- at the time it was district policy or practice not to opt out parents or families who had asked to be opted out; is that right?

A. Uh-huh. Yeah. Right.

Q. With the exception of the journalism class that we'll talk about in a minute; is that right?
A. Correct.
Q. Okay. We can turn now to Exhibit 5. And it might be easier to have Exhibit 5 pulled up on one tab and Exhibit 3 pulled up on the other. And Exhibit 3 was the Gaggle contract. But turning to Exhibit 5, let me know when you have it pulled up.
A. I have five pulled up now.
Q. Okay. Do you recognize Exhibit 5?
A. Yes.
Q. How do you recognize it?
A. It's the Student Acceptable Use Policy that families should annually -- students and families should annually complete.
Q. Understood. And at the bottom of Page 2, it says "Amended September 2019." Who generally amends this and approves the subsequent versions?
A. It's normally administration if there are any necessary changes that need to be made. But, for the most part, it's a

A. No, but that a particular law required the use of surveillance.

Q. And can you tell me a little bit more about that, the particular law that would require the use of surveillance.

A. CIPA.

MR. GNEFKOW: Objection. But you can answer.

A. CIPA.

Q. (By Mr. Rosenthal) Okay. And we talked a little bit before about CIPA, CIPA. And there's a -- are you aware that there's a federal version and then there's a Kansas State cognate?

A. There's a Kansas State what now?

Q. Cognate. There's a Kansas version of CIPA, and it's KCIPA?

A. No.

Q. Can you tell me a little bit more about, based on your personal understanding, what about CIPA would require monitoring?

MR. GNEFKOW: Objection. You can answer.

A. Based on what I've heard from our attorneys and technology folks is that we were

required to monitor and surveil district devices in order to protect our students.

Q. (By Mr. Rosenthal) Understood. Based on what you heard from advisors, did that monitoring go beyond merely implementing a firewall?

A. Repeat that question.

Q. Did -- based on what you knew at the time, does your requirement to comply with state or federal law require active monitoring of student content?

A. That was my understanding.

MR. GNEFKOW: Objection.

Q. (By Mr. Rosenthal) And based on your understanding, that would be a measure beyond just a firewall of blocking a student from access to a potentially inappropriate site; is that correct?

MR. GNEFKOW: Objection. You can answer.

THE DEPONENT: Are you saying, yes, I can answer?

MR. GNEFKOW: Yes. Sorry. Unless I direct you not to answer, you have to answer over the objection.

MR. GNEFKOW: Objection.

A. No, not in the context of drug-sniffing dogs or metal detectors. For example, if there was a metal detector or a detector that students can walk through, and it detects this kid is having suicidal ideations, yes, I would want that. You know, unfortunately, we don't have that.

Q. (By Mr. Rosenthal) Can you tell me the difference in your view between Gaggle as an instrument and the drug-sniffing dog as an instrument?

A. Gaggle as an instrument -- it's more preventative. A metal detector -- already have the gun in my bag and I'm going through this metal detector. Drug-sniffing dog, the marijuana is already in my locker. Whereas, Gaggle would potentially alert staff before I even -- before I'm at home putting the gun in my book bag, it could potentially alert staff.

And that's what I was talking about earlier in terms of being preventative to get student support and -- early. Similarly, I'm going to bring you a pound of

marijuana tomorrow. You know, well, if that's at 7:00 at night, I can have law enforcement at the house to intervene before you come to school with that. So it's more preventative I would say.

Q. Understood. Is there any individualized suspicion that a student at Lawrence USD, when you were superintendant, had done anything wrong before Gaggle had gone through the content of the person's digital notebook?

A. Is there any suspicion that the student's done anything wrong before --

Q. Correct.

A. No.

Q. Okay. Going back to -- oh, I don't think we've looked at this. If you can pull up, please, Exhibit 12.

A. Okay.

Q. And do you see Exhibit 12, it reads, "JT Intellectual Property"?

A. Yes.

Q. Do you recognize Exhibit 12?

A. Yes.

Q. Can you tell me how and what it