IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | |
|---|---|
| JACK TELL; NATASHA TORKZABAN; MORGAN SALISBURY; OPAL MORRIS; HENRY FARTHING; SUZANA KENNEDY; NAOMI SUIPANG; ASHLYN TELL, PHOEBE MORRIS, E.B. a minor, by and through his parent and next friend CATHERINE P. BATZA, PH.D.; and H.C., a minor, by and through his parents and next friends DANIELLE BRUNIN and ERIK CHANEY, | ) |
| Plaintiffs, | ) No. 2:25-cv-02428-KHV-GEB |
| v. | ) |
| LAWRENCE USD 497, a political subdivision of the State of Kansas, | ) |
| Defendant. | ) |

DEPOSITION OF E.B., a Witness, taken on behalf of the Defendant before Jane A. Blackerby, CSR #1369, CCR #877, pursuant to Notice on the 1st day of October, 2026, at the offices of Lewis Brisbois Bisgaard & Smith, LLP, 4600 Madison Avenue, Suite 700, Kansas City, Missouri.



EXHIBIT 12

through preschool.
Q. Okay. That's right. You said 20-some years you lived to Lawrence. No, that wouldn't make sense.
A. That would be quite impressive since I was about five, so 2014-ish.
Q. You are currently, is it, a managing editor or the managing editor of the Budget?
A. The managing editor for Budget online. There's a lot of editors.
Q. A lot of editors, but you're the single managing editor for the online?
A. The single managing editor for the online. There's the editor in chief above me of the online.
Q. Which currently is who?
A. Claire Lindemyer.
Q. Can you spell that?
A. Sure. C-l-a-i-r-e L-i-n-d-e-m-e-y-e-r. Sorry. Not really good at spelling out loud.
Q. Were you associated with the Budget your freshman, sophomore years as well?
A. My freshman year for the first semester I took 21st Century journalism. It's a prerequisite to joining staff, but counselors

activities at LHS?
A. Yes, I do.
Q. What are those?
A. I do track and field, Topeka Model UN as an officer. I am doing this year Chicago Model UN, NHS and Young Democrats.
Q. No other sports?
A. No.
Q. Why is it Topeka and Chicago UN as opposed to Lawrence UN?
A. Because it was originally in Topeka a year ago and now it is in -- I mean, now it's held at KU for the past several years, ever since COVID at least, but it's a smaller regional one just for really Kansas and surrounding area, and then Chicago Model UN is for the entire Midwest and it takes place in Chicago.
Q. Do you do that with other LHS students?
A. Yes, both.
Q. Can you tell me a little bit about your responsibilities as the managing editor of the Budget online edition.
A. I still have responsibilities of a normal staffer, so I still write stories and do

other such assignments, but then I also help edit stories that will be put on the online form of the Budget, and sorry, and help run the website. I help put staff, profile pictures up there. I help, you know, get stories published onto the website. I do, you know, all of the things we normally expect.

Q. Who is the current editor and chief of the paper Budget?

A. I'm trying to remember. I think that would be the news EICs who again, there's a lot of editors. I think the news EICs would be in charge of both the yearbook and the print form, though, and that would be Tessa Sanders. If you need me to spell that I can, and who else is it. I can't remember. Their profiles are on the website, also, if you would like to just --

Q. Okay.

A. -- go there at some point, or I can share them at a later date.

Q. Can you tell me about the overlap between the paper Budget and the online Budget in terms of articles? In other words, do all the articles appear in both, or --

A. No, not all articles will appear in

have on them. So is that really different from what the school is doing?

A. I mean, yes. I do think that it is, because your words aren't physical objects. Like they aren't -- they aren't a piece of metal. Just saying certain words is not as much of a present danger as a metal object going through a security screening. And airports, again, have this -- I mean, after 911 they have a more aggressive level of security and searching than almost any other place in the United States. I think it is strange to compare a school, although it does have a heightened level to, you know, such an extreme. I don't think that it has been tested yet in a court where certain boundaries lie, and I don't necessarily think those searches are totally comparable.

Q. Does LHS have walk-through metal detectors?

A. No.

Q. Do you know if any other school in USD 497 does?

A. I'm quite certain they don't.

Q. This year can you think of -- are you

aware of any example where any content that you created, and I'll go back to include either an e-mail you sent or something you placed on the Google drive was flagged by ManagedMethods?

A. Me personally, no.

Q. And what about last year?

MR. JOHNSON: What was the question, did it happen or do you know?

Q. (By Mr. Grant) I think my question was can you think of an example or are you aware of an example of this year?

A. Not --

Q. This school year, sorry.

A. For me personally, not that I'm aware of. I do know of others that have been, certainly.

Q. What can you tell me about that?

A. I cannot tell you their names. They spoke under the condition of journalistic anonymity, but I know of someone who just two weeks ago was flagged for Gaggle for content that the Dungeons and Dragons Club, and you know, this was the nth time they had been flagged by Gaggle for something of similar nature or for school assignments.

Q. Okay. Are you friends with the other Plaintiffs?

A. I'm certainly friends with the other Plaintiffs, but I wouldn't say that I'm close friends. I cannot list all of their names off the top of my head, that's for sure.

Q. Neither could I, so. Do you work on the yearbook?

A. I write stories for yearbook. I write sidebars for the yearbook. I do not take part in designing or publishing or doing any other things for the yearbook, other than like my slight aid as an editor to other editors, but not in a real organized fashion.

Q. And is that -- is your relationship with the printed Budget similar?

A. I'm a little bit more involved with printed Budget, but yes.

Q. Okay. Have you taken any art classes at LHS?

A. I have taken jewelry making.

Q. I'm sorry?

A. Metal work, jewelry making. It has a few names, but metal, small things.

Q. Small metal things?

A. Making, yes.
Q. Is that the name of the class, small metal class making? Okay. Do your claims in this case relate in any way to any art you have created?
A. My claims. No.
Q. Have you taken any photography classes?
A. I have not yet. I think I might in the future.
Q. Do you -- have you taken any photography in your capacity as or in connection with your work on the Budget?
A. A small amount here and there. I am mainly a writer for Budget, but I have done some odd jobs or taken some photos as backups in case others have problems.
Q. Are you aware that your photography has ever been flagged at any point by either Gaggle or ManagedMethods?
A. Not that I'm aware of.
Q. I asked you earlier if you're aware of any of your content having been flagged this year by ManagedMethods. Are you aware of any content you created last school year that was flagged by ManagedMethods?

A. What was your other question?
Q. I was talking about this school year.
A. Oh.
Q. Which is new.
A. Not that I'm aware of, no.
Q. Okay. And your freshman year, are you aware of your content that was flagged by Gaggle?
A. Not that I'm aware of.
Q. Okay. And the NATO presentation, which we'll talk about in a little bit, did you create that while you were in middle school?
A. I believe at the very end of eighth grade or somewhere -- somewhere in the -- somewhere in that region. This is getting to the point where it's quite a long time ago, and it was in a -- it was in gifted and special courses, whatever you want to call that class, which I had taken -- I have taken every single year since I was in second grade. And in middle school there was a lot of long-term substitutes, and so a lot of times we would end up working on very similar projects, so I worked a lot on like international criminal court, NATO, UN, like every major super national international

organization. So all of the presentations kind of blend a bit together. So somewhere in the late eighth. I would be surprised if it was seventh grade years.
Q. Okay. You currently have a school issued computer. Is that right?
A. That's correct, yeah.
Q. Is that a Mac book?
A. Yes.
Q. Have you had a Mac book every school year at LHS?
A. Yes. Wait, no. That's -- no, I have not.
Q. What device did you have your freshman year?
A. I had an iPad.
Q. And then sophomore and year senior a Mac book?
A. Yes, I believe so.
Q. Did you ever maintain those devices over the summer?
A. Yes.
Q. For how many summers?
A. Last summer I maintained it for either almost or the entire summer. I don't quite

remember which. I had it for a good chunk of summer for journalism purposes, and then in eighth grade into my freshman year I did have it in summer because I kept my iPad the full summer. Maybe another year, too. I have kept it more than most.

Q. And did you have to request special permission to keep your device over the summer?

A. Probably, but I don't remember exactly what I did or the specifics. A lot of it was probably handled by my teachers as well, at least in terms of journalism.

Q. The complaint, and I'll show you a copy in a moment, references that you have used personal devices to do reporting work for the Budget. Does that sound familiar?

A. That is true.

Q. What personal devices have you used for your work on Budget?

A. I have used my personal laptop. I have used my iPhone. I think that is all the personal devices, although I have used personal accounts that I know Gaggle does not have access to and that's my primary I use like for recordings that I know that Gaggle doesn't

normally have access to for recording most interviews, although I have done interviews on my phone or especially just if I believe they might be sensitive.

Q. If not on your iPhone, how did you do recordings?

A. I used voicemail modes on my school issued laptop, which is not Google Suite. So I don't believe it is under Gaggle.

Q. Okay.

A. To my knowledge.

Q. So I mean, how does that work practically? You would be like sitting in a room with somebody like this and you would have voice memos on your laptop?

A. I have to put my laptop over here. It's quite inconvenient, but...

Q. So other than your iPhone and the voice memos app on your school laptop, is there any other device you have used to do -- to record interviews?

A. I don't think so, no.

Q. In terms of your iPhone, how do you use your iPhone to do journalism work beyond recording interviews?

A. Occasionally I have kept story drafts or thoughts about how I want to do something in one form or another haphazardly across my iPhone, but...

Q. Do you believe that content is subject to monitoring?

A. I would be very concerned if it wasn't.

Q. I understand that, but do you believe that it is?

A. No, sorry.

Q. Okay. That's fine. In terms of your personal laptop, can you describe for me generally how you use your personal laptop to do journalism work?

A. It just is a -- I use it, the exact same as my school laptop for writing for, you know, transcribe, for planning out stories, except with the added benefit that it is not under surveillance so long as I'm not using a District Google account, if I'm using my personal e-mail or whatnot.

Q. I just wanted to confirm and be clear about your understanding of the circumstances under which content on your laptop is or is not Budget to school monitoring. Am I correct that

if you're using your personal laptop to, let's say, let's say draft something.

A. Yes.

Q. So long as you do not save that draft to the Google Suite that is not subject to monitoring, based on your understanding. Is that right?

A. Based on my understanding, the only things that Gaggle is able to see is things underneath my district managed account, Google Suite.

Q. Okay.

A. So no. Or yeah.

Q. By using your personal devices in that way does that enable you to do your journalism work without regard to ManagedMethods or other schooling monitoring?

A. Absolutely, not, no. At the end of the day, every single thing I do must end up on a school Google doc that is put into shared drives with other school accounts and put into school room classrooms. At the end of the day everything must end up under a document that is seen by Gaggle. It is just that occasionally I will get to have steps in between that are, if I

know about it?

A. I think it is possible, yes.

Q. But just to be clear, you're not able to cite any example of that actually happening?

A. I cannot cite a specific instance, no.

Q. Have you ever been subject to discipline at all by the school for any reason?

A. I don't think so. No.

Q. Not to your knowledge, is what you said?

A. No, it's just like I got put in timeout in elementary school for, you know, saying a thing. I don't know, but no, not to my knowledge.

Q. Okay. Paragraph 15 alleges that there is no meaningful way for students to opt out of the District surveillance regime. Do you see that?

A. Yes.

Q. Wouldn't you agree with me that because you're able to use your personal device to do journalism work, at least to an extent, that you are able to avoid monitoring at least to some degree. Correct?

A. To some degree, but I absolutely

disagree with the characterization that I'm able to avoid it in relation to all things, and --

Q. Right. Which I didn't ask.

A. No, but the beginning part of your question, you clarified it down at the end.

Q. Right.

A. But no, I can't opt out in almost all aspects to -- in most classes. Sometimes in journalism it isn't possible to opt out. There are more specific things where you get put with somebody else, or there are -- there is an inherent need. I mean, it's 2026. Laptops and the Google Suite and documents are the way that all business is conducted. I can't just like pen and paper every single assignment for every class or any large portion of my assignments. Everything is a going to Google doc. Everything is a Google classroom.

Q. Have you ever asked Ms. Ladd if there is some way that either you or the journalism staff in general could perform journalism work in a way that would not been subject to monitoring?

A. Yeah. I mean, the Plaintiffs and Ms. Ladd and I'm sure Ms. Tholen back when they

that you are -- that this policy applies to you as a junior at Lawrence High School.

MR. JOHNSON: Same objection.

A. I can assume it does, yes.

Q. (By Mr. Grant) And do you agree that you have no expectation of privacy when using District e-mail?

MR. JOHNSON: Objection, calls for legal conclusion, but you can answer.

A. Yes.

Q. (By Mr. Grant) And do you agree that you have no expectation of privacy when using computer applications?

MR. JOHNSON: Same objection.

A. I understand that is what the policy says, yes.

Q. (By Mr. Grant) When you use the Google Suite to do journalism or for that matter any school work, that is done through computer applications. Is that correct?

A. Yes, although I would be curious on whether or not Kansas Shield would give me an expectation of privacy on a higher level than this policy because of its statements on prior review, but...

Q. So let's set aside any journalism content for a moment.

A. Yes.

Q. Do you understand that if you, for example, write a paper for an English class and put that on the Google drive that you have no expectation of privacy with regard to that document?

MR. JOHNSON: Same objection concerning a legal conclusion, but you can answer.

A. According to this policy, yes.

Q. (By Mr. Grant) Okay. Paragraph 105 describes the school's acceptable use policy.

A. Yes.

Q. It's quoted there and it is attached to Second Amended Complaint as Exhibit PLO. The attachments are not printed out here. Do you see the portion of that policy quote that states students will not have any expectation of privacy when using any District owned device?

A. Yes.

Q. Do you understand that as a junior at LHS you are subject to this policy as well?

MR. JOHNSON: Same objection,

calls for legal conclusion, but you can answer.
A. Yes.
Q. (By Mr. Grant) And Paragraph 109 on the same page states that students are prohibited from using school internet services or transmitting documents without signing the AUP. Do you see that?
A. I do, yes.
Q. Do you know whether you signed an AUP yourself?
A. I certainly have no memory of it.
Q. Do you know if somebody signed it on your behalf?
A. I do not, no. I know that --
MR. JOHNSON: You answered the question.
Q. (By Mr. Grant) Do you have any reason to doubt that either you or somebody on your behalf signed an AUP?
MR. JOHNSON: Objection, calls for speculation, but you can answer.
A. In the sense that I believe we asked for a signed copy in discovery and it has not been provided to us, yes, I do have reason.
Q. (By Mr. Grant) Any other reason beyond

that which you just stated?

A. Beyond that, no.

Q. Okay. If you look at Paragraph 114. It alleges that shortly after the District's implementation of Gaggle Plaintiff student journalists working for Budget noticed that various materials were being seized?

A. Uh-huh, or yes.

Q. Did you -- do you need to clarify anything? Looks like you were reviewing privacy policy again?

A. I was, yes, but it was for questions that I assume you will be asking soon. Not any you have asked yet.

Q. Okay. With regard to Paragraph 114, what I was going to ask you, and you know, I understand you're one of the younger Plaintiffs but do you know, and again, I'm pretty sure you said you didn't have role in preparing this document, but are you one of the Plaintiffs who's referred to in Paragraph 114?

A. No. Not to my knowledge.

Q. Okay. Paragraphs 189 through 190 describe an effort that the District made to remover student journalists from Gaggle's

Q. Given that you were not even aware of Gaggle's existence this time, how do you know that Gaggle flagged and quarantined the document?

A. I just want to remind that I was not part of the writing of this, of the second amended complaint. I am not specifically aware. I am not positive. I cannot tell you with absolute certainty that is what happened. That is my suspicion. I don't understand how it could have happened else wise -- or sorry, wait. Yeah, no, that's right. But I have no definite proof.

Q. So what exactly happened? I mean, this paragraph says you couldn't access the document, but what do you remember happening regarding this presentation?

A. I remember a day before I went to class and tried to find the document I had been working on it and I couldn't find it. It was not on my Google drive. It was one of the most frequently accessed folders that I had. It was a project I was working on every day and I couldn't find it. And after the class was over I was walking in the hallway and I bumped into

an administrator, who I don't know who it was.

I was not -- I mean, I have never been in trouble. I don't know any of the office people other than who do attendance, who very briefly asked me some questions about the presentation and seemed a little bit confused but then kind of immediately cleared things up and then which was just a strange thing for me. I was a little bit confused about what was going on at the time, and then the next day I was able to find it again and I was just continued working on it. Again, I didn't know Gaggle. I didn't know what was happening. It wasn't particularly important to me. I couldn't find it, talked to someone, couldn't find it.

Q. Just try to slow down a little bit when you're giving your answers.

A. Sorry. I apologize.

Q. Paragraph 292 talks about several essays deleted by Gaggle.

A. Yes. This was, again, not edited by me. And same with my -- I guess my interrogatories, is that the name of the -- okay. They -- that was a miscommunication. I do not contend that several of my essays were

deleted by Gaggle. I apologize about that.

Q. Okay.

A. I will not make that assertion.

Q. Okay. And in Paragraph 293 is the story that we have talking about involving Hang12.

A. Yes.

Q. And I just want to confirm, because this is not an allegation that's made specifically in the Complaint because -- so when I read Paragraph 293, my understanding of what had happened was that you stored interviews and research on your personal device, but then proceeded to publish the article as you normally would have. But based on your testimony and response to other questions, it sounds like you're also claiming that you published a different story than the one you otherwise might have but more for the monitoring. Is that correct?

A. That is correct.

Q. Okay. I'll draw your attention back to Paragraph 4 of the Complaint, and I had asked you a little bit earlier to your general understanding of how Gaggle and ManagedMethods

Q. Okay. Beyond the possible, and sorry if these questions are going to seem repetitive, but you know, you provided testimony in response to other questions but then specifically with regard to Paragraph 4, and now, with me, having pointed you to that paragraph and have an understanding of how the process works as alleged by the Plaintiffs, setting aside the possible NATO example, are you aware of any content of yours that was ever flagged?

A. I am not.

Q. And so then am I correct to infer or assume that you're therefore not aware of any other example of any examples of where a contractor identified your content as suspect?

A. That is correct.

Q. And you're not aware of a District official having reviewed your content?

A. That is also correct.

Q. And beyond the example of NATO, has any District official ever spoken for you about content that you have created in a way that led you to believe that somebody had reviewed that content?

A. Not off the top of my head, no.

A. Not to my memory.
Q. I had asked you earlier with regard to the acceptable use policy described in the Complaint whether you or somebody on your behalf had ever signed it, and you said that you didn't remember yourself having signed it or you weren't aware of anybody else having signed it on your behalf. Is that correct?
A. Correct.
Q. Now having this document in front of you does that change your answer at all?
A. Nope.
Q. And if I told you that LHS required an acceptable use policy to be signed by every student as a prerequisite to enrollment each year, would you have any reason to doubt that?
MR. JOHNSON: Objection, calls for speculation, but you can answer.
A. I have no reason to doubt that, no.
Q. (By Mr. Grant) If you look at the first page, the heading on the bottom or there is a heading at the bottom that says students will. Do you see that?
A. Yes.
Q. And the second bullet point says that

"Students will expect any District device to be regularly inspected for inappropriate material." Do you see that?

A. Yes.

Q. Did you understand, or do you understand as a junior at LHS that any school device that you have is subject to inspection in this way?

MR. JOHNSON: Objection, calls for a legal conclusion, but you can answer.

A. I understood that this was a part of the terms of some of the device policy standards, yes.

Q. Okay.

A. However, only after joining this lawsuit, I should say.

Q. The first sentence of the third bullet point states that students will expect, and then it goes on to say that e-mail transmission and receptions would be subject to review. Do you see that?

A. Yes.

Q. And do you understand that as a student at the District that your e-mail transmissions are subject to review?

A. Yes.

Q. Do you see the final sentence of that bullet point states that all such information and/or files shall be and remain the property of the school District?

MR. JOHNSON: Objection, calls for -- you asked him does he say that. I'm sorry, no objection to that.

A. Yes.

Q. (By Mr. Grant) And do you understand that all of your information and files are the property of the school District?

MR. JOHNSON: Objection, calls for a legal conclusion, but you can answer.

A. Yes.

Q. (By Mr. Grant) And do you see the latter part of that sentence states that no user shall have any expectation of privacy regarding the use of the devices, District network or District's internet. Do you see that?

A. Yes.

Q. And do you understand that as a junior at LHS you have no expectation of privacy regarding those items listed there?

MR. JOHNSON: Objection, calls

for legal conclusion.

A. Can you repeat that question? I'm sorry.

Q. (By Mr. Grant) Do you have an understanding as a junior at LHS that you have no expectation of privacy regarding the items listed there?

MR. JOHNSON: Same objection.

A. Yes.

Q. (By Mr. Grant) If you were to browse a website on a computer of LHS library, would you expect your browsing history to be private?

A. No.

Q. I'm going to show you now the first new exhibit, a copy of which I will also hand to the court reporter to be marked as Exhibit 147.

(E.B. Exhibit 147 was marked for identification by the reporter.)

MR. JOHNSON: I'll tell you right now, Cameron, that I mistakenly sent to you a draft version, and I will -- I just wanted to see which exhibit you were going to use, but he's willing to answer any questions that you have.

THE WITNESS: These were before

my edits, though, is what I'm going to say. I did not -- there will be things in here that I will not agree with.

MR. JOHNSON: That was a mistake on my part.

Q. (By Mr. Grant) Okay. Do you have any edits to your response to Interrogatory 1 that's in front of us?

A. Yes.

Q. What are your edits?

A. First, I think it's the 2022-2023 year, the 2023-2024 school years, not the ones following. It wasn't about NATO. I think it was about the international criminal court. That's not really material. I would -- I believe Gaggle flagged a portion of the presentation, because I have no definite proof. Several updates. Again, I said that was a miscommunication. I make no such claims towards that. The rest is correct.

Q. So the entire time we've been talking about a NATO presentation that was, in fact, an ICC presentation?

A. I think so. It was something in the branch of super national organizations. Maybe

it NATO. I believe it was ICC.

Q. Regardless of whether it was NATO or ICC, is the part about it mentioning nuclear and chemical warfare accurate? That's in the second -- or sorry, the first sentence of your answer to Question 1.

A. Chemical warfare certainly. I'm not sure about nuclear warfare. It might or night not. It would have referenced war criminals, so I'm sure it referenced criminal warfare, but I would be a little surprised if it mentions nuclear warfare.

Q. Do you remember anything more about what the presentation was about other than it referenced war criminals and you believe chemical warfare?

A. It was about the -- it was the ICC presentation. Again, I have had trouble finding these. These are very old documents, and I create a lot of them in the span of time, I think. In the year or in the two years that I'm not sure which one I did this in I probably made over 20 presentations that were about like super national organizations because I had so many long-term subs that kept on giving me the same