IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JACK TELL; NATASHA TORKZABAN; MORGAN SALISBURY; OPAL MORRIS; HENRY FARTHING; SUZANA KENNEDY; NAOMI SUI PANG; ASHLYN TELL; PHOEBE MORRIS; E.B., a minor, by and through his parent and next friend, CATHERINE P. BATZA, Ph.D.; and H.C., a minor, by and through his parents and next friends, DANIELLE BRUNIN and ERIK CHANEY,

Plaintiffs,

vs.

LAWRENCE USD 497, a political subdivision of the State of Kansas,

Defendant.

Case No: 2:25-cv-02428-KHV-GEB

DEPOSITION OF H.C., taken on September 8, 2026, 9:30 a.m., remotely via Zoom Videoconference, before Stacy L. Decker, a Certified Court Reporter, taken on behalf of the Defendant.



EXHIBIT 13

A. Yes.
Q. What was it?
A. 10208144.
Q. And is that also your student ID number?
A. Yes.
Q. Earlier you mentioned that you -- you mentioned a contract that you had to renew every year. What contract were you referring to?
MR. JOHNSON: Objection. That calls for a legal conclusion.
But you can go ahead and answer the question.
A. I believe it was -- I can't remember the name. It was just the document they had us sign just going over like what not to do with our iPad, things like that.
Q. (By Ms. Harris) Did you sign one this year?
A. Yes.
Q. Do you have a copy of what it is that you signed?
A. I do not.
Q. And did you sign it or did your

parents sign it?
A. We both did.
Q. And is that the same every year, both you and your parents signed the contract you're referring to?
A. Let me think. I might -- I think only I signed it. Sorry. Or no. I believe it's both of us who signed it. Can you restate your question. Sorry.
MS. HARRIS: Stacy, could you read the question back.
(The pending question was read by the court reporter.)
A. Yes.
Q. (By Ms. Harris) I'm going to share my screen with you. Can you see my screen okay?
A. Yes, I can.
Q. Have you seen this document before?
A. Yes. This is the document I was referring to.
Q. And so would this be the document that you and your parents would have signed each year when you were issued a, iPad from

the school district?

A. Yes.

MR. JOHNSON: Melika, could you identify the document.

MS. HARRIS: I'm sorry. And this document was previously introduced as Exhibit Number 5. This is the student Acceptable Use Policy.

Q. (By Ms. Harris) And is this -- and to your knowledge is this the same document that you and your parents signed each year after being issued the iPad?

A. Yes.

Q. Okay. Now I'd like to direct your attention to under the first section, it says, "Expectations for all students." And it says, "Students will," and then it says under the second bullet point, "use technology for educational purposes."

Did you see that there?

A. Yes.

Q. Okay. So is it your understanding that the iPad issued to you by the school was to only be used for educational purposes?

A. Yes.

MR. JOHNSON: Objection. The document speaks for itself.
You can answer.
A. Yes.
Q. (By Ms. Harris) Okay. I'd like to go down to the bottom of the first page where it states, "Additional expectations for students with personally assigned computing devices."
Do you see that section?
A. Yes.
Q. And then under the second bullet point, it says students -- well, under the second bullet point, it says, "expect any district device to be regularly inspected for inappropriate material, which might include unlicensed software or inappropriate content and software. Any inappropriate content or licensed software will be removed."
Did I read that correctly?
A. Yes.
Q. So is it your understanding, from reading this document, that students are to expect that the school-issued device would be regularly inspected for inappropriate

material?

A. Yes.

Q. Okay. And then if we look at the third bullet point, it says, "expect without prior notice any and all usage of the district network and internet access, including, but not by way of limitation, email transmissions and receptions to be subject to review. Any information gathered during monitoring may be copied and/or stored. All such information and/or file shall be and remain the property of the school district and the user shall have any expectation of privacy regarding the use of the devices, district network, or the district's internet."

Did I read that correctly?

A. Yes.

Q. (By Ms. Harris) So based on your understanding of the district's Acceptable Use Policy, would it be correct that students should expect without prior notice for the district network and internet access, including email transmissions, to be monitored?

MR. JOHNSON: Calls for a legal

conclusion.
MR. ROSENTHAL: Improper hypothetical.
MR. JOHNSON: Harrison, just me.
MR. ROSENTHAL: Okay.
MR. JOHNSON: Objection, calls for a legal conclusion.
You can answer it.
A. Yes.
Q. (By Ms. Harris) Now, in this lawsuit plaintiffs have alleged that, "Through the district's use of Gaggle and similar platforms such as ManagedMethods, the district conducted searches of students' expressions."
Is that your understanding of the allegations made in this lawsuit?
MR. JOHNSON: Objection. Assumes facts not in evidence.
But go ahead and answer if you can.
A. Yes.
Q. (By Ms. Harris) When did you first learn that the school district was using Gaggle?
A. I first learned that Gaggle -- or that the school district was using Gaggle sometime I think in early 2024 or -- no, not

like is turned in, like anything that Google has access to.

Q. Now, would this be the school's Google Workspace or your personal Google Workspace?

A. The school's.

Q. Do you have a Google Workspace or Google email account that is not connected to your school? Do you have a personal Gmail account?

A. Yes.

Q. Has your understanding of how Gaggle worked changed since you read the article that your mom sent to you in fall of 2024?

A. I believe that it -- it was way more aggressive on like how it searched things than what I previously believed.

Q. Okay. And what do you mean by way more aggressive?

A. Like even words that you don't think would be flagged would get flagged in my -- such as my personal experience.

Q. How did you gain that understanding?

using Gaggle but is using ManagedMethods.
Q. Where did you see these articles?
A. I can't remember.
Q. Did you search for them yourself or were they sent to you?
A. I searched for them.
Q. Do you recall who wrote the articles?
A. I do not.
Q. Okay. And what is your understanding of how ManagedMethods works?
A. I think it behaves the exact same as Gaggle.
Q. To your knowledge were there any differences?
A. The only difference that I have noticed is that students aren't getting pulled into like the front office or counselor's offices under ManagedMethods, but I still believe that they're still searching through everything.
Q. Did you own a personal laptop or iPad while you were in middle school?
A. No -- or yes. Yes. Personal computer.

Q. Did you ever use that personal computer to access the school's Google Workspace?
A. I did.
Q. And for what reason?
A. To complete my assignments and look through emails, things like that.
Q. Do you still have that laptop or computer?
A. Yes.
Q. When you used your personal computer to complete assignments, did you ever keep copies of those assignments or emails or anything that you sent?
A. Yes.
Q. Did you save them to like your personal desktop?
A. They're saved on Google Workspace through the district.
Q. Okay. So you didn't download them or save them to your --
A. No.
Q. Okay. When did you first discuss or think about the possibility of filing a lawsuit in relation to Gaggle and

A. How it like searched through all that stuff and then how people were getting like pulled into the office, things like that, and that's when I realized that happened to me.

Q. And when you say that happened to you, what are you referring to?

A. That I got pulled into the counselor's office and Gaggled basically.

Q. So when did you overhear that conversation in the bike shop?

A. It was in winter of 2025.

Q. When were you pulled into an office?

A. Early 2024 or late 2023.

Q. So after you had this conversation in the bike shop, is that when you decided to file a lawsuit?

MR. JOHNSON: Objection. That assumes facts not in evidence. There's no evidence as to what -- it was a conversation.

Go ahead and answer if you can.

A. I talked with Mr. Rosenthal more about the case and like -- he was talking about if it was something I was interested in

A. Just when we would do assignments.
Q. What's -- go ahead.
A. We were just made to do things on like our iPads.
Q. Did you store any journalism or photography on your iPad?
A. No. I was in middle school. We did not have journalism or photography.
Q. Did you store academic writings on your iPad?
A. Yes.
Q. What about personal expressions?
A. Maybe. I don't know.
Q. Did you store anything on your iPad that was not related to your schoolwork?
A. Yes.
Q. What types of things?
A. Memes, just random photos, things like that.
Q. Earlier when we looked at the school's Acceptable Use Policy -- and I'll go back to Exhibit Number 5. At the top of the page, it states that expectations for all students and students will use technology for educational purposes.

Do you see that there?
A. Yes.
Q. So why is it that you would have stored things on your iPad that were not related to your schoolwork?
MR. JOHNSON: Objection, misstates the evidence. There's a difference between education and schoolwork.
But go ahead and answer the question.
A. Can you restate your question.
Q. (By Ms. Harris) Okay. I'll actually rephrase it.
Did you store things on your iPad that were not related to your education in the Lawrence School District?
A. Yes.
Q. And what types of things were those?
A. Memes, images, like funny images, things like that.
Q. What was your purpose of storing items on your school-issued iPad that were not for educational purposes?
A. To show to my friends.
Q. Have any of the items that you

stored for non-educational purposes on your school-issued iPad to your knowledge been seized by the defendant?

A. They were not.

Q. Now, during this time when you stored the non-educational materials on the iPad issued by the school district, you also had your own personal computer; is that correct?

A. Not at the time period -- or yes. Yes. I had a separate computer, but yes.

Q. Okay. And did you also have a cell phone at that point in time?

A. Yes.

Q. So why would those materials be stored on the school-issued iPad instead of your personal computer or your cell phone?

A. Well, I wanted to -- sorry. I wanted to show them to my friends during the school day, because we were really bored and we were not permitted to use our personal devices during class.

Q. But you could have stored those same documents and materials on your personal computer and your personal cell phone,

correct?

A. Yes.

Q. I'd like to direct your attention to Paragraph 28. It states -- the second paragraph states that, "Plaintiffs E.B. and H.C. are current students who remain subject to the district's AI surveillance monitoring and seek to use district-managed accounts, platforms, and devices without unreasonable search, seizure, and/or censorship of their protected expression."

Do you see that there?

A. Yes.

Q. Do you contend that any of your personal expressions have been searched by the district?

MR. JOHNSON: Objection, asked and answered.

Go ahead.

A. Absolutely.

Q. (By Ms. Harris) Okay. And which personal expressions?

A. If you look in Paragraph 27, I sent a joke in an email to one of my friends, and that was -- I believe it was seized by

Gaggle. Yeah.

Q. Are there any other communications or expressions or writings that you contend were seized by Gaggle?

A. I do not.

Q. What about ManagedMethods?

I'm sorry. I didn't hear your answer?

A. No.

Q. And I believe -- so Paragraph 45 states that, "Contrary to these assurances, students reported that Gaggle flagged email communications accessed via personal devices, including messages sent from personal phones through school-issued Gmails. Students also reported that Gaggle flagged content stored in Google Drive folders not intended for school assignments such as personal writings and draft editorials."

Did I read that correctly?

A. You did.

Q. Do you believe Paragraph 45 to be a true statement?

A. Yes.

Q. Okay. Other than the one email

communication that you referenced earlier, to your knowledge were there any other communications flagged by -- any of your email communications that were flagged by Gaggle?

MR. JOHNSON: Objection. Calls for speculation.

But you can answer.

A. No.

Q. (By Ms. Harris) And the email communication that you allege was flagged by Gaggle, was that sent through the school's Google Workspace email account?

A. Yes.

Q. And who was that email sent to?

A. A.R.

Q. Do you recall when that email was sent?

A. No.

Q. Can you estimate when the email was sent?

A. Late 2023 or early 2024.

Q. What did the email say?

A. I sent a joking -- like my friend had called me some like silly name, and I responded to that with, "Stop bullying me."

schools and -- yeah, he was able to switch schools. And it was late enough in the school year that I believe you're not able to switch schools without a reason like bullying.

Q. Do you know of anyone else who was bullied other than the friend?

A. Yes.

Q. Who else?

A. T something.

Q. The friend that had to switch schools, what was that friend's initials?

A. W.F.

Q. And the other friend was bullied whose name begins with a T, how was that person bullied?

A. Made fun of for personal interests, called names, pushed around, things like that.

Q. Were the administrators made aware of T being bullied?

A. I don't know.

MR. JOHNSON: Objection. Calls for speculation.

Go ahead and answer.

A. No.

Q. (By Ms. Harris) How did you become aware that T was being bullied?
A. I witnessed it.
Q. Is there anyone else at West Middle School that you're aware of who was being bullied?
A. Not that I can think of.
Q. I'm going to scroll down to direct your attention to Paragraph 108. And 108 states that, "The AUP provides consequences for AUP violations, including suspension from use of district technology, suspension or expulsion from school, and any other consequence outlined in the student handbook."
Do you see that there?
A. Yes.
Q. And do you have -- and AUP, that is the Acceptable Use Policy, correct?
A. Yes.
Q. Were you ever suspended or disciplined or expelled from school for any violations of the Acceptable Use Policy?
A. No.
Q. Are you aware of any student who was disciplined for violations of the

A. No.
Q. When you were called into the meeting with Ms. Fike, what all did you discuss?
A. Just she showed me the snippet of the email that, you know, contained, "Stop bullying me." Basically what's discussed in 295, which is -- she asked me if the bullying was a problem and if the school needed to intervene.
Q. Was there anyone else present for the meeting with Ms. Fike?
A. No.
Q. Did you have any other conversations with any other administrators or counselors or teachers related to the email referenced in Paragraph 295?
A. I did not.
Q. Is this the only time that you have had any communications with a counselor or a teacher or an administrator regarding one of your email communications being flagged by Gaggle?
A. Yes.
Q. Okay. To your knowledge have any

of your email communications been flagged by ManagedMethods?

A. Not that I know of.

Q. To your knowledge have any other writings of yours, photographs, memes, or anything else that you've stored in the Google Workspace been flagged by Gaggle or ManagedMethods?

A. Not that I know of.

Q. And you understand that Gaggle flagged your email because it contained language that potentially indicated that you might be experiencing bullying at school, correct?

MR. JOHNSON: Objection. Calls for speculation.

But you can go ahead and answer.

Q. (By Ms. Harris) H.C., you can answer.

A. I think my internet cut out.

Q. Were you able to answer the question?

A. I did not hear you.

Q. Okay. You understand that Gaggle flagged the email referenced in Paragraph 295

because it contained language that potentially indicated that you may have been experiencing bullying; is that correct?

A. Yes.

Q. And as you stated, bullying had been an issue at West Middle School, correct?

A. Yes.

Q. And would you agree that an allegation of bullying is a serious matter?

A. Yes.

Q. And if a school counselor received information suggesting that a student is being bullied, you'd expect the counselor to look into that, correct?

A. I would.

Q. And before meeting with you in late 2024 or early 2025, would Ms. Fike have had any reason to know that your email was a joke?

A. If she --

MR. JOHNSON: Objection. Calls for speculation.

You can answer.

A. If she was able to view the whole email thread, which just included my friend

calling me some name, she would have been able to understand that that was a joke.

Q. (By Ms. Harris) But sitting here today, you're unable to recall the name that A.R. called you in the initial email; is that correct?

A. Correct.

Q. Would you agree that you speaking with Ms. Fike, the counselor, gave you an opportunity to explain that the email was just a joke?

A. Yes, I had to explain to her that it was a joke.

Q. And after you gave the explanation that it was just a joke, you were permitted to return to your class, right?

A. Correct.

Q. And you weren't disciplined for the email?

A. I was not.

Q. And did she put any restrictions on you afterwards as to the types of emails you were then able to send?

A. No.

Q. Did any school official, like a

counselor or teacher, administrator, tell you that you were no longer able to send joking emails to your friend?

A. No.

Q. Now, if we scroll down to Paragraph 297, it states, "As a direct and proximate result of this experience, H.C. stopped sending joke emails and changed the way he communicated online."

How did you change the way that you communicated online?

A. Well, for starters, I stopped sending joke emails. Yeah. I wouldn't send images I thought could get flagged. After that I pretty much kept it strictly -- only like casual talk, like small talk or educational emails.

Q. So after your meeting with Ms. Fike regarding the joking email, then you just -- all subsequent emails were for educational purposes?

A. No. I would still send emails to my friends, but I would avoid words I thought would get flagged.

Q. What type of words did you think

would get flagged?
A. Bullying, any type of swear word, which, I mean -- yes. Any words like you'd expect to be in like some kind of confrontation, things like that. Or like, quote, unquote, shut up, things like that.
Q. Did the meeting with Ms. Fike change the way in which you completed your schoolwork assignments?
A. No.
Q. Did it change the way in which you communicated with your teachers?
A. No.
Q. Okay.
MR. JOHNSON: Could we take a break?
MS. HARRIS: Yes.
(Recess.)
Q. (By Ms. Harris) I'm going to share my screen with you. H.C., are you able to see my screen okay?
A. I am.
Q. Okay. And we can mark this one -- I believe we are up to Exhibit 101.
MR. JOHNSON: I think that's right, yes.

MS. HARRIS: And I will upload to the exhibit share.

(Exhibit 101 was marked.)

Q. (By Ms. Harris) H.C., this document -- have you seen this document before?

A. I have, yes.

Q. Okay. And these are Plaintiff H.C.'s Answers to Defendants First Interrogatories, correct?

A. Yes.

Q. Okay. When is the first time you've seen this document?

A. When Mr. Johnson sent it to me to review.

Q. And did you sign a verification for these interrogatories?

A. I have not been able to yet.

Q. When do you intend on doing so?

A. Today. I'd like to get it printed out and have the notary notarize it today.

Q. Okay. So I'm just going to briefly go over some of the questions in these interrogatory responses with you.

Interrogatory Number 1 asks you to

identify each document sent or received by you which you contend was flagged, searched, seized, deleted, quarantined, censored, or otherwise interfered with by defendant or monitoring software.

And in response, you identified one email that was sent in late 2024 or early 2025 while you attended West Middle School where you sent a joking email reply to a friend which included the phrase, "Stop bullying me."

Is that the same email we discussed earlier when we were discussing the complaint?

A. Yes.

Q. Okay. And then, to your knowledge, that was the only document that was flagged, searched, seized, deleted, quarantined, censored, or otherwise interfered with by defendant or the monitoring software Gaggle or ManagedMethods?

A. That I know of, yes.

Q. Why do you believe that the email was deleted by Gaggle?

A. I searched for it and I was not