**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| JACK TELL; NATASHA TORKZABAN; MORGAN SALISBURY; OPAL MORRIS; HENRY FARTHING; SUZANA KENNEDY; NAOMI SUI PANG; ASHLYN TELL; PHOEBE MORRIS; E.B., a minor, by and through his parent and next friend CATHERINE P. BATZA, Ph.D.; and H.C., a minor, by and through his parents and next friends DANIELLE BRUNIN and ERIK CHANEY,<br><br>*Plaintiffs*,<br><br>v.<br><br>LAWRENCE USD 497, a political subdivision of the State of Kansas,<br><br>*Defendant*. | ) | Case No. 25-2428-KHV-GEB |

**PRETRIAL ORDER**

A pretrial conference was conducted in this case on October 29, 2026, by U.S. Magistrate Judge Gwynne E. Birzer. Plaintiffs Jack Tell, Natasha Torkzaban, Morgan Salisbury, Opal Morris, Henry Farthing, Suzana Kennedy, Naomi Sui Pang, Ashlyn Tell, Phoebe Morris, E.B., and H.C. appeared through counsel, Mark P. Johnson, Harrison M. Rosenthal, Jacob S. Margolies, and Rebecca Hughes Parker (pro hac vice) of Dentons US LLP. Defendant Lawrence USD 497 appeared through counsel Cameron Grant and Andrew Gnefkow of Lewis Brisbois Bisgaard & Smith, LLP.

This pretrial order supersedes all pleadings and controls the subsequent course of this case. It will not be modified except by consent of the parties and the Court's approval, or by order of the Court to prevent manifest injustice. Fed. R. Civ. P. 16(d)-(e); D. Kan. Rule 16.2(a).

**1. PRELIMINARY MATTERS.**

**a. Personal Jurisdiction.** The Court's personal jurisdiction over the parties is not disputed.

**b. Venue.** Venue in this Court is not disputed.

**c. Governing Law.** Subject to the court's determination of the law that applies to the case, the parties believe and agree federal law governs Plaintiffs' claims under 42 U.S.C. § 1983 and the First, Fourth and Fourteenth Amendments to the U.S. Constitution. Kansas state law and federal law regulate the District's operations as a public school established and governed by the State of Kansas. Kansas law governed the Kansas Open Records Act claims, which have been adjudicated and are not presented for trial; no state-law merits claim remains for trial.

**2. STIPULATIONS.**

**A.** The following facts are stipulated:

**a.** Lawrence USD 497 is a Kansas public school district and the sole remaining defendant.

**b.** The Board of Education approved the purchase of Gaggle on August 28, 2023.

**c.** On July 8, 2024, the Board voted 6–1 to renew Gaggle for the 2024–2025 school year at an annual cost of approximately $53,411.25.

**d.** The District replaced Gaggle with ManagedMethods in late summer or fall 2025, with transitional overlap.

**e.** E.B. attends Lawrence High School and H.C. attends Free State High School. The District issued each a Google account and device for the 2026–2027 school year.

**B. Exhibits**

The Parties agree that the District maintains records in the ordinary course of its business and that it is the ordinary course of the District's business to maintain such records. Documents

Bates stamped by the District are presumptively authentic for purposes of summary judgment and trial, provided, however, that the authenticity of a document does not foreclose other evidentiary objections, including without limitation hearsay within hearsay, and any objection that documents in the District's possession created by third parties may not qualify as business records under Fed R. Evid. 803(6).

**3. FACTUAL CONTENTIONS.**

**a. Contentions of Plaintiffs.**

The District requires students to create and submit schoolwork, journalism, and art in District-managed Google Workspace accounts. It selected and implemented Gaggle, and later ManagedMethods, to examine the content of those accounts around the clock, including developing drafts, private messages, and photographs, without suspicion of wrongdoing or inappropriate content. Account-based scanning reached content created or accessed outside school and on personal devices. Plaintiffs challenge that suspicionless examination and the resulting alerts, flagging, quarantine, removal, delivery holds, and interference with access and sharing, which restricted lawful expression that did not threaten safety or materially disrupt school activities.

The Board approved Gaggle on August 28, 2023, and renewed it on July 8, 2024, after students had raised search, seizure, speech, press, and opt-out objections in a written demand that Board member GR Gordon-Ross read; he saw no issue with renewal and knew litigation could follow. The District held no town hall or public forum to solicit or receive public comment on the proposed use, or continued use, of any program to monitor students' online activity or use of Google Workspace. Senior District administrators then selected and renewed ManagedMethods, which continues the same round-the-clock monitoring of student accounts. Students, their adviser, and families notified the District that the programs interfered with lawful expression, and the

District continued the challenged practices notwithstanding those notifications, under its policies and the decisions of its final policymakers.

Policy IIBG and the Acceptable Use Policy purport to permit monitoring and disclaim any student privacy in District systems, but Plaintiffs dispute that their general terms establish knowing and voluntary consent to the challenged examination and restrictions. Students sometimes received devices without signing the agreement, and the District's designees could not confirm that the District had identified or produced a signed agreement from any Plaintiff. Students must use District accounts for required schoolwork and journalism. The District rejected a general opt-out from monitoring, including Gaggle's available opt-out capability, and permits only designated course or journalism exemptions, so students cannot refuse the District's surveillance terms without forfeiting meaningful access to public education.

Policy JT recognizes student ownership of publications, articles, materials, models, and other items except work produced at the District's request for its use, and in responding to Request for Admission No. 156, the District stated that students are on notice that their files "may be restricted by the District, and are not the property of the District." Plaintiffs assert privacy and possessory interests in their own communications, files, publications, academic work, and artistic work, including work stored or submitted through District-managed platforms. Policy JHCA, under which student journalists ordinarily choose their own stories and the District does not require prepublication approval, and the Kansas Student Publications Act inform the student-journalism context, including the claimed confidentiality and independence of student newsgathering and publication; no separate claim under the Kansas Student Publications Act is asserted.

The programs failed to distinguish lawful academic discussion, art, and reporting from material warranting intervention. They applied undefined or insufficiently defined categories,

including nudity, self-harm, toxicity, drug use, and threats, through undisclosed keywords and AI-driven risk scoring, without communicating adequate standards to students and without notice to students or a prompt review, appeal, or restoration procedure. ManagedMethods alerted on the word "lit" and on *Things Fall Apart* annotations that an assistant principal identified as legitimate classwork. The District's former technology director testified that Gaggle was not a federal or state requirement.

After Gaggle interfered with student journalism and art, Jack Tell, Natasha Torkzaban, Morgan Salisbury, and their adviser met with District representatives in March 2024 to object. Before the March 29 meeting, the District discouraged the students from bringing their own counsel, while the District's counsel attended; the District also brought counsel to the meetings without advance notice to the students. The District then represented that journalism students would be exempted from Gaggle. The exemption did not fully end monitoring or blocking, as the District's December 2024 email and Suzana Kennedy's continued coverage reflect, and the District's former communications director testified that Gaggle was interfering with confidential journalistic work. Plaintiffs dispute the present scope and implementation of exemptions under ManagedMethods.

Jack Tell, Natasha Torkzaban, and Morgan Salisbury worked on *The Budget*. On March 29, 2024, as part of reporting on Gaggle, Natasha sent a test email to adviser Barbara Tholen, who sat beside her; Gaggle flagged it, the District held it for staff examination, and Tholen did not receive it. Natasha and her colleagues then avoided email and worked in person where possible. A reporting test word list Morgan prepared with Jack and Natasha generated a Gaggle alert. The list disappeared from Morgan's Google Drive, and its link stopped providing access; Assistant Principal Mark Preut told Morgan he had seen the list through Gaggle. Jack and fellow student

journalists moved documents into Tholen's account to avoid scanning, consuming time they could have spent on journalism, and Tholen found that duplicating thousands of files under her ownership was unworkable and expensive.

Opal Morris and Henry Farthing created photographs in the District's visual-arts program. The District flagged Opal's Drive items for nudity on December 14, 2023, and May 2, 2024, and Henry's items between December 2023 and October 2024, and it quarantined photographs from both accounts. Security interrupted Opal's class presentation and escorted her to a closed room, where three administrators questioned her about the flagged photographs before viewing them. She was told she was "free to go back to class, just not to talk about it," never finished the presentation, and lost access to her photographs until the day after the questioning. Henry was escorted from class to the office and questioned and did not feel free to leave. The District trained administrators to question students before viewing suspected nudity images. The District's mental-health director later testified that she did not find the photographs inappropriate and that nothing in them violated a school rule, could cause a substantial disruption, or warranted discipline. Henry then stopped taking self-portraits, shifted to landscapes, and moved work outside Drive. Naomi Sui Pang, whose teacher required video journalists to upload segments to a shared Google Drive, witnessed Opal's removal from class and became more cautious about uploading her own work.

Suzana Kennedy investigated the program as a student journalist. Gaggle blocked delivery of a spreadsheet produced in response to her KORA request, which she obtained only after investigating the delay, and delayed an email exchange with Julie Boyle concerning requested records. In early August 2025, days after this lawsuit was filed, *The Budget* adviser Abbi Epperson-Ladd asked Principal Quentin Rials and Assistant Principal Elaina Honas about reporting on the litigation, recalled the answer "no," and conveyed that restriction to Ashlyn Tell, *The Budget*'s

editor-in-chief. Englebrick testified that Rials acknowledged imposing a prohibition on investigating and reporting on Gaggle and said he had been instructed to do so, identifying a meeting with Superintendent Swift, Assistant Superintendent Ryan, and human-resources director Ron May as the source of that instruction. Swift testified that pending litigation has no bearing on whether an article should go to print. On August 14, 2025, District counsel confirmed that Rials had issued the directive and that it had been lifted, and Rials issued an assurance memorandum on August 15. Ashlyn drafted her article on August 14 intending to publish the next day, but after a District teacher warned her on August 15 that her adviser could be fired if students reported on the lawsuit, the article did not appear until August 19.

Ashlyn Tell and Phoebe Morris used their District accounts for journalism. The District flagged six of Ashlyn's Drive items for self-harm from July 21 through September 16, 2025. It flagged Phoebe's Drive item for nudity on December 8, 2023, and its quarantine report identifies a quarantine associated with Phoebe's account. Phoebe experienced stress from creating and communicating journalism under monitoring.

E.B. and H.C. must use District accounts for schoolwork, and E.B. must place his reporting in District Google documents for editing and submission. E.B. temporarily lost access to a class presentation. Because "every quote I have and every sentence I write must end up in a Gaggle monitored Google document," he narrowed his reporting on an arts organization's collaboration with a suicide-prevention hotline. After an email H.C. sent containing "Stop bullying me" was flagged, he was removed from class and questioned by a counselor, was embarrassed when he returned to his classmates, and changed his school-email communications. The District ties any exemption to course enrollment or adviser identification and relies on adviser-based "relational monitoring" for exempt journalists.

E.B. and H.C. remain subject to ManagedMethods' automated scanning, flagging, and quarantine of their District-managed Google Workspace content, including Gmail, Drive, Shared Drive, Docs, Sheets, Slides, Chat, Meet, and Classroom content, without suspicion of wrongdoing or inappropriate content, advance notice, or a meaningful opportunity to contest. Switching devices does not avoid account-level scanning, and changing vendors did not end the challenged conduct. The operative standards lack adequate notice and enforcement limits and reach substantial protected journalism, art, academic discussion, ordinary communication, and parent, counselor, and teacher communications.

Ashlyn Tell and Phoebe Morris, acting as student editors, submitted KORA requests on October 30, 2025, seeking records about the District's replacement of Gaggle with ManagedMethods for their reporting. After ECF No. 56 ordered production, the District on April 13, 2026, asked them to refrain from sharing non-exempt records produced under KORA, and beginning April 14 it stamped its production "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" although no protective order had been entered. The District later agreed to remove those watermarks, and the protective orders later entered (ECF Nos. 88, 91) confirm that non-exempt KORA records may be published and shared. Ashlyn and Phoebe contend that the no-sharing demand and confidentiality markings chilled their reporting on, and dissemination of, those public records. The statutory KORA claims were resolved by prior orders, as noted in the footnote to Section 5.

**b. Contentions of Defendant.**

**i.** The District Implemented Gaggle and ManagedMethods to Address Mental Health Issues, and Threats of Violence and Suicide.

The District contends it has *in loco parentis* authority, and a moral obligation, to ensure its students' safety. As Plaintiffs Natasha Torkzaban, Morgan Salisbury, and Jack Tell stated in an

article they published in The Budget on April 18, 2024: "Schools have very real fears around the mental health crisis facing our generation."

Having identified mental health and safety issues affecting its students, the District chose to respond in part through the use of software that monitors student content on District and on District-issued computers.

Technology pervades the District's classrooms. The plaintiff students performed substantial work on school-issued devices, primarily iPads and laptops issued by the school; they sent and received a substantial number of emails using their school-issued accounts; and they placed substantial school work product on the district's servers. Just as technology facilitated the District's provision of these services to the students, so too does technology facilitate the District's monitoring of those platforms for activity that violates school policy or that reflects imminent risk to student health, safety and well-being.

Monitoring software has allowed the District to identify students facing issues including suicidal ideations, bullying, substance abuse, and physical abuse. In some cases, the District could *only* identify imminent risks to students through its use of monitoring, such as when a student placed a suicide note on the district-issued server over the summer.

The District has observed that students who are at risk of suicide or self-harm often don't tell a teacher or a parent, but they may write about it in a document, a search, or an email. The District has the ability to detect such content on its servers, in real time, including at night and on weekends, when no adult could otherwise be aware of the content and intervene. District officials believe that if the use of monitoring saves a single life – and it has – the District cannot justify *not* utilizing tools such as Gaggle and ManagedMethods.

The same logic applies to threats against others. The District has observed that in nearly every review of a school attack, the attacker left a digital trace or their intentions, in writing, online, or to peers. The District has determined that behavioral threat assessment, now standard practice nationwide, depends on surfacing those risk identifiers early. Monitoring *District accounts* gives threat assessment teams information they would never otherwise receive, so the District can assess and intervene through support rather than discipline. Bullying, sexual harassment, grooming, and sextortion follow the same pattern: much of it happens through digital channels. The District cannot monitor every aspect of a student's digital life, and the District does not monitor the entire universe of Plaintiffs' digital content, but the District can, and has a moral imperative, to monitor content on *school-issued devices*, or created on or transmitted through *school district servers,* or using *school district email accounts* to identify such content. That is what the District has done.

**ii.** The District's Selection and Implementation of Gaggle.

Gaggle is a student safety service that works inside the Google Workspace or Microsoft 365 accounts the district already provides for schoolwork. It reviews content created and shared in those accounts, including email, documents, chats, and uploaded files and images, looking for signs that a student is in danger, putting others in danger, or perpetrating or becoming the victim of illegal activity. It does not track students' personal phones, private social media, or home internet use. It works only within the District's own educational systems, under an acceptable-use policy families agree to.

The system combines machine learning with trained human reviewers. The software flags potential concerns, and a person evaluates each one before anything reaches the District. That human layer screens out most false alarms, so counselors and administrators see only content that a trained reviewer believes merits attention. Alerts are tiered by severity. Minor policy issues are

logged for routine follow-up. Serious concerns, such as a suicide note, a plan to self-harm, a threat of violence, or evidence of abuse, trigger immediate contact with designated District staff around the clock. The system doesn't sleep on weekends or holidays, which is when many students in crisis are most alone.

When content involves explicit images of minors or similar harmful material, Gaggle removed it from District systems, so the District wasn't hosting it, and students weren't further victimized by its spread. What happens after an alert stays entirely with the District and its professionals; Gaggle didn't discipline students. It gave adults the opportunity to help a child they might never otherwise have known was struggling.

Former superintendent Dr. Anthony Lewis, his cabinet, curriculum staff, and District social workers began discussing how the District could better help students with significant increase in student mental-health challenges, a problem affecting school districts nationwide. Safety concerns compounded the problem. In a single month, administrators found two guns at Lawrence High School. Dr. Lewis spoke personally with both students. Each had brought a gun because he feared for his own safety, and neither had told a single adult at school or at home. Dr. Lewis recognized that students "live on devices" and express themselves through them, and he decided the District needed a way to learn when a student was in crisis before harm occurred. Community members were also urging the District to do more to keep students safe. The District supports students during the school day, but because much can happen in the evenings and on weekends, Dr. Lewis wanted a tool that could identify students in need outside school hours, to the extent the students utilized their school accounts during that time.

Before Gaggle, the District had no technology to monitor student content. IT staff reviewed a student's files only when a building administrator asked them to investigate a specific situation,

usually one that had already occurred. One IT employee handled those requests, about five a month, by running keyword searches of the named student's folders. For a district of roughly 12,000 students, that reactive, one-person process was not effective. Gaggle was intended to replace it. The District's existing Computer Use policy, IIBG, already provided that students and staff have no expectation of privacy in District email and computer systems, that District systems may be monitored without notice, and that the superintendent oversees the District system. Dr. Lewis viewed Gaggle as a way to put that policy into practice: to monitor activity on District-owned devices, to let administrators intervene early before an incident, and to teach students appropriate use of technology.

Gaggle operated on district-owned systems, in furtherance of the District’s compelling interests in preventing student violence and addressing mental health issues. Gaggle restricted no viewpoint; it looked for indicators of harm, and students remained free to write, research, and express themselves. Where expression signaled a real threat, Gaggle enabled the school to act, as permitted and in fact compelled by the Constitution.

**iii.** The District Curtailed Monitoring to an Extent, in Response to Student Journalists’ Concerns.

While the District has a compelling interest in protecting student safety and mental health, the District also values student journalism and other speech. On November 10, 2023, Lawrence High School journalism advisor Barb Tholen emailed District staff about Gaggle's potential effect on student journalism and asked whether the journalism program's shared folders could be excluded. District staff responded promptly. Principal Quentin Rials replied within about an hour, and the building technology specialist and IT staff answered Ms. Tholen's questions within three days. Director of Technology David Vignery had many conversations with Ms. Tholen, considered her concerns important, and told her he wanted to work with her to resolve them.

On November 16, 2023, student editor Jack Tell asked to meet with Mr. Vignery and others. Mr. Vignery agreed the next day. Shortly afterward, Mr. Vignery became seriously ill. He was home sick beginning at Thanksgiving, was hospitalized in late December, and remained on medical leave into early 2024. He informed Mr. Tell of his illness, and the students understood the meeting was delayed in part for that reason.

During this period, Gaggle served its intended purpose. On December 1, 2023, a Gaggle alert regarding threatening language in a student's email prompted a brief precautionary lockdown at Free State High School. Administrators investigated and confirmed that no threat had been made. On December 19, 2023, Lawrence High School administrators sent families a set of frequently asked questions explaining how Gaggle worked.

In early 2024, Gaggle forwarded alerts concerning photographs that Lawrence High School photography students had uploaded to their District accounts. Assistant Principal Greg Farley met briefly with the students involved, as administrators were trained to do: to confirm there was no safety concern or obscene or illegal material, and resolved the alert. He told plaintiff Henry Farthing: "You're not in trouble. We just have to bring everyone in and talk about it." The meeting lasted a few minutes. Mr. Farthing was not disciplined and was never called to the office again.

On February 9, 2024, Ms. Tholen and other journalism, art, and photography teachers emailed District leadership, expressing concern that student images were being deleted. The images had not been deleted; they were held pending administrator review and could be released once the review was complete. Superintendent Dr. Anthony Lewis was briefed on the concerns and referred them to counsel and the technology department. By February 13, 2024, Mr. Tell acknowledged in writing that the image issues are being resolved. When students raised the art

images directly with Dr. Lewis in March, he directed building administrators to release any images determined to be appropriate.

On February 29, 2024, Mr. Tell sent the District a list of the students' concerns. The District scheduled a meeting promptly. On March 6, 2024, Dr. Lewis personally met with four student journalists and Ms. Tholen, joined by the District's mental-health coordinator, the director of technology, the executive director of communications, school administrators, and counsel. The purpose was to listen.

The students presented their concerns, including the confidentiality of unpublished notes and sources. The District agreed that protecting the confidentiality of student news gathering was a legitimate concern. That day, Dr. Lewis directed Mr. Vignery to research options and consult with Gaggle. The District also asked counsel to review the legal authorities the students cited and, later, a March 18 letter from the Student Press Law Center.

On March 29, 2024, the District met with the students again to present options. The District first offered to move the journalism program to Microsoft OneDrive, which Gaggle did not scan, and offered IT staff to help with the transition. The students declined because migrating their files would be burdensome. The District then agreed to pursue the approach the students preferred: exempting journalism students from Gaggle monitoring.

Gaggle had never received a request to exempt a group of students and was not set up to do so. At the District's request, Gaggle developed a custom solution. The District placed the journalism classes in a separate organizational unit that Gaggle excluded from monitoring. By early April 2024, approximately 160 student journalists at both high schools were exempt from Gaggle.

Dr. Lewis made the decision to exempt students from Gaggle while balancing it against the District's responsibility for the safety of every student, including journalism students. To address that responsibility, he asked Ms. Tholen to remain attentive to her students' wellbeing. He kept Board members informed through his regular individual meetings with them. Mr. Vignery continued to work with Ms. Tholen and the students to refine the exemption, and it was a significant improvement.

**iv.** The District Replaced Gaggle with Managed Methods, which Monitors to a Lesser Degree, Based on Three Reasonable, Constitutionally Permissible Considerations.

In the summer of 2025, two years into its three-year contract with Gaggle, the District exercised its right to terminate its Gaggle contract, and replaced it with ManagedMethods. This decision was made for three reasons: (1) ManagedMethods is cheaper; (2) ManagedMethods sends fewer alerts to school officials, reducing the oversight burden on them; and (3) ManagedMethods monitors content to a lesser degree, balancing the District's concerns against the students' interests in free speech and privacy.

ManagedMethods operates in much the same way as Gaggle. Amid a budget crunch, as part of its regular technology review, the District switched from Gaggle to ManagedMethods, in part because ManagedMethods is cheaper. Further, some District administrators had complained about the extent of Gaggle alerts they were receiving; the switch to ManagedMethods helped to alleviate this concern because District officials receive fewer alerts through ManagedMethods. Finally, ManagedMethods is more easily customizable, and allows the District to in effect dial down its monitoring. Student journalists, for example, can be and are exempt from ManagedMethods.

**v.** Gaggle's Impact on Student Safety Through Content Monitoring.

The District adopted Gaggle to meet a real and documented need: students in crisis who would not ask for help. Before Gaggle, the District learned of a struggling student only after an administrator already suspected a problem. Dr. Lewis spoke personally with two students who had brought guns to Lawrence High School because they feared for their safety, and neither had told a single adult. Gaggle gave the District a way to reach those students, including in the evenings and on weekends, when no teacher would have been in a position to intervene.

Gaggle delivered on its purpose. Trained human reviewers screened every flag, and in the first year Gaggle forwarded 1,169 actionable incidents to the District, including 60 "possible student situations," which Gaggle defined as imminent threats to a student or others. Administrators responded by calling parents, bringing in counselors and social workers, and notifying the families of students who had been threatened. In one instance, Gaggle flagged a suicide note. The District was initially unable to reach the student's parent(s), but alerted law enforcement, and authorities ultimately intervened with life-saving measures. It is entirely possible, if not likely, that student would not be alive today but for Gaggle.

Gaggle was not used or intended as a disciplinary tool, and the District never used it to suppress speech. No Plaintiff was disciplined through Gaggle, and the District never barred any Plaintiff from reporting on a topic or publishing an article. The District never learned the identify of any confidential source through Gaggle. The Plaintiffs and District students who had their work quarantined by Gaggle met with District administrators and had their work returned. In at least two instances, student content that was seized by Gaggle was deliberately intended to be seized by Plaintiffs in the form of a list of specific triggering words and a message concerning declining mental health.

Plaintiffs' exposure to Gaggle was brief, and it is over. The District responded to the student journalists' concerns within weeks, exempting journalism students from Gaggle in April 2024. Three Plaintiffs graduated a month later, and the District stopped using Gaggle in 2025. Gaggle served a compelling student-safety interest with concrete results, without infringing upon Plaintiffs' constitutional rights.

**vi.** The District Further Considered its Legal Obligations to Students when it Implemented Monitoring.

In addition to its moral obligations and its desire and need to protect student safety, the District also implemented monitoring to comply with federal laws and regulations. The Children's Internet Protection Act conditions E-rate funding on an internet safety policy that includes monitoring minors' online activities. Title IX makes districts liable for deliberate indifference to known peer harassment, and courts and juries increasingly ask what a district *could* have known through reasonable diligence. State anti-bullying and suicide-prevention mandates impose affirmative obligations to identify and respond to at-risk students. The District implemented monitoring, in part, as a means to comply with these laws and regulations.

**vii.** Monitoring Occurs only on District-Owned Devices and Servers, Subject to Agreements and Policies Disclaiming any Privacy Interest.

The District's monitoring of student content only takes place on school-owned devices and systems, which Plaintiffs acknowledged were subject to monitoring.

As Plaintiffs acknowledges in the Second Amended Complaint (ECF 101), students are required to agree to the District's Acceptable Use Policy ("AUP") as a condition to enrollment. The AUP provides: "Students Will … Expect any district device to be regularly inspected for inappropriate material, which might include … inappropriate content … Expect, without prior notice, any and all usage of the district network and internet access, including, but not by way of

limitation, e-mail transmissions and receptions to be subject to review … no user shall have any expectation of privacy regarding the use of the device(s), district network, or the district's Internet."

Separately, Board Policy IIBG contains a section on Use of District Computers, which provides: "Computer systems are for educational and professional use. All information created or access by staff and students may be subject to monitoring without notice …"

Board Policy IIBG contains a separate section on Privacy Rights, which provides: "Employees and/or students shall have no expectation of privacy when using district email, other official communication systems, or computer applications. Any email, computer application, or information in district computers or computer systems may be subject to monitoring without notice …"

Based on these disclosures alone, the District contends the Plaintiffs consented to or were aware of the District's monitoring, and that they have no reasonable expectation of privacy on school-owned devices, or content on the District's servers. .

**viii.** The District Alternatively has Independent, Constitutionally Permissible Bases to Conduct Monitoring.

Automated scanning of District systems for indicators of serious harm is narrow, content-neutral, and tied directly to student safety. The District's programs also add safeguards: human review before any escalation, limits on who sees alerts, data retention limits, and policies that route concerns to counselors rather than to discipline or police. Those safeguards address arguable infringements upon privacy without sacrificing protective benefit.

The District contends that Gaggle and ManagedMethods inevitably will generate false positives, but that false positives establish neither the inefficacy nor the unconstitutionality of the District's monitoring. In a perfect world, technology could alert educators only to actual, imminent

threats of violence or abuse. But imperfect monitoring is not the same as unconstitutional, or even inefficacious monitoring. In the District's view, false positives do not de-justify monitoring, any more than metal detectors in airports are de-justified because the vast majority of objects detected are not bombs or weapons.

In adopting monitoring, the District weighed two possible types of errors, the impacts of which disproportionately weigh in favor of monitoring. A false positive means no action is taken, or a counselor has a brief conversation with a student who, it turns out, is fine. A false negative can mean a death. Faced with a choice between monitoring with false positives or not monitoring, the District chose the option favoring a practice that has and will save students' lives.

**ix.** Farthing's and Morriss's Images Were not Objectionable, but Farthing and Morris Were not Disciplined, and False Positives are the Inevitable Result of Necessarily Imperfect Monitoring for Child Pornography or Obscene Images.

The District has an interest in identifying images such as photographs that may include, for example, child pornography. Compared to written content such as an email or a Word document, monitoring images presents unique challenges, in at least two respects. First, image monitoring cannot be accomplished by a keyword search. Second, if content is identified as potentially illegal, the District must take action to ensure the image is not disseminated, and as such, potentially illegal material must be more strictly quarantined.

Plaintiffs allege that Morris and Farthing's images were temporarily seized in the form of a quarantine. The District agrees the images quarantined were not pornographic or obscene, and they did not violate school policy. The District contends, however, that the flagging and quarantining of those images was the inevitable result of an imperfect system that, out of necessity, scans all images.

The District's scanning and quarantining of images is not perfect, nor could it be. Nor does the law demand perfection. But Morris and Farthing faced no discipline related to the existence of the images – Defendant denies that the Plaintiffs having been "summoned," as they phrase it, to meet with administrators to discuss the images, was a form of discipline. More broadly, this example of false positives does not establish either that Gaggle was ineffective, or that it was implemented or operated unconstitutionally.

**x.** The District Did Not Unconstitutionally Restrain Ashlyn Tell's Reporting.

On August 14, 2025, then-Principal Dr. Quinton Rials, and Assistant Principal Dr. Elaina Honas met with Abbi Epperson-Ladd, who had taken over Barbara Tholen's role as the journalism advisor. Following that meeting, Ms. Ladd had a discussion with Ashlyn Tell, following which Ms. Tell understood that Dr. Rials had instructed Ms. Ladd *The Budget* was not to report on this lawsuit, which Plaintiffs had filed a couple weeks earlier.

Shortly after meeting with Ms. Tell, without any prompting from anyone at the District, Ms. Ladd sent Ashlyn Tell a text message stating that upon further reflection, Ms. Ladd believed she had misunderstood Dr. Rials, and that his comment was that the District would not be *commenting* on the lawsuit. Ms. Ladd confirmed during her deposition she believes she misheard or misunderstood Dr. Rials during the meeting. Dr. Rials is deceased, but Dr. Honas confirmed through deposition testimony that Dr. Rials did not issue any directive that The Budget was not to report on the lawsuit. Later on August 14, District attorney Brad Finkeldei confirmed to Plaintiffs' attorney that the District would not "prohibit, delay, condition, or otherwise retrain any student journalist or journalism adviser from reporting on" the lawsuit. On August 15, 2025, a letter from Dr. Rials was delivered to Ms. Ladd further confirming that the District would not "prohibit, delay,

condition or otherwise restrain any student journalist or journalism adviser from lawful reporting on any subject …"

On the afternoon of August 15, Ashlyn Tell had a conversation with District teacher Jeff Plinsky, who was also a teacher's union representative. Mr. Plinsky told Ms. Tell, in a conversation she recorded, that no matter what the District's stated position, the District could fire Ms. Ladd, a non-tenured teacher, if students reported on the lawsuit. Mr. Plinsky stated this subjective opinion based on his own personal experience of having been terminated for unjust reasons earlier in his career.

Neither Dr. Rials nor anyone else ever told Ms. Ladd or anyone else that the student journalists could not report on the lawsuit. Nor did Mr. Plinsky. The District's position or policy, which is accurately reflected in Mr. Finkeldei's confirmation that no restriction existed, and Dr. Rials' confirmatory letter. Ms. Tell was not in fact restricted, and any statement that she would or could be restricted was a statement contrary to District policy, as to which the District cannot be legally responsible.

## 4. LEGAL CLAIMS AND DEFENSES.

### a. Legal Claims of Plaintiffs.

All claims are asserted against Lawrence USD 497. "All Plaintiffs" means Jack Tell, Natasha Torkzaban, Morgan Salisbury, Opal Morris, Henry Farthing, Suzana Kennedy, Naomi Sui Pang, Ashlyn Tell, Phoebe Morris, E.B., and H.C. Claim numbers below correspond to the body of the Second Amended Complaint (ECF No. 101).

Ashlyn Tell and Phoebe Morris asserted the Tenth through Twelfth Claims concerning adequate search, disclosure of responsive records, and timely response under the Kansas Open Records Act, K.S.A. 45-215 et seq. Those claims were adjudicated in Plaintiffs' favor through ECF Nos. 56, 79, and 119 and are not presented for trial; their status, enforcement of the existing

orders, and any additional recoverable fees and costs are addressed in the footnote to Section 5 and in Section 5(b).

ECF No. 56 dismissed the separately named Board of Education, Greg Farley, and Quentin Rials as defendants; dismissed Ashlyn Tell's First Amendment retaliation claim; dismissed as moot the graduated Plaintiffs' claims for prospective relief and the claims for prospective relief concerning the withdrawn August 2025 reporting restriction; and also held that the damages component of the reporting-restriction claim is not moot. ECF No. 56 at 28–31, 44–45. Those defendants and dismissed claims are not reinstated by this order, and graduated Plaintiffs do not pursue prospective federal relief. Consistent with ECF No. 56, the First, Second, Fourth, and Fifth Claims identify remedies rather than independent causes of action. The operative complaint's body proceeds from the Eighth Claim to the Tenth Claim, although its table of contents lists a Ninth Claim; the prior-restraint theory that Plaintiffs' summary-judgment papers designate as Count IX is presented below under the Sixth Claim. Plaintiffs preserve any available appellate challenge to adverse prior rulings; compliance with those rulings does not constitute voluntary abandonment of appellate rights.

**Plaintiffs assert that they are entitled to recovery on the following claims and theories:**

**Municipal attribution.** For each federal claim and theory below, including the Third, Sixth, Seventh, and Eighth Claims and the remedies requested through the First, Second, Fourth, and Fifth Claims, Plaintiffs contend that the District acted under color of state law and that its official policies; the decisions of its final policymakers, including the Board's adoption and renewal of Gaggle and the adoption, maintenance, and renewal of ManagedMethods; its configuration choices; and its authorized implementation or ratification of the challenged practices

were the moving force behind Plaintiffs' injuries. Final policymaking authority, including the scope of any delegation, is determined under applicable law.

**1.** Third Claim - Fourth Amendment

Plaintiffs contend that the District's round-the-clock examination of student content violates the Fourth Amendment because (1) the District's continuous screening of required accounts is a Fourth Amendment search; (2) no special need justifies searching everything students write; (3) the District's continuous-search policy is facially unreasonable; and (4) the program is unconstitutional as applied to E.B. and H.C. Plaintiffs also contend that the District's completed searches and seizures violated the Fourth Amendment, including (a) the quarantine of Opal Morris's and Henry Farthing's photographs, the denial of access to those photographs, and their continued withholding after review; (b) the quarantine associated with Phoebe Morris's account; (c) the alert on, and loss of access to, Morgan Salisbury's reporting test document; (d) the hold on Natasha Torkzaban's March 29, 2024 email and the blocked delivery of Suzana Kennedy's KORA records spreadsheet; (e) the temporary loss of access to E.B.'s class presentation; (f) the interference with H.C.'s access to, and delivery of, his flagged email; and (g) the continuous examination of each Plaintiff's account content. Plaintiffs further assert a Fourth Amendment detention theory: each of the following encounters was itself an unreasonable seizure of the student's person, initiated solely because of an automated alert and without reasonable suspicion of wrongdoing, and not merely evidence of injury from the monitoring. Opal Morris was removed from class by security and questioned by three administrators in a closed room about flagged photographs before they viewed them, consistent with the District's training to question students before viewing suspected nudity images. Henry Farthing was escorted from class to the office, questioned about flagged photographs, and did not feel free to leave. H.C. was removed from class

and questioned by a counselor about a flagged email before returning to class. The District's responsibility for each encounter rests on the municipal-attribution contentions stated above.

All Plaintiffs seek damages under 42 U.S.C. § 1983 and the Third Claim; E.B. and H.C. seek the related declaratory and injunctive relief requested in the First and Second Claims. Plaintiffs contend that the District unreasonably searched their own content and, where access or use was restricted, meaningfully interfered with their possessory interests. Plaintiffs dispute effective consent and contend that the searches and seizures were unreasonable under the applicable public-school standards, including any asserted special-needs justification. Plaintiffs further contend that the District acted under color of state law and that its official policies, final policymaking decisions, adoption and renewal of Gaggle, adoption and maintenance of ManagedMethods, and authorized implementation or ratification of the challenged practices were the moving force behind the Fourth Amendment injuries.

**2.** Sixth Claim - First Amendment

Plaintiffs contend that the continuing content review independently violates the First Amendment because (1) the District cannot justify the burden it imposes on protected student expression; (2) compulsory review presently chills E.B.'s and H.C.'s expression; and (3) compulsory content review is substantially overbroad. Plaintiffs also contend that the District's completed restrictions violated the First Amendment, including (a) the hold on Natasha Torkzaban's test email, the blocked delivery of Suzana Kennedy's KORA records spreadsheet, and the delay of Suzana's email exchange with Julie Boyle, including holds that continued after journalism exemptions; (b) the alert on, and suppression of, Morgan Salisbury's reporting test document; (c) the flagging, quarantine, and withholding of Opal Morris's and Henry Farthing's artistic photographs and the quarantine associated with Phoebe Morris's account; (d) the

instruction forbidding Opal Morris to discuss her questioning with other students; (e) the burdens on Jack Tell's, Naomi Sui Pang's, Ashlyn Tell's, and Phoebe Morris's newsgathering, storage, and publication, and the flagging of Ashlyn's Drive items; (f) the chilling of Jack Tell's, Natasha Torkzaban's, and Morgan Salisbury's advocacy and reporting through the March 2024 meetings and the District's represented but incomplete journalism exemption, which Plaintiffs contend the District undertook in response to, and to deter, their protected reporting and objections; (g) the flagging of E.B.'s and H.C.'s communications and work, including H.C.'s flagged email and ensuing questioning; and (h) the prior-restraint and KORA-related theories described below. All Plaintiffs seek damages under § 1983 and the Sixth Claim; E.B. and H.C. seek the related declaratory and injunctive relief requested in the Fourth and Fifth Claims.

**Prior restraint (Ashlyn Tell).** Ashlyn Tell asserts under the Sixth Claim that the August 2025 prohibition on The Budget's reporting about this lawsuit, communicated to her by adviser Abbi Epperson-Ladd after Epperson-Ladd's meeting with Principal Rials and Assistant Principal Honas, was an unconstitutional prior restraint and content-based restriction on student journalism that lacked any legitimate pedagogical justification. The restriction, together with a District teacher's August 15, 2025 warning that her adviser could be fired if students reported on the lawsuit, delayed publication of her article. Plaintiffs contend the restriction is attributable to the District because Rials attributed it to an instruction arising from a meeting with Superintendent Swift, Assistant Superintendent Ryan, and human-resources director Ron May, and because District officials with final policymaking authority directed, authorized, or ratified it. Ashlyn seeks damages for this completed violation, including for deprivation of constitutional rights, emotional distress, and lost or delayed publication opportunities. She does not seek to reinstate the retaliation claim or the prospective relief concerning the withdrawn restriction that ECF No. 56 dismissed.

**KORA-related First Amendment theory (Ashlyn Tell and Phoebe Morris).** Ashlyn Tell and Phoebe Morris assert under the Sixth Claim that the District's April 13, 2026 request that they refrain from sharing non-exempt public records produced in response to their October 30, 2025 KORA requests, and its stamping of those records "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" when no protective order had been entered, restricted and chilled their publication and dissemination, as student journalists, of public records on a matter of public concern, in violation of the First Amendment. They further contend, as alleged in SAC ¶ 327, that the District's delay in producing those records and its demand for excessive review charges burdened their protected newsgathering. This constitutional theory is distinct from the statutory KORA claims adjudicated in ECF Nos. 56, 79, and 119, and Plaintiffs seek no duplicate recovery for those statutory violations.

**3.** Seventh Claim - Vagueness

E.B. and H.C. assert the Seventh Claim under § 1983 and seek declaratory relief on the First, Fourth, and Fourteenth Amendment grounds pleaded there. SAC ¶¶ 399–401. The challenged standards are the District's content-screening and restriction criteria as implemented through Gaggle and ManagedMethods: the categories of "references to self-harm, depression, drug use, and violent threats," and related nudity, toxicity, and safety categories, applied through undisclosed keyword lists, AI-driven "risk" scoring, and automated flagging, quarantine, unsharing, or deletion, without published narrowing standards, notice, or a review or appeal process. Plaintiffs contend that these standards fail to give fair notice of the content subject to restriction and lack sufficiently definite standards to prevent arbitrary enforcement, particularly where protected expression is affected. To the extent not resolved on the pending dispositive motions, Plaintiffs' facial-vagueness theory remains for trial. To the extent not established by

stipulation or the District's Rule 36 admissions, the particular categories, settings, and functions the District enabled will be proved at trial.

**4.** Eighth Claim - Overbreadth

E.B. and H.C. assert the Eighth Claim under § 1983 and seek declaratory relief on the constitutional grounds pleaded there. SAC ¶¶ 407–414. They challenge the same content-screening and restriction standards and practices identified in Section (a)(3). Plaintiffs contend that, as applied through Gaggle and ManagedMethods, those standards reach a substantial amount of protected expression in relation to their legitimate sweep, including flagging or restricting messages containing phrases such as "called me a," "called her a," "very uncomfortable," and "my mental health"; student journalists' drafts and reporting materials; and dress-code-compliant artistic photographs. They seek facial relief and relief addressing application of those standards to their own expression.

**5. Contentions - Rule 36 Admissions.** Matters admitted under Fed. R. Civ. P. 36 are conclusively established for this action unless the Court, on motion, permits withdrawal or amendment under Rule 36(b), and that nothing in this order withdraws or amends any admission. Plaintiffs contend that the District's responses to Plaintiffs' Requests for Admission establish, among other matters, that Principal Rials communicated a reporting restriction in August 2025 (No. 46); that Morgan Salisbury's reporting test document generated a Gaggle alert (Nos. 149–150); that Gaggle flagged Natasha Torkzaban's March 29, 2024 test email and that its delivery was delayed for examination by District staff (No. 152); that ManagedMethods is configured to scan files in E.B.'s and H.C.'s accounts and that switching devices does not prevent that scanning (Nos. 183–184, 187–188); and that the account-level quarantines and image removals occurred as identified in Nos. 40, 44, 95, and 139–141. Plaintiffs object to the presentation at trial of any

contention in Sections 3(b) or 4(b) that is inconsistent with an admitted matter, absent leave under Rule 36(b).

Plaintiffs contend the effect of responses the District served after the response deadline, is that each matter not timely answered is admitted under Rule 36(a)(3) and remains conclusively established.

**b. Defenses of Defendant.**[1]

**i.** E.B. lacks standing to maintain claims for declaratory or injunctive relief because he is enrolled in a journalism class, and he is therefore exempt from MangaedMethods.

**ii.** H.C. lacks standing because he failed to identify any actual, concrete, or imminent infringement upon his speech.

**iii.** All monitoring performed by Gaggle or Managed Methods occurred on District-provided devices, emails on District-provided email accounts, and on files saved on District-provided cloud storage. Before the plaintiffs were granted access to these District-owned devices and networks, the plaintiffs agreed to the District's Acceptable Use Policy that acknowledged the District's ownership and maintenance of the devices, emails, files, and directories; the District's right inspect these devices and systems for inappropriate material; that the plaintiffs would have no expectation of privacy in their use of the District-provided devices, email system, and file network; that the plaintiffs were obligated to only use the technology for educational purposes and as directed by District staff; and that any file or information transmitted on the District network could be copied and stored by the District. Use of the devices and accounts was also subject to board policies that similarly provided for monitoring. Therefore, the plaintiffs had no reasonable expectation of privacy protected by the Fourth Amendment in their use of the District-provided devices, email system, and file system.

**iv.** Even assuming the students had an expectation of privacy in the material alleged to have been monitored, the monitoring was reasonable and constitutionally permissible under the Fourth Amendment as a limited "special needs" search. As a public school, the District has legitimate special needs in preventing student-on-student harassment, promoting civil

[1] Plaintiffs object to reinstatement, through this order or general incorporation of earlier pleadings, of the defenses the District withdrew (affirmative defenses 2, 4, 6, and 21) or identified as moot following ECF No. 56 (defenses 5, 16, 20, 22, and 27) in its August 14, 2026 First Supplemental Answer to Interrogatory No. 16.

discourse between students, preventing student violence, preventing student drug use, and maintaining student health and safety. The District's monitoring served these needs by allowing the District to identify and intervene against bullying, attempts to organize fights outside of school, threats against other students, student communications promoting drug use, and serious mental health crises. The District's monitoring was a limited, unintrusive search: while all emails, files, and devices were scanned by Gaggle and Managed Methods, a person only reviewed the scanned item when the monitoring system flagged it for containing words and phrases in a context that implicated the District's special needs. Of these flagged items, only a small subset warranted student intervention. Thus, the searches predominantly preserved student privacy from District faculty review, were tailored to assist the District in addressing its special needs as a public school, and rarely interrupted student activity.

**v.** Any file saved on a network maintained by the District was the digital property of the District, not the plaintiff who uploaded the file. Any interference with the file as a result of the monitoring did not violate the plaintiffs' Fourth Amendment right against an unreasonable seizure because they did not have any property interest in a District-maintained file.

**vi.** Plaintiffs Jack Tell, Naomi Sui Pang, Ashlyn Tell, Phoebe Morris, and H.C. cannot demonstrate that they ever lost even temporary access to any file or email maintained on District network and, therefore, they never suffered any seizure of their files or emails at all.

**vii.** No plaintiff can demonstrate that any file that they uploaded on the District network was permanently deleted.

**viii.** Any temporary restraint on a plaintiff's ability to access a file on the District-maintained network was reasonable given the need to preserve the file for review by the District for compliance with its Acceptable Use Policy and given that the restraint only occurred for a short time period between the initial flag and a prompt investigation and resolution of the flag.

**ix.** Any temporary restraint on a plaintiff's ability to access a file on the District-maintained network had no meaningful impact on a plaintiff's interest in the file because the plaintiff had the ability to continue accessing the temporarily restrained file in an off-network copy.

**x.** Plaintiff Jack Tell, Naomi Sui Pang, Ashlyn Tell, Phoebe Morris, Henry Farthing, E.B., and H.C. cannot demonstrate that any of their emails or communications were delayed by the District's monitoring.

**xi.** Any temporary interference with a plaintiff's email or other communications as a result of the monitoring was reasonable to ensure that students limited their communication on the nonpublic forum of the District

network to educational purposes, as they agreed in the Acceptable Use Policy.

**xii.** No plaintiff can identify any speech protected by the First Amendment that they were chilled from as a result of the District's monitoring, preventing the court from evaluating whether the alleged chilling effect actually deterred the plaintiffs from engaging in speech protected by the First Amendment.

**xiii.** Plaintiffs Jack Tell, Naomi Sui Pang, Ashlyn Tell, Phoebe Morris, Henry Farthing, and E.B. cannot identify a single communication that was flagged or otherwise impacted by the District's monitoring and, as a result, could not identify any concrete, objective consequence that they sought to avoid by self-censoring

**xiv.** No plaintiff was disciplined for any communication flagged by the District's monitoring and, as a result, they cannot identify any concrete, objective consequence that they sought to avoid by self-censoring

**xv.** No plaintiff can identify a District action taken against any student's protected speech as a result of the monitoring that was sufficiently severe to create an objectively reasonable chill on plaintiffs' speech, and as a result, no plaintiff can identify any concrete, objective consequence that they sought to avoid by self-censoring.

**xvi.** Any speech that any plaintiff was reasonably chilled from making was not protected by the First Amendment, given that the First Amendment allows the District to restrict uncivil language as inappropriate for public school.

**xvii.** The First Amendment permits the District to create reasonable, viewpoint-neutral regulations its devices, email system, and file network to ensure that these nonpublic forums were used for their dedicated educational use and to ensure that students did not use the forums for an improper purpose—such as student harassment or distracting from other students' education. The District's monitoring was reasonably implemented to enforce these regulations and reasonable given that it allowed for manual review of any flagged communication. Therefore the monitoring did not violate the plaintiffs' First Amendment rights.

**xviii.** The District's monitoring, in the form of flagging student communication that triggered keywords and phrases, was reasonable. The trigger keywords and phrases were geared to identifying potential bullying, harassment, drug use, and threats, which were not permitted on the nonpublic forum. Additionally, when communications were flagged, they were manually reviewed for compliance with the purpose of the forum and reinstated if determined to be compliant with the educational purpose of the forum.

**xix.** The District's monitoring did not constitute a prior restraint on any speech or journalistic material because the monitoring itself did not interfere with the publication of any communication.

**xx.** To the extent that a communication was flagged and quarantined from viewing by others after its publication, such automatic temporary removal was consistent with the District's right to maintain the educational nature of its non-public platforms and, thus, not a prior restraint.

**xxi.** The District's monitoring of the plaintiffs' journalistic materials did not impede their ability to conduct journalistic activities because it did not interfere with any journalistic material. No plaintiff can identify any specific instance of a journalistic material that was flagged for review or quarantined by the District  Any journalist opportunities lost due to time spent avoiding the District's lawful monitoring is attributable to the plaintiffs' unilateral efforts.

**xxii.** To any extent the plaintiffs needed to maintain confidentiality in their reporting, they had the option to maintain confidential sources in materials in a medium not monitored by the District. Any time lost due to the plaintiff attempting to remove the entirety of their journalistic operations off District-provided platforms was in excess of the time reasonably necessary to preserve journalistic privilege.

**xxiii.** The plaintiffs had no reasonable expectation in maintaining the confidentiality of their sources because, under K.S.A. 72-7211(d), all reporting could be reviewed by a school employee, the journalism teacher, for its consistency with the high standards of English and journalism—including verifying the legitimacy of any confidential source as an ordinary supervising editor would at a reporting outlet.

**xxiv.** The monitoring performed by Gaggle and Managed Methods cannot be considered vague or overbroad under the First Amendment because the monitoring did not prohibit any additional speech beyond what was already deemed inappropriate by District staff.

**xxv.** Given the District's special needs to enforce student discipline and to respond to wide range of possible student conduct, the District's policy regarding school-appropriate communication was not unconstitutionally vague or overbroad for lack of precision, especially because District staff made the final determination on whether a communication was not school-appropriate and routinely did not impose any discipline for flagged communications that were school-related.

**xxvi.** No official District policy prevented any student, including Ashlyn Tell, from publishing any story related to the plaintiffs' litigation regarding the District's monitoring.

**xxvii.** To any extent that any employee of the District informed Ashlyn Tell that the District prohibited reporting related to the subject litigation, such communication was not due to any formal District policy and due entirely to the employee's incorrect understanding of the District's policy.

**xxviii.** In response to any credible report that a District employee attempted to restrain any plaintiff from reporting on the subject litigation, the District promptly responded and reiterated its official policy that such reporting must be allowed, preventing any mistakenly issued prohibition from evolving into an unofficial District policy or custom.

**xxix.** The District never intended to discipline any employee or student as a result of any student reporting regarding the subject litigation.

**xxx.** To any extent that any employee of the District attempted to dissuade a plaintiff from reporting on the subject litigation by implying that the District could discipline an employee or student in retaliation for the plaintiff's reporting, that communication did not accurately reflect the District's official policy against imposing such discipline.

**xxxi.** In response to any credible report that a District employee implied that the District would discipline a District employee or student in retaliation for a plaintiff's reporting on the subject litigation, the District promptly responded and reiterated its official policy that such reporting must be allowed and would not result in discipline for any person, preventing the creation of any unofficial District policy or custom.

**xxxii.** Plaintiffs served supplemental damages disclosures on October 29, 2026. The District disputes the timeliness and sufficiency of these disclosures under Rule 26 and the Scheduling Order, and otherwise contends Plaintiffs should not be permitted to seek compensatory damages based on Defendant's contention that Plaintiffs failed to properly disclose them.

**xxxiii.** On April 8, 2026, Judge Vratil ordered the District to respond to Plaintiffs' prior requests for information under the Kansas Open Records Act (KORA). (ECF 56.) On June 1, 2026, Judge Vratil further ordered Defendant to provide weekly status reports regarding its KORA compliance. (ECF 79.) Defendant has complied with Judge Vratil's orders. Plaintiffs have never disputed the accuracy of Defendant's KORA status reports, and they have not claimed, since at least August 7, 2026, that Defendant has failed to comply either with KORA or Judge Vratil's April 8, 2026, Order. Regarding Plaintiffs' claim for past non-compliance with KORA, Judge Vratil awarded Plaintiffs their attorneys' fees (ECF 179), which Defendant paid. Plaintiffs'' claim for a past KORA violation has been fully remedied, and Plaintiffs do not allege an ongoing KORA violation; accordingly, their claims regarding KORA are moot.

## 5. DAMAGES AND NON-MONETARY RELIEF REQUESTED.[2]

**a.** Damages under the Third and Sixth Claims[3]

Each of the eleven Plaintiffs, including Morgan Salisbury, seeks compensatory damages from Lawrence USD 497 under the Third Claim for proven Fourth Amendment injury and under the Sixth Claim for proven First Amendment injury. Plaintiffs contend that Morgan Salisbury's deposition testimony concerning monetary compensation, and any other Plaintiff's deposition testimony concerning the types or amounts of damages sought, reflects a lay witness's understanding, not a waiver or election of remedies, and does not limit his claim or any other Plaintiff's claim; Defendant's contrary position, if any, is preserved for resolution by the Court. The non-economic amount under each claim is unliquidated and not susceptible to mathematical computation, and Plaintiffs request assessment by the jury. Plaintiffs do not presently state a plaintiff-specific non-economic dollar amount or range. They will provide one if the Court so directs, and they do not waive the right to suggest an amount or range to the jury, subject to the Court's rulings. Defendant objects to any request for relief beyond that stated in Plaintiffs' initial disclosures, as stated in Section 4(b); Plaintiffs dispute that objection and contend that their pleadings, interrogatory answers, deposition testimony, and October 29, 2026 supplemental damages disclosures timely disclosed their compensatory claims, and that any gap was substantially justified or harmless under Rule 37(c)(1).

---

[2] The KORA claims are not presented for trial. This pretrial order does not vacate or modify ECF Nos. 56, 79, or 119, or any later order addressing their enforcement or satisfaction. Any application concerning enforcement of those orders or additional recoverable KORA fees and costs must be presented separately to the Court.

[3] Defendant objects to Plaintiffs' inclusion of claims for compensatory damages in the Pretrial Order on the grounds that Plaintiffs failed to disclose them in accordance with Rule 26 and the Scheduling Order. Plaintiffs disagree with Defendant's contention that such damages were not properly disclosed, and maintain their request for such damages is properly included in the Pretrial Order.

For each Plaintiff under each of those claims, economic damages presently sought are $0: no lost earnings, medical expenses, tuition loss, or other out-of-pocket loss is claimed. Each Plaintiff alternatively seeks $1 in nominal damages under each claim if a constitutional violation is established without proof of compensable actual injury. Plaintiffs seek a single recovery for any injury common to the two claims, without duplication.

The non-economic claims concern the actual consequences identified below, including, where proven, reputational harm of the kind alleged in SAC ¶¶ 365 and 394. Valuation depends on the nature, severity, duration, and consequences of each Plaintiff's proven injury. Plaintiffs do not seek an award based on the abstract importance of a constitutional right. An unliquidated non-economic claim is not a concession that the injury has a value of $0. No punitive damages are sought against the District.

**i.** Jack Tell

Interference with student journalism, lost time and expressive opportunities, anxiety concerning monitoring of his own work, and the burden of moving or recreating journalism materials in the adviser's account to avoid monitoring and restrictions.

**ii.** Natasha Torkzaban

Interference with reporting and communications, disruption of journalism work, and resulting distress, including restrictions affecting the test email, the ensuing meeting, and resort to in-person communications.

**iii.** Morgan Salisbury

Interference with reporting and access to journalism materials, including the alert on, and loss of access to, the collaboratively prepared reporting test document, and the resulting burden on expression and journalism.

**iv.** Opal Morris

Distress, humiliation, embarrassment, detention, and interference with artistic work arising from removal from class, questioning about allegedly indecent photographs, review of the portfolio, the instruction not to discuss the questioning, and restricted access to the work. The claimed injury includes the period before access was restored.

**v.** Henry Farthing

Distress, detention, and embarrassment associated with removal from class and questioning, and interference with artistic expression arising from the treatment of photography as inappropriate and restrictions affecting sharing, including a temporary reluctance to take portraits.

**vi.** Suzana Kennedy

Anxiety and emotional upset attributable to monitoring and restrictions on journalistic communications, including Gaggle's blocked delivery of the spreadsheet produced in response to her KORA request and interference with the Boyle email exchange. Recovery is sought only for injury caused or aggravated by the challenged conduct.

**vii.** Naomi Sui Pang

The individual burden on journalism and video-production work, including self-censorship and concern about uploading protected work after learning of restrictions affecting other students.

**viii.** Ashlyn Tell

Anxiety, emotional distress, delayed publication, and interference with editorial decisions and journalism attributable to the August 2025 reporting restriction, monitoring of Ashlyn's accounts, the District's delay in producing, and excessive charges for, records requested under KORA, and the restrictions on dissemination of KORA-produced records. This request excludes the separately dismissed August 2025 retaliation theory and does not duplicate the KORA fee award.

**ix.** Phoebe Morris

Stress and emotional injury from creating and communicating journalism under monitoring; interference with protected journalistic research, materials, and communications through District-managed accounts, including the quarantine associated with her account; the burden on her newsgathering from the District's delay in producing, and excessive charges for, records requested under KORA; and the chilling of her reporting on, and dissemination of, KORA-produced public records..

**x.** E.B.

Temporary loss of access to a class presentation and resulting interference with schoolwork and expression, to the extent attributable to the challenged program; and concern, self-censorship, and changes in research or storage practices after learning of monitoring.

**xi.** H.C.

Fear and nervousness when removed from class and taken to the office concerning an email, embarrassment upon returning to classmates, and resulting changes in communications and self-censorship.

**b. Federal Declaratory and Injunctive Relief**

E.B. and H.C. seek relief under 42 U.S.C. § 1983, 28 U.S.C. §§ 2201–2202, and the Court's equitable authority through the First, Second, Fourth, Fifth, Seventh, and Eighth Claims and the theories identified in Section 4(a). They request declarations that the challenged content examination and restrictions violate the Fourth and First Amendments and that the operative policies and practices are unconstitutionally vague and overbroad. The requested relief concerns the challenged functions, whether performed by Gaggle, ManagedMethods, or a successor, and Plaintiffs contend the vendor change does not moot the continuing claims..

They request a permanent injunction against the District and persons bound under Rule 65(d)(2) prohibiting the challenged continuous, suspicionless examination of their account contents and communications awaiting delivery, and prohibiting alerts, quarantine, deletion, unsharing, revocation while preserving ordinary educational access, ordinary instructional review, lawful filtering, independently justified searches, and emergency responses. They also request implementation and reporting requirements sufficient to make that relief effective, including certification, by a deadline set by the Court, of the configuration changes that exclude E.B.'s and H.C.'s accounts and communications from the challenged scanning, quarantine, and delivery restrictions, and reporting of any later restriction applied to them. In the alternative, if the Court declines to enjoin examination itself, E.B. and H.C. request prompt notice identifying any file or communication whose access ManagedMethods restricts, prompt contextual review by a District employee, and restoration of access once the basis for the restriction is resolved.

Program-wide relief is sought to the extent necessary and legally authorized to remedy the ongoing injuries and facial violations established by E.B. and H.C. The final injunction must identify the prohibited conduct with Rule 65(d) specificity. Plaintiffs contend that ongoing interference with constitutional rights causes irreparable injury, damages provide no adequate remedy for future violations, and the balance of equities and public interest favor relief.

**c. Attorney Fees, Costs, and Interest**

Plaintiffs seek reasonable attorney fees and recoverable expenses under 42 U.S.C. § 1988 on the federal claims, together with taxable costs under Rule 54(d) and 28 U.S.C. § 1920. These requests will be supported through the applicable fee and cost procedures. Ashlyn Tell and Phoebe Morris preserve any right to seek additional reasonable fees and costs under K.S.A. 45-222 for compensable KORA work not included in ECF No. 119, subject to applicable procedures and

deadlines. No duplicate recovery is sought. The $113,480.35 award in ECF No. 119 remains governed by that order and is separate from each Plaintiff's compensatory demand. The separate obligation imposed on Lewis Brisbois Bisgaard & Smith LLP in ECF No. 137 to compensate Mr. Rosenthal and Mr. Margolies for 1.1 hours each also remains governed by that order. Plaintiffs also seek prejudgment interest to the extent authorized and postjudgment interest under 28 U.S.C. § 1961.

**6. AMENDMENTS TO PLEADINGS.**

None.

**7. DISCOVERY.**

Under the scheduling order and any amendments, all discovery was to have been completed by October 30, 2026. Discovery is complete.

Unopposed discovery may continue after the deadline to complete discovery so long as it does not delay briefing or ruling on dispositive motions or other pretrial preparations. Although discovery may be conducted beyond the deadline to complete discovery if all parties agree to do so, under these circumstances the court will not be available to resolve any disputes that arise during the course of such extended discovery.

**8. MOTIONS.**

**a. Pending Motions.**

Plaintiffs' Motion for Partial Summary Judgment (ECF No. 192), filed November 2, 2026, supported by Plaintiffs' Memorandum in Support (ECF No. 193); and Defendant's Motion for Partial Summary Judgment and supporting memorandum (ECF No. 194), filed November 2, 2026.

**b. Additional Pretrial Motions.**

Under ECF No. 74, as preserved by ECF No. 183, dispositive motions were due November 2, 2026 at 5:00 p.m. The parties filed the motions identified above. Responses are due November 16, 2026 at 5:00 p.m.; and replies are due November 23, 2026 at 5:00 p.m. The parties must follow the Court's summary-judgment guidelines and D. Kan. Rule 56.1. The parties should follow the summary-judgment guidelines on the court's website:

https://ksd.uscourts.gov/sites/ksd/files/Summary-Judgment-Guidelines%202023.pdf

Principal briefs in support of, or in response to, summary judgment motions must not exceed 40 pages and replies must not exceed 15 pages. *See* D. KAN. RULE 7.1(d)(2). Any motion to exceed these page limits or for an extension of briefing deadlines must be filed at least three days before the brief's filing deadline. *See* D. KAN. RULE 6.1(a), 7.1(d)(4).

Defendant objected to the inclusion of Plaintiffs' claims for compensatory damages in the Pretrial Order during the Pretrial Conference. To the extent Defendant's objections are overruled and Plaintiffs' claims for compensatory damages are contained in the Pretrial Order, Defendant intends to file a motion under Rules 72 and 37(c) to strike Plaintiffs' request for such damages from the Pretrial Order.

Defendant may file a motion under Rule 36(b) to withdraw any matter deemed admitted based on Plaintiffs' contention that Defendant's responses to Plaintiffs' Second Requests for Admissions were untimely served.

The parties anticipate filing other routine Trial motions, as set forth in Section 9 below.

**c. Motions Regarding Expert Testimony.**

Not applicable; neither party has designated or disclosed experts in this case.

**9. TRIAL.**

The trial docket setting is **January 4, 2027, at 9:00 a.m., in Kansas City, Kansas**. This case will be tried by a jury. Both sides have demanded a jury. Issues triable to a jury will be tried to a jury; equitable relief and other matters committed to the Court will be decided by the Court. Trial is expected to take approximately ten days. The Court will attempt to decide any timely filed dispositive motions before trial. If no dispositive motions are timely filed, or if the case remains at issue after timely dispositive motions have been decided, then the trial judge may enter an order or convene another pretrial conference to set deadlines for filing final witness and exhibit disclosures, exchanging and marking trial exhibits, designating deposition testimony for presentation at trial, motions in limine, proposed instructions in jury trials, and proposed findings of fact and conclusions of law in bench trials.

**10. ALTERNATIVE DISPUTE RESOLUTION (ADR).**

The status of settlement negotiations is as follows: The parties participated in mediation on October 26, 2026, with Jay Daugherty of Jay Daugherty Mediation & Arbitration. The case did not settle at mediation, and discussions are continuing.

The parties are reminded that, under D. Kan. Rule 40.3, they must immediately notify the Court if they reach an agreement that resolves the litigation as to any or all parties. Jury costs may be assessed under this rule if the parties do not provide notice of settlement to the Court's jury coordinator at least one full business day before the scheduled trial date.

IT IS SO ORDERED.

Dated November 13, 2026, at Wichita, Kansas.

s/ Gwynne E. Birzer
GWYNNE E. BIRZER
U.S. Magistrate Judge