**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

JACK TELL; NATASHA TORKZABAN; MORGAN SALISBURY; OPAL MORRIS; HENRY FARTHING; SUZANA KENNEDY; NAOMI SUI PANG; ASHLYN TELL; PHOEBE MORRIS; E.B., a minor, by and through his parent and next friend CATHERINE P. BATZA, Ph.D.; and H.C., a minor, by and through his parents and next friends DANIELLE BRUNIN and ERIK CHANEY,

*Plaintiffs*,

v.

LAWRENCE USD 497, a political subdivision of the State of Kansas,

*Defendant*.

Case No. 2:25-cv-02428-KHV-GEB

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

STATEMENT OF DISPUTED MATERIAL FACTS ........ 1

STATEMENT OF ADDITIONAL MATERIAL FACTS ........ 7

INTRODUCTION ........ 13

ARGUMENT ........ 16

I. The District cannot obtain judgment on an exemption its own admission contradicts ........ 16

A. This Court has already distinguished an end to monitoring from a change in its operation ........ 16

B. The October admission establishes actual scanning configuration despite E.B.'s enrollment ........ 18

C. The evidence supports initial injury, and any later cessation must satisfy the separate mootness test ........ 19

D. H.C.'s continuing examination independently requires a decision on the merits ........ 22

II. The students' changed expression establishes more than a subjective objection to surveillance ........ 22

A. Actual self-censorship is cognizable when an objectively justified fear causes it ........ 22

B. H.C. changed what he writes after the District flagged and questioned him ........ 23

C. E.B. identified a reporting decision that monitoring changed ........ 25

D. Winsness does not resolve the disputed account coverage ........ 27

III. Continuous examination of compelled student accounts is a search that an inspection disclaimer does not justify ........ 28

A. The District cannot remove its commissioned examination from the Fourth Amendment by outsourcing it ........ 28

B. Students retain privacy interests in the contents the District requires them to create ........ 29

C. The AUP supplies notice, but notice does not manufacture unlimited consent ... 30

D. The locker cases do not authorize continuous examination of expression ... 32

E. Workplace ownership does not answer the privacy question in a compulsory educational account ... 33

F. The District's categorical position has no limiting principle tied to the intrusion ... 34

IV. The special-needs balance does not justify treating student expression as a continuous screening checkpoint ... 35

A. The balance must account for the information examined, not merely the absence of bodily contact ... 35

B. A technique that detects a bounded physical indicator differs from one that evaluates expression ... 36

C. The District's exemptions demonstrate an actual alternative and an acknowledged expressive cost ... 37

D. The actual consequences of mistaken classifications belong in the balance ... 38

E. CIPA requires an Internet-safety policy, not this particular examination of stored expression ... 39

F. Kansas law supplies no mandate for the District's method and protects the interests it burdens ... 40

V. The program burdens protected expression even when the District allows the message to arrive ... 41

A. Delivery is not the measure of First Amendment freedom ... 41

B. The school's authority depends on the expression and its educational role ... 42

C. Kansas law and District policy place editorial responsibility with students ... 43

D. Calling ManagedMethods a tool does not answer the vagueness claim ... 44

E. The overbreadth inquiry reaches the whole practice, including its deterrent effect ... 45

F. The Fourth Amendment permits review of the common search authorization ........ 46

VI. A narrower quarantine policy does not dispose of the search and speech claims ........ 47

A. Examination and interference with possession are different constitutional events ........ 47

B. Current quarantine authority and completed restrictions require separate treatment ........ 47

VII. The Court should preserve the surviving claims and relief outside the motion's grounds ........ 48

CONCLUSION ........ 49

CERTIFICATE OF SERVICE ........ 52

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adarand Constructors, Inc. v. Slater*,
528 U.S. 216 (2000)....................20

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................16, 20

*Bd. of Educ. v. Earls*,
536 U.S. 822 (2002)....................35, 38

*Beaird v. Seagate Tech., Inc.*,
145 F.3d 1159 (10th Cir. 1998) ....................49

*Black Emergency Response Team v. Drummond*,
191 F.4th 1198 (10th Cir. 2026) ....................44

*Brammer-Hoelter v. Twin Peaks Charter Acad.*,
602 F.3d 1175 (10th Cir. 2010) ....................22, 24, 27

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973)....................23, 27

*Burlison v. Springfield Pub. Schs.*,
708 F.3d 1034 (8th Cir. 2013) ....................37

*Carey v. Piphus*,
435 U.S. 247 (1978)....................48

*City of Los Angeles v. Patel*,
576 U.S. 409 (2015)....................46

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)....................23

*Doe ex rel. Doe v. Little Rock Sch. Dist.*,
380 F.3d 349 (8th Cir. 2004) ....................30

*Dubbs v. Head Start, Inc.*,
336 F.3d 1194 (10th Cir. 2003) ....................30, 35

*FBI v. Fikre*,
601 U.S. 234 (2024)....................21

*Florida v. Jimeno*,
500 U.S. 248 (1991)....30

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000)....19, 20

*Hazelwood Sch. Dist. v. Kuhlmeier*,
484 U.S. 260 (1988)....42

*Illinois v. Caballes*,
543 U.S. 405 (2005)....36

*Initiative & Referendum Inst. v. Walker*,
450 F.3d 1082 (10th Cir. 2006) (en banc)....22, 27

*Laird v. Tatum*,
408 U.S. 1 (1972)....23, 41

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)....19, 25

*M.C. v. Shawnee Mission Unified Sch. Dist. No. 512*,
363 F. Supp. 3d 1182 (D. Kan. 2019)....43

*Mahanoy Area Sch. Dist. v. B.L.*,
594 U.S. 180 (2021)....43

*Memphis Cmty. Sch. Dist. v. Stachura*,
477 U.S. 299 (1986)....48

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)....45, 46

*NAACP v. Button*,
371 U.S. 415 (1963)....23

*New Jersey v. T.L.O.*,
469 U.S. 325 (1985)....29, 32, 34

*O'Connor v. Ortega*,
480 U.S. 709 (1987) (plurality opinion)....33

*Prison Legal News v. Fed. Bureau of Prisons*,
944 F.3d 868 (10th Cir. 2019)....21

*Riley v. California*,
573 U.S. 373 (2014)....29

*Rio Grande Found. v. Oliver*,
57 F.4th 1147 (10th Cir. 2023) ....................19, 23

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
547 U.S. 47 (2006)....................22

*Safford Unified Sch. Dist. No. 1 v. Redding*,
557 U.S. 364 (2009)....................34

*Sec'y of State of Md. v. Joseph H. Munson Co.*,
467 U.S. 947 (1984)....................23

*Soldal v. Cook Cnty.*,
506 U.S. 56 (1992)....................48

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969)....................42

*United States v. Ackerman*,
831 F.3d 1292 (10th Cir. 2016) ....................28

*United States v. Angevine*,
281 F.3d 1130 (10th Cir. 2002) ....................33

*United States v. Hansen*,
599 U.S. 762 (2023)....................27, 45, 46

*United States v. Jacobsen*,
466 U.S. 109 (1984)....................47

*United States v. Place*,
462 U.S. 696 (1983)....................36

*Uzuegbunam v. Preczewski*,
592 U.S. 279 (2021)....................48

*Vernonia Sch. Dist. 47J v. Acton*,
515 U.S. 646 (1995)....................35, 46

*Winsness v. Yocom*,
433 F.3d 727 (10th Cir. 2006) ....................27

*Wyo. Gun Owners v. Gray*,
83 F.4th 1224 (10th Cir. 2023) ....................44

*Zamora v. Pomeroy*,
639 F.2d 662 (10th Cir. 1981) ....................32

*Zorn v. City of Marion*,
774 F. Supp. 3d 1279 (D. Kan. 2025)....................33

*Zurcher v. Stanford Daily*,
436 U.S. 547 (1978)....................43

**Statutes**

Title 42 of the United States Code
§ 1988....................49

Title 47 of the United States Code
§ 254(h)(5)(B), (l)....................39

Children's Internet Protection Act § 1702(b), Pub. L. No. 106-554, 114 Stat. 2763, 2763A-336 (2000)....................39

K.S.A.
72-6315....................40
72-6316....................40
72-7211(b)....................43
72-7211(d)–(e)....................43
75-2589....................40

**Rules and Regulations**

Title 47 of the Code of Federal Regulations
§ 54.520(c)(1), (4)....................39

District of Kansas Rule
56.1(b)(1)....................1

Fed. R. Civ. P. 56(c)(1)(B)....................1

Federal Rules of Civil Procedure
36(b)....................18, 49
56....................20
56(a)....................16
56(g)....................49

## STATEMENT OF DISPUTED MATERIAL FACTS

Under D. Kan. Rule 56.1(b)(1), Plaintiffs respond below, by paragraph number, to Defendant's numbered facts in ECF No. 194 at 10–20:[1]

**District ¶ 4.** The cited Polk testimony addresses Polk's employment history; it does not establish when the District began using Gaggle. Polk 30(b)(6) Dep. 7:12–15, 14:3–12, ECF No. 194-3. Plaintiffs do not otherwise dispute that the District began using Gaggle in late 2023.

**District ¶ 5.** Controverted in part. The cited Polk testimony addresses where Gaggle training took place; it does not establish that the District's executive leadership adopted a recommendation by a team Polk led. Polk 30(b)(6) Dep. 17:25–18:5, 19:8–24:3, ECF No. 194-3.

**District ¶ 6.** Swift identified cost, federal monitoring requirements, and invasiveness. Swift Dep. 140:13–23, ECF No. 194-4. Polk described his recommendation as primarily financial. Asked whether he recalled any criterion beyond cost and excess alerts, he answered, "I don't believe so." Polk 30(b)(6) Dep. 27:4–28:8, ECF No. 193-10.

**District ¶ 8.** Controverted in part. The cited testimony does not establish that District staff forwarded alerts to buildings during fall 2025 or that Gaggle remained operational until November or December 2025; the cited Polk testimony addresses the absence of a contract with ManagedMethods. Luckett 30(b)(6) Dep. 22:2–24:25, ECF No. 194-5; Polk 30(b)(6) Dep. 45:2–17, ECF No. 194-3.

**District ¶ 9.** Controverted. The cited Polk testimony addresses the absence of a contract between the District and ManagedMethods, and the cited Luckett testimony addresses Gaggle-

[1] Admissions are for purposes of this motion only. Where the record Defendant cites does not support a fact, Plaintiffs controvert it on that basis. Fed. R. Civ. P. 56(c)(1)(B); D. Kan. Rule 56.1(b)(1). Defendant's exhibits are cited by ECF attachment number; where a cited page is not included in the filed exhibit, Plaintiffs so state. Citations to ECF filings, including ECF Nos. 193 and 194 and discovery-response attachments, use the ECF page number. Deposition citations use the reporter's page and line numbers.

related training. Neither establishes the calibration or rollout events stated. Polk 30(b)(6) Dep. 43:10–44:24, ECF No. 194-3; Luckett 30(b)(6) Dep. 22:9–17, ECF No. 194-5.

**District ¶ 10.** Controverted in part. The cited deposition testimony addresses when Polk first became involved with Gaggle and whether the journalism exclusion was functioning. Polk 30(b)(6) Dep. 20:11–15, 40:8–21, ECF No. 194-3. Polk's declaration supports the statement that the District renewed its ManagedMethods subscription, Polk Decl. ¶ 8, ECF No. 194-2, but its account of when ManagedMethods became operational is inconsistent with the rollout described in Fact 9.

**District ¶ 13.** The cited pages either do not contain testimony supporting the statement or are not included in the filed exhibits. Polk 30(b)(6) Dep. 26:9–30:13, ECF No. 194-3; Luckett 30(b)(6) Dep. 15:12–16:18, ECF No. 194-5. Plaintiffs do not dispute that the District adjusted ManagedMethods after alerts associated with "lit." AF 4.

**District ¶ 14.** Controverted as unsupported by the cited record. The cited Polk testimony addresses "white noise," false positives, correspondence with Gaggle, and the District's changing priorities; the cited Farley testimony professes no knowledge of the services provided, and the alert categories appear only in a question he did not answer; and Exhibit 8 describes what ManagedMethods offers to monitor, not the categories on which the District configured alerts. Polk 30(b)(6) Dep. 28:7–19, 35:10–25, 45:18–46:10, ECF No. 194-3; Farley Dep. 66:3–70:11, ECF No. 194-7; LBOE_00003118–20, ECF No. 194-8. Plaintiffs do not dispute that substance-abuse and cyberbullying policies were not enabled in ManagedMethods. Polk 30(b)(6) Dep. 48:18–49:12, ECF No. 193-10.

**District ¶ 15.** The cited testimony is not included in Exhibit 5. Luckett 30(b)(6) Dep. 37:11–15, 53:8–12, ECF No. 194-5. Plaintiffs do not dispute that the District's designee described

the alert process as "100 percent machine learning." Luckett 30(b)(6) Dep. 55:24–56:3, ECF No. 193-9.

**District ¶ 16.** Controverted. The cited September 2 Luckett testimony states only that the District may decide alert categories and recipients; it does not establish to whom alerts are actually routed. Luckett Dep. 109:16–21, ECF No. 194-9. The cited October 27 pages are not included in Exhibit 5. Luckett 30(b)(6) Dep. 41:19–44:11, ECF No. 194-5.

**District ¶ 17.** The cited Luckett pages are not included in Exhibit 5, and the cited Polk testimony does not address student email. Luckett 30(b)(6) Dep. 68:23–69:5, ECF No. 194-5; Polk 30(b)(6) Dep. 35:10–25, ECF No. 194-3. For purposes of this motion, Plaintiffs do not contend that ManagedMethods blocks delivery of ordinary email; their claims do not depend on blocking. *See* Part V.A.

**District ¶ 18.** The cited Polk testimony addresses Gaggle, not ManagedMethods, and the cited Luckett pages are not included in Exhibit 5. Polk 30(b)(6) Dep. 35:10–36:17, ECF No. 194-3; Luckett 30(b)(6) Dep. 54:9–13, 61:15–62:8, ECF No. 194-5. Luckett identified a narrower quarantine category than "sexually explicit imagery." Asked about material containing nudity, she testified, "It was never quarantined," and explained, "The only content that can be quarantined is child pornography." Luckett 30(b)(6) Dep. 64:8–65:2, ECF No. 193-9.

**District ¶ 20.** Controverted as unsupported; the cited pages are not included in Exhibit 5. Luckett 30(b)(6) Dep. 45:12–46:13, 47:1–48:22, ECF No. 194-5. Training content does not establish what occurs in practice: a counselor met alone with H.C. after a flag, and Opal Morris was escorted from class and questioned before administrators viewed the flagged photographs. AF 19, 24.

**District ¶ 21.** Controverted in part. The cited Luckett pages are not included in Exhibit 5. Luckett 30(b)(6) Dep. 60:13–61:14, ECF No. 194-5. Polk's declaration supports only the statement that he found no discipline arising from ManagedMethods alerts. Polk Decl. ¶ 11, ECF No. 194-2. *See infra* Resp. to District ¶ 59.

**District ¶ 22.** Uncontroverted that the District decided in spring 2024 to exempt journalism students from Gaggle, although the cited Luckett pages are not included in Exhibit 5. Luckett 30(b)(6) Dep. 72:7–73:24, ECF No. 194-5. The exclusion did not operate as intended for some accounts. AF 16, 27.

**District ¶ 23.** Uncontroverted that the exemption effort "took some work." Polk 30(b)(6) Dep. 63:17–24, ECF No. 194-3. Pages 64–65 are not included in Exhibit 3, and the remaining cited testimony addresses the AUP, not exemptions. The difficulties extended beyond setup: Gaggle continued to apply to some accounts after their exclusion. AF 16.

**District ¶¶ 24, 27.** E.B. has taken Media Design & Production since fall 2025. On October 22, 2026, the District admitted that ManagedMethods was configured to scan files in his account. It also described the notice E.B. had "[b]efore ManagedMethods first scanned E.B.'s District-managed Google account." Def.'s Second RFA Resps. Nos. 187, 194, ECF No. 193-3 at 50–52. On November 2, Polk declared that the account remained in the exempt unit and was then unmonitored. He gave no date for any change. Polk Decl. ¶¶ 12–13, ECF No. 194-2.

**District ¶ 28.** Uncontroverted that H.C.'s account is monitored by ManagedMethods. Polk Decl. ¶ 14, ECF No. 194-2. The cited H.C. testimony does not address enrollment in an exempt course. H.C. Dep. 36:5–8, ECF No. 194-13.

**District ¶ 40.** Uncontroverted, except that Vignery Dep. 74:5–7, ECF No. 194-10, does not support the statement.

**District ¶ 44.** Controverted in part. Vignery Dep. 55:11–13 and 56:8–57:24, and Polk 30(b)(6) Dep. 51:18–25 and 54:5–55:5, do not support the statement; the pages attributed to Vignery at 55–57 in Exhibit 10 are from the H.C. deposition. ECF Nos. 194-3, 194-10. No cited testimony establishes that parents acknowledge the AUP electronically, that acknowledgment results in issuance of a device, or that the District runs reports and follows up with families. Some students received devices without signed agreements, and the District's designee could not confirm that signed agreements requested from buildings had been produced. AF 12.

**District ¶ 45.** Controverted in part. The cited Polk testimony states that the District will "engage with" families who do not acknowledge the AUP; it does not state that their students may nonetheless enroll. Polk 30(b)(6) Dep. 50:11–22, 52:5–53:25, 55:9–56:24, ECF No. 194-3. Whether a student may decline a take-home device does not establish that the student may complete required account-based work without monitoring. AF 9–10.

**District ¶ 47.** E.B. did not recall signing the acceptable use policy (AUP) or know whether anyone signed for him. Asked if he had reason to doubt a signature, he said he believed the signed copy requested in discovery had not been provided and answered, "yes, I do have reason." He accepted counsel's hypothetical about an enrollment requirement. E.B. Dep. 92:9–93:2, 105:2–19, ECF No. 194-12. The District denied that acknowledgment was a condition of E.B.'s 2026–27 enrollment. It required agreement for access to District technology. Def.'s Second RFA Resp. No. 198, ECF No. 193-3 at 53.

**District ¶ 48.** E.B. acknowledged the terms on District email, devices, and file ownership. He questioned whether his journalism had greater privacy protection. When counsel set journalism aside and asked about an English paper, he answered, "According to this policy, yes." He learned

of the device-inspection terms after joining this suit. E.B. Dep. 90:5–91:12, 106:5–16, 107:10–108:9, ECF No. 194-12.

**District ¶ 54.** Controverted in part. The cited Lewis testimony states only that "attorneys and technology folks" had said CIPA requires monitoring; it does not address E-Rate. Lewis Dep. 48:22–49:13, 107:6–108:12, ECF No. 194-11. The cited Polk testimony addresses exemptions, not statutory requirements. Polk 30(b)(6) Dep. 62:15–63:20, ECF No. 194-3. The District's understanding of what federal law requires does not establish what it requires. *See* Part IV.E; AF 32.

**District ¶ 55.** Polk testified that the calibrated alerts warranted investigation or conversation. Polk 30(b)(6) Dep. 47:14–24, ECF No. 193-10. Honas considered a ManagedMethods alert on *Things Fall Apart* annotations a false positive. In February 2026 she also received an alert about an August 2023 message and wrote, "My plan is to ignore given the date of the message." Honas Dep. 175:6–16, 176:12–15, 177:6–13, 178:17–179:8, ECF No. 193-26.

**District ¶¶ 57–58.** The pages containing the cited testimony are not included in Exhibit 5. Luckett 30(b)(6) Dep. 47:9–48:18, 85:24–86:6, ECF No. 194-5.

**District ¶ 59 (see also ¶ 21).** The cited Luckett pages are not included in Exhibit 5. Polk found no discipline arising from ManagedMethods alerts in PowerSchool. Polk Decl. ¶ 11, ECF No. 194-2. The AUP permits suspension or expulsion for a violation. ECF No. 193-32 at 3. The District itself identifies "possible discipline, counseling, or referral to law enforcement" following a ManagedMethods flag. ECF No. 194 at 37.

**District ¶¶ 60–61.** The cited pages are not included in Exhibit 5. Luckett credited information gathered through Gaggle with saving lives. Asked whether the same was true of

ManagedMethods, she answered, "Not that I'm aware of." Luckett 30(b)(6) Dep. 81:12–82:15 (Oct. 27, 2026). She recounted the five interventions and attributed the holiday-break abuse alert to Gaggle. *Id.* at 83:13–86:12.

**STATEMENT OF ADDITIONAL MATERIAL FACTS**

Plaintiffs separately state the following additional material facts:[2]

1. The District monitors student content in covered Google Workspace accounts around the clock. Polk testified: "We are monitoring student content inside the G Suite under student accounts 24 hours a day, seven days a week, yes." Account monitoring also applies when a student accesses a District account off campus on a personal device. Polk 30(b)(6) Dep. 44:7–9, 52:10–22, ECF No. 193-10.

2. Englebrick agreed that the District continued monitoring student content in Google Suite 24/7 using a different method after the vendor change. Englebrick Dep. 186:20–24, ECF No. 193-25.

3. Polk distinguished the content examined from the alerts generated: "all the content is being monitored in a similar way. We are looking for very different things." He explained that substance-abuse and cyberbullying policies were not enabled in ManagedMethods and that "what we're being alerted on is changing." Polk 30(b)(6) Dep. 48:18–49:12, ECF No. 193-10.

4. During ManagedMethods' rollout, the District encountered alerts associated with "lit," a term that could refer to intoxication or academic literature. Polk explained that the District has AP literature courses and adjusted the system. Polk 30(b)(6) Dep. 29:4–15, ECF No. 193-10; Def.'s Fact 13.

---

[2] "AF" refers to these numbered facts. A designation of "30(b)(6)" identifies testimony given for the District; other deposition references identify the witness's individual testimony. "Dep. Ex." identifies the original deposition exhibit, followed by its filed ECF attachment.

5. Honas identified a ManagedMethods alert for a *Things Fall Apart* annotation associated with an English teacher's account. She understood the work to be either the teacher's or a student's annotations, believed it was legitimate classwork, and considered the alert a false positive. She did not know whether access to the assignment had been affected. Honas Dep. 177:1–179:8, ECF No. 193-26.

6. Honas identified a February 2026 ManagedMethods alert concerning a message dated August 2023. Her contemporaneous email stated that she planned to ignore it because of its date. Honas Dep. 175:6–176:15, ECF No. 193-26.

7. A software flag does not itself establish a violation of District policy. Swift testified that staff consider context, intent, the nature of the material, and appropriate support after an alert. Swift 30(b)(6) Dep. 24:7–25:22, ECF No. 193-11.

8. The District's AUP directs students with assigned devices to save information to assigned cloud storage, requires protection of passwords, and conditions technology use on agreement to the policy. It also warns of inspection, monitoring, and removal of inappropriate material. Dep. Ex. 5 at 1–2, ECF No. 193-32; ECF No. 194-17.

9. The District does not offer a general family opt-out from student-account monitoring. Polk identified designated journalism courses as exceptions. Former Superintendent Lewis testified that when the District considered allowing parents to opt out, "the answer was absolutely not." When a parent asked in August 2024 to opt his son out of Gaggle, Englebrick replied that "the District may not allow your student to 'opt out' of using Gaggle on district issued devices," citing asserted federal and state requirements. Englebrick distinguished Gaggle's contractual opt-out capability from the District's choice not to offer it. Polk 30(b)(6) Dep. 62:3–

21, ECF No. 193-10; Lewis Dep. 105:19–21, ECF No. 193-13; ECF No. 23-22 at 2; Englebrick Dep. 120:7–24, 121:20–122:22, ECF No. 193-25.

10. Luckett agreed that students have to use District accounts for coursework and that, although paper submission is theoretically possible, students rarely if ever submit work that way. She did not believe students or parents could opt out. Luckett Dep. 211:16–212:8, ECF No. 193-27.

11. Policy JT states that students own their work unless it is produced at the District's request for its use. Swift understood class assignments and student-publication work to fall within that exception, but agreed that saving work in a District Google account is not itself the act that transfers ownership. Dep. Ex. 12 at 1, ECF No. 193-33; Swift 30(b)(6) Dep. 14:17–16:6, ECF No. 193-11.

12. Some students received devices without signed acceptable-use agreements, and the District tracked unsigned agreements. Polk could not verify that signed agreements requested from school buildings had been produced in this litigation. H.C. testified that he and his parents sign the agreement each year; E.B. did not remember signing one. Vignery Dep. 55:21–57:8, ECF No. 193-12; Polk 30(b)(6) Dep. 61:4–19, ECF No. 193-10; H.C. Dep. 12:7–13:2, 14:9–13, ECF No. 193-29; E.B. Dep. 92:9–24, ECF No. 193-28.

13. In its October 22, 2026 answers, the District expressly admitted that ManagedMethods was configured to scan files stored in E.B.'s and H.C.'s District-managed Google accounts as of that response. It also admitted that the device used to access either account does not affect the account-based scanning. Def.'s Second RFA Resps. Nos. 183–184, 187–188, ECF No. 193-3 at 48–50.

14. Polk's November 2 declaration states that E.B. has been enrolled in Media Design & Production since fall 2025 and that E.B.'s account is not monitored by ManagedMethods. It describes Google Workspace records showing the account remains in the exempt organizational unit as of the declaration. Polk Decl. ¶¶ 12–13, ECF No. 194-2.

15. Polk described the exemption as tied to enrollment in specified courses. Swift described it as a longstanding District practice and explained that the exempt group changes with course enrollment. She also testified that an adviser can identify a student journalist who is not enrolled in the class for an exemption. Polk 30(b)(6) Dep. 41:1–25, ECF No. 193-10; Swift 30(b)(6) Dep. 65:12–66:15, 69:18–70:25, ECF No. 193-11.

16. The earlier Gaggle exclusion did not always stop content blocking: the District admitted that excluded accounts could remain subject to a system limitation affecting delivery, and that Gaggle services continued to apply to Kennedy's account for a period after it was placed in "/Gaggle Excluded." Def.'s Second RFA Resps. Nos. 103–108, 153, ECF No. 193-3; Dep. Ex. 139 at 2, ECF No. 193-39.

17. E.B. testified that monitoring affected the questions he asked and the focus of an article about an arts collaboration with a suicide-prevention hotline. He emphasized the curatorial aspect and avoided a fuller account of the hotline and its staff's experiences. E.B. Dep. 19:4–20:23, ECF No. 193-28.

18. E.B. uses personal equipment for some preparatory journalism work. He testified that the collaborative editing process ultimately requires drafts to be placed in the District's shared Google environment and that coordinating the process through private accounts would be extremely difficult. E.B. Dep. 56:14–58:23, ECF No. 193-28.

19. H.C.'s account is currently monitored. After Gaggle flagged his "Stop bullying me" email, a counselor met with him alone to ask whether the school needed to intervene. H.C. testified that he then stopped sending joke emails, avoided images and words he thought could be flagged, and attributed his self-censorship to the meeting. He did not change schoolwork or communications with teachers. Polk Decl. ¶ 14, ECF No. 194-2; H.C. Dep. 49:1–50:24, 54:10–55:13, 61:17–62:16, ECF No. 193-29.

20. The District's records attribute the majority of certain Gaggle photographic incidents to false positives from a class project involving a portfolio of photographs resembling a state of undress. Dep. Ex. 4 at 7 (DEF 000144), ECF No. 193-31.

21. When shown the photographs during her individual deposition, Luckett did not find them inappropriate and agreed that nothing shown violated a school rule, could cause substantial disruption, or would subject a student to discipline. She had not recalled reviewing the photographs previously. Luckett Dep. 177:13–179:2, ECF No. 193-27.

22. Under Gaggle, staff initially did not know how to restore quarantined files. Luckett described a period of months spent resolving restoration procedures and identified an art submission to its teacher as a non-issue warranting restoration. Luckett 30(b)(6) Dep. 60:1–61:16, ECF No. 193-9.

23. Farthing uploaded photographs to Drive so the photography teacher could see them and was "absolutely okay with my photography teacher looking at it," but not with the District. After the questioning, Farthing stopped taking self-portraits, shifted toward landscapes partly because Farthing "felt more comfortable with the District seeing that," and moved work outside Drive. Farthing Dep. 51:6–55:23, ECF No. 193-14.

24. Opal Morris testified that security interrupted a class presentation and escorted her to a room with administrators who questioned her about flagged photographs before viewing them. She lost access to photographs until the day after questioning and was told not to discuss the incident with other students. Opal Morris Dep. 40:9–44:12, 48:1–49:12, ECF No. 193-15.

25. Torkzaban sent a test email to journalism adviser Tholen while Tholen sat beside her. The District admitted the email was flagged and delayed for staff examination; Tholen testified that she did not receive it. Torkzaban testified that student journalists thereafter tried to avoid email and work in person. Torkzaban Dep. 140:22–143:24, 147:4–11, ECF No. 193-16; Tholen Dep. 157:20–22, ECF No. 193-17; Def.'s Second RFA Resp. No. 152, ECF No. 193-3.

26. Salisbury described a blocked document created with other journalists and a subsequent conversation in which Assistant Principal Preut said he had seen the list through Gaggle. Salisbury Dep. 8:1–10:23, ECF No. 193-18.

27. The District's Gaggle service also blocked delivery of a spreadsheet associated with Kennedy's KORA request after her account had been placed in an excluded organizational unit. Def.'s Second RFA Resps. Nos. 103–108, 153, ECF No. 193-3; Dep. Ex. 139 at 2, ECF No. 193-39.

28. Gaggle quarantine restricted student access to files. A copy retained in Google Vault remained available to District personnel but did not restore the student's access. Def.'s Second RFA Resps. Nos. 115, 117, 127, ECF No. 193-3; Vignery Dep. 84:2–16, 86:8–15, ECF No. 193-12.

29. Outside discovery materials in this action, the District did not provide E.B. or H.C. a written definition of "toxicity." It admitted that no District policy requires an opportunity to

contest a quarantine before it occurs, while stating that students may request review and restoration afterward. Def.'s Second RFA Resps. Nos. 154–155, 157, ECF No. 193-3 at 41–42.

30. Swift testified that journalists were exempted because of First Amendment concerns and described reliance on the adviser's close relationship with the journalist and increased "relational monitoring" to address safety for exempt students. Swift 30(b)(6) Dep. 57:4–58:10, ECF No. 193-11.

31. Boyle testified that administrators agreed the journalistic work process should remain confidential and that Gaggle was interfering with that process. Boyle Dep. 63:6–14, ECF No. 193-22.

32. Vignery testified that Gaggle was not a federal or state requirement and that the District selected it to extend existing content filtering. Englebrick identified Vignery as the source of his understanding of the E-Rate rationale. Vignery Dep. 158:6–19, ECF No. 193-12; Englebrick Dep. 67:1–8, ECF No. 193-25.

33. Swift testified that central administration does not select student-publication topics and that the District does not require administrative approval of stories before publication. Policy JHCA provides procedures governing disapproval. Swift 30(b)(6) Dep. 19:3–18, ECF No. 193-11; Dep. Ex. 12 at 2, ECF No. 193-33.

## INTRODUCTION

This is the second time the District has asked this Court to look away from the challenged monitoring by announcing that it has stopped. The first time, the District relied on its decision to stop using Gaggle. Plaintiffs showed that ManagedMethods had taken its place. The Court rejected the premise: "other than switching from Gaggle to ManagedMethods, defendants have not ceased or altered their challenged behavior." ECF No. 56 at 30. Changing the vendor did not end the controversy. The question was what the District continued to do to students' accounts.

The District now runs the same play, narrowed to a single student. It seeks judgment against E.B. "for one simple reason": he takes Media Design & Production and is therefore exempt from ManagedMethods. ECF No. 194 at 8. But on October 22, the District expressly admitted that ManagedMethods was configured to scan files in E.B.'s account. Def.'s Second RFA Resp. No. 187, ECF No. 193-3 at 50. Eleven days later, James Polk, the District's Senior Director of Data, Assessment and Information Technology, declared that E.B.'s account was not monitored because he was enrolled in that course—and had been since fall 2025. Polk Decl. ¶¶ 1, 12–13, ECF No. 194-2. The declaration never identifies when the admitted configuration changed. If it did not change, the admission defeats the premise of complete exclusion. If the District later ended monitoring that injured E.B. when he joined this case, it bears the burden of showing that his claims for prospective relief are moot. Either way, E.B.'s course enrollment alone cannot reconcile the District's own evidence.

An exemption on paper is not an exemption in operation. The District's earlier Gaggle exclusions failed to prevent some content restrictions, including a blocked KORA spreadsheet sent to an excluded student journalist. Additional Facts ("AF") 13–16, 27. The current record calls for examination of E.B.'s actual account coverage and the effect of monitoring on his reporting. It does not permit judgment merely because the District has labeled his course exempt.

As to H.C., there is no dispute that the examination continues. The District acknowledges that ManagedMethods scans his account and that this supplies a basis for Fourth Amendment standing. ECF No. 194 at 26. It nevertheless argues that he lacks a First Amendment injury because ManagedMethods has not blocked his work. H.C.'s injury is not hypothetical. He replied to a friend, "Stop bullying me"; Gaggle flagged the email; a counselor questioned him alone; and he stopped sending joke emails and began avoiding words and images he thought would attract

attention. AF 19. That is a student who learned, from direct experience, what happens when the machine notices him. The replacement system uses narrower alert categories, but it still examines his communications and sends concerns to officials who decide whether to intervene. AF 1–7. The District must answer that continuing deterrent effect, not merely point out that the email gets delivered.

The merits turn on an equally basic distinction: notice of a search does not establish its constitutional reasonableness. The District cannot settle the Fourth Amendment question by putting "no expectation of privacy" in an enrollment policy and requiring students to use the accounts the policy covers. Luckett agreed that students have to use District accounts for coursework and that paper submission, though theoretically possible, is rarely if ever used. Luckett Dep. 211:16–212:8, ECF No. 193-27. Former Superintendent Anthony Lewis testified that when the District considered allowing parents to opt out, "the answer was absolutely not." Lewis Dep. 105:19–21, ECF No. 193-13. And when a parent asked, the District refused, even though Gaggle offered an opt-out capability the District chose not to use. AF 9. Those facts require a real inquiry into permission, scope, and reasonableness. They cannot be reduced to a click in an enrollment portal.

Nor is continuous examination of student expression the equivalent of a drug dog or a metal detector. Those techniques look for bounded physical indicators. ManagedMethods evaluates content. It generated alerts involving "lit" in a district with AP literature courses; it flagged annotations on *Things Fall Apart* that an assistant principal considered legitimate classwork; and it surfaced an August 2023 message in February 2026. AF 4–6. A system that retrieves years-old expression is reading an archive. The Court need not call this a digital strip search to recognize that it is not a metal detector.

The District's own witness identified the continuity that its motion obscures: "all the content is being monitored in a similar way. We are looking for very different things." Polk 30(b)(6) Dep. 48:22–24, ECF No. 193-10. Narrower alerts matter, but they do not erase the examination that precedes them. The District's safety objectives deserve weight; they do not answer whether this particular intrusion is justified. On this record, the District is not entitled to judgment, and its motion should be denied.

## ARGUMENT

The District's motion depends on treating disputed propositions as settled: that a course-based exemption necessarily stopped examination of E.B.'s account, that monitoring cannot chill speech unless it blocks delivery, and that an inspection disclaimer supplies consent to continuous content analysis. The record supports none of those shortcuts. On this motion, the Court must credit Plaintiffs' evidence and draw reasonable inferences in their favor; it may not weigh competing testimony or resolve credibility. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 255 (1986). Plaintiffs' separate motion does not reverse that rule. Their evidence answers the District's asserted grounds and precludes the judgment it seeks. Fed. R. Civ. P. 56(a).

### I. The District cannot obtain judgment on an exemption its own admission contradicts

#### A. This Court has already distinguished an end to monitoring from a change in its operation

The District previously sought dismissal of the monitoring claims because it had decided to stop using Gaggle. Plaintiffs answered that ManagedMethods continued the same challenged practice: examination of student content in District Google accounts, followed by alerts and official intervention. This Court agreed that the alleged vendor substitution had not ended the controversy. ECF No. 56 at 29–30. Its explanation went to the conduct, not the product name: the

District had not ceased the challenged behavior simply by replacing Gaggle with ManagedMethods. *Id.* at 30.

Discovery has supplied the distinction that mattered to that ruling. Deputy Superintendent Larry Englebrick agreed that the District was doing the same thing—monitoring student content on Google Suite 24/7—by a different method. Englebrick Dep. 186:20–24, ECF No. 193-25. Polk testified in the present tense: "We are monitoring student content inside the G Suite under student accounts 24 hours a day, seven days a week, yes." Polk 30(b)(6) Dep. 44:7–9, ECF No. 193-10. He distinguished a change in what produces alerts from a change in what the system examines. *Id.* at 48:18–49:12. AF 1–3.

The District describes differences in the new ManagedMethods platform: it does not block email, has no vendor human review, uses narrower alert categories, and limits automatic quarantine to suspected child pornography. Def.'s Facts 14–18; *see* Luckett 30(b)(6) Dep. 64:8–65:2, ECF No. 193-9. Plaintiffs controvert several of those facts as unsupported by the cited record, Resp. to Def.'s Facts 14–18, but their argument does not depend on denying the changes. It depends on identifying what remains: the District still causes the content of covered accounts to be examined before it knows whether anything in them presents a concern. Improving what happens after an examination is not the same as ending the examination.

The April ruling arose on the allegations then before the Court; it does not substitute for evidence now. But its central distinction remains decisive. The District must establish cessation of the challenged conduct as to the plaintiff whose claims it seeks to dismiss. The statement that a vendor retired, or that a student belongs to an exempt course, does not itself establish what happened to that student's account.

### B. The October admission establishes actual scanning configuration despite E.B.'s enrollment

The District's exemption argument encounters its own direct answer to Request 187: "Defendant admits that, as of the date of this response, ManagedMethods is configured to scan files stored in E.B.'s District-managed Google account." Def.'s Second RFA Resp. No. 187, ECF No. 193-3 at 50. The response is dated October 22, 2026. It is an express admission, independent of Plaintiffs' separate position concerning the timeliness of the second-set answers. *See* ECF No. 193 at 9 n.2. Rule 36(b) makes the admitted matter conclusive unless the Court permits withdrawal or amendment. Fed. R. Civ. P. 36(b). A later declaration cannot silently withdraw it.

Polk's November 2 declaration relies on enrollment to reach the opposite account-specific conclusion. Paragraph 12 states that E.B. has taken Media Design & Production since fall 2025. Paragraph 13 states that students in that course are exempt and that Google Workspace records show E.B.'s account remains in the exempt unit as of the declaration. ECF No. 194-2 ¶¶ 12–13. The declaration does not identify an implementation date or explain why the District admitted scanning configuration on October 22 while E.B. was already taking the course.

That omission matters on either reading of the evidence. If the District says E.B. was continuously and effectively excluded, the October admission is contrary proof. If the District says the account configuration changed after October 22, enrollment since fall 2025 cannot establish that the exclusion was effective throughout that period. The two statements concern different dates, so they do not necessarily conflict about the same instant. But the later statement cannot erase what the District admitted was true eleven days earlier.

The history of exclusions reinforces the need to distinguish an administrative designation from its operation. The District admits that Gaggle continued to affect delivery for some excluded accounts and continued providing service to Suzana Kennedy's account after its move to "/Gaggle

Excluded." AF 16, 27. Those admissions do not prove that ManagedMethods repeats the same defect. They do refute the assumption that placement in an organizational unit, without more, conclusively establishes the absence of examination or restriction.

E.B.'s inability to identify a ManagedMethods alert does not cure the evidentiary problem. The District examines far more content than it flags, and by its own account staff do not invariably notify students of an alert. AF 1–7; Def.'s Fact 19. Absence of a known flag is therefore not absence of a search. The District's own account-specific admission is more probative of the configuration than E.B.'s lack of knowledge of what its software reported.

### C. The evidence supports initial injury, and any later cessation must satisfy the separate mootness test

E.B. joined the case through the Second Amended Complaint filed July 10, 2026. ECF No. 101; ECF No. 194 at 22. Plaintiffs must establish his injury at that point, together with traceability and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Initial standing and a subsequent loss of a live interest are distinct inquiries. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81, 189–92 (2000); *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1162–64 (10th Cir. 2023).

The evidence of E.B.'s injury is concrete. He identified a story whose questions and focus he changed because his reporting ultimately entered the District's Google environment. AF 17–18. He described an ongoing collaborative process requiring his work to enter shared District storage. *Id.* He also kept his school device for most or all of summer 2026 for journalism, the period in which he joined this suit. E.B. Dep. 52:20–53:6, ECF No. 194-12. The District describes a continuing account-level monitoring program and expressly admitted that E.B.'s account was configured for scanning while he was enrolled in the course now invoked as the reason he could not be affected. AF 1–3, 13–15. Taken together, that evidence supports the inference that the

claimed exemption did not eliminate the burden on his reporting merely because his course appeared on a list.

The October answer establishes its stated date, not every earlier date. Plaintiffs rely on it together with the testimony about the continuing practice and E.B.'s actual expressive choices. The District's contrary inference—that course enrollment conclusively establishes an effective exemption throughout the relevant period—cannot be accepted without reconciling the admission and determining how the exemption operated. Rule 56 does not permit the Court to choose that inference against Plaintiffs. *Anderson*, 477 U.S. at 255. The account's actual coverage matters to both the historical standing inquiry and the claimed present absence of injury.

If the District establishes a later change that removed an injury existing when E.B. joined, voluntary cessation governs that change. A defendant cannot defeat judicial review merely by suspending the challenged conduct. The District must show it is absolutely clear that the challenged monitoring of E.B.'s account could not reasonably be expected to recur. *Laidlaw*, 528 U.S. at 189–90. This Court has already applied that standard here, explaining that the party asserting mootness bears a heavy burden. ECF No. 56 at 29–31 (citing *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000)).

The Court's treatment of the publication ban shows the difference. There, the District produced a formal memorandum and email, sworn assurances against renewed restrictions, and a subsequent period without adverse action. ECF No. 56 at 30–31. Here, Polk describes present account status and course enrollment. He does not explain the admitted October configuration or identify the particular change that supposedly removed it. Nor does his declaration address what happens when E.B.'s enrollment changes. On the District's own theory, the exemption lasts only while E.B. remains in a listed course; if he does not enroll in one in a later term, nothing in the

record shows his account would remain exempt absent a separate identification by his adviser, while his reporting continues. A protection that depends on a student's course selection each term leaves recurrence reasonably expected.

Swift described the exemption as longstanding and also explained that the exempt group changes with enrollment. An adviser may identify a journalist outside a listed course for an exemption. Swift 30(b)(6) Dep. 65:12–66:15, 69:18–70:25, ECF No. 193-11. The practice thus depends on enrollment or a further identification by an adviser. The District offers no account-specific explanation showing how those conditions answer the unresolved configuration history or ensure continued coverage of E.B.'s ongoing reporting.

*FBI v. Fikre*, 601 U.S. 234, 241–44 (2024), requires attention to precisely that question: what the defendant's evidence establishes about future conduct. A declaration is evidence, and the government need not confess illegality to establish mootness. But a declaration about present status must still address whether the plaintiff may again encounter the challenged practice through the same or similar conduct. Here, the defect is not the absence of a particular form of promise. It is the gap between an admitted examination, a later assertion of exclusion, and an exemption whose coverage depends on changing circumstances.

Nor do Plaintiffs rely on the abstract possibility that a future official might reverse course. *See Prison Legal News v. Fed. Bureau of Prisons*, 944 F.3d 868, 880–81 (10th Cir. 2019). They rely on an actual admission concerning this account, actual failures of earlier exclusions, and testimony describing how the current exempt population changes. Those facts require an answer. The District cannot replace one with the word "exempt."

### D. H.C.'s continuing examination independently requires a decision on the merits

Whatever the Court concludes about E.B.'s coverage, H.C. remains monitored. Polk Decl. ¶ 14, ECF No. 194-2. The District acknowledges that the examination supplies a basis for H.C. to assert a Fourth Amendment injury, then argues that its policy makes that examination permissible. ECF No. 194 at 26, 29–34. That second proposition is a merits defense. It is not a jurisdictional consequence of E.B.'s course schedule.

One plaintiff with standing may support adjudication of the same claim for the same relief. *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). H.C.'s live challenge therefore prevents an exemption ruling concerning E.B. from disposing of the common challenge to continuing account examination. His First Amendment standing rests on its own evidence, addressed next. The District's concession of Fourth Amendment standing is not treated as a concession on every claim; its narrower concession is enough to require a decision on the ongoing search.

## II. The students' changed expression establishes more than a subjective objection to surveillance

### A. Actual self-censorship is cognizable when an objectively justified fear causes it

The District's First Amendment argument places too much weight on the absence of a blocked document. Government can injure speakers by deterring expression before it is written or sent. The Tenth Circuit recognizes a judicially cognizable injury when a chilling effect arises from an objectively justified fear of real consequences. *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1088–89 (10th Cir. 2006) (en banc); *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1183 (10th Cir. 2010). The inquiry concerns both the change in the plaintiff's desire to speak and the objective basis for that change.

*Rio Grande Foundation* illustrates the distinction. The Tenth Circuit held that evidence of past advocacy, intended future speech, and tailoring of speech to avoid disclosure requirements could support standing; the plaintiff did not have to submit the speech to a prohibition before challenging its deterrent effect. 57 F.4th at 1163–65. Here, too, Plaintiffs identify actual expressive activity, actual changes to it, and the continuing government practice that prompted those changes.

*Clapper v. Amnesty International USA*, 568 U.S. 398, 410–16 (2013), does not require a different result. It rejected an injury manufactured by precautions against a speculative chain of future events. *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972), rejected subjective chill unsupported by a specific present harm or threat of future harm. Plaintiffs supply what those cases lacked: personal experiences and expressive decisions tied to the District's examination of the accounts they use. Whether those experiences objectively explain their present self-censorship must be assessed on that evidence, not resolved by attaching the word "subjective" to it.

The First Amendment's protection of breathing space reinforces the importance of the inquiry. *NAACP v. Button*, 371 U.S. 415, 433 (1963). Plaintiffs do not seek an exception to Article III. They invoke the established distinction between an individual injury to one's own speech and the additional ability, once standing exists, to challenge an overbroad rule's effect on others. *Broadrick v. Oklahoma*, 413 U.S. 601, 611–12 (1973); *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956–58 (1984). Plaintiffs' own injuries come first.

**B. H.C. changed what he writes after the District flagged and questioned him**

H.C. did not merely learn that a monitoring program existed and become uneasy. He was flagged. A friend called him a silly name; he replied, "Stop bullying me"; Gaggle identified the email; and a counselor met with him alone for roughly ten minutes to ask whether he was being bullied. Def.'s Facts 34–36. He responded by changing what he writes. He stopped sending joke emails, confined his communications to casual or educational exchanges, and avoided words and

images he thought would be flagged. H.C. Dep. 49:1–50:24, 54:10–55:13, 61:17–62:16, ECF No. 193-29; AF 19. The District's own exhibit records his answer that this self-censorship continues because he must use a District-issued iPad, Google Classroom, and other platforms that remain subject to ManagedMethods. ECF No. 194-14 at 8–9 (Interrog. No. 8). That the joke served no educational purpose does not answer the claim: he was questioned as a possible bullying victim, not for violating a use rule, and the deterrence he describes follows from the flag and the intervention.

Those facts address both parts of *Brammer-Hoelter*. 602 F.3d at 1183. The change in expression is actual, and the event that prompted it is identifiable. H.C. experienced official follow-up to an innocuous message and adjusted his speech to avoid another such encounter. He need not have been disciplined for the encounter to matter. Nor must the counselor have intended to suppress a joke. The issue is whether the District's examination and follow-up objectively deterred protected expression.

The limits of his testimony do not erase that evidence. H.C. did not say that a teacher ordered him to stop joking, that he was punished, or that the incident changed his schoolwork or communications with teachers. Def.'s Facts 36–39. Those facts narrow the injury; they do not negate his testimony that he stopped sending joke emails to friends. The First Amendment protects the speech he changed as well as the assignments he did not.

The District responds that the incident occurred under Gaggle and that ManagedMethods does not use the former bullying category. ECF No. 194 at 26–27. That is a relevant change, but it does not answer the claim of continuing deterrence. H.C.'s account is still examined. The District still receives concerns generated from expression and decides whether to question the student. AF

1–7, 19; Def.'s Facts 16, 19–20, 28. His fear concerns the consequences of that process, not simply whether the identical three words would trigger the same category today.

Current evidence supplies an objective basis for that concern. ManagedMethods generated alerts involving "lit" and literary annotations that an assistant principal regarded as legitimate classwork. AF 4–5. A software label does not decide what the writing means; staff must supply context after the machine flags it. AF 7. Students who have already been questioned over an innocuous message have a concrete reason to avoid expression they believe could be misunderstood again. The District may dispute that inference, but it cannot obtain summary judgment by ignoring the current examples that support it.

The AUP reinforces the notice of ongoing examination on which the District itself relies. ECF No. 194 at 29–30. That notice does not prove injury by itself. Together with H.C.'s experience, the current configuration, and the current false-positive evidence, however, it makes his concern more than an idiosyncratic fear of an unknown program. The same District tells him his account is subject to review and argues that his awareness of that review is constitutionally irrelevant. The record requires the Court to examine its actual effect.

The injury is traceable to the District's chosen process, and an order restraining unconstitutional examination and use of the resulting information would address its source. *Lujan*, 504 U.S. at 560–61. No injunction against classroom counseling in general is necessary to reach that conclusion. The challenged conduct is the account examination and the resulting intervention that caused H.C. to change his speech.

**C. E.B. identified a reporting decision that monitoring changed**

E.B. described an article about an arts organization's collaboration with a suicide-prevention hotline. Monitoring made him cautious about the questions he asked and the content he wrote. He emphasized the curatorial side of the collaboration and avoided fuller treatment of the

hotline and its staff's experiences. E.B. Dep. 19:4–20:23, ECF No. 193-28; AF 17. He explained the connection:

> at the end of the day every quote I have and every sentence I write must end up in a Gaggle monitored Google document, which means that I had to be selective with the words and phrases I use and the content that I was willing to put on the page.

*Id.* at 19:14–20. That testimony identifies the reporting, the choice, and the reason for it. It is not an abstract assertion that journalists dislike surveillance.

The District's personal-device argument does not address the workflow he described. He can keep interviews or an early draft on personal equipment. But when the work enters collaborative editing, it must be placed in the District's shared Google environment. *Id.* at 56:14–58:23. As he put it, "every single thing I do must end up on a school Google doc" shared with other school accounts. *Id.* at 56:18–24. Sending drafts among private accounts would make coordination and grading extremely difficult. *Id.* at 58:8–23. Moving the first step of a reporting process off a school device does not remove the later steps from an account-level examination.

The exemption dispute therefore matters to the actual injury he describes. An effective exclusion could change the analysis, but its effectiveness cannot be assumed from enrollment while the District's own answer admits a scanning configuration for his account. Part I addresses that evidence. A student's concern about required reporting in an account the District admits configuring for examination is not defeated by pointing to a private laptop he uses before the work enters that account.

The earlier recipient-side limitations also explain why the actual coverage of an exclusion matters. Under Gaggle, an excluded sender's material could be examined in a non-excluded recipient's account. Def.'s Second RFA Resp. No. 110, ECF No. 193-3. Plaintiffs do not treat that historical admission as proof of every current ManagedMethods setting. It demonstrates why an

exclusion must be evaluated against the shared reporting process rather than treated as an answer simply because the sender's name appears in an organizational unit.

**D. Winsness does not resolve the disputed account coverage**

The District compares E.B. to a plaintiff in *Winsness v. Yocom*, 433 F.3d 727, 732–34 (10th Cir. 2006), whose feared prosecution was undermined by express disavowals from the officials responsible for enforcement. ECF No. 194 at 25. Here, the District continues to operate and defend the challenged monitoring, and its own evidence must be reconciled as to E.B.'s account. A declaration of exemption deserves consideration. It is not a substitute for resolving an account-specific admission of scanning or determining the exclusion's coverage.

The difference is factual, not a demand for an enforceable promise in every case. In *Winsness*, the disavowals addressed the feared enforcement. Here, the disputed examination is the very act the District has admitted configuring its system to perform. The Court must assess that evidence under *Walker* and *Brammer-Hoelter* before finding E.B.'s deterrence objectively baseless.

*Winsness* also requires an individual injury before a plaintiff invokes facial overbreadth. 433 F.3d at 734. Plaintiffs meet that issue with their own testimony and the District's account evidence, not by borrowing injury from others. Once a plaintiff establishes the requisite personal injury, the overbreadth doctrine permits examination of the policy's effect on other protected expression. *Broadrick*, 413 U.S. at 612; *United States v. Hansen*, 599 U.S. 762, 769–70 (2023). The breadth of that inquiry belongs in the merits analysis, not in a rule that speech must first be blocked to be chilled.

## III. Continuous examination of compelled student accounts is a search that an inspection disclaimer does not justify

### A. The District cannot remove its commissioned examination from the Fourth Amendment by outsourcing it

The District selects the accounts, chooses the categories, receives the alerts, and determines the response. Def.'s Facts 11, 13–20. The content examination is undertaken for the District's purposes through the service it procured. A government-directed examination does not become private merely because a vendor supplies the employees or the software that performs it.

*United States v. Ackerman*, 831 F.3d 1292, 1300–08 (10th Cir. 2016), explains why the identity and scope of the examination matter. There, AOL's private screening preceded NCMEC's opening of an email and its attachments. The Tenth Circuit rejected the proposition that the governmental examination necessarily fell within the private search simply because a provider had already flagged material. *Id.* at 1305–08. Here, the District commissions the screening from the outset. It is not a bystander receiving an unsolicited private discovery; its chosen system performs the antecedent examination.

The informational distinction in *Ackerman* also defeats the District's suggestion that no protected interest is implicated until a person opens a flag. A technique confined to identifying contraband presents a different question from examination capable of revealing lawful private information. *Id.* at 1306–08. This system evaluates documents and communications whose content includes reporting, literature, photographs, and personal exchanges. It has flagged legitimate classwork. AF 4–7. The District cannot avoid scrutiny of that examination by focusing exclusively on the smaller set of alerts that reaches a human reviewer.

The Court need not hold that all automated processing is a search to decide this case. Plaintiffs challenge a particular government-directed analysis of expressive content, undertaken to identify concerns about the writer or the work and to enable official intervention. The software's

categories do not establish a policy violation. Staff must examine context, intent, and the material itself after an alert. Swift 30(b)(6) Dep. 24:7–25:22, ECF No. 193-11. That dependence on meaning is the point: the program examines information beyond the presence of an independently unlawful object.

### B. Students retain privacy interests in the contents the District requires them to create

Public school students retain legitimate privacy interests despite the school's custodial authority. *New Jersey v. T.L.O.*, 469 U.S. 325, 333–39 (1985). The school setting affects the reasonableness of an intrusion; it does not extinguish the inquiry. The question here concerns students' intellectual contents, not merely the District's ownership of a computer casing or server.

Digital storage makes the nature of those contents especially important. *Riley v. California*, 573 U.S. 373, 393–98 (2014), explains how the quantity, variety, and historical depth of digital information distinguish it from a single physical container. Plaintiffs invoke that reasoning within the school-search framework, rather than importing *Riley*'s warrant requirement into every school examination. The record supplies the concrete application: ManagedMethods surfaced a message from August 2023 in February 2026. AF 6. It reaches the accumulated work in an account, not simply an object carried through a school entrance that morning.

The District answers that a student complying with its AUP should keep only school-related material in the account. ECF No. 194 at 32. But the school-related material is the protected material: journalism, art, literary annotations, essays, and drafts. Farthing welcomed the photography teacher's review but changed the work to avoid the District's surveillance. AF 23. Permission for a teacher to evaluate assigned work does not authorize the District's separate, continuous examination of that work and everything stored around it. An educational purpose for creating the work does not settle every later use the government may make of it.

### C. The AUP supplies notice, but notice does not manufacture unlimited consent

The District relies on the AUP and its inspection policies to collapse three distinct questions: whether students knew monitoring could occur, whether they consented to the particular examination, and whether that examination was reasonable. ECF No. 194 at 29–34. The policies are relevant evidence. They are not a constitutional judgment rendered in advance by the party conducting the search.

Consent depends on actual permission and its objectively understood scope. *Florida v. Jimeno*, 500 U.S. 248, 251–52 (1991). In *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1207–12 (10th Cir. 2003), the court examined the actual forms and circumstances rather than treating participation in an educational program as authorization for every physical examination the institution arranged. Forms addressing particular procedures and emergencies did not conclusively resolve consent to the examinations actually performed. The same discipline is required here: identify the permission, then compare it with the intrusion.

The AUP warns of inspection for inappropriate material and review of network and email use. It also directs students to save information in assigned storage and protect their passwords. AF 8. The District reads those provisions as eliminating any privacy in every covered document, at every stage of its creation, across devices and locations. The record permits a narrower understanding of permission to use an educational account. A warning that an institution may inspect material does not necessarily authorize constant analysis of the semantic content of all the material it requires a student to place there.

*Doe ex rel. Doe v. Little Rock School District*, 380 F.3d 349, 353–54 (8th Cir. 2004), rejects the circular premise that announcing an inspection policy necessarily eliminates the privacy interest that makes the inspection constitutionally significant. Otherwise, a school could answer

any objection to a suspicionless search by printing a sufficiently broad notice. The Constitution measures the announced practice; the announcement does not displace the Constitution.

The practical conditions reinforce the issue. The District offers no general family opt-out from account monitoring, and when a parent asked for one, the District refused, citing asserted legal requirements, even though Gaggle offered an opt-out capability the District chose not to use. AF 9. Luckett agreed that students have to use District accounts for coursework and that paper submission, though theoretically possible, is rarely if ever used. Luckett Dep. 211:16–212:8, ECF No. 193-27. E.B. described the required shared-document process, and H.C.'s teachers require District technology for assignments. AF 18; H.C. Dep. 35:16–36:11, ECF No. 193-29. The ability to decline a take-home device does not establish an ability to complete required account-based work free of the challenged examination.

H.C. acknowledged that he and his parents sign the agreement, and both current students acknowledged what the policies say. Plaintiffs do not depend on denying that evidence. Their point is that an acknowledgment of institutional rules does not automatically resolve the voluntariness and scope of permission under the conditions the institution imposes. Educational compulsion, the account's required use, the stated inspection purpose, and the actual method all bear on that inquiry.

The District also overstates E.B.'s testimony. Its Fact 47 says he had no reason to doubt that an AUP was signed. He testified that he had no memory of signing one and did have a reason to doubt it: the requested signed copy had not been provided. E.B. Dep. 92:9–24, ECF No. 193-28. His agreement that a policy would apply if signing were an enrollment requirement is not a recollection that he signed it. E.B. Dep. 105:2–19, ECF No. 194-12. Likewise, when asked about assignments, he qualified answers by reference to what the policy says and distinguished his

possible privacy interest in journalism. *Id.* at 90:5–91:12. The Court should consider all of those answers, rather than convert a student's acknowledgment of policy language into a conclusive waiver of the claim that the policy is unconstitutional.

### D. The locker cases do not authorize continuous examination of expression

The District's locker authorities rest on retained access, joint control, and the school's interest in preventing misuse of physical storage. ECF No. 194 at 31–32. They do not establish that every government-provided place of storage is constitutionally identical. Nor does *T.L.O.*'s express reservation of the school-locker question supply the missing holding. 469 U.S. at 337 n.5. A reservation is not a rule extinguishing privacy in all school-provided accounts.

The Tenth Circuit's decision in *Zamora v. Pomeroy*, 639 F.2d 662, 670–71 (10th Cir. 1981), illustrates the difference. Officials opened a locker after a trained dog alerted, in a setting where the school retained joint control. A locker search occurs at a discrete moment; no one monitors the inside of a locker around the clock. Here, the District examines expressive contents continuously to generate the indication that might prompt further review. The examination precedes any account-specific concern.

The point does not depend on pretending that every locker decision requires individualized suspicion. Some of the District's authorities permit routine inspections under retained-control policies. The distinction is the character and reach of the intrusion. A physical inspection for contraband does not continuously evaluate years of writing and communications to infer whether the author presents a concern. The District must justify that additional informational intrusion, not merely establish that it possesses the means to open the account.

*T.L.O.* itself recognized the highly personal character of photographs, letters, and diaries students bring to school. 469 U.S. at 339. Their modern counterparts do not lose all protection because an assignment or reporting process requires digital storage. The District's argument would

make the school's choice of platform dispositive of the students' constitutional interests in its contents. The cited locker decisions do not make that extension.

### E. Workplace ownership does not answer the privacy question in a compulsory educational account

The employee analogy requires the same attention to context. *United States v. Angevine*, 281 F.3d 1130, 1134–35 (10th Cir. 2002), considered university ownership, explicit monitoring warnings, and actual auditing in rejecting an employee's claimed privacy in material on his work computer. *O'Connor v. Ortega*, 480 U.S. 709, 717–18, 725–26 (1987) (plurality opinion), likewise makes the operational realities and purpose of the intrusion central. Neither decision announces that ownership alone eliminates every privacy interest in everything stored on government equipment.

*Zorn v. City of Marion*, 774 F. Supp. 3d 1279 (D. Kan. 2025), applied that contextual inquiry to allegations about a particular workplace computer, including the absence of alleged steps to secure it. *See id.*, No. 24-2044-DDC-GEB, ECF No. 88 at 31–34 (Mar. 28, 2025). The District's collection of workplace and privilege decisions does not decide whether mandatory educational use permits continuous examination of student expression. ECF No. 194 at 33–34. The analogy supplies considerations to examine, not a substitute for examining them.

The educational relationship is materially different. The District requires students to produce writing, photographs, analysis, and reporting through its accounts. Its function is to elicit and develop that expression. Treating the required means of production as a reason that the expression loses all privacy would convert the educational obligation itself into the government's permission to examine without limit. Students' required use, password protection, editorial responsibilities, and expectations about who will review submitted work all belong in the analysis. AF 8–12, 18, 23, 33.

The District's own Policy JT also prevents ownership from doing the work the motion assigns it. The policy recognizes student ownership subject to an exception for work produced at the District's request for its use. Swift interpreted that exception broadly, including assignments and publication work, but agreed that saving material in a District Google account is not itself the act that transfers ownership. AF 11. That evidence does not establish that every item in the account is District property. Still less does it establish that every examination of it is constitutionally reasonable.

**F. The District's categorical position has no limiting principle tied to the intrusion**

The District asserts that H.C. "cannot suffer any Fourth Amendment injury resulting from the District monitoring" under its policies. ECF No. 194 at 33. That proposition would resolve the case before considering what is read, why it is read, how far back the examination reaches, or what follows. A disclaimer would do all the constitutional work.

The school-search cases require more. *T.L.O.* evaluates scope against justification. 469 U.S. at 341–42. *Safford Unified School District No. 1 v. Redding*, 557 U.S. 364, 374–77 (2009), demonstrates that an otherwise legitimate school concern does not justify every degree of intrusion. Those decisions do not eliminate the distinct special-needs framework for suspicionless programs. They foreclose the premise that government ownership and a safety objective make the character of the examination irrelevant.

Here, that character is central. The system reaches unfinished reporting, academic analysis, private exchanges, and older stored messages. AF 1–6, 17–18. The District must justify the actual examination within the applicable constitutional framework. It cannot avoid that task by declaring the account private enough that students must safeguard its password, yet devoid of any constitutionally protected interest when the District examines its contents.

## IV. The special-needs balance does not justify treating student expression as a continuous screening checkpoint

### A. The balance must account for the information examined, not merely the absence of bodily contact

The special-needs inquiry weighs the privacy interest, the character of the intrusion, and the nature and immediacy of the governmental concern together with the search's efficacy. *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 654–65 (1995); *Bd. of Educ. v. Earls*, 536 U.S. 822, 830–38 (2002). The District emphasizes the seriousness of suicide and violence prevention and describes the intrusion as minimal. ECF No. 194 at 34–41. The interests are serious. The conclusion does not follow without evaluating the means.

An absence of bodily contact does not make informational intrusion disappear. *Vernonia* examined the limits of the drug tests, the information they disclosed, and the restrictions on use and dissemination. 515 U.S. at 658–60. *Earls* likewise considered confidentiality, limited consequences, and use of the results for extracurricular eligibility rather than academic punishment or criminal prosecution. 536 U.S. at 832–34. Those limitations mattered because the Court assessed what the government obtained and did with it.

The District also invokes *Dubbs* for the weight of a school's custodial role and preventive purpose. ECF No. 194 at 39–41. Two other premises of the special-needs cases do not transfer. The students in *Vernonia* and *Earls* could avoid testing by declining an extracurricular activity. 515 U.S. at 657; 536 U.S. at 831–32. H.C. signed the AUP, but he needs his account for ordinary coursework and has no general opt-out. AF 9–10; H.C. Dep. 35:16–36:11, ECF No. 193-29. And although the initial scan reaches every covered account, a flag singles out a particular child for official follow-up, as it did H.C. AF 19. Those facts bear directly on the District's claims of meaningful choice and absence of individualized stigma. *See Dubbs*, 336 F.3d at 1213–15.

The District identifies analogous safeguards here: narrower categories, no vendor human review, limited staff access, professional follow-up, and no discipline arising from ManagedMethods alerts. Def.'s Facts 14–21, 56–59. Several of those facts lack the record support the District cites. Resp. to Def.'s Facts 14–18, 20–21, 57–59. Even accepting them, they belong on the District's side of the balance. Plaintiffs' evidence belongs on the other: continuous examination of compelled accounts, legitimate expression producing alerts, historical depth, and actual changes to reporting and communication. AF 1–7, 17–19. The existence of safeguards does not permit the District to omit the intrusion they are meant to constrain.

### B. A technique that detects a bounded physical indicator differs from one that evaluates expression

The District's screening analogies obscure the relevant information. A properly conducted narcotics-dog sniff is constitutionally distinctive because it reveals the presence or absence of contraband without exposing general private information. *United States v. Place*, 462 U.S. 696, 707 (1983); *Illinois v. Caballes*, 543 U.S. 405, 409 (2005). Drug tests and magnetometers have their own limits and can disclose more than a literal single bit; a metal object is not necessarily contraband. But each analogy requires analysis of a bounded screening target and the information revealed. None licenses the assumption that examination of expressive content is equally confined.

ManagedMethods evaluates what students write and store. It applies classifications to documents and messages and reports concerns that require human interpretation. The District's witness described its alert process as "100 percent machine learning." Luckett 30(b)(6) Dep. 55:24–56:3, ECF No. 193-9. The District says its current categories address such matters as suicide, self-harm, and threats of violence. Def.'s Fact 14. The inquiry necessarily concerns meaning and context. Reporting on suicide prevention is not evidence that its author intends self-

harm; analyzing a novel is not a threat; assembling a class portfolio of photographs that resemble a state of undress is not necessarily sexual misconduct.

The record makes the distinction concrete. ManagedMethods generated alerts involving "lit" in a district that teaches AP literature. It flagged annotations on *Things Fall Apart* that Honas considered legitimate classwork. AF 4–5. Under Gaggle, photographs from a class project generated repeated false-positive restrictions. AF 20–24. These examples do not establish that every alert is erroneous. They establish that the process reaches lawful expression and that a machine classification is not a contraband determination.

Nor does *Burlison v. Springfield Public Schools*, 708 F.3d 1034, 1036–41 (8th Cir. 2013), resolve the issue. The temporary separation of students from belongings during a drug-dog exercise differs in duration, informational scope, and purpose from continuous evaluation of account contents. Plaintiffs challenge neither every safety measure nor every momentary restriction of school property. They challenge the breadth of this examination and its effect on the expression the school requires students to create.

### C. The District's exemptions demonstrate an actual alternative and an acknowledged expressive cost

The exemption evidence is especially probative because it describes the District's own choices. As Swift herself explained: "We have carved out journalists because we feel that strongly about the First Amendment right." Swift 30(b)(6) Dep. 57:4–5, ECF No. 193-11. She described increased "relational monitoring" through the adviser's close relationship with the student. *Id.* at 58:3–10. Boyle agreed that the journalistic work process should remain confidential and that Gaggle was interfering with it. Boyle Dep. 63:6–14, ECF No. 193-22. AF 30–31.

That evidence directly answers two propositions in the motion: that monitoring imposes no meaningful expressive cost and that this particular method is necessary to discharge the District's

safety duties. For exempt journalists, the District recognizes the cost and uses an adviser-based approach. Plaintiffs need not invent a hypothetical alternative; the District already uses one.

*Earls* does not require the least intrusive conceivable method, and the exemption does not automatically establish liability. 536 U.S. at 837–38. Its significance is evidentiary. The District cannot describe continuous machine examination as indispensable without explaining why it dispenses with that examination for some students and what the alternative demonstrates about the fit between the means and the concern. Nor can it invoke the exemption as protection for E.B. while treating the expressive burden that prompted the accommodation as unreal.

The reported safety interventions deserve the same disciplined treatment. Plaintiffs accept the seriousness of the incidents and the assistance described in Def.'s Facts 60–61. A successful intervention bears on efficacy. But Luckett credited information gathered through Gaggle with saving lives; asked whether the same was true of ManagedMethods, she answered, "Not that I'm aware of." Luckett 30(b)(6) Dep. 81:12–82:15. A successful intervention does not, standing alone, establish that continuous examination of all covered expression is reasonable. The balance must include the scope and cost of the practice that produces those interventions, along with the safeguards and alternatives the District itself employs.

**D. The actual consequences of mistaken classifications belong in the balance**

The historical record shows why content classifications cannot be treated as costless. The District attributed the majority of certain Gaggle photographic incidents to false positives from a class portfolio project. AF 20. Shown the photographs, Luckett did not find them inappropriate and agreed that they presented no identified rule violation, substantial disruption, or basis for discipline. AF 21. Staff initially did not know how to restore quarantined files. AF 22. Farthing stopped taking self-portraits, shifted toward landscapes, and moved work outside Google Drive.

AF 23. Opal was escorted from class and questioned about photographs before the administrators viewed them. AF 24.

ManagedMethods' narrower quarantine policy changes the present seizure inquiry; Plaintiffs address it in Part VI. The completed incidents remain relevant to the nature of the expressive interests at stake and to the students' understanding of official intervention. Current classwork alerts and the continued need for staff to interpret context connect that concern to the present process. AF 4–7. The District's improved handling of some outputs does not establish that the informational intrusion preceding them is minimal.

### E. CIPA requires an Internet-safety policy, not this particular examination of stored expression

The District argues that federal law mandates monitoring for the content ManagedMethods detects. ECF No. 194 at 41–42. That proposition moves from a general obligation to a particular method without statutory support.

CIPA requires qualifying schools to enforce an Internet-safety policy that includes monitoring minors' online activities and specified technology-protection measures. It also requires education about appropriate online behavior. 47 U.S.C. § 254(h)(5)(B), (l); 47 C.F.R. § 54.520(c)(1), (4). The required protection measures address access to specified visual depictions. The statute does not prescribe continuous semantic examination of every stored draft, annotation, and account communication, much less declare that examination constitutionally reasonable.

Congress expressly provided that CIPA should not be construed to require tracking the Internet use of an identifiable minor or adult. Children's Internet Protection Act § 1702(b), Pub. L. No. 106-554, 114 Stat. 2763, 2763A-336 (2000). That language does not prohibit all identified monitoring. It does defeat the argument that CIPA itself requires the particular account-by-account

content analysis challenged here. A general monitoring condition is not a statutory command to use this product or this method.

The District's own technology witness distinguished the two. Its former technology director, David Vignery, testified that Gaggle was not a federal or state requirement and extended the content filtering already in place. Vignery Dep. 158:6–19, ECF No. 193-12. Englebrick identified Vignery as the source of his understanding of the E-Rate rationale. Englebrick Dep. 67:1–8, ECF No. 193-25. AF 32. The witness testimony does not decide the statute's meaning; it confirms that the District's chosen implementation should not be confused with the requirement itself.

Even a funding condition encouraging a particular practice would not resolve the Fourth Amendment question. The condition may inform the governmental interest. The Court must still determine whether the resulting search is reasonable. The District's exemptions and adviser-based safety measures underscore that its own compliance practice does not depend on machine examination of every student's expression.

### F. Kansas law supplies no mandate for the District's method and protects the interests it burdens

Kansas law likewise supplies no mandate for the District's method. The District has invoked the Kansas Internet Protection Act to refuse a family opt-out, ECF No. 23-22 at 2, but that statute addresses blocking or filtering access to specified visual depictions. K.S.A. 75-2589. It supplies no command to read all stored student documents.

Other Kansas statutes point the other way. A school district may not "use any device or mechanism to assess a student's physiological or emotional state" without written consent, K.S.A. 72-6315, and specified nonacademic examinations concerning private attitudes, values, beliefs, or practices require notice and consent, K.S.A. 72-6316. Those enactments inform the balance

without requiring adjudication of their direct application to ManagedMethods: the State has recognized that method, consent, and notice matter even when the purpose is student welfare.

The special-needs balance must therefore be performed on the practice the District actually chose. The governmental interests are substantial. So are the privacy and expressive interests exposed by continuous examination of required accounts. The record of legitimate work being flagged, the depth and continuity of the examination, the students' changed expression, and the District's own alternative for exempt journalists preclude the categorical judgment sought here.

## V. The program burdens protected expression even when the District allows the message to arrive

### A. Delivery is not the measure of First Amendment freedom

The District's answer to the First Amendment claims is that ManagedMethods does not block ordinary email and therefore does not restrict speech. ECF No. 194 at 43, 46. That answer leaves the injury untouched. Students can receive every message they send and still stop writing the things they would otherwise write because the government is examining them. H.C. changed his communications after a flag brought him before a counselor. E.B. changed his reporting because his notes and drafts had to pass through the monitored environment. AF 17–19. Their injury is the expression the program deters before there is anything to deliver.

Even *Laird* recognized that governmental action falling short of a direct prohibition can deter protected expression. 408 U.S. at 11. Its insistence on a concrete injury is answered here by the students' accounts, their own changed expression, the District's monitoring admission, and the record of what official intervention entails. Parts I–II, supra. The First Amendment does not require journalists to abandon their sources or students to invite another intervention before they may challenge the practice causing them to censor themselves.

The District's own administrators understood the problem. Boyle agreed that the journalistic work process should remain confidential and that Gaggle interfered with it. Swift identified First Amendment concerns as the reason for the exemption. AF 30–31. Those statements expose the inadequacy of an argument that recognizes no expressive burden unless the software blocks delivery. The District accommodated student journalism precisely because the burden was broader than that.

The completed restrictions further demonstrate the expressive interests at stake. Gaggle restricted class photographs, a journalist's test email, a collaborative document, and a KORA spreadsheet. AF 20–28. ManagedMethods has changed some of those functions. It continues the examination of covered accounts, and the record documents alerts on legitimate academic work. AF 1–7. Plaintiffs' First Amendment theory reaches both the restrictions already imposed and the objectively grounded deterrence caused by the continuing examination. A change in delivery settings does not answer both.

### B. The school's authority depends on the expression and its educational role

The government does not acquire plenary authority over student expression by owning the server on which students must create it. *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 508–09, 513–14 (1969), requires a sufficient justification grounded in disruption or interference with the rights of others. *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 270–73 (1988), permits editorial control over qualifying school-sponsored expression when reasonably related to legitimate pedagogical concerns. Neither decision treats the location of a file as the end of the inquiry.

The distinction matters here. Reviewing an assignment to teach a student is one activity. Continuously examining every draft and private communication for semantic indicators is another. Farthing wanted the photography teacher to see the photographs but did not want the District

examining them. E.B.'s drafts move through a collaborative editorial process that requires District storage. AF 18, 23. The District cannot justify the entire account examination simply by observing that some contents will eventually be submitted for educational review.

The reach beyond campus also requires justification. *Mahanoy Area School District v. B.L.*, 594 U.S. 180, 188–90 (2021), recognizes substantial school interests in threats, serious harassment, and rules governing online school activities, while emphasizing the limits on a school's authority over off-campus expression and the concern raised by regulation throughout the day. The use of a school account makes context relevant; it does not eliminate those limits. Here, the examination follows the account onto personal devices and into the home. AF 1, 13.

Nor does the safety label erase the special concern for journalistic materials. *Zurcher v. Stanford Daily*, 436 U.S. 547, 564–66 (1978), upheld the availability of a properly supported search of a newspaper's premises while requiring scrupulous application of Fourth Amendment protections where expressive materials are involved. That scrutiny belongs here, where the District routinely reaches reporting drafts and source communications.

**C. Kansas law and District policy place editorial responsibility with students**

The Kansas Student Publications Act assigns news and opinion content to student editors and limits attribution of student expression to the district. K.S.A. 72-7211(d)–(e). This Court has explained the Act's protection of student publications in *M.C. v. Shawnee Mission Unified School District No. 512*, 363 F. Supp. 3d 1182, 1200–02 (D. Kan. 2019). The District's own practice accords with that allocation: central administration does not choose topics or require administrative approval of stories before publication, and Policy JHCA supplies procedures for disapproval. AF 33.

The Act permits review of student publications only under specified conditions. K.S.A. 72-7211(b). That limited role does not establish authority to examine continuously every interview

note, unfinished sentence, and confidential exchange from which journalism is made—a distinction the District's own journalism exemption recognizes. AF 30–31.

**D. Calling ManagedMethods a tool does not answer the vagueness claim**

Count VII challenges the District's surveillance policies and practices. ECF No. 101 ¶ 399. The District responds that a tool cannot be vague. ECF No. 194 at 43. But a government cannot insulate its operative standards from review by placing their application inside a tool. The relevant questions concern the rules governing classification and intervention, the notice students receive, and the discretion exercised when expression triggers official action.

A policy may be unconstitutionally vague if it fails to give reasonable notice of prohibited conduct or permits arbitrary enforcement. *Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1233–34 (10th Cir. 2023). *Black Emergency Response Team v. Drummond*, 191 F.4th 1198, 1212–17 (10th Cir. 2026), requires attention to the actual text and distinguishes facial from as-applied challenges. It rejects the proposition that imperfect precision alone establishes facial vagueness. Its analysis, however, does not exempt a school's policies from review merely because the school administers them through software.

The challenged practice presents a concrete gap between the announced categories and the consequences of classification. The AUP warns of inappropriate material. A software flag nevertheless establishes no policy violation; staff must determine context and intent afterward. AF 7–8. Legitimate literary work has generated an alert. AF 5. Outside discovery, the District supplied neither E.B. nor H.C. a written definition of toxicity. Although students may seek review and restoration afterward, no District policy requires an opportunity to contest a quarantine before it occurs. AF 29. These facts bear on notice and discretion at the point when the practice affects expression.

The District's assertion that every covered file is scanned does not resolve that issue. ECF No. 194 at 45. Students may know that everything will be examined without knowing what makes their lawful expression a basis for official intervention. Plaintiffs reserved the facial-vagueness theory for trial in their own motion, ECF No. 193 at 22, but the record and distinctions above show why the District is not entitled to judgment on it either.

### E. The overbreadth inquiry reaches the whole practice, including its deterrent effect

First Amendment overbreadth requires a substantial unconstitutional sweep relative to the challenged practice's legitimate applications. *Hansen*, 599 U.S. at 769–70. *Moody v. NetChoice, LLC*, 603 U.S. 707, 723–26 (2024), requires identification of the practice's full scope and comparison of its constitutional and unconstitutional applications. Plaintiffs bear that burden. The District's assertion that a system delivering email cannot be overbroad skips the inquiry rather than defeating it.

The practice identified here is the District's authorization of continuous content examination in covered student accounts, together with the resulting classification, official review, and restrictions. It reaches academic work, journalism, artwork, and communications, including material accessed from home and retained long after its creation. AF 1–7, 13, 17–28. Its current configuration excludes designated accounts, narrows alert categories, and limits quarantine. Those limits belong in the analysis. So do the antecedent examination and the expression students decline to create because of it.

The legitimate applications include addressing credible threats, serious harassment within the school's authority, and other concrete safety concerns through constitutionally reasonable means. The challenged applications include the examination and resulting burdens on confidential reporting, protected artwork, and innocuous communication without a sufficient educational or

safety justification. The record supplies examples of each expressive category, evidence of actual changes in speech, and testimony that content review continues across the covered population. It also supplies the District's recognition that journalistic work requires an accommodation. AF 17–31.

At minimum, the motion's delivery-based premise supplies no basis to dispose of the concrete as-applied speech claims. The Court should separately analyze the facial claim under *Hansen* and *Moody*, using the actual scope and operation of the challenged practice, rather than treating the absence of an email block as dispositive of both forms of relief.

### F. The Fourth Amendment permits review of the common search authorization

The Fourth Amendment challenge to the common authorization presents a separate question from First Amendment overbreadth. *City of Los Angeles v. Patel*, 576 U.S. 409, 415–23 (2015), rejected a categorical bar to facial Fourth Amendment challenges and identified *Vernonia* as an example of review of a school search policy. Plaintiffs challenge the authorization under which the District continuously examines covered accounts, not merely a series of unrelated alerts.

That authorization can be evaluated against the privacy interests, scope, safeguards, and asserted need established in this record. An independently justified response to an emergency does not itself validate the antecedent examination of every covered account. *Patel*, 576 U.S. at 418–19. The District may defend particular conduct under consent, exigency, or another applicable doctrine. Those independent grounds do not supply a categorical answer to the challenged program.

## VI. A narrower quarantine policy does not dispose of the search and speech claims

### A. Examination and interference with possession are different constitutional events

A search infringes a protected privacy interest; a seizure meaningfully interferes with a possessory interest. *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). The District's argument that ManagedMethods does not hold ordinary email or quarantine documents concerning suicide, self-harm, or violence addresses possession and delivery. ECF No. 194 at 28. It does not answer whether the preceding examination is a search or whether that examination burdens expression.

The distinction is decisive for H.C. The District admits that his account is monitored. A ruling that he has not established a present threat of a particular quarantine would not establish that the monitoring is constitutional, extinguish his asserted privacy injury, or answer his documented self-censorship. The motion should not turn a narrower seizure argument into judgment on those independent injuries.

### B. Current quarantine authority and completed restrictions require separate treatment

The present record describes ManagedMethods quarantine for suspected child pornography, a materially narrower category than all sexually explicit imagery or the earlier Gaggle classifications. Luckett 30(b)(6) Dep. 64:8–65:2, ECF No. 193-9; Polk 30(b)(6) Dep. 38:5–18, ECF No. 193-10. Plaintiffs do not treat that capability alone as proof that either current student faces an imminent seizure. Nor do they assume that every historical Gaggle restriction will recur under the present configuration. Their prospective seizure theory must be assessed against the particular student, the current operation, and any supported likelihood of recurrence.

The completed restrictions remain a different matter. Gaggle prevented students from accessing files, and the District's retained Vault copy did not return that access. AF 28. The photographs, delayed email, blocked document, and blocked spreadsheet demonstrate actual

interference with students' control over their work. AF 20–27. The Fourth Amendment protects possessory interests independently of privacy. *Soldal v. Cook Cnty.*, 506 U.S. 56, 61–64 (1992). Retaining an administrative copy is not the same as restoring the owner's use.

## VII. The Court should preserve the surviving claims and relief outside the motion's grounds

The District asks to dismiss Counts I, II, IV, V, VII, and VIII. ECF No. 194 at 47. The motion does not reach Counts III and VI, and both current students also seek damages for completed injuries. This Court has already construed Counts I, II, IV, and V as prayers for relief rather than standalone claims. ECF No. 56 at 40. The requested declaratory and injunctive relief therefore follows the surviving substantive claims, subject to the standing and merits requirements for each form of relief. Relabeling the prayers does not establish that no current student may obtain prospective relief. If the Court concludes that a particular student lacks standing for a particular form of prospective relief, any dismissal should be without prejudice and limited to that student and that relief.

Plaintiffs' decision not to seek affirmative summary judgment on a theory does not concede Defendant's entitlement to judgment on it. Any ruling should identify the particular claim, plaintiff, theory, and remedy actually decided.

The former students' nominal-damages claims, which the District expressly excludes from this motion, ECF No. 194 at 10, remain pending and should remain outside any judgment entered on it. A completed constitutional injury may support nominal damages even when prospective relief becomes unavailable. *Uzuegbunam v. Preczewski*, 592 U.S. 279, 285–92 (2021). Plaintiffs also preserve any properly pleaded and surviving claim for compensatory relief supported by proof of actual injury, including emotional distress where legally recoverable. *Carey v. Piphus*, 435 U.S. 247, 263–64 (1978); *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 306–08 (1986). They

do not seek damages based on an abstract valuation of constitutional rights. Any recoverable fees and costs under 42 U.S.C. § 1988 likewise follow the claims and relief on which Plaintiffs prevail.

The detention theory concerning Opal Morris and Henry Farthing, and the theory concerning restricted dissemination of KORA-produced material, were reserved in Plaintiffs' own memorandum. ECF No. 193 at 22. To the extent those theories remain within the operative pleadings and pretrial order and outside the grounds presented here, this motion supplies no basis to decide them.

If the Court denies judgment on a claim but identifies facts not genuinely disputed, Plaintiffs request appropriate treatment under Rule 56(g), including recognition of the District's express Rule 36(b) admissions to the extent not withdrawn or amended. Fed. R. Civ. P. 56(g), 36(b). The Court should identify the facts the actual record conclusively resolves while preserving disputed issues for trial.

Finally, if the District's reply relies on a new ground or new evidence—such as account-history evidence offered to reconcile the October admission with the November declaration—Plaintiffs request an opportunity to respond before the Court relies on it. *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1164–65 (10th Cir. 1998).

## CONCLUSION

The District requires students to create their schoolwork, journalism, art, and much of their correspondence inside its Google environment. It then examines the contents of covered accounts around the clock, including off campus and on personal devices. When that examination deters protected expression, the District points to an inspection disclaimer. When a student challenges the practice, it points to an exemption whose operation its own admission puts in dispute. And when Plaintiffs identify the breadth of the examination, the District answers with the narrower number of alerts it chooses to receive.

None of those answers resolves the constitutional question. Notice of a search is not its justification. Delivery of a message does not restore the expression a student decided not to write. A vendor change does not eliminate the examination that continues. And a present account designation cannot carry the District's burden without confronting the record of what happened and what may recur.

The students' testimony supplies the human consequence: reporting narrowed, jokes abandoned, photographs changed, and work moved elsewhere to avoid attention. The District's own witnesses supply the operational consequence: content continues to be examined even when alert settings change. Its admissions supply the factual dispute over E.B. Its concessions establish that H.C. remains within the monitored population. Those facts warrant adjudication under the constitutional standards, not judgment founded on the proposition that there is nothing left to examine.

For these reasons, Plaintiffs respectfully request that the Court deny Defendant Lawrence USD 497's Motion for Partial Summary Judgment. If the Court grants any part of the motion, Plaintiffs request a ruling confined to the particular plaintiff, claim, theory, and relief actually resolved, preserving all remaining issues for trial and granting such further relief as is just and proper.

Dated: November 16, 2026

Respectfully submitted,

**DENTONS US LLP**

By: */s/ Harrison M. Rosenthal*
Mark P. Johnson (Kan. No. 22289)
Harrison M. Rosenthal (Kan. No. 28894)
Jacob S. Margolies (Kan. No. 29470)
Rebecca Hughes Parker* (NY No. 4321287)

4520 Main Street, Suite 1100
Kansas City, Missouri 64111-7700
Telephone: (816) 460-2400
Facsimile: (816) 531-7545
mark.johnson@dentons.com
harrison.rosenthal@dentons.com
jacob.margolies@dentons.com
rebeccahughes.parker@dentons.com
**Admitted Pro Hac Vice*

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 16, 2026, the foregoing Plaintiffs' Response in Opposition to Defendant's Motion for Partial Summary Judgment was electronically filed using the Court's CM/ECF system, which will send notice to counsel of record for Defendant Lawrence USD 497:

Cameron E. Grant
Andrew J. Gnefkow
Melika Harris
Lewis Brisbois Bisgaard & Smith LLP
4600 Madison Avenue, Suite 700
Kansas City, Missouri 64112
cameron.grant@lewisbrisbois.com
andrew.gnefkow@lewisbrisbois.com
melika.harris@lewisbrisbois.com

*/s/ Harrison M. Rosenthal*
Counsel for Plaintiffs