**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| JACK TELL; NATASHA TORKZABAN; MORGAN SALISBURY; OPAL MORRIS; HENRY FARTHING; SUZANA KENNEDY; NAOMI SUI PANG; ASHLYN TELL; PHOEBE MORRIS; E.B., a minor, by and through his parent and next friend CATHERINE P. BATZA, Ph.D.; and H.C., a minor, by and through his parents and next friends DANIELLE BRUNIN and ERIK CHANEY,<br><br>*Plaintiffs*<br><br>v.<br><br>LAWRENCE USD 497, a political subdivision of the State of Kansas,<br><br>*Defendant* | ) | Case No. 2:25-cv-02428-KHV-GEB |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Cameron E. Grant
Melika Harris
Andrew Gnefkow
LEWIS BRISBOIS BISGAARD & SMITH LLP
4600 Madison Ave., Suite 700
Kansas City, MO 64112
(816) 299-4255
Cameron.Grant@lewisbrisbois.com
Melika.Harris@lewisbrisbois.com
Andrew.Gnefkow@lewisbrisbois.com

*Counsel for Defendant*

Kansas City, Missouri
November 16, 2026

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iv

INDEX OF EXHIBITS ........ vi

INTRODUCTION ........ 1

RESPONSE TO PLAINTIFFS' STATEMENTS OF FACT ........ 2

DEFENDANT'S ADDITIONAL STATEMENTS OF FACT ........ 12

ARGUMENT ........ 18

I. THE DISTRICT DOES NOT DISPUTE POINTS I.A AND IV OF PLAINTIFFS' MOTION, BUT THOSE POINTS DO NOT ESTABLISH PLAINTIFFS' ENTITLEMENT TO SUMMARY JUDGMENT ........ 18

II. PLAINTIFFS' MOTION FAILS TO ACCOUNT FOR DIFFERENCES BETWEEN GAGGLE AND MANAGEDMETHODS, AND THE FACT THAT E.B. IS EXEMPT FROM MONITORING ........ 19

III. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON THEIR FOURTH AMENDMENT CLAIMS SHOULD BE DENIED ........ 20

A. Plaintiffs had no reasonable expectation of privacy when using District technology ........ 20

1. E.B., H.C., Opal and Henry signed the District's Acceptable Use Policy, which disclaims any expectation of privacy ........ 20

2. District policies advised the students their use of District technology was subject to monitoring ........ 21

3. Plaintiffs had no reasonable expectation of privacy when using District technology ........ 21

B. To the extent Plaintiffs had a reasonable expectation of privacy, the District's monitoring was justified as a special needs search ........ 26

C. Opal and Henry are not entitled to summary judgment based on the facts specific to them ........ 29

1. Opal and Henry lacked any possessory interest in their photographs ........ 29

2. Even if Opal and Henry had some possessory interest in the files, the District's quarantine of their files was either a reasonable seizure, or caused only *de minimis* injury ........ 31

D. E.B. and H.C. fail to establish any separate basis for Fourth Amendment Liability ........ 34

IV. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON THEIR FIRST AMENDMENT CLAIMS MUST BE DENIED .................................. 35

A. The District's monitoring operates as a reasonable restriction to preserve its non-public technology forums. ....................................... 35

B. The former students lack any independent basis for summary judgment ........................................................................ 38

1. Suzana Kennedy ........................................................................ 39

2. Natasha Torkzaban ................................................................... 39

3. Morgan Salisbury ...................................................................... 40

4. Jack Tell, Ashlyn Tell, Naomi Sui Pang, and Phoebe Morris........ 41

C. Opal Morris and Ashlyn Tell are not entitled to summary judgment on their First Amendment claims because they have not demonstrated the District's alleged prohibitions were attributable to District policy, and issues of fact preclude summary judgment ..... 41

1. Ashlyn Tell.................................................................................. 41

2. Opal Morris................................................................................. 42

V. PLAINTIFFS' MOTION FOR A PERMANENT INJUNCTION SHOULD BE DENIED ........................................................................ 43

A. E.B. lacks standing altogether, and H.C. lacks standing because he fails to identify concrete particularized harm and ManagedMethods does not seize content in violation of the Fourth Amendment........... 43

B. E.B. and H.C. lack standing sufficient establish their right to an injunction on their First Amendment chilling effect claims .............. 44

1. The District's current monitoring does not directly interfere with E.B. and H.C.'s speech or expressive conduct....................... 44

2. E.B. and H.C. lack standing to maintain their overbreadth challenge, or alternatively, their challenge fails .......................... 45

3. E.B. and H.C. are not entitled to an injunction against the District's use of ManagedMethods due to their subjective chilling effect claims. ......................................................... 45

C. E.B.'s and H.C.'s motion for a permanent injunction should be denied, balancing the *Kitchen* factors ................................................ 48

1. Actual Success ............................................................................ 48

2. Irreparable Harm ....................................................................... 48

3. Whether threatened injury outweighs the harm the injunction may cause the opposing party ........ 49

4. Whether the injunction will not adversely affect the public interest ........ 49

CONCLUSION ........ 50

# TABLE OF AUTHORITIES

## Cases

*A.B. v. Adams-Arapahoe 28J Sch. Dist.,* 831 F.Supp.2d 1226 (D. Colo. 2011) .......... 19

*A.M. v. Holmes*, 830 F.3d 1123 (10th Cir. 2016) .......... 33

*Bd. of Cnty. Com'rs v. Brown*, 520 U.S. 397 (10th Cir. 1997) .......... 34, 39

*Bd. of Educ. v. Earls*, 536 U.S. 822 (2002) .......... 25, 27, 28, 48

*Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986) .......... 37

*Bingham v. Baycare Heath System*, 2016 WL 3917513 (M.D. Fla. July 2016) .......... 25

*Bobbs-Merrill Co. v. Straus*, 210 U.S. 339 (1908) .......... 30

*Brown v. Enter. Merchants Ass'n*, 564 U.S. 786 (2011) .......... 41

*Bruce v. Kelly*, 2021 WL 4284534 (D. Kan. 2021) .......... 36

*Cardwell v. Lewis*, 417 U.S. 583 (1974) .......... 32

*Collins v. City of Harker Heights,* 503 U.S. 115 (1992) .......... 19

*Cornelius v. NAACP Legal Def. Fund*, 473 U.S. 788 (1985) .......... 37

*Crowson v. Washington Cty. Utah,* 983 F.3d 1166 (10th Cir. 2020) .......... 19

*Doe ex rel Doe v. Little Rock School Dist.*, 380 F.3d 349 (8th Cir. 2004) .......... 24

*Dubbs v. Head Start, Inc.*, 336 F.3d 1194 (10th Cir. 2003) .......... 27

*Eureka Water Co. v. Nestle Waters North America, Inc.*, 690 F.3d 1139 (10th Cir. 2012) .......... 30

*Foley v. Carlsbad Municipal Schs.*, 2011 WL 13286401 (D.N.M. Jan. 24, 2011) .......... 32

*Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*, 586 U.S. 296 (2019) .......... 30

*Haynes v. Attorney Gen. of Kan.*, 2005 WL 2704956 (D. Kan. Aug. 26, 2005) .......... 25

*Hazelwood Sch Dist. v. Kuhmeier*, 484 U.S. 260 (1988) .......... 45

*In re Ind. Serv. Orgs. Antitrust Litig.*, 85 F. Supp. 2d 1130 (D. Kan. 2000) .......... 30

*In re Isiah B.*, 500 N.W.2d 637 (Wis. 1993) .......... 24

*Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082 (10th Cir. 2006) .......... 46

*Kitchen v. Herbert,* 755 F.3d 1193 (10th Cir. 2014) .......... 44

*L.F. v. Lake Wash. Sch. Dist. #414*, 947 F.3d 621 (9th Cir. 2020) .......... 36

*Lakey, Lakey v. Bryant*, 181 F.4th 1013 (10th Cir. 2026) .......... 43

*Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748 (10th Cir. 2024) .......... 49

*M.C. v. Shawnee Mission USD No. 512*, 363 F. Supp. 3d 1182 (D. Kan. 2019) .......... 45

*Mahanoy Area Sch. Dist. v. B.L. ex re Levy*, 594 U.S. 180 (2021) .......... 37

*Minn. Voters All. v. Manksy*, 585 U.S. 1 (2018) .......... 37

*Muick v. Glenayre Elecs.*, 280 F.3d 741 (7th Cir. 2002) .......... 24, 25

*Murthy v. Missouri*, 603 U.S. 43 (2024) .......... 44, 47

*New Jersey v. T.L.O.*, 469 U.S. 325 (1985) .......... 22, 23, 26, 27

*Page v. Lexington Cnty. Sch. Dist. One*, 531 F.3d 275 (4th Cir. 2008) .......... 36

*Perry Educ. Ass'n v. Perry Local Educators" Ass'n*, 460 U.S. 37 (1983) .......... 36

*PETA v. Tabak*, 109 F.4th 627 (D.C. Cir. 2024) .......... 37

*Pure Power Boot Camp v. Warrior Fitness Boot Camp*. 587 F. Supp. 548 (S.D.N.Y. 2008) .......... 25

*Riley v. California*, 573 U.S. 373 (2014) .......... 23

*Sprague v. Spokane Valley Fire Dep't*, 409 P.3d 160 (Wash. 2018) .......... 36

*State v. Jones*, 666 N.W.2d 142 (Iowa 2003) .......... 24

*State v. Stein*, 456 P.2d 1 (Kan. 1969) .......... 24

*Stephens v. Cady*, 55 U.S. 528 (1852) .......... 30

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) .......... 37, 45

*United States v. Angevine*, 281 F.3d 1130 (10th Cir. 2002) .......... 26

*United States v. Brown*, 925 F.2d 1301 (10th Cir. 1991) .......... 30

*United States v. Jacobsen*, 466 U.S. 109 (1984) .......... 29, 31, 32

*Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646 (1995) .......... 22

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) .......... 37

*Winsenss v. Yocom*, 433 F.3d 727 (10th Cir. 2006) .......... 46

**<u>Statutes</u>**

42 U.S.C. § 1983 .......... *passim*

47 U.S.C. § 254(h)(5)(B) .......... 50

**<u>Other Authorities</u>**

Fed. R. Civ. P. 56 .......... 2

D. Kan. Rule 56.1 .......... 2, 12

**INDEX OF EXHIBITS**

Exhibit 1 – David Vignery deposition transcript excerpts.
Exhibit 2 – Morgan Salisbury deposition transcript excerpts.
Exhibit 3 – Natasha Torkzaban deposition transcript excerpts.
Exhibit 4 – Naomi Sui Pang deposition transcript excerpts.
Exhibit 5 – Plaintiffs' Second Amended Complaint.
Exhibit 6 – Henry Farthing deposition transcript excerpts.
Exhibit 7 – Kiley Luckett FRCP 30(b)(6) deposition transcript excepts.
Exhibit 8 – Policy JT.
Exhibit 9 – Acceptable Use Policy (SAC Ex. P).
Exhibit 10 – Jeanice Swift deposition transcript excerpts.
Exhibit 11 – Jack Tell deposition transcript excerpts.
Exhibit 12 – James Polk FRCP 30(b)(6) deposition transcript excerpts.
Exhibit 13 – Kiley Luckett deposition transcript excerpts.
Exhibit 14 – Greg Farley deposition transcript excerpts.
Exhibit 15 – Policy IIBG.
Exhibit 16 – Abbi Epperson-Ladd deposition transcript excerpts.
Exhibit 17 – Epperson-Ladd Text Message
Exhibit 18 – Ashlyn Tell deposition transcript excepts.
Exhibit 19 – Elaina Honas deposition transcript excerpts.
Exhibit 20 – Jeanice Swift FRCP 30(b)(6) deposition transcript excerpts.
Exhibit 21 – E.B. deposition transcript excerpts.
Exhibit 22 – Declaration of James Polk in Support of Defendant's Motion.
Exhibit 23 – H.C. deposition transcript excerpts.
Exhibit 24 – Anthony Lewis deposition transcript excerpts.
Exhibit 25 – Policy IIBG (SAC Ex. K).
Exhibit 26 – Policy JCAB (SAC Ex. O).
Exhibit 27 – Phoebe Morris deposition transcript excepts.
Exhibit 28 – Declaration of James Polk in Opposition of Plaintiffs' Motion.
Exhibit 29 – Suzana Kennedy deposition transcript excepts.
Exhibit 30 – Registration Acknowledgment for Henry Farthing.
Exhibit 31 – Registration Acknowledgment for Opal Morris.
Exhibit 32 – Opal Morris transcript excerpts
Exhibit 33 – Gaggle FAQ.

Defendant Lawrence USD 497 ("Defendant" or the "District") respectfully submits the following response to Plaintiffs' motion for partial summary judgment (ECF 193).

## INTRODUCTION

Plaintiffs ask the Court to grant summary judgment and permanently enjoin the District's use of ManagedMethods, without a trial, based on E.B.'s and H.C.'s allegations that ManagedMethods constantly scans their content – but without identifying any harm that E.B. and H.C. have ever actually suffered that is traceable to ManagedMethods. Plaintiffs request this relief despite that ManagedMethods is the tool the District uses to comply with the Children's Internet Protection Act, as is necessary to receive federal funds for education within the District, and despite that the District's monitoring over the last several years has proved effective in saving lives, preventing suicide, and intervening in cases of child abuse, in addition to monitoring for the creation and dissemination of child pornography.

Plaintiffs' motion addresses District monitoring generally but ignores that ManagedMethods has a lesser scope and reach compared to Gaggle. ManagedMethods does not quarantine content, and monitors only for suicide and self-harm, threats of violence, and sexually explicit images. No Plaintiff has identified *any speech* that ManagedMethods, as opposed to Gaggle, has ever interfered with. And yet, Plaintiffs ask the Court to enjoin the District's use of ManagedMethods, which would jeopardize Federal E-Rate funding the District depends upon to educate its roughly 10,000 students.

Former-student plaintiffs seek summary judgment on certain issues as well. The District does not seek to minimize the legitimacy of the free speech and privacy interests the students seek to protect through this lawsuit, but respectfully, while the *rights* Plaintiffs identify are of great importance, the *harm* they identify is *de minimis*, particularly in relation to the harm the District is able to prevent through monitoring.

There is no claim as to which Plaintiffs have established their entitlement to summary judgment, and they are certainly not entitled to summary judgment granting the ultimate relief they seek – an injunction against the District's continued use of ManagedMethods – especially not where E.B. is not subject to monitoring at all, and the only specific incident H.C. alleges in support of his claims is *Gaggle's* prior quarantine of a "joking email" he sent in middle school, and following which he only sent e-mails related to education – which is the purpose for which the District provides H.C. with technology in the first place.

## DEFENDANT'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED MATERIAL FACTS

Pursuant to Fed. R. Civ. Proc. 56(c) and D. Kan. Local Rule 56.1(b)(1), Defendant identifies the following material facts it disputes. If Defendant does not address facts below, they are either undisputed for purposes of, or immaterial to, Plaintiffs' current motion. Defendant does not admit any fact not addressed below for any other purpose.[1]

### A. The District adopted compulsory, continuous examination of student communications and files.

1. Undisputed, but incomplete: The District no longer uses Gaggle, having replaced it with ManagedMethods, as discussed elsewhere in Plaintiffs' statements.

[1] Plaintiffs' motion contends that Defendant's responses to Plaintiffs' Second Requests for Admission were untimely served, and therefore requests 91-199 are deemed admitted. (ECF 193, n.2) For purposes of their motion, Plaintiffs invoke Defendant's purported admission of RFA 151 in support of the portion of Fact 25 contending the District had advance notice of Torkzaban's test email. Plaintiffs invoke RFA 156 in the argument portion of their motion, at the end of the first paragraph on page 38, describing the injunctive relief they seek.

As reflected in the Pretrial Order Section 8.b (ECF 200 – Additional Pretrial Motions), Defendant may file a motion under Rule 36 withdrawing any admissions. But any admissions are immaterial to Plaintiffs' current motion: as explained in Defendant's response to Fact 25 below, it is immaterial whether the District had advance notice of Torkzaban's test email, and Defendant argues against the summary injunctive relief Plaintiffs seek, for reasons independent of any purported admission of RFA 156. Further, even in the two instances where Plaintiffs rely on purported admissions, they cite other evidence as well. It is thus unnecessary for the Court to determine whether RFAs 151 and 156 are deemed admitted, or alternatively whether any admission may be withdrawn, in ruling on Plaintiffs' motion.

2. Disputed in part. Gaggle scanned messages and documents when students accessed them on personal devices, but *only if* the documents interacted with the District's servers; the District did not otherwise scan the Plaintiffs' personal devices. (Ex. 1, Vignery Dep. 95:10–96:3; Ex. 2, Salisbury Dep. 95:8–96:13; Ex. 3, Torkzaban Dep. 117:9–16; Ex. 4, Sui Pang Dep. 79:6–13.)

4. Disputed in part. Quarantine restricted student access to an extent, but (1) Quarantined files were eventually restored (Ex. 5, SAC ¶ 163; Ex. 6, Farthing Dep. 79:11–23); and (2) by spring 2024, the District had given head principals authority to restore quarantined files immediately (Ex. 7, Luckett 30(b)(6) Dep. 57:10–58:11).

8. Disputed in part. Policy JT's exception covers student work produced at the District's request for its use, which includes class assignments and student-publication work, as Dr. Swift testified. (SUMF ¶ 8; Ex. 8, Swift Dep. Ex. 12 at 1). The AUP separately provides that information and files on District systems remain District property. (Ex. 9; DSOF 43).

9. Disputed in part. While students *who use District technology* are not allowed to opt out of monitoring, (1) A family that declines the AUP may still enroll the student. (DSOF 45); (2) Specific classes and research projects can be excluded from alerting. For example, a seventh-grade Civil War unit can be excluded so it does not generate weapons alerts. (Ex. 10, Swift Dep. 208:16–209:21); (3) ManagedMethods does not monitor personal accounts, personal storage, or personal devices. (DSOF 12); and (4) Plaintiffs E.B., Torkzaban, Jack Tell, and Salisbury used personal devices and accounts for their journalism (DSOF 50; Ex. 3, Torkzaban Dep. 116:16–117:16; Ex. 11, J. Tell Dep. 105:18–108:1; Ex. 2, Salisbury Dep. 125:8–17).

**B. The replacement program continues the same round-the-clock examination of student content.**

10. Disputed in part. Dr. Englebrick's testimony is quoted correctly, but (1) Dr. Englebrick did not testify in a 30(b)(6) capacity, and the District disputes SOF 10 to the extent Plaintiffs imply Gaggle and ManagedMethods performed the same functions: (1) Gaggle reviewed email along with notes, files, and to-do lists. ManagedMethods has been "dialed in" to a narrower set of communications, with flag words limited to self-harm, violence or threats, and lewd or pornographic images. (Ex. 10, Swift Dep. 197:18–198:11, 199:12–200:2); (2) The District decides which storage locations are scanned, and personal notes can be excluded. (*Id.* at 207:20–208:4, 211:8–15); (3) The District no longer monitors students in kindergarten through fifth grade. (*Id.* at 140:16–141:10, 145:17–146:16); and (4) Unlike Gaggle, ManagedMethods does not alert on substance abuse or cyberbullying. It involves no vendor human review of student content, does not block or delay email, and quarantines nothing other than sexually explicit imagery. (DSOF 14–15, 17–18).

12. Disputed in part. Plaintiffs state that personal device use off campus does not avoid account-level scanning, but ManagedMethods does not monitor personal accounts, personal storage, or content stored *only* on personal devices, and it does not manage or access devices. (DSOF 12). Mr. Polk gave the quoted answer in response to a question he described as "loaded." In the surrounding testimony, he explained that the District calibrated the platform so that alerts go only to matters warranting investigation. (Ex. 12, Polk 30(b)(6) Dep. 41:2–14, 44:12–24).

13. Disputed in part. The District agrees ManagedMethods operates continuously but disputes that changes do "not eliminate the underlying examination." (1) Immediately after the passage Plaintiffs quote, Mr. Polk testified "[s]o there are changes, yes." He explained that ManagedMethods no longer alerts on substance abuse or cyberbullying. (Ex.

12, Polk 30(b)(6) Dep. 45:21–46:10); (2) He distinguished "white noise" from false positives: an alert can be accurate yet not warrant intervention. (*Id.* 25:22–26:8); (3) The District removed terms, such as "lit," that produced alerts not rising to a safety concern, and it configured alerts only for suicide and self-harm, threats of violence, and sexually explicit images. (DSOF 13–14); and (4) The narrowing applies to what is scanned, not only to what generates an alert. ManagedMethods is set to a narrower set of communications and storage locations than Gaggle. (Ex. 10, Swift Dep. 199:12–200:2, 207:20–208:4).

15. Disputed in part. Defendant agrees that ManagedMethods' current quarantine category concerns only suspected child pornography, and that ordinary nudity and self-harm alerts do not trigger the same restrictions. Defendant disputes the characterization that ManagedMethods alerts are "100 percent machine learning," and states that any such characterization is beyond the scope of Ms. Luckett's 30(b)(6) designation. Defendant states that ManagedMethods generates alerts through automated detection without vendor human review, so no person outside the District reviews student content before an alert. Alerts go only to designated District administrators. (DSOF 15–16, 59.) ManagedMethods quarantines nothing other than sexually explicit imagery, which Plaintiffs describe as suspected child pornography. (DSOF 18).

16. Disputed in part because Plaintiffs refer to the absence of a policy providing "an opportunity to contest a ManagedMethods quarantine, but ManagedMethods quarantines only sexually explicit imagery, (DSOF 18), which no Plaintiff claims a right to possess. The District states no content of E.B. or H.C. has ever been quarantined by ManagedMethods. (DSOF 32, 37).

**C. Quarantine denied students access to their photographs.**

21. Disputed in part. Defendant disputes the portion of Ms. Luckett's testimony quoted for the proposition that the District did not know how to get the photos back. This

paragraph omits context: (1) The "didn't know how to get them back" remark describes only the initial period after Gaggle's launch. The District then created a restoration practice and, by spring 2024, gave head principals authority to restore files immediately. (Ex. 7, Luckett 30(b)(6) Dep. 57:10–58:11); (2) "Non-issue." That remark described the review system the District built so that art assignments would not be quarantined. (*Id.* 30:4–9); and (3) "I do not" find the images inappropriate. Before answering, Ms. Luckett testified that "[i]nappropriate is a very open to interpretation." Her answer was limited to her personal view of exhibits shown to her years later, which she did not recall having reviewed. (Ex. 13, Luckett Dep. 177:13–178:1, 178:16–21). The restored images were returned to the students, and Farthing never permanently lost any image. (Ex. 6, Farthing Dep. 79:11–23).

22. Disputed in part. The District denies that Henry Farthing reasonably stopped taking photographs because of Gaggle. Farthing kept copies of his work and never permanently lost an image. (Ex. 6, Farthing Dep. 57:11–20, 79:11–23). The administrator who met with him told him he was not in trouble and that staff had to speak with each student whose content was flagged. They met alone for a few minutes, and Farthing returned to class without discipline. (*Id.* 122:5–123:10, 127:21–129:11). Farthing faced no academic consequences for the quarantine—he reuploaded the quarantined photos without incident. Farthing never asked from the photos to be restored or was even aware when they were. (*Id.* 94:05-94:12.) Farthing's choice of subjects and his use of a personal film camera were his own decisions, made under Gaggle. Neither arose under ManagedMethods. (*Id.* 57:11–20).

23. Disputed in part. While Opal lost access to the copies, she had access to the originals, on her SD card. (Ex. 32, Morris Dep. 27:24-28:01.) While the photos were not restored until the next day, Opal only lost access to the uploaded photos for at most one day, (Morris Dep. 48:01-48:21) which did not prevent her from meeting the assignment deadline for the picture or even provide time with her to speak with teacher about the quarantine.

(Ex. 32, Morris Dep. 27:19-28:23.) There is no evidence that "security" interrupted Opal's class. The paragraph attributes an instruction not to discuss the matter further to District policy. Plaintiffs cite no District policy directing that instruction. Mr. Farley, who handled the art-student alerts, does not recall the meeting. (Ex. 14, Farley Dep. 84:6–90:5, 110:17–114:13). District training instructs administrators who respond to monitoring alerts to "maintain student privacy and dignity whenever possible" and to speak with the student privately, outside the presence of other students. Administrators conduct one-on-one meetings for sensitive subjects. (Ex. 7, Luckett 30(b)(6) Dep. 48:14–22, 85:24–86:6; Ex. 14, Farley Dep. 53:17–54:4.) Content flagged as potential child sexual abuse material is omitted from the alert itself, and administrators were instructed not to view suspected illegal images. (Ex. 7, Luckett 30(b)(6) Dep. 25:24–26:7, 28:16–24). No student was disciplined. (Ex. 5, SAC ¶ 148).

24. Disputed in part. Plaintiffs' statement describes only "initial training," but omits that in December 2023, after the art-student incident, the District changed its training. After that incident, administrators would view the flagged image and resolve it without pulling the student out of class. (Ex. 7, Luckett 30(b)(6) Dep. 29:12–30:21). Current training instructs administrators to speak with the student privately, to tell the student that the student is not in trouble, and to maintain student privacy and dignity whenever possible. (DSOF 20, 57).

**D. The District intercepted student journalism, including a message to an advisor sitting beside its author.**

26. Disputed in part. The District agrees Torkzaban's email was quarantined for staff review, but states this is immaterial to any injury Torkzaban suffered: (1) Tholen was sitting next to Torkzaban, who could communicate with her directly; (2) Torkzaban drafted her reporting about Gaggle in a personal account that was not monitored. (Ex. 3, Torkzaban

Dep. 116:16–117:16); and (3) The delay occurred under Gaggle's pre-April 2024 configuration. ManagedMethods does not block, hold, or delay email. (SUMF ¶ 5; DSOF 17). (4) Torkzaban did not send the email because she was "really worried about [her] mental health," as the content of the email states, rather, she sent it to test Gaggle. (Ex. 3, Torkzaban Dep. 140:22-141:10.) (5) Torkzaban never lost access to the email herself; it remained in her sent folder, and she was able to retrieve a copy of the email after graduating, using Google Takeout. (Id., 145:6-146:6.)

27. Disputed in part. There is no record evidence about what Mr. Pruet "told Morgan," and any evidence of the same constitutes hearsay. The District does not deny that Salisbury created the word list and Gagge quarantined it.

28. Disputed in part. Plaintiffs state their efforts "consumed time they could have spent creating journalism," but the District denies Plaintiffs' contention these steps were necessary or caused them damages: (1) Jack Tell and other editors used personal Google accounts for stories they considered sensitive. (Ex. 11, J. Tell Dep. 105:18–108:1); (2) Jack Tell does not know whether any of his own files or emails were ever flagged. (*Id.* 35:13–17, 38:19–22); (3) Sui Pang does not know whether any of her content was flagged. (Ex. 4, Sui Pang Dep. 59:13–60:2); and (4) In spring 2024, the District exempted journalism students' accounts from Gaggle monitoring. Under ManagedMethods, students enrolled in designated journalism and media courses are exempt altogether. (DSOF 22–25).

29. Disputed in part. Kennedy implies Gaggle service "continued on her account" pursuant to District policy, but the District attempted to exempt Kennedy's account; the delay resulted from a vendor configuration issue, which was then corrected. (SUMF ¶ 30; Ex. 15, Dep. Ex. 139 at 2; Ex. 29, Kennedy Dep. 57:21–58:15, 63:5–12, 67:12–16, 69:3–9, 129:7–131:16).

31. Disputed in part. The District disputes that Gaggle was "interfering with" student journalism and states the District exempted journalism students from Gaggle monitoring. That exemption continues under ManagedMethods for students enrolled in designated journalism and media courses. (DSOF 22–25).

32. Disputed in part. The District disputes the notion that under no circumstance would a student know that an email had not been delivered, as is demonstrated by the Torkzaban example above, in which Torkzaban was able to verify her email to Tholen was not delivered. Further, ManagedMethods has no blocking feature, so no student's email goes undelivered. (DSOF 17; Ex. 7, Luckett 30(b)(6) Dep. 68:5–69:5). Administrators decide case by case whether to speak with a student, in part to protect student privacy. (DSOF 19, 57).

**E. Administrators banned student reporting about this lawsuit.**

33. Disputed. The District controverts the scope of what Dr. Rials conveyed, and further disputes the District ever implemented a "reporting restriction": (1) Ms. Epperson-Ladd testified that "[t]he only word I remember is no," that she did not know or remember the context, and that she recalled no clarification (Ex. 16, Epperson-Ladd Dep. 37:11–38:20, 38:22–39:20); (2) She did not recall Dr. Rials specifying which publications he meant, received nothing in writing, and had no other communication on the subject before classes started. Ms. Ladd subsequently sent Ashlyn Tell a text message stating that she believed Dr. Rials had stated only that the District would not comment on the Gaggle lawsuit. (Ex. 17, Dep. Ex. 121; Ex. 18, A. Tell Dep. 16:19-19:3, 22:9-23:6; Ex. 16, Epperson-Ladd Dep. 59:18-24, 90:16-12). Dr. Honas similarly recalls that Dr. Rials stated the District would not comment on the lawsuit (Ex. 19, Honas Dep. 62:6-10; see also id. 62:11-24, 63:10-17). Dr. Swift testified on behalf of the District that under no circumstances would students be told that they could not report on any lawsuit. (Ex. 20, Swift 30(b)(6) Dep. 32:7-9, 32:19-25; see also *id.* 29:10-24, 30:1-11, 33:13-15).

34. Disputed. The District disputes that anyone at the District instructed Dr. Rials to restrict reporting: (1) The District objects under Fed. R. Civ. P. 56(c)(2) and Fed. R. Evid. 802 to using Dr. Englebrick's account of what Dr. Rials said others told him to prove that Dr. Swift, Ms. Ryan, or Mr. May issued an instruction. The statement is hearsay within hearsay, and Plaintiffs have not shown that the inner statement falls within any exception; (2) Dr. Swift understood Dr. Rials to have meant that he would not comment on the litigation, not that students could not report on it. She met with the LHS administrative team to make clear that "there would never be any limitation" on student reporting. (Ex. 10, Swift Dep. 53:14-21, 54:4–55:9); (3) Dr. Swift testified that there was never a directive not to comment, and that the District "would not tell a principal, nor any member of our team, that reporting on a topic was not allowed." (*Id.* 127:11–16; SUMF ¶ 35).

37. Disputed in part. The District agrees that the day after the conversation between Dr. Rials and Ms. Ladd, on August 15, 2025, Dr. Rials issued memorandum lifting any prior restriction that had existed. The District disputes Plaintiffs' characterization of "the prior reporting restriction": As set forth in its response to SOF 33, the District denies Dr. Rials communicated a reporting restriction.

38. Disputed in part. The District disputes Plaintiffs' statement that Ashlyn delayed publication of "her article" that she had drafted on August 14, 2025, until August 19. The District states that on or about August 19, 2025, Ashlyn published an article on the LHS Budget's website entitled: Victory: Court notes journalism adviser's legal protections; district issues memo affirming no restraints on student press. (https://lhsbudget.com/news/2025/08/19/victory-court-notes-journalism-advisers-legal-protections-district-issues-memo-affirming-no-restraints-on-student-press/). The article references, among other things, Judge Vratil's August 19, 2025 ruling. Plaintiffs have not produced any prior drafts of the article. The District denies publication of Ashlyn's August

19, 2025 article was delayed, insofar as the article reports on events that occurred the same day as publication, so necessarily, the article could not have been drafted on August 14.

**E. The District scans E.B.'s and H.C.'s required accounts today.**

40. The District disputes that "every single thing [E.B. does] must end up on a school Google doc." E.B. uses his personal laptop, his iPhone, and personal accounts for journalism work, including recording interviews, because he knows those are not monitored. (DSOF 50). His testimony concerns where final work is submitted for editing, not where it is researched or drafted. (Ex. 21, E.B. Dep. 56:14-58:7).

41. Disputed. (1) E.B. is enrolled in Media Design & Production, also known as Digital Media Technology. Every student enrolled in that course is exempt from ManagedMethods altogether. (DSOF 24, 27; Ex. 22, Polk Decl. ¶ 13). E.B.'s District account is in the exempt organizational unit and is not monitored. (Ex. 22, Polk Decl. ¶¶ 12-13 & attachment.); (2) The District is not aware of any exempt student being flagged. (DSOF 25).

42. The District disputes that every sentence E.B. writes must end up in a Gaggle monitored document. (See response to SOF 40-41 above.) The District also disputes that E.B. would reasonably have "shifted his reporting" in response to Gaggle. E.B.'s quoted testimony describes his practice under Gaggle ("a Gaggle monitored Google document"), not under ManagedMethods. He is not aware of any of his content being flagged by ManagedMethods, he has never been disciplined, and he is now exempt from monitoring. (Ex. 21, E.B. Dep. 19:14–20; DSOF 27, 32–33). The District disputes that H.C. broadly changed his communications after a counsel questioned him about the "joking email." H.C.'s counselor's conversation with him took place under Gaggle, while he attended West Middle School. (DSOF 34). H.C. agrees that a counselor who learns a student may be bullied should look into it, and that the meeting gave him an opportunity to explain. (Ex. 23, H.C. Dep. 51:24–53:12). The meeting did not change how he completed schoolwork or communicated with teachers.

(DSOF 36). H.C. is not aware of any of his content being flagged by ManagedMethods. (DSOF 37). ManagedMethods is not configured to alert on cyberbullying, the subject of the flagged email. (DSOF 14, 35).

43. Disputed in part. Dr. Englebrick was not designated as a 30(b)(6) witness, and no witness testified that monitoring of "stored essay drafts and District-account activity" is a necessary component of CIPA compliance. The quote from Mr. Vignery's deposition is accurate, but he is no longer employed by the District. The District states it participates in the federal E-Rate program and understands that program and the Children's Internet Protection Act to require it to monitor student activity on District devices and accounts. (DSOF 54; Ex. 24, Lewis Dep. 107:6–108:12). The District's choice of ManagedMethods balanced that obligation against cost and the goal of not being more invasive than necessary. (DSOF 6; Ex. 10, Swift Dep. 140:16–141:10). What CIPA requires is a legal question, not a fact.

**F. Plaintiffs described their injuries and the damages they seek.**

The District does not dispute Facts 44-45, but these facts do not relate to Plaintiffs' current motion. These facts appear to be included to preempt the District's forthcoming motion to strike Plaintiffs' request for compensatory damages from the pretrial order, which the District has not yet filed.

**DEFENDANT'S STATEMENTS OF ADDITIONAL MATERIAL FACT**

Pursuant to D. Kan. Local Rule 56.1(b)(2), the District sets forth the following additional facts (each a "DSOF") it relies upon in opposition to Plaintiffs' motion (numbering continues from Plaintiff's SOF 45):

**G. Acceptable Use Policy and Board Technology Policies**

DSOF 46. Board Policy IIBG provides that students "shall have no expectation of privacy when using district email, other official communication systems, or computer

applications," and that information in District computer systems "may be subject to monitoring without notice." (Ex. 5, SAC ¶ 84; Ex. 25, SAC Ex. K; Ex. 24, Lewis Dep. pp. 47:12–48:21.)

DSOF 47. Board Policy JCAB provides that students "shall have no expectation of privacy when utilizing district property." (Ex. 5, SAC ¶ 102; Ex. 26, SAC Ex. O.)

DSOF 48. The Student Acceptable Use Policy provides that students will use technology for educational purposes and will not have any expectation of privacy when using District-owned devices or with respect to email, files, or directories. It also provides that email transmissions are subject to review without prior notice, and that information and files remain the property of the District. (Ex. 5, SAC ¶¶ 105–106; Ex. 9, SAC Ex. P.)

DSOF 49. Parents acknowledge the AUP electronically, through a form in the District's enrollment platform, when they enroll or re-enroll a student. By doing so, they acknowledge that the student will be issued a District account and devices. The District runs reports, most often before each school year, to identify students without an acknowledgment on file and follows up with those families. (Ex. 12, Polk 30(b)(6) Dep. pp. 51:18–25, 54:5–55:5, 56:3–57:20; Ex. 1, Vignery Dep. pp. 55:11–13, 56:8–57:24, 153:13–154:12.)

DSOF 50. A family that declines to acknowledge the AUP may still enroll the student. Such a student may use building devices at school but traditionally does not take them home. The number of students without an AUP on file is small. (Ex. 12, Polk 30(b)(6) Dep. pp. 50:11–22, 52:5–53:25, 55:9–56:24.)

DSOF 51. H.C. and his parents signed the AUP each year he was issued a District iPad, including the 2026–2027 school year. (Ex. 23, H.C. Dep. pp. 12:7–14:13.)

DSOF 52. E.B. has no reason to doubt that the AUP was signed by him or on his behalf as a condition of enrollment. (Ex. 21, E.B. Dep. pp. 92:9–93:2, 105:13–19).

DSOF 53. Jeromy Morris agreed to the AUP on behalf of Opal Morris. (Ex. 30).

DSOF 54. Sarah Farthing agreed to the AUP on behalf of Henry Farthing. (Ex. 31).

DSOF 55. E.B. and H.C. acknowledged the AUP at their deposition. H.C. understood that his District iPad was for educational purposes, that District devices would be inspected, and that District email could be reviewed without prior notice. E.B. agreed that he has no expectation of privacy in District email, in schoolwork stored on District Google Drive, or in District devices, and that his files are District property. (Ex. 23, H.C. Dep. pp. 14:14–17:8; Ex. 21, E.B. Dep. pp. 90:5–91:12, 106:5–108:13.)

**H. Tailoring of ManagedMethods.**

DSOF 56. The District no longer monitors students in kindergarten through fifth grade, whose device time is minimal and closely supervised by teachers. ManagedMethods covers approximately 5,800 accounts of students in grades 6–12. (Ex. 10, Swift Dep. 140:16–141:10, 145:17–146:16, 177:2–8).

DSOF 57. Reducing invasiveness was one of the two key reasons the District moved from Gaggle to ManagedMethods; the other was cost. The District sought to avoid being overly invasive into students' work without a legitimate reason. (Ex. 10, Swift Dep. 146:17–147:3, 150:5–9).

DSOF 58. ManagedMethods is set to a narrower set of communications than Gaggle, which reviewed email along with notes, files, and to-do lists. The District determines which storage locations ManagedMethods scans, and personal notes can be excluded. (Ex. 10, Swift Dep. 197:18–198:11, 199:12–200:2, 207:20–208:4, 211:8–15).

DSOF 59. Teachers can ask the District to exclude specific classes or research units from alerting. For example, a seventh-grade Civil War unit can be excluded so that it does not generate weapons alerts. (Ex. 10, Swift Dep. 208:16–209:21).

DSOF 60. The District continues to calibrate ManagedMethods. It adjusts settings, observes the effect for a week or two, and adjusts again. (Ex. 10, Swift Dep. 212:22–213:14; Ex. 12, Polk 30(b)(6) Dep. 44:12–24).

DSOF 61. An excessive volume of low-priority alerts diverts counselors from students experiencing suicidal ideation. Reducing that volume serves the District's student-safety interest. (Ex. 4, Swift Dep. 143:2–145:6).

**I. Changes to the response process of the District.**

DSOF 62. In December 2023, the District changed its training. Administrators now view a flagged image and resolve it without pulling the student out of class. (Ex. 7, Luckett 30(b)(6) Dep. 29:12–30:21).

DSOF 63. By spring 2024, the District had given head principals authority to restore quarantined files immediately. (Ex. 7, Luckett 30(b)(6) Dep. 57:10–58:11).

**J. The misinterpreted reporting restriction on the Lawsuit.**

DSOF 64. Dr. Swift understood Dr. Rials's statement to mean that he would not comment on the litigation, not that students could not report on it. She met with the LHS administrative team to make clear that there would never be any limitation on student reporting. She helped prepare the August 15, 2025 memorandum confirming that students may report on any topic. (Ex. 10, Swift Dep. 54:4–55:9, 114:20–116:14, 127:11–16).

DSOF 65. Ms. Epperson-Ladd recalls only the word "no" from her meeting with Dr. Rials. She does not recall its context or any clarification, does not recall him specifying any publication, and received nothing in writing. (Ex. 16, Epperson-Ladd Dep. 37:11–39:20).

**K. Plaintiffs' own content.**

DSOF 66. Jack Tell does not know whether any of his files or emails was ever flagged. (Ex. 11, J. Tell Dep. 35:13–17, 38:19–22).

DSOF 67. Naomi Sui Pang does not know whether any of her content was flagged or reviewed. (Ex. 4, Sui Pang Dep. 59:13–60:2).

DSOF 68. Ashlyn Tell does not know whether any of her content was flagged, and is not aware of any content of hers that the District deleted. (Ex. 18, A. Tell Dep. 77:13–16, 88:6–14).

DSOF 69. Phoebe Morris has no knowledge of any of her content being flagged. (Ex. 27, P. Morris Dep. 27:24–28:1, 65:19–21).

DSOF 70. The only emails of Salisbury and Torkzaban that were held from delivery were emails they wrote deliberately to test whether Gaggle would flag them: (1) Salisbury's roughly ten undelivered emails were all designed to trigger Gaggle, and he knows of no other email of his that was flagged. (Ex. 2, Salisbury Dep. 12:24–14:23); and (2) Torkzaban wrote her March 29, 2024 email to simulate a mental-health concern in order to test Gaggle. (Ex. 3, Torkzaban Dep. 141:11–15, 240:7–17).

### L. ManagedMethods Is Necessary for the District's CIPA Compliance and E-Rate Funding.

DSOF 71. The District bases its certification of compliance with the Children's Internet Protection Act (CIPA) on its use of ManagedMethods. That compliance is required for the District to maintain its E-Rate contract with the Federal Government for the provision of internet access throughout the District, including its K–12 schools. (Ex. 28, Polk Decl. ¶¶ 1–5).

DSOF 72. If the District were to stop using ManagedMethods such that it could no longer certify CIPA compliance, the District would lose its E-Rate funding. (*Id.* ¶ 6).

DSOF 73. The District receives millions of dollars each year from the Federal Government through E-Rate funding, supporting 10,000 students, and 2,500 teachers, staff and contractors. (*Id.* ¶¶ 7–8).

DSOF 74. The District would not be able to continue operations if it lost E-Rate funding, which sustains virtually every aspect of the District's operational infrastructure. (*Id.*, ¶ 9.) Loss of E-Rate funding would have immediate, irreparable, disastrous consequences for the District's ability to educate its students, maintain its many education. Programs, maintain student safety, and employ teachers and staff. (*Id.*, ¶ 11.)

DSOF 75. Separately, the District uses ManagedMethods to monitor student accounts for safety concerns, including pornographic images, and an injunction would impede the District's ability to perform these functions, potentially resulting in undetected incidents of unsafe behavior, threats of student violence, or the creation of dissemination of child pornography. (*Id.* ¶ 10).

**M. Gaggle's Functionality**

DSOF 76. Gaggle automatically flagged student content based on keywords, and its human safety team reviewed the flags before sending alerts to a school administrator. The administrator met with the student about the flagged content and decided whether it should be un-quarantined. Once the administrator resolved the alert, the temporarily quarantined content was restored to the student's account. (Ex. 1, Vignery Dep. 22:12–23:12; Ex. 13, Luckett Dep. 80:4–22; Ex. 14, Farley Dep. 36:7–11; Ex. 7, Luckett 30(b)(6) Dep. 53:22–55:2.)

DSOF 77. Under District Policy IIBG, student computer use is for educational purposes and may be monitored by District administrators. The District used Gaggle to flag student files and communications that raised policy or safety concerns. Gaggle quarantined content only when it involved lewd or nude images or potential child pornography, and the quarantine was temporary so that a District administrator could review the content and decide whether further action was warranted. If the administrator found the content was not an issue, it was restored to the student. Otherwise, the administrator followed up with the

student. (Ex. 24, Lewis Dep. 46:15–47:11; Ex. 7, Luckett 30(b)(6) Dep. 58:7–23, 63:24–64:12; Ex. 13, Luckett Dep. 80:4–22; Ex. 14, Farley Dep. 36:7–11).

**N. Miscellaneous**

DSOF 78. The District maintains a student's Google Suite for one year after separation before deleting it. (Ex. 33.)

DSOF 79. The District's intervention made possible by monitoring includes the following examples: (1) intervening after a student wrote a suicide note on the District account during the summer, which was flagged; the District reached the student's family, and the student was hospitalized the same day, before the student could act on the plan; (2) a student emailed a friend overnight about an overdose attempt; the email was flagged, police were called and the student was taken to the hospital; (3) during a holiday break, an alert revealed that a student was being physically abused by a parent, and the District contacted the Department for Children and Families; (4) a student wrote about repeated heavy drinking and not wanting to live that way; the content was flagged and staff helped the student enter substance-use treatment; and (5) a student disclosed sexual exploitation at a residential treatment facility, the content was flagged and staff helped the student make reports and obtain intensive therapy. (Ex. 7, Luckett 30(b)(6) (81:9–83:6, 85:6–12.)

## ARGUMENT

### I. THE DISTRICT DOES NOT DISPUTE POINTS I.A AND IV OF PLAINTIFFS' MOTION, BUT THOSE POINTS DO NOT ESTABLISH PLAINTIFFS' ENTITLEMENT TO SUMMARY JUDGMENT.

Point I.A of Plaintiffs' motion argues the District's monitoring is a Fourth Amendment search. The District agrees that it conducts searches within the meaning of the Fourth Amendment through its use of ManagedMethods. Of course, it does not automatically follow the search is unconstitutional.

Point IV of Plaintiffs' motion argues the District is liable for its use of ManagedMethods. As to District liability, the "proper analysis requires [the court] to separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the [municipality] is responsible for that violation." *Crowson v. Washington Cty. Utah,* 983 F.3d 1166, 1186 (10th Cir. 2020) (quoting *Collins v. City of Harker Heights,* 503 U.S. 115, 120 (1992)). Plaintiffs must show either: (1) the person who inflicted the constitutional harm was acting pursuant to an official District policy, practice or custom; (2) the constitutional tort-feasor had final decision-making authority for the District; or (3) the District failed to adequately train or supervise its employees." *A.B. v. Adams-Arapahoe 28J Sch. Dist.,* 831 F.Supp.2d 1226, 1248 (D. Colo. 2011) (citation omitted).

The District does not dispute that if its use of Gaggle and ManagedMethods violated § 1983, the District may be held liable for that violation, insofar as use of those tools was official District policy. This analysis does not, however, extend to Ashlyn Tell's claim that Dr. Rials issued a reporting restriction, or Opal Morris's claim that former Assistant Principal Greg Farley directed her not to discuss the District's quarantining of her photography, neither of which reflected District policy, assuming the conversations occurred as described by Plaintiffs. Those separate points are addressed in Section IV below.

## II. PLAINTIFFS' MOTION FAILS TO ACCOUNT FOR DIFFERENCES BETWEEN GAGGLE AND MANAGEDMETHODS, AND THE FACT THAT E.B. IS EXEMPT FROM MONITORING.

As explained in the District's motion for partial summary judgment (ECF 194), ManagedMethods operates on a lesser scope and scale compared to Gaggle. ManagedMethods flags only for suicide and self-harm, threats of violence, and sexually explicit images (ECF 194 SOF 14.) And unlike Gaggle, ManagedMethods does not quarantine or remove content, except for sexually explicit imagery. (ECF 194, SOF 18.) Furthermore, ManagedMethods

exempts students enrolled in journalism classes, including current plaintiff E.B. (ECF 194, SOF 22-27.) Plaintiffs do not distinguish between Gaggle and Managed Methods, and virtually all the alleged violations of their rights occurred under Gaggle. While Defendant highlights relevant differences as applicable below, the Court should bear in mind that the former students' claims for damages based on past violations through Gaggle, and the current students' claims for injunctive relief as to ManagedMethods, relate to different monitoring tools, with different scope, that the District utilized in different ways at different times.

## III. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON THEIR FOURTH AMENDMENT CLAIMS SHOULD BE DENIED.

Point I of Plaintiffs' motion asks the Court to summarily determine that the District's use of Gaggle constituted, and its continuing use of ManagedMethods constitutes, an impermissible search. Point I.D seeks summary judgment on E.B.'s and H.C.'s claims for declaratory and injunctive relief, and damages under the Fourth Amendment. Point III.A seeks summary judgment based on Opal's and Henry's claims that the District violated their Fourth Amendment rights. Plaintiffs' motion on these points should be denied.

### A. Plaintiffs had no reasonable expectation of privacy when using District technology.

1. <u>E.B., H.C., Opal and Henry signed the District's Acceptable Use Policy, which disclaims any expectation of privacy</u>.

The four plaintiffs who seek summary judgment on their Fourth Amendment claims (or their parents) signed the District's Acceptable Use Policy. (PSOF 7; DSOF 51-55.) The AUP states that Students will: "Expect any district device to be regularly inspected for inappropriate material, which might include unlicensed software or inappropriate content and software." (DSOF 48, Ex. 9.)[2] Students will also:

[2] When Defendant cites "PSOF" in this Argument portion, Defendant refers the Court to its response to the corresponding Plaintiff statement of fact, set forth above.

> Expect, without prior notice, any and all usage of the district network and internet access, including but not by way of limitation, e-mail transmissions and receptions to be subject to review. Any information gathered during monitoring may be copied and or stored. All such information and/or files shall be and remain the property of the school district and ***no user shall have any expectation of privacy*** regarding the use of the devices(s), district network, or the district's internet.

(*Id.*, Ex. 9 (emphasis added).)

2. District policies advised the students their use of District technology was subject to monitoring.

The District maintains policy IIBG, which is part of the Student Handbook. (DSOF 46.) District Policy IIBG, regarding Computer Use, provides: "Computer systems are for educational and professional use. All information created or accessed by staff and students ***may be subject to monitoring without notice*** by district administrators and/or school staff when appropriate." (DSOF 46, Ex. 25 (emphasis added).)

Policy IIBG provides the following under Privacy Rights:

> Employees and/or students shall have ***no expectation of privacy*** when using district email, other official communication systems, or computer applications. Any email, computer application, or information in district computers or computer systems ***may be subject to monitoring without notice*** by administration and/or school staff when appropriate.

(*Id.*)

Board Policy JCAB provides that students "shall have no expectation of privacy when utilizing district property." (DSOF 47, Ex. 26.)

3. Plaintiffs had no reasonable expectation of privacy when using District technology.

"The Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'" *Vernonia Sch. Dist. ock against v. Acton*, 515 U.S. 646, 654 (1995). Defendants cite several cases to support their claim that Plaintiffs have a reasonable expectation of privacy in the content the District monitors, but all are distinguishable for one of two reasons.

First, the vast majority of Plaintiffs' cited caselaw concerns police searches. Schools have much greater authority to monitor students than police because schools have special needs to protect their students, maintain discipline, and provide tutelary instruction. *Vernonia*, 515 U.S. at 655-57. Here, the District monitors in furtherance of these specials needs, rather than in support of any law enforcement function. Much of the caselaw Plaintiffs cite involves protections against law enforcement, which implicates much more robust Fourth Amendment protection. *See New Jersey v. T.L.O.*, 469 U.S. 325, 341 n.7 (1985) (expressly distinguishing a teacher searching a student's bag from a police officer performing the same search on school property and identifying caselaw holding police searches require more substantial justification).

Second, almost every case cited by Plaintiffs, including all cases involving searches performed by school officials, concerns searches of a person's body, personal belongings, or personal electronic devices and/or accounts. Here, however, the District only monitors District-owned devices, or emails and files maintained on District servers it provides to Plaintiffs exclusively for educational use, not personal use. This distinction is crucial.[3] In *T.L.O.*, the Supreme Court rejected the argument that students have absolutely no expectation of privacy while on school grounds, relying heavily on the reality that students

[3] For example, Plaintiffs cite *Riley v. California*, 573 U.S. 373 (2014), to assert that the privacy interest implicated by the District's monitoring is greater simply because it concerns the Plaintiffs' electronic files. The facts of *Riley* could not be more different from the present facts. In *Riley*, the Supreme Court refused to allow a police officer to search the student's phone without a warrant. *Id.* at 374-75, 403. The Court identified a litany of *personal* information normally stored on a *personal* cellphone, *id.* at 393-96, that justified not extending the search-incident-to-arrest exception to the Fourth Amendment's warrant requirement, *id.* at 401. None of the personal information identified in *Riley* is reached by the District's monitoring because the District monitors electronic devices reserved for educational use, not personal use. Furthermore, while the police in *Riley* certainly had no possessory right to access Riley's personal phone, the District monitors its own property, which it permits Plaintiffs to access. And while Riley had an expectation of privacy against a search of the contents of his phone (as anyone would), the District provided extensive notice to Plaintiffs that the technological resources it provided would be subject to monitoring, eliminating any expectation to the contrary.

may bring "nondisruptive yet highly personal items" to school on their persons or in their wallets. *Id.* Thus, the Supreme Court held that a schoolteacher could not search a student's purse without any justification because such a search "is undoubtedly a severe violation of subjective expectations of privacy." *Id.* at 337-38. But while addressing the search of a student's personal belongings, the Supreme Court expressly declined to decide "whether a schoolchild has a legitimate expectation of privacy in lockers, desks, or other school property provided for the storage of school supplies[,]" i.e., school property temporarily provided for a student's use. *Id.* at 337 n.5. Thus, even the cases Plaintiffs cite pertaining to searches conducted in schools are distinguishable from the present facts because the District's monitoring does not reach the personal effects of students, a distinction expressly demarcated by the Supreme Court in *T.L.O.*

Two bodies of caselaw are more directly applicable to Plaintiffs' claims. First, many courts have held that when the school provides notice that the lockers are subject to search and maintains access to the locker, the student has no reasonable expectation of privacy. *See State v. Stein*, 456 P.2d 1, 3 (Kan. 1969) (joint control over student-provided lockers allows for a school official to inspect the locker over the student's objection); *In re Isiah B.*, 500 N.W.2d 637, 649-50 (Wis. 1993) ("School administrations may retain adopt a locker policy retaining ownership and possessory control of school lockers and give notice of that policy to students. Because Isiah B. had no reasonable expectation privacy in his locker, there was no Fourth Amendment violation[.]").

Lockers more strongly implicate a student's reasonable expectation of privacy. In some cases holding that a student has a reasonable expectation of privacy in a locker, the primary justification is that lockers hold personal items: "[A] locker presents a similar island of privacy in an otherwise public school. Numerous permissible items of a private nature are

secreted away within a locker on a daily basis with the expectation that those items will remain private." *State v. Jones*, 666 N.W.2d 142, 148 (Iowa 2003). Here, however, the District's monitoring does not reach a student's personal items.

Second, courts have authorized employer monitoring of workplace electronic devices, files, and emails. Like the District's monitoring, workplace monitoring (1) is not for law-enforcement purposes; (2) is conducted by an entity with a possessory interest in the area monitored, and (3) does not implicate the same privacy concerns associated with searching an individual's personal belongings or person. When an employer provides notice to its employee that it will monitor the files on the employee's workplace computer and retains the ability to conduct that search without the employee's consent, courts have consistently held that the employee has no reasonable expectation of privacy.[4] *Muick v. Glenayre Elecs.*, 280 F.3d 741, 743 (7th Cir. 2002) ("But Glenayre had announced that it could inspect the laptops that it furnished for the use of its employees, and this destroyed any reasonable expectation of privacy that Muick might have had and so scotches his claim." (citations omitted)); *Haynes v. Attorney Gen. of Kan.*, 2005 WL 2704956, at *4 (D. Kan. Aug. 26, 2005) (unpublished) (collecting cases rejecting the government employee's section 1983 claim for a Fourth Amendment injury because the employee had no reasonable expectation of privacy against his government employer where the employer provided notice of monitoring); *cf. Bingham v.*

---

[4] Plaintiffs cite *Doe ex rel Doe v. Little Rock School Dist.*, 380 F.3d 349 (8th Cir. 2004), to assert that prior notice of a search cannot override an expectation of privacy protected by the Fourth Amendment. (ECF 193 at 17.) Plaintiffs are correct. In *Doe*, the government searched an area that is definitively protected by the Fourth Amendment, a student's closed backpack, without proper justification. *Id.* at 353-54. The Eighth Circuit determined that the school could not override a student's well-established privacy interest to their own backpack by imposing a unilateral policy subjecting the backpack to search. *id.* at 354. Here, however, the District did not search any of the Plaintiffs' personal belongings. Instead, the District monitored its own technological resources that it provided to Plaintiffs. In such circumstances, prior notice that technology will be monitored by the provider is a critical component in determining whether a party has any reasonable expectation of privacy under the Fourth Amendment. Such prior notice defeats a party's claim of a reasonable expectation of privacy, removing Fourth Amendment protection.

*Baycare Heath System*, 2016 WL 3917513, at *4 (M.D. Fla. July 2016) (unpublished) ("it appears that the majority of courts have found that an employee has no reasonable expectation of privacy in workplace e-mails when the employer's policy limits personal use or otherwise restricts employees' use of its system and notifies employees of its policy"); *Pure Power Boot Camp v. Warrior Fitness Boot Camp*. 587 F. Supp. 548, 559-560 (S.D.N.Y. 2008) (collecting cases to demonstrate "[c]ourts have routinely found that employees have no reasonable expectation of privacy in their workplace computers, where the employer has a policy which clearly informs employees that company computers cannot be used for personal e-mail activity, and that they will be monitored.").

Like the employer cases, the District provided technology to the Plaintiffs for educational use only, and notified Plaintiffs their devices were subject to monitoring.[5] All Plaintiffs signed or acknowledged the District's AUP, and they all attend school subject to District policies disclaiming any expectation of privacy when using District technology. Plaintiffs were aware the District would be monitoring their devices, files, and emails. The workplace cases dictate Plaintiffs had no objectively reasonable expectation of privacy.

Despite recognizing rulings that a party has no reasonable expectation of privacy, citing *United States v. Angevine*, 281 F.3d 1130 (10th Cir. 2002), Plaintiffs urge the Court against extending this reasoning to schools, but Plaintiffs provide no explanation for why students in a school should be afforded privacy protection that courts have routinely denied

---

[5] Plaintiffs argue that any condition placed on access to the technology provided by the District must be justified by "special needs." (ECF 193 at 25-26.) This is incorrect. The Supreme Court's "special needs" jurisprudence recognizes the government may intrude upon an individual's Fourth Amendment rights without any suspicion of unlawful conduct when justified by a special need. *Bd. of Educ. v. Earls*, 536 U.S. 822, 829 (2002). But where the government does not intrude on an individual's Fourth Amendment rights, no "special needs" justification is necessary. *See id.* (explaining when a government's special needs justifies conduct that would ordinarily violate the Fourth Amendment). The District's monitoring of its own technology, which it provides to students with notice of its right and ability to monitor, does not invade any reasonable expectation of privacy protected by the Fourth Amendment, so the District need not (although it may) justify monitoring based on special needs.

to adults in similar circumstances. If any distinction should be made, Plaintiffs, as students in a school, have a *reduced* privacy interest compared to adult employees because a workplace does not maintain the same level of custody over its employees or carry the responsibility of providing for their education. *See Veronia*, 515 U.S. at 657 ("[S]tudents within the school environment have a lesser expectation of privacy than members of the population generally." (quoting *T.L.O.*, 469 U.S. at 348 (Powell, J., concurring))).

The undisputed facts demonstrate the District notified Plaintiffs they had no reasonable expectation of privacy in the use of District-owned laptops, emails, or files, and that the District maintained the ability to access these platforms as a condition of access to the technology—a reasonable condition to ensure students used the technology appropriately. Plaintiffs are not entitled to summary judgment because they had no reasonable expectation of privacy in the technological material the District monitored.

**B. To the extent Plaintiffs had a reasonable expectation of privacy, the District's monitoring was justified as a special needs search.**

The Fourth Amendment applies differently in schools than anywhere else because schools have special needs to provide for the safety and the education of children within the school's custody. *Bd. of Educ. v. Earls*, 536 U.S. 822, 829-30 (2002). A school's special needs may justify suspicionless searches of its students. *Id.* at 829. In evaluating whether a school's special needs search is constitutional, a court balances the privacy interest at stake, *id.* at 830, and the degree of intrusion of privacy, *id.* at 832, against "the nature and immediacy of the government's concerns and the efficacy of the Policy in meeting them[,]" *id.* at 834. If this balance supports a finding that the school's search is a reasonably effective means of addressing the school's concerns, then the search is constitutional. *See id.* at 837-38.

Plaintiffs contend the District's monitoring is unconstitutional primarily because it is broader in scope than other special needs searches. However, Plaintiffs do not meaningfully

address the nature of the privacy interest implicated by the District's monitoring. Many special needs searches involve a highly protected privacy interest, such as searching a person's body or personal belongings. *See Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1213 & n.10 (10th Cir. 2003). Here, in contrast, the District monitors technology provided to students only for educational purposes. At most, the Plaintiffs' privacy interest in this technology is similar to a locker, another form of school-owned property temporarily provided for a student's use. The Supreme Court recognized that this interest is significantly less protected than the search of a student's personal items and, in fact, may not have any Fourth Amendment protection at all. *T.L.O*, 469 U.S. at 337 n.5. Thus, at the outset, the privacy interest implicated by the District's monitoring is considerably lower than in other cases approving the constitutionality of special needs searches.

Further supporting the reasonableness of the District's monitoring, the District has taken several precautions to lessen the intrusiveness of its monitoring. In *Earls*, the Supreme Court's evaluation of the privacy intrusion heavily considered the school's efforts to protect students' privacy interests. *See* 536 at 832-33. While Plaintiffs object to the scope of monitoring, the scope is justified: every file and email on the District's servers, no matter the time created, implicates the District's interest in maintaining student safety and the integrity of its technology against harmful use. To minimize any intrusion on student privacy, District employees do not personally review every student file and communication; instead, under ManagedMethods, questionable content is identified through an autonomous keyword search that does not expose the content of the file or communication to any person at all. (PSOF 15.) Typically, no District personnel lays eyes on any student content. (*Id.*) The District's searches are akin to a metal detector: every item is scanned by an autonomous machine, but no person is searched further unless the autonomous scan registers certain

criteria. When such content is identified, the content is revealed only to a select group of District faculty. (PSOF 15.)

Meanwhile, the District clearly has a legitimate interest in addressing the safety of its students, including preventing acts of violence and providing support for mental health crises. And the District has an interest in preventing students from co-opting its technology resources to engage in illegal conduct, such as disseminating child pornography.

Plaintiffs somewhat acknowledge the legitimacy of the District's interests, but argue that the District could address them through less intrusive means. However, the Supreme Court has rejected this measure of reasonableness: "'reasonableness under the Fourth Amendment does not require employing the least intrusive means, because '[t]he logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers.'" *Id.* at 837.

Plaintiffs cite a series of false-positive alerts generated by ManagedMethods to argue the District's monitoring is ineffective at achieving special needs. However, the constitutional standard of reasonableness is not whether a search generates false positives; courts instead consider whether the search is a reasonable means of achieving the concerns identified by the District when weighed against the intrusion of privacy interest at stake. *Id.* at 834.

The District's monitoring has been effective: it has allowed the District to provide additional mental health support to its students, including addressing mental health concerns that would not have been identified if the District had instead followed the alternative suggested by Plaintiffs. (DSOF 79.) Compared to the limited privacy interest implicated by monitoring and the precautions taken by the District to further minimize the intrusion on that privacy interest, the monitoring is justified as a special needs search.

### C. Opal and Henry are not entitled to summary judgment based on the facts specific to them.

Point III.A of Plaintiffs' motion seeks summary judgment on Opal's and Henry's Fourth Amendment claims. The District does not deny Opal and Henry lost access to photographs for a short period of time because they were quarantined by Gaggle. The District also acknowledges the photographs are not pornographic and do not violate school policy. Nevertheless, Opal and Henry are not entitled to summary judgment, first, because Opal and Henry had no reasonable expectation of privacy as to these images, or alternatively, the District's scanning of their content is justified as a special needs search. Separately, their unique claims do not support summary judgment for the additional reasons below.

#### 1. Opal and Henry lacked any possessory interest in their photographs.

A seizure under the Fourth Amendment occurs only when the government meaningfully interferes with an individual's possessory interest. *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). Plaintiffs allege the District unlawfully seized their photographs by quarantining them. To establish a possessory right to their files, Plaintiffs rely primarily on the District's School Board Policy JT, but this policy does not establish Plaintiffs' ownership over the electronic files maintained on the District's servers, rather it concerns a student's ownership over intellectual property, which is distinct.

Intellectual property is intangible and distinct from the medium containing the property. *See United States v. Brown*, 925 F.2d 1301, 1307-08 (10th Cir. 1991); *Eureka Water Co. v. Nestle Waters North America, Inc.*, 690 F.3d 1139, (10th Cir. 2012) ("Although one can express the content of intellectual property in a movable medium … the intellectual property remains intangible."); *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 350-51 (1908) (reasoning that an author's intellectual property right over the content contained in a book did not include the right to place restrictions on a buyer's title over a purchased physical copy of the

book); *Stephens v. Cady*, 55 U.S. 528, 531 (1852) ("[T]he property in the copy-right is regarded as a different and distinct right, wholly detached from … physical existence[.]").

A person's ownership of intellectual property does not create a right of ownership over every medium containing the intellectual property. If an employee stores a draft of a book on a workplace computer and is fired before saving the draft to the employee's personal computer, the employee has no intellectual property right to demand that the employer permanently allow the employee continued access to the draft on their workplace computer.[6]

While Plaintiffs may have intellectual property rights in their photographs,[7] they do not have possessory rights over the files maintained on the District's technological resources.[8] Illustrating the District's possessory control over its files, when a student graduates, the District wipes the student's devices, deletes the student's Google Classroom account and files, and deletes the student's email account. Students have no right to demand that the District permanently maintain their work product (at the District's expense) based on intellectual property rights. Instead, students may maintain personal copies of the files using "Google Takeout." (PSOF 26.) Even before a student graduates, the District's AUP explicitly reserves its right to remove inappropriate content, demonstrating the District's right to remove content maintained on its property. (DSOF 48, Ex. 9.)

---

[6] However, the employee would retain the exclusive right to reproduce distribute, or display the contents of the draft. *Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*, 586 U.S. 296, 301-02 (2019). Or, the employee could demand that the workplace refrain from publishing to contents of the draft. *See In re Ind. Serv. Orgs. Antitrust Litig.*, 85 F. Supp. 2d 1130, 1176 (D. Kan. 2000) ("A copyright give its holder the right to refuse to license its original expression to others.").

[7] None of the Plaintiffs contend that the District infringed upon their intellectual property rights by attempting to reproduce or publish their work product without their consent.

[8] In contrast, students have complete ownership over the files saved locally to their personal devices, forwarded to their personal email, or stored on their personal file storage. Plaintiffs do not allege that the District's monitoring and quarantining extended to these *personal* copies of their work product.

Plaintiffs' intellectual property rights in their student work product do not extend to a possessory right over the files maintained on the District's technological resources that happen to contain this intellectual property. Because Plaintiffs had no possessory interest in these District-maintained files (or at least a possessory right greater than the District's), the files are and were never protected from seizure, and the District cannot have unlawfully seized the content.

2. <u>Even if Opal and Henry had some possessory interest in the files, the District's quarantine of their files was either a reasonable seizure, or caused only *de minimis* injury</u>.

A seizure under the Fourth Amendment does not occur unless the loss of access to the property is meaningful. *Jacobsen*, 466 U.S. at 1656. When a privacy invasion is merely abstract or theoretical without any actual consequence, or when the impact of the seizure so minor as to be unnoticeable, it is not actionable. *Cardwell v. Lewis*, 417 U.S. 583, 591-92 (1974); *Jacobsen*, 466 U.S. at 125 & n.27 (the permanent deprivation of a "trace" amount of cocaine was *de minimis* because the amount lost was so small that it could not be noticed).

Furthermore, the Fourth Amendment applies differently in a school setting. "In determining the reasonableness of a search or seizure in the school setting, the Court must balance the government's interest in protecting the health and welfare of students against the privacy interest of the individual." *Foley v. Carlsbad Municipal Schs.*, 2011 WL 13286401, at *3 (D.N.M. Jan. 24, 2011) (unpublished) (citations omitted). Plaintiffs cannot establish that they suffered anything more than *de minimis* Fourth Amendment injury.

(a) Henry Farthing

Discovery established Farthing only experienced a single seizure of his art uploaded to District servers: five photos that he uploaded to be graded by his teacher (not for his own personal access) were removed. (PSOF 22.) When notified of this loss of access, Farthing did not ask for the photos to be restored. (*Id.*) Instead, he simply uploaded exact copies of the

missing photos to the same folder, which were then graded without further incident. (*Id.*) After these copies were graded, Farthing never even bothered to check if the missing files were ever restored. (*Id.*) Farthing's actions demonstrate that this loss of access was *de minimis* and could only be meaningful as an abstract injury, not one actionable under the Fourth Amendment.

(b) Opal Morris

Opal Morris alleges only that she lost access to copies of some photos that she uploaded to the District's servers. (PSOF 17, 19.) The photos were uploaded to be graded as part of an assignment (PSOF 23); thus, they were neither confidential nor intended to be worked on before the assignment deadline. Subsequently, Opal's photos were quarantined for suspected nudity (PSOF 19), which clearly implicated the District's legitimate interest in preventing the distribution of sexually explicit images of minors. Given Gaggle's alert of potential nudity, the District was justified in temporarily seizing the images for further investigation and to prevent further potential dissemination of the images on its servers before the investigation.[9] Once the investigation was complete, the District began the process of restoring the copies of the photos that had been quarantined. The photos were restored within a day of the original seizure—before Morris even had the opportunity to speak with her teacher about the quarantine or before the deadline for the submission passed. (PSOF 23.) Given the District's significant interest in preventing the dissemination of sexually

[9] Morris argues that the District was not justified in temporarily seizing the photos because no one from the District actually reviewed the content of the photos before the seizure. But, in the school setting, the Fourth Amendment only requires reasonable suspicion of a violation of school rules to justify a search or seizure; it does not require actual knowledge that a violation occurred. *A.M. v. Holmes*, 830 F.3d 1123, 1158 (10th Cir. 2016) ("The official need not possess absolute certainty that a search will produce [evidence of school rule violation]."). Here, the Gaggle alert for potential nudity was sufficient to create suspicion of an issue that implicated the District's special interest in preventing the dissemination of sexually explicit images on its technological platforms, justifying a more intrusive review by the District. The seizure was also necessary to advance the District's legitimate interest to prevent potential harm to students that could arise from such dissemination.

explicit images of minors, the temporary nature of the quarantine, and the prompt restoration of the photos after the completed investigation, the overall seizure was reasonable.

Morris contends the length of the quarantine (less than a single day (PSOF 23)) was unreasonable, but the delay is insufficient to support a section 1983 claim for one of two reasons. First, the Fourth Amendment does not require perfection, just reasonableness. By necessity, the Fourth Amendment must allow for a reasonable amount of time to go through the logistical process of reviewing seized material, and then returning it if appropriate. Here, the District began restoring Morris's photos promptly after determining they were not improper. While this process took some time logistically, Morris does not allege any harm suffered as a result of any delay. Furthermore, even while the District quarantined these copies, Morris retained access to the original photos, which were saved on the SD card in the camera used to take the photos. (PSOF 23.) Thus, the delay did not completely deprive Morris of her access to the photos, just copies of the photos that were maintained on the District's servers.

Second, section 1983 only imposes liability on the District for its deliberate conduct. *Bd. of Cnty. Com'rs v. Brown*, 520 U.S. 397, 404 (10th Cir. 1997). The District is not liable under a theory of respondeat superior or for actions that are not attributable to the District's official policy. Accepting Morris's allegation that restoration of her copies was delayed due to difficulties encountered during the restoration process, the delay would not be attributable to the District's deliberate conduct. Instead, the delay would be attributable to (1) technical issues with the restoration process itself or (2) the inability of District employees to execute the District's policy of prompt restoration. (PSOF 21.) Neither cause is attributable to the District's official policy, which provided for the prompt restoration of the photos.

### D. E.B. and H.C. fail to establish any separate basis for Fourth Amendment Liability.

Point I.D of Plaintiffs' motion argues ManagedMethods is unconstitutional as applied to E.B. and H.C. They request relief under Counts I and II, and a determination of liability under Count III. Referring to the Second Amended Complaint (ECF 101), Counts I and II sought declaratory and injunctive relief under the Fourth Amendment, and Count III sought Fourth Amendment damages. Because Defendant separately addresses Plaintiffs' motion for injunctive relief at point V below, Defendant only addresses Plaintiffs' motion for a determination of Fourth Amendment liability in this section.

As to their claim for Fourth Amendment liability, there is a disconnect between the relief E.B. and H.C. seek, and the factual basis for their motion. The Second Amended Complaint alleges only that E.B.'s NATO presentation was seized (ECF 101, ¶ 290), and that H.C.'s "joking email" was seized (ECF 101, ¶ 295). However, E.B. and H.C. do not include those facts in their current motion. Rather, point I.D of their motion cites only to facts 39-42, which do not reference seized content, and which state only that E.B.'s and H.C.'s accounts are monitored, and that they have changed their communications as a result. In other words, although Point I.D of Plaintiffs' motion seeks summary judgment that the District's "program" is unconstitutional as applied to them, they omit from their motion the specific facts based upon which their claim was initially based.

For all the reasons set forth above, E.B. and H.C. are not entitled to summary judgment on Fourth Amendment liability. They acknowledged the AUP, their access to District technology was subject to policies disclaiming any expectation of privacy, and the District's use of technology is alternatively justified as a special needs search. E.B. and H.C. do not offer any facts to establish Fourth Amendment liability, beyond that they are subject to monitoring. They do *not* seek to establish liability based on the District's prior seizure of

E.B.'s NATO presentation or H.C.'s joking email. As there is no independent basis for liability, this branch of Plaintiffs' motion must be denied for the other reasons stated in this section.[10]

## IV. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON THEIR FIRST AMENDMENT CLAIMS MUST BE DENIED.

Section II.A of Plaintiffs' motion argues the District's monitoring violates the First Amendment generally. Section II.B argues the District's review chills E.B's and H.C.'s expression. Section III.B argues the District violated Natasha's and Suzana's First Amendment rights by blocking their reporting communications. And Section III.C argues the District: (i) violated Opal's First Amendment rights by directing her not to talk about the quarantining of her photography; and (ii) violated Ashlyn's First Amendment rights by issuing a "reporting ban," through Dr. Rials. The Court should deny these aspects of Plaintiffs' motion.

### A. The District's monitoring operates as a reasonable restriction to preserve its non-public technology forums.

The government may restrict speech to differing degrees depending on where the speech occurs. When speech occurs on property owned by the government, courts apply forum analysis to determine the extent to which the government may regulate that speech. *Perry Educ. Ass'n v. Perry Local Educators" Ass'n*, 460 U.S. 37, 46-47 (1983) (explaining the factual differences between traditional public forums, designated public forums, and nonpublic forums and the different levels of scrutiny applied to speech regulations in each forum).

The District's email and file storage systems are nonpublic forums. *See id.* at 46-47; *L.F. v. Lake Wash. Sch. Dist. #414*, 947 F.3d 621, 627 n.7 (9th Cir. 2020) ("L.F. contends that

[10] Had E.B. and H.C. included facts regarding their alleged loss of E.B.'s presentation and H.C.'s joking email in their motion, Defendant would have made additional arguments about why those incidents do not establish the District's Fourth Amendment liability to E.B. and H.C. E.B. and H.C. should not be permitted to present these facts for the first time in reply.

the District's email system should be considered a designated public forum because the District uses the system as its primary method of contact with the public … But access alone is not enough to transform public property into a public forum.”); *Page v. Lexington Cnty. Sch. Dist. One*, 531 F.3d 275, 285 (4th Cir. 2008); *Sprague v. Spokane Valley Fire Dep't*, 409 P.3d 160, 173 (Wash. 2018) (accepting the parties' agreement that a government agency's email system is a nonpublic forum); *Bruce v. Kelly*, 2021 WL 4284534, at *29 (D. Kan. 2021) (unpublished) (“[S]everal courts—including the Supreme Court—have held that government mail and email systems are not state-created public forums.” (collecting cases)).

“In a nonpublic forum . . . the government has much more flexibility to craft rules limiting speech. The government may reserve such a forum ‘for its intended purposes … as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.’” *Minn. Voters All. v. Manksy*, 585 U.S. 1, 11–12 (2018) (quoting *Perry*, 460 U.S. at 46). “Reasonableness is to be assessed in light of the purpose of the forum[.]” *PETA v. Tabak*, 109 F.4th 627, 636 (D.C. Cir. 2024). In maintaining the purpose of the nonpublic forum, the government must only adopt *reasonable* regulation; it does not need to adopt the “most reasonable or the only reasonable limitation.” *Cornelius v. NAACP Legal Def. Fund*, 473 U.S. 788, 808 (1985).

Restrictions in nonpublic forums do not need to be narrowly tailored; they may be overinclusive or underinclusive. *See Manksy*, 585 U.S. at 16. The restrictions need not be precisely defined. *Id.* at 21(“P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.” (alteration in original) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989))). And the State's restrictions do not need to eliminate the exercise of discretion, rather “the State must be able to articulate some sensible

basis for distinguishing what may come in from what must stay out," *id.* at 16, and provide "objective, workable standards" for the exercise of discretion, *id.* at 21.

Here, the District expressly reserved its non-public forums for educational purposes, not personal purposes. The District was entitled to enforce reasonable rules to encourage civil communications between students. *See Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683 (1986) ("Nothing in the Constitution prohibits the states from insisting that certain modes of expression are inappropriate and subject to sanctions. The inculcation of these values is truly the 'work of the schools.'"); *Mahanoy Area Sch. Dist. v. B.L. ex re Levy*, 594 U.S. 180, 188–89 (2021) (citing *Tinker* for the proposition that schools have a "special interest" in regulating speech that materially disrupts classwork or invades that rights of other students and suggesting that this interest includes stopping bullying and harassment).

The District previously used Gaggle's quarantine feature to enforce its policies surrounding school-appropriate communications on its nonpublic forums; if Gaggle detected keywords in files and communications that implicated the District's policies or concerns, Gaggle temporarily quarantined the file to allow for District administrators to review the flagged content and determine if it warranted further action. (DSOF 77.) If the administrator immediately determined the communication or file was not an issue, it would be restored. If not, the administrator would follow-up with the student. (DSOF 77.)

A filter that automatically blocks content based on key words and phrases can be a reasonable regulation of a nonpublic forum when it includes a means of manual bypass:

> In *American Library Association*, for example, even though the pornography filters erroneously blocked some websites that did not show pornographic content, the Supreme Court held that the policy was reasonable in part because library patrons could easily disable the filtering software by asking a librarian to unblock the site either temporarily for their own use or permanently for use by others. 539 U.S. at 209, 123 S.Ct. 2297.

*Tabak*, 109 F.4th at 638 (comparing an automatic keyword filter to the procedure in *American Library Association* and determining that the automatic keyword filter was an unreasonable form of regulation of the non-public forum because it lacked the flexibility of manual review).

Here, Gaggle operated as an automatic filter for key words and phrases while still allowing for manual review of quarantined content by a school administrator, which included speaking with a student about the communication, and a method to restore the content after its temporary removal. (DSOF 76.) Thus, the District's use of Gaggle—before it was permanently discontinued for ManagedMethods, which performs no filtering—was a reasonable regulation of the District's nonpublic forums.

Because the District has a legal right to use monitoring as a means of regulating its nonpublic forums, any chilling effect the Plaintiffs experienced is not traceable to a violation of their First Amendment rights and, therefore, not actionable under section 1983. *See Walker*, 450 F.3d at 1088-1090, 1099-1101 (recognizing that the plaintiffs alleged an objectively justified chilling effect from a statute but nonetheless rejecting plaintiffs' claim for injunctive relief against the statute on the merits because the statute did not violate the plaintiffs' First Amendment rights). Therefore, Plaintiffs are not entitled to summary judgment based on any chilling effect attributable to monitoring generally.

**B. The former students lack any independent basis for summary judgment.**

The former student Plaintiffs have also failed to demonstrate their entitlement to summary judgment related to individual violations alleged by them. For a court to impose municipal liability under section 1983, a plaintiff must establish a violation of their federally protected rights. *Brown*, 520 U.S. at 402-403. The plaintiff must also demonstrate that the rights violation is not only attributable to the municipality but also that "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Brown*,

520 U.S. at 404. A violation of a plaintiff's right that is attributable to the unintended conduct of the District is insufficient to impose section 1983 liability. *See id.*

1. Suzana Kennedy

Suzana Kennedy alleges that the District violated her First Amendment journalistic reporting rights when Gaggle prevented her from receiving records she requested under KORA. Kennedy admits that, at this time, the District had attempted to exempt her from monitoring by Gaggle, but due to a technical error, the exemption was unsuccessful, so Gaggle initially quarantined records that should have been provided to her, before she ultimately received the records from the District. (PSOF 29.) Accepting the alleged facts as true, the delay Kennedy faced is not attributable to any deliberate conduct of the District, but rather technical error in executing the District's official policy of exempting journalism accounts from Gaggle. Had this policy been effectively implemented, Kennedy would have received her records in a timely manner. Because the delay in Kennedy's receipt of records is attributable to a technical error that contradicted the District's official policy, Kennedy cannot obtain summary judgment.

2. Natasha Torkzaban

In her section 1983 claim for violation of her First Amendment rights, Torkzaban alleges that the District restricted her right of free press when Gaggle intercepted an email sent to her journalism advisor Ms. Tholen, which allegedly prevented her from engaging in legally protected journalistic fact-gathering. Plaintiffs' motion mischaracterizes the nature and purpose of Torkzaban's email. The email, which Torkzaban sent with Ms. Tholen sitting next to her, states: "Hey Barb, The meeting today had me stressed, really worried about my mental health. Was too busy to talk to you in class, but sometimes you have to test the waters." The email itself was not meant to convey any truthful information, and Torkzaban did not have a mental health concern at the time; rather, email was intended to test the

parameters of Gaggle's quarantining. (PSOF 26.) This matters for two reasons. One, Gaggle did not impede Torkzaban's ability to transmit truthful information to Tholen. Two, the *act of the email's quarantine* completed Torkzaban's journalistic purpose in sending it, which was to determine whether an email with the language Torkzaban selected would trigger Gaggle. The District did not interfere with Torkzaban's fact-gathering exercise, nor did it prevent Torkzaban from reporting the results to anyone. The quarantine did not therefore violate Torkzaban's First Amendment rights. Plaintiffs' motion does not allege that Gaggle interfered with Torkzaban's other content. Because she has failed to demonstrate a violation of her First Amendment rights due to any quarantine by Gaggle, she is not entitled to summary judgment on her 1983 claims that proceed under that theory.

3. <u>Morgan Salisbury</u>

Similar to Torkzaban, Salisbury alleges the District violated his First Amendment right to free speech when it quarantined a series of emails and a Google Document that contained a list of words that were sent for the purpose of testing the parameters of Gaggle's quarantine. Fundamentally, the First Amendment protects speech when it communicates an idea or message. *See Brown v. Enter. Merchants Ass'n*, 564 U.S. 786, 790-91 (2011) (explaining that the First Amendment prevents the government from restricting speech solely because of its message, idea, subject matter, or content). The series of unconnected words contained in the Google document and in Salisbury's emails were only intended as a test of Gaggle's quarantine system, not an attempt to communicate any idea or message.[11] (PSOF 29, DSOF 70.) Because Morgan's items that were quarantined by Gaggle were not expressive speech but rather tests designed to trigger Gaggle's quarantining feature, the

[11] This point might be different if the unconnected words were intended to be some sort of message, but that is not what Morgan has alleged. Morgan has consistently maintained that the document was intended to simply test what would trigger a quarantine by Gaggle.

quarantines did not violate Salisbury's First Amendment rights. Like Torkzaban, Salisbury does not allege Gaggle quarantined any other of his other files or emails.

4. Jack Tell, Ashlyn Tell, Naomi Sui Pang, and Phoebe Morris

Plaintiffs' motion presents no evidence that Jack Tell, Ashlyn Tell, Naomi Sui Pang, and Phoebe Morris were ever aware of their content being flagged or quarantined. Having failed to demonstrate any seizure or interference attributable to the District's monitoring, these plaintiffs are not entitled to summary judgment.

**C. Opal Morris and Ashlyn Tell are not entitled to summary judgment on their First Amendment claims because they have not demonstrated the District's alleged prohibitions were attributable to District policy, and issues of fact preclude summary judgment.**

Opal Morris alleges she was told not to talk about the quarantining of her photography, and Ashlyn Tell alleges Dr. Rials told Ms. Ladd the students were not to report about Gaggle. As the parties holding the burden of proof on these claims, Opal and Ashlyn are entitled to summary judgment only if they demonstrate that the undisputed facts entitle them to judgment as a matter of law. Both claims are subject to genuine disputes of material fact that to preclude summary judgment.

1. Ashlyn Tell

Ashlyn alleges Dr. Rials told Ms. Ladd that students were not to report on Gaggle, and this chilled her reporting in violation of the First Amendment. Ms. Ladd acknowledges she initially advised Ashlyn against reporting on the litigation, but she almost immediately attributed that initial statement to her misunderstanding of what she had heard, in a text message she sent to Ashlyn on August 19, 2025. (PSOF 33.) Dr. Quinton Rials submitted a Declaration in this case dated August 29, 2025, in which he stated that District staff would not themselves comment on ongoing litigation, but "no school or district official would restrict students' lawful reporting on the lawsuit – or on any other subject." (PSOF 33, 34, 37.) After

reviewing Dr. Rials' Declaration, Ms. Ladd testified she believes she "misunderstood what [she] heard in the initial meeting." (PSOF 33-34.) Dr. Honas, who attended the initial meeting recalled Ms. Ladd asked about students wanting to report on Gaggle, "and [Dr. Rials] told her that because it's a lawsuit we would not be able to comment on it." (*Id.*) District Superintendent Jeanice Swift stated her understanding of Dr. Rials' statement was that he "won't be commenting as opposed to students are not allowed to report on this topic." (*Id.*) Upon learning of a possible misunderstanding, Dr. Swift clarified in person with Dr. Rials and "all members of that administrative team … that there would … not ever be a limitation on student journalists and their activities of reporting." (*Id.*)

There is <u>no evidence</u> that Dr. Rials communicated to Ms. Ladd that the students were not to report on Gaggle. While Ms. Ladd may have initially conveyed that sentiment to Ashlyn based on a misunderstanding of what Dr. Rials said, a mistaken understanding of District policy is insufficient to supply section 1983 liability unless further evidence demonstrates the employee's version of the policy implementation was so widespread that it amounted to unofficial policy. *See Lakey v. Bryant*, 181 F.4th 1013, 1032-33 (10th Cir. 2026).

There is, at the very least, an issue of fact as to what Dr. Rials said, but even if Plaintiffs could somehow establish that Dr. Rials directed Ms. Ladd that students were not to report on the Gaggle lawsuit – despite the absence of a single witness to the conversation who has testified to that fact – Dr. Rials would have been conveying a sentiment directly contrary to the District's policy, as articulated by Dr. Swift, that students were not prohibited from reporting on any topic. Thus, Ashlyn has failed to establish undisputed facts supporting a prior restraint on her speech attributable to District policy.

2. <u>Opal Morris</u>

Opal Morris alleges that after she was taken out a class presentation for a meeting regarding photographs that were quarantined by Gaggle due to potential nudity, Greg

Farley, the assistant principal who held the meeting, told her not to discuss the contents of the meeting with others. Farley does not recall giving that order and also attributes it to the District's policy that meetings regarding suspected nudity must remain confidential to protect student privacy, a policy not challenged by Plaintiffs. (PSOF 23.) Like Ashlyn's claim, genuine disputes of material fact remain on whether the constitutional violation is attributable to an unconstitutional policy adopted by the District. Because Opal has failed to establish undisputed facts supporting an unconstitutional prior restraint on her speech attributable to a District policy, she is not entitled to summary judgment.

## V. PLAINTIFFS' MOTION FOR A PERMANENT INJUNCTION SHOULD BE DENIED.

Point V of Plaintiffs' motion seeks an injunction. To obtain a permanent injunction on summary judgment, the plaintiffs must show: "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Kitchen v. Herbert,* 755 F.3d 1193, 1208 (10th Cir. 2014) (quotation and citation omitted). Weighing these factors, Plaintiffs' request for a permanent injunction should be denied.

### A. E.B. lacks standing altogether, and H.C. lacks standing because he fails to identify concrete particularized harm and ManagedMethods does not seize content in violation of the Fourth Amendment.

As explained in the District's motion at Points I-III, E.B. lacks standing because he is exempt from ManagedMethods, H.C. lacks standing because he fails to identify any concrete, particularized and imminent harm, and H.C. lacks standing because ManagedMethods does not seize content. (ECF 194 at 17-21.) Even if the Court denies the District's motion and is unable to determine as a matter of law that these Plaintiffs lack standing, any issue of fact as to their standing would similarly preclude summary judgment in their favor.

### B. E.B. and H.C. lack standing sufficient establish their right to an injunction on their First Amendment chilling effect claims.

#### 1. The District's current monitoring does not directly interfere with E.B. and H.C.'s speech or expressive conduct.

To be eligible for prospective relief, a party must demonstrate the presence of an ongoing injury or threatened future injury. *Murthy v. Missouri*, 603 U.S. 43, 69 (2024). In their motion, E.B. and H.C. allege ManagedMethods places an ongoing burden on their First Amendment rights because it interferes with their schoolwork and communications. They support their claims by analogizing ManagedMethods to cases where a school official either prohibited or directly interfered with student communication or reporting.[12] However, ManagedMethods does not interfere with E.B.'s or H.C.'s ability to speak freely. Unlike Gaggle, ManagedMethods does not quarantine student emails or files—it only provides an alert to District administrators when it detects content that implicates the District's concerns regarding students safety. Whatever content E.B. and H.C. put into an email or file on District servers, they will not lose access to it—unless it contains sexually explicit images, which E.B. and H.C. do not allege they intend to create. E.B. and H.C. present no evidence to dispute that ManagedMethods does not quarantine content; all the incidents of quarantining that they allege occurred under Gaggle. Because ManagedMethods imposes no burden at all on student speech, E.B. and H.C. are not entitled to an injunction against its use on that basis.

[12] *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) (school ban prohibited expressive conduct); *Hazelwood Sch Dist. v. Kuhmeier*, 484 U.S. 260 (1988) (principal altered student speech by editing a student newspaper); *M.C. v. Shawnee Mission USD No. 512*, 363 F. Supp. 3d 1182 (D. Kan. 2019) (principal interfered with student reporting by preventing a student from taking pictures for a new article).

2. E.B. and H.C. lack standing to maintain their overbreadth challenge, or alternatively, their challenge fails.

In Section II.C of Plaintiffs' motion, E.B. and H.C. contend the District's use of ManagedMethods is unconstitutionally overbroad. Before a plaintiff may challenge the overbreadth of a government restriction, they must first establish standing:

> Finally, Mr. Larsen appears to argue that we should dispense with the requirement that he suffer an injury-in-fact because he is bringing a facial challenge on First Amendment grounds under the "overbreadth" doctrine. This is a misunderstanding. Overbreadth is an exception to the *prudential* standing doctrine requiring plaintiffs to show that their own First Amendment rights (as opposed to the rights of third parties) have been violated, but it does not exempt plaintiffs—even plaintiffs bringing facial challenges on overbreadth grounds—from the bedrock Article III standing requirements of injury-in-fact, causation, and redressability.

*Winsenss v. Yocom*, 433 F.3d 727, 734 (10th Cir. 2006) (citation omitted).

Neither E.B. nor H.C. have established any ongoing First Amendment injury arising from ManagedMethods, therefore, they lack standing to pursue an overbreadth challenge. Alternatively, Plaintiffs have not established their entitlement to summary judgment on this claim because (1) ManagedMethods does not regulate or censor H.C.'s communications in any way, so it cannot be overbroad; and (2) ManagedMethods does not perform an action that could be considered an overbroad seizure or search. Defendant briefed these latter two issues at pages 39-40 of its own motion (ECF 194 at 39-40), and incorporates its arguments here.

3. E.B. and H.C. are not entitled to an injunction against the District's use of ManagedMethods due to their subjective chilling effect claims.

Because E.B. and H.C. cannot demonstrate any threat that ManagedMethods will interfere with their speech in the future, any injunction against ManagedMethods must rely entirely on the only other injury they allege: an ongoing chill on their speech. A subjective feeling of an alleged chilling effect is insufficient to sustain an actionable First Amendment injury. *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1088 (10th Cir. 2006). Otherwise, plaintiffs could challenge any government action they disagreed with on the basis

that it caused them to be deterred from speaking in some way: "If all it took to summon the jurisdiction of the federal courts were a bare assertion that, as a result of government action, one is discouraged from speaking, there would be little left of the Article III threshold in First Amendment cases." *Id.* To sustain a First Amendment injury, the chilling effect must be objectively justified from a fear of real consequences. *Id.* Objective justification requires a demonstrated fear of objective harm, i.e., negative consequences, that would result from participating in protected speech or expression. *Id.* Self-censorship performed out of fear of imagined or theoretical consequences is self-inflicted, not attributable to a government actor; therefore, it cannot support standing to pursue a claim for prospective relief under the First Amendment. *Murthy*, 603 U.S. at 73. For the same reason, ongoing self-censorship based on the government's past, discontinued actions cannot justify prospective relief. *Id.*

E.B. has no standing to pursue an injunction against the District's use of ManagedMethods because he is not subject to monitoring, due to his enrollment in a journalism class. But even without this exception, E.B. would not be able to demonstrate an objectively justified fear of harmful consequences traceable to ManagedMethods that would cause him to be more selective with his words and to avoid certain topics when writing, such as mental health. In his deposition, E.B. stated that he engaged in this self-censorship to avoid losing access to his files and emails; to avoid discipline; and to avoid any kind of questioning from District, even if this questioning were simply to check-in on E.B.'s mental health. These fears are either entirely imaginary or insufficient. Regarding E.B.'s first concern, ManagedMethods does not quarantine student content, so E.B.'s purported concern is based on the District's discontinued actions, not any future imminent threat. Regarding E.B.'s second concern, since transitioning from ManagedMethods to Gaggle, school administrators have adopted a policy of not imposing discipline based on ManagedMethods

alerts; Plaintiffs do not cite a single contrary incident where a student was disciplined due to a ManagedMethods alert, to create a genuine issue of fact.

E.B.'s final concern—inquiries from District administrators about his emails and files—is only a consequence E.B. could theoretically face in the future (if he were not exempted from monitoring). This concern is insufficient to objectively justify E.B.'s self-censorship for two reasons. First, to support a chilling effect, a person's self-censorship must be done to avoid a concrete *harm*. The brief questioning that E.B. seeks to avoid would be done exclusively for E.B.'s benefit, and E.B. never articulates why this kind of meeting would be harmful to him. Second, even accepting *arguendo* that a brief, non-disciplinary safety check-in could be considered harmful in some way, the First Amendment must be applied with due consideration of the District's special needs. *See Bethel Sch. Dist. No. 403*, 478 U.S. 675, 682-84 (1986) (explaining that rights of children in a public school must be applied in consideration of a school's special needs, including with regard to the First Amendment). The District's special need to maintain student safety, as recognized in *Earls*, surely allows for school administrators to briefly follow up on a student's statements or expressions without violating the student's First Amendment rights. That is all the District does here: if ManagedMethods detects content implicating student safety, *and* a District administrator agrees that the content implicates student safety after reviewing the alert, the administrator briefly checks in with the student. To disallow such check-ins on the basis that a student might be chilled from speech that could be mistaken for a mental health emergency would prevent the District from intervening in true student health emergencies. E.B.'s abstract[13] concern that a teacher might briefly check-in with him to ensure that a reference to suicide

[13] E.B.'s concern is purely abstract in two ways. First, he is not even subject to ManagedMethods monitoring due to his journalism exemption. Second, E.B. does not allege even a single time where he is aware of a ManagedMethods alert escalating to even a brief safety check-in.

is related to a class assignment does not defeat the District's interest in detecting and intervening against threatened suicide attempts.

Unlike E.B., H.C.'s content is actually monitored. However, H.C.'s concerns that lead him to self-censor are essentially identical to E.B.'s concerns. H.C. alleges that he self-censors by no longer sending jokes to his friends through the District's email system. H.C. cites similar concerns as E.B.: he seeks to avoid having his emails quarantined, to avoid facing discipline, and to avoid even a brief discussion with District administrators regarding the contents of his emails. Like E.B., the first two concerns are completely imaginary, and H.C.'s final concern is not an objectively reasonable fear of a negative consequence sufficient to support a First Amendment injury that justifies enjoining the entirety of the District's safety monitoring system.

E.B. and H.C.'s self-censorship is the result of a self-imposed chilling effect, not an objectively justified fear that the District will harm them as a result of their protected speech. Thus, they suffer no ongoing First Amendment injury traceable to the District's monitoring that justifies prospective relief.

### C. E.B.'s and H.C.'s motion for a permanent injunction should be denied, balancing the *Kitchen* factors.

#### 1. Actual Success

Plaintiffs seek a permanent, rather than a preliminary injunction. Therefore, they must demonstrate actual success, not a mere likelihood of success. *Kitchen,* 755 F.3d at 1208. If Plaintiffs' motion is denied, their motion for a permanent injunction must be denied; if Plaintiffs' motion is granted, the Court should proceed to evaluate the other factors. *See id.*

#### 2. Irreparable Harm

Although the violation of constitutional rights generally constitutes irreparable harm, alleging a constitutional *violation* is insufficient; a party must also establish *harm*. *See*

*Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 755 (10th Cir. 2024), cert. denied, 145 S. Ct. 1047, 220 L. Ed. 2d 378 (2025) ("[I]f Leachco fails to show that the alleged constitutional violation has caused it, or will cause it, specific harm, then Leachco cannot establish irreparable harm."). Here, H.C. alleges that because Gaggle quarantined his joking email, he stopped sending joking emails, and would only send emails related to casual talk, like small talk or educational emails. Respectfully to H.C., refraining from sending joking emails at school is not constitutional harm. E.B. contends that he has to be "selective with words and phrases [he] uses," and that he previously shifted the direction of a story in the Fall of 2025 (PSOF 42), but E.B. is now exempt from ManagedMethods, so any harm E.B. allegedly suffered could be remedied, at most, through damages, not an injunction.

3. Whether threatened injury outweighs the harm the injunction may cause the opposing party.

To obtain funding through the Federal Government's E-Rate program, the District must certify its compliance with the Children's Internet Protection Act ("CIPA"). 47 U.S.C. § 254(h)(5)(B). The District currently certifies its CIPA compliance through its use of ManagedMethods. (DSOF 71, Ex. 28.) This compliance is necessary for the District to maintain its E-rate contract with the Federal Government, through which the District receives millions of dollars, which funds virtually every aspect of the District's operational and educational infrastructure, inclusive of K-12. (DSOF 73-74.) Were the District Court to enjoin the District's use of ManagedMethods, the District would lose its federal E-Rate funding. (DSOF 72.)

The District's loss of E-Rate funding would cause disastrous, irreparable harm to the District's roughly 10,000 students, in addition to roughly 2,500 teachers, contractors and staff. (DSOF 74.) Just as the malfunction of a single router in Arkansas reportedly led the

FAA to stop flights nationwide, the District would effectively cease to operate if it were to lose federal E-Rate funding. (*Id.*)

On the other hand, the harm to E.B. and H.C. is minimal or non-existent, as set forth above. This factor weighs against an injunction.

4. <u>Whether the injunction will not adversely affect the public interest</u>.

In the circumstances of this case, any injury to the District is coterminous with injury to the public at large. This case is not one in which a private interest must be balanced against public interests. Any injury to the District *is* injury to the public. Based on all these factors, Plaintiffs' motion for a permanent injunction should be denied.

## CONCLUSION

Defendant requests that the Court deny Plaintiffs' motion for partial summary judgment (ECF 193).

Respectfully submitted,

LEWIS BRISBOIS BISGAARD & SMITH, LLP

By: /s/ *Cameron E. Grant*

Cameron E. Grant, KS No. 28388
Melika Harris, KS No. 30908
Andre Gnefkow, KS. No. 79266
4600 Madison Ave., Suite 700
Kansas City, MO 64112
Telephone: (816)299-4255
Facsimile: (816)299-4245
Cameron.Grant@lewisbrisbois.com
Melika.Harris@lewisbrisbois.com
Andrew.Gnefkow@lewisbrisbois.com

*Counsel for Defendant*