IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| JACK TELL; NATASHA TORKZABAN; MORGAN SALISBURY; OPAL MORRIS; HENRY FARTHING; SUZANA KENNEDY; NAOMI SUI PANG; ASHLYN TELL; PHOEBE MORRIS; E.B., a minor, by and through his parent and next friend, CATHERINE P. BATZA, Ph.D.; and H.C., a minor, by and through his parents and next friends, DANIELLE BRUNIN and ERIK CHANEY, | ) | |
| Plaintiffs, | ) | |
| vs. | ) | Case No: 2:25-cv-02428-KHV-GEB |
| LAWRENCE USD 497, a political subdivision of the State of Kansas, | ) | |
| Defendant. | ) | |

DEPOSITION OF DAVID VIGNERY, taken on September 10, 2026, at 9:30 a.m., at Dentons US, LLP, 4520 Main Street, Suite 1100, Kansas City, Missouri, 64111, before Stacy L. Decker, a Certified Court Reporter, taken on behalf of the Plaintiffs.



EXHIBIT 1

video phone call presentation. They were not onsite.

Q. Okay. Thank you. So how many people did they have involved in the presentation?

A. I don't remember.

Q. Where is Gaggle located, headquartered, if you know?

A. I don't know.

Q. What services did Gaggle say they would provide to the school district?

A. It was similar to content filtering, which we would -- were already, you know, doing and required to do. But what it did is it took keywords such as gun, bomb, kill, die, words like that, and it flagged those. It didn't do anything with it, with the information, other than flagging them and letting whoever the district assigned to receive those emails be notified.

Q. Who would be notified?

A. In that particular case, it was building administrator or guidance counselor.

Q. Is building administrator like principal?

A. Yes.
Q. We in the --
A. Or assistant principal.
Q. All right. Did Gaggle at that time provide any sort of human review of flagged material before a notice was sent to the school district?
A. Yes.
Q. How did they describe what that person did?
A. They would see the flags before we would see the flags. They would evaluate that and see if it was valid or pertinent to send on to us at that point.
Q. So it was a two-step process?
A. Yes.
Q. First they would look at everything the students uploaded and search for particular words or other kind of potentially suspicious content; is that correct?
A. Yes.
Q. And then the second step would be a person employed by Gaggle, as far as you knew, who would review that; and if that

mandate?

MR. GNEFKOW: Objection. But you can answer.

A. It's a policy that states what we expect from students.

Q. (By Mr. Johnson) But the point of view of the Lawrence School District, the Acceptable Use Policy was a mandate, parents and students had no choice, they had to --

A. Agree to it.

Q. They had to agree to it. And how would they agree to it?

A. It was done during the enrollment period with a parent signature.

Q. What were the consequences of the parents or the students not agreeing to it?

A. Less availability to technology.

Q. Any availability of district devices?

A. I don't remember.

Q. Okay. Didn't they have to sign or acknowledge the Acceptable Use Policy in order to receive from the district a laptop or an iPad?

A. Not necessarily in Lawrence.

Q. Can you give me examples of students who didn't sign this Acceptable Use Policy and yet were still issued district laptops or iPads?

A. I'm not sure I can give you an example, but I know it happened.

Q. How do you know it happened?

A. Because I knew who agreed to the process and I knew who had devices. The librarians were involved in that process of getting students to finish that enrollment or that signature with their parents if it had not happened prior to school starting.

Q. Did you or somebody within Lawrence School District maintain a list of students or families who had not signed the Acceptable Use Policy?

A. It was in the school information system.

Q. So there was a list?

A. Yes.

Q. How often would you look at that list?

A. I wouldn't look at it.

Q. Who would?

A. It was usually the building's administration or, like I said, through the librarians that were tasked with that, from the administration to help with that process.
Q. So from your understanding, when someone within the school administration asked to see the list, it could be produced to them?
A. Yes.
Q. Did the school district, to your knowledge, maintain a file of signed Acceptable Use Policies?
A. A physical file?
Q. Yes.
A. Not to my knowledge.
Q. Because it was a piece of paper they signed, correct?
A. At the time we were with Gaggle, we may have been electronic. I can't recall when that started.
Q. But if electronic, there is a file, a virtual file --
A. In the student's information system.
Q. And, upon request, that information could be retrieved?

emails to their friends?

A. I have no idea.

MR. JOHNSON: It's noon. Let's take lunch. Okay?

(Recess.)

Q. (By Mr. Johnson) We are now back on the record. I have a couple of questions to finish up about the Acceptable Use Policy.

A. This one, the student handbook?

Q. This actually will not relate directly to it, but I just want to confirm a couple of things.

First, the monitoring from Gaggle occurred at the Google Suite level, not at the device level?

A. Correct.

Q. So the content on the district devices, if you just look at the devices themselves, was not monitored?

A. Correct.

Q. And the same would be true for content on personal devices, that was not monitored?

A. Correct.

Q. It was only when the student

connected to the Google Suite that the monitoring occurred?
A. Correct. That's exactly what I wanted to say.
Q. You're welcome. Kidding. Sorry.
And the one question about the Acceptable Use Policy is this, it does not say that the district had to have any suspicion that it would find inappropriate content?
A. I would agree with that.
Q. Now, is it correct that Gaggle was annually renewable, 2023-2024, then it would be renewed '24-'25?
A. Yes.
Q. And so you were around for the renewal of Gaggle in the summer of 2024?
A. Yes.
Q. You stopped work I believe you said in November of '24?
A. Correct.
Q. Do you remember if there was any concern expressed about the service provided by Gaggle in the context of whether it would be renewed?
A. No, not that I'm aware of.

A. Yes.
Q. From your understanding, isn't it true that the AUP was never a matter of negotiation with either students or families?
A. During my time there, there was never a revision or request for revision.
Q. Do you know --
A. -- by anyone.
Q. Do you know if, before it was implemented, the district issued a draft for comments from students or families?
A. I don't know that.
Q. Do you know if the district had any concern about having students younger than 18 sign the AUP?
A. It was their parents that signed the AUP.
Q. So it was your understanding that students younger than 18 were not supposed to sign the AUP?
A. Correct.
Q. And it was their parents that were supposed to sign the AUP?
A. Correct.
Q. Was that a matter of practice or a

written policy, if you know?
A. I can't answer that.
Q. So while you were there, you didn't see any written policy that says, for our students younger than 18, their parents are supposed to sign the AUP?
A. No.
Q. You didn't see anything?
A. I didn't see anything like that.
Q. But it's your understanding that was the practice?
A. Correct.
(Exhibit 114 was marked.)
Q. I'm going to hand you a document which the court reporter is going to mark as 114. This purports to be an email dated February 6, 2024, from Natasha Torkzaban to you. Do you remember receiving this email?
A. I don't recall this. And I'm trying to remember the actual date that I came back. This is before I came back.
Q. Good point. Sorry. So you had not yet returned to work?
A. Right.
Q. While you were away from work, did