IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JACK TELL; NATASHA TORKZABAN; MORGAN SALISBURY; OPAL MORRIS; HENRY FARTHING; SUZANA KENNEDY; NAOMI SUI PANG; ASHLYN TELL; PHOEBE MORRIS; E.B., a minor, by and through his parent and next friend, CATHERINE P. BATZA, Ph.D.; and H.C., a minor, by and through his parents and next friends, DANIELLE BRUNIN and ERIK CHANEY,

Plaintiffs,

vs.

LAWRENCE USD 497, a political subdivision of the State of Kansas,

Defendant.

Case No: 2:25-cv-02428-KHV-GEB

FOR READ AND SIGN PURPOSES ONLY

RULE 30(b)(6) DEPOSITION OF DEFENDANT LAWRENCE USD 497, by its designated representative, KYLIE LUCKETT, taken on October 27, 2026, at 9:30 a.m., taken remotely via Zoom Videoconference, before Stacy L. Decker, a Certified Court Reporter, taken on behalf of the Plaintiffs.



EXHIBIT 7

during the fall of 2025?

A. That is correct.

Q. Can you tell me, if you can remember, a date or a month in which ManagedMethods was made universal throughout the District.

Maybe I can ask that a little differently.

A. Okay.

Q. Was ManagedMethods rolled out for the entire District in the spring semester of 2026?

FOR READ AND SIGN PURPOSES ONLY

A. So I'm -- it's -- so the monitoring of it versus the staff having access and being trained and utilizing it were two separate times. So I don't want to speak incorrectly about -- so there was monitoring like we had it -- they had it on and they were looking. But then once they like kind of did their beta testing and things are working, then it was -- like the login information was given to administrators and then they started logging in and looking at it.

Q. So then is it fair to say that, during the fall of 2025, that alerts were not

going to the building administrators?

A. So in fall of 2025, we had -- there was Gaggle that had alerts, and there was also for a time ManagedMethods that was in that beta pilot testing. So there was always monitoring and there was always district staff that were looking and addressing alerts. There was not always building administrators that were reviewing and addressing alerts.

Q. It's fair to say that, with district staff looking at alerts in the fall of 2025, that was not the same as building administrators looking at those alerts?

FOR READ AND SIGN PURPOSES ONLY

A. It was not the same. If there was an alert that needed addressing by school staff, then district staff alerted the building.

Q. And that was with -- let's just say testing of ManagedMethods?

A. Yes.

Q. Was Gaggle also being used during that fall 2025 period?

A. Yes.

Q. How long into the fall, if you remember, was Gaggle utilized?

be images, words, emails. Yes, they were.

Q. But they were told look at the content?

A. Look at the alert. Not -- I don't want to specify content, because there are times where, if the content was thought to be illegal, they were not instructed to look at it because of wanting to protect our staff. And so that's when others, like law enforcement, would potentially get involved or we would talk with students about how this came up, do you have any ideas.

FOR READ AND SIGN PURPOSES ONLY

Q. Were they trained not to look at content that had been flagged because of nudity?

A. They were -- yes, that is correct.

Q. So they were told, if you receive an alert that indicates there's nudity in the flagged content, don't look at it?

A. In the initial we didn't have the ability to just view them. We had additional training later to go in and view what came up. And so as that happens, we just wanted to be careful -- the District wanted staff to be careful about what they were viewing on their

devices and what they had --

Q. So when Gaggle was implemented, the building administrators who received the alerts did not have the capability to review the content of flagged material?

A. It depends on the severity of it.

Q. What figured into the determining the content was too severe to look at?

A. If it -- if it was thought to be child pornography.

Q. Okay. What about nudity? From the District's point of view, is there a difference between nudity and child pornography?

FOR READ AND SIGN PURPOSES ONLY

A. Yes.

Q. Can you describe for me, from the District's point of view, what that difference is.

A. You can have nudity -- there's nudity that is not child pornography. There is -- you can have nudity without a sexual component. I also don't know that I feel -- like I wouldn't say that the District has a stance on the difference between nudity and child pornography like that I can say -- I

don't know if I'm being helpful here.
Q. Is it fair to say that the only material that building administrators who received alerts were not to look at before talking to the student was materials suspected to be child pornography?
A. It would -- nudity or child pornography.
Q. Nudity or child pornography?
A. Yes.
Q. Okay. So that's an expansion of what you just said.
FOR READ AND SIGN PURPOSES ONLY
A. My apologies.
Q. That's fine. Let's make it clear. That if the material was suspected as either containing nudity or child pornography, the administrator receiving the alert was trained not to look at the material before talking to the student?
A. Yes.
Q. And how would the alert indicate that the material was suspected to be child pornography?
A. There was like a speech or text box that would come up indicating that this is

students saying meet me here after -- meet at the football field after school, we're going to fight.

Q. I've seen a couple of movies about that.

A. Yeah. So then that alert would come in, and then the building principal would look at it and say, okay, what do we need to do, let's pull the student who sent this, talk with them, figure out what might be going on, provide supportive measures to maybe the other student who is the potential target, whether we need to dismiss them early, have them go somewhere else.

If it were a suicidal situation, we would connect that -- we would connect that student with mental health support, whether it's a school counselor a school social worker. If it was -- it really is dependent on the type of situation that it was.

If it is substance abuse, we would pull in the student and discuss, say, you know, this came up, how can we support you, are you needing support; we want to make sure you know support is available.

FOR READ AND SIGN PURPOSES ONLY

the alert, because we were informed that it was a -- you know, potentially a student emailing the teacher saying, hey, I'm really struggling with my anxiety, this assignment is going to be late. So we didn't want that email to not go through.

So then we made it so they would automatically go through. It would potentially still alert, because, if a student is having stress, anxiety, depression, we want the proper people to know about that. And then -- but whether it would come to -- but then it would automatically go through.

FOR READ AND SIGN PURPOSES ONLY

When it came to, you know, potential pictures, images, things like that, once we then -- if it was something that was pulled, it was called quarantined. If it was quarantined, it was then reviewed. And then if it was something that was inappropriate, it was addressed in that manner. If it wasn't, it was resolved, and then the image or file or whatever it was goes back directly to the student's device -- or not device. Their account, I should say.

Q. So with respect to material other

than emails, if Gaggle flagged it, the material was automatically quarantined?

A. That is incorrect. No. It -- certain severity levels it would be quarantined. So I could -- a student could be writing just, you know, nonsense jibber-jabber, and it alerts the system, but it doesn't necessarily disappear.

Q. Would that decision to quarantine the material be up to the Gaggle person reviewing the material?

A. Yes.

FOR READ AND SIGN PURPOSES ONLY

Q. So when Gaggle flagged material, it was not automatically quarantined?

A. That is correct.

Q. It was up to the Gaggle personnel to decide whether it should be quarantined?

A. That is correct. But, also, the order of operations in that is important. So scan, scan, scan, we think this could be something that is concerning, then it goes to the human, yes, this is concerning, so we're going to alert the school. But it's still there because it's only mildly concerning, let's say. So it's still in the student's

account. We're sending an alert to the school. That is one.

Q. So just to make sure, with Gaggle, if material was flagged but not quarantined, an alert was still sent to the school?

A. So some of this could be semantics. Like the flagged and like alerted, all of those I think are kind of synonymous. So if we say something was flagged, that means it was a concern and, therefore, an alert was brought -- was created in the Gaggle system.

FOR READ AND SIGN PURPOSES ONLY

Q. All right. And then the Gaggle person would have to decide whether to send an alert to the school?

A. We only received alerts when a human at Gaggle decided that we should receive an alert.

Q. Okay.

MR. JOHNSON: We need to take a break. I have to make a call.

MR. GRANT: We were about time for a break anyway.

(Recess.)

Q. (By Mr. Johnson) So with ManagedMethods, the alert comes when content

because you're telling me you can't; you don't have them sign an additional document about use of the District devices?

A. We're able to run reports in order to identify students that do not have an AUP on file.

Q. How often do you run those reports?

A. We run them most frequently at the beginning of school years.

Q. Is it correct that, today, a student does not have to sign an AUP in order to enroll; that, in fact, the enrollment process contains, in essence, a requirement that parents agree to the AUP before the student can be enrolled?

A. Can you reword that for me.

Q. Sure. Is it correct that, today, in order for a parent to enroll his or her child with the District, there is a notice contained in the electronic enrollment software that requires the parent to acknowledge the AUP?

A. There is a form inside the enrollment platform that is requiring parents

FOR READ AND SIGN PURPOSES ONLY

to acknowledge the AUP.

Q. And it's an electronic form; it's not a paper form?

A. That's correct.

Q. So there's no longer anything that the student or parents, I guess we would say, use as a wet signature?

A. No.

Q. If the parent chooses not to acknowledge the AUP, will the District still enroll the student?

A. Yes. Yes. We -- and I've referenced this. But we have families that contact us concerned around a number of things when enrolling students. If the AUP is one of those things, we engage with those families to understand what the hesitations are. We work to inform them as to why we would like the AUP acknowledged and signed and help them through that process.

If families are adamantly against signing that AUP, we typically do work with those families. Because, like I said, we are a public school. We're going to welcome all students in our District.

FOR READ AND SIGN PURPOSES ONLY

that material deleted from the District's servers?

A. I cannot answer the technical side of that. I don't know how the metadata and all of that work.

Q. In all of those situations, were the students responsible for uploading that material disciplined?

A. No.

Q. In any of those situations were the students responsible for uploading that material disciplined?

FOR READ AND SIGN PURPOSES ONLY

A. No.

Q. So what you're telling me is that, in no situations where students uploaded content containing nudity, the students were disciplined?

A. Those were situations in which there was support that was -- I'm not saying that nothing happened, but it was not a discipline like they were suspended or what you would think of as like a traditional discipline. No, it was not viewed -- Gaggle is not used as a disciplinary tool. It was a support and safety tool.

Q. And then with respect to ManagedMethods, hopefully asked the series of questions concerning Gaggle, are you aware of any student being disciplined as a result of uploading content with nudity while ManagedMethods has been in use?

A. No.

Q. Are you aware of any situation with ManagedMethods where that content, including nudity, was restored to the students?

A. Was content including nudity restored to a student through ManagedMethods?

Q. Yes.

A. It was never quarantined, so therefore it could not be restored.

Q. So is what you're telling me that, under ManagedMethods, content including -- well, no content was ever quarantined?

A. The only content that can be quarantined is child pornography.

Q. Under ManagedMethods?

A. Correct.

Q. With respect to material containing indications of self-harm, under

FOR READ AND SIGN PURPOSES ONLY

A. That is correct.
Q. Material that was blocked, would that still be available to the student who generated the email?
A. Yes.
Q. But it would not be delivered?
A. That is correct.
Q. Got it. And the student -- let me ask you this. I'm sorry.
Would the student know that the email had not been delivered?
A. They would not.
Q. Did that block by Gaggle generate an alert?
A. Yes.
Q. And then the district administrator, assistant principal, whoever, would review the email and determine whether it should be unblocked?
A. In the beginning, yes.
Q. But after -- I think you said a couple of months, something like that --
A. Yes.
Q. -- y'all determined -- sorry, I grew up in Texas -- y'all determined that

FOR READ AND SIGN PURPOSES ONLY

blocking was inappropriate for that email?
A. That is correct.
Q. And you -- not you --
A. The District resolved the issue of -- the District felt it was an issue that an email that a student sent to a staff member should not be blocked. And so the District worked with Gaggle to resolve that issue.
Q. All right. And that, as far as you remember, occurred sometime during the spring semester of 2024?
A. Yes.
FOR READ AND SIGN PURPOSES ONLY
Q. So if there were examples of emails not delivered subsequent to that change, that would be inconsistent with the District asking Gaggle to unblock those emails?
A. That is correct.
Q. All right. Where am I? This gets convoluted. I get confused. And he's not saying anything. He knows exactly what -- well...
And would the student, after the change in, you know, in Gaggle blocking these emails, be correct in assuming that the email

Q. Is it fair to say that the statistics concerning what the District would consider to be positive results were provided by Gaggle?

A. The statistics for positive results were provided by Gaggle? I can't answer that in a yes-or-no question. It is very complex in the terms of how we define a positive result. Whether -- is a positive result flagging a concern versus being made aware of something versus intervention, so.

Q. Is it correct that, on behalf of the District, Dr. Lewis stated that Gaggle had saved 31 lives?

FOR READ AND SIGN PURPOSES ONLY

A. Yes.

Q. Again, on behalf of the District, do you believe those statistics are accurate?

A. No.

Q. Can you tell me, on behalf of the District, why you don't think those statistics are accurate?

A. I would say that a -- within the breadth of everything that Gaggle can look at, not everything is a life or death situation. It doesn't mean there wasn't very positive

impact and support, but I cannot say that 31 lives were saved. I can speak to the lives that were saved --

Q. So I'm -- okay. On behalf of the District, can you provide what you believe is an accurate estimate? Well, first, as to whether lives had been saved?

A. Yes, lives have been saved.

Q. By Gaggle?

A. By the information gathered through Gaggle, the District was able to save lives, yes.

FOR READ AND SIGN PURPOSES ONLY

Q. Is it the same with respect to ManagedMethods?

A. Not that I'm aware of.

Q. Okay. Is it correct that Dr. Lewis made this statement in the context of the meetings that occurred in March of 2024?

A. I can't speak on behalf of the District as to when he made the statement. I thought it was at a board meeting, but I don't know.

Q. Thank you. Is it correct that, as far as the District knows, Dr. Lewis based those statements on dashboard documents

provided by Gaggle?
A. Yes.
Q. And so is it correct to say that, again, on behalf of the District, Dr. Lewis' statement was supported only by information provided by Gaggle?
A. No.
Q. What are -- to your knowledge and to the District's knowledge, on what other information did Dr. Lewis base his statements?
A. Conversations with district and building administrators who had been involved with responding to alerts.
Q. Now, in Paragraph 9, one of the subjects you've been designated to testify about is documented outcomes. Can you tell me what documented outcomes -- by using that term "documented," did that mean something that has been put down in writing?
MR. GRANT: Objection. These are the plaintiffs' topics. I don't -- it seems like --
MR. JOHNSON: Okay. I'll ask it this way.
Q. (By Mr. Johnson) By documented

FOR READ AND SIGN PURPOSES ONLY

suicide.

There was another situation in which a student in the middle of the night emailed her friend apologizing for overdosing on ibuprofen, attempting to take her life, in which nonemergency police were called because it was in the middle of the night and they were able to take the student by ambulance to the hospital in order to be seen. So she did not succumb to her injuries.

There was another situation in which a student had been being physically abused by their parent, and it was over a holiday break and that -- because of the alert to Gaggle, Department for Children and Families was able to be contacted and get that student the support and to safety that they needed.

There was another positive outcome in which a student sent a message about being blackout drunk consistently and not wanting to live this way anymore in which the staff was able to support that student in getting him to substance use treatment.

There was another situation where

FOR READ AND SIGN PURPOSES ONLY

a student had been taken advantage of sexually in her PRTF that she was living in. And we were able to support that student in making reports and getting into intensive therapy that she needed in order to, you know, be able to cope with the situation that had happened.

Would you like me to keep going or --

Q. It sounds like you're quite familiar with these issues; is that correct?

A. The District is quite familiar with them, yes.

FOR READ AND SIGN PURPOSES ONLY

Q. Have you reviewed documentation concerning those five incidents you just identified in preparation for your deposition?

A. No.

Q. Do any of the incidents appear in any of the documents you have before you today?

A. That I have?

Q. Yes.

A. No.

Q. But in each of these cases, is it correct that the District generated some documentation of the incident?