IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JACK TELL; NATASHA TORKZABAN, MORGAN SALISBURY; OPAL MORRIS; HENRY FARTHING; SUZANA KENNEDY; NAOMI SUI PANG; ASHLYN TELL; PHOEBE MORRIS; E.B., a minor, by and through his parent and next friend, CATHERINE P. BATZA, Ph.D.; and H.C., a minor, by and through his parents and next friends, DANIELLE BRUNIN and ERIK CHANEY,

Plaintiffs,

vs. No. 2:25-CV-02428-KHV-GEB

LAWRENCE USD 497, a political subdivision of the State of Kansas,

Defendant.

DEPOSITION OF DR. JEANICE SWIFT, a Witness, taken on behalf of the Plaintiffs before Kelsey Robbins Schmalz, CSR No. 1571, CCR No. 1148, RPR, pursuant to Notice on the 15th day of October, 2026, at the offices of Dentons US LLP, 4520 Main Street, Suite 1100, Kansas City, Missouri.



EXHIBIT 10

A. I don't recall the date.
Q. And do you recall by what method you were contacted, email, phone?
A. I don't recall the method of contact exactly.
Q. What do you recall about -- I believe you said misunderstanding. What do you recall about the misunderstanding?
A. What I recall is that there was some question raised. That question was concerning to me because of our fundamental commitment that students report on any and all matters that they deem worthy of reporting, and so once that -- it came to me that there was any question, I clarified not just with Dr. Rials but with all members of that administrative team -- I clarified in person that there would never be any limitation other than those in the law, some of which are noted here, but there would not ever be a limitation on student journalists and their activities of reporting.
Q. And you said earlier, I believe, a concerning question. What was the question at issue?
A. The concern that came to me was at that

time just if the journalism teacher had understood correctly what the principal had stated about that question of reporting.

Q. And what did you understand -- what did you understand to have been stated that required clarification?

A. My understanding was that the principal's statement he felt was more around I won't be commenting as opposed to students are not allowed to report on this topic.

Q. Understood.

A. So our work was to clarify that.

Q. And, Dr. Swift, to the greatest extent possible just for the record, if you could please name all of the folks and the time and everything else, that would help me and our court reporter.

And by the journalism teacher are we referring to Abbi Epperson-Ladd; is that correct?

A. We are. I want to clarify I did not speak with Abbi Epperson-Ladd on my clarification. My clarification was with the administrative group. I can do my best to name them if you want.

Q. Yes, please.

A. Would have been Dr. Quentin Rials, Greg Farley, assistant principal; Dr. Elaina Honas, assistant principal; I believe Patrick Graham was in the room but I'm recalling from my memory so I just want to be clear on that; and Mike Gillman. Those were the individuals with whom I connected briefly to clarify that there would never be any limitation.

Q. Understood. And we'll get further into that meeting, but in terms of background what did you understand the students, the student journalists had been told?

A. I was not at all involved, and the purpose of that meeting that day was not around the student journalists' understanding. The clarification on that day was a concern that, as I understood it, the journalism teacher had misunderstood the principal's statement.

Q. Before August 15th of 2025, do you recall giving any instruction to district employees about publishing student journalism?

A. And are you referencing August 15th, because that was the date of this conversation with administrators?

memorandum that is attached to Exhibit 54 the same memorandum that is in the screen shot on Exhibit 175?
A. I guess we could analyze word for word, but it appears to be, yes.
Q. Thank you very much.
MR. ROSENTHAL: Could you read her answer, not the one just given but the one before? Actually, the question and answer. Thank you.
(Reporter clarification.)
(The previous answer from Page 113, Line 16, through Page 113, Line 24 was read by the reporter.)
BY MR. ROSENTHAL:
Q. The shared document, is that a Google document?
A. I don't have direct recall, but that would be our normal practice.
Q. Who was the team that developed the document?
A. I think it was just the three of us, Dr. Englebrick, Quentin Rials and myself.
Q. And do you recall when that process began?

A. It was sometime over that Thursday Friday time frame. I can't say what moment we started on it but that's when it happened.

Q. And why was a former document involving the superintendent, the deputy superintendent and the building principal necessary to correct this misunderstanding as it's been called?

A. I wanted to verify that our district practice in line with the First Amendment was being communicated. It had come to me that there had been some sort of miscommunication, so this was a trust but verify moment. We're clarifying that, yes, student journalists may publish, may report on any topic.

Q. Okay. And on -- so I'm clear, the memo began -- or you all began to create the memo potentially on Thursday, August 14th?

A. I don't recall, but it would have been in that window of Thursday to Friday.

Q. And then yourself and Dr. Englebrick --

A. Yes.

Q. Did Dr. Englebrick attend -- and forgive me if you've answered this -- the meeting on the 15th?

A. Yes, he did.

Q. And why did he attend, if you know?

A. We both went for the shared purpose of clarifying that all on the administrative team were clear.

You remember the prior day Dr. Englebrick was working on some of this. Do you recall that period of time? Yes.

Q. Do you recall personally proposing or approving certain language or words in the August 15th memo?

A. That is my work to clarify, so obviously yes. We wrote the communication to ensure that the district's position was clear. Absolutely.

Q. Understood. Was there a reason why this memo as it was written does not mention the purported restriction of publishing on the lawsuit?

A. I don't think there's a particular reason. I think this communication is focused on clarification. You remember there was a misunderstanding evidently between Dr. Rials and Abbi Epperson-Ladd. I was not at that time clear on all of the nuances of their interaction, but I was clear that we needed to

is the only one with personal knowledge of an event and that person is not able to comment on that event, would that frustrate a journalist's ability to gain information about an event in question?

MR. GRANT: Objection to the hypothetical.

THE WITNESS: So I answer?

MR. GRANT: You can answer if you're able to.

A. I want to get in the record that there was never a directive to not comment, and we discussed that in detail earlier, so there was not a directive not to comment. It's generally our practice, so I just want to clarify that piece.

BY MR. ROSENTHAL:

Q. Thank you. I'm handing you what's being marked as Exhibit 182, which I will also hand your counsel and will represent to both of you and to put on the record that I don't know where the Bates number on this is but this is a LBOE production 00065888-65889.

(Swift Exhibit No. 182 was marked for identification.)

your office, you do not individually recall those other examples?

A. I do not, but if James were sitting here I would recognize all of the names because we in course of conversation discussed each one, the advantages, the disadvantages, what's the cost, how do we make this work.

Q. Understood. Do the names Securely or GoGuardian mean anything to you?

A. Not particularly. The first one is one I've heard of. The second one is not one I've heard.

Q. Understood. And out of those do you recall how you landed specifically on ManagedMethods?

A. Again, that really is James's work, but it was a good balance of meeting -- I would summarize it as superintendent as it was a decent balance of meeting our requirement under federal E-Rate and other federal requirements to monitor for student safety, it was a balance of that, of not being overly invasive and then the third leg of the stool, cost.

We also made the decision -- you didn't ask me this so I probably shouldn't even say it,

but we also made the decision to do 6-12 and not K-5, so the streamline -- I use the word streamline, folks get tired of that word, but it really is about balancing need and resource and finding kind of the sweet spot and we do that with staffing and with tools and with all manner of things in order to manage a $300 million annual recurring budget responsibly so I can stand in front of our taxpayers with a clean conscience.

Q. Thank you. How, if at all, was David Vignery involved in the ManagedMethods decision?

A. He was not part of our district for -- I don't have the date in front of me but his retirement predated the summer of 2025 conversation by some significant period of time. We would have to look it up.

Q. Understood. You mentioned the three legs of the stool being the federal requirements to monitor, not being overly invasive and cost?

A. Uh-huh. There are probably other legs of the stool but those are three I'm recalling at the moment, kind of criteria, you know, that we're figuring out.

Q. Understood. To your knowledge, what

overly evasive, why was that of concern to you?

A. There are a couple of reasons why that was of concern. One is that our resources in terms of human capital are limited and so it is very important that the hours in the day of a counselor or teacher or administrator are used to deliver and do the work.

When there is a great deal of white noise in the system it takes up a lot of bandwidth, and if a tool is wide open and flagging many, many things -- I'm being very frank because that's what we're here for. Yes. We didn't get all dressed up to not speak the truth so I'm speaking the truth.

When a tool is wide, wide open, an administrator, a counselor, a teacher can get a tremendous number of flags each day which means their energy is dissipated, and so there's a desire as you work with these tools to really narrow to ensure that our monitoring is around those issues required, first of all, for student safety, student safety before anything else, and secondly to meet the duties and obligations of our federal requirements.

So there had been a desire for some

time -- some days administrators -- I mean, you've seen the data. You all spent months figuring out the data. Some days they would get 100 or they might get 20, and in my practical view of the world, when you get everything you can prioritize nothing, so there was a desire in streamlining to balance getting real needs of students, mental health, I'm going to shoot up the school, got a gun with me today, you know, student safety and mental health.

There was a priority to get that tighter and cleaner, and so there are a variety of ways to do that and James Polk -- I don't mean to keep referencing him but he is the expert on how one can maintain the safety priority but reduce the white noise that counselors and teachers and principals are getting in their inboxes every day.

Q. Understood. So in part as related to not being overly invasive, that was important in terms of student safety, encompassing mental health, the duties and obligations under law and --

A. And concerns like, for example, of a student with suicidal ideations. And so when

you speak with Kiley Luckett, she and her team of social workers and counselors -- those students who need that support, it's important that our people be able to dedicate their human resource to that effort and not be flagged on a bunch of white noise in the system.

Q. Understood. Anything else?

A. No, but that is the delicate balance that we were working to achieve.

Q. Understood. And just to recall not -- recalling this is not a memory test, but the federal duties and obligations, you know that they exist but can't at this time specify what they are?

A. I can't give you the chapter and verse, but James can.

Q. With that as background, why was the decision made to omit kindergarten through fifth grade students from monitoring?

A. Because we're also on a parallel track working to reduce -- and this effort is widely documented and we're leaders in the country on it. We're working to reduce tech time for lower el and upper el and moving away from a one-to-one device situation. Most of their

very -- now very limited -- you have two elementary students and I want to talk to you about that because it's so important that -- you know, during COVID we had to go full tech to get educated for a while, but we were on an effort to dial back that tech exposure, so -- and we still are on that effort, so the K-5 use of technology when it occurs is much more limited now and it is under the direct close supervision of a teacher or para-educator.

So the assessment now different from the COVID years is that our elementary students are really -- K-1 are not on tech at all, 2 through 5 it's very limited time on tech, so we were able to reduce our expense quite a bit just with that one shift.

Q. Understood. We talked about, once again those three legs, federal requirements, not being overly invasive and cost and all the various subparts. Was student privacy a reason for considering a change?

A. And that is in the invasive bucket is around protecting students and not being overly invasive into their work unless there was some legitimate reason. Any flag you're going to

occasionally get something by accident that's not important but we wanted to reduce the frequency with which we were getting those.

Q. Understood. Was student journalism or student journalism concerns a reason for considering the change?

A. You know, for me, and I know this sounds counter to the effort that you all are on, that was never a concern that I had because we have such a priority around protecting and supporting and enhancing our student journalism for me, and I know that situation predates me but that was not a driving concern.

Q. Understood. Did you have a role in -- and I can break this down by topic -- evaluation, piloting, selecting, purchasing, implementing or ending Gaggle access?

A. Other than to discuss in the team, as I've said before that that was what we were doing. I certainly sat in meetings and heard the data from Gaggle, but it -- it was the tech team and folks who had that monitoring responsibility who were collecting and analyzing that data.

Q. Was there any information that you

tech adjustments at that time. But yes, in July I would have said we're with Gaggle, and by August we had found an opportunity and we were moving into that opportunity.

Q. And was there a new fact specifically that changed that plan in that time frame?

A. The savings probably is the leading. And the -- and reducing the invasiveness. Those were the two key factors.

Q. Do you recall when, for example, the pilot phase ended and the implementation began? I know you spoke earlier about I think it was a rolling implementation?

A. Yeah. I'm not the one to speak to the details of that, but this was not an endeavor where we were going to pilot for a long time. We were ready to make a change, we had an opportunity, and James can speak to the details of how that phased in through -- there was a period of time where only members of our central team were monitoring the flags in order to verify, trust and verify that the product was going to do the job, and he can speak to the exact phases of that through the fall.

Q. Understood. By early July, had anyone

A. Yes.
Q. And do you see on the first page under quantity 5,800 accounts, Google and Microsoft, 12 months, students 6th through 12th grade above under comments from Morgan Thompson and 14,790 after 15 percent discount? Do you see that as well?
A. Yes.
Q. Did you approve this contract or scope?
A. I approved this direction in taking this step. The details of the contract are carried out by the team, and you can see Mr. Polk took care of this for the district as is his job, yes.
Q. And it was Mr. Polk who accepted the incorporated terms into this document?
A. And incorporated terms you're referring to?
Q. With respect to the quantity, the discount.
A. Yes. And I generally approved that endeavor and those general numbers, but the details are carried out by this individual.
Q. If I direct your attention now to page -- I'm sorry, Exhibit 83, do you recognize

and the whole IT team would be looking at this, so everybody gets a piece of it just to make sure we're saying the accurate information.

Q. Understood. And who was the first name that you mentioned before, Summer?

A. Summer Workman, who was the second chair in communications who -- and now she leads the team.

Q. Dr. Swift, going back to the exhibit that you just pulled up and reminded me of which was 34, and the last page that we were just talking about, do you have that handy?

A. Yes.

Q. Before that communication went out on that final page, do you recall whether you or someone else approved the technical assertions of how ManagedMethods worked?

A. Based on my conversations with the board, I gave the tech team and we discussed in cabinet a general lay of the land on where we would set the dial, and this second -- this page that you just pointed out says the three areas, self-harm concerns, violence or threat-related content and images that meet criteria as lewd or pornographic, and that definition is more a part

of that federal guideline, but we gave the team those guardrails, and then your question was around the specifics?

What particular part did you ask me about? I mean, we narrowed together what the areas would be based on our conversations with the board, our conversations with principals, and we got it narrowed, and then the tech team works with ManagedMethods to say what are the flag words -- they get down to the nitty-gritty.

Does that make sense?

Q. Yes. And you answered my question.

A. Okay. That's what I was worried about that I found a lot of things on my way to not answering your question.

Q. Everything you have to say I can assure you will help answer my question.

If you recall, I believe you were asked this at your hearing and I believe I asked you whether you knew about the moniker "g-word" for Gaggle?

A. Yes. Yes.

Q. And I believe your answer at the time was you don't recall?

A. No, I don't. We often -- educators are

the worst. We will substitute a letter -- you give us any concept and we will boil it down to two letters or four letters or one letter. No, there was no significance to that.

Q. Understood.

A. And, in fact, I ask my team often to stop it because the world then has no idea what we're talking about.

Q. Did I ask whether to your knowledge ManagedMethods works in the same manner as Gaggle?

A. Well, there are some distinctions that we liked in that bucket of being invasive. In that -- I don't mean to keep pointing to James Polk but he will draw you and color in the photograph with this, but, for example, Gaggle reviewed not only email but it went beyond to review, as you noted earlier, notes and files and -- it -- even if you have the little to do list on your upper right-hand corner, it monitored everything.

So ManagedMethods has been dialed in to just manage a narrower set of communications, and -- and the set of flag words has been placed squarely into those three areas that we noted,

not a much wider set that was used with Gaggle previously.

Q. Understood. And did I ask do you know whether the district had a contract with ManagedMethods?

A. I don't believe there is a written contract. We looked for it when Ashlyn or whichever student sent that KORA request and we don't see a contract. We have that document that you have which is often what tech companies will do, and this is called -- this is like a -- I have the word in my mind but it's getting late and I forget, but it's like just a snapshot of your agreement, how many kids you have, how much per kid, therefore here's where we are.

Q. Understood. I'm handing to you and your counsel what has been previously marked as Exhibit 76, and I will ask whether you recognize Exhibit 76.

A. Not specifically, but if I read it it will come back to me probably.

Okay. And the date of this was March 4th. Okay.

Q. And having reviewed Exhibit 76, does that refresh your recollection on what this is?

A. Yes.
Q. -- who are journalism students who could be opted out --
A. I see.
Q. -- of Gaggle monitoring.
A. I see. That practice may very well have continued.
Q. Under ManagedMethods?
A. Yes. And I'm not to speak of that because I don't know that detail, but I'm curious now.
Q. Understood. Can we stipulate -- and feel free to disagree. Does student monitoring involve or constitute scanning of student documents?
A. There is a narrowing of -- do you mean now or before with Gaggle?
Q. In general. Does student -- yes, in general.
A. In general, monitoring can include documents, and with our new tool there are specifications that you can make inside of that scanning direction so that, say, personal notes are not a part of it or are a part of it, Word documents are a part of it or are not part of

it.

Q. And do you know who makes that determination?

A. That's the tech team with James Polk leading that have taken our guardrails, and they work with the mental health team, Kiley and her team, so that they're sure to get that dialed in just right where they're getting areas of concern but not getting all the other research projects on guns and all the things.

Q. Understood. And if I further understand what you just said, the flags or false positives regarding research assignments on bombs or guns are not elevated for staff or faculty review?

A. Well, they have managed for that, and so that's where James would tell us give us an example of how you manage so that we don't get a hundred flags when seventh grade studies the civil war or eighth grade studies the Civil War. You know what I'm saying. So they have structures in place for that.

Q. Such that the flags -- so that they do not receive flags from those purely academic and protected activities?

A. Yes.

Q. Okay. Can we agree that even if a flag does not arise, those assignments would still be analyzed by ManagedMethods as a software?

A. Not under some circumstances. So like if the teacher -- the seventh grade team reports to IT, hey, we're doing the Civil War. They're going to be researching muskets and it's going to lead to cannons and they're probably going to be on some gun sites, then they can set all of that aside so that we don't get a lot of noise around it.

Q. Understood. So it sounds like perhaps outside of a proactive teacher warning that their students will be doing an assignment that may trigger Gaggle, in which case -- or student monitoring in which case the monitoring can be configured not to scan that class. Are there other examples where student monitoring could be or students could be exempt from monitoring?

A. Typically students are not exempt but the activity or the research project or the class may be exempt.

Q. Understood. And in that situation for that class that's researching guns or Civil War

A. What's more fair is that the practice of upholding the work of student journalists is stronger than ever in the district. What I don't know is how to explain the technical details of is it a list of students like you say it was before that Matt Fish holds on a sticky note at his desk so that when the flag comes through or is it that ManagedMethods has the exemption. I don't know where it happens, but the value is stronger than ever.

Q. And the principal person who would know all of this information with respect to how student monitoring functions and operates currently is James Polk?

A. It is. And it's his team who does it and, as you can see in that one email, Matt Fish has been kind of in the front seat on that.

Q. Understood. And it's James Polk, Matt Fish and that team that would select the categories or refinement with respect to filtering alerts?

A. They've been given very clear direction from our discussions with the board and from our discussions with building principals and from the wisdom of counselors and social workers who

work with children and students every day, and so they've received very strong and clear guidance.

Now, on the ground that working out those technical details with ManagedMethods and they can speak to that.

Q. And the guidance, is that -- is there written guidance, is it oral guidance?

A. It's been more conversations, and then as they place the technical directions in the ManagedMethods, they observe it for a week or two to see how it impacts the number of flags and the kinds of flags, so this is an iterative process that continues.

Q. Thank you. I will hand to you what has been previously marked as Exhibit 55, and once again, I apologize that a portion of this document is cut off but I will show a copy to your counsel and represent that this is Exhibit 55, which is LBOE 38122.

Have you seen this document, Exhibit 55, before, Dr. Swift?

A. I have not.

Q. Do you know what it purports to be?

A. I don't know what it is. No.