IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| JACK TELL; NATASHA TORKZABAN; MORGAN SALISBURY; OPAL MORRIS; HENRY FARTHING; SUZANA KENNEDY; NAOMI SUI PANG; ASHLYN TELL; PHOEBE MORRIS; E.B., a minor, by and through his parent and next friend, CATHERINE P. BATZA, Ph.D.; and H.C., a minor, by and through his parents and next friends, DANIELLE BRUNIN and ERIK CHANEY, | ) | |
| Plaintiffs, | ) | |
| vs. | ) | Case No: 2:25-cv-02428-KHV-GEB |
| LAWRENCE USD 497, a political subdivision of the State of Kansas, | ) | |
| Defendant. | ) | |

DEPOSITION OF JACK TELL, taken on August 24, 2026, at 9:30 a.m., at Lewis Brisbois Bisgaard & Smith, LLP, 4600 Madison Avenue, Suite 700, Kansas City, Missouri, 64112, before Stacy L. Decker, a Certified Court Reporter, taken on behalf of the Defendant.

Q. What did you talk about?
A. We updated her generally on what was going on, and she keeps up to date with all the court filings. And, yeah, we talked about -- yeah, I don't know, general lawsuit news.
Q. Do you know how she keeps up with the court filings?
A. I suppose I don't.
Q. Okay. Did you ever work on the LHS yearbook?
A. Yes.
Q. During what years did you work on the yearbook?
A. All three years I wrote stories that appeared in the yearbook. In terms of editing and leadership, I did a small amount senior year, but not very much.
Q. Was editing and leadership that you described during your senior year different from what you had done the other three years?
A. Yeah. My senior year I was editor-in-chief of a different publication, but that with the territory came with some

editing and page design every once in a while for the yearbook when they needed help.

Q. When you say other publication, you mean The Budget?

A. Yeah, The Budget online. Yeah.

Q. What did you do to prepare for today's deposition?

A. I read through the second amended complaint. I -- and talked with Harrison.

Q. Did you bring any documents with you?

A. I did not.

Q. My understanding from, again, having deposed Morgan and Natasha is that there is at least one group text chain that involves you and other plaintiffs; is that correct?

A. Yeah, that's correct.

Q. How many different group text chains are you a part of that involve only plaintiffs, do you know?

A. Probably four or five.

Q. And is that just different groups of plaintiffs?

A. That's correct.

Q. Okay. Did you review those text messages in preparation for today's deposition?
A. No.
Q. You're aware that Morgan Salisbury was deposed; is that correct?
A. Yes.
Q. Did you communicate with him at all about his deposition?
A. I did.
Q. What did he say about his deposition?
A. He said he enjoyed it. He said it went for a long time. Yeah.
Q. Do you remember anything else he said about it?
A. He said there were some hard questions that made him --
Q. That's what I like to hear. Okay. Sorry to interrupt you. Anything else?
A. I don't think so.
Q. Okay. And were those conversations in person or were they in writing?
A. No. They were over the phone.

Q. Okay. Did you speak to Natasha about her deposition?
A. I did not.
Q. Did you speak with Henry Farthing about his deposition?
A. I did not.
Q. Were you aware that Morgan was present at Julie Boyle's deposition?
A. Yes.
Q. Did you communicate with Morgan at all about Julie Boyle's deposition?
A. Yes.
Q. What did Morgan say about Julie's deposition?
MR. ROSENTHAL: I'm going to object to the extent these conversations were with me or an attorney was present.
I would direct you not to answer those. But if you had one-on-one discussions with Morgan that did not involve counsel, you can answer.
MR. GRANT: Or conversations involving other plaintiffs but not counsel?
MR. ROSENTHAL: Yes.
MR. GRANT: Okay.

Q. No drugs or medication, anything like that?

A. No.

Q. And just to let you know, you can take a break at any time. The exception is, while a question is pending, you can't typically take a break. So typically -- like I typically like to take a break about every one hour.

A. Great.

Q. Just so you know that's coming. But if you need a break more frequently than that, just let me know and we can accommodate that.

A. Great.

Q. So having established that your last year at LHS was the 2024 school year, am I correct that you were never subject to monitoring by Managed Methods?

A. That's correct.

Q. And you know generally what Gaggle and Managed Methods are, correct?

A. Yes.

Q. Okay. So to hopefully make this upcoming series of questions clear, I'm going

to distinguish between emails and files. So when I ask you questions about files, that could mean any document that was created in any form. It could be a Google doc, a Google spreadsheet, could be a journalism template, anything like that; whereas, an email is an email.

So, again, I'll be clear as I'm asking each question, but I just wanted to flag, not to use a loaded term, but flag that I'll be asking you questions and distinguishing between emails and files.

A. Great.

Q. Okay. I'm going to hand you a copy of Exhibit 69, which is a document I think you said you've already reviewed.

MR. GRANT: Harrison, do you want or need copies of previously introduced exhibits? I have copies for you, but if you don't need them, I won't give them to you.

MR. ROSENTHAL: Is there a place in like a folder online where everything is saved?

MR. GRANT: So this one I know is in exhibit share from Natasha's deposition. And

at that time, or maybe he was athletic director at that time, but he was just one of the administrators who worked with us when we had questions.

Q. And then what's the difference between a building administrator and a district administrator?

A. When I say building administrator, I mean principals or assistant principals in the Lawrence High School building. And when I say district administrators, I mean people who work in the district office.

Q. Okay. Do you know whether any of your content -- so now I'm talking about either files or emails. Do you know if any of your content was ever flagged by Gaggle?

A. I don't know.

Q. Are you aware of anyone else whose content was flagged by Gaggle?

A. I am.

Q. Who are you aware of whose content was flagged by Gaggle?

A. Morgan Salisbury, Natasha Torkzaban, Henry Farthing, Opal Morris. That's it.

A. No.
Q. And Henry, am I also correct that Henry was called to the office regarding a photograph?
A. Yes.
Q. Are you aware of any other of Henry's content that was flagged?
A. No.
Q. And then Natasha, I believe you said it was an essay that she had edited; is that correct?
A. Yes.
Q. Are you aware of any other content by Natasha that was flagged?
A. Yes.
Q. What other content by Natasha?
A. I believe she sent an email to Barb Tholen that was never received.
Q. Just to confirm, you are not aware that any of your content, meaning either files or emails, were flagged; is that correct?
A. That's correct. I'm not sure I would know if they were flagged. So they may have been, but I am not aware.
MR. GRANT: Okay. And I'm not trying

A. That's correct.
Q. Do you remember if any other students attended those meetings?
A. There were no other students.
Q. Do you remember who, if anyone, from the school, and by that I mean either the school or the district, non-students, attended that meeting?
A. Yes, there were.
Q. Do you remember who those people were? Can you just tell me everyone you remember who attended.
A. Yes, there were quite a few. Dr. Lewis, the superintendent; Dr. Rials, our principal; Kylie Luckett, Julie Boyle, David Cunningham. I believe Mark Preut was there. Cynthia Johnson was there.
That's all I've got off the top of my head.
Q. Were you aware that Morgan was going to record that meeting?
A. Yes.
Q. Was there a discussion about that in advance?
A. I believe so.

communicated your acceptance of that proposal?

A. We certainly replied to the email, and I -- my memory is fuzzy here, but I believe David Vignery may have come in person to LHS and discussed it -- discussed the details of it with our journalism advisor.

Q. If you can look at Paragraph 389 of the complaint.

A. Yeah.

Q. This is one of the paragraphs in the complaint that describes the relief that the plaintiffs are requesting. And, again, trying to avoid too many legal terms, but do you understand that the complaint requests injunctive relief?

A. Yes.

Q. And do you understand generally that the complaint is asking the district to do certain things or not do certain things?

A. Yes.

Q. Okay. And in Paragraph 389, there's a statement that the plaintiffs are entitled to an order enjoining the district from operating suspicionless surveillance.

Do you see that?

A. I would agree that Gaggle couldn't monitor the handwritten notes. However, I would add that the vast majority of my notes were taken online.
Q. Did you use your school device to do that?
A. Yes.
Q. Did you ever use your personal laptop to do that?
A. No.
Q. Once you became aware of the Gaggle issue, did you take any steps to circumvent Gaggle in the sense of doing journalism work in a way that Gaggle would not be able to monitor?
A. Yes.
Q. Can you describe those for me.
A. I believe we tried to do some work on personal Google accounts.
Q. And was that effective -- well, so first of all, I will ask you, were you able to successfully circumvent Gaggle monitoring in that way?
A. In a sense -- well, partly I would say, because we were confident that Gaggle

would not scan personal documents. However, that was not an effective solution for removing all the journalism work from Gaggle, because we were not able to do very much work on personal documents.

Q. And why is that?

A. Because, again, the journalism system kind of relies on a unified Google Drive -- centralized, I should say, Google Drive to do things like submit assignments for editing, edit, that sort of thing.

Q. So I'm not understanding that fully. So in my mind if you -- I understand that you used Google generally. And, you know, other witnesses have testified about a lot of the journalism work being, you know, collaborative work.

And so if we take, for example, a journalism template, that I know at least some of the students used for their reporting, if you -- if the journalism students had decided we're going to keep using the journalism template, but we are going to use that template only on our personal accounts, is there any reason you wouldn't have been able

to do that?

MR. ROSENTHAL: Objection, form.

A. No.

Q. (By Mr. Grant) Okay. So can you expand a little bit more upon why using your personal Google accounts was not really a workable solution essentially.

A. Yes. Partly because it's time consuming to switch accounts. And so while it was feasible for a small number of stories that we thought were maybe more sensitive, it would not be feasible for the entire work product to be conducted on personal accounts, not least because there's not enough storage in the personal free Google account to store all of the massive amount of files and photos that the journalism staff produces.

Q. So am I correct that the school's Google accounts had more storage than a personal account would?

A. Yes.

Q. Okay. Beyond the storage, is there any other reason that it would not have been practical to use personal accounts to do the journalism work?

A. I mean, yes, there's lots of reasons. Most of them involve just time. Like we could have, you know, gone back to handwritten notes and typewriters if we wanted to, but that's similarly not a realistic method of doing journalism.

Q. So you say there are lots of reasons. I want to understand what all the reasons are. So you mentioned storage and then the extra time that would be required to do things by hand or using a typewriter. Are there any other reasons that was not a practical solution?

A. Yeah. I mean, we assigned our reporters stories using a management software called Trello that worked well with the school Google Drive, and it wouldn't have been possible to use Trello with a whole bunch of different personal Google accounts.

Journalism assignments were submitted on Google Classroom in some cases, and grades were given out via the school system. So for those reasons it would be impossible to completely switch.

Q. You've mentioned Trello a couple