IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| JACK TELL; NATASHA TORKZABAN; MORGAN SALISBURY; OPAL MORRIS; HENRY FARTHING; SUZANA KENNEDY; NAOMI SUI PANG; ASHLYN TELL; PHOEBE MORRIS; E.B., a minor, by and through his parent and next friend, CATHERINE P. BATZA, Ph.D.; and H.C., a minor, by and through his parents and next friends, DANIELLE BRUNIN and ERIK CHANEY, Plaintiffs, | ) |
| vs. | ) Case No: 2:25-cv-02428-KHV-GEB |
| LAWRENCE USD 497, a political subdivision of the State of Kansas, Defendant. | ) |

DEPOSITION OF GREG FARLEY, taken on August 10, 2026, at 9:30 a.m., at Dentons US, LLP, 4520 Main Street, Suite 1100, Kansas City, Missouri, 64111, before Stacy L. Decker, a Certified Court Reporter, taken on behalf of the Plaintiffs.



EXHIBIT 14

copies of the notice being sent to anybody else within the district?

A. I don't remember looking at the two notifications.

Q. When you were told you would be receiving these notices, were you told what you were supposed to do with them?

A. As I remember it, it was visit with the student, determine if there is a safety concern, first of all, and then resolve it or notify someone if safety was a problem.

Q. What information was contained in the notices you received, name of student, nature of concern, for example?

A. Name of the student. Yeah, something to do with why it was flagged. And then usually there was a tag which may have been like the keyword that it saw if it was written, or it would have said basically why it was flagged.

Q. Were you given instructions about how quickly you were supposed to act on these notices?

A. I don't remember.

Q. Over the -- now, did you also

A. Yes. They're never held against their will, if that's what you're asking.
Q. (By Mr. Johnson) When you called a student to your office, did you tell them they could leave at any time?
A. They were not -- that's not something that I would typically tell them right away.
Q. So do you think it would be reasonable for a student to think that, they've been called to the office, they can't leave?
MR. GRANT: Objection.
A. Again, I'd -- I can't speculate on what they would or would not feel once they're there.
Q. (By Mr. Johnson) When you met with a student about a Gaggle notice, did you typically do that one on one, or did you have someone else there for that discussion?
A. It happened both ways.
Q. Why would you have someone else present for a meeting to discuss a Gaggle notice?
A. It would -- again, it kind of

varies on the situation. If it's a student who wrote about suicidal ideation, then you'd want to have that conversation more in a one-on-one type situation.

Q. Did it have to do with what you at least perceived to be the seriousness of the issue?

A. No, not typically the seriousness. More the general kind of feeling of what is involved.

Q. Potential for some sort of dangerous situation to evolve?

A. You'd have to -- I don't understand, because that's kind of a --

Q. Well, you mentioned suicidal ideation.

A. Right.

Q. Would you have another person present if the student had a reputation for being difficult?

A. It's possible. Again, it depends on the relationship with the individual student oftentimes.

Q. Is it fair to say that you had in your head the names of the students who had

MR. JOHNSON: Harrison works in this law firm.

Q. (By Mr. Johnson) Have you seen Exhibits 36 and 37 before?

A. I don't recall seeing these.

Q. Did you meet with students by the name of Henry Farthing and Opal Morris?

A. I don't recall a meeting with them.

Q. Did you have a meeting with a number of art students in which you interviewed them about potentially inappropriate content?

A. I don't recall that meeting.

Q. Do you remember receiving Gaggle notices concerning Henry Farthing and Opal Morris?

A. I don't recall those names specifically.

Q. But consistent with your earlier testimony, if you met with them concerning a Gaggle notice, an entry on a Gaggle form would have been made to determine -- to report the resolution of your meeting?

MR. GRANT: Objection.

A. In general, I tried to -- when a meeting was over, I tried to resolve the incident. But, like I said, if there were other people present, it not necessarily would have been me that completed it.
Q. (By Mr. Johnson) Okay. But if the testimony from other witnesses in this case was that you had such a meeting, would you have any reason to question that?
A. No. I don't recall the meeting. That's all I can speak to.
Q. And, similarly, you don't recall a meeting at which up to 11 students were called into your office --
A. I don't.
Q. -- to be interviewed about Gaggle notices?
A. I don't recall that, no.
Q. And, similarly, you would not be able to recall any other district employees who were present during those meetings?
A. I wouldn't be able to tell you by name who was in there, because I can't remember the meeting.
Q. Who were some of the district

employees that you had accompany you in meetings with students concerning Gaggle notices?

A. So for Gaggle notices, it would most typically be Mark Preut, Elaina Honas, Mike Gillman.

Q. And they were all assistant principals?

A. They were, yes.

Q. Anybody else?

A. Sometimes there might be a social worker involved and possibly a counselor.

Q. Would the social worker and the counselor both be district employees?

A. As far as I know, yes.

Q. Do you remember their names? Were there a number of them?

A. There were a few. Lynisha Thomas, Carissa Welsh. And, again, I'm not saying any of these were present at any time, but they're social workers and counselors that were there, so.

Q. I understand.

A. They may have been called in depending on who had a relationship with

different students.
Q. When you had either a social worker or a counselor at one of these interview sessions, did they have the responsibility to prepare a report concerning the meeting?
A. Depending on what -- they may have had to prepare a report depending on what -- what was indicated in the alert.
Q. So there were circumstances in which either the social worker or a counselor would prepare a report?
A. Yes, it's possible.
Q. You remember that distinctly?
A. Well, I don't remember an individual happening. But I know that, if there was an indicator of self-harm and if they had met with the student and then self-harm was still indicated by the student after meeting with that social worker or counselor, then they would have probably gone through, filled out a DCF report, contacted home or whatever it happened to be.
Q. That's sort of a different path of reporting from what you would do, right?

A. Well, they would also -- they could also resolve it in the Gaggle system, depending on what they had found out.

Q. I just want to be clear here. You don't remember interviewing either Henry Farthing or Opal Morris concerning a Gaggle notice?

A. I do not remember interviewing either Opal Morris or Henry Farthing.

Q. And, similarly, you don't remember either of these photographs, Exhibits 36 and 37?

A. I do not remember them, no.

Q. And you don't know if one of them took one and the other did the other; you don't have any recollection as to which was responsible for which image?

A. I couldn't tell you who is responsible for which.

Q. You said that in some circumstances you would have security officers go get the students, and in others they would be -- they would receive something called a call slip and they would come to your office.

Do you remember sending security

officers to get Henry Farthing and Opal Morris out of their classes?
A. I don't remember that, no.
Q. And, similarly, you don't remember summoning any other students for a meeting in your office at the same time you summoned Henry Farthing and Opal Morris?
A. You just said I summoned them. I don't recall summoning them, so I don't recall summoning other students, either, for this meeting that apparently they have said happened.
Q. Okay. So I just want to make sure, you're not saying that they're making this up; you're saying you --
A. I don't remember. I'm not saying anything about what they have said. I don't remember the meeting. That's all.
Q. And you don't remember anything about the images that these students had generated?
A. Are we talking about these images here?
Q. These images and images that maybe some of the other students called to that

meeting generated.

A. No, I don't.

Q. Did you know Henry Farthing and Opal Morris before that -- did you know them?

A. I don't remember either Opal Morris or Henry Farthing.

Q. Okay. Were they assigned to you in your alphabet -- let's assume that this meeting occurred in the spring of 2024. Do you know if either the names Morris or Farthing would have been assigned to you?

A. They would not have been assigned to me.

Q. So they weren't in the alphabetical list you were responsible for?

A. Correct.

Q. When you had these meetings, did you ever prepare sort of a personal memo or personal notes about the meeting?

A. I may have. I don't -- I took notes.

Q. What happened to those notes?

A. They're probably -- my guess would be they maybe have been destroyed at this point. They were -- I left things in my

A. I think this is the first time I've seen it, right now.

Q. Okay. Let me ask you a few questions. I excerpted portions of the Second Amended Complaint that concern the allegations concerning Opal Morris' and Henry Farthing's images.

If you'll look at the second page of the document, which is, in fact, Page 31 of the Second Amended Complaint, starting with Roman Numeral V, the allegations follow concerning the district's search and seizure of Opal Morris' and Henry farther's personal effects.

Do you see that?

A. I do.

Q. Now, in Paragraph 124, which is at the bottom of Page 31, the allegation is made that, in early 2024, district administrators summoned art, journalism, and photography students to the front office at Lawrence High School for questioning.

Do you remember any such incident?

A. No, I do not. And again, that doesn't mean it didn't happen. Just I don't

remember that.

Q. 125 alleges that, among those summoned, were Plaintiffs Opal Morris and Henry Farthing.

Can I assume, similarly, you don't remember that?

A. I believe I already answered earlier today that I don't remember emailing with those two students.

Q. Paragraph 130 alleges neither Morris nor Farthing felt free to leave during the encounter.

I believe earlier you told me that you knew that students could leave meetings with you in which you discussed Gaggle notices, but you did not make it a practice to tell students they had the right to leave; is that correct?

A. When I -- typically when I would meet with students, I did not tell them that they were free to leave.

Q. Even though you knew they were free to leave?

A. No one's -- unless law enforcement is involved, people can leave our offices.

They can definitely leave my office, because you have to come around to my side of the desk. It's the furthest from the --

Q. Why don't you describe your office to us.

A. Well, if that's where it happened, it's the door, there's probably three chairs here. So if that's the door, there's three chairs. You come around to my side of the desk, and that's where my computer is.

Q. I'm going to have you do a diagram.

A. That's fine. Now the problem is this says it's in the front office, though. But I'll draw mine for you.

Q. Please do. So give us a diagram of your office, and then let's do a second one of the front office.

A. And that's pretty close to what it is.

(Exhibit 42 was marked.)

Q. So 42 is your office. Why don't you diagram the front office for us.

A. The whole front office?

Q. In Paragraph 124 the allegation is

that these students were summoned to the front office of Lawrence High School.

A. Which is what I just said.

Q. Yes. I just want to make sure -- a lot of time I have to say this for the record.

A. Okay.

Q. So could you give us a diagram -- create a diagram of the front office.

A. The entire front office is a really involved diagram.

Q. Do your best.

A. I will. It's not great, but.

Q. Thank you.

(Exhibit 43 was marked.)

A. You've got an office over here, a couple offices down that hallway, or actually principal's office and a conference room. And then that's kind of all the rest of it. And that would be like a wall.

Q. Okay. Thank you. In Paragraph 131 of the Second Amended Complaint, the allegation is, "Then Lawrence High School assistant principal, Greg Farley, then asked who wants to go first."

Do you remember saying anything like that in any meeting with students concerning Gaggle notices?

A. Not that I recall.

Q. Paragraph 135, which is the next page states, "Farley then accused Morris of having photos or documents on her computer that constituted indecent exposure or child pornography."

Do you remember ever using those words in a meeting with students to discuss Gaggle notices?

A. I do not remember using those words.

Q. Here's a speculation. Do you think you would remember if you used -- if you had used those words?

A. I don't think I would have accused anyone. I would have asked. If I had said those words, it would have been asking.

Q. Do you remember asking --

A. I don't.

Q. You just don't remember ever using these words in talking with the students?

A. If I -- in talking with students,