IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JACK TELL; NATASHA TORKZABAN; MORGAN SALISBURY; OPAL MORRIS; HENRY FARTHING; SUZANA KENNEDY; NAOMI SUI PANG; ASHLYN TELL; PHOEBE MORRIS; E.B., a minor, by and through his parent and next friend, CATHERINE P. BATZA, Ph.D.; and H.C., a minor, by and through his parents and next friends, DANIELLE BRUNIN and ERIK CHANEY,

Plaintiffs,

vs.

LAWRENCE USD 497, a political subdivision of the State of Kansas,

Defendant.

Case No: 2:25-cv-02428-KHV-GEB

DEPOSITION OF ASHLYN TELL, taken on September 17, 2026, at 10:30 a.m., remotely via Zoom Videoconference, before Stacy L. Decker, a Certified Court Reporter, taken on behalf of the Defendant.



EXHIBIT 18

should probably like get some reporters together to start putting together a story on just like the lawsuit itself that had been filed. And that's when she informed me of the directive.

Q. Had you ever met Mrs. Ladd before that day?

A. Yes. I had met her once I believe the school year prior. At the very end of the school year, we knew that my previous journalism advisor was leaving, and we knew Mrs. Ladd was going to replace her. And so Mrs. Ladd came to do a meet and greet. And then I had met her again the previous day, which was the first day of school.

Q. Did you talk about Gaggle at all on the first day of school with her?

A. No. Not that I recall.

(Exhibit 121 was marked.)

Q. All right. I've now introduced Exhibit 121. So, Ashlyn, do you have Exhibit 121 open on your screen?

A. Yes.

Q. And this is a document that shows a text that Mrs. Ladd sent to you; is that

correct?

A. That's correct.

Q. It looks like this came from an iPhone; is that correct?

A. Yes.

Q. Did you locate this text on your personal iPhone?

A. Yes.

Q. If you could just take a -- and this is a text from Mrs. Ladd to you, correct?

A. Correct.

Q. If you could just take a moment to read it, I'll have some questions for you about it.

A. Okay. Okay.

Q. Do you know when you received this text?

A. I was actually going to ask that. I don't -- it was either August 14th or 15th, that Thursday -- I want to say it was like that Thursday night, I think.

Q. Would you be able to look on your phone right now and tell me when you received that?

A. Yeah, I can do that.

Q. Okay.

A. Oh, this was the 19th.

Q. August 19th?

A. Yes.

Q. Okay. Do you know if there is anything that prompted Ms. Ladd to send you this text?

MR. JOHNSON: Objection. Calls for speculation.

But go ahead and answer.

A. Yes. I had told her that we're going to -- that like fellow editors and I were publishing a story on Gaggle that night. And so just like because she was my advisor, I let her know of that. And that was what she responded with.

Q. (By Mr. Grant) Do you know, did you let her know that via text?

A. Yes.

Q. And I thought maybe there was something you were about to clarify maybe about the date you received it before I asked that question. Was there anything you were going to add?

A. I had mistakenly said earlier it

was maybe the 14th or 15th, but I remember it was the 19th, and I have it right here it was the 19th.

Q. Okay. And I'm sorry if you already said this, but what time did you receive it? Are you able to see that?

A. Yeah. I received it at 8:42 p.m.

Q. Okay. And did you reply to the text?

A. Yes.

Q. And what did you say?

A. Well, she had also sent two more texts after that and. Then I replied after all three texts and said, "Sounds good. Thank you for letting me know this and I appreciate Mr. Saltz looking at it. I do think because this part of the case is an explicit victory for the publication, we can say victory. Does that sound right to you?"

Because she had asked about the word "victory" in the --

Q. Yeah, and I do have those texts as well. I just double-checked. So, yeah, I had isolated her -- sorry. I'll try not to talk over you.

received Ms. Ladd's text prior to the date on which Exhibit 69 was filed with the court, correct?

A. Could you repeat that. Sorry.

Q. Sure. So as of the date Exhibit 69 was filed with the court, which was July 10, 2026 --

A. Yeah.

Q. -- I just want to confirm that, as of that date, you had already received the text reflected as Exhibit 121, correct?

A. Yes. Correct.

Q. So notwithstanding that you had this text from Ms. Ladd on August 19th where she conveyed to you I believe I misunderstood Dr. Rials, why does the complaint continue to allege that Dr. Rials issued this directive?

A. Because I never -- like there was never any reason for me to believe that he truly did not issue the directive.

Q. Well, but -- sorry. Go ahead.

A. In fact, like the district themselves issued a memo saying that like the directive had been lifted, so.

Q. Right. But you said that there

was no reason for you to believe that he had not issued the directive. But isn't Ms. Ladd's text a reason for you to believe perhaps Dr. Rials did not issue the directive?

A. I didn't interpret it as a reason to believe that he didn't issue the directive.

Q. Exhibit 121, it appears to me that -- well, so, first of all, did you take a screenshot of the text and that's how we now have the image that we see at Exhibit 121?

A. Yes, I took a screenshot.

Q. And then it appears to indicate that, on Exhibit 121, at the moment you took the screenshot, you had been on a phone call for 10 minutes; is that right?

A. Yes.

Q. Do you remember who you were on the phone call with?

MR. ROSENTHAL: I think we should object.

MR. JOHNSON: Objection. Attorney-client privilege.

MR. GRANT: Okay, so I think that answers my question.

MR. JOHNSON: Yeah.

questions about those three steps that are described in that.

First of all, is that -- do you agree with those statements about how Gaggle operates?

A. Yes.

Q. So I'll ask you about the different steps that are described in that paragraph. First is the flagging, then is review by a Gaggle contractor, and then is review by the district. Are you with me?

A. Yes.

Q. Okay. Starting with step one, do you know if any of your content was ever flagged by Gaggle?

A. I don't know for sure. I -- yeah, I don't know for sure.

Q. Would you consider flagging by Gaggle without anything more to be seizure of your content?

A. No.

Q. And this will probably draw an objection from your counsel about asking for a legal conclusion, but would you consider seizure -- or, I'm sorry, flagging by Gaggle

district's access to our drive.

Like there was definitely continued question as to how much access they had. It was a question for sure. And there was -- I did not have any sure answer.

Q. Do you contend that the district ever deleted any content that you created?

A. I can't be sure.

Q. Well, I think you could be sure if you knew you had content that was deleted. So my question is, are you aware of any content that you ever created that you know the district deleted?

A. No, I'm not aware of any.

Q. Okay. The complaint alleges that journalism was chilled. Would you agree with me that that allegation appears in the complaint?

A. I would agree.

Q. Can you explain to me in your view how your journalism was chilled by the district.

A. Are you talking about the specific instance in the fall of 2025?

Q. No. We've obviously talked about

MR. JOHNSON: Objection. Asked and answered.
But go ahead.
A. Doesn't that sentence say by causing searches? Am I looking at the wrong sentence?
Q. (By Mr. Grant) Yeah. There's -- sorry. I skipped over some words because I'm trying to isolate the specific part I'm asking about.
So the second sentence of Paragraph 3.
A. Yes.
Q. And I understand your allegations I think about the searches. But, again, with reference to this sentence, I'm asking you what you contend of your content was seized.
A. Like my content specifically?
Q. Yes.
A. I don't think I had an instance that I am aware of where my content was seized, I don't think. But it's hard to know.
Q. In terms of censorship, do you contend that any of your protected material was censored?