IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | | |
|---|---|---|
| JACK TELL; NATASHA TORKZABAN; MORGAN SALISBURY; OPAL MORRIS; HENRY FARTHING; SUZANA KENNEDY; NAOMI SUIPANG; ASHLYN TELL, PHOEBE MORRIS, E.B. a minor, by and through his parent and next friend CATHERINE P. BATZA, PH.D.; and H.C., a minor, by and through his parents and next friends DANIELLE BRUNIN and ERIK CHANEY, | ) | No. 2:25-cv-02428-KHV-GEB |
| Plaintiffs, | ) | |
| v. | ) | |
| LAWRENCE USD 497, a political subdivision of the State of Kansas, | ) | |
| Defendant. | ) | |

DEPOSITION OF E.B., a Witness, taken on behalf of the Defendant before Jane A. Blackerby, CSR #1369, CCR #877, pursuant to Notice on the 1st day of October, 2026, at the offices of Lewis Brisbois Bisgaard & Smith, LLP, 4600 Madison Avenue, Suite 700, Kansas City, Missouri.



EXHIBIT 21

might be -- if you go to my profile you will have stories that aren't properly attributed to me or that's missing stories.

Q. Okay. So how did the school's monitoring impact that story?

A. I mean, it made me more cautious about what questions I felt comfortable asking the people who I talked to. It encouraged me to censor the content that I wrote in that document as it pertains to Gaggle, as in the end it will end up on a Google doc. I can keep interviews as far away as I can from school devices, which is what I did do very consciously. I can be careful about what questions I ask, but at the end of the day every quote I have and every sentence I write must end up in a Gaggle monitored Google document, which means that I had to be selective with the words and phrases I use and the content that I was willing to put on the page.

Q. In terms of the questions that you asked, I understand that you took some steps to do journalism work, not on a school device or in a way that would not be stored on the Google -- and school's Google server, and we'll talk about

that in a little bit, but how did the school's monitoring impact the actual questions you were asking for that story?

A. It made me focus on a separate aspect, to an extent. It made me focus more on the, you know, curatorial side of it and less on what lifeline is and what it does, and what the experience of the people who staff the hotline are, what they experience as part of the role.

Q. Can you explain what you mean by the curatorial aspect?

A. As I said, it was a collaboration between Hang12, our curator base, make art exhibitions and lifelines, which is a suicide prevention hotline. So focused more on the art show aspect of that collaboration, on more of the, you know, student artistic piece rather than the suicide preventing -- I mean, I mentioned that it was, you know, in collaboration with the suicide hotline. I talked about that connection, but I framed the story very much in a specific way as to avoid dealing with the deeper nature of lifelines.

Q. Can you explain to me the collaboration between Hang12 and the suicide prevention?

if you're using your personal laptop to, let's say, let's say draft something.

A. Yes.

Q. So long as you do not save that draft to the Google Suite that is not subject to monitoring, based on your understanding. Is that right?

A. Based on my understanding, the only things that Gaggle is able to see is things underneath my district managed account, Google Suite.

Q. Okay.

A. So no. Or yeah.

Q. By using your personal devices in that way does that enable you to do your journalism work without regard to ManagedMethods or other schooling monitoring?

A. Absolutely, not, no. At the end of the day, every single thing I do must end up on a school Google doc that is put into shared drives with other school accounts and put into school room classrooms. At the end of the day everything must end up under a document that is seen by Gaggle. It is just that occasionally I will get to have steps in between that are, if I

am very conscious about it, remain independent.

Q. You say at the end of the day it must end up on the school's Google drive. At what point in the process of writing an article are you required to maintain the document on the school's Google drive?

A. Once you have a draft that is being submitted for, because editors will then go and edit that draft, and through the way that journalism has to work to be any level of efficient or functional, it needs to have -- you need to take your document and put it into the journalism drive into the cycle whatever stories folder, where editors will then be assigned to go and edit that story and putting it in that drive automatically gives every editor, every single person access to it and is necessary for us to work with any level of speed or efficiency. Up to that point you could keep it off if you were conscious about it, but most of the time unless it's a sensitive story you just write on it the document, because I mean, yeah.

Q. If I'm understanding correctly, the work that you do to prepare articles for the online Budget that eventually end up on the

Budget's website, is the edit process is collaborative, and so it sounds like what you're saying is that in order for that process to work necessarily a draft must once it's ready for the editing process, be stored on the school's Google drive. Is that correct?

A. Correct.

Q. Is there any reason you couldn't, for example, send a draft from your personal laptop to another student's private e-mail account to do that process?

A. It would be incredibly difficult to coordinate. It would make it near impossible for our teacher to do any kind of grading because she would have to be a private e-mail of the teacher would have to be cc'd into everything, which I'm not even sure if that's allowed under new laws about student-teacher communications. It would just be so -- I mean, our staff is massive. It would be so difficult to coordinate and to keep running smoothly, and not everyone is going to have a non-school issued Google account. Like there is a reason why the school gives this out to students because it's a useful and fruitful tool for

that you are -- that this policy applies to you as a junior at Lawrence High School.

MR. JOHNSON: Same objection.

A. I can assume it does, yes.

Q. (By Mr. Grant) And do you agree that you have no expectation of privacy when using District e-mail?

MR. JOHNSON: Objection, calls for legal conclusion, but you can answer.

A. Yes.

Q. (By Mr. Grant) And do you agree that you have no expectation of privacy when using computer applications?

MR. JOHNSON: Same objection.

A. I understand that is what the policy says, yes.

Q. (By Mr. Grant) When you use the Google Suite to do journalism or for that matter any school work, that is done through computer applications. Is that correct?

A. Yes, although I would be curious on whether or not Kansas Shield would give me an expectation of privacy on a higher level than this policy because of its statements on prior review, but...

Q. So let's set aside any journalism content for a moment.

A. Yes.

Q. Do you understand that if you, for example, write a paper for an English class and put that on the Google drive that you have no expectation of privacy with regard to that document?

MR. JOHNSON: Same objection concerning a legal conclusion, but you can answer.

A. According to this policy, yes.

Q. (By Mr. Grant) Okay. Paragraph 105 describes the school's acceptable use policy.

A. Yes.

Q. It's quoted there and it is attached to Second Amended Complaint as Exhibit PLO. The attachments are not printed out here. Do you see the portion of that policy quote that states students will not have any expectation of privacy when using any District owned device?

A. Yes.

Q. Do you understand that as a junior at LHS you are subject to this policy as well?

MR. JOHNSON: Same objection,

calls for legal conclusion, but you can answer.
A. Yes.
Q. (By Mr. Grant) And Paragraph 109 on the same page states that students are prohibited from using school internet services or transmitting documents without signing the AUP. Do you see that?
A. I do, yes.
Q. Do you know whether you signed an AUP yourself?
A. I certainly have no memory of it.
Q. Do you know if somebody signed it on your behalf?
A. I do not, no. I know that --
MR. JOHNSON: You answered the question.
Q. (By Mr. Grant) Do you have any reason to doubt that either you or somebody on your behalf signed an AUP?
MR. JOHNSON: Objection, calls for speculation, but you can answer.
A. In the sense that I believe we asked for a signed copy in discovery and it has not been provided to us, yes, I do have reason.
Q. (By Mr. Grant) Any other reason beyond

that which you just stated?
A. Beyond that, no.
Q. Okay. If you look at Paragraph 114. It alleges that shortly after the District's implementation of Gaggle Plaintiff student journalists working for Budget noticed that various materials were being seized?
A. Uh-huh, or yes.
Q. Did you -- do you need to clarify anything? Looks like you were reviewing privacy policy again?
A. I was, yes, but it was for questions that I assume you will be asking soon. Not any you have asked yet.
Q. Okay. With regard to Paragraph 114, what I was going to ask you, and you know, I understand you're one of the younger Plaintiffs but do you know, and again, I'm pretty sure you said you didn't have role in preparing this document, but are you one of the Plaintiffs who's referred to in Paragraph 114?
A. No. Not to my knowledge.
Q. Okay. Paragraphs 189 through 190 describe an effort that the District made to remover student journalists from Gaggle's

A. Not to my memory.
Q. I had asked you earlier with regard to the acceptable use policy described in the Complaint whether you or somebody on your behalf had ever signed it, and you said that you didn't remember yourself having signed it or you weren't aware of anybody else having signed it on your behalf. Is that correct?
A. Correct.
Q. Now having this document in front of you does that change your answer at all?
A. Nope.
Q. And if I told you that LHS required an acceptable use policy to be signed by every student as a prerequisite to enrollment each year, would you have any reason to doubt that?
MR. JOHNSON: Objection, calls for speculation, but you can answer.
A. I have no reason to doubt that, no.
Q. (By Mr. Grant) If you look at the first page, the heading on the bottom or there is a heading at the bottom that says students will. Do you see that?
A. Yes.
Q. And the second bullet point says that

"Students will expect any District device to be regularly inspected for inappropriate material." Do you see that?

A. Yes.

Q. Did you understand, or do you understand as a junior at LHS that any school device that you have is subject to inspection in this way?

MR. JOHNSON: Objection, calls for a legal conclusion, but you can answer.

A. I understood that this was a part of the terms of some of the device policy standards, yes.

Q. Okay.

A. However, only after joining this lawsuit, I should say.

Q. The first sentence of the third bullet point states that students will expect, and then it goes on to say that e-mail transmission and receptions would be subject to review. Do you see that?

A. Yes.

Q. And do you understand that as a student at the District that your e-mail transmissions are subject to review?

A. Yes.
Q. Do you see the final sentence of that bullet point states that all such information and/or files shall be and remain the property of the school District?
MR. JOHNSON: Objection, calls for -- you asked him does he say that. I'm sorry, no objection to that.
A. Yes.
Q. (By Mr. Grant) And do you understand that all of your information and files are the property of the school District?
MR. JOHNSON: Objection, calls for a legal conclusion, but you can answer.
A. Yes.
Q. (By Mr. Grant) And do you see the latter part of that sentence states that no user shall have any expectation of privacy regarding the use of the devices, District network or District's internet. Do you see that?
A. Yes.
Q. And do you understand that as a junior at LHS you have no expectation of privacy regarding those items listed there?
MR. JOHNSON: Objection, calls

for legal conclusion.

A. Can you repeat that question? I'm sorry.

Q. (By Mr. Grant) Do you have an understanding as a junior at LHS that you have no expectation of privacy regarding the items listed there?

MR. JOHNSON: Same objection.

A. Yes.

Q. (By Mr. Grant) If you were to browse a website on a computer of LHS library, would you expect your browsing history to be private?

A. No.

Q. I'm going to show you now the first new exhibit, a copy of which I will also hand to the court reporter to be marked as Exhibit 147.

(E.B. Exhibit 147 was marked for identification by the reporter.)

MR. JOHNSON: I'll tell you right now, Cameron, that I mistakenly sent to you a draft version, and I will -- I just wanted to see which exhibit you were going to use, but he's willing to answer any questions that you have.

THE WITNESS: These were before