IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| JACK TELL; NATASHA TORKZABAN; MORGAN SALISBURY; OPAL MORRIS; HENRY FARTHING; SUZANA KENNEDY; NAOMI SUI PANG; ASHLYN TELL; PHOEBE MORRIS; E.B., a minor, by and through his parent and next friend, CATHERINE P. BATZA, Ph.D.; and H.C., a minor, by and through his parents and next friends, DANIELLE BRUNIN and ERIK CHANEY, | ) | |
| Plaintiffs, | ) | |
| vs. | ) | Case No: 2:25-cv-02428-KHV-GEB |
| LAWRENCE USD 497, a political subdivision of the State of Kansas, | ) | |
| Defendant. | ) | |

DEPOSITION OF H.C., taken on September 8, 2026, 9:30 a.m., remotely via Zoom Videoconference, before Stacy L. Decker, a Certified Court Reporter, taken on behalf of the Defendant.



EXHIBIT 23

A. Yes.
Q. What was it?
A. 10208144.
Q. And is that also your student ID number?
A. Yes.
Q. Earlier you mentioned that you -- you mentioned a contract that you had to renew every year. What contract were you referring to?
MR. JOHNSON: Objection. That calls for a legal conclusion.
But you can go ahead and answer the question.
A. I believe it was -- I can't remember the name. It was just the document they had us sign just going over like what not to do with our iPad, things like that.
Q. (By Ms. Harris) Did you sign one this year?
A. Yes.
Q. Do you have a copy of what it is that you signed?
A. I do not.
Q. And did you sign it or did your

parents sign it?

A. We both did.

Q. And is that the same every year, both you and your parents signed the contract you're referring to?

A. Let me think. I might -- I think only I signed it. Sorry. Or no. I believe it's both of us who signed it. Can you restate your question. Sorry.

MS. HARRIS: Stacy, could you read the question back.

(The pending question was read by the court reporter.)

A. Yes.

Q. (By Ms. Harris) I'm going to share my screen with you. Can you see my screen okay?

A. Yes, I can.

Q. Have you seen this document before?

A. Yes. This is the document I was referring to.

Q. And so would this be the document that you and your parents would have signed each year when you were issued a, iPad from

the school district?

A. Yes.

MR. JOHNSON: Melika, could you identify the document.

MS. HARRIS: I'm sorry. And this document was previously introduced as Exhibit Number 5. This is the student Acceptable Use Policy.

Q. (By Ms. Harris) And is this -- and to your knowledge is this the same document that you and your parents signed each year after being issued the iPad?

A. Yes.

Q. Okay. Now I'd like to direct your attention to under the first section, it says, "Expectations for all students." And it says, "Students will," and then it says under the second bullet point, "use technology for educational purposes."

Did you see that there?

A. Yes.

Q. Okay. So is it your understanding that the iPad issued to you by the school was to only be used for educational purposes?

A. Yes.

MR. JOHNSON: Objection. The document speaks for itself.
You can answer.
A. Yes.
Q. (By Ms. Harris) Okay. I'd like to go down to the bottom of the first page where it states, "Additional expectations for students with personally assigned computing devices."
Do you see that section?
A. Yes.
Q. And then under the second bullet point, it says students -- well, under the second bullet point, it says, "expect any district device to be regularly inspected for inappropriate material, which might include unlicensed software or inappropriate content and software. Any inappropriate content or licensed software will be removed."
Did I read that correctly?
A. Yes.
Q. So is it your understanding, from reading this document, that students are to expect that the school-issued device would be regularly inspected for inappropriate

material?

A. Yes.

Q. Okay. And then if we look at the third bullet point, it says, "expect without prior notice any and all usage of the district network and internet access, including, but not by way of limitation, email transmissions and receptions to be subject to review. Any information gathered during monitoring may be copied and/or stored. All such information and/or file shall be and remain the property of the school district and the user shall have any expectation of privacy regarding the use of the devices, district network, or the district's internet."

Did I read that correctly?

A. Yes.

Q. (By Ms. Harris) So based on your understanding of the district's Acceptable Use Policy, would it be correct that students should expect without prior notice for the district network and internet access, including email transmissions, to be monitored?

MR. JOHNSON: Calls for a legal

conclusion.
MR. ROSENTHAL: Improper hypothetical.
MR. JOHNSON: Harrison, just me.
MR. ROSENTHAL: Okay.
MR. JOHNSON: Objection, calls for a legal conclusion.
You can answer it.
A. Yes.
Q. (By Ms. Harris) Now, in this lawsuit plaintiffs have alleged that, "Through the district's use of Gaggle and similar platforms such as ManagedMethods, the district conducted searches of students' expressions."
Is that your understanding of the allegations made in this lawsuit?
MR. JOHNSON: Objection. Assumes facts not in evidence.
But go ahead and answer if you can.
A. Yes.
Q. (By Ms. Harris) When did you first learn that the school district was using Gaggle?
A. I first learned that Gaggle -- or that the school district was using Gaggle sometime I think in early 2024 or -- no, not

of your email communications been flagged by ManagedMethods?
A. Not that I know of.
Q. To your knowledge have any other writings of yours, photographs, memes, or anything else that you've stored in the Google Workspace been flagged by Gaggle or ManagedMethods?
A. Not that I know of.
Q. And you understand that Gaggle flagged your email because it contained language that potentially indicated that you might be experiencing bullying at school, correct?
MR. JOHNSON: Objection. Calls for speculation.
But you can go ahead and answer.
Q. (By Ms. Harris) H.C., you can answer.
A. I think my internet cut out.
Q. Were you able to answer the question?
A. I did not hear you.
Q. Okay. You understand that Gaggle flagged the email referenced in Paragraph 295

because it contained language that potentially indicated that you may have been experiencing bullying; is that correct?
A. Yes.
Q. And as you stated, bullying had been an issue at West Middle School, correct?
A. Yes.
Q. And would you agree that an allegation of bullying is a serious matter?
A. Yes.
Q. And if a school counselor received information suggesting that a student is being bullied, you'd expect the counselor to look into that, correct?
A. I would.
Q. And before meeting with you in late 2024 or early 2025, would Ms. Fike have had any reason to know that your email was a joke?
A. If she --
MR. JOHNSON: Objection. Calls for speculation.
You can answer.
A. If she was able to view the whole email thread, which just included my friend

calling me some name, she would have been able to understand that that was a joke.

Q. (By Ms. Harris) But sitting here today, you're unable to recall the name that A.R. called you in the initial email; is that correct?

A. Correct.

Q. Would you agree that you speaking with Ms. Fike, the counselor, gave you an opportunity to explain that the email was just a joke?

A. Yes, I had to explain to her that it was a joke.

Q. And after you gave the explanation that it was just a joke, you were permitted to return to your class, right?

A. Correct.

Q. And you weren't disciplined for the email?

A. I was not.

Q. And did she put any restrictions on you afterwards as to the types of emails you were then able to send?

A. No.

Q. Did any school official, like a