IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| JACK TELL; NATASHA TORKZABAN; MORGAN SALISBURY; OPAL MORRIS; HENRY FARTHING; SUZANA KENNEDY; NAOMI SUI PANG; ASHLYN TELL; PHOEBE MORRIS; E.B., a minor, by and through his parent and next friend, CATHERINE P. BATZA, Ph.D.; and H.C., a minor, by and through his parents and next friends, DANIELLE BRUNIN and ERIK CHANEY, | ) | |
| Plaintiffs, | ) | |
| vs. | ) | Case No: 2:25-cv-02428-KHV-GEB |
| LAWRENCE USD 497, a political subdivision of the State of Kansas, | ) | |
| Defendant. | ) | |

DEPOSITION OF JACK TELL, taken on August 24, 2026, at 9:30 a.m., at Lewis Brisbois Bisgaard & Smith, LLP, 4600 Madison Avenue, Suite 700, Kansas City, Missouri, 64112, before Stacy L. Decker, a Certified Court Reporter, taken on behalf of the Defendant.

Page 66

MR. ROSENTHAL: Objection.
A. Yeah, that's sort of -- well, I won't talk about like the reporting specifics. When we were -- when we had meetings with -- sort of advocacy meetings with district and building administrators and we asked them how we could -- how best to work with them and work with Gaggle on this, they were insistent that they would be the go-between between us and Gaggle.
Q. (By Mr. Grant) But that answer related to working with the district and working with Gaggle. I'm talking about reporting. In all of your reporting about Gaggle, is there any reason -- did you ever attempt to reach out to anybody at Gaggle?
MR. ROSENTHAL: Objection. Same admonition with respect to reporters privilege.
MR. GRANT: Although I'm asking -- it sounds like the answer is no, they did not reach out, so I question how or why that could be subject to the privilege, but.
A. I would say, yes, we did reach out.

Page 67

Q. (By Mr. Grant) Who did you reach out to, do you remember?
MR. ROSENTHAL: Objection. This is asking about privileged material sources of his reporting.
THE DEPONENT: Should I answer it?
MR. ROSENTHAL: If you can answer the -- I'm going to direct the witness not to answer.
If you can answer in general terms without discussing the specific sources that you reached out to, do so.
A. I can't answer.
Q. (By Mr. Grant) Did you ever receive any communication from Gaggle directly?
A. I don't think I can answer that --
MR. ROSENTHAL: Same objection.
Q. (By Mr. Grant) All right. So that was actually my next line of questioning was about your use generally of confidential sources, and I would like to understand that a little bit better.
On any issue, did you ever utilize confidential sources during the course of your

Page 68

reporting for The Budget?
A. I did not personally ever use a confidential source.
Q. Okay. I'm going to show you a document that has been marked as Exhibit 67.
MR. GRANT: All right. These are the initial disclosures that are in Natasha's folder.
MR. ROSENTHAL: Thank you.
Q. (By Mr. Grant) Okay. So you've looked through the document briefly. Have you seen this document before?
A. I've seen parts of it.
Q. What parts do you remember seeing before?
A. On Page 1, my name and my little blurb there.
Q. Okay. Did you assist your attorneys with identifying individuals with discoverable information, which is the heading on the page you're looking at, Page 2?
A. Yes, I suppose so.
Q. Okay. Do you understand generally that this list of 26 names is a list that the plaintiffs disclosed of individuals who they

Page 69

contend has discoverable information?
A. Yes.
Q. Okay. Do you know if there is anybody who has discoverable information who is not among the 26 names that were listed because they are considered a confidential source?
A. No.
Q. Sorry. You don't know or you know that is not the case?
A. That is not the case.
Q. Okay. And I'll draw your attention to Section 3, which is toward the end. It's Page 14, the next to the last page. Do you see that the heading is computation of damages?
A. Yes.
Q. The first sentence under that heading says, "Plaintiffs presently seek declaratory and injunctive relief and nominal damages for alleged constitutional violations."
Do you see that?
A. Yes.
Q. And I know these are legal terms.

Page 70

But where it says "Plaintiffs presently seek," and this document is from not that long ago, from June 8, 2026, to your knowledge -- well, and in terms of you personally, are you seeking any additional relief since the date of this document that is not reflected in Section 3?
A. No.
Q. All right. We won't need that document again, so you can set it to the side. And I'm now going to refer back to the complaint.
So going back to the complaint, Paragraph 3 refers, in the middle of the paragraph, to the seizure and censorship of protected materials. Do you see that?
A. Yes.
Q. I'm going to ask you some questions now about censorship.
Did the district ever prohibit you personally from publishing an article on a certain topic?
A. No.
Q. And to your knowledge did the district -- and I'll limit it to the time you

Page 71

were a senior. Did the district ever prohibit The Budget from publishing an article on a certain topic?
A. No.
Q. Did the district ever attempt to dissuade The Budget from publishing an article on a certain topic?
A. No.
Q. Did the district ever suggest to you topics that you should report on?
A. What do you mean by the district?
Q. Well, I'll -- so I'll withdraw that question.
Did anybody at Lawrence High School, any non-student, ever suggest topics that The Budget should report on?
A. Yes.
Q. Can you describe for me any examples you can remember.
A. Barb Tholen, the journalism advisor, frequently advised us on what topics to report on. I also frequently had my other teachers suggest story ideas that they saw.
Q. Would there have ever been any repercussion if you did not report on topics

Page 72

they had suggested?
A. No.
Q. So the answers to your previous few questions in mind, again, with reference to Paragraph 3 that alleges the seizure and censorship of protected materials, can you tell me how you contend the district censored you.
A. My -- the district certainly censored Ashlyn Tell in her reporting at the beginning of last year.
Q. Okay. So I can ask her about that. She's another plaintiff in this case.
But in terms of the time during which you were a student at LHS, can you cite for me any examples that you would contend are examples of the district censoring The Budget?
A. No.
Q. Okay. I'm going to show you Exhibit 59, which should be in Natasha's folder. Do you remember receiving an award from the KSPA?
A. Yes.
Q. Do you have a general understanding of what the KSPA is?

Page 73

A. I do.
Q. What is it generally?
A. It's a -- well, a press association that supports the work -- supports and recognizes the work of student journalists in Kansas.
Q. The date of this article appears as reflected on the top to be August 29, 2025. Do you see that?
A. Yes.
Q. Do you remember when you received the KSPA award?
MR. ROSENTHAL: Objection to this line of questioning for lack of foundation.
A. I don't remember specifically. It would have been sometime that summer.
Q. (By Mr. Grant) And the first paragraph under the heading states that the journalism staff were winners of the 2025 KSPA Courage in Student Journalism Award. Do you see that?
A. Yes.
Q. Do you know why you would have received a 2025 award even though you had graduated from LHS in 2024?

Page 106

would not scan personal documents. However, that was not an effective solution for removing all the journalism work from Gaggle, because we were not able to do very much work on personal documents.

Q. And why is that?

A. Because, again, the journalism system kind of relies on a unified Google Drive -- centralized, I should say, Google Drive to do things like submit assignments for editing, edit, that sort of thing.

Q. So I'm not understanding that fully. So in my mind if you -- I understand that you used Google generally. And, you know, other witnesses have testified about a lot of the journalism work being, you know, collaborative work.

And so if we take, for example, a journalism template, that I know at least some of the students used for their reporting, if you -- if the journalism students had decided we're going to keep using the journalism template, but we are going to use that template only on our personal accounts, is there any reason you wouldn't have been able

Page 107

to do that?

MR. ROSENTHAL: Objection, form.

A. No.

Q. (By Mr. Grant) Okay. So can you expand a little bit more upon why using your personal Google accounts was not really a workable solution essentially.

A. Yes. Partly because it's time consuming to switch accounts. And so while it was feasible for a small number of stories that we thought were maybe more sensitive, it would not be feasible for the entire work product to be conducted on personal accounts, not least because there's not enough storage in the personal free Google account to store all of the massive amount of files and photos that the journalism staff produces.

Q. So am I correct that the school's Google accounts had more storage than a personal account would?

A. Yes.

Q. Okay. Beyond the storage, is there any other reason that it would not have been practical to use personal accounts to do the journalism work?

Page 108

A. I mean, yes, there's lots of reasons. Most of them involve just time. Like we could have, you know, gone back to handwritten notes and typewriters if we wanted to, but that's similarly not a realistic method of doing journalism.

Q. So you say there are lots of reasons. I want to understand what all the reasons are. So you mentioned storage and then the extra time that would be required to do things by hand or using a typewriter. Are there any other reasons that was not a practical solution?

A. Yeah. I mean, we assigned our reporters stories using a management software called Trello that worked well with the school Google Drive, and it wouldn't have been possible to use Trello with a whole bunch of different personal Google accounts.

Journalism assignments were submitted on Google Classroom in some cases, and grades were given out via the school system. So for those reasons it would be impossible to completely switch.

Q. You've mentioned Trello a couple

Page 109

times. I have not heard of that before. Can you tell me more about what Trello is and how you used Trello.

A. Yeah. It's a software made for like task organization for large teams. And so that's how we would -- there's things called cards on Trello that each reporter or photographer would have an assignment that's on a Trello card. And a template would be linked to that Trello card, and they would kind of work off that Trello system.

MR. GRANT: Okay. So we're kind of at a natural break now, so -- just a five-minute break.

(Recess.)

MR. GRANT: Back on the record.

MR. ROSENTHAL: As we're back on the record, there's one preliminary matter we need to address, which I will let the witness bring up.

A. Yeah, I think there's a -- I would like to on the record correct a statement I made earlier.

Q. (By Mr. Grant) Okay.

A. I think I answered your question

earlier and said that there wasn't anything besides the declaratory and injunctive relief, and I would like to add that we are also seeking compensatory damages as well.
Q. Okay. Hold on one second. Which exhibit was that, do you know?
A. 67 and 69 are the ones that I'm talking about.
Q. So going to Exhibit 67 --
A. Yes.
Q. -- I think my question was in reference to Section 3 of that document, which is on Page 14.
A. Yep.
Q. And so the sentence that I had asked you about said, "Plaintiffs presently seek declaratory and injunctive relief and nominal damages for alleged constitutional violations."
Do you see that?
A. Yes.
Q. When you say compensatory damages, do you believe those to be beyond nominal damages?
A. Yes.



Q. So what compensatory damages are you seeking?
A. We are seeking -- I mean, we've been injured by constitutional violation, and we require compensatory damages to make us whole.
Q. Who is the "we" in that sentence?
A. The plaintiffs.
Q. So you're speaking on behalf of all the plaintiffs?
MR. ROSENTHAL: Objection.
A. I am.
Q. (By Mr. Grant) So what compensatory damages would make Zana Kennedy whole?
A. That's up to the jury.
Q. Okay. Right. So that may be true, but we're entitled to disclosure of the information you're -- of the damages you're seeking.
So what damages is Zana Kennedy going to ask the jury to award her?
MR. ROSENTHAL: Objection, form.
You can answer if you know.
A. I don't know.



Q. (By Mr. Grant) Well, you just testified that all of the plaintiffs are seeking compensatory damages, and those are beyond nominal damages you said. So what compensatory damages is Zana Kennedy seeking?
MR. ROSENTHAL: Same objection.
MR. GRANT: I mean, it's his testimony, so now I'm asking follow-up questions.
A. I'm just reading from the second amended claim where we -- in our prayer for relief in Section F we ask that we be awarded, plaintiffs, compensatory and nominal damages against defendant.
Q. (By Mr. Grant) Okay. So that's great that that's what you're reading from. I'm asking you questions about Exhibit 67, which is a document that the plaintiffs are required to provide under the rules. We're entitled to know this information.
You said the plaintiffs are seeking compensatory damages beyond nominal damages. So I'll ask you that question again. What compensatory damages is Zana Kennedy seeking?



A. I don't know.
Q. So you can't tell me?
A. That's correct.
MR. ROSENTHAL: Objection to form.
If you have personal knowledge of any of this, you can answer as to your personal knowledge.
A. Yeah, I don't have personal knowledge of what Zana Kennedy is seeking.
Q. (By Mr. Grant) Okay. What compensatory damages are you seeking?
A. Whatever the jury sees fit as to render me whole.
Q. So it could be a billion dollars?
A. That's correct.
Q. Okay. We can move on.
When did you first discuss the possibility of filing -- when did you first consider the possibility of filing a lawsuit against the school, if you remember?
A. Consider the possibility of filing a lawsuit. Probably sometime after that March 29th meeting.
Q. And do you remember if it was before the April meeting?