IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| JACK TELL; NATASHA TORKZABAN; MORGAN SALISBURY; OPAL MORRIS; HENRY FARTHING; SUZANA KENNEDY; NAOMI SUI PANG; ASHLYN TELL; PHOEBE MORRIS; E.B., a minor, by and through his parent and next friend, CATHERINE P. BATZA, Ph.D.; and H.C., a minor, by and through his parents and next friends, DANIELLE BRUNIN and ERIK CHANEY, | ) | |
| Plaintiffs, | ) | |
| vs. | ) | Case No: 2:25-cv-02428-KHV-GEB |
| LAWRENCE USD 497, a political subdivision of the State of Kansas, | ) | |
| Defendant. | ) | |

DEPOSITION OF ASHLYN TELL, taken on September 17, 2026, at 10:30 a.m., remotely via Zoom Videoconference, before Stacy L. Decker, a Certified Court Reporter, taken on behalf of the Defendant.

Page 106

Q. All right. I've now introduced Exhibit 135.
A. Okay.
Q. This was an article you published on December 30, 2025; is that right?
A. Yes.
Q. Do you recall at this point whether you were aware that Gaggle had been replaced by ManagedMethods?
A. I was aware, because that was in the middle of my -- like I was still waiting for more information on ManagedMethods. So, yes, I was aware of the switch.
Q. This article contains the following words that I noticed, gun, shot, bullets, died, shooting, gun violence, active shooter, hopelessness, despairing, and agony.
Do you have any reason to doubt the accuracy of the statement I just made?
A. I don't.
Q. Are any of those words words that you would expect would be flagged by ManagedMethods, if you know?
A. I don't know. I think I would have thought they would definitely be flagged

Page 107

by Gaggle. At this point I still didn't know how ManagedMethods worked.
Q. And is it fair to say that your general awareness of ManagedMethods at this point in time did not impact your publication of this article?
A. I would say it's the same situation for the -- as with the other one that you just showed.
Q. And do you know if this article was flagged by ManagedMethods?
A. I don't know.
Q. All right.
MR. GRANT: All right. I think we can take a short break since I'm at a good stopping point.
(Recess.)
Q. (By Mr. Grant) I had introduced Exhibit 67.
A. Okay.
Q. My only question about this document -- well, have you seen this document before?
A. Yes.
Q. If you could look at Section 3,

Page 108

which is on the next to the last page, Page 14.
A. Okay.
Q. Do you see that it's computation of damages?
A. Yes.
Q. The first sentence says, "Plaintiffs presently seek declaratory and injunctive relief and nominal damages for alleged constitutional violations."
Do you see that?
A. Yes.
Q. That was presently as of, I'm assuming, June 8, 2026?
A. Yes.
Q. Are there any other damages you are now seeking?
A. I think we are seeking -- yeah, those damages that are in that document that are like the -- I think it's the same.
Q. Okay. Going back for a moment to the devices that you used while you were in school, did you -- did the school issue a MacBook?
A. Yes.

Page 109

Q. Okay. And did you have a MacBook each year you attended LHS?
A. I had it my freshman year. And then sophomore year I think we all had iPads. They switched to iPads for the year. And then they switched back -- I think it was they switched back for the last two years. Well, I always had a computer through journalism, because journalism kids and some art students got computers because of like the software that we worked on.
So there was only a very, very short period of time where I worked on it. But I had an iPad I think for all of my sophomore year. And I think it was our junior year that they switched back to being completely computers. Or it could -- maybe it was our senior year that they switched back. But I used a computer all through high school except when I was at San Marcos.
Q. You mean a school-issued computer?
A. Yes, a school-issued. I did not have one of my own.
Q. I'm probably going to portray some technical illiteracy here, but a MacBook --

Page 138

A. I can't definitively say that because, like if there is a document that like I had created -- like I had documents from 6th grade on in my drive. And so if like there's a document in there that was flagged and seized and like I hadn't looked at that document in a while, it -- like there would be really no reason for me to know that it was completely gone. So that's kind of the basis of why I said what I said.
Q. But you're not aware of that having happened?
A. Yeah, I'm not aware of that.
Q. And, again, on question one, I think there's a typo in the last sentence of your answer. I think you meant to say "I have not had access"?
A. Oh, yeah. "Not had access."
Q. But you did intend to say that you have not had access, correct?
A. Yeah. Like pretty soon after I graduated, they rescinded access to all of that, all of your drive, all of that.
Q. In response to Interrogatory 3, this was asking you to identify injury loss or

Page 139

damage.
A. Okay. Yes, I see that.
Q. And so you talk about failure to respond to KORA requests and then stifling of reporting in August of 2025.
A. Uh-huh.
Q. So, you know, I understand your allegation there. Then the last sentence of this -- or, sorry, the next to the last sentence of this response says that, "These activities caused me anxiety and emotional concern."
Do you see that?
A. I do.
Q. Are you seeking money compensation in this lawsuit due to your anxiety or your emotional concern?
A. I'm seeking whatever the jury decides is like -- is the right compensation for these damages, because like I was harmed, and that's what I was getting at there.
Q. I mean, I get that, that of course the jury is going to decide. But you'll be asking them to compensate you for certain things, and we are entitled to know what those

Page 140

things are.
And so my question is, will you be asking the jury for compensation for anxiety?
A. Yes, I think I certainly will.
Q. Will you be asking them for compensation for emotional concern?
A. Yeah. The emotional distress that I experienced because of these actions by my district and especially in like -- in the case of like that -- I think back to that first week, I was incredibly stressful because of the prior restraint that I was feeling was both unlawful and also just emotionally difficult. So yes. I do think those things are -- like I was harmed, and that is -- that does necessitate compensatory relief.
Q. And how much money are you going to ask the jury to award you?
A. However much -- it could be anywhere from a thousand to a million. Like any -- whatever they decide is the correct amount to compensate.
Q. So you're going to ask them for between 1,000 and $1 million; is that right?
A. It could be whatever they decide.

Page 141

Q. So it could be more than a million?
A. It could be.
Q. It could be a billion dollars?
A. It could be.
Q. So for all we know, the plaintiffs in this case, however many of them there are, 11, I think, or 12, so you could be asking the jury for upwards of $12 billion?
MR. JOHNSON: Objection. That mischaracterizes the witness' testimony. She's only testifying about herself.
MR. GRANT: Okay.
Q. (By Mr. Grant) So between 1,000 and one billion, correct?
A. I think I said -- I don't know what I -- my point is that it could be a lot of money, and it could also -- it could be whatever they decide. These are -- like speech and -- these sorts of damages, there's not a set way to like calculate, and so it really is up to the jury. I can't speak for what they will decide.
Q. Have you produced any documents that would substantiate emotional harm that

Page 142

you suffered as a result of what you allege the district did?
MR. JOHNSON: Well, objection that it calls for a legal conclusion.
But you can answer it.
A. Can you repeat the question.
Q. (By Mr. Grant) Yes. Have you produced any documents that relate to the emotional harm for which you will be requesting the jury award you some amount of money?
A. Yeah, I think I probably -- like there were text messages. There were like different -- I mean, even the story that I wrote talking about like what happened, I think those all speak to the sort of stressful situation. And, also, just like -- yeah, I think those all speak to the damages that I stipulate.
Q. Have you produced any medical records in this case?
A. No.
Q. Have you seen any therapists between 2004 and the present?
A. Yes.

Page 143

Q. Can you tell me how many therapists?
A. One.
Q. Okay. Have you seen any psychiatrists or psychologists during that period?
A. Yes.
Q. Can you tell me how many?
A. One.
MR. GRANT: So, Mark, I'm going to call for the production of those records, and we'll need an authorization for those, and for any other plaintiff who is claiming emotional damages.
MR. JOHNSON: Okay. We'll talk to you about it. Yeah.
MR. GRANT: Okay.
Q. (By Mr. Grant) In response to Interrogatory 8, we asked you to identify instances where monitoring software interfered with your journalistic, artistic, or other expressive activities. Do you see that?
A. Yes.
Q. And in your answer you said that as to -- as for interference with your

Page 144

journalism, you were careful not to upload content consisting of notes, interviews, and other content that could jeopardize the identity of sources. Do you see that?
A. Yes.
Q. So did you maintain journalism notes in non-electronic form?
A. Sometimes -- like there was definitely -- well, I don't know. Like on paper do you mean?
Q. So what I'm getting at is that your answer suggests to me that you had notes, interviews, and other content that you did not upload. But your answer is just a little bit unclear to me.
So, first of all, my question is did you actually have content consisting of notes, interviews, and other content that you did not upload?
A. I can't think of a specific example.
Q. And so my follow-up question was going to be how you maintained that material in such a way that you did not upload it. And so that's why I started to ask you about

Page 145

whether you kept them in paper form.
So the interviews I understand you did on your personal phone, and so I can understand how you would have avoided uploading those.
A. Yeah.
Q. But in terms of notes, did you take notes that you then did not upload to the Google servers?
A. There was some notes on like -- like probably some Gaggle reporting that it would have been produced in discovery. But that I -- I like took notes on My Notes app on my phone, and that wouldn't have been district usage. I think it also just broadly speaks to the fact that, if there was a story that I was -- like where I wanted to protect the identity of who I was interviewing, I think I would have been very careful knowing that Gaggle or ManagedMethods was functioning, because I knew that that probably wouldn't be quite as -- like it wouldn't be as anonymous as it would have otherwise been without Gaggle.
Q. And did taking notes on your personal phone alleviate your concerns about