IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| JACK TELL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 2:25-cv-02428-KHV-GEB |
| LAWRENCE USD 497, a political subdivision of the State of Kansas. | ) | |
| | ) | |
| Defendant. | ) | |

VIDEOCONFERENCE DISCOVERY DEPOSITION
SUZANA KENNEDY
APPEARING REMOTELY
SEPTEMBER 18, 2026
9:33 A.M. CENTRAL TIME

REPORTED BY: A. Christine Hylton, RPR, CSR

Page 86

ing, step one was flagging by Gaggle, step two was then review of flagged content by a Gaggle contractor; so am I correct that you can't say definitively that any of your content was ever reviewed by a Gaggle contractor?

A. Correct.

Q. I do want to confirm again -- I think you just said this.

Am I correct that nobody at the District ever spoke to you about content of yours that was flagged?

A. Yeah, that's correct.

Q. Okay. Do you contend that the District ever discovered the identity of confidential sources that you used for reporting through the -- through its use of Gaggle?

A. I don't know if they did or not.

Q. Do you know if they discovered the identity of anybody else's confidential sources?

A. I don't know if they did or not, and they would not have -- they have not at least communicated to any journalists who was working on that material, whether or not they discovered their confidential sources.

Q. You've discussed, when you were talking

Page 87

about the chilling effect, your general awareness that Gaggle was operating in the background as you were doing journalistic work.

Can you identify for me any way you changed your reporting behavior due to that awareness?

A. I think that being a student journalist, it becomes part of your identity, it becomes part of your livelihood.

The fact that I was aware that I was being monitored constantly, and that the content that I was producing was being monitored constantly, was a very upsetting thing to experience; and while I didn't directly change any procedure that I did to complete my journalistic work, I had a very -- it changed my experience as a student journalist.

It changed how I felt while I was reporting, it changed how I felt while I was writing, and I think that that is significant -- is as significant as having to change the process of my reporting.

MR. GRANT: Okay. I've introduced Exhibit 67.

(Exhibit 67 marked.)

BY MR. GRANT:

Page 88

Q. Have you seen this document before?

A. Yes.

Q. The only part of this document I'm going to ask about is page 14 of the PDF, also page 14 of the document, which is section III, in the Computation of Damages.

If the document states that Plaintiffs presently seek declaratory and injunctive relief and nominal damages for alleged constitutional violations. Do you see that?

A. Yes.

Q. Is there any other relief that you're seeking other than what's stated there?

MR. ROSENTHAL: Objection, to the extent it calls for a legal conclusion, but the witness should answer.

THE WITNESS: Compensatory, sorry, I'm having -- I have trouble pronouncing that word, compensatory damages.

BY MR. GRANT:

Q. Oh, so you're also -- so, in fact, so this is not accurate?

A. Only nominal damage is not accurate.

MR. ROSENTHAL: I would object, form; and the witness should answer.

Page 89

MR. GRANT: So --

THE WITNESS: Only nominal...

BY MR. GRANT:

Q. Yeah, so that was the nominal damages part. The only naminal -- nominal damage -- oh, wow, that's really hard to say -- the only nominal damage part is not accurate; is that what you're saying?

A. Yes.

Q. So if I understood your answer correctly, you are now, in fact, also seeking compensatory damages, is that what you said?

A. Yes.

MR. ROSENTHAL: Objection, form.

BY MR. GRANT:

Q. What are you seeking compensatory damages for?

A. For the general unrest and upset that knowing the monitoring of Gaggle, or knowing that the presence of Gaggle -- knowing the presence of Gaggle was there caused me and to -- for the disruption of the delivery of information from my KORA request, and for the general, again, sense of unease and self-censor -- censorship that I had to incorporate into my reporting as a journalist.

Q. So was there something that changed between

Page 90

June 8, 2026, and today based upon which you're now seeking emotional distress damages?

MR. ROSENTHAL: Objection.

THE WITNESS: No, I -- is that because it doesn't say in the statement that I am seeking emotional distress damages.

MR. GRANT: Well, I -- I am trying to figure out what damages the Plaintiffs are seeking, and I still don't know.

This document is supposed to inform me of that.

This is a document that is required under the federal rules, the entire purpose of which is to put the District on notice of what damages the Plaintiffs are seeking and the document which you testified you reviewed is tated -- is dated June 8, 2026.

You have now clarified that the statement is not accurate, that it is not a complete statement of the damages that you plan to seek; so my follow-up question is did something change between June 8th, 2026, and today, based upon which you are now seeking emotional distress damages that you just described?

MR. ROSENTHAL: Objection on a variety of grounds: Form, mischaracterizes the testimony, and

Page 91

the document speaks for itself, as does the Second Amended Complaint.

MR. GRANT: Well, the document certainly speaks for itself, and the testimony is now the document is not accurate, and so I'm trying to figure out how that happened.

MR. ROSENTHAL: The same -- same objec- tion, misstates prior testimony.

The witness can answer.

THE WITNESS: I think that, yes, I not having included -- I'm seeking like emotional damages or emotional distress is not accurate.

Nothing has changed in between the time frame of the document being signed and the document or and today, but I agree that the Complaint speaks for itself, and emphasizing what emotional distress it implemented on me.

MR. GRANT: Okay. So I think we can take a short break now, go off the record.

(Recess taken)

MR. GRANT: Zana, I'm going to introduce a document that's been previously marked as Exhibit 5. You'll have it in one second.

(Exhibit 5 marked.)

DIRECT EXAMINATION CONTINUED

Page 92

BY MR. GRANT:

Q. You should have it now.

A. Yes.

Q. Have you ever seen any version of this document before?

A. Have I seen a version of this? Yes.

Q. I'm sorry. I didn't catch the first part of your answer. I don't know if it was a glitch on my end.

You kind of like froze for a second, so can you repeat that answer?

A. I've seen a version of this, yes.

Q. Okay. Do you know if you ever signed any version of this document?

A. I don't have any memory of signing the document.

Q. Do you know if your parents ever signed a document like this on your behalf?

A. I don't believe so.

It doesn't look like there's any place for their signature.

Q. There is a signature line on the second page.

A. Uh-huh --

Q. Do you --

Page 93

A. -- (inaudible).

THE COURT REPORTER: I'm sorry.

What was the last part, Zana?

THE WITNESS: For the student, it looks like.

BY MR. GRANT:

Q. Okay. Do you know whether this policy was in place during the time you attended Lawrence High School?

A. I am aware of this policy now; but during my time before my involvement in the case, I was not really aware.

Q. Okay. Toward the bottom of the first page, there's a heading that says Students Will, and then there are three bullet points, do you see that?

A. Yes.

Q. Under the second bullet point it says that students will expect without -- oh, sorry, I was about to read the wrong part.

It says students will expect any district device to be regularly inspected for inappropriate material. Do you see that?

A. Yes.

Q. I asked you earlier whether or not you knew if the District had the ability to inspect your

Page 102

Q. Did -- did you print that page out to sign it, or no?
A. No, I digitally signed it.
Q. Okay. Are you planning to provide a notarized copy of your Verification?
A. Yes, I think that I'm working to figure that out.
Q. Okay. Fair enough.
Turning to the first page of the document and Interrogatory 1, in terms of the answer, did -- did you draft that answer yourself?
MR. ROSENTHAL: Objection.
THE WITNESS: I helped draft the answer, yes.
BY MR. GRANT:
Q. Okay. The request was for you to identify each document which you contend was flagged, searched, seized, deleted, quarantined, censored or otherwise interfered with. Do you see that?
A. Yes.
Q. I think your answer only responded to the part about the flagging, because you state in your answer that it's impossible for you to definitively say whether or not a document was flagged, and you go on to talk about your understanding of how the

Page 103

flagging worked.
Then you say as far as you know, all your documents that were scanned or flagged were uploaded to the District device.
So with -- with that in mind, and we've already talked about this somewhat, but I wanted to go over it again in reference to this specific interrogatory.
Am I correct that you cannot -- cannot identify any document that was seized?
A. I -- my -- the emails that I corresponded with Julie Boyle, those emails were seized.
Q. Okay. Is there a reason you didn't identify that in response to this interrogatory?
MR. ROSENTHAL: Objection, attorney/client privilege.
She can answer, if she knows.
THE WITNESS: I believe I answered this in a separate part of this document.
I think that my answer to that question is encompassed here.
BY MR. GRANT:
Q. Well, how would I know that, by looking at this document?
A. Not that specific part of the document, but

Page 104

I think the answer to that question is later addressed.
Q. Okay. So, you know, rather -- rather there are a lot of verbs in Interrogatory No. 1, rather than ask you potentially repetitive questions, I'm just going to give you, you know, one more opportunity, because again, this is my only opportunity to depose you prior to trial, and so I -- I -- you've talked about the KORA response that was delayed, and you said it was flagged by Gaggle.
In response to Interrogatory 1, and again, with that -- with me having pointed out to you that there are different things it's asking about, is there any other document you can identify as you're sitting here right now that is responsive to Interrogatory 1?
A. I can't definitively think of any other document that was seized, but I, from how I know that the system works, all of my documents were searched by the Gaggle system.
Q. Okay. So all -- so in response to the search part, you're identifying all your documents?
A. To my knowledge.
Q. Yeah, to your knowledge, fair enough.
Then no other documents you can identify

Page 105

specifically that are responsive to the remainder of Interrogatory 1?
A. Yes.
Q. Okay. Question 3 is about your damages, and more specifically it's about -- it's asking you to identify any injury, loss, or damage that you contend you sustained.
Then here in the first sentence of your response you talk about anxiety and emotional upset and you talk about being disturbed, then you talk about the KORA response, and then at the end there's reference a chill on your journalistic efforts.
In terms of the anxiety you suffered, did you ever seek any medical treatment for that anxiety?
A. No, I didn't seek any medical treatment because of that anxiety specifically, but it was genuinely upsetting to have this monitoring on my journalistic work.
Q. Had you ever experienced anxiety generally before the District implemented Gaggle?
A. I think the focus on anxiety is not specifically relevant, it's the fact that the District was monitoring my content was genuinely upsetting in the context of my journalistic work and in my identity as a journalist, which was a very large part of my

identity in high school.
That effect, whenever I was working on journalism and aware of the scope of the monitoring was very upsetting.
Q. Okay, so I -- I obviously did not draft this response, somebody did.
Then you verified it, and so you included among your damages that you're claiming in this case anxiety; but based on what you just said, are you or are you not seeking damages from the District for anxiety?
MR. ROSENTHAL: Objection, form.
THE WITNESS: Yes, sorry, I'll rephrase.
The constant monitoring of the -- of my work, as a journalist and a student, was very anxiety-inducing --
MR. GRANT: Okay, then I'll --
THE WITNESS: -- so yes.
BY MR. GRANT:
Q. Okay. Then I'll ask the question I asked previously, which was have you experienced anxiety in your life prior to the District's implementation of Gaggle?
MR. ROSENTHAL: Objection.
THE WITNESS: Yes.



BY MR. GRANT:
Q. Okay. Have you ever sought any form of treatment for anxiety, whether that be a therapist, a general practitioner, a psychiatrist, a psychologist, have -- have you ever seen a professional regarding anxiety?
MR. ROSENTHAL: Objection.
THE WITNESS: Yes, I have. I --
BY MR. GRANT:
Q. When -- Sorry, go ahead.
A. No.
MR. ROSENTHAL: There's no question pending.
Is there a question pending?
MR. GRANT: Well, no, I accidentally cut her off, as I was about --
MR. ROSENTHAL: Okay.
MR. GRANT: -- to start my next question.
MR. ROSENTHAL: Okay.
THE WITNESS: Yes --
MR. GRANT: Were you --
THE WITNESS: -- I have.
BY MR. GRANT:
Q. Sorry. We keep --
A. I was done.



Q. I told you it was going to be my fault if we talked over each other --
A. All right.
Q. -- and I stand by that.
When did you first seek any type of professional treatment for anxiety?
A. I don't remember specifically.
Q. Do you remember were you in high school?
A. Yes.
Q. Do you remember which -- if you were a freshman or a sophomore or a junior?
A. Yes, but I also don't think this is relevant to the anxiety that Gaggle caused me, because you can experience influxes and intense, like different levels of intensity or anxiety for like variable factors.
Q. Right, but you're asking the District to pay you money for anxiety, and so it's now a part of the case, and so I have to ask about it.
If you want to withdrawal your claim for damages for anxiety, I will not need to ask about it; but again, I didn't write this answer. I'm not the one making the claim, and so, you know, I mean, your lawyer can tell you that in any case, where somebody claims emotional distress damages, their mental state



or whatever it is before and after the incident is then relevant, so --
A. Okay.
Q. -- that's why I'm asking you these questions.
I don't -- I don't -- It's not that I want to, or that I care, but it's because it's been placed at issue through this answer, is why I'm asking.
A. Sure.
MR. ROSENTHAL: Was there a question in there?
MR. GRANT: No, no, I was responding to Zana's statement that my questions were not relevant.
MR. ROSENTHAL: I think --
Okay, the witness is instructed to answer the question.
Counsel, please ask your next question.
MR. GRANT: Okay, so I don't think there was a question pending.
MR. ROSENTHAL: Okay.
BY MR. GRANT:
Q. Can you tell me who you have sought treatment from for anxiety?
MR. ROSENTHAL: Objection.