IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| JACK TELL; NATASHA TORKZABAN; MORGAN SALISBURY; OPAL MORRIS; HENRY FARTHING; SUZANA KENNEDY; NAOMI SUIPANG; ASHLYN TELL, PHOEBE MORRIS, E.B. a minor, by and through his parent and next friend CATHERINE P. BATA, PH.D.; and H.C., a minor, by and through his parents and next friends DANIELLE BRUNN and ERIK CHANEY, | ) No. 2:25-cv-02428-KHV-GFB |
| Plaintiffs, | ) |
| v. | ) |
| LAWRENCE USD 497, a political subdivision of the State of Kansas, | ) |
| Defendant. | ) |

DEPOSITION OF OPAL MORRIS, a Plaintiff, taken on behalf of the Defendant before Jane A. Blackerby, CSR #1369, CCR #877, pursuant to Notice on the 23rd day of October, 2026, at the offices of Lewis Brisbois Bisgaard & Smith, LLP, Madison Avenue, Suite 700, Kansas City, Missouri.

Page 54

know, how I would feel if 15 people were sitting across from me interrogating me about my work because of my incident.
Q. But you never changed the type of content that you were photographing because of Gaggle. Right?
A. Correct.
Q. So you wouldn't be able to identify any specific photograph or project that you decided not to pursue because of concerns related to Gaggle. Correct?
A. Correct.
Q. Okay. I'm going to hand you what was previously marked as Exhibit 67. These are Plaintiffs' Initial Disclosures. Have you seen this document before?
A. Yes.
Q. Okay. What is the first time you would have seen this document?
A. I'm not sure. Early, like, probably mid to late 2024.
Q. Okay. Section 1 of this document is entitled Name, Address and Telephone Number of Individuals With Discoverable Information. There are 26 items listed here. To your

Page 55

knowledge, are there any additional individuals with discoverable information regarding your claims in this lawsuit?
A. No. I think this is everyone that would be involved.
Q. Okay. And then if we go to Section 3 titled Computation of Damages, which is on Page 14, it states that Plaintiffs presently seek declaratory and injunctive relief and nominal damages for alleged constitutional violations. Do you see that there?
A. Yes.
Q. Okay. What specific injunctive relief are you seeking in this case?
MR. JOHNSON: Objection, calls for a legal conclusion. But if you can answer, you can answer.
A. I mean, I would need clarity of what you're asking.
Q. (By Ms. Harris) Well, is there anything that you are asking the court to order the Defendant to do or to stop doing in this case?
A. I mean, I'm not sure what we exactly have, like, that we want them to stop doing and

Page 56

I know that they have changed -- you have mentioned ManagedMethods, and like other surveillance systems that they have in place. So there would be tighter restrictions on those and more freedom of speech for students in the arts and journalism.
Q. So when you ask -- what does that mean? Like when you say you want more freedom of teach and tighter restrictions, what do you mean by that?
A. To be protected so that our work doesn't get taken from our devices and so that we are interrogated for our work, and that everything isn't constantly searched by the administration.
Q. Okay. And then it states that Plaintiffs are seeking nominal damages.
MR. JOHNSON: I want to make sure that mischaracterizes the testimony because as the -- and it says we are presently seeking, so don't morph that into something that is not tied to the date of the initial disclosures.
MS. HARRIS: My question was, it says here that Plaintiffs are seeking nominal damages. That is what it says here.

Page 57

MR. JOHNSON: Plaintiffs presently seek declaratory and injunctive relief and nominal damages. Presently is typed and the date of June 8, 2026.
MS. HARRIS: Okay.
MR. JOHNSON: That's four months ago.
Q. (By Ms. Harris) Okay. So are you seeking damages other than declaratory and injunctive relief and nominal damages?
A. Yeah. I mean, we would love -- I would hope to see monetary compensation for this case.
Q. What amount of monetary compensation are you seeking?
A. More or around $10,000.
Q. When did you make the decision to seek monetary compensation in the amount of $10,000?
A. There wasn't a specific moment when we decided this, but when it had been going on for years at this point and years of stress and working and deliberating on this case we decided that monetarily was like fair for what we were doing with this case and what we had been through the past couple years.
Q. And when you say we, who are you

Page 58

referring to?
A. Me and the Plaintiffs.
Q. And you had a discussion about this?
MR. JOHNSON: Objection, attorney-client privilege. Outside of your discussions with your attorneys did you have a discussion with the Plaintiffs regarding the monetary compensation that you're seeking?
A. We only discussed with our attorneys.
Q. (By Ms. Harris) Did the District ever tell you that you had to refrain from uploading certain content or images to the Google Suite?
A. We were not given information about what would or wouldn't trigger Gaggle.
Q. Did the District ever tell you to edit any photographs or projects or assignments that you were working on?
A. After my meeting with the administration members I didn't have contact with the administration about Gaggle directly.
Q. Did you contend that the District censored you in any way related to the photographs that you were taking and then going to upload to the Google Suite?
A. I think taking them off of my device

Page 59

and interrogating and accusing me of uploading nudity and child pornography is definitely a form of active censoring of school work.
Q. Okay. Earlier you mentioned that the school issued you a laptop. When were you issued the laptop?
A. It was at the beginning of every year.
Q. Was -- did you have a user name to access the Google Suite?
A. Yes.
Q. Okay. Was that your student ID number?
A. Yes.
Q. Do you recall what your student ID number was?
A. Yes.
Q. Okay. What was it?
A. 10200557.
Q. Okay. Do you recall whether or not you have ever reviewed the student handbook?
A. Maybe briefly in like the intro to like freshman year of high school.
Q. Was that a physical copy of the handbook or a digital copy?
A. I don't remember.
Q. Are you aware that Lawrence High School

Page 60

had an acceptable use policy?
A. Yes.
Q. Okay. When did you first become aware of the accessible use policy?
A. Since elementary school. Like middle school.
Q. Do you recall whether or not you signed the acceptable use policy?
A. I believe we had to to get our devices, our school issued devices.
Q. Did you have to sign it every year?
A. I don't remember.
Q. When was the last time you recall signing the acceptable use policy?
A. I don't remember.
Q. Do you know if your parents signed the acceptable use policy as well?
A. I believe it was only our signatures.
MR. JOHNSON: What was that? I'm sorry? I missed that.
THE WITNESS: It was only our signatures. Do you have a copy of the acceptable use?
Q. (By Ms. Harris) I do, and that was going to be my next exhibit here.

Page 61

MR. JOHNSON: The one she signed?
Q. (By Ms. Harris) I don't think I have a copy of the one that you signed.
MR. JOHNSON: You don't have any of them.
Q. (By Ms. Harris) Do you have a copy of the one that you signed?
A. We were not given copies of the once we signed.
Q. I would like to hand you what was previously marked as Exhibit 5. Have you ever seen this version of the Student Acceptable Use Policy before?
A. I mean, I'm not sure if I have seen this exact one without my signature on it.
Q. Okay. So you don't know whether or not this was the acceptable use policy you signed?
A. Yeah. I'm not sure.
Q. Okay. I would like to direct your attention to the bottom of the first page. The second bullet point under Additional Expectations For Students With Personally Assigned Computing Devices. Do you see that there?
A. Yes.