IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JACK TELL; NATASHA TORKZABAN; MORGAN SALISBURY; OPAL MORRIS; HENRY FARTHING; SUZANA KENNEDY; NAOMI SUI PANG; ASHLYN TELL; PHOEBE MORRIS; E.B., a minor, by and through his parent and next friend, CATHERINE P. BATZA, Ph.D.; and H.C., a minor, by and through his parents and next friends, DANIELLE BRUNIN and ERIK CHANEY,

Plaintiffs,

vs.

LAWRENCE USD 497, a political subdivision of the State of Kansas,

Defendant.

Case No: 2:25-cv-02428-KHV-GEB

RULE 30(b)(6) DEPOSITION OF DEFENDANT LAWRENCE USD 497, by its designated representative, JAMES POLK, taken on October 27, 2026, at 12:30 p.m., taken remotely via Zoom Videoconference, before Stacy L. Decker, a Certified Court Reporter, taken on behalf of the Plaintiffs.

A P P E A R A N C E S

For the Plaintiffs:

MR. MARK P. JOHNSON
MR. HARRISON ROSENTHAL
DENTONS US, LLP
4520 Main Street, Suite 1100
Kansas City, Missouri 64111
mark.johnson@dentons.com

For the Defendant:

MR. CAMERON GRANT
LEWIS BRISBOIS
BISGAARD & SMITH, LLP
4600 Madison Ave, Suite 700
Kansas City, Missouri 64112
cameron.grant@lewisbrisbois.com



I N D E X


EXAMINATION BY: PAGE:

Mr. Johnson................................4


(No exhibits marked.)



JAMES POLK,

of lawful age, having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, testified as follows:

EXAMINATION

BY MR. JOHNSON:

Q. Mr. Polk, I'm Mark Johnson. I'm a lawyer for the plaintiffs in this case. I'm a partner with the Dentons Law Firm here in Kansas City. And you have drawn the short straw to testify on behalf of certain subjects on behalf of the District. Okay. You're ready to do that?

A. Yes, sir.

Q. Thank you very much. Okay. For the purposes of the record, I'm going to hand you a document which has previously been marked as Exhibit 200 and a second document previously marked as Exhibit 201. They were marked in a deposition earlier this morning with Ms. Luckett. And I'm going to have them included in the record in your deposition as well, entirely the same documents.

Exhibit 200 is the notice of deposition under Rule 30(b)(6), and



Exhibit 201 is Mr. Grant's response to that deposition notice that he sent to me about 10 days ago or so. And I don't anticipate asking you any questions concerning these documents. I just wanted to put them on the record.

Now, I see you have in front of you a binder. Can you tell me what the binder contains?

A. The binder contains exhibits from this case that I can use to reference through this process.

Q. I know there's a number of them, but could you just tell me what the numbers of the exhibits are.

A. It looks like the largest number I see is 191.

MR. GRANT: I think the question is to identify every exhibit.

Q. (By Mr. Johnson) Yeah. Just tell me the numbers.

A. One, 60, 74, 82, 79, 78, three, four, 90, 91, 18, 183, 186, three, 55, 58, 51, 96, 91, four, three, four, 55, 95, 94, 93, 92, 91, four, D, E, F, H, 55, D, 94, 93, B, C, F,

Page 6

H, G, 51, J, 73, 91, four, seven, 15, 58, 77, 140, five, 38, 91, four, five, 76, 122, 144, 10, 52, 77, 95, 88, 87, 84, 83, 81, 80, 85, 89, and 191.
Q. Okay. Mr. Polk, have you reviewed each of the documents whose numbers you just gave me?
A. I believe so, yes.
Q. Do you consider yourself familiar with the content of those documents?
A. I believe so, yes.
Q. Thank you. Tell me what your position with the school District is.
A. Yeah. My current position is I'm the senior director of data technology -- or data assessment and information technology.
Q. How long have you held that job?
A. This job I've held since July 1st.
Q. Of 2026?
A. Yes.
Q. How long have you been employed by the District?
A. Since June, July of 2020.
Q. What was your first job at the District?

Page 7

A. I was principal of Quail Run Elementary.
Q. Did you continue as sort of a district administrator for a while?
A. I was a building principal for four years, and then I took the job of director of data and assessment in the summer of, I believe, 2024.
Q. While you were a building administrator, did you do any teaching?
A. I substitute taught from time to time, but no.
Q. Did you succeed David Vignery as the director of sort of technology for the District?
A. It's not as cut and dry as it sounds. David left the District and there was around a 16-month gap between him leaving and me taking over the department of technology.
Q. Was there anybody else -- did anybody else hold that job in the interim?
A. Not in that time, no.
Q. And so about -- well, three months ago or so, congratulations --
A. Thanks.

Page 8

Q. -- you succeeded to this position.
Prior to your being -- you know, having the title, did you perform the tasks of directing the District's technology?
A. No.
Q. What training do you have in the area of -- you know, I guess you say educational technology?
A. Yeah. My training is the years experience that I was either a teacher, a coach, an assistant principal, or principal. In the first role that I got at the District level, while I wasn't in charge of the District technology, I was in charge of our integration and data services team, which a large part of that team's job is, not only state and federal reporting, but also integrating with new products and continued products so they would work in our ecosystem.
Q. Is that 2024 and beyond?
A. Yes. Correct.
Q. Prior to 2024 -- that's director of data and assessment; did I get that correct?
A. Correct.

Page 9

Q. Did you have any responsibility with respect to the District's technology?
A. No.
Q. Did you have any responsibility with respect to the monitoring of student content?
A. Yes.
Q. Can you tell me what responsibility you had there.
A. Yes. As a building principal, there would be situations where we would see students engaging in accessing websites or inappropriate things, similar to passing notes but in a technologically advanced way, where we would go in and check their browser history and then go through the discipline process with those students and communicating with their parents and investigating.
Q. Now, you're familiar with Gaggle?
A. Correct.
Q. And subject to check, Gaggle was implemented at the District during the fall of 2023. Do you agree with that?
A. Yeah.
Q. Prior to that, what experience, if

Page 10

any, did you have with monitoring content that the students loaded to the District's servers?
A. There was -- there was a process in which the District reviewed sensitive content from the students. As an elementary principal, I did not have a lot of experience with that as students don't take devices home. Most of the student usage of devices is in a room that is supervised by teachers. So our exposure to those types of events is significantly less than --
Q. Were you an elementary school principal until you received the designation of director of data and assessment in 2024?
A. That's correct.
Q. And is it correct that the students at the elementary school level were not monitored as the students at the middle school and high school level for monitoring?
A. During which time?
Q. Well, during the time that you were an elementary school principal.
A. They were monitored in the same way.
Q. Well, does that mean that all of

Page 11

the student content -- elementary student content was monitored just as with the middle school and upper school students?
A. That's correct.
Q. Before Gaggle how was that monitoring done?
A. Yeah, there's a program called Cloudblock that allows the District -- allows entities to monitor for keywords inside of the organization. So it's a really basic model, but you would set your parameters for which words you wanted to monitor. And then that process prior to Gaggle was those alerts would go to a District employee for physical review.
Q. And was Cloudblock in place for the entire time between your starting with the District in 2020 and your -- well, and until Gaggle was implemented?
A. That's my understanding.
Q. Is it correct that the words searched for by Cloudblock were selected by the District?
A. I don't have knowledge of that.
Q. You had no involvement in what words Cloudblock sought?

Page 12

A. No.
Q. To your knowledge did anybody at the District have any involvement in determining the words that were searched for by Cloudblock?
A. I don't have experience with how Cloudblock was set up and the parameters in which they went through identifying that process. In our normal situations and how we on-board with programs like that, there would be an extensive on-boarding process where there would be conversation around what was getting flagged and what wasn't.
Q. Is it fair to say you don't know whether the District had involvement in determining what was being searched for by Cloudblock?
A. That's correct.
Q. And once Cloudblock identified concerning content, was a message generated to somebody within the District?
A. Correct.
Q. To whom was it sent?
A. An employee in the technology department.

Page 13

Q. Was that Matt Fish?
A. That is my understanding.
Q. Have you ever talked to Mr. Fish about his involvement with Cloudblock?
A. A little bit. But it was before my time, so not extensively.
Q. But Mr. Fish is still with the District?
A. Correct.
Q. And he would be available for you to talk to?
A. Correct.
Q. Are you his boss?
A. I am.
Q. Are you his direct boss; in other words, he reports directly to you?
A. Correct.
Q. So in 2024 you received the promotion to director of data and assessment, and then two years later you get the job you're presently in?
A. Correct.
Q. So there was no other job between?
A. No.
Q. How did your duties change with

Page 14

your promotion to your present position?
A. There were several things that changed. The main one is that I now supervise around 12 additional employees than I was supervising before. In addition to that, I now -- the employees that I manage are technology employees. So our Tier 1 technology support, which is our building technicians, and then our network team, which is in charge of our network infrastructure in allowing WiFi, cybersecurity, and all of those components.
Q. Do you have any involvement with the District's participation in the E-Rate program?
A. Yes. In that process I'm being on-boarded slowly into knowing that. We have another employee that's been in charge of that since David Vignery.
Q. Who is that?
A. Paula Murrish.
Q. Paul?
A. Paula Murrish.
Q. Oh, I'm sorry. Does the E-Rate program provide subsidies to the school

Page 15

District?
A. Yes, that's my understanding.
Q. And are those subsidies utilized to, at least in part, pay for the District's broadband access?
A. That is correct.
Q. Are the E-Rate subsidies used for any other purpose that you're aware of?
A. As I'm not completely familiar with E-Rate as I had my first meeting on it yesterday actually, I can't answer that fully.
Q. Did you have your first meeting on E-Rate yesterday because of -- to help you prepare for your testimony today?
A. No.
Q. So it was entirely coincidental?
A. Yeah.
Q. When you received your promotion to director of data and assessment, Gaggle monitoring was already in place; is that correct?
A. That's correct.
Q. When you -- had you had any involvement with Gaggle until you received that promotion?

Page 16

A. The involvement that I had with Gaggle prior to that was the same experience that other building principals would have had. So the initial launch of the product, training of the product, and then monitoring of the product.
Q. Were you an elementary school principal for the entire time from 2020 to 2024?
A. Yes.
Q. Tell me about the training you received as an elementary school principal concerning Gaggle.
A. My memory of the training is that there was an announcement that we were on-boarding that product I believe in December of 2023. And then there was a training offered in one of our regular Thursday professional development sessions in the following month.
Q. Who conducted that training?
A. I don't recall. I know the people that were involved in the conversation were Cynthia Johnson and David Vignery primarily.
Q. Do you remember somebody named

Page 17

Ms. Luckett being involved in that training?
A. Likely that she was involved. I don't recall.
Q. Was there somebody from Gaggle involved in that training?
MR. GRANT: I'm sorry. Mark, can you clarify. Are these kind of background questions about what James knows personally, or are you now in the 30(b)(6)?
MR. JOHNSON: These can be background. It kind of informs his knowledge for testifying on behalf of the District.
MR. GRANT: So, James, you're clear about the distinction? So far we're not into the District testimony part; this remains background about your personal knowledge.
THE DEPONENT: Okay.
MR. JOHNSON: What did I ask, Stacy?
(The pending question was read by the Court Reporter as follows: Was there somebody from Gaggle involved in that training?)
A. I don't recall.
Q. (By Mr. Johnson) Was the training remote?
A. I believe the training was onsite

at District office.
Q. Which District office?
A. The one on McDonald Drive.
Q. I'm going to hand you a document that's previously been marked in the case. It's the Gaggle contract.
MR. GRANT: James I believe has a copy in his binder.
Q. (By Mr. Johnson) And now we're getting into you testifying on behalf of the District.
A. Okay.
Q. Okay. So you have the District's contract with Gaggle in front of you; is that correct?
A. Yeah.
Q. Now, one of the subjects that you've been designated to testify on behalf of the District is contained in Item 1 of the letter from Mr. Grant, Exhibit 201. And it indicates you're going to testify for the District concerning decisions made concerning the selection, adoption, implementation, continued use, and so forth, of the programs including contracts? Yes?



A. Okay.
Q. And I believe you have in front of you the contract that the District had with Gaggle; is that correct?
A. That's correct.
Q. Was that contract in place when you were promoted to the position of director of data and assessment?
A. Yes.
Q. Were you given a copy of the contract?
A. No.
Q. Did you at any time before your promotion this past July have in your possession a copy of Exhibit 3, the contract?
A. I don't believe so.
MR. GRANT: Again, Mark, so that question was him personally, not did the District have a copy --
MR. JOHNSON: Okay.
Q. (By Mr. Johnson) To your knowledge, as testifying on behalf of the District, did the District provide you a copy of the contract with Gaggle?
A. No.



Q. As the director of data and assessment, is it fair to say that you worked with Gaggle monitoring on a daily basis?
A. No.
Q. Did you, as director of data and assessment, ever work with Gaggle monitoring?
A. No. Well, that might be a nuanced question.
Q. I'm not sure it is. But go ahead.
A. I was not directly involved in working with Gaggle. My involvement with Gaggle came in during the summer of 2025 when we were exploring our contracts broadly with our vendors to see where we could streamline and find savings.
Q. So prior to the summer of 2025, is it fair to say that you had no involvement with Gaggle?
A. Prior to the summer of 2025. Personally I had involvement when I a was building principal. When I took the job at the District level, my job as director of data and assessment did not overlap with Gaggle, no.
Q. So you were not involved in the



administration of the Gaggle software?
A. No.
Q. And any information that you have to testify on behalf of the District concerning Gaggle prior to the summer of 2025, except for your involvement as an elementary school principal, would have come from someone else?
A. It would have come from someone else or the exhibits that I reviewed for this case.
Q. But with respect to the exhibits that you reviewed for the case, is it fair to say that, prior to the summer of 2025, the information contained in those exhibits is, from your point of view, secondhand, not from personal involvement?
A. That's correct.
Q. So in the summer of 2025, I think you told me that the District sort of became involved in a program to review all of the contracts and services the District had?
A. Yeah. My scope in that was focused on more of the technology side, so programs and services software. So that was

Page 22

kind of my purview in that --
Q. So during that period of time, the summer of 2025, can you tell me what technology programs the District reviewed to determine whether to continue or not continue to monitor?
A. Yeah. And as I met with Andrew yesterday, I shared a document that was my own during that time frame that listed. I think it was eight different programs that I evaluated and made recommendations to either discontinue or pivot to a different product.
Some of those products would have been Panorama, which was a survey software that we used for our culture and climate surveys previously. One of those products was titled digiCOACH, which was our digital walk-through tool that was being underutilized in the District. Learning A-Z was another example of those. And I think the total that I found was around $216,000 in savings.
Q. Other than Gaggle were any of the products that you oversaw the evaluation of -- did any of those products include the function of student monitoring?

Page 23

A. I don't believe so.
Q. After you completed -- well, is it fair to say that you were the person responsible for making recommendations concerning retention or cancellation of technology products in the summer of 2025?
A. I think my work was critical in making decisions on what to move forward with, what to pivot off of, and what to end our contracts with. I was not the primary decision maker. Those are things that, in our process as a school district, at that time the level of employment that I was at, I would do a lot of that work and make recommendations, informed recommendations, to our executive leadership team. And our executive leadership team would then move forward with those decisions, whether that be needing board approval or just an executive leadership team decision.
Q. So at the end of this process in the summer of 2025, you made recommendations to the executive leadership team concerning technology products?
A. Yes.

Page 24

Q. Did you make recommendations to the executive leadership team for each of the products that your team reviewed and evaluated?
A. Not for each product. We made recommendations based on the products that we identified where we could find savings. If we reviewed a product and deemed that we needed to continue with that product, we weren't making recommendations to continue.
Our focus at that time was finding savings and streamlining. And so the recommendations that we would be making to the executive leadership team involved changes that we would be making.
Q. Do you remember how many products that your team recommended should be cancelled?
A. The products that we reviewed and wanted to make changes to totalled eight from a -- what was the term you used, cancelled?
Q. I said cancelled.
A. I don't recall off the cuff, but it was less than eight.
Q. So the recommendation sort of in a

Page 25

global sense was keep these products, delete these products. So you made a recommendation about each one of the products that your team reviewed?
A. That's correct.
Q. And with respect to the products which your team recommended be cancelled, did the executive leadership team adopt each of your recommendations?
A. I don't believe so. I believe there were a few that we -- that we did keep in place.
Q. No. I understand there were a few kept in place. But you made recommendations you said concerning you think eight products?
A. Yeah.
Q. Some pro, some con. Did the executive leadership team reject any of the recommendations your team made?
A. I believe they did, and I don't recall perfectly what it might have been. But I think there was a product -- Learning A-Z is the product I'm thinking of -- or no, not Learning A-Z. Raz Kids was one of the products that we had reviewed and made a

Page 26

recommendation on.
And I believe we delayed our renewal of that product. Once teachers came back for the school year, we realized that that product was essential to their work. And so that would be an example of one that they did not take my proposal on.
Q. With the exception of that recommendation, did the executive leadership team adopt the other recommendations that your team made?
A. I believe so.
Q. And is it fair to say that one of the recommendations your team made was to replace Gaggle?
A. That's correct.
Q. Is it fair to say that the recommendation you made concerning Gaggle was financial, in other words, find something cheaper?
A. No. The directive was never about Gaggle. The directive was much broader than that. It's let's evaluate what we are paying for and let's see if we can find savings in there. And the word we use in our district is

Page 27

"streamline." Gaggle is a product that came out of that work. It was never targeted work at Gaggle.
Q. I get that. But is it fair to say that the recommendation you made, your team made, concerning Gaggle was financial?
A. Primarily, yes.
Q. What other factors played into the recommendation that your team made?
A. Yeah. Some of the feedback that I had heard in the use of Gaggle, and I think it's pretty well documented, was the amount of white noise that Gaggle created, the amount of alerts that it was causing.
And so as we reviewed and went through that process to explore other alternatives, finding something that we could really dial in and reduce the amount of white noise in our system so that we were providing our administrators with alerts that were appropriate and needed and pressing and not more than that. That was a factor that went into it as well.
We thought this might be an opportunity for us to find a product that

Page 28

worked better and was more targeted for what we were after.
Q. Beyond the white noise factor and the financial factor, can you remember any other criterion playing into the recommendation that you made to the executive leadership team?
A. I don't believe so.
Q. Thank you. Now, the white noise factor, I mean, could we also say that's false positives?
A. That's one way of putting it. In my experience, ManagedMethods is the product that we pivoted to, and I did a lot of the on-boarding for that product. In my experience with those types of products, it's not necessarily a false positive. There might be something that flags in the system for very specific reasons, but it doesn't raise to the level of intervention or investigation. And so when we talk about white noise, it's more -- it's more that than necessarily like a false positive.
Q. When you use the term "white noise," does that include alerts sent by

Page 29

Gaggle that were found by the District administrators not to include language that was actually of concern?
A. Yeah. So an example that we ran into with ManagedMethods when we rolled it out is the word "lit" as an example. So when you hear the word "lit," it could be used in reference to getting drunk or high. But in a school system, we have AP lit courses.
So when you isolate things down and you look at the white noise that I'm referring to or rising to the level of severity, it really is dialing it in to make sure that we're monitoring what needs to be monitored and not more.
Q. Would it be fair to say that some of the white noise generated by Gaggle was because of the particular words they were searching for?
A. That could be a factor.
Q. To your knowledge did the District ever provide a list of words to Gaggle that the District wanted Gaggle to search for?
A. To my knowledge, I do not believe that that was the case.

Page 30

Q. Do you know if that was done with respect to ManagedMethods? In other words, did the District provide a list of words that they believed ManagedMethods should search for?
A. No, we did not. The way that that worked with ManagedMethods is we rolled out that product and -- ManagedMethods has they call them policies. But they have policies that are essentially prewritten that monitor for a stock amount of things.
So if you're looking at the toxicity policy inside of ManagedMethods, it's going to look for words like bomb, knife, gun. Those are all predetermined words that ManagedMethods has inside of their platform.
So some of the work that we did in the on-boarding process of that product is we reviewed what they had and then we made changes to that, if necessary. We never submitted a list to them. We worked off the list that they had.
Q. How did the District make those changes?
A. We really -- you know, our charge

Page 31

and focus when we made the decision to shift products with ManagedMethods was really focused on student safety. And so as we worked to on-board that product, that was really what we tried to keep in the forefront is what are we looking at and what are we monitoring so that we can ensure that all students in our system are safe from, not only thoughts of suicide and self-harm, but also from, you know, potentially catastrophic events, fights, threats of violence, and things like that.
Q. But you earlier said that the District did not provide a list of words to ManagedMethods to search for?
A. Uh-huh.
Q. Is what you're saying now that the District provided words that they wanted to see a change in the list of the words that ManagedMethods was searching for?
A. No, that's not what I'm saying.
Q. What are you saying? I thought I heard you say that, in the implementation of ManagedMethods, the District worked with ManagedMethods to come up with a list of words

Page 32

that would be appropriate?
A. The words that -- we started with the words that ManagedMethods had identified. They had policies inside their platform. We worked backwards from that list. We never provided them a list of words. We worked with what was inside their platform.
Q. So did you communicate with ManagedMethods saying, in effect, take those words out, add a few words? Was it done that way?
A. Not quite. As we worked with ManagedMethods to on-board and reviewed what was populating in the alerts and flags that were occurring, there were some common themes that we realized. And the lit example that I gave earlier is one where, if we realized that certain words were flagging that weren't going to rise to the level of threat, then, yes, we did work with the company to essentially remove those from the monitoring.
Q. How did you go about doing that? Who did you communicate with within ManagedMethods?
A. We worked with our ManagedMethods

Page 33

point of contacts. We had -- just like when you on-board with any company, you have a sales associate that you work with and you have a technician that you work with. You have a technician that you work with in order to on-board and launch those products in the platform.
Q. Before you became the director of data and assessment, had people within the District, whether administrators or board members, expressed dissatisfaction with Gaggle?
A. Is this me personally or --
Q. No. Are you aware of people within the District? I think that's what you're here to testify about.
A. I'm aware that there were frustrations with the -- I've referenced it as white noise, with the amount of flagging that was occurring.
Q. Were you aware that the board had said they wanted to replace Gaggle? This is in the spring of 2024.
A. I was not aware of that.
Q. During the summer of 2025, when

Page 34

your team was in the process of evaluating a number of products, did you or someone on your team communicate with Gaggle about concern with their services?
A. I did not have that conversation with Gaggle. The communication that we had with Gaggle during that time frame was around wanting to end our contract with them. And my understanding of that was because of the financial impact.
Q. When did the District make Gaggle aware that they were considering cancelling Gaggle?
A. Yeah. My understanding of that is it was in that same time frame, that July, August of 2025, when we started that communication with them.
Q. And on behalf of the District, who was responsible for that communication?
A. I'm not sure I'm aware of that.
Q. Was it somebody on your team?
A. No.
Q. How did you become aware that the communication like that was occurring?
A. Through debriefs of cabinet when

Page 35

we would talk about the direction that we were going when we get briefed in certain things and we get told to move forward with certain products and not with others.
Q. So it wasn't you, it wasn't somebody on your team. Were you given to understand it was somebody in the executive leadership team who was having that communication with Gaggle?
A. That would be my understanding.
Q. Did you ever see an email from a Gaggle representative during that period of time that indicated the school district was changing priorities?
A. Personally I'm not aware of an email.
Q. Were you made aware that Gaggle was concerned that the District was changing priorities?
A. I personally was not made aware of that. I did not have communication with Gaggle.
Q. During the summer of 2025, did you become aware of communications with Gaggle by the District indicating that their service was

Page 36

too expensive?
A. Say that again.
Q. Did you become aware during the summer of 2025 that there was communication between the District and Gaggle in which the District expressed concern about the cost of the Gaggle product?
A. That's an interesting question. The work I was doing would make me think that that communication had happened. I'm not aware of the District communications that occurred between the parties. But, I mean, that was directly related to the work that I was doing. So in the conversation that was had with Gaggle, I would -- I would make an assumption that that was what was communicated.
Q. Were you aware that Gaggle made an effort to save the business?
A. No.
Q. So as far as you know, and you're testifying here on behalf of the District, the decision to cancel Gaggle was made by the District, and Gaggle made no attempt to come back and try to save the business?

Page 37

A. I'm not aware of that.
Q. Did the District -- did your team, for example, ask that the features provided by Gaggle be changed to reduce the white noise you're talking about?
A. At what time?
Q. At the time you were evaluating the product.
A. No.
Q. Are you aware that, early on with the use of Gaggle in the spring of 2024, that the District requested and Gaggle agreed to delete a feature that blocked student email?
A. Tell me more about that. Blocking student email?
Q. Blocking student email, not delivering it.
A. There's an exhibit in this binder, I think it's Exhibit 4, that mentions in April of 2024 Gaggle adjusted their platform to allow the delivery if it was an email between student and staff even if resulted in an alert. That's under the block section, so, yes, I'm aware of that.
Q. So the term they use is

Page 38

adjustment. I've heard it characterized as changing a feature from the Gaggle service. In your mind is that the same thing?

A. Yeah. Yeah. And I think that's -- I think that's one of the things that when -- when we looked at ManagedMethods, one of the ways that ManagedMethods really works in our system now is that, other than inappropriate images that were required to monitor for, information is flowing all the time. So there's no quarantine or blocking that's happening inside of ManagedMethods.

And so we're still alerted and flagged to issues that are happening. But the student experience is unaffected, because that information is still flowing. So that was something that we put in place as we looked at ManagedMethods for sure. So that makes sense to me.

Q. Are you aware if the District ever asked ManagedMethods to change any other features in the service they provided to the District?

A. We asked them to, I mean, work with us on implementing, and that

Page 39

implementation process is a negotiation of how can we get this the best -- I mean, if our, you know, focus on student safety, not only -- that played out in many ways. It plays out in the types of policies that we enacted and are monitoring on. It played out in how we are, as Gaggle calls it, blocking or quarantining. I mean, that is the on-boarding process is working with the company to take their product and make it suit the best needs of our organization.

Q. When was the on-boarding process with Gaggle conducted?

A. With Gaggle?

Q. Yeah.

A. That would have been in the winter of 2023 I would think.

Q. And we see the change in the blocking of student email that Gaggle agreed to.

Are you aware of any other feature of the service provided by Gaggle to the District that was changed between implementation and your study of the products in the summer of 2025, in other words, over a

Page 40

year-and-a-half period?

A. Yeah, the exclusion of certain students.

Q. Okay. And that occurred spring or so of 2024?

A. That's my understanding.

Q. So had the exclusion of certain students been implemented before you became director of data and assessment?

A. That's correct.

Q. And from the District's point of view, that exclusion of certain students was working; is that correct?

A. Define working.

Q. The students were no longer being flagged for anything they posted on the District servers?

A. So there's nuance to this, so --

Q. No. Hold on. There's not nuance to that. It's a yes or no. Was it working or was it not working?

MR. GRANT: Objection. You can answer the -- you don't have to -- you're not forced to answer the question as yes or no if you don't feel like you can answer it yes or no.

Page 41

A. The way that that was set up, I think it's important to clarify how it functions. Students are exempt from monitoring, and the way that that was set up, based on their enrollment in certain courses.

Q. Right. By the way, I apologize for being a little short about that.

A. That's okay. And so as students, and through the process that they took to identify these courses, it is digital media technology and journalism media communications. Students that are enrolled in those courses are exempt from monitoring status. Now, when students are not enrolled in those courses, students are being monitored. I think that's an important thing to note.

Q. And I appreciate that. Thank you for that distinction.

And as far as you know, that has been the program since the exemptions were first implemented in 2024?

A. As far as I know.

Q. And that continues to today?

A. That continues to today.



Veritext Legal Solutions
www.veritext.com 888-391-3376

Page 42

Q. When you were studying the products in the summer of 2025, was information brought to you concerning expressions by staff about the number of alerts Gaggle was generating?
A. Not specifically. As you asked earlier, was I aware of -- I forget what you called it, but essentially grievances against Gaggle and the District. I was aware that there was a high number of alerts that were occurring. But that was not brought to me as a reason to explore a different product or anything like that.
Q. But I thought that you said white noise. Is white noise different from too many alerts?
A. No. Those things are the same.
Q. Okay, thanks. With respect to ManagedMethods, are you aware whether the District has ever had a contract with ManagedMethods similar in content to the contract with Gaggle?
A. No.
Q. The contract -- the District has never had such a contract?

Page 43

A. Not to my understanding.
Q. Why not?
A. Yeah, so ManagedMethods, the adoption of that product was a single year under $20,000, and it was simply sent as an invoice to us. There's no contract that we signed in order to initiate those services.
Q. But it's now been extended beyond a single year; is that fair to say?
A. We have renewed that contract for one more year.
Q. Again, you used the word contract. Is there now what many people would consider a contract between the District and ManagedMethods?
A. No. We renewed with that product for one more year.
Q. Why is there no contract?
A. That's not dissimilar to how we engage with most of our services. Being invoiced for products is common practice.
Q. So it's fair to say that the District is conducting stem to stern, 24 hours a day, seven days a week, monitoring of student content based on an invoice?

Page 44

A. That's a loaded question.
Q. Of course it is.
MR. GRANT: For the record, they've all been loaded questions. Just so we're clear.
THE DEPONENT: That's true.
A. We are monitoring student content inside the G Suite under student accounts 24 hours a day, seven days a week, yes.
Q. (By Mr. Johnson) From your experience versus director of data and assessment, and now --
A. Data assessment and information technology. Just add another comma.
Q. -- is it common to conduct such functions without a contract that specifies how the service is to be provided?
A. It varies greatly with the different products that we engage with. There are products that we engage with, typically multiyear agreements, where we do sign a contract. In that case, we are making a commitment to that company that we will be partners with them for multiple years.
Because we're a school district,

Page 45

we aren't offered the opportunity to pay a lot of contracts up front, so we have to pay them annually based on the budget that's allocated to us. And there's always variability in those contracts, because when you enter in a multiyear contract, your budget could change drastically based on lots of external factors as well as there could be a reason that the board might not approve that contract to extend for other years.
So in the case of engaging with companies for multiple years, you do see contracts. In annual services that you engage with a company in, oftentimes those are continued engagements. Even if they're initial, a single-year usage, invoices are still common practice.
Q. So you have it -- sort of an annual invoice from ManagedMethods. Does that -- I mean, from the District's point of view, does that invoice incorporate the terms set by ManagedMethods in its website?
A. Yes.
Q. Do you know if ManagedMethods has changed the description of its terms in its

Page 46

website since the District entered into this invoice relationship with them?
A. I'm not aware.
Q. It could have happened but you don't know?
A. Correct.
Q. Have the services provided by ManagedMethods changed in any way since the District adopted ManagedMethods in 2025?
A. Yes.
Q. In what way have they changed?
A. Yeah. I think I have described the process that -- the deliberate intentional process that we took with them to on-board their product so that it functioned in the desired way focusing on student safety.
And, you know, one of the things we did with them was work with them to raise the floor on the level of alerts that we were getting.
Q. Okay. So you -- when you say raise the floor -- go ahead.
When you say raise the floor, do you mean that the District was looking for more alerts from ManagedMethods?

Page 47

A. No. When we rolled out ManagedMethods initially, we noticed that we were getting a lot of white noise, that we were getting too many alerts that didn't --
Q. Just as with Gaggle?
A. Yeah, correct. Yes. And so that's why, the deliberate intentional roll-out, we let ManagedMethods work before releasing it to the buildings in January of 2026.
Q. Kind of a beta test?
A. It was more calibrating and dialing it in than beta testing. And -- because what we didn't want to do was unleash a product that was going to inundate our administrators into alerts. So we worked really hard to make sure that, when we launched that product, we were monitoring for very specific things focused on student safety. And the alerts that were coming through that process were raising to the level that we wanted it to be where it needed investigation, conversation, interrogation into those things, yes.
Q. Did the District announce that it

Page 48

was implementing ManagedMethods?
A. I know that I worked on a document -- it's one of the exhibits in here. 79, I think. Well, it's referenced in 78, the draft management talking points for comms.
I worked on a document that outlined kind of what ManagedMethods was, what it would be monitoring. Because around this time we were starting to discuss how we would roll this out to buildings.
Because it was working in the background, we were receiving the alerts at the District level and sometimes forwarding those on to buildings. And so we were getting questions from building administrators about what is this and -- and so, yes, we worked on something to put out to them.
Q. Is it fair to say that the search of student content changed with the implementation of ManagedMethods?
A. I think it depends how you define change. I think we made some -- all the content is being monitored in a similar way. We are looking for very different things. One of the things that was in Exhibit 201 was

Page 49

talking about the exact type of things that it's looking for. And there are distinctions.
In Gaggle they were looking for things like substance abuse. They were looking for things like cyberbullying. Those are not policies in which we've enacted inside of ManagedMethods as we've really dialed in what we're looking for.
So there are changes, yes. I don't know if we're changing what we're monitoring, but what we're being alerted on is changing.
Q. Did the District conduct a town hall or a forum at which parents could learn about the changes from Gaggle to ManagedMethods?
A. Not to my knowledge.
Q. Did the District solicit comments from parents or other interested individuals concerning the change in the service between Gaggle and ManagedMethods?
A. We did some pretty extensive work with some of our buildings to -- before we rolled out ManagedMethods to the District to get feedback on what they were seeing, the

Page 50

types of alerts that they were getting, how the product was working for them and received a lot of positive feedback on the --

Q. Did any of the feedback solicited come from parents?

A. Not that I'm aware of.

Q. Did any of the feedback solicited come from people, this would be students and staff, from people outside the buildings, members of the community?

A. So not staff?

Q. Not staff. I'm distinguishing -- this may be a bad way of putting it, inside the buildings and outside the buildings.

A. Not to my knowledge.

Q. And with the changes that you've mentioned in the service provided by ManagedMethods, have any town halls or solicitations from community information been sought?

A. I'm very sorry. Say that one more time.

Q. You've testified how the services provided by ManagedMethods have been changed. You called it sort of upping --

Page 51

A. Raising the floor.

Q. Raising the floor. Thank you. And that would be a change in the service being provided by ManagedMethods; is that fair to say?

A. You could say that.

Q. Thank you. With that, were any town halls conducted or solicitations for information from the community?

A. Not to my knowledge. And when we make changes to products, we don't -- we don't often -- well, not often. We don't always open it up to community feedback. We recently changed assessment platforms. That's not something that we open up for feedback. We were conducting business as usual, making what we thought were appropriate and good changes focused on student safety, and we conducted business the way that we thought best and went through a really extensive process to on-board that I think is really solid.

Q. Got it. Thank you. To your knowledge has the District generated any statistics concerning what it considers to be successful outcomes with the use of student

Page 52

monitoring?

MR. GRANT: Objection. That's out of this topic.

MR. JOHNSON: Just wanted to make sure. You don't want to hear him testifying to it. Sorry about that.

THE DEPONENT: That's okay.

Q. (By Mr. Johnson) Item Number 3, just want to make sure we're clear on something. The District monitors student content uploaded to the Google Suite even if the student is off campus?

A. So the monitoring for these products is done through student accounts. So the accounts are not tied to devices. So if a student is in their account, logged in on personal device off campus, if they're logged into our account, it is being monitored.

Q. Okay. Just wanted to make sure.

And that includes if the student is using a personal device?

A. Yes.

Q. Is it your understanding that, to receive the education that the state has specified they are to receive, students at

Page 53

Lawrence School District have to have a student account?

A. We are a public school, so all students are welcome. In our current infrastructure, all of our students have a district account.

Q. I understand all of them do. But do they have to have a student account in order to receive their education?

A. We absolutely work with families to address concerns when they're presented to us to understand what are the hesitations to engage in the use of technology or the use of student accounts. We often in those get opportunities to explain to them why student accounts are important, especially in our secondary schools and the type of learning that transpires. Some of those things are really important. Does a student have to have an account in order to attend our school system, no.

Q. They don't. Can you quantify the number of students at the school district who do not have student accounts?

A. I couldn't speak for it perfectly,

Page 54

no.

Q. Do you know if there is a total count, a running total, of the number of students enrolled with the District who do not have student accounts?

A. I'm not aware of a total kept.

Q. So as far as you know, the District doesn't track that number?

A. I mean, I believe that we could audit that number if we needed to.

Q. Why don't you?

A. I've never been asked that before.

Q. Well, you're being asked now.

A. Why don't we look to see how many students don't have District accounts?

Q. Yes.

A. So it would be uncommon for a student to not have a student account. As students enroll into our District and re-enroll into our District, part of that process is signing our Acceptable Use Policy. And so by signing our Acceptable Use Policy, those parents are acknowledging that students are going to have accounts, they are going to be issued devices, among many other things.

Page 55

Q. Is it District policy not to issue District devices to students who do not sign the Acceptable Use Policy?

A. Yeah, it's not that cut and dry. When we have students that don't sign our Acceptable Use Policy, there are courses in which we teach that students need technology for. And just because a student doesn't sign an AUP or a family doesn't sign an AUP, we still want students to have really rich educational experiences. So there are situations where we have devices on hand at buildings that students can engage with. But traditionally students don't take those devices home.

Q. So is what you're telling me that students don't have to sign the Acceptable Use Policy to use District devices?

A. I'm saying that we prioritize the student experience in our District. And, while students signing an AUP is imperative, we have been known to work with families to make it so that students can engage in curriculum when necessary.

Q. How often does that occur?

Page 56

A. It depends. It happened -- I mean, it happens from time to time.

Q. Does the District track the number of students who fit that description?

A. Tracking is not the word I would use for it. Are we aware that there are students that don't sign the AUP, yes.

Q. Okay. For students who don't sign the AUP and have to have access to District devices in order to do their work, do the students have to sign something that indicates they're using a District device?

A. We go through a pretty extensive process to try to engage with families so that we don't run into those situations. In the past we have printed paper copies of the AUP. We've done home visits to engage with families to get them to sign documents to ensure that their students can engage in the curriculum.

If they do not get the AUP signed, I don't believe there's an additional document we would have a student sign as we need someone, a parent, guardian, or a student that's 18, to sign the AUP.

Q. So you don't track that number

Page 57

because you're telling me you can't; you don't have them sign an additional document about use of the District devices?

A. We're able to run reports in order to identify students that do not have an AUP on file.

Q. How often do you run those reports?

A. We run them most frequently at the beginning of school years.

Q. Is it correct that, today, a student does not have to sign an AUP in order to enroll; that, in fact, the enrollment process contains, in essence, a requirement that parents agree to the AUP before the student can be enrolled?

A. Can you reword that for me.

Q. Sure. Is it correct that, today, in order for a parent to enroll his or her child with the District, there is a notice contained in the electronic enrollment software that requires the parent to acknowledge the AUP?

A. There is a form inside the enrollment platform that is requiring parents

to acknowledge the AUP.
Q. And it's an electronic form; it's not a paper form?
A. That's correct.
Q. So there's no longer anything that the student or parents, I guess we would say, use as a wet signature?
A. No.
Q. If the parent chooses not to acknowledge the AUP, will the District still enroll the student?
A. Yes. Yes. We -- and I've referenced this. But we have families that contact us concerned around a number of things when enrolling students. If the AUP is one of those things, we engage with those families to understand what the hesitations are. We work to inform them as to why we would like the AUP acknowledged and signed and help them through that process.
If families are adamantly against signing that AUP, we typically do work with those families. Because, like I said, we are a public school. We're going to welcome all students in our District.



Q. Does the District track how many students are enrolled through the process you just described?
A. Well, they would fall under the category of a student not having an AUP, so we would be able to run a report on that.
Q. I think you said the District routinely runs that report at the start of the school year?
A. Uh-huh.
Q. Have you seen that report for the '26-'27 school year?
A. Of course.
Q. Do you remember how many students are numbered on that -- included in that report?
A. It's -- I don't recall the exact number, but it is a small number.
Q. A handful?
A. Yeah.
Q. Less than 10?
A. I don't know.
Q. Less than 100? That would be a pretty big number, wouldn't it?
A. We run that report leading up to



the school year several times. And so that number, as the school year approaches, shrinks and shrinks. So I don't recall what the last time we ran that was.
Q. Who is responsible for following up with parents who have not acknowledged the AUP?
A. That varies. That varies. Sometimes that will fall on the enrollment center. They're our first line of contact with the families. So if families have concerns, that's normally a place. Sometimes the enrollment center will kick back to the buildings. So building principals or office staff might engage with those families.
And then, occasionally, those will get kicked up the chain to the District level. And so if it's specifically a technology concern, it might come my way. If it's a teaching and learning concern, it might go to the associate superintendant of teaching and learning.
Q. So you have been with the District since 2020. At what point did the AUP process stop being a paper process, if you know?



A. I don't know. Since the time that I went to District office in 2024 it was an electronic process.
Q. Are you aware of the District keeping files of signed Acceptable Use Policies?
A. Yes.
Q. Do those files exist today?
A. I can't verify that as I have not seen those, but I believe that buildings would have a record of that.
Q. Do you know if the District has asked the buildings to produce those files in the context of this litigation?
A. Yes.
Q. Do you know whether those files were turned over in the course of this litigation?
A. Not at this time.
MR. GRANT: Do you want to take a break?
MR. JOHNSON: Let's take a few minutes, yeah.
(Recess.)
Q. (By Mr. Johnson) Now, I've been

Page 62

asking you, Mr. Polk, about Acceptable Use Policies and the like. The last item in Number 6 is opt-outs. So is it correct that, for as long as you have been in technology issues with the District, so going back to the middle of 2024, the District has not allowed opt-outs from student monitoring?
A. That's correct.
Q. Are you aware of any exceptions to that? In other words, are you aware of any situations where students have been allowed to opt out of student monitoring?
A. Yes. Students --
Q. Please tell me about that.
A. Students that are enrolled in digital media technology and journalism media communications, those students are the exception.
Q. With those exceptions, any other examples of opt-outs of which you are aware?
A. No.
Q. Do you have any information as to how many students have sought opt-outs other than, again, the journalism students?
A. No, I'm not aware of students who

Page 63

have sought opt-outs.
Q. Number 7, with respect to journalism and art exemptions, do you have any sense as to whether those exemptions have been effective?
A. And by effective, you mean they haven't been flagged?
Q. Yes.
A. Yes, I believe they have been effective.
Q. Are you aware of any of the students who were supposed to be exempted who have been flagged?
A. I'm not aware, no.
Q. And that would be by either Gaggle or ManagedMethods?
A. Personally, I'm unaware. I believe that, as the exceptions were being put in place, that there were definitely -- I mean, the configuration of excluding those students was pretty -- it was a very large task, and so my understanding is that it took some work. And so I'm not exactly sure on when the -- when the configuration was at the point it is now that allowed them to not be

Page 64

flagged.
Q. Can you describe what had to be done to accomplish the exemptions.
A. Yeah. So in layman's terms, when student accounts are created into our environment, they're essentially all put in one house, and that's -- we call it an OU. And so all the --
Q. OU like -- it's not short for Oklahoma University I assume?
A. No. I'm blanking on what an --
MR. GRANT: Operating unit.
THE DEPONENT: Operating unit. Thank you.
A. So it's placed in one house. In order to exempt these students, we had to build a second place for those students to go. And not only did we have to build a second place for those students to go, we also had to find a way to automate those students populating into that house.
So that's why the course enrollments are such an important piece to that, because that is allowing us to automate it so that it's happening automatically rather

Page 65

than having someone manually place them in that course, which would leave us open to leaving someone off potentially.
Q. So the system picks students out, not because of who they are, but because of the fact that they're enrolled in a certain course?
A. That is correct.
Q. And when that happens, they are, again, in layman's terms, picked out of one OU and put into a newly created OU?
A. That is correct.
Q. Just to be sure, are you designated for and prepared to testify as to the District's rationale for being required to monitor student content?
A. The District's rationale in regards to --
Q. The legal rationale, why we're doing it.
A. Yes.
Q. Why don't you tell me, what is the District's rationale for saying that the District is required to do this student monitoring.

Page 66

A. Yeah. So based on the -- what's outlined in CIPA as well as our -- our accepting of E-Rate funds and, quite frankly, kind of our moral obligation to keep students safe, we are required to monitor what they're doing on devices that we issued to them and accounts that we issued to them.
Q. So with respect to legal requirements -- moral requirements we'll kind of put to the side for the moment.
It's the provisions of CIPA and the provisions of the -- let's say the FCC's specification for E-Rate funding. Okay.
A. Uh-huh.
Q. And then there's sort of a -- the personal feeling that the District has that it has a moral obligation to its community?
A. Yeah, I think, you know, especially when we were talking about pivoting platforms into ManagedMethods, you know, student safety was definitely something that was a huge priority for us, being able to keep students safe, whether that be from themselves or from others. Our obligation to provide a safe and caring environment for students to be

Page 67

able to thrive academically is our number one priority.
Q. Are teachers and staff included among the personnel at the District who are expected to monitor or watch student behavior?
A. Yes.
Q. And is it correct to say that much of the information concerning problematic student behavior comes from teachers?
A. Teachers are the primary staff members. Teachers, whether that be certified or classified staff members, are the primary individuals in the District that are interacting with students. So a lot of our knowledge of what is going on with students and student behaviors comes from that group, yes.
Q. Now, if the District has a legal obligation to monitor student content under CIPA and the E-Rate funding rules, why did Dr. Lewis suggest that the journalism students be exempted from monitoring?
A. My understanding is that those concessions were made to avoid ending up in a situation like we are right now. And from my

Page 68

perspective, as the director of technology, at this time it's extremely problematic that we would not be monitoring a certain subset of students to keep them safe. That is -- that is a concern of mine. Just because a student --
Q. No, I understand. I understand. If there's more you want to say, please.
A. No. I just -- just because a student is enrolled in a certain type of course doesn't mean that they are more or less likely to provide -- to not have mental health concerns or provide a threat to the general student population, so that is where my concern is.
Q. I appreciate that. Thank you.
As I understand it, Dr. Lewis, when he raised the issue of exempting the journalism students, said something to this effect: He expected the journalism teachers to kind of take over that role, make sure they watched their students very closely to see if there's any concerning behavior. Did you hear anything of that nature?
A. No.

Page 69

Q. Does that assuage any concern you have about exempting the journalism students from monitoring?
A. I think it's the obligation of any staff member, teacher, paraprofessional, anyone employed by the District, to be active supervisors when interacting with children, whether that be in an electronic platform or on a playground. It's our responsibility as a staff member to do our best to keep students safe.
And so while we all -- while staff are always going to make their best effort to do that, it would be very difficult for a teacher to monitor a student's inbox.
Q. Now, in the time that you have been involved in District technology matters, in other words, since the summer of 2024, have you heard -- to your knowledge has any district administrator provided instructions for student journalists not to write stories about Gaggle?
A. The only thing I'm familiar with are the -- in regards to that are the exhibits that are in here.

Page 70

Q. What in those exhibits indicates that to you?
A. Well, let me find it. I'm having a hard time locating the -- there's a -- I'm having a hard time locating it. Well, the closest thing I can find to what I was thinking of is Exhibit H.
Q. That would be Exhibit H as an attachment to the Second Amended Complaint?
A. It is an email with the managing editor of The Budget inquiring for a comment on AI monitoring software in the school, and Dr. Rials responding that he had no comment on this request.
Q. Who is the person with The Budget who --
A. Claire Lindenmeyer.
Q. And what's the date?
A. It is November 5th of 2025.
Q. Okay. Let me hand you a document which has been marked as Exhibit 185. It's the invoice of ManagedMethods. Is this the invoice you addressed earlier concerning the documentation of the arrangement with ManagedMethods?

Page 71

A. Yes.
Q. Is there, to your knowledge, any other document subsequent to this one, and this is from -- it has a date September 29, 2025.
Anything subsequent to that that you're aware of concerning the relationship between ManagedMethods and the District?
A. Not that I'm aware of.
Q. If you look at the second page, I believe the -- I don't have it in front of me. This is sort of from memory. Okay, thanks.
It says, terms and conditions, and next to it has ManagedMethods.com/terms.
A. Uh-huh.
Q. To your knowledge does that mean that the terms and conditions of service are governed by information on ManagedMethods' website?
A. I would suppose.
Q. Do you have a copy of that page from the ManagedMethods website in your office today?
A. No.
Q. Is it fair to say that

Page 72

ManagedMethods could unilaterally change the content of that website and thereby unilaterally change the provision of service to the District?
MR. GRANT: Objection to the extent it calls for a legal conclusion.
You can answer.
Q. (By Mr. Johnson) If you know.
A. I think ManagedMethods is their own company and could do what their company is outlined to do.
Q. Okay. And thereby change the services being provided to the District?
A. Sure. It's possible.
Q. Have you ever raised a concern about that within the District?
A. No.
Q. Do you know if anybody within the District has raised a concern about that?
A. Not to my knowledge.
Q. Now, in item 10 of the letter from Mr. Grant, that addresses the issues concerning two minor plaintiffs, in other words, plaintiffs under the age of 18, E.B. and H.C., who are existing students with the

Page 73

District.
It's correct to say that, as students of the District, they are subject today to the monitoring utilizing ManagedMethods?
A. Unless they are enrolled in the courses that I've outlined already.
Q. And I was going to ask about that. Thank you.
So unless they are enrolled essentially in journalism courses, they are subject to the comprehensive monitoring of their content?
A. That is correct.
Q. In item number 13, does the District maintain any logs of alerts received from ManagedMethods?
A. The logs that we would have in regards to ManagedMethods would be inside the ManagedMethods platform.
Q. So created and maintained by ManagedMethods?
A. Yes.
Q. 14th and final, this has to do with requests under the Kansas Open Records

Page 74

Act from two students, Ashlyn Tell and Phoebe Morris.
Did you have anything to do with preparing responses for identifying documents to respond to those open records requests?
A. I was involved in looking if I personally had any documents related to the KORA request to see if I could produce.
Q. Who made that request of you?
A. At that time our executive director of communications, Jake Potter, was handling a vast majority of our KORA requests.
Q. And the request here says that you will be prepared to testify concerning searches and productions responding to Ashlyn Tell's and Phoebe Morris' October 30, 2025, KORA requests.
Other than receiving the requests from Mr. Potter to determine if you had any documents responsive to this request, did you have any involvement in responding to the requests, identifying documents pursuant to the requests, and producing those documents?
A. Other than what I've outlined already, no, I was not directly involved with

Page 75

that.
Q. In preparing for today's deposition, did you familiarize yourself with what would be the answers to the issues I just raised?
A. I've done my best to familiarize myself with the process we undergo in order to fulfill KORA requests specifically related to this. I prepared as best I could.
Q. What did you do to prepare?
A. I reviewed the exhibits that were made available to me.
Q. Other than yourself, do you know who was sort of consulted to help identify documents responsive to the -- I'll call them the Tell/Morris requests?
A. Our -- the network team in our school district assists in locating documents as that team is -- it manages our Google Suite and something called Google Vault, which allows us to look for specific requests like this. So it would be members of the network team that I'm aware of that would help with this.
Q. Who is the network team?

Page 76

A. Matt Fish would have one of them. Another member of the network team is Isaac Webb.
Q. In the correspondence and documentation that you reviewed, did you see any content addressing the -- any deadline to respond to these KORA requests?
A. This is number 14, right? Can I review it real quick?
Q. Sure. What document number are you looking at?
A. I'm looking at 88 right now between Jake Potter and Phoebe Morris. It says we provided the estimate for your narrowed KORA request dated February 4, 2026.
Q. What's the date of that email?
A. February 4th, 2026.
Q. Thank you. Is that an email that provides to Ms. Morris an estimate of the amount of money she would have to pay in order for the District to produce the documents she requested?
A. It looks like there are hourly rates in here.
Q. There are hourly rates, no totals?

Page 77

A. It doesn't look to be.
Q. Anything else that you consulted that could provide answers to the questions I raised a moment ago concerning the deadlines for producing documents?
A. There is an estimated total cost on that email.
Q. And what is it?
A. $6,392.32.
Q. From your review of the documents, is it your understanding that Ms. Morris had to pay that amount to the District before the District would produce any documents?
A. I don't know how payment usually works, if the payment must be done up front or if it can be done after the fact.
Q. Is it your understanding Ms. Morris would have to pay that amount before the District would begin to identify the documents to be produced?
A. I'm unclear of how that order of operations works.
Q. And, finally, this Item 14 ends with the nonprivileged factual basis for any claimed unavailability or continuing

Page 78

withholding.
A. Uh-huh.
Q. From what you have reviewed, are those issues addressed, in other words, reasons for the unavailability of documents or the withholding of documents?
A. I'm unclear what you're asking.
Q. Did the material that you -- well, first let me ask you this: Before reviewing the material in preparation for the deposition, did you have any understanding as to the nonprivileged factual basis for any claimed unavailability or continuing withholding?
A. Not that I'm aware of.
Q. After you reviewed documents in preparation for today's deposition, did you acquire any knowledge concerning those issues, in other words, reasons that the District --
A. Oh, I'm tracking now. Thank you. Sorry. It took me a minute.
Q. Sure.
A. Yeah, my understanding is that the request was very large. The amount of information that was being asked to provide

Page 79

was an unusually large amount. And in my knowledge of KORA requests, producing the documentation is one step of the process. Reviewing and redacting the information provided is another step of the process. And that process oftentimes is the most tedious process.
Q. Understood. But with your understanding of the KORA process, are those reasons, the breadth of the request, the amount of time it would take to review the documents identified, are those reasons not to produce documents?
MR. GRANT: Objection to the extent it calls for a legal conclusion.
But you can answer if you know.
A. I'm not an expert in KORA. But I do believe that KORA talks about an undue burden on the organization, and KORA requests are no one's full-time job at Lawrence Public Schools. So the -- when we get KORA requests that are very large, they require someone to stop doing what their full-time job is to process those requests.
Q. (By Mr. Johnson) Are you aware

Page 80

that the District had a practice of not charging students for KORA requests?
A. No.
Q. That was badly phrased.
Do you not know or does the District have such a practice?
A. I do not know.
Q. Either way. Okay, thank you.
MR. JOHNSON: That's all I have. Thanks.
MR. GRANT: I need to correct something that I said earlier, I think during Kylie Luckett's portion, that was incorrect. The exhibits that have letters are not exhibits to the Second Amended Complaint. What they are are exhibits that I took with me from Dr. Swift's deposition that I did not have numbers for.
MR. JOHNSON: No biggie.
MR. GRANT: So if you want to us to, we can identify --
MR. JOHNSON: Why don't you just identify the numbers for me, then we're good.
MR. GRANT: Okay.
MR. JOHNSON: Thank you very much for

Page 81

your time.
(The deposition concluded at 2:55 p.m.)

C E R T I F I C A T E

I, STACY L. DECKER, a Certified Court Reporter within and for the State of Missouri and Certified Shorthand Reporter within and for the State of Kansas, hereby certify that the within-named witness was first duly sworn to testify the truth, and that the testimony by said witness was given in response to the questions propounded, as herein set forth, was first taken in machine shorthand by me and afterwards reduced to writing under my direction and supervision, and is a true and correct record of the testimony given by the witness.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or relative or employee of such attorneys or counsel, or financially interested in the action.

WITNESS my hand and official seal at my office [illegible]is 30th day of Oc[illegible]



STACY L. DECKER, CSR, CCR
CSR No. 1540
State of Kansas



Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

October 30, 2026

To: Cameron E. Grant

Case Name: Tell, Jack Et Al v. Lawrence USD 497

Veritext Reference Number: 8533685

Witness: James Polk - Lawrence USD 497 , 30(b)(6) Deposition Date: 10/27/2026

Dear Sir/Madam:

Enclosed please find a deposition transcript. Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change. Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

NO NOTARY REQUIRED IN CA



DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 8533685
CASE NAME: Tell, Jack Et Al v. Lawrence USD 497
DATE OF DEPOSITION: 10/27/2026
WITNESS' NAME: James Polk - Lawrence USD 497 , 30(b)(6)

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have made no changes to the testimony as transcribed by the court reporter.

______________ ______________________
Date James Polk - Lawrence USD 497 , 30(b)(6)

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this ______ day of____________________, 20____.

________________________________
Notary Public

________________________________
Commission Expiration Date



DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 8533685
CASE NAME: Tell, Jack Et Al v. Lawrence USD 497
DATE OF DEPOSITION: 10/27/2026
WITNESS' NAME: James Polk - Lawrence USD 497 , 30(b)(6)

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

______________ ______________________
Date James Polk - Lawrence USD 497 , 30(b)(6)

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They have listed all of their corrections in the appended Errata Sheet;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this ______ day of____________________, 20____.

________________________________
Notary Public

________________________________
Commission Expiration Date

ERRATA SHEET
VERITEXT LEGAL SOLUTIONS MIDWEST
ASSIGNMENT NO: 8533685

PAGE/LINE(S) / CHANGE /REASON

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

______________ ______________________

Date James Polk - Lawrence USD 497 , 30(b)(6)

SUBSCRIBED AND SWORN TO BEFORE ME THIS ________

DAY OF ______________________, 20______ .

________________________________

Notary Public

________________________________

Commission Expiration Date

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.