IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| JACK TELL; NATASHA TORKZABAN; MORGAN SALISBURY; OPAL MORRIS; HENRY FARTHING; SUZANA KENNEDY; NAOMI SUI PANG; ASHLYN TELL; PHOEBE MORRIS; E.B., a minor, by and through his parent and next friend, CATHERINE P. BATZA, Ph.D.; and H.C., a minor, by and through his parents and next friends, DANIELLE BRUNIN and ERIK CHANEY, | |
| Plaintiffs, | |
| vs. | Case No: 2:25-cv-02428-KHV-GEB |
| LAWRENCE USD 497, a political subdivision of the State of Kansas, | |
| Defendant. | |

RULE 30(b)(6) DEPOSITION OF DEFENDANT LAWRENCE USD 497, by its designated representative, KYLIE LUCKETT, taken on October 27, 2026, at 9:30 a.m., taken remotely via Zoom Videoconference, before Stacy L. Decker, a Certified Court Reporter, taken on behalf of the Plaintiffs.

A P P E A R A N C E S

For the Plaintiffs:

MR. MARK P. JOHNSON
MR. HARRISON ROSENTHAL
DENTONS US, LLP
4520 Main Street, Suite 1100
Kansas City, Missouri 64111
mark.johnson@dentons.com

For the Defendant:

MR. CAMERON GRANT
LEWIS BRISBOIS
BISGAARD & SMITH, LLP
4600 Madison Ave, Suite 700
Kansas City, Missouri 64112
cameron.grant@lewisbrisbois.com



I N D E X


EXAMINATION BY: PAGE:

Mr. Johnson...............................4

EXHIBITS

Exhibit 200 - Rule 30(b)(6) Notice........4

Exhibit 201 - Response to Rule 30(b)(6) Notice......................4




KYLIE LUCKETT,

of lawful age, having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, testified as follows:

EXAMINATION

BY MR. JOHNSON:

Q. Good morning, Ms. Luckett. I'm Mark Johnson. I'm one of the lawyers for the plaintiffs in this case. And you're accompanied by counsel for the District, Cameron Grant.

We'll be able to dispense with a lot of the normal early deposition stuff, because you've already had your deposition taken, and you presumably remember all the things you were told to do and not to do.

A. I do.

Q. Very good. Okay. I have two exhibits that I'd like to mark.

(Exhibits 200 and 201 were marked.)

Q. So, Ms. Luckett, I'm handing you a document which I will ask the court reporter to mark as Exhibit 200. And I'm handing a copy to your counsel as well. It will be two exhibits to Stacy, so she can mark them there.



MR. GRANT: Okay.

MR. JOHNSON: So we have 200. And then a second document, which I will ask the court reporter to mark as Exhibit 201, and I'll hand a copy to Mr. Grant as well.

Q. (By Mr. Johnson) Exhibit 200 is the Rule 30(b)(6) notice that we served on the District's counsel, and Exhibit 201 is the District counsel's response to that 30(b)(6) notice in which counsel identified the witnesses who will be testifying concerning certain topics that we included in our notice.

MR. JOHNSON: I'm handing those to the witness simply for purposes of the record. The only question I'm going to ask Ms. Luckett, and I think it would be -- probably Mr. Grant will confirm this -- is that this morning I received an email from Mr. Grant indicating that, rather than you testifying with respect to issues in Paragraph 2, it will be the superintendent, Ms. Swift?

MR. GRANT: That is correct.

MR. JOHNSON: Okay. So that shortens your deposition a little bit. I'm sure you're really unhappy to hear that.

Page 6

Q. (By Mr. Johnson) Okay. So the first topic about which you have been designated as a witness by the District appears in Paragraph 3. And it indicates that you are prepared to testify about the operation of the program; is that correct?
A. That is correct.
Q. And it appears you brought some documents with you this morning. Can you tell me what documents you brought with you?
A. I brought evidence that has been submitted to the record.
Q. It would probably be -- are they exhibit numbers or deposition transcripts?
A. Exhibit numbers.
Q. So what do you have with you?
A. Exhibit 51, Exhibit 60, Exhibit 74, Exhibit 82, Exhibit 92, Exhibit 12, Exhibit 96, Exhibit 95, Exhibit 91, Exhibit 4, Exhibit 190, Exhibit 55, Exhibit 1, Exhibit 136.
Some of these are -- I'm just going to read, because some of them are repetitive. But I'm just going to go so I get all of them.

Page 7

Exhibit 95, Exhibit 94, Exhibit 93, Exhibit 92, Exhibit 91, Exhibit 124, Exhibit B, Exhibit C, Exhibit D, Exhibit E, Exhibit F, Exhibit D, Exhibit H, Exhibit 55, Exhibit 51.
Q. I'm sorry. You said exhibits B through H?
A. That is correct.
Q. All right. Okay. I'm sorry. I interrupted you. Please keep going.
MR. GRANT: And those are -- I believe those are exhibits to the Second Amended Complaint.
MR. JOHNSON: Oh, okay.
Q. (By Mr. Johnson) Okay.
A. Exhibit 51, Exhibit 5, Exhibit J, Exhibit 94, Exhibit 4, Exhibit 93, Exhibit 124, Exhibit 7, Exhibit 12, Exhibit 139, Exhibit 111, Exhibit 77, Exhibit 91, Exhibit 136, Exhibit 22, Exhibit 31, Exhibit G. That is all.
Q. That's enough.
MR. JOHNSON: By the way, I forgot. Harrison, are you on?
MR. ROSENTHAL: Yes.

Page 8

MR. JOHNSON: I'm going to ask him to ask you who he should be interfacing with on the pretrial order issues.
MR. GRANT: Well, it's due in 15 minutes, so, you know. Andrew is standing by, though, obviously to address any comments, I guess.
MR. ROSENTHAL: I'll give Andrew a call.
Q. (By Mr. Johnson) And you have a binder with you. Does that binder contain each of the exhibits that you mentioned?
A. That is correct.
Q. Okay. Now, what role did you play in the operation of the programs, and that would include Gaggle and ManagedMethods?
A. I serve as the director of mental health for Lawrence Public Schools.
Q. Now, have you had that position for the entire time that the Gaggle and ManagedMethods have been used?
A. I have not.
Q. When did you succeed to that title?
A. December of 2024.

Page 9

Q. December of '24. So at that time Gaggle was in use?
A. That is correct.
Q. And who did you succeed in that job?
A. The position wasn't a position prior to me.
Q. Could you describe for me what your responsibilities are from the operation of the monitoring programs.
A. Training administrators, overseeing alerts, supporting staff and supporting students, districtwide data.
Q. Okay. I think I might have missed one. Training administrators, overseeing alerts, districtwide data. There was something about students?
A. Supporting, supporting students.
Q. Can you describe for me the training that you have overseen with respect to district administrators.
A. We -- there was training directly with Gaggle in order to train on the platform. And then I provided ongoing training on the response and how to handle responses and

Page 10

support students, whether it is the administrator supporting or who to refer on to if it was necessary.

Q. Had you done any of that with respect to ManagedMethods?

MR. GRANT: Mark, I'm sorry, can you clarify if you're asking in her personal capacity or whether the District has done that?

MR. JOHNSON: Well, I'm sorry. Whether the District has done that. You're here to testify about that.

Q. (By Mr. Johnson) With respect to training administrators, what has the District done since it implemented ManagedMethods?

MR. GRANT: And objection. The Topic 3, Ms. Luckett has been designated to testify regarding the operation of the programs, which I'm not sure would include training of district personnel.

Q. (By Mr. Johnson) Let me ask you this. Can the District operate the programs without training administrators?

A. It cannot.

Q. So would you agree with me that

Page 11

training administrators is a part of the operation of the monitoring programs?

A. I would not.

Q. Why not?

A. I would say that training is prior to the operation of the program.

Q. So then on behalf of the District, your testimony is that, prior to the implementation of the programs, they were not operating?

A. That is not what I said.

Q. Would you agree with me that training, I think you agree, is necessary to operation of the programs?

A. I would agree.

Q. Okay.

MR. GRANT: And I really apologize, but training is, in fact, part of topic four as to which Kylie has been designated. So I'll do my best not to interrupt, but it's a little bit more difficult when I'm trying to view the topics. But Ms. Luckett has, in fact, been designated to testify about training, topic four, I apologize.

Q. (By Mr. Johnson) Why don't we

Page 12

then talk about the training that the District has provided to administrators. Has it done so for both Gaggle and ManagedMethods?

A. It has.

Q. Can you describe for me what training the District has -- the District conducted for administrators with respect to the operation of Gaggle?

A. Yes. There were online trainings with the Gaggle staff for all -- all building administrators. And then there was ongoing as-needed training when it came to on-boarding new staff members and how to utilize the platform as well as best practices in utilizing the platform.

Q. You used the term building administrators. Can you tell me, from the District's point of view, who are building administrators?

A. Principals, associate principals, and assistant principals.

Q. So the District has not provided any training to teachers and other staff? With respect to Gaggle, it didn't provide training to those people?

Page 13

A. Buildings that have members of their mental health team involved in Gaggle were given training. General teachers were not because they were not utilizing. Anyone who was utilizing Gaggle within the District was given training.

Q. Can you tell me from the District's point of view what you mean by the -- what you mean by the word utilizing Gaggle.

A. Logging into the platform, observing alerts, responding to alerts.

Q. And the training included people from Gaggle?

A. That is correct.

Q. Was any of that training conducted in person with Gaggle personnel?

A. It was not.

Q. Will you describe for me the role that Gaggle personnel played in the training.

A. To go over the platform, the nuts and bolts, ins and outs, how to utilize the platform, what it does.

Q. In that training did the Gaggle personnel respond to any questions from the people being trained?

Page 14

A. Yes.
Q. Can you tell me what some of the questions that the building administrators asked of Gaggle people.
A. Not with certainty.
Q. I understand.
A. It would be a --
Q. Just what you can remember.
A. Just clarifying questions on where to access items, how to -- what are the time frames that the -- are being utilized, what are the keywords, what happens if, you know, fill-in-the-blank type.
Q. And what do you mean by the term "keywords"?
A. So when it comes to what words is the AI looking for, what does it flag, can words be added to that, can words be omitted from that, that sort of question.
Q. Do you remember any of the building administrators asking to see a list of those words?
A. I do not.
Q. Do you remember whether the District, as part of training, provided a list

Page 15

of the words that Gaggle would be searching for?
A. Gaggle searches for more than just like individual words. So there's not just like a set of -- and that list is consistently changing within the context of how students and things that evolve. So there was not, to my knowledge, just a set here are the 101 words that we search for. It was --
Q. To answer my question, I asked you whether, as part of the training, you remember whether any of the building administrators asking to see a list of words that Gaggle would search for?
A. Not at the training that I was present at, no.
Q. Are you aware that building administrators in training ever posed a question like that, even if you weren't present?
A. I am not sure.
Q. As someone playing a role in the training of district personnel with respect to Gaggle, did you ever ask to see a list of the words that Gaggle would search for?

Page 16

A. You're asking me as an individual?
Q. Yes.
THE DEPONENT: Am I speaking as an individual?
MR. GRANT: You can answer that question. The record is clear he's asking if you specifically did that, so yes.
A. No, I did not.
Q. (By Mr. Johnson) As a part of the training, are you aware of any district personnel ever asking to have input into the words that Gaggle would search for?
A. Yes.
Q. Could you tell me about that.
A. So more than the words that it would search for, it was the words that it would omit. So when we are working on a certain unit or a certain -- there are certain themes within debate that they are searching; how we could, as they are typing up a potential speech, not have some of those words in that context.
But as far as like searching for we want to make sure you search for this code word for a drug or new slang term, that was

Page 17

nothing that I asked for.
Q. Are you aware of any district personnel as part of training asking for input into the words that Gaggle would search for?
A. I am not.
Q. As part of the training did you see the list of words that Gaggle would search for?
A. I did not.
Q. As part of the training are you aware of any other district administrator asking to see a copy of the words that Gaggle would search for?
A. I am not.
Q. As part of training for ManagedMethods, are you aware of any district administrator asking to see a copy of the words that ManagedMethods would search for?
A. I am not.
Q. Are you aware of any district administrator -- I'm sorry, building administrator, asking to have input into the words ManagedMethods would search for?
A. Similarly, it is not to search for these words, but to omit these words, yes.

Page 18

Q. Can you tell me some of the words that the building administrators, as part of the training, asked to be omitted from the words that Gaggle would search for?
A. You know, weapons of mass destruction, that would be an example. So because it is being -- it's not talking about a weapon that could be a threat, so that came up. The word lit.
Q. L-i-t?
A. L-i-t. Which is used to get lit, but also for -- it's short for English literature. So how those can be confused.
Q. Then with respect to ManagedMethods, do you remember, as part of the training, any of the building administrators asking for certain words to be omitted from the list ManagedMethods would search for?
A. Lit was also one of those.
Q. Can you remember any others?
A. No, not when it pertains to ManagedMethods.
Q. In the operation of the programs, Gaggle and ManagedMethods, are you aware of

Page 19

any incident in which either Gaggle or ManagedMethods flagged words that the building administrators had asked not to be included?
A. I want to make sure I'm understanding correctly.
Q. Sure.
A. Were there words that had been requested to not be flagged by either program that then got flagged?
Q. That's right.
A. I do not know.
Q. Is there somebody at the -- I mean, to your knowledge, somebody at the District who would know the answer to that question?
A. James Polk would be the person who I think would have content knowledge on that. I handle the people more than the back end of the program. That was my role.
Q. Now, this is in Paragraph 4 of Mr. Grant's letter. You've been designated to testify on behalf of the District concerning reviewing -- would this be the operation of the monitoring programs?
A. I don't understand your question.

Page 20

I'm sorry.
Q. Okay. Well, Paragraph 4 reads, The District's operative written and unwritten standards and procedures for flagging, reviewing, restricting, et cetera, et cetera.
Talking about reviewing, did you, for example, on behalf of the District, review the materials provided to building administrators concerning the use of Gaggle?
A. Am I allowed to ask a question? Like can you clarify, what do you mean materials?
Q. That assumes that -- as part of the operation of the monitoring programs, were written materials provided to the building administrators?
A. Yes.
MR. GRANT: So just objection just to clarify. I think it should have been clear based on the way that we broke up Kylie versus James Polk. So the portion of four that refers to the word "viewing," we understood it to be the word "viewing" of the alerts themselves and flagged materials.
So the yellow portions are kind of the

Page 21

more technical -- like the procedures for flagging, the restricting, the disclosing, the categories, definitions, keywords, which is James' area.
But Ms. Luckett is prepared to testify about the reviewing of the alerts themselves and perhaps the underlying content.
THE DEPONENT: Yes.
Q. (By Mr. Johnson) Okay. Were written materials provided to building administrators concerning how they were to review alerts from Gaggle?
A. Yes.
Q. And ManagedMethods?
A. Yes.
Q. Can you tell me who prepared those written materials?
A. I did.
Q. As far as you know, did anyone else have input into preparing those written materials?
A. Yes.
Q. Who else did?
A. The executive director of inclusion, engagement, and belonging, who was

Page 22

my supervisor at the time.
Q. Is that Cynthia Johnson?
A. It is Cynthia Johnson.
Q. Anybody else you can remember?
A. No.
Q. Were those materials provided to the building administrators as part of the training?
A. It was a follow-up to the -- it was -- it wasn't in the initial training. It was a subsequent.
Q. So the initial training was all oral; is that correct? There were no written materials; it was all spoken to them?
A. Yes.
Q. How often were written materials provided to the building administrators concerning how they were to review alerts?
A. It was -- there was one document that was shared. And then if there was a new administrator, then it would get shared with them.
Q. So what you remember is that there was one set of written materials prepared for training, and that was distributed to the

Page 23

building administrators; is that right?
A. Yes.
Q. And then as new building administrators came online, so to speak, they were also given a set of the same materials?
A. Yes.
Q. All right. Was that the case for both Gaggle and ManagedMethods?
A. It was not.
Q. What you just testified to, is that with respect to Gaggle?
A. That is correct.
Q. How was the situation different with respect to ManagedMethods?
A. ManagedMethods was rolled out in a different way in a time that I was not directly involved. So the District was utilizing the ManagedMethods platform while -- and kind of going through fine-tuning. And then there was -- they were doing kind of like a test run of the program with a couple of buildings. And then after that, it was rolled out districtwide. And training was provided. I was not a part of that training.
Q. Okay. So thank you for that

Page 24

answer. Let me kind of break it down a little bit so it's sort of clear on the record.
Is it correct that you were not involved in ManagedMethods training?
A. That is correct. I was on maternity leave.
Q. Is it correct that ManagedMethods was rolled out over a period of time?
A. Yes.
Q. Was there, to use a term we often use, sort of an alpha test with a couple of schools?
A. Yes.
Q. How long did that last?
A. That lasted for the fall of '25 semester, with just district administrators going through and observing. And then once it rolled out to the buildings, it rolled out in the spring of '26 and then it was late spring of '26 to the rest, in which that training was all done and the materials were created by James Polk.
Q. Okay. Thank you. So is it correct that ManagedMethods was not used for the entirety -- covering the entire District

Page 25

during the fall of 2025?
A. That is correct.
Q. Can you tell me, if you can remember, a date or a month in which ManagedMethods was made universal throughout the District.
Maybe I can ask that a little differently.
A. Okay.
Q. Was ManagedMethods rolled out for the entire District in the spring semester of 2026?
A. So I'm -- it's -- so the monitoring of it versus the staff having access and being trained and utilizing it were two separate times. So I don't want to speak incorrectly about -- so there was monitoring like we had it -- they had it on and they were looking. But then once they like kind of did their beta testing and things are working, then it was -- like the login information was given to administrators and then they started logging in and looking at it.
Q. So then is it fair to say that, during the fall of 2025, that alerts were not

Page 26

going to the building administrators?
A. So in fall of 2025, we had -- there was Gaggle that had alerts, and there was also for a time ManagedMethods that was in that beta pilot testing. So there was always monitoring and there was always district staff that were looking and addressing alerts. There was not always building administrators that were reviewing and addressing alerts.
Q. It's fair to say that, with district staff looking at alerts in the fall of 2025, that was not the same as building administrators looking at those alerts?
A. It was not the same. If there was an alert that needed addressing by school staff, then district staff alerted the building.
Q. And that was with -- let's just say testing of ManagedMethods?
A. Yes.
Q. Was Gaggle also being used during that fall 2025 period?
A. Yes.
Q. How long into the fall, if you remember, was Gaggle utilized?

Page 27

A. I believe November or December, I believe. I don't --
Q. You're looking -- is that information contained in an exhibit?
A. I believe -- well, looking at the alert information, I believe it was. But I'm not 100 percent sure.
Q. And when you use the term alert information, are you talking about a list of alerts?
A. Uh-huh.
Q. Okay. In the materials for the training provided to building administrators with respect to reviewing alerts, were the administrators instructed to review themselves, look at themselves, the content that had been the subject of an alert with Gaggle?
A. Yes.
Q. So they were told -- is it fair to say that they were trained to look at the content first before talking with any student about that content?
A. They were instructed to look at the alerts and review the alert, so that could

Page 28

be images, words, emails. Yes, they were.
Q. But they were told look at the content?
A. Look at the alert. Not -- I don't want to specify content, because there are times where, if the content was thought to be illegal, they were not instructed to look at it because of wanting to protect our staff. And so that's when others, like law enforcement, would potentially get involved or we would talk with students about how this came up, do you have any ideas.
Q. Were they trained not to look at content that had been flagged because of nudity?
A. They were -- yes, that is correct.
Q. So they were told, if you receive an alert that indicates there's nudity in the flagged content, don't look at it?
A. In the initial we didn't have the ability to just view them. We had additional training later to go in and view what came up. And so as that happens, we just wanted to be careful -- the District wanted staff to be careful about what they were viewing on their

Page 29

devices and what they had --
Q. So when Gaggle was implemented, the building administrators who received the alerts did not have the capability to review the content of flagged material?
A. It depends on the severity of it.
Q. What figured into the determining the content was too severe to look at?
A. If it -- if it was thought to be child pornography.
Q. Okay. What about nudity? From the District's point of view, is there a difference between nudity and child pornography?
A. Yes.
Q. Can you describe for me, from the District's point of view, what that difference is.
A. You can have nudity -- there's nudity that is not child pornography. There is -- you can have nudity without a sexual component. I also don't know that I feel -- like I wouldn't say that the District has a stance on the difference between nudity and child pornography like that I can say -- I

Page 30

don't know if I'm being helpful here.
Q. Is it fair to say that the only material that building administrators who received alerts were not to look at before talking to the student was materials suspected to be child pornography?
A. It would -- nudity or child pornography.
Q. Nudity or child pornography?
A. Yes.
Q. Okay. So that's an expansion of what you just said.
A. My apologies.
Q. That's fine. Let's make it clear. That if the material was suspected as either containing nudity or child pornography, the administrator receiving the alert was trained not to look at the material before talking to the student?
A. Yes.
Q. And how would the alert indicate that the material was suspected to be child pornography?
A. There was like a speech or text box that would come up indicating that this is

Page 31

potential child pornography and -- I can't recall the exact words that it would say, but due to specific laws this has been omitted from the actual alert.
Q. Okay. But with respect to content flagged as possibly containing nudity, the building administrators were trained also not to look at that before talking to the student; is that fair?
A. Yes.
Q. Was that training ever changed? Were they ever instructed to look at that material before talking to the student?
A. Yes.
Q. Can you tell me when that took place?
A. As we on-boarded and learned what was being flagged and what wasn't and what could, it was then to look at it and then determine is this truly -- to what level of severity is this. For example, it could be -- is it a student in a bathing suit, which is different than a student that is naked and exposing themselves or performing sexual acts.
Q. Can you tell me when that changed?

Page 32

A. I would say December of '23, around that --
Q. What happened -- can you tell me whether that instruction was changed as a consequence of a situation where a number of art students were called to the front office to explain content they had posted, uploaded, to the district servers?
A. Yes. Once we learned that that was happening, we needed a system to try to make it not happen, so how can we look at this information and then determine is this a risk, nope; it is their assignment that they were turning in, it is a non-issue, so --
Q. I understand that. There you're talking about the incident in isolation. What I'm asking you is did the training to the administrators receiving alerts change as a consequence of that incident?
A. Yes.
Q. Tell me how it changed.
A. As I was kind of trying to say, it was look -- and we went through and -- so it also depended if it -- so staff members are trained to go in, we learned how to view like

Page 33

quarantined images, because that's what it was called, is it an image that needs to be quarantined; and, if not, to resolve the incident. So then it would not be quarantined versus waiting, pulling the student in, figuring it out, and then going back.
Q. How was that new training communicated to the building administrators?
A. Through conversations and through -- we really depended on the building -- the District depended on the building administrators who were utilizing it every day, working with students to say what needs to happen, what works, what doesn't work, and to test it out. So through leveled meetings with building administrators.
Q. To make sure that the building administrators all got the same message, was anything in writing generated, an email, a text, or the like, containing that change in training?
A. I am not certain.
Q. You're not certain? What do you mean by that? It could have been or --
A. There's definitely emails and

Page 34

messages, this is how we want to do it. But was there a here's a new training document that outlines this, I don't believe so. But it is more --

Q. At that time, you know, can you tell me who at the District would be responsible for creating any changes, written changes in training, to the administrators receiving it?

A. It would have been collaborative between the inclusion, engagement, and belonging team and the tech team with the how it works.

Q. Were you a part of the --

A. Inclusion, engagement, and belonging? I was, yes.

Q. So as a consequence of that situation in December of 2023, the District changed its policy with respect to reviewing certain flagged materials?

A. Yes. It was -- the District responded differently based on the -- what we had learned about how the system worked in practice.

Q. Did the District ask Gaggle to

Page 35

revise its flagging practices to avoid flagging material such as -- such as was involved in that situation in December 2023?

A. Yes.

Q. Did Gaggle respond to that?

A. Yes.

Q. Can you tell me to what extent Gaggle amended its practices on reviewing and flagging material?

A. So the way it would work is if there was something in particular we wanted to kind of be viewed or not viewed, what happened -- what would happen if, say, there was an alert, we would then -- you have the ability to email back to like the person who had reviewed it. And that is where we would say this is an art assignment or this is a literature assignment, disregard items like this.

And then there would kind of be a notification on our account to look at things differently, so we could -- it was correspondence going back and forth between Gaggle and the District and, hey, these things -- these type of things don't need to be

Page 36

flagged for us.

Q. Before that situation occurred -- the District have the capability to communicate directly with the Gaggle personnel reviewing materials?

A. Yes.

Q. Can you tell me how that was done.

A. Through email. It's -- a Gaggle alert comes through email, and you are able just to respond directly. Like if you hit reply on the email, it would go back to the person who reviewed it.

Q. Did the alerts that the District received from Gaggle include contact information for the Gaggle person who reviewed the material?

A. It -- yes, it -- it definitely included their like -- like name or like who the user was, whether it was like a direct contact number or something, I can't remember. But you had the ability just to reply, and it would get back with them.

Q. Do you know whether Gaggle -- let me ask it this way.

In the situation involved in

Page 37

December of 2023, do you know whether Gaggle instructed all of its personnel to adopt the change in reviewing practice on material possibly containing nudity?

A. I can't speak for how Gaggle informed their staff, but it was something that was to be put kind of on our account or know within -- I don't know what their back end system was like, but there was -- yes. I would say, yes, there was something. I don't want to guess as to what it was, but.

Q. Right. So in testifying to that, you are speculating that Gaggle distributed that information to all of the personnel that reviewed material before it was flagged?

A. I -- when it comes to their staff, no, it was on our account. That information was -- I would say it was on our account of -- but if it got disseminated to all of the staff who worked within our accounts, I do not know.

Q. So when you tell me it's -- it was on the District's account, did Gaggle provide a copy of the instructions that it communicated to their personnel concerning the review of material generated by Lawrence

School District students?
MR. GRANT: Objection.
You can answer if you know.
THE DEPONENT: I don't.
Q. (By Mr. Johnson) Okay. Now, we've talked about the situation with Gaggle.
With ManagedMethods, did the District ever communicate with ManagedMethods about flagged material generating an alert which, upon review, the District determined was not objectionable?
A. Yes.
Q. Did any of that have to do with material containing nudity?
A. I'm unaware.
Q. Did any of that have to do with material containing possible child pornography?
A. Sorry. Will you ask the initial question again. I want to make sure I'm taking it back to --
Q. Sure. Do you know whether the District ever communicated with ManagedMethods concerning alerts involving certain content that the District felt should not have been



flagged because it allegedly contained child pornography?
A. I do not know.
Q. And then just to make sure we're clear, the same question with respect to nudity, was there -- do you know if the District ever communicated with ManagedMethods concerning alerts generated because of material allegedly containing nudity?
A. I do not know. James Polk -- I was on maternity leave when they were going through all of that, so.
Q. When were you on maternity leave?
A. September '25 to December '25. So I do know things like that came -- from conversations came up in the beta testing and as they were kind of honing in the criteria. But I don't know all to what those looked and sounded like.
Q. And is it correct that the District knew that ManagedMethods did not have any human intervention before an alert was generated?
A. That is correct.
Q. On behalf of the District, did you



ever have any contact with any of the Gaggle personnel who reviewed material?
A. No.
Q. Do you know whether the District assigned that task to any particular person?
A. It -- so the contact with Gaggle was with our -- like our support team, not the individuals doing the scanning. We had like a customer service, like our customer care representative, I believe was her name, so she is the one we would connect with on things, and then she would take it back to the Gaggle side of things. So I was -- no one from the District was ever in direct contact -- well, no, I don't want to say that -- because you are as you're messaging them.
Sorry. I'm getting confused here.
So I guess, yes, we were in contact with those doing the screening, because when you send that email that says this is not anything that needs to be flagged, that would be a direct contact.
Q. Did you -- did the District provide copies of those email contacts to the Gaggle support team as well?



A. No.
Q. When a district administrator receiving an alert classified the alert as a non-issue, was that supposed to be the end of that situation?
A. I don't know that I can answer that question in a yes or no because there's so many different factors that could go on with a type of alert.
Q. Let me ask you this way. If a member of the team receiving alerts from Gaggle reviewed the material and said this is a non-issue, was that the end of it?
A. It was still on the school to go in and mark it as a non-issue, and ultimately the decision was theirs. The District review was to make sure things weren't getting missed. It was kind of that safety net of how this one's still open, has somebody addressed it, et cetera.
Q. And when you say, hey, it's still open, does that mean that the district administrator receiving the alert was trained to provide some input into the record of that alert indicating this is not a problem?

Page 42

A. I think the answer is no. But I'm not -- so the district administrator sees an alert. It is a non-issue. But it's been two weeks and that hasn't been marked as resolved. Then the district administrator would say maybe email the person or have a conversation, call, I noticed this is still open, make sure you're going in -- it was a kind of regular thing to alert building administrators, make sure you're going in and resolving Gaggle alerts.

Q. Now, you used the term marked. Does that mean that there was something that the person receiving the alert was supposed to do? Was there some sort of record in which that administrator was supposed to post a statement or check a box that says non-issue?

A. Yes, there was a resolve button that administrators were directed to resolve the issue. And it's either resolved, is it a non-issue, resolved, provided counseling, resolved, contacted parents, whatever that resolution was. But that's how we did -- like the difference between an open and closed case was --

Page 43

Q. So that was a record that the District generated and retained?

A. It was through the Gaggle dashboard.

Q. Did the District retain a copy, electronically or paper, of that -- did you call it dashboard? What was the term you used, the Gaggle dashboard?

A. Uh-huh.

Q. Did the District retain a copy of that?

A. We -- when we were utilizing Gaggle, we had access to go back to view closed cases, run like an export of the different --

Q. So it -- if you didn't retain a hard copy, you could -- the District could access it electronically?

A. Yes. All of -- all of Gaggle was done electronically. There was not like hard copies of things that were printed or...

Q. With the change to ManagedMethods, was a similar record generated when alerts were resolved?

A. ManagedMethods operates

Page 44

differently. So it is not the same as open, closed, or resolved.

Q. Can you describe to me what interface, if any, that the district administrators had with ManagedMethods so they could indicate that an alert had been resolved?

A. So there is a notes option and there's a label option where they can label, you know, resolved or followed up. There's also an ignore button. So if it's something that doesn't need to be looked at, it can be ignored.

Q. Has the District trained building administrators to utilize the options that you just described?

A. Yes.

Q. Has the District trained the building administrators and people receiving alerts to use that option; in other words, you have to use this option?

A. It has not been made a requirement to utilize options.

Q. As someone involved in the training of building administrators, do you

Page 45

know to what extent the building administrators and people receiving alerts take advantage of that option?

A. Not in a way that I can quantify.

Q. What do you mean by that?

A. Like I would not be able to tell you this percentage of administrators utilize these features or this team utilizes these features or how they do it. Because ultimately the building is responsible for going through and making sure they are aware of what's going on, and so how they elect to do it is how -- as long as they have some system to know, yes, we've looked at this, yes, we've looked at this, it may not be through the exact way that maybe another building does.

Q. So is whether to take advantage of this option provided by ManagedMethods determined on a building-by-building basis?

A. Yes.

Q. Would it be fair to say that -- let's say at Lawrence High School, this is hypothetical, I admit, it would be up to the principal to decide whether to tell his or her

Page 46

staff to utilize this ManagedMethods option?
A. It would be a team, a team decision. So it would be -- for the hypothetical at Lawrence High School, you have a principal and four assistant principals. So they would come together and say this is how we are going to address these within our alpha groupings, and when you've looked at something, you know, either put a note in or put a label in or --
Q. Just to make sure, you used the term alpha groupings. Is that short for alphabetical?
A. Yes. Sorry.
Q. That's fine. I'm not a product of public high school, so this is something I'm kind of learning.
But my understanding is that students are assigned to an administrator by alphabet?
A. That is correct, based on their last name.
Q. So let's move on to Item 5.
A. Okay.
Q. And this is -- as I understand it,

Page 47

the way it's been divided up is that you are here to testify concerning, what, notice to students concerning flagged content?
MR. GRANT: Yeah, I don't think it's limited to flagged content.
Q. Well, notice to students concerning content issues; is that a fair way of putting it?
A. Yeah.
Q. Okay. And then the procedures utilized at the District for reviewing, accessing, and restoring content to students?
A. Yes.
Q. Thank you. All right. So with respect to notice to students, is it fair to say that, with both Gaggle and ManagedMethods, the District does not notify students of a flag?
A. That is correct.
Q. So when does the District notify students concerning content that may be concerning?
A. So if, in either one of the programs, an alert comes in saying that -- for example, let's say it's an email between two

Page 48

students saying meet me here after -- meet at the football field after school, we're going to fight.
Q. I've seen a couple of movies about that.
A. Yeah. So then that alert would come in, and then the building principal would look at it and say, okay, what do we need to do, let's pull the student who sent this, talk with them, figure out what might be going on, provide supportive measures to maybe the other student who is the potential target, whether we need to dismiss them early, have them go somewhere else.
If it were a suicidal situation, we would connect that -- we would connect that student with mental health support, whether it's a school counselor a school social worker. If it was -- it really is dependent on the type of situation that it was.
If it is substance abuse, we would pull in the student and discuss, say, you know, this came up, how can we support you, are you needing support; we want to make sure you know support is available.

Page 49

Q. So is it fair to say, then, that notice to students of flagged content is determined on a case-by-case basis?
A. That is correct.
Q. And it's determined based on the content of the material?
A. Uh-huh. Yes, it is based on the content of the material.
Q. Is the decision to notify the student made by the administrator receiving the alert?
A. Yes.
Q. Are the administrators trained on how they should intervene in such situations? And, by that, I mean, pull this kid into the office and talk to them one on one or get some other administrators involved? Is there any training on how the notice is to be provided to the student?
A. Yes.
Q. Can you tell me about that.
A. That, again, would depend on the situation and the severity of the situation. If it is a message that says, you know, I have a weapon in my backpack, it's on after school,

Page 50

we are going to -- they're going to get law enforcement involved, they're going to complete a threat assessment, they're going to go through it that way.

If it is a situation where it is a student, you know, writing just about self-harm and that they don't -- they don't think they're good enough, or whatever the case may be, then that principal is going to alert, let's say, that student's counselor or social worker and say, hey, this came up, I'd like you to go pull them and have a conversation with them; let's see what supports we need to offer.

If it is a -- you know, reports of abuse or neglect, it would be similar. We might have the counselor and the principal come in and say, hey, we just want to talk to you, you're not in trouble, we want to -- we got this alert and we want to know how we can help you, et cetera.

Q. Are administrators trained to provide that notice personally to the student, in other words, face to face?

A. Sorry. It depends -- yes,

Page 51

depending on the situation.

Q. Are administrators trained to provide that notice in an isolated environment, in other words, not among the student population, but had the students pulled into the office?

A. Yes. That was the instruction is to pull the student aside, make sure they know that they are not in trouble, have the conversation.

Q. But when you say pull the student aside, that can be, you know, in the hallway, hey, I want to talk to you for a second?

A. It could be that. It could be sending a pass to a student to the office or to student services. It also is dependent on -- and when it comes to Gaggle, are we in school, are we not in school, because those would look very different.

Q. Are the same procedures used with ManagedMethods that were used with Gaggle with respect to notifying students?

A. Yes.

Q. And I think we have already talked about what would constitute procedures for

Page 52

review. Here we're talking about review by the administrator receiving the alert?

MR. GRANT: It's your topic, so.

MR. JOHNSON: I understand.

Q. (By Mr. Johnson) When you see the words procedures for review, do you interpret that as review by the administrator?

A. I do.

Q. Okay. And we talked about that already. How about access, what procedures have been in place with Gaggle and ManagedMethods to allow administrators to access the material that's been flagged?

A. Those procedures have changed over the course of utilizing the program. So when it comes to Gaggle and being able to -- because what was happening initially with Gaggle is -- there were emails that were potentially not being sent. It was called a block. So they weren't being sent because of the subject of the email.

Once we learned that that was happening and we didn't want it to happen, we kind of turned that feature off, so then the email would still send and then we would get

Page 53

the alert, because we were informed that it was a -- you know, potentially a student emailing the teacher saying, hey, I'm really struggling with my anxiety, this assignment is going to be late. So we didn't want that email to not go through.

So then we made it so they would automatically go through. It would potentially still alert, because, if a student is having stress, anxiety, depression, we want the proper people to know about that. And then -- but whether it would come to -- but then it would automatically go through.

When it came to, you know, potential pictures, images, things like that, once we then -- if it was something that was pulled, it was called quarantined. If it was quarantined, it was then reviewed. And then if it was something that was inappropriate, it was addressed in that manner. If it wasn't, it was resolved, and then the image or file or whatever it was goes back directly to the student's device -- or not device. Their account, I should say.

Q. So with respect to material other

Page 54

than emails, if Gaggle flagged it, the material was automatically quarantined?
A. That is incorrect. No. It -- certain severity levels it would be quarantined. So I could -- a student could be writing just, you know, nonsense jibber-jabber, and it alerts the system, but it doesn't necessarily disappear.
Q. Would that decision to quarantine the material be up to the Gaggle person reviewing the material?
A. Yes.
Q. So when Gaggle flagged material, it was not automatically quarantined?
A. That is correct.
Q. It was up to the Gaggle personnel to decide whether it should be quarantined?
A. That is correct. But, also, the order of operations in that is important. So scan, scan, scan, we think this could be something that is concerning, then it goes to the human, yes, this is concerning, so we're going to alert the school. But it's still there because it's only mildly concerning, let's say. So it's still in the student's

Page 55

account. We're sending an alert to the school. That is one.
Q. So just to make sure, with Gaggle, if material was flagged but not quarantined, an alert was still sent to the school?
A. So some of this could be semantics. Like the flagged and like alerted, all of those I think are kind of synonymous. So if we say something was flagged, that means it was a concern and, therefore, an alert was brought -- was created in the Gaggle system.
Q. All right. And then the Gaggle person would have to decide whether to send an alert to the school?
A. We only received alerts when a human at Gaggle decided that we should receive an alert.
Q. Okay.
MR. JOHNSON: We need to take a break. I have to make a call.
MR. GRANT: We were about time for a break anyway.
(Recess.)
Q. (By Mr. Johnson) So with ManagedMethods, the alert comes when content

Page 56

is identified as being concerning?
A. That is correct. It is 100 percent machine learning.
Q. When alerts were received from Gaggle and are now received from ManagedMethods, is it up to the administrator to determine whether to notify the student?
A. It is.
Q. And is it also fair to say that it's up to the administrator to determine how that notice should be delivered?
A. It is.
Q. Now, what procedures are in place for restoring documents to student access after an alert has been resolved?
A. Sorry. Could you ask that one more time.
Q. Of course. I'll break it down.
Does the administrator have to take some action to restore a document to the student's access?
A. Once the -- when the Gaggle alert has been resolved, if there wasn't -- then it would automatically go back.
Q. And is that also true with respect

Page 57

to ManagedMethods?
A. ManagedMethods does not quarantine in the same way that Gaggle did. So it is not.
Q. I'll come back to that in a second.
With respect to ManagedMethods, what action, if any, did the administrators have to take to restore the document to the student?
A. ManagedMethods is not --
Q. I'm talking about Gaggle here.
A. Sorry. I thought you said ManagedMethods.
Q. Maybe I did.
A. All that they would have to do is resolve the alert. And it wasn't in a flash instant, but it would go back and that would be on the student's drive and the student's email. Wherever it was found, it would go back to that location.
Q. But to resolve the alert, Gaggle didn't just say -- imagine, okay, he's resolving the alert and then it goes back. The administrator has to do something, has to

Page 58

push a button, has to make an entry --
A. They have to click resolve. They have to click resolve and close the case as a non-issue.
Q. And at that point Gaggle, using its processes, restores the document to the student?
A. That is correct.
Q. And you said, at least you inferred or implied, whatever the right word is, that it wasn't immediate; there was some process that had to be followed?
A. I wouldn't say there's a process that has to be followed. It's just computers take time to sync. So, you know, once it gets resolved as a non-issue, then check -- there is also a way to manually go in and un-quarantine an item that -- so there was two different ways to do it. You could have the automatic, once it was resolved, and the administrators -- certain administrators had the ability to go in and manually put it back.
Q. So there's two ways documents could be restored to students?
A. Yes.

Page 59

Q. One using the Gaggle process and one using almost like a manual process by the Lawrence School District administrator?
A. Building administrators also had -- the head principals had that access. Not everyone had that access.
Q. So a head principal could immediately restore a document to a student?
A. Yes.
Q. But not the other building administrators?
A. Not the other building administrators or the counselors or the social workers that were in Gaggle for the mental health side of things.
Q. Do you know why the District granted that option to the head principals?
A. Because they are the building leaders and the ones ultimately responsible for all of their staff and students.
Q. And so would it be fair to say that, with respect to students who did not immediately regain access to their documents, that would mean that the Gaggle restoration process was used?

Page 60

A. I do need to clarify that this was the process after we realized what was happening. In the initial, when things were getting quarantined, we didn't know how to get them back, and so it was -- there was definitely a time where it was. We were talking about, well, can we just put it on a flash drive to get it back to the student or how do we figure that out.
So in the initial ones, we were aware it was an issue, it was not an instant resolve and then it goes back. Once we learned that it was an issue, then that's when we put that practice in place, and we learned from Gaggle how to go through and un-quarantine.
Q. So for how long was that an issue that that was resolved by giving head principals the power to restore?
A. Probably a couple of months to work out everything between all of the different parties to figure it out.
Q. So would it be fair to say that sometime during the spring of 2024 head principals were given the right to restore

Page 61

documents immediately?
A. Yes.
Q. Were the head principals, as far as you know, given any instructions as to when they should restore documents immediately to students?
A. When there were non-issues.
Q. Does that mean that all documents that were identified as non-issues would have been subject to the head principal restoring them immediately?
A. No. So, for example, if a picture was quarantined and it was an art submission to the art teacher, that is a non-issue, it would go in to the art teacher. Automatically go ahead and put that back.
If it is a picture that -- or a video, for example, that showed children committing sexual acts, then we are stopping, we are not --
Q. That's child pornography. Sorry.
A. It gets a little difficult when you're in high school, but -- that would not be automatically put back. It went through, you know, the SRO, talking with the SRO, and

Page 62

went through a different process.
Q. Here's a question I haven't asked. Again, on behalf of the District, are you aware of any situation in which content flagged was actually shown to depict child pornography?
A. Child pornography is -- can I say yes and then clarify? Okay. So it would not have been classified as child pornography, because the students in question were not children. We work with 17- and 18-year-olds in our school system. Was it sexually graphic and inappropriate, yes. But it would not constitute child pornography.
Q. So you are aware of situations where content was flagged and was determined to contain nudity?
A. Yes.
Q. In all of those situations, was that material quarantined?
A. Yes.
Q. In all of those situations was that material not restored to the student?
A. That is correct.
Q. In all of those situations, was

Page 63

that material deleted from the District's servers?
A. I cannot answer the technical side of that. I don't know how the metadata and all of that work.
Q. In all of those situations, were the students responsible for uploading that material disciplined?
A. No.
Q. In any of those situations were the students responsible for uploading that material disciplined?
A. No.
Q. So what you're telling me is that, in no situations where students uploaded content containing nudity, the students were disciplined?
A. Those were situations in which there was support that was -- I'm not saying that nothing happened, but it was not a discipline like they were suspended or what you would think of as like a traditional discipline. No, it was not viewed -- Gaggle is not used as a disciplinary tool. It was a support and safety tool.

Page 64

Q. And then with respect to ManagedMethods, hopefully asked the series of questions concerning Gaggle, are you aware of any student being disciplined as a result of uploading content with nudity while ManagedMethods has been in use?
A. No.
Q. Are you aware of any situation with ManagedMethods where that content, including nudity, was restored to the students?
A. Was content including nudity restored to a student through ManagedMethods?
Q. Yes.
A. It was never quarantined, so therefore it could not be restored.
Q. So is what you're telling me that, under ManagedMethods, content including -- well, no content was ever quarantined?
A. The only content that can be quarantined is child pornography.
Q. Under ManagedMethods?
A. Correct.
Q. With respect to material containing indications of self-harm, under

Page 65

ManagedMethods was that material quarantined?
A. No.
Q. And the quarantine would be up to the ManagedMethods -- the Gaggle personnel?
A. You went ManagedMethods, then Gaggle.
Q. Okay. With respect to Gaggle.
A. Okay.
Q. Material uploaded by students containing content about self-harm, that was supposed to be flagged by Gaggle; is that correct?
A. That is correct.
Q. That material was then reviewed by the Gaggle employee, contractor?
A. That is correct.
Q. And then that Gaggle contractor or employee decided whether to generate an alert to the District?
A. That is correct.
Q. And when that alert was generated, was that material quarantined?
A. It was not quarantined.
Q. Who decided whether the material would be quarantined?

Page 66

A. Gaggle.
Q. But they had the option of saying, here's an alert, we're not quarantining it?
A. So the difference between, just for clarity here, a quarantine and like a block. So if it were an email -- so if a student is sending an email to their teacher saying I am really struggling, I'm having issues of self-harm, that is going to alert.
In the beginning that would alert and it would block, so the email wouldn't actually go through. So once we learned that was happening, the District removed the blocking feature so that the email would automatically send.
Q. That's actually where I was going. You mentioned that a while ago and --
A. Okay.
Q. Okay. But with respect to material other than emails, are you saying that Gaggle could generate an alert but not quarantine?
A. Exactly.
Q. So it was up to the Gaggle person to determine whether a quarantine should be

Page 67

put in place?
A. Yes. And quarantining only happened when it came to like lewd images, the nudity, the child pornography. If a student wrote a document about suicide and hating their life, that was never quarantined. It would still always be there. That is correct.
Q. Okay. So a student, and this is with Gaggle, who was writing her college application essay, and she posted it -- or she uploaded it to the District servers for some reason and it contained words that Gaggle flagged, is what you're telling me that material would never have been quarantined?
A. It should not have been quarantined.
Q. It should not have been quarantined?
A. No. And to my knowledge it wasn't.
Q. Okay. Let's talk about emails. Let's go back to emails. Sorry.
So there was -- on the District's behalf, you're telling me there's a difference between blocking and quarantining?

Page 68

A. That is correct.
Q. Material that was blocked, would that still be available to the student who generated the email?
A. Yes.
Q. But it would not be delivered?
A. That is correct.
Q. Got it. And the student -- let me ask you this. I'm sorry.
Would the student know that the email had not been delivered?
A. They would not.
Q. Did that block by Gaggle generate an alert?
A. Yes.
Q. And then the district administrator, assistant principal, whoever, would review the email and determine whether it should be unblocked?
A. In the beginning, yes.
Q. But after -- I think you said a couple of months, something like that --
A. Yes.
Q. -- y'all determined -- sorry, I grew up in Texas -- y'all determined that

Page 69

blocking was inappropriate for that email?
A. That is correct.
Q. And you -- not you --
A. The District resolved the issue of -- the District felt it was an issue that an email that a student sent to a staff member should not be blocked. And so the District worked with Gaggle to resolve that issue.
Q. All right. And that, as far as you remember, occurred sometime during the spring semester of 2024?
A. Yes.
Q. So if there were examples of emails not delivered subsequent to that change, that would be inconsistent with the District asking Gaggle to unblock those emails?
A. That is correct.
Q. All right. Where am I? This gets convoluted. I get confused. And he's not saying anything. He knows exactly what -- well...
And would the student, after the change in, you know, in Gaggle blocking these emails, be correct in assuming that the email

Page 70

had been delivered?
MR. GRANT: Objection.
You may answer if you know.
A. Could you ask it --
Q. (By Mr. Johnson) I'll break it down. Before the District asked Gaggle to disable the feature blocking emails, the student would not know that the email had been blocked?
A. That is correct.
Q. And, similarly, once that feature was deleted, the student would not know that the email had been detected, but the email was still delivered to the intended recipient?
A. That is correct.
Q. Was that feature deleted only for email?
A. Blocking was only something that was on email. So the original intent for blocking would be to block a student from sending a threatening message to another student. So once we learned it was also blocking information being sent to staff, that is what we corrected.
Q. I want to make sure we're clear on

Page 71

that. Is it correct that blocking was still in place for student-to-student email?
A. That is correct.
Q. So it was -- that feature was removed for student to staff?
A. That is correct.
Q. That would include teachers?
A. That is correct.
Q. Was that feature ever in place for student -- strike that -- teacher-to-student email?
A. No. Gaggle did not monitor staff accounts.
Q. Okay. And so the blocking continued for student-to-student email until Gaggle was replaced with ManagedMethods?
A. I believe so, yes.
Q. Is there a similar feature with ManagedMethods that blocks student-to-student email if the email contains concerning content?
A. No.
Q. So with ManagedMethods, all student-to-student email is delivered?
A. Yes.

Page 72

Q. When the District changed providers from Gaggle to ManagedMethods, was the issue of blocking student email brought up?
A. I cannot speak to that.
Q. Would that be Mr. Polk?
A. Yes.
Q. Okay. But whether student-to-student email was being blocked, some action had to be taken by a district administrator to unblock that email?
A. Yes, if it needed to be unblocked.
Q. Let's go down to number eight. To your knowledge were contents generated by identified students ever subject to more intense monitoring by Gaggle?
A. No.
Q. So if -- as far as you know, on no occasion did the District ever ask Gaggle to monitor a specific student's content more closely than other students?
A. No.
Q. But unless a student was exempted from monitoring, Gaggle monitored that student's -- monitored all students' content

Page 73

non-discriminatorily, so they monitored every student's content unless the student was exempt?
A. There weren't students who were exempted, at least not in the beginning.
Q. I know in the beginning. But in -- is it the District's position that after a while some students were exempted?
MR. GRANT: Objection to the extent this impedes upon James Polk's territory. And I don't think Ms. Luckett is designated to testify about the exemptions.
MR. JOHNSON: Well, I think it does fall within Number 8. It says other District responses to monitoring-related incidents alleged in the Second Amended Complaint.
I think it falls within the purview of her testimony, because, as we understand it, after the March 2024 meetings, the District agreed -- and the students complaining about it, the District agreed to exempt certain students.
MR. GRANT: So in terms of the technical aspects, our interpretation is that fell within 10, which specifically mentions



Veritext Legal Solutions
www.veritext.com 888-391-3376

Page 74

exemption. So Mr. Polk will be prepared to testify about the exemptions, including those in 2024.
MR. JOHNSON: I still think it falls within the District's responses in the complaints raised in the March 2024 meetings.
MR. GRANT: Yes. And so I think, again, to the extent that we -- you know, we highlighted it in topic eight, the yellow portion was technical mechanisms of the response --
MR. JOHNSON: Well, that may be how you interpret it.
MR. GRANT: Yes. So I'm saying James Polk is prepared to testify about the exemptions. And so you can, of course, ask Ms. Luckett --
MR. JOHNSON: Is James Polk prepared to testify about how the District's decisions to exempt certain students, or is he simply going to testify about how that exemption was implemented? In other words, he took orders from somebody. Here's the list of students. Somebody determined what that list of students was. It was not Mr. Polk?

Page 75

MR. GRANT: That's correct.
MR. JOHNSON: And that's what I want to ask Ms. Luckett about.
A. Journalism students. It was -- so there was a process going back and forth to figure out how the District could make it work. Originally, there was the idea that journalism students could use Microsoft, because Microsoft was not monitored by Gaggle.
Q. (By Mr. Johnson) That was determined not to be a workable solution?
A. That wasn't going to be workable. So then they figured out a way to utilize the students, the student journalists, to that -- the journalism drive. And so it was -- it was based on the journalism like status. The technical aspects, I cannot speak to. James Polk can, but --
Q. I'm not asking about that. But as far as you know, and having been involved on behalf of the District with this monitoring since its implementation, to put it simply, did those exemptions work?
A. Eventually, yes, they worked.
Q. What do you mean by eventually?

Page 76

For a while, they didn't?
A. It took troubleshooting to figure out all of the ins and outs. I don't know the background of what that was. But I know there was conversations and kind of testing being done to see, were alerts coming in, were they not. But they did figure out a way for it to work.
Q. On behalf of the District, was it Superintendent Lewis who made the decision to exempt certain students?
A. Yes.
Q. To your knowledge, and, again, this is operating on behalf of the District, are you aware that any other administrators had input into that decision?
A. On the decision like whether -- who to omit? I'm not supposed to be asking questions.
Q. Yeah.
A. That wasn't a topic of conversation. It was to address the concern raised by the journalism students.
Q. Thank you. On behalf of the District, is it fair to say that both Gaggle

Page 77

and ManagedMethods only search for certain content, words?
A. No.
Q. What else do they search for beyond content?
A. This might be an over-explanation, but specifically like Gaggle is searching everything. It's constantly going through everything. And, yes, it's only looking for those certain words or thoughts, but it's looking through everything for those words and thoughts or words or phrases. So I don't --
Q. It's fair to say they're not searching for the students' thoughts; is that right?
A. If a student has written down their thoughts is what I was thinking. Sorry.
Q. That's okay. Thoughts as expressed in words?
A. Yes.
Q. Got it.
A. I just wanted to be clear that Gaggle -- it is the difference between like searching and finding. It is searching everything to find specific words and phrases.



Veritext Legal Solutions
www.veritext.com 888-391-3376

Page 78

Q. But in conducting those searches, they don't -- could either Gaggle or ManagedMethods articulate a suspicion they're going to find something of concern?
A. I'm sorry. I'm not --
Q. Let me ask it this way then. Did the District, in its operation of Gaggle, then ManagedMethods, tell ManagedMethods and Gaggle that they had to have some suspicion they were going to find content of concern?
A. I don't -- I don't know why I feel stupid right now. So are you asking like the level of concern or -- like the District, we --
Q. Let me approach it from another end?
A. I'm sorry.
Q. That's fine. That's fine.
As a district administrator with involvement in this monitoring, has the District ever analogized this monitoring as being nothing more than searching student lockers or the equivalent of searching student lockers?
A. It is not the equivalent of

Page 79

searching student lockers, and I don't believe the District would say that.
Q. Would the District say that it has to have some reason to search student lockers?
MR. GRANT: Objection. I think this is beyond the topics, locker searches.
Q. (By Mr. Johnson) Have you ever heard anybody within the District analogize the comprehensive monitoring of student content to searching student lockers?
A. Are you asking me as an individual or --
Q. No. Have you -- has anybody at the District expressed that?
A. Not to my knowledge, but I don't know every -- I know every administrator, but I don't know every conversation or thoughts that every administrator has had.
Q. Is it fair to say that the District's use of the monitoring software has, since late 2023, resulted in a comprehensive 24 hours a day, seven days a week, 365 days a year, search for content of concern that students have posted on District servers?
A. Many facets to that question. So

Page 80

I would say that the District maintains that we -- prior to even 20 -- to any program that we have -- programs that we're discussing, Gaggle and ManagedMethods, we have had monitoring of student accounts prior to.
There is nothing new with how we monitor information. Well, that's not true that it's nothing new. There's new parts to it. Monitoring isn't a new thing. We have been for a long time monitoring use of student accounts, and we do monitor those -- the monitoring happens 24/7, yes.
Q. How long have you been with the District?
A. Since 2014.
Q. Throughout your tenure with the District, has the District been conducting this monitoring of student accounts?
A. Yes.
Q. In Paragraph 9 you are identified as the person to testify on behalf of the District concerning records of positive results from the monitoring. Is that a fair way to put it?
A. Yes.

Page 81

Q. Is it fair to say that the statistics concerning what the District would consider to be positive results were provided by Gaggle?
A. The statistics for positive results were provided by Gaggle? I can't answer that in a yes-or-no question. It is very complex in the terms of how we define a positive result. Whether -- is a positive result flagging a concern versus being made aware of something versus intervention, so.
Q. Is it correct that, on behalf of the District, Dr. Lewis stated that Gaggle had saved 31 lives?
A. Yes.
Q. Again, on behalf of the District, do you believe those statistics are accurate?
A. No.
Q. Can you tell me, on behalf of the District, why you don't think those statistics are accurate?
A. I would say that a -- within the breadth of everything that Gaggle can look at, not everything is a life or death situation. It doesn't mean there wasn't very positive

Page 82

impact and support, but I cannot say that 31 lives were saved. I can speak to the lives that were saved --
Q. So I'm -- okay. On behalf of the District, can you provide what you believe is an accurate estimate? Well, first, as to whether lives had been saved?
A. Yes, lives have been saved.
Q. By Gaggle?
A. By the information gathered through Gaggle, the District was able to save lives, yes.
Q. Is it the same with respect to ManagedMethods?
A. Not that I'm aware of.
Q. Okay. Is it correct that Dr. Lewis made this statement in the context of the meetings that occurred in March of 2024?
A. I can't speak on behalf of the District as to when he made the statement. I thought it was at a board meeting, but I don't know.
Q. Thank you. Is it correct that, as far as the District knows, Dr. Lewis based those statements on dashboard documents

Page 83

provided by Gaggle?
A. Yes.
Q. And so is it correct to say that, again, on behalf of the District, Dr. Lewis' statement was supported only by information provided by Gaggle?
A. No.
Q. What are -- to your knowledge and to the District's knowledge, on what other information did Dr. Lewis base his statements?
A. Conversations with district and building administrators who had been involved with responding to alerts.
Q. Now, in Paragraph 9, one of the subjects you've been designated to testify about is documented outcomes. Can you tell me what documented outcomes -- by using that term "documented," did that mean something that has been put down in writing?
MR. GRANT: Objection. These are the plaintiffs' topics. I don't -- it seems like --
MR. JOHNSON: Okay. I'll ask it this way.
Q. (By Mr. Johnson) By documented

Page 84

outcome, would you agree with me that that could include statements concerning outcomes, something in writing?
A. Would documented outcomes include statements in writing?
Q. Yes.
A. Potentially, yes.
Q. Are you aware of any documents the District has generated concerning outcomes the District considers as positive from the monitoring?
A. Yes.
Q. Please tell me about some of those.
A. There was a situation where a student had written a suicide note on their District account, and the District was able -- it was summer, and so school was not in session. And the District was able to get in contact with that student's family, and they were able to get him into safety, get him -- it was a student who had struggled with suicidal ideation in the past. They were able to have him hospitalized, and that day he was not able to go through with his plan to die by

Page 85

suicide.

There was another situation in which a student in the middle of the night emailed her friend apologizing for overdosing on ibuprofen, attempting to take her life, in which nonemergency police were called because it was in the middle of the night and they were able to take the student by ambulance to the hospital in order to be seen. So she did not succumb to her injuries.

There was another situation in which a student had been being physically abused by their parent, and it was over a holiday break and that -- because of the alert to Gaggle, Department for Children and Families was able to be contacted and get that student the support and to safety that they needed.

There was another positive outcome in which a student sent a message about being blackout drunk consistently and not wanting to live this way anymore in which the staff was able to support that student in getting him to substance use treatment.

There was another situation where



Veritext Legal Solutions
www.veritext.com 888-391-3376

Page 86

a student had been taken advantage of sexually in her PRTF that she was living in. And we were able to support that student in making reports and getting into intensive therapy that she needed in order to, you know, be able to cope with the situation that had happened.
Would you like me to keep going or --
Q. It sounds like you're quite familiar with these issues; is that correct?
A. The District is quite familiar with them, yes.
Q. Have you reviewed documentation concerning those five incidents you just identified in preparation for your deposition?
A. No.
Q. Do any of the incidents appear in any of the documents you have before you today?
A. That I have?
Q. Yes.
A. No.
Q. But in each of these cases, is it correct that the District generated some documentation of the incident?

Page 87

A. Yes.
Q. Is that documentation, as far as you know, in the District's possession?
A. Yes.
Q. Without asking you to personally identify any of the issues -- individuals involved, was one of them named Jeffrey Clark?
MR. GRANT: I'm not sure how somebody could answer that question.
A. I can't -- without identifying --
Q. (By Mr. Johnson) Let me ask you this. In discussions that we had yesterday, an incident was described to us occurring in the summer of 2025 concerning a student suicide issue. And can you tell me whether any of the incidents you just described occurred in summer of 2025?
MR. GRANT: Objection. It's just a predicate of question, but it's completely inappropriate. I think by discussions yesterday, Mr. Johnson was referring to mediation discussions. So to reference those on a record is not appropriate. And it also violates the confidentiality of the mediation to ask the witness about them.

Page 88

MR. JOHNSON: I can certainly ask whether any of these incidents occurred in the summer of 2025.
MR. GRANT: I would agree that's an appropriate question. The bell has been rung, so to speak.
A. Yes.
Q. (By Mr. Johnson) And was that a student suicide issue?
A. Yes.
Q. And since it was in 2025, can you determine whether it was identified by Gaggle or ManagedMethods?
A. Gaggle.
Q. Other than the statement that Dr. Lewis made about saving 31 lives, are you aware of the District making any other claim concerning the number of lives that have been saved by monitoring?
A. No.
Q. Testifying on behalf of the District, are you aware of the District requesting Gaggle to eliminate any functions other than the email blocking function?
A. No.

Page 89

Q. To your recollection, did any of the training provided to district administrators concerning monitoring include content relating to student privacy?
A. Yes.
Q. What can you tell me about that?
A. It was instructed to maintain student privacy and dignity whenever possible.
Q. Did that training include any content concerning the District's Acceptable Use Policy?
A. No.
Q. Is it fair to say that the training included material stating that students did not have an expectation of privacy concerning the material they posted to the District servers?
A. No.
Q. It did not include that?
A. The training for administrators?
Q. Right.
A. No.
Q. Now, the notices to students, Number 5, concerning the -- concerning flagged content, did that include any statement to the

students that they have privacy interests in that flagged material?

A. I'm sorry. Could you ask that again.

Q. One of the topics that you are designated as testifying about on behalf of the District is the notice to students when -- with respect to the content that gets flagged.

In those notices, were the students told that they did not have a privacy interest in the material?

A. I hear everything. Can you define -- like what do you mean privacy interest? Like an expectation of privacy?

Q. An expectation of privacy.

A. So a student has been flagged and -- for something that is in there, and the information, kind of the notice, the telling the student, hey, this happened, is part of that -- them being made aware that they do not have an expectation of privacy?

Q. Right.

A. No. I apologize.

Q. That's fine.

A. The expectation of privacy goes



through the AUP that gets signed.

Q. Okay. Now, you've been designated as testifying on behalf of outcomes. Does the District maintain logs or records of outcomes? I think you already testified about it, but --

A. Yeah, like -- yes.

Q. Does the District maintain records of student agreements to the Acceptable Use Policy?

MR. GRANT: Objection. This is beyond any topic designated for Ms. Luckett.

MR. JOHNSON: Are you instructing her not to answer the question?

MR. GRANT: I mean, she can answer, but I don't think the answer would bind the District, because this is a topic specifically for James Polk.

Q. (By Mr. Johnson) Do you know?

A. Sorry. Between that, I don't recall the question you were asking about the student.

MR. GRANT: Yeah, this is squarely topic six, which is James Polk.

Q. (By Mr. Johnson) How long has Mr. Polk been with the District?



A. I'm not HR. Sorry. I don't know. Like it's been six or seven -- six years or so. I believe he's been in his position for two or three.

MR. JOHNSON: That's all I've got. Thanks.

MR. GRANT: All right.

(The deposition concluded at 12:02 p.m.)



C E R T I F I C A T E

I, STACY L. DECKER, a Certified Court Reporter within and for the State of Missouri and Certified Shorthand Reporter within and for the State of Kansas, hereby certify that the within-named witness was first duly sworn to testify the truth, and that the testimony by said witness was given in response to the questions propounded, as herein set forth, was first taken in machine shorthand by me and afterwards reduced to writing under my direction and supervision, and is a true and correct record of the testimony given by the witness.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or relative or employee of such attorneys or counsel, or financially interested in the action.

WITNESS my hand and official seal at my office i[illegible] is 30th day of Oct[illegible]

STACY L. DECKER, CSR, CCR
CSR No. 1540
State of Kansas

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

October 30, 2026

To: Cameron E. Grant

Case Name: Tell, Jack Et Al v. Lawrence USD 497

Veritext Reference Number: 8533685

Witness: Kiley Luckett Deposition Date: 10/27/2026

Dear Sir/Madam:

Enclosed please find a deposition transcript. Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change. Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,
Production Department

NO NOTARY REQUIRED IN CA



DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 8533685
CASE NAME: Tell, Jack Et Al v. Lawrence USD 497
DATE OF DEPOSITION: 10/27/2026
WITNESS' NAME: Kiley Luckett

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have made no changes to the testimony as transcribed by the court reporter.

______________ ______________________
Date Kiley Luckett

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this ______ day of_____________________, 20____.

________________________________
Notary Public

________________________________
Commission Expiration Date



DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 8533685
CASE NAME: Tell, Jack Et Al v. Lawrence USD 497
DATE OF DEPOSITION: 10/27/2026
WITNESS' NAME: Kiley Luckett

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

______________ ______________________
Date Kiley Luckett

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They have listed all of their corrections in the appended Errata Sheet;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this ______ day of_____________________, 20____.

________________________________
Notary Public

________________________________
Commission Expiration Date



ERRATA SHEET
VERITEXT LEGAL SOLUTIONS MIDWEST
ASSIGNMENT NO: 8533685

PAGE/LINE(S) / CHANGE /REASON

_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________
_______________________________________________________

________________ _________________________
Date Kiley Luckett

SUBSCRIBED AND SWORN TO BEFORE ME THIS ________
DAY OF ________________________, 20______ .

______________________________________
Notary Public

______________________________________
Commission Expiration Date

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.